IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

JUDGE DAMON R. LEICHTY

MAGISTRATE JUDGE JOHN E. MARTIN

ORIGINAL

CASE NO. 3:24-CV-00185


MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF MICHAEL SMITH, AND ON HER OWN BEHALF,

Plaintiff


V.


RON NEAL, ET AL.,

Defendants


DEPONENT:  WARDEN RON NEAL

DATE:      AUGUST 29, 2025

REPORTER:  TAYLOR R. WELSH

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, MYSTI VALENCIA, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF MICHAEL SMITH, AND ON
HER OWN BEHALF:

Locke Bowman, Esquire

Megan Pierce, Esquire (Appeared via videoconference)

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: locke@loevy.com

       megan@loevy.com

Page 3

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, RON NEAL, JASON NOWATZKE,
CHRISTOPHER BEAL, DANIELLE BROWN, DEBORAH TAYLOR,
DOUGLAS WARDLOW, ART KAUFMAN, ANDREW KMITTA, JANILLE
WHITAKER, LIEUTENANT SMITH, OFFICER CROSS:

Brandyn Arnold, Esquire

Allison Mauk, Esquire

Office of the Attorney General

Indiana Government Center North

302 West Washington Street

Indianapolis, Indiana 46204

Telephone No.: (317) 232-6201

E-mail: brandyn.arnold@atg.in.gov

      allison.mauk@atg.in.gov

Also Present: Steffi Cornejo, Videographer

Page 4

INDEX

PROCEEDINGS — Page 8

DIRECT EXAMINATION BY MR. BOWMAN — 9

CROSS-EXAMINATION BY MR. ARNOLD — 234

REDIRECT EXAMINATION BY MR. BOWMAN — 239

EXHIBITS

Exhibit — Page

1 - Ron Neal Testimony Transcript - July 15, 2020 — 17
   Denise Dwyer v. Ron Neal, et al.

2 - Ron Neal Testimony Transcript - September 22, — 17
   2020 - Denise Dwyer v. Ron Neal, et al.

3 - Photograph of Michael Smith's Cell — 85

4 - E-mail Sent to Richard Brown and James — 102
   Basinger in regard to Fire Brigade
   Bates STATE 028533-028534

5 - Internal Affairs Report of Investigation for — 123
   Devine Fire - May 1, 2017
   Bates STATE 022713-022722

6 - Collective of Text Messages with Dr. Chico — 110
   and Others - Bates STATE 044740-044757

7 - After Action Review - April 24, 2017 — 124

Page 5

EXHIBITS (CONTINUED)

Exhibit — Page

8 - Collective of E-mails Regarding the Fire of — 144
   Filzen - May 8, 2022
   Bates STATE 008460-008483

9 - E-mail to Michele Masley — 156
   Bates STATE 035419-035420

10 - E-mail to Richard Brown, James Basinger, — 161
   and Kevin Orme Regarding the Events of the
   Smith Fire - January 14, 2023
   Bates STATE 028469

11 - Collective of E-mails to Kevin Orme Subject — 163
   on "Very Brief Summary-Smith 953102"

12 - E-mail to William Lessner and others — 169
   January 14, 2023 - Bates STATE 032893

13 - Report of Investigation - March 7, 2023 — 176
   Bates STATE 000015-000018

14 - E-mail Forwarded to Brown, Basinger and Orme — 182
   of the Updated Report from Larry Haskell
   Bates STATE 028466-028467

15 - E-mails Involving Kevin Orme and Adam Bootz — 184
   in regard to Operations Shakedown Tracker
   Bates STATE 021333-0213334

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

Page 6

EXHIBITS (CONTINUED)

Exhibit                                                          Page

16 - E-mail to Brown, Basinger, and Orme in            189
     regard of Michael Smith Incident Reports and
     Conduct Reports - January 14, 2023
     Bates STATE 032649-032650
17 - E-mails with James Basinger                       192
     January 18th and 19th - Bates STATE 028874
18 - E-mail to Richard Brown in regard to              195
     Jennifer Smith and Family - Bates STATE 028764
19 - Minutes of the Department Head Meeting            199
     January 18, 2023 - Bates STATE 032090-032092
20 - Critical Incident Debriefing                      201
     February 21, 2023 - Bates STATE 000104-000105
21 - E-mail Sent to Group of ISP Staff Team            220
     January 16, 2023 - Bates STATE 035210
22 - E-mail from Callie Burke Forwarded to             229
     Steve McCann with Still Image Extracted from
     Surveillance Camera - Bates STATE 044633-044634

FORMAL REQUEST

1 - Documents, e-mails, announcements, or notes from
    the Incident Review Committee reflecting property
    in cells and fire hazards in cells

Page 7

STIPULATION

The VIDEO deposition of WARDEN RON NEAL was taken at the HAMPTON INN & SUITES, 2842 CARLSON DRIVE, HAMMOND, INDIANA 46323, on FRIDAY the 29TH day of AUGUST 2025 at 10:04 a.m. (CT); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that TAYLOR R. WELSH, being a Notary Public and Court Reporter, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Page 8

PROCEEDINGS

THE VIDEOGRAPHER:  All right.  Good morning, everyone.  My name is Steffi Cornejo.  I'm the videographer today, and Taylor Welsh is the court reporter.  Today is the 29th day of August 2025, and the time is 10:04 a.m.  We're at Hampton Inn & Suites, Hammond, to take the deposition Warden Neal in the matter of Mysti Valencia as personal representative of the estate of Michael Smith and on her own behalf, Ron Neal, et al. -- v. Ron Neal, et al., pending in the United States District Court for the Northern District of Indiana, South Bend Division, Case number 3:24-CV-00185.  Will Counsel please identify themselves for the record?

MR. BOWMAN:  My name is Locke Bowman, appearing here on behalf of the plaintiff.

MR. ARNOLD:  My name is Brandyn Arnold, appearing on behalf of the defendants.

MS. MAUK:  Allison Mauk, appearing on behalf of the defendants.

THE VIDEOGRAPHER:  Mr. Neal, will you please raise your right hand to be sworn by the court reporter?

THE REPORTER:  Do you solemnly swear or affirm

Page 9

that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  Thank you.  Counsel, you may begin.

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.  Thanks.  Could you state your name for the record please, sir?

A.  Sure.  My name is Ron Neal, N-E-A-L.

Q.  Mr. Neal, I see that you have brought a white binder with you.  It's about -- has about an inch-and-a-half worth of typed material inside of it, and some tabs on the right margin.  Could you -- and you have it in front of you open.  Can you tell me what that is?

A.  Yeah, it's just some stuff that I printed to refresh my memory of both the Devine case as well as Michael Smith.  So there's a compilation of stuff: the fire marshal's report, as well as the facility report. A lot of the statements from staff and the offenders on the fire brigade.  Coroner's report.  Some task -- task sheets that we developed for training for staff.  Some photos from our incident review committee, which is a committee that meets every morning.  Some various

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 10

e-mails about subjects related to this case. Policies. Task sheets, again. Some affirmation on shakedowns within the prison, as well as conduct reports that have been written within the prison. Recent fires that have taken place in the prison. Equipment from the offender fire department that we purchased over the years. So that's basically what's in the folder.

Q. Thank you. Have you reviewed all of these in order to be prepared to testify here this morning?

A. Yes. Most of it, yes.

Q. You referred to a fire marshal's report and an incident report. Are those as to both the Devine and the Smith fires, or just one of the two?

A. They're primarily the Smith fire. I do have some information from the Devine case, but I didn't bring all that material.

Q. Okay. Here's what I'm going to have to ask you to do: I'm going to ask you to close the binder, please, and set it aside. I would like you to testify from your memory.

A. Sure.

Q. If a document would assist you in refreshing your recollection, there's a process for making a record as to whether your recollection will be refreshed by the document. The reason I make that request is that I want

Page 11

your testimony. I don't want you to tell me what's in the document, okay?

A. Okay.

Q. Okay. In addition to the documents that you just described, have you reviewed any other materials, documentary or otherwise, in order to be prepared to testify this morning?

A. I reviewed quite a bit. Most of it, I believe, is in the folder that I brought with me today. But there are a lot of documents in both the Devine case as well as the Michael Smith case. So I mean, I'm sure I've looked at other documents that I did not bring with me today.

MR. BOWMAN: Should the record reflect that we've been joined by someone else at this point?

THE REPORTER: Oh, sorry. I have a Megan Pierce.

MR. BOWMAN: Well, thank you.

BY MR. BOWMAN:

Q. Have you looked at any video?

A. Not recently.

Q. Okay. So not in connection with preparing to testify --

A. No.

Q. -- this morning? Have you read any

Page 12

transcripts of the testimony of other witnesses in this case or in the Devine case?

A. No.

Q. Have you looked at any of the legal filings in either case?

A. I have. Yes, yes.

Q. Which ones?

A. Well, the Devine case.

Q. What did you look at?

A. I basically looked at what the -- what was presented from the court as that case was settled.

Q. As the case was settled?

A. As the case was --

Q. Progressed? I need your answer, sir.

A. Okay. If that's what it was, then that's what it was. That -- what I have is a record of documents from the court about the Devine fire and -- I don't know the official term for it, so --

Q. Got it.

A. -- I'll your word for it.

Q. Let -- well, I'm not going to -- I'm not going to want to be, you -- you -- you know, putting things in your mind. And I don't want you to agree with something just because I've said it. I need your independent memory and your independent testimony; you understand

Page 13

that?

A. I do.

Q. If I were to suggest to you that there was a summary judgment opinion, I don't know, maybe 30, 40 pages in length, would that refresh your recollection that you looked at that particular document with respect to the Devine case?

A. I believe that is the document that I'm referring to, yes.

Q. I see you looking over at Mr. Arnold. I -- and he's not here to answer the questions. You are. If the truth is that you don't recall the document, you're not sure, that's your answer.

A. That's not why I'm looking at Mr. Arnold, but I understand.

Q. Okay. So having been through these materials in your folder, as well as legal filings in the Devine case and -- and other things, as you just testified, do you believe that you are fully prepared and fully ready to testify in this case this morning?

A. I do.

Q. I know you've been around this track before, but I always go through this with people. Ground rules. You have a right to a break whenever you would like to stop.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 14

A.   Appreciate that.

Q.   And we'll probably take breaks, you know, every hour or so.  More frequently if you need it.  My only provision for you, though, is that if there is a question that I have asked you, I would like your answer to that question before we take a break, okay?

A.   Fair enough.

Q.   The court reporter needs us to do our best not to talk at the same time.  I'm a little bit slow of speech, so please be sure that I have finished asking my question before you start providing your answer, okay?

A.   Okay.

Q.   And I will try to extend you the same courtesy.  I will not start asking a new question before you finish your answer, to the best of my ability.  All right?

A.   I appreciate that.

Q.   Now, this gets hard for both of us when we get into -- probably a good idea to silence your phone for this procedure.  I'm sorry if it keeps you off the line.  I hope you've made arrangements for the day.  I should do the same thing.  Okay.  So I was starting to say, not talking over each other gets more difficult when you get into sensitive subjects.  You'll want to make your points, I'm going to want to make my points.  We have to

Page 15

double down on this, you know, important process, even when it gets like that, okay?

A.   Understood.

Q.   The reason for it is, in fairness to both of us, Taylor should have my question in the record before your answer starts so it's clear what you're answering and what's going on, okay?  Next thing is probably the most important, is -- is that you have an absolute right to questions that you understand.  So if my question doesn't make sense, because my voice has dropped, because I am not a prison administrator and I don't know your business, so I'm not asking stuff that makes sense to you, or for any other reason, you should tell me.  Will you do that?

A.   I will.

Q.   If you don't say that you don't understand a question, here's what's going to happen: The question is going to be in the record, in the transcript, followed by your answer.  Everybody will assume that you are responding to the question that has been asked and that you understood the question, right?  So with that in mind, it's very important in fairness to you that you follow this rule.  Will you do that?

A.   I will.

Q.   Okay.  I think that's it.

Page 16

A.   Okay.

Q.   I didn't ask you this, but you are hale and hardy, no illness or impediments; you're ready to go this morning, right?

A.   Yes, I'm --

Q.   Okay.

A.   -- healthy and ready to go.

Q.   Good.  Thank you.  I read the transcript of two depositions that you gave in the Devine case.  Did you look those over?

A.   I did not look those over.

MR. BOWMAN:  Okay.  Taylor, it's been so long since I've done a deposition in person, I forgot to get the exhibit stickers.  Do you have some --

THE REPORTER:  No, that's fine.  I do have some.

MR. BOWMAN:  Thank you.  I can do it.  Fix it quicker.

THE REPORTER:  Don't worry about the dates.  Like, writing the date, I can --

MR. BOWMAN:  Okay.  All right.

THE REPORTER:  Thank you.

MR. BOWMAN:  So I'll just put the numbers on it, and you'll take it from there.

THE REPORTER:  Yes.  Yep.  Then I'll get the

Page 17

dates for it.

MR. BOWMAN:  All right.  All right.  I'm going to hand you two transcripts, the first of which I'm marking for identification as Exhibit 1.  It is the transcript of a deposition that you gave in the matter of Denise Dwyer v. Ron Neal, on July 15th, 2020.  The second document, which I'm marking for identification as Exhibit 2 to your deposition, is a transcript of your testimony in a deposition in that same case on September 22nd, 2020.

(Exhibit 1 was marked for identification.)

(Exhibit 2 was marked for identification.)

BY MR. BOWMAN:

Q.   And I am not going to ask you to look at anything, unless you need to.  But if anything you need to do to confirm that I've accurately described the documents, please do.  My question is, as to both transcripts, when you were placed under oath and testified in deposition in those cases, did you testify truthfully?

A.   Yes.

Q.   And did you testify accurately, to the best of your ability?

A.   Yes.

Q.   Do you have a memory of giving those

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 18

depositions, just in general?

A.   I remember giving the depositions.

Q.   And after the depositions, did you have any concern that, oh my God, I said something that's not right, I need to correct something?

A.   No.

Q.   Did you have -- I should know this from reading the transcript, did you have an opportunity to read over the transcripts and review them for accuracy after you were deposed in the Devine case?

A.   I honestly don't remember seeing them after I was deposed.

Q.   Okay.  All right, but no concerns whatever about the accuracy of your testimony in those two transcripts?

A.   No.

Q.   Super.  I'm going to take them back.  We're going to set them aside and get them out of your way. So one of the things that you said when you testified in the Devine case -- we'll just refer to Dwyer as the Devine case so we know what we're talking about, right?

A.   Yes.

Q.   One of the things that you told folks in that earlier case was that you, at that time, resided on the grounds of the Indiana State Prison.  Is that still the

Page 19

case?

A.   That is still the case.

Q.   Can you describe for me your residence?

A.   Sure.  My residence is approximately 100 yards from the front door of the Indiana State Prison.

Q.   And is it outside the perimeter or is it behind the --

A.   No, it's outside the perimeter.

Q.   Is it -- if it -- if I'm walking down that walkway toward the main entrance, is your residence over on the right?

A.   If you're walking down the walkway toward the main entrance of the prison, it's the first house on the left.

Q.   First house on the left.

A.   So let me clarify.  When I say inside the perimeter or outside the perimeter, I'm outside the perimeter walls of the prison.  There is a fence that surrounds the -- my -- my property.  So yes and no.

Q.   Have you lived in that residence since you became warden?

A.   Yes.

Q.   Do you have family who lives with you there?

A.   It's just my wife, yes.

Q.   Any kids, at -- at any point?

Page 20

A.   My son used to live with me before he moved out to his --

Q.   Before he moved?

A.   -- home.

Q.   Okay.  Is your house -- do -- do you know what the -- the era is when it was constructed?  Is it an old place?

A.   It's an older building.  I -- I don't know the year it was constructed.  But the prison itself is 165 years old.  I would assume that the house is probably at least 100 years old.

Q.   So I wanted to talk with you for a minute about the cellhouses -- we're -- we're going to focus, obviously on B cellhouse and A cellhouse for purposes of our question and answer today.  But I gather from your prior testimony that those two cellhouses are examples of which you referred to as an Auburn-style cellhouse; do -- do I have that right?

A.   You have that right, yes.

Q.   Each of them, if my memory serves, when I was on the prison grounds of a few weeks ago, was constructed around 1930; is that right?

A.   I -- I have no idea when each building was -- was constructed.  I can tell you that the prison was established in 1860.  So which of those buildings were

Page 21

there in 1860 and which were built later?  I don't know.

Q.   Well, do you think that A cellhouse could date all the way back to 1860?

A.   I personally do.  I think it's one of the original structures, yes.

Q.   Is B cellhouse also an original structure?

A.   I think every cellhouse that you see is an original structure.

Q.   Okay.  So these are -- I think there's a plaque on the front of A cellhouse that makes a reference to 1930; do you know what that's about?

A.   May have been when it was renovated or something of that nature, but I don't think that's the original construction date.

Q.   So this building dates all the way back to the middle of the 19th century?

A.   Yes.

Q.   This is serious old school, right?

A.   Yes.

Q.   Have you been involved in any discussions about taking the -- the current Indiana State Prison facility offline and closing it?

A.   I've been a part of some of -- some of those discussions, yes.

Q.   Okay.  Can you tell me, is there a plan to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

Page 22

close the prison?

A.   There is not.

Q.   Okay.  Do you think that there should be?

A.   I do not.

Q.   Is there any concern within the Indiana Department of Correction about the antiquated nature of the Indiana State Prison complex?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  There are some capital projects that I would love to see completed to improve the Indiana State Prison.

BY MR. BOWMAN:

Q.   Do you think that a cellhouse should be either rebuilt or substantially renovated?

A.   The only thing I think A cell has needs, that's feasible, I had put in a capital project for replacing windows, but that's more of a conditions of confinement, ACA, American Correctional Association, standard-type of an issue as to why I -- I say that. Other than that, I've asked about putting fire suppression systems in not just A cellhouse, but every cellhouse.  And I've asked of that through my construction services director, who works through Department of Administration to get funding for capital projects.  And I've been told that's not feasible,

Page 23

financially astronomical, and it just could not be done.

Q.   What -- I don't want to get into a long discussion with this, but can you briefly state what the fire suppression system that you have, what that is that you've requested for A cellhouse and some of the other older living units.

THE REPORTER:  What units?

MR. BOWMAN:  Living units.

THE REPORTER:  Oh, living units.  Yeah.

THE WITNESS:  Are you asking what currently exists?

BY MR. BOWMAN:

Q.   No, I'm asking what you suggested and were told was not feasible.

A.   I inquired if there was a possibility to put sprinkler systems, fire suppression systems in the cellhouses at the Indiana State Prison.

Q.   And the answer was no, too much money, not feasible?

A.   Too much money, not feasible.  It -- with the physical structure, the way it was, and the age that it is, it's simply not possible.

Q.   So obviously, a modern building, or a modern prison housing unit, would -- would have to have a sprinkler system in it in order to pass muster with the

Page 24

ACA; is that correct?

A.   Yes.

Q.   But A cellhouse is too old, and doesn't have that, and does -- and to retrofit it with that suppression system would be financially impossible?

A.   Correct.  There are waivers for older facilities in regard to those --

Q.   Sure.

A.   -- ACA standards.

Q.   Have you, at any time, given any consideration to constructing a hydrant within A cellhouse to which a fire hose could be affixed as an additional fire suppression mechanism?

A.   There were additional fire hydrants placed in various locations throughout the Indiana State Prison to make them more accessible to be able to fight fires, in numerous locations throughout the prison itself.  So that has been done, to an extent.

Q.   So I'm not clear about your answer.  My question was, have you given any consideration to the construction of a hydrant within the four walls of A cellhouse to which a hose could be affixed as a fire suppression mechanism within that living unit?

A.   I -- I hesitate, Locke, simply because I'm trying to -- to refresh my memory.  I know, in a lot of

Page 25

the cellhouses, there are -- are wall-mounted hydrants that a hose can be hooked up to, and, obviously, a hose reeled out wherever they need to go inside the cellhouses.  I would have to double-check.  I'm not positive whether one exists inside A cellhouse or not. But I know that there are hydrants close to each housing unit.

Q.   Okay.  So couple of things about your answer: Number one, I appreciate your addressing me by my first name.  I introduced myself to you with my first name when we met off the record a moment ago.  But when I'm in a formal legal proceeding like this is, they call me Mr. Bowman.  And I appreciate if you would do the courtesy of addressing me by my proper title when I'm functioning as a lawyer.  And I, of course, would extend the same courtesy to you, okay?

A.   Sure.

Q.   Thank you.  Second problem I have with your answer is it is not responsive to my question.  My question is, and maybe you don't know but I'd appreciate any answer to my question.  Here comes the third time. Have you at any time given any consideration to installing a fire hydrant within the four walls of a cellhouse to which a hose could be affixed that could be used as a fire suppression mechanism within that living

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 26

unit? And I see you looking at Mr. Arnold again. And --

A. Well, Mr. Arnold --

Q. And I'm looking for your answer, not his.

A. I understand. I mean, part of me would -- my answer is this: Yes, I would give it consideration. Have we looked at -- at putting a hydrant inside of a cellhouse specifically within the four walls of the cellhouse? We have not.

Q. Okay. Why not?

A. Because there are hydrants close enough to the cellhouse, the housing unit, and every housing unit, so that the fire brigade can hook up a hose and reach any area with inside each house unit.

Q. So what I understand you to be saying in answer to my question is, no, we have not considered putting a hydrant within the walls of a cellhouse because, in our view, the hydrant system throughout the -- throughout the ISP campus is sufficient. Do I have that right?

A. That's a summary of what I said. I -- I also said that I believe there may be a wall hydrant within a cellhouse, but I would've to verify that. I know there are wall hydrants inside several of the housing units.

Q. Right. Okay. So I -- let me see if I can

Page 27

understand or unpack this a little bit. Your view is whatever the case, whether there's a hydrant within a cellhouse or not -- and you're not sure, right, as you said?

A. I would have to verify.

Q. Right. So whether there is or there isn't, your view is the hydrant system throughout the campus of the Indiana State Prison is sufficient as it is?

A. Yes. That is my view.

Q. Thank you. Other than the sprinkler system -- and I should -- I didn't clarify this with you when you were talking about it a minute ago. You have proposed a sprinkler system for A cellhouse, yes?

A. For every cellhouse, but including A cellhouse. Yes, sir.

Q. B cellhouse?

A. For every cellhouse, yes.

Q. So B cellhouse, yes?

A. Yes.

Q. C cellhouse?

A. Yes.

Q. And D cellhouse?

A. Yes.

Q. Okay. Other than the four -- actually, three of the ones that I just mentioned, A, B, and C, these

Page 28

are the -- are all old Auburn-style living units, correct?

A. Correct.

Q. And when we say Auburn-style -- I should know my history better than I do. Is that based on -- is that name taken from a correctional facility that was online in the 19th century?

A. The way it was described to me -- and -- and again, this is coming from my director of construction services, years ago, told me that these were Auburn-style cellhouses, the five tiers of cells that backed up against each other with a midway running down the middle. Those were Auburn-style cellhouses. So to answer your question, I don't know --

Q. Okay.

A. -- if it --

Q. A, B, and C are like that, yes?

A. A, B, C, and D are like that.

Q. So D -- are there any others or just those four?

A. Those four are Auburn-style cellhouses.

Q. Are there any others?

A. No.

Q. Okay. And D, as I understand, it is segregation restrictive housing?

Page 29

A. That's correct.

Q. And is that a living unit of the same size, same number of prisoners in that unit as in A, B, and C?

A. Very similar. They're all a little bit different in how many they house, but in size and structure, five tiers set up with the same design. Yes, it's just like the others.

Q. If I were to walk into D cellhouse, what differences would I notice as between D and the general population housing units that include A, B, and C?

A. The differences in D cellhouse, being that it's a restrictive status housing unit or --

Q. Yeah.

A. -- lockup unit is simply that you would see outdoor rec runs, we call rec cages or rec runs, on the outside of the cellhouse before you go in. You would also see fencing with locks on the fencing and man gates that you have to open to get into the cellhouse. Once you've entered the cellhouse, you would see more interior gating that restrict movement within the cellhouse, so --

Q. Are the cell fronts the same?

A. Excuse me?

Q. Are the cell fronts the same? Are they open-bar cell fronts?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 30

A.   The cell fronts are the same.

Q.   And apart from what you've described, it's the same -- essentially the same deal?

A.   Essentially the same setup as A, B, and C, yes.

Q.   But, obviously, experientially for the prisoners inside D cellhouse, life is much harder?

A.   Harder --

MR. ARNOLD:  Objection to form.

THE WITNESS:  Harder from the perspective that it's a lockup unit.  So they're in their cells much more often than the guys in general population are. They're escorted to the shower while in restraints by an officer.  They're escorted to outdoor recreation by officers, limited property in that environment.  So yes, a lot -- a lot more restrictions and a lot tighter movements.

BY MR. BOWMAN:

Q.   When you say "limited property," is property limited to what can be stored in a locked box?

A.   In which unit are you --

Q.   In D.

A.   In D cellhouse, it is actually specified what property is authorized in those units, in those cells.

Q.   And that would be what?

Page 31

A.   I would have to refer to a list.

Q.   I'm not going to hold you to the specifics, just -- in -- in general terms.

A.   In general terms, they have some hygiene supplies inside their cell.  They have bedding.  They have a pillow.  They have, obviously, socks, underwear. They have, I believe, three changes of clothing. They're allowed to have a TV if they've had good conduct while in restrictive housing for the first 90 days of their stay there.  But that's basically it.

Q.   Any legal papers?

A.   They're allowed to have legal work in D, yes.

Q.   And A, B, and C, and the other general population units, what are the restrictions on personal property?

A.   We restrict --

Q.   In -- in general terms.

A.   In general terms, they choose what property they want to keep inside their cell, but we restrict it to 4.5 cubic feet of property.

Q.   And that 4.5 cubic feet is enough property to fit inside a container or do -- do you just intuit?

A.   There's a property box that each offender has in their cell.  After the Devine fire, we changed out the old Norix property boxes, which were plastic,

Page 32

because we saw that it -- even though it was non-fire resistant, it burnt pretty effectively during the fire. So we got rid of the plastic Norix boxes.  And I had ICI, our -- an entity of the Department of Corrections. It's Indiana Correctional Industries, build steel property boxes, because I thought this would do better with fires.  And they're -- they are essentially 4.5 cubic feet.  So all their property, essentially, is supposed to fit inside the property box with the exception of the bigger items, such as a tablet and their TV.

Q.   Okay.  Now, can we agree that that is a rule that's honored in the breach?

A.   Can we agree that's a rule what?

Q.   That is honored in the breach.  Do you know what I mean by that?

A.   No.  Could you --

Q.   In practice, that rule is frequently disregarded; is that not correct?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  That rule is enforced as frequently as we can possibly enforce it.  And I -- I -- if you'll allow me to explain --

BY MR. BOWMAN:

Q.   Actually, I don't need a long explanation.  If

Page 33

-- I understand your answer to be --

A.   We try to enforce that rule.

Q.   Okay.  So I'm incorrect.  The rule is enforced?

A.   That is correct.

Q.   All right.  Now, I was in A cellhouse in -- at the prison a few weeks ago in the company of several people, including witnesses who may eventually testify in this case.  And if they, one or -- or both of the witnesses, were to testify that in fact there is a substantial amount of personal property scattered about in most of the cells in A cellhouse, or there was on that particular day when we were there in the presence of high-ranking members of your administration, would you say that they were lying?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  I wouldn't say they were lying. I would say you saw what you saw.  I would say --

BY MR. BOWMAN:

Q.   So how do you go about enforcing -- and when I say you, I mean, how -- how do you expect your staff to go about enforcing the property limitations?

A.   I have instructed my staff to shake down every cell within the Indiana State Prison once a quarter. And as they shakedown every cell, they're not only



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 34

looking for drugs and contraband and other altered state property, altered clothing, but they're also supposed to verify that they have no more than 4.5 cubic feet of property.

So occasionally there are issues where offenders have court deadlines or they're working on a case or something of that nature, and they have an abundance of legal papers in their cell. And it can get very tenuous between the staff person and the offender, because the offender, obviously, contends, yes, they have all of that for the case that he's working on. I try to get my staff to make them decide which papers you actually need for the matter you're working on and put the others in the property room. I will say that sometimes staff disregard that because they don't want to argue with the offender for the next half hour over what's needed and what isn't.

Q. Right. So it's not a perfect system, you acknowledge?

A. It's not a perfect system, no.

Q. Now, you have testified that the mechanism for enforcing the limitation of property rule is to subject every individual cell within the facility to a shakedown at least once per quarter. Do I correctly -- did I correctly summarize that?

Page 35

A. That's correct.

Q. In addition to that mechanism, is there anything else that you expect your staff to do to enforce the property limitation?

A. I mean, they're always supposed to be inspecting property for, like I said, altered property, property that's been modified. Curtains, at the Indiana State Prison, are an ongoing issue because the offenders like to put up curtains for their privacy. So I expect my staff to remove those curtains.

Q. Okay. So I'm not sure I understand your answer. In addition to the quarterly shakedown that you expect to happen in each cell in the Indiana State Prison, is there any other mechanism for enforcement of the limited property rule that you expect your staff to adhere to?

A. We do things such as scans of the facility through an outside contractor to try to identify cell phones and other electronics in the prison that aren't supposed to be there. So when those items are identified through that outside company, I expect my staff to go find those items and remove them from the cellhouse or the cell. So that's another method of removing property.

Q. So one thing that could happen is, as a

Page 36

general rule throughout the facility, there's a requirement that staff conduct rounds every 30 minutes, correct?

A. Security checks. Yes, sir.

Q. Security checks. Got it. When a security check is made, the staff member making the security check is -- is expected to look into each cell on the tier long enough to confirm that the individual is alive and well in that cell and -- and then move on, right?

A. Yes. The point of the security check is basically to check on the well-being of the offender that's living in that cell, that they're alive, that they're not doing something that they're not supposed to be doing. Ideally, I would ask my staff as they're doing security checks or count six times a day, if you see a cell with an abundance of property in it to make note of that so that it can be reported to the custody supervisor and followed up on for a shakedown after the fact.

Q. Right. That's a pretty simple and straightforward way of enforcing this requirement, right?

A. Agreed.

Q. But it doesn't happen, right?

MR. ARNOLD: Objection --

Page 37

THE WITNESS: Not always.

MR. ARNOLD: -- as to form.

BY MR. BOWMAN:

Q. Have you sent out directives to your staff to encourage this at any point in the past, I don't know, five years?

A. There's several things we've done with the staff. I mentioned that.

Q. And my question is -- just my question.

A. Okay.

Q. I get to ask my questions. Have you sent out written directives to your staff at any point in the past five years to encourage compliance with this expectation with respect to security checks? That actually is a yes or a no.

A. That's what I started to answer, sir. But yes is -- is the answer.

Q. Okay. How frequently do you do that?

A. There are numerous directives that are put out in the facility that stay, put out and enforce. They're upgraded once a year and at this --

Q. Okay. So in answer to my question, you're referring to general workers.

A. I thought you were going to let me finish my responses before you interrupted me, Mr. Bowman.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 38

Q.  Well, that's kind of a fair point and kind of not a fair point.  Because I expect my questions to be answered.  I don't want to be filibustered, okay?  I just want you to answer my questions.  That's my -- this is my opportunity to ask you questions, and I'm entitled to your answers to the questions I've asked, not to the speech that you would like to give.

MR. ARNOLD:  He can -- you can clarify answers to the -- you know, it's a yes or no.  It's not clear to him that it's, like, yes --

MR. BOWMAN:  If --

MR. ARNOLD:  -- or no.

BY MR. BOWMAN:

Q.  If you can't answer a question yes or no, just say, I can't answer that yes or no, Mr. Bowman.  I need to explain the answer.

A.  Mr. Bowman, you didn't ask for a yes-or-no answer.

Q.  Okay.  Let me try it again.  When you refer to written directives that have been sent out in the past five years asking staff to comply with your expectation that personal property in cells be examined and tracked when security rounds are made, are you referring just to general orders?  That's a yes or no.

A.  No.

Page 39

Q.  Okay.  What in additional to general orders are you referring to?

A.  There are facility housekeeping plans that also talk about --

Q.  Okay.

A.  -- property within the cell.  General post orders, you're correct, also reflect the same thing.  Specific post orders for each post reflect the same thing.  I believe there's some policies regarding fire hazards, fire safety that also reflect the same.

Q.  And, I mean, the truth is that nobody really reads the policies, right?  They exist on paper, but nobody reads them.

MR. ARNOLD:  Objection as to form.

THE WITNESS:  That is not the truth.  No.

BY MR. BOWMAN:

Q.  Okay.  Other than post orders, housekeeping plans, fire safety rules, have you undertaken to underscore the importance of minimizing personal property within cells by e-mail, an announcement of any kind in writing over the course of the past five years?

A.  Yes.

Q.  And when have you done that?

A.  Monday through Friday.  Every day.

Q.  Every day you do that.  So if I were to ask

Page 40

Mr. Arnold for all of the documents reflecting your underscoring that requirement, he would provide me with probably 1,500 documents?

A.  He could provide you with the daily Incident Review Committee notes, which reflect on the issue that we're talking about, property and cells, fire hazards inside cells that happen Monday through Friday.

Q.  So Monday through Friday, you're sending out something to this effect?

A.  Via an Incident Review Committee meeting note, yes.

Q.  Okay.  All right.  I'll follow up on that.  How do you -- given that you're hammering this point on a daily basis, how do you explain the fact that personal property is accumulating in cells, curtains are in front of cells, and this requirement is often being disregarded?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  Even though the point is driven home repeatedly and we're writing hundreds of conduct reports on a monthly basis for such things, such as curtains hanging on the south fronts, you're only as good as your staff, okay?  And, I mean, I have some staff that are outstanding that will do the job each and every time that they're on the

Page 41

range that I ask them to do, and I have others that don't.  Those ones that don't we try to hold accountable through progressive discipline until we work them out the door and they're no longer employed.

BY MR. BOWMAN:

Q.  So it's a matter of staff failure?  You're doing what you can?

MR. ARNOLD:  Objection as to form.

BY MR. BOWMAN:

Q.  Is that correct?

A.  Yes.  We're doing what we can.

Q.  So I just want to make sure that I have an accurate understanding of some of your personal history.  You started at the Indiana Department of Correction many years ago as a line CO; is that correct?

A.  I began as a correctional officer.  Yes, sir.

Q.  And you didn't stay in that capacity for a -- for very long.  You were identified early on as a guy with the capability of handling administrative matters, and you moved into case management, that sort of thing; is that right?

A.  I moved up through the ranks, both in custody, finished my college degree, and continued to promote through the system.  Yes, sir.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 42

Q. Right. You started out at Westville?

A. No, sir.

Q. Where did you start out?

A. My first job as a correctional officer was at the Correctional Industrial Complex in Pendleton, Indiana.

Q. In where?

A. Pendleton, Indiana.

Q. Pendleton, Indiana. And is that also known as the Pendleton Correctional Facility today?

A. Today, it's known as the Correctional Industrial Facility instead of complex, but it's still in Pendleton.

Q. Okay. It's separate from Pendleton, the prison?

A. It's separate from the Indiana Reformatory, now known as the Pendleton Correctional Facility. Yes, sir.

Q. Got it. Thanks for your patience with me. And I understand from your testimony before that the facility where you worked was partly or entirely a mental health facility. Do I have that right?

A. May I explain?

Q. Yes, please do.

A. My time at the state, I worked at the state

Page 43

hospital back in the mid-'80s, '85 to '89, which was a state developmental center for the mentally retarded people in our society. I transferred into the Department of Corrections in 1989 at the Correctional Industrial Complex as a correctional officer where I held several positions. I've also worked at the New Castle Correctional Facility in New Castle, Indiana, the Pendleton Correctional Facility you were referring to in Pendleton, the Westville Correctional Facility in Westville, as well as Indiana State Prison.

Q. Okay. So you've been in a number of different places?

A. Yes, sir.

Q. Why did you decide to leave the state hospital and become a correctional officer?

A. At the time, I was a young man, and I saw corrections as more of the path that I wanted to go into.

Q. Why?

A. Because at the time, I was, like I said, a young man. I wanted to work in law enforcement ultimately. And actually, my plan was to not only finish my bachelor's degree, but to go on to law school. Due to family and children, I didn't quite make it as far as I wanted to, so I stayed in corrections and

Page 44

promoted through the ranks.

Q. Okay. Did the Indiana Department of Correction assist you in earning your college degree or did you do that on your own independently?

A. I did that on my own independently.

Q. Okay. And you got the degree, I think, in 2007?

A. 2007. Yes, sir.

Q. When did you come to ISP?

A. I came to ISP in December of 2007.

Q. Initially, your position was?

A. At ISP?

Q. Yes.

A. Was -- at that time, they called them assistant superintendents.

Q. Right. Deputy warden?

A. Deputy warden today, over reentry was the first position I held there.

Q. Right. So is it just a coincidence that your arrival at ISP coordinates with your getting the bachelor's degree?

A. No. The first position I held after getting my bachelor's degree was an assistant -- an assistant superintendent position at the Westville Correctional Facility.

Page 45

Q. Did having the -- is it a BA, a bachelor of arts?

A. Bachelor of Science --

Q. That --

A. -- in criminal justice.

Q. BS in criminal justice. Did your gaining that degree qualify you for the assistant superintendent rank?

A. It did.

Q. Okay. And then your first position as an assistant superintendent was where? I know you just said. I didn't --

A. At the Westville --

Q. At Westville.

A. -- Correctional Facility.

Q. And you were at Westville for just a period of months?

A. February of 2007 until I was transferred by the commissioner to the Indiana State Prison in December of that same year.

Q. Was it your desire to be transferred or did it just happen to you?

A. That was agency needs. I was transferred.

Q. And you became warden at ISP when?

A. 2014.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 46

Q.   Were you the assistant superintendent deputy warden over reentry for that entire seven-year period, or did you have other responsibilities?

A.   I was -- I was the deputy warden, or assistant superintendent of reentry, for approximately ten months until I was transferred to the operation side.  So most of my time as deputy warden was over operations.

Q.   Okay.  As deputy warden over operations, what were your responsibilities?

A.   My responsibilities were to -- at that time, the major custody supervisor reported directly to me, so I had oversight of all of the custody ranks from the correctional officer all the way through the correctional major.  I was responsible for oversight of the daily operation in the prison, personal property, discipline.  I also supervised the maintenance department.

Q.   Okay.  So that's a lot?

A.   Yes, it is.

Q.   Okay.  And you did that for the better part of seven years?

A.   Yes, sir.

Q.   And then how did it come about that you were promoted to warden in December of 2014?

A.   The current superintendent that was there at

Page 47

that time, William Wilson, was promoted into a regional director position.  I interviewed for the position and was selected for the promotion.

Q.   And you've been in the position ever since?

A.   Yes.

Q.   Can you tell me what your duties are as warden of Indiana State Prison?

A.   My duties are to oversee the entire facility, every aspect of it from oversight of the offender population, as well as all the staff, as well as all the contractors.  So basically, I oversee everything at the facility.

Q.   Would it be fair to say that the buck stops with you?

A.   At the facility, yes, sir.

Q.   At the facility?  That you have the ultimate responsibility for the safety and the security of everybody behind those walls?

        MR. ARNOLD:  Objection as to form.
        THE WITNESS:  Yes.
BY MR. BOWMAN:

Q.   So this is my least favorite part.  Will you give me the organizational chart, to the best of your ability, with -- I understand that you, as warden, would be at the top of the command structure at Indiana State

Page 48

Prison, correct?

A.   Is that where you wish to begin --

Q.   That is where I wish to begin.

A.   -- halfway down?

Q.   Yeah.

A.   Okay.

Q.   And then I would like to know who your direct reports are first.

A.   Okay.  So my direct reports are Jason Nowatzke, Deputy Warden of Operations.

Q.   And he -- so he has the job you used to have?

A.   He does.

Q.   Okay.  And he has the same responsibilities that you just described as undertaking yourself when you were in the position?

A.   They have changed slightly, but for the most part, yes.

Q.   Okay.  How have they changed?

A.   The major is now a direct report to me instead of the Deputy Board of Operations.

Q.   Okay.  So the major is the head of custody?

A.   Yes.

Q.   And the major supervises all of the uniformed folks in the facility?

A.   That's correct.

Page 49

Q.   COs, sergeants, lieutenants?

A.   Yes, sir.

Q.   Shift supervisors and --

A.   Everyone in uniform.  Yes, sir.

Q.   And that'll -- and that'll flows directly to you on the organizational chart?

A.   Yes.

Q.   Okay.  Who else?

A.   Dawn Buss is the deputy warden of reentry.

Q.   Also, a position that you once held?

A.   Yes.

Q.   And what are her responsibilities?

A.   Dawn supervises the reentry staff, which are made up of unit team managers, case work managers, case workers.  Obviously, their job is dealing with more of the program side or the offender's case plan.  She also supervises two program directors and supervise a variety of programs in the prison.  She has oversight of recreation, education, medical services, and food services.

Q.   All right.  And who else?

A.   Then I have the lead investigator, Aaron Jonas.

Q.   That would be the Internal Affairs Department?

A.   Yes.  Investigations and Intelligence is what

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 50

we now call it.

Q.   Okay.  Well, I couldn't remember the -- which came first.  So it's now I&I.  Used to be IA?

A.   Yes, sir.

Q.   Got you.  And who is currently in that position?

A.   Aaron Jonas, J-O-N-A-S.

Q.   Okay.  That used to be Mr. Lessner?

A.   Yes.

Q.   Did Jonas replace Lessner directly?

A.   He did, yes.

Q.   And then Waylon was in that position back at the time of the Devine matter, correct?

A.   That's correct.

Q.   Okay.  All right.  Who else?

A.   Debbie Abram -- or I'm sorry, Debbie Taylor, who's my safety hazard manager.

Q.   Okay.  Who else?

A.   Pam James, who's the facility and litigation liaison and public information officer.

Q.   Okay.  Pam James would be somebody that -- somebody like me, has to deal with in order to arrange for matters related to the present?

A.   Attorney visits, yes, legal documents, that kind of thing.

Page 51

Q.   As well as public information?

A.   As well as public information.

Q.   Meaning if there are press inquiries?

A.   Yes, sir.

Q.   You supervised an execution not too long ago; is that correct?

A.   Yes.

Q.   And so, she is dealing with press inquiries in relation to that, I assume?

A.   She is, as well as the director of public information for the department assists her with that, yes.

Q.   Got it.  Okay.  Who else?

A.   Let me see.  Donna Garrett is my administrative assistant in my office.  Major Wardlow, who was the custody supervisor.

Q.   We talked about that.  And that's a direct report to you?

A.   Now it is.  Yes.

Q.   Have we got everybody?

A.   Yeah, I think so.

Q.   Okay.

A.   I might missing one, but I don't think so.

Q.   All right.  So I wanted to focus in with you on the safety hazard manager position.  What are the

Page 52

responsibilities of that job?

A.   The responsibilities of that position are to oversee the offender fire brigade, to make sure that they have what they need and that they're doing the things that should be done in the facility.  She also does inspections throughout the facility to site violations of OSHA, any work orders that need to be turned into the maintenance department.

She conducts a monthly report of any deficiencies found that's cited.  She also follows up on that monthly reported deficiencies to make sure that the items that were previously cited or that work orders that were turned in for are repaired.  She has oversight of the fire alarm system to make sure that it's functional throughout the prison.  She has oversight of fire extinguishers to make sure that they are where they're supposed to be, that they're filled, they're ready to be used.  She's also the offender ADA compliance manager.

Q.   That's just an add-on?

A.   That's an add-on.  Yeah.

Q.   Anything else?

A.   That pretty much covers it.

Q.   Fire drills?

A.   She also provides fire drills in collaboration

Page 53

with custody supervisor.

Q.   A certain amount of this position is handling paperwork, right?

A.   There's a lot of paperwork in her position.  Yes.

Q.   Yeah.  And Ms. Taylor is -- I believe has a GED; is that right?

A.   I'm not sure what her educational level is off the top of my head, Mr. Bowman.

Q.   Yeah.  And prior to going into this position, she had been a correctional officer, right?

A.   Correct.

Q.   She had no background or experience in managing the physical structure of a facility, right?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  Most of it, I would say that's probably correct.  Most of it.  What she did pick up, she picked up while she was in custody and had shown interest in that job or that field.  And then a lot of jobs within the Department of Correction, you fill with what we call understaffed positions.  So it's not the best candidate we would like for the position, but we get them up to speed through on-the-job training.

BY MR. BOWMAN:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 54

Q.   Got it.  I -- and can we agree that by background and training and education, Ms. Taylor is underqualified for the position that she holds?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  I -- I wish she had more education and background in the position.

BY MR. BOWMAN:

Q.   So I'm going to respectfully ask that you answer my question yes or no if you can.  And if you can't, that's fair.  Can we agree that by education, background, and training, Ms. Taylor is underqualified for the position that she holds, yes or no?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  Every position has minimum qualifications.  She met the minimum qualifications for the position that she was interviewed and selected for that position.

BY MR. BOWMAN:

Q.   But your judgment is that she's not the ideal person for the job, right?

A.   She could use more training.

Q.   Yeah.  She is not -- has no background in OSHA regulations, requirements of OSHA, fair?

MR. ARNOLD:  Objection as to form.

THE WITNESS:  She's learned quite a bit about

Page 55

OSHA through her supervisor that has trained her in OSHA standards, OSHA code, responding to OSHA violations, OSHA inspections and facilities.  So in the time she's been in the position, she's learned quite a bit.

BY MR. BOWMAN:

Q.   Coming into the position, she had no background in that area, right?

A.   Just what she got through the current safety manager that she, like I said, job-shadowed on occasion because she had an interest in that position.

Q.   Okay.  She has no engineering background, right?

A.   Not to my knowledge.

Q.   She has no background in fire protection?

A.   Prior to --

MR. ARNOLD:  Objection as to form.

THE WITNESS:  Prior to taking the job?  No.

BY MR. BOWMAN:

Q.   She's learned on the job.  And who has she learned from -- I -- actually, I need an audible answer to that.  She has learned on the job?

A.   She has learned on the job.  Yes.

Q.   Who has she learned from?

A.   She has learned from Greg Lintz.  He's the

Page 56

director of safety.  I forget his exact title, but fire safety for the Department of Correction.  She's also learned from Kevin Orme, who's the director of construction services for the Department of Correction.  She's learned from Gordon Becher, who's the fire chief for the Department of Correction.  She's learned from other safety managers who's been in the position at other facilities for a long period of time that she's done cross-training with. She's learned from staff that have been in the position prior to her.  Some of it she's learned from the staff and the offenders and -- and the fire brigade currently.

Q.   Okay.  So she picks up some stuff from folks in the fire brigade?

A.   Sure.  They -- they are State-certified, as well as Homeland Security-certified as firefighters.  Yes.

Q.   They can be a source of information and background to supplement background that she does not have, correct?

A.   I am sure that she's picked things up from them.  Yes.

Q.   Who other than the folks that prisoners on the fire brigade -- and to be clear for our record, the fire brigade is a prisoner fire department within ISP, right?

Page 57

A.   Right.  It is an offender fire brigade.  Yes.

Q.   Who, other than the fire brigade at ISP, has Ms. Taylor picked up a background about fire prevention from?

A.   Could you say that again?  I'm sorry.

Q.   Sure.  Who at ISP specifically, as opposed to IDOC, Indianapolis, has Ms. Taylor picked up information about fire protection from and prevention other than folks on the fire brigade?

A.   I would say other staff that have a background in fire that work on volunteer fire departments.  That's probably it.  Mainly at ISP.  The rest would be outside of ISP.

Q.   So as far as ISP is concerned, it's pretty much for Ms. Taylor catch as catch can, fair?

A.   Mrs. Taylor what?

Q.   As far as her picking up information about fire protection and fire prevention and fire and response, those are things under her jurisdiction, right?

A.   Yes.

Q.   Who other than Ms. Taylor has jurisdiction over fire protection, fire prevention, and fire response at ISP?

A.   Well, Ms. Taylor's the primary supervisor of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 58

the fire department at ISP, but the custody supervisor also has some oversight over the offenders. They are offenders. The deputy warden of operation has some oversight over that area as well.

Q. I think you may have sidestepped my question. Maybe I didn't understand your answer. Who other than Ms. Taylor at ISP has specific responsibility for fire prevention, protection, and response?

MR. ARNOLD: Objection to form. Asked and answered.

BY MR. BOWMAN:

Q. I get a little frustrated by these meaningful glances between you and Mr. Arnold. I'm just asking if -- if he needs to make an objection, he will do it. But I need your answer to my question unless he tells you not to answer it. Do you need the question back?

A. Big picture, everyone has an interest in fire safety --

Q. Sure. But I didn't ask you that. I asked you: Who specifically by job description and function within ISP has responsibility for fire prevention, fire response, fire protection other than Ms. Taylor, if anyone?

A. Ms. Taylor is the primary person who has that responsibility. There are several others who also have

Page 59

some responsibility in that area as I first explained.

Q. Right. And you indicated that the major supervising -- the custody staff and the deputy warden of operations have responsibility for oversight of the fire brigade. I get that. Right?

A. Correct.

Q. Okay.

A. As well as myself. Yes, sir.

Q. As well as yourself. So setting that issue aside, recognizing the fire brigade prisoners and they're obviously going to be supervised by custody staff, right?

A. Right.

Q. Setting that issue aside, who other than Ms. Taylor has responsibility at the Indiana State Prison for fire protection, fire prevention, and fire response?

A. She has that primary responsibility. The folks we just talked about also have some responsibilities in that area. For example, a lieutenant or a sergeant that's assigned to a specific housing unit that sees that the fire alarm system is not functioning has a responsibility to report that deficiency to Ms. Taylor --

Q. Right.

Page 60

A. -- so that it can be fixed.

Q. Right.

A. So everyone is responsible for fire safety at the Indiana State Prison.

Q. Got that. All of us should look out for fire -- call the fire department if we see a fire and so forth, right?

A. Correct. Yes, sir.

Q. You and I have responsibility to make sure a fire doesn't happen here at the Hampton Inn this morning, right?

A. Yes, sir.

Q. Okay. I got that. I'm asking: Who other than Ms. Taylor has the bottom-line authority and responsibility for that function, namely fire prevention, fire protection, and fire response, in addition to or other than Ms. Taylor?

MR. ARNOLD: Objection as to form.

THE WITNESS: Sir, she's the primary person. I -- I've answered that several times. I really don't know how else to answer it. There are also several other folks who've had responsibilities to make sure that fire alarm systems are functional, that the fire department has what they need, that -- that the fire -- firemen are released from their cells, that

Page 61

they have count letters, go to their jobs every day. I mean, there's a lot of folks that play a part in that -- in that scheme.

BY MR. BOWMAN:

Q. See, we're talking past each other, okay? I --

A. I'm trying to answer your question.

Q. I actually think you're trying to evade my question, but let me try again. My understanding is -- and you described a scenario where the custody supervisor in a living unit sees that a fire alarm is not functional. That custody supervisor has the responsibility to report that deficiency, right?

A. Yes.

Q. They report that deficiency to Ms. Taylor, right?

A. Yes.

Q. And that is because Ms. Taylor is the person with bottom-line responsibility for ensuring that the fire alarms, among other things, are fully functional, right?

A. She is the point of contact at the facility to make sure those things are functional. Yes, sir.

Q. Okay. So I'm trying to get clarity from you that bottom line, Ms. Taylor is the person with

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 62

authority and responsibility at ISP for fire prevention, fire detection, fire response, and so forth; is that correct?

A.   I'm not trying to evade your question, sir. For the most part, yes.  And I say that because of -- here's a -- a good example.  Because the supervisor, the major, in his job description, he is responsible to assist the safety manager in making sure that fire drills happen on a frequent basis in every unit on every shift, both day and nighttime.  So there are other people that it's written into their job descriptions that also have the same responsibilities.  Ms. Taylor is the primary person, which we've established lately.

Q.   Except I would like you to answer my question and to confirm without ambiguity that Ms. Taylor has the bottom-line responsibility, the final say-so at ISP with respect to fire prevention, fire response, and fire safety in general.

A.   So --

MR. ARNOLD:  Objection to form.  Asked and answered.

BY MR. BOWMAN:

Q.   Can you answer my question yes or no?  If it's not a question you can answer yes or no --

A.   No.

Page 63

Q.   -- and then I'll accept you can't answer that yes or no.

A.   I don't think she is the -- the only person at ISP with that responsibility.

Q.   Okay.  Who other than she has bottom-line responsibility for that?  Do you?

A.   I do.

Q.   Okay.  So who else?

A.   As I explained, the custody supervisor does. Through fire drills, the deputy warden does.  The housing unit lieutenant does.  A lot of supervisory staff have responsibilities to make sure that fire alarm systems are functional, that all the things that we've discussed previous happen.

Q.   Yes.

A.   It's not just her --

Q.   Can we agree -- and can we agree that Ms. Taylor has overall supervisory responsibility over those functions that you've just listed?

MR. ARNOLD:  Objection to form.

THE WITNESS:  Most of those duties fall under her job description, but again, other staff also have responsibilities.

BY MR. BOWMAN:

Q.   All right.  Thanks.  We're going to take a

Page 64

break at this point.

THE VIDEOGRAPHER:  We're going off the record. Time is now 11:24 a.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record for the deposition of Warden Neal.  My name is Steffi.  Today is August 29th, 2025.  And the time is 11:38 a.m.

BY MR. BOWMAN:

Q.   Was it your responsibility to hire Deborah Taylor or to put Deborah Taylor in the position of safety hazard manager?

A.   I was not on that interview board.  No, sir.

Q.   Okay.  Who made that decision?

A.   Greg Lintz had the final selection, I believe.

Q.   Central IDOC?

A.   Yes.

Q.   Got it.  So in the event of a fire emergency, am I correct that I&I is responsible for conducting an investigation?

A.   In a significant fire incident, they are responsible for conducting an investigation.  Yes, sir.

Q.   And how do we define significant fire event?

A.   For example, if an offender is upset and throws some clothes out on the front of his range,

Page 65

outside of his cell, in front of his range, sparks it, sets it on fire because he's mad at staff or he wants something and it's quickly extinguished and causes no problems for him or other offenders, then those don't result in a -- a formal investigation by I&I.  If someone is injured or there's significant property damage or an outside hospital trip, those are always investigated.

Q.   So let me make sure that I understand you.  A significant fire is one in which there is significant property damage, personal injury, or fatality?

A.   For the most part.

Q.   Right.  And is there some addition or clarification that's necessary?

A.   Well, I -- I don't know that -- you repeated everything I said, so that's why I phrased it the way I phrased it.  But if there's injury to the offender or staff, an investigation is warranted.  It requires an outside medical trip or medical treatment, an investigation is warranted.  If it has significant property damage, an investigation is warranted.  If other offenders require medical treatment because the fire set by a -- a different offender, such as smoke inhalation, then an investigation would be one.

Q.   And that investigation is done by I&I.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 66

A.    Yes, sir.

Q.    The Indiana State Fire Marshal may also do an investigation of a significant fire at your facility, correct?

A.    They can.  Yes, sir.

Q.    And that happened in the Devine fire and in the Smith fire?

A.    Yes.

Q.    There is also a fire safety function at IDO Central in Indianapolis, correct?

A.    There are staff that work for the central office division of IDOC that yes, Greg Lintz, for example, is over safety.  Gordon Becher is the director of fire safety for the DOC who work under Kevin Orme, the director of construction services.

Q.    And when you have a significant fire at the Indiana State Prison as a matter of practice and policy, does IDOC Central send an investigator to investigate the occurrence?

A.    Sometimes, yes.  Sometimes no.

Q.    Depends.  I need a verbal answer.

A.    It depends on the circumstances and the severity of the fire, yes.

Q.    Okay.  If it's serious enough, IDOC Central may send an investigator.

Page 67

A.    They may send an investigator, or we do an OSHA report and they may send an investigator.

Q.    All right.  Have you ever requested an agency other than the fire marshal and other than an OSHA investigator as you just described, have you ever asked an outside agency to come in and review a fire incident?

A.    State police.

Q.    Any other outside agency?

A.    Not to my knowledge.

Q.    Have you ever asked NIC, for example, to come in and review a specific fire incident?

A.    Several of us have been to NIC for training. We have not invited NIC into the Indiana State Prison to review a specific fire incident, no.

Q.    Any other similar corrections, oversight, or --

A.    -- corrections.

Q.    Sorry.  You're interrupting.  I'll start over and -- and I didn't mean that as a criticism.  It happens.  Other -- have you ever asked other than NIC, have you ever asked an accreditation or a correctional standard setting agency to come in and review a specific fire incident in your prison?

A.    The American Correctional Association does audits at our facility once every three years.

Page 68

Significant incidents are listed as formal documentation as a part of standards for ACA.  So they review them through that process.

Q.    Yeah, but I'm asking you a different question. I think you know the question I'm asking you.  Have you ever asked ACA to come in in response to a specific incident outside of their normal three-year audit process to review that specific incident and evaluate the response and so forth?

A.    We have not invited ACA in for a specific fire incident, other than their normal review period.

Q.    When your -- I am going to refer to I&I as Internal Affairs just because it's easier to say, and we will understand what we're talking about, right?

A.    Yes.

Q.    Other than -- strike that.  Let me start over. What is the reason that Internal Affairs conducts and a review of a significant fire incident?

A.    It -- it would depend on what the circumstances are, but they investigate any incident for posterity's sake of, you know, who did what, what happened, what took place, who was involved, what serious illness, injury, death, injury, those kind of things occurred.  So the that's what they're looking for in an investigation to determine if -- if staff did what

Page 69

they were supposed to do.  Did they not do what they were supposed to do?  Were they in violation of policy? Those things are also cited.

Q.    Okay.  Can we agree that an important purpose of an after the fact investigation is to learn from history?

A.    Sure.

Q.    We can agree that identifying mistakes and lapses is important, so that bad things don't happen again, right?

A.    I think we all learn from past issues and mistakes, yes.

Q.    Right.  So with that in mind, it's important from your standpoint as the guy with the ultimate responsibility in the prison, that the investigations are thorough, right?

A.    Yes.

Q.    And that they do not shy away from asking the hard questions, right?

A.    Investigations should be thorough, right, they should not shy away from asking anything.

Q.    And they should -- I -- you -- you -- you know, you expect that the people underneath you are going to give you the unvarnished truth so that you can change things when they need to be changed, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 70

A.   I expect the truth from all of my employees, especially internal affairs investigations, so they can go a lot of different ways, outside charges with the prosecutor, termination of employees, changes in operations.  They can have a lot of impact, right.

Q.   And we can agree that if in the aftermath of a serious incident folks shy away from the hard questions and aren't honest about what happened and where there were failures, that that's a problem for institutional safety, right?

A.   You're saying if they did that?

Q.   If they did that, that would be a problem.

A.   If they did that, that would be a concern, yes.

Q.   Now specifically as to fires, they are a fact of life at the Indiana State Prison; is that correct?

A.   They're a fact of life at the Indiana State Prison because offenders set fires, yes.

Q.   So one repeat problem at ISP, and it's, I think you've testified in the past, it's centered at D cellhouse, the restrictive housing unit, is that prisoners will deliberately set fires, right?

A.   That happens in every cellhouse, but prisoners do deliberately set fires, yes, sir.

Q.   That is a serious safety risk whenever that

Page 71

happens, right?

A.   Sure.

Q.   It is a danger to the prisoner who has set the fire, right?

A.   It can be, yes.

Q.   And it can be a danger to staff and to other prisoners in the vicinity of that individual, right?

A.   It can be, yes, sir.

Q.   And having a rapid and effective response to every fire at the Indiana State Prison is an imperative, right --

A.   Yes.

Q.   -- because of the dynamics of fire among other things, right?

A.   Yes.  You want to put a fire out as soon as possible.

Q.   The thing about fire is that if it is not addressed immediately and urgently, it has the capacity to, in short order, become potentially lethal, right?

A.   It can.

Q.   It can.  And with that in mind, you understand that having a rapid and effective response is necessary to save lives, right?

A.   Yes.

Q.   It's necessary to prevent injury, right?

Page 72

A.   Yes.

Q.   And can we agree that there are -- that -- that this needs to be a priority at the Indiana State Prison?

A.   It needs to be, and it is a priority at the Indiana State Prison.

Q.   Right.  And it is -- I -- I -- I don't want to put -- I don't want to exaggerate it.  I want to be fair to you.  It is, in reality, a frequent occurrence that the fire brigade and staff, one or the other or both, are required to respond to a fire at the Indiana State Prison?

A.   There are several fires at the Indiana State Prison.  Many are put out by staff because they're simple range fires.  Sometimes the fire brigade is activated because of larger scale fires, yes.

Q.   Right.  So it -- it's not like this happens once a year or even once a month.  It happens more frequently than that, right?

A.   Sometimes.  I mean, sometimes there are months you don't have any.  Sometimes there's months where you'll have, you know, four or five, it just depends on the behavior of the offenders.

Q.   We have been given in this case a lot of documents --

Page 73

A.   Sure.

Q.   -- that -- including incident reports relating to responses to fires, and we've reviewed them.  Would you think it was out of line with your memory and your experience, if I were to suggest to you that the documents that we have reviewed reflect that the -- either the alarm, the fire alarm has been tripped or there has been an actual fire to which staff or the fire brigade has had to respond approximately 134 times in the period between the Devine fire in April of 2017 and the Smith fire in January of '23.  Does that number seem out of line to you, or would you acknowledge that that's about right?

A.   In a five-year period of time, that's -- that could be correct.

Q.   Right.  So your point is it's not uniform, it's not every week, right?

A.   Right.

Q.   But sometimes it might be twice a week, right?

A.   Sometimes it might be twice a day.

Q.   Right.  Right.  So the point is that fires happen frequently enough that responding to them with expedition and with proper procedure is an essential priority for your staff in that facility, right?

A.   Yes.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit H

Page 74

Q.   And you mentioned that a lot of fires start because prisoners deliberately set them, right?

A.   Yes.

Q.   That is a crime, potentially, right?

A.   Yes.

Q.   And it's going to cause a conduct report, if not referral for criminal prosecution, correct?

A.   That's correct.

Q.   The -- that's not always the case, sometimes fires start by accident, right?

A.   I mean, I -- I can recall a few cases around the state.  I'm saying, if the state prison where a fire started in a dryer that overheated and caught clothes on fire or something of that nature, outlets, which is 99 percent of where most of my fires start, because offenders sparked the outlet.  I don't recall any fires that just happened on their own in recent years.

Q.   Well, we're going to get into some documents and some discussion about this later, but do you view the Smith fire as a fire that was deliberately set as an act of arson?

A.   I view the Smith fire as a fire that started as a result of Michael Smith using a homemade grinding wheel and device that he created to work on other offenders' electronics, which sparked -- caused sparks,

Page 75

lighting his sheet and mattress on fire.  So his violation of the rules by using altered equipment and state supplies caused a fire.

Q.   Yes.  So can we agree -- maybe we can't agree.  Can we agree -- your point is this, as I understand it.  Mr. Smith was doing something in his cell that he was not authorized to do, right?

A.   Yes, that's correct.

Q.   And then -- and the evidence for that is the artifacts from the fire that the fire marshal and the investigators recovered, right?

A.   That's correct.

Q.   Yes.

A.   They did a nice job of citing all those things.

Q.   Right.  And of course you don't know exactly what happened, but that's -- that's the inference from the evidence?

A.   That's correct.

Q.   Now, can we agree that there is a difference between engaging in unauthorized behavior and inadvertently starting a fire, on the one hand, and planning to start a fire and deliberately setting the fire, on the other hand?  Can we agree that those are two different scenarios?

Page 76

A.   I would agree those could be two different scenarios, yes.

Q.   Okay.  So can you accept the proposition, maybe you can't, that Mr. Smith started the fire that resulted in his death by accident?

A.   I think that the fire in Mr. Smith's cell was started as a result of him using a grinding wheel on electronic equipment which caught his sheet on fire.  I don't think he intentionally set his sheet on fire.

Q.   It was an accident in other words?

A.   I -- I believe so.

Q.   Okay.  So sometimes prisoners -- or strike that.  Let me start over.  Sometimes there are fires at the Indiana State Prison that are the result of deliberate intentional fire setting.  Oftentimes that happens.  You've testified to that, right?

A.   That's the vast majority, yes, sir.

Q.   And sometimes fires are started by accident, right?

A.   This would be one of those examples of that, yes.

Q.   And sometimes fires start -- the dryer fire, for example, not as a result of any action by an individual, but just because of an electrical defect or the like, quite beyond any individual's action, right?

Page 77

That's another possibility for how a fire could start and you've seen that happen at least in the occasion that you cited, right?

A.   In this occasion, I -- I -- I would agree with that.  The fire in the electrical or in the dryer that I mentioned happened because the vendor working in the laundry had overloaded the dryer with numerous bags of laundry and, you know, so there was a cause to the fire.

Q.   All right.  So somebody was at fault there as well.

A.   Yeah.

Q.   Okay.  But let me ask you a new question.  Whether a fire is the result of an accident or whether it is an intentional act, from the standpoint of early detection, effective response, and adherence to policy and best practices, doesn't matter, right?

A.   Doesn't matter in the respect that it's still going to be a fire.

Q.   Right.  Your responsibility and the responsibility of the people who work for you is to get that fire out as quickly as possible, no matter the origin, right?

A.   Right.

Q.   Your responsibility and the responsibility of the people you work for is not to debate whether

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 78

somebody deserved to be burnt or to die as a result of their actions. Your responsibility is to save them if you possibly can, right?

A. Absolutely -- absolutely.

Q. So another way, you correct me if I'm wrong. I've been talking with people. I've heard things. Another way that fires sometimes start at the Indiana State Prison is from the use of hot pots. Can we agree about that?

A. Hot pots are the cause of fire sometimes, and inmates take those, right.

Q. And that would be an example of -- perhaps a prisoner would have a hot pot in their cell. They would be negligent in that they would not pay attention. The hot pot would -- the liquid in the hot pot would evaporate and the -- the thing can set on fire?

A. That's correct.

Q. And that would be an example of an accident --

A. Correct.

Q. -- not best practice, but certainly not a deliberate fire, right?

A. Right. And it is complacency or whatever you want to -- you say, but I mean, yes, they have left their hot pot on, they've left their cell or a length of time, sufficient enough to allow the hot pot to overheat

Page 79

oil, whatever was in and out and cause a fire, yeah.

Q. And we spent a lot of time earlier today talking about property in cells, right?

A. Yes.

Q. Yes. And that's a sensitive subject in the context of talking about fire because of the reality that excessive personal property in one of those small cells in the Auburn-style cellhouses at Indiana State Prison is a risk for a fire increasing and becoming lethal when otherwise it might not, right?

A. Property load and -- and fuel for a fire is always a concern. I would clarify that the cell sizes of the cells of the Indiana State Prison meet ACA standards of national standards for cell sizes.

Q. Sure. I wasn't suggesting that they didn't, but the point is, and I don't think that we disagree, is that the fuel load for a fire can be an important factor in how hot the fire burns and how rapidly it increases, right?

A. It's always a concern, yes, sir.

Q. So that is a big reason, among others, why it's important for you and your staff to limit personal property in each of these cells, right?

A. That's why we limit personal property. It's why we do 8,000 shakedowns a year and have housekeeping

Page 80

plans and metal property boxes, and I could go on and on. Yes, sir.

Q. Yes, you could. And all of that is important, particularly in an old building, like A cellhouse, right?

MR. ARNOLD: Objection to form.

THE WITNESS: It's important in any cell space, yes.

BY MR. BOWMAN:

Q. And it's particularly important in an old building, like A cellhouse that doesn't have a sprinkler system, right?

A. Yes.

Q. It's particularly important because -- well, actually, let me stop and just lay some foundation here. One of the features of this 1860 model housing facility in Indiana State Prison is it's long and narrow, right?

A. Yes. They're -- they're long and yeah, I -- could be described as narrow.

Q. I mean, it's -- I can't remember the directions, but it's -- you've got a north -- in A cellhouse, you've got a north side and you've got a south side and the distance from the perimeter of the north side to the perimeter of the south side is a lot less than if you go from east to west and you're looking

Page 81

down the range, right?

A. They are far longer than they are wider, yes, sir.

Q. Well put.

A. Yeah.

Q. And the feature of that is that there's limited visibility for correction staff, right?

A. It depends on where they are in their viewpoint, but --

Q. Yeah. Depends on where --

A. -- that can be, yes.

Q. -- depends on where they are. And that stands in contrast to modern construction, which favors the pod arrangement, right?

A. Yes.

Q. And so, I mean, if you have a pod, you can put a command center in the center of the pod and the person in charge of that unit has got full visibility into the entirety of the unit or much of it, right?

A. Most newer facilities are designed that way, yes.

Q. And that's for reason, right? So they have --

A. Yes, clear sites of -- viewing sites, yes.

Q. You don't have that at A cellhouse?

A. It's a different setup, yes, that's correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 82

Q.   Okay.  And that raises the importance of being vigilant in terms of your monitoring, right?

A.   That's why we require 30-minute security checks and the monitoring that we do, yes, sir.

Q.   Okay.  In A cellhouse, you have a smoke detection system at the top of the fifth range, right?

A.   Yes.  Yes.

Q.   Smoke travels up --

A.   Yes.

Q.   -- and it needs to travel up five levels from the bottom, hypothetically, in order to trigger those alarms, right?

A.   Yes.

Q.   So that tall design is different than you might find in a modern facility where the smoke detection system and the ceiling is at a lower level, yes?

A.   Yes.  Most newer facilities I've worked at or seen are two floors.  Some are three, most are two.

Q.   Yeah.  So this is again, a feature of A cellhouse that makes it more susceptible to fire?

A.   Yes.  More susceptible to fire?

Q.   More susceptible to fire developing and not being detected.

A.   It takes a little longer to reach the -- the

Page 83

smoke detectors because of the five tiers.  I -- I would say that.

Q.   Okay.  Are you aware that in modern -- I mean, an issue about fire in a prison and just to step back and state the obvious is, if I am a prisoner confined in a cell and a fire starts in my cell, my risk is very high, if I can't get out of that cell, right?

A.   It is, which is why we try to educate them about setting fires inside their cells, yes.

Q.   And it's also why you need to be vigilant, and your staff needs to be vigilant in terms of keeping eyes on the cells, right?

A.   Yes.

Q.   Because they've got a responsibility not to set fires, but you've got a responsibility to respond if they do, right?

A.   Yes.  Life and safety of both the staff, the offenders, and the public are my responsibility, yes.

Q.   Correct.  So it's a heightened responsibility given the nature of the environment with respect to fires because of this confinement issue, right?

A.   Fires are a concern at all times, so yes.

Q.   I mean, I thought we could agree on this point without too much back and forth, but if a fire starts here, I mean, there could be a problem if it starts

Page 84

between us and the door.  But as a general matter, if a fire starts in this room we're in right now, everybody here has got the capacity to get out the door, right, in theory?

A.   Right.

Q.   Unlike a cell where we would all be confined in here and at much greater risk, right?

A.   If we are confined, we're at a greater risk, yes.

Q.   And if we are confined, we are dependent upon, in a prison, you and your staff to respond to us on an urgent basis, right?

A.   That's for any prison, yes, sir.

Q.   And that is why -- and -- and it's particularly the case when you're dealing with this old A cellhouse, right?  That has all of these features that we've just been discussing?

A.   The size of the cellhouse, the long ranges, are all additional measures.  The time it takes smoke to get to the smoke detectors, they're all factors, yes.

Q.   And another factor in A cellhouse is the locking system, right?

A.   What -- what do you mean by that?

Q.   A cellhouse on the lower ranges uses an antiquated locking system, right?

Page 85

MR. ARNOLD:  Objection as to form.

THE WITNESS:  It is an older locking system, yes, sir.

BY MR. BOWMAN:

Q.   Does the locking system date all the way back to 1860?

A.   Some of them do, yes.

Q.   Does the locking system on the second tier of A cellhouse date all the way back to the -- to 1860?

A.   One of the original locking systems, right.

MR. BOWMAN:  I'm going to show you what I'm going to mark for identification as Exhibit -- the Exhibit 3 to your deposition.  I didn't bring extra copies.  They're available on the cloud.  Let me --

(Exhibit 3 was marked for identification.)

MR. ARNOLD:  We may want --

MR. BOWMAN:  -- let me hand this to you before I -- yeah.

BY MR. BOWMAN:

Q.   Yeah.  Just hand you this one.  Can you tell us what Exhibit 3 is?

A.   Exhibit 3 is L252.

Q.   And I'm going to represent to you that this photograph was taken during our opportunity to come into A cellhouse and inspect it a few weeks ago, okay?  So



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 86

this actually is the cell in which Mr. Smith perished. And it's you -- you're not going to quarrel with the accuracy of the photograph, right?

A. No.

Q. So we've got an old-fashioned lock that secures the cell, correct?

A. Those are Brinks locks that are very old, yes.

Q. And the only way to open that lock is for a staff member to come to the front of that cell with a key, the particular key that unlocks that cell and turn the lock and open the door, right?

A. That's correct.

Q. There is no possibility for a remote unlocking of this particular cell door?

A. Not with that lock, no.

Q. And that is different from other cells at Indiana State Prison, for example, right? They can be opened remotely.

A. There are some cells that can be opened remotely, yes.

Q. And it's certainly different from the way cells are designed today?

A. Most cells today are built with magnetic locking systems that can be popped or opened from the control station, yes.

Page 87

Q. Like when I go into Indiana State Prison, somebody can press a button and a door slides open. I've walked through the gate, right?

A. That's correct.

Q. And that's how it typically works in a new design cell within the living unit of a facility, right?

A. They're electronically controlled, yes.

Q. Now, in addition to the lock at the front of the cell, there is also a roll bar at the top that helps secure the door, right?

A. Correct.

Q. And in this picture, I believe that the gray structure going horizontally across the top of the photograph is the roll bar, right?

A. It's the roll bar, yes, sir.

Q. And we see some exposed unpainted area on that roll bar. And that's an indication that the bar is in the open position?

A. It is open, yes.

Q. And if I were going to secure that cell, I would have to shut the door, put the key in the lock, turn the lock, and then roll the bar so that the bar would hook on to the top of the cell door, and further secure it shut; is that accurate?

A. That's accurate.

Page 88

Q. Contrariwise, if I wanted to open the cell, the first thing I would have to do is go down to the end of the range and literally roll the bar with a crank that is located at the end of the range, correct?

A. Correct.

Q. And then after I had done that, that would be the point at which I could go to the cell front and succeed in opening the -- opening the door, right?

A. That is correct.

Q. Each cell on this particular range has to be opened in the same way?

A. Yes.

Q. Now, if you look a little bit down from the top of the cell door, below the roll bar, you see a chain hanging down. Are you able to observe that?

A. I see it.

Q. And then there's a -- I don't have the words for it. A thing that sticks out from one of the bars, and you can hook the chain through that hole there and further secure the door in that fashion, right?

A. Right.

Q. And at the Indiana State Prison, the commissary furnishes locks to prisoners that they may use to secure their cells with a padlock, using that chain and that attachment there on the cell door, right?

Page 89

A. That is correct.

Q. So that would be a third barrier to entry in that cell beyond the two that we've already discussed, right?

A. If they're all locked. Yes.

Q. If they're all locked. And the prisoner has the opportunity to perform that third lock on the cell, should he choose to do so?

A. If he chooses, that's his choice. Yes.

Q. Now, why do you allow that?

A. Because a lot of men in this environment -- this is maximum security, a vast majority of the population are doing life. So they take a lot of pride in their property, and photos, and things that they have in their cell. And this environment, when you run mass line movements, say to chow or outdoor recreation, and the roll bars are rolled, and offenders have opened their cells, they are fearful that the officers won't come by fast enough to lock their cell door before another offender would rob them, let's say, or steal their property. So that's why they like to use chains and padlocks to further secure their personal belongings.

Q. What do you think about that?

A. Well, it's always been controversial. But I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 90

mean, for us, we keep bolt cutters in the officer station in every control room. We also have master keys to all of those padlocks. It's an extra couple seconds for us to get in that cell, if we had to open that cell.

Q. I see. Well, somebody has to remember to bring the bolt cutters, right?

A. They would've to bring the bolt -- bolt cutters or keys. Yeah.

Q. And then the operation would have to be performed to unhook that lock in one fashion or another, either by cutting the chain or responding to the lock, right?

A. Cutting the chain or opening the lock. Yes, sir.

Q. Right. So if I understand your answer, you say that this is being done in order to facilitate the prisoners' desire to secure their personal property.

A. That's what most of the men will tell you is why they prefer the chain and the padlock, the third lock. I have some that will tell you that they're afraid of being assaulted by other offenders, so they want to secure themselves as much as possible because they think other offenders might be able to access their cell, get inside, and assault them. So that's the other method or reason.

Page 91

Q. The -- you say it's controversial. And the reason it's controversial is because while it facilitates safety of personal property and safety of person, it also bars staff entry into the cell when staff entry is essential, right?

MR. ARNOLD: Objection to form.

THE WITNESS: As I said, it takes -- it takes whatever amount of time it -- it takes to get the lock unlocked. Yes.

BY MR. BOWMAN:

Q. Now having an antiquated locking system, and having -- well, actually, before I get there, let me ask you this. We talked about the property boxes, the 4.5 cubic feet of personal property limitation, and the fact that personal property should fit into a box. Providing a lock on the box would be an alternative way to secure the safety of personal property within cells; would it not?

A. I can only tell you that the -- to some extent, that would be true, to answer your question. It used to be that way when we had the Norix boxes inside the cells of the Indiana State Prison. The Norix boxes had a lid that they could put a padlock on and secure whatever property they wanted to inside the Norix box. The problem with that was -- is that other offenders

Page 92

knew how to jimmy the -- the Norix box, to still break into the box, or break the padlock off to get into the Norix box. Not to mention, like I said, they burnt pretty well during the previous fire.

Q. You now use a metal box?

A. I do.

Q. Does the metal box have the ability to lock?

A. It does not.

Q. Could you, in theory, ask folks to design a metal box that could be locked?

A. Could we do that?

Q. That's my question.

A. We could do that. Yes.

Q. And that would be an alternative way to secure the safety of personal property?

A. It would be an idea. But again, all of their personal property usually does not get put in the property box. So from the offender's perspective, he's going to cite the same concerns to you about his property being stolen, whether I put a lid on that metal property box or not.

Q. Right. Because the reality is that there's a lot more personal property in most of these cells than would possibly fit in one of those boxes. Isn't that the reality?

Page 93

A. Well, the reality is, as I said, even though the 4.5 cubic feet is the metal property box itself, that does not include the tab of the TV or a fan. The larger items are not included in the 4.5 cubic feet of property, whether or not the individual has more clothing, or paperwork, or whatever in excess of 4.5 cubic feet. Right.

Q. So can we agree -- we've talked about a number of factors about the physical structure, the environment in a cellhouse, that increase the danger and the risks associated with fire. Can we agree that this locking mechanism, the three locks that are potentially available on each of these cells, is another factor that heightens the risk and the vulnerability from fire?

A. If an offender starts a fire inside his cell, the additional lock will take extra time to remove to pull him out of that cell.

Q. Right. It's not like somebody can press a button down on the other end of the range and help this guy get out of the cell, right?

A. I agree.

Q. And because of that, it becomes all the more important that you and your staff are vigilant and have eyes on, in terms of ensuring that people are safe from fire when they're locked inside of these cells; is that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 94

fair?

A.   I think we do everything possible to ensure and -- that the offenders are safe inside their cells with the exception of them starting a fire of their own accord.

Q.   Let me try the question again.

MR. BOWMAN:  Actually, would you mind, Taylor, reading the question back for the warden?

THE REPORTER:  Sure.

BY MR. BOWMAN:

Q.   I'm going to ask you to listen to the question when Taylor reads it back.  And I'm hoping for an answer to the question that I've asked you.

A.   I'm trying to provide answers to your questions, sir.

(The requested question was played back.)

THE WITNESS:  As we -- as we've established previously, our concern is always to save life.  So to say because a man's locked in his cell, it's our concern to be vigilant, to make sure he's safe?  I would agree.  Yes.  That -- it's always our concern to make sure a man is safe.  The only thing I added was the fact that if an individual starts a fire of his own accord inside that cell, then it's very hard for my staff to see everything, as we've established

Page 95

earlier.

BY MR. BOWMAN:

Q.   So it's on him?

MR. ARNOLD:  Objection to form.

THE WITNESS:  I didn't say it's on him, but he's playing Russian Roulette with his life.  I mean, I've got staff doing rounds on ten ranges in a very large cellhouse.  Usually, three to four staff assigned to each of those cellhouses.  If he lights a fire after an officer walks by, he's taking a significant chance.

BY MR. BOWMAN:

Q.   Your former Head of Internal Affairs, William Lessner, testified with respect to Mr. Smith that in his judgment, Mr. Smith was the one responsible for his own death.  I guess he formed that judgment after investigation.  Is that also your view?

A.   My view is that Josh Devine started the fire inside of the call.

Q.   I'm asking about Smith at the minute.

A.   Oh, with Smith?  Can you -- can you repeat the question again?

Q.   Yeah, I'll ask it again.  William Lessner testified last week that his opinion was that Smith was responsible for his own death.  And that to the extent

Page 96

he perished, it was on him.  Is that also your view?

A.   I think it's very tragic, but I do think that Mr. Smith caused the fire inside his cell, and unfortunately, staff were not able to get him out in time to save his life --

Q.   So --

A.   Ultimately, yes.  He -- he caused his own death.

Q.   Okay.  And you feel no sense of regret or personal remorse due to any failure whatsoever, on the part of yourself or any member of your staff; is that right?

MR. ARNOLD:  Objection to form.

THE WITNESS:  I hate to see any death.  All death is tragic, I mean -- and I see a lot, not just fire death.  I see a lot of death in this business.  It's all tragic.  But, you know, there's some times that my staff cannot save every life of men that try to commit suicide, or set fires in their cells, or -- despite our best efforts.  I mean, we can't.

BY MR. BOWMAN:

Q.   Okay.  So my question is: There's nothing that anybody on your end did wrong, in your opinion, in this whole thing?

MR. ARNOLD:  Objection to form.

Page 97

THE WITNESS:  I think staff -- I think staff responded in a very timely manner in this case, and did everything possible to get Mr. Smith out of his cell once they became aware of the fire existing.

BY MR. BOWMAN:

Q.   And there is nothing that you would tell your staff to do differently, right?

A.   I would tell my staff, as I tell my staff every day, to remain diligent.  Do your security checks, do your routes, do your job.

Q.   Have you ever given any consideration to requiring that a particular -- that one correctional officer assigned to the Auburn-style living units remain on the upper tiers continuously throughout their shift as additional eyes on the cellhouse?

A.   Sir, I would love to have more staff to be able to do different things.  That's an idea.  We do have staff assigned to different ranges inside the cellhouse.

Q.   See, you're not answering my question.  I -- respectfully, I'd like you to answer my question.  I understand that your staff are limited, right?

A.   Yes.

Q.   You have limited staff --

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporter.com
www.kentuckianareporters.com

Exhibit H

Page 98

Q. -- right? You have a hard time attracting people to be correctional officers, right?

A. That's correct.

Q. It's a lousy job, right?

MR. ARNOLD: Objection to form.

BY MR. BOWMAN:

Q. Well, there are vacancies.

A. There are vacancies. This job is not for everyone.

Q. Right. Okay. That's a better way of putting it. It is a job that is not for everybody, right?

A. Correct.

Q. Okay. And so, in each living unit on a particular shift, you have what? Three or four staffs -- staff members, including supervisor in a cellhouse?

A. In the general population housing units, such as a cellhouse, that's typically the case. Yes.

Q. That's typically the case. Okay. So that's a limitation within which you have to work, right?

A. Correct. That's what I --

Q. -- because the -- these are facts of life. You can't get more staff.

A. We try to get more staff, but that's still pretty, well, general staffing -- for the 40 years I've been in this business, that's pretty well consistent

Page 99

staffing.

Q. All right. So here comes my question. Given that limitation, have you ever given consideration to requiring one of the three or four staff members assigned to a cellhouse to be continuously on one of the upper tiers throughout their shift as additional eyes on the unit?

A. Not permanently. I mean, they are -- I do have staff that are assigned to the 400 and 500 ranges as their assignment. That's their duty for the day, to watch those ranges.

Q. I get that, and I should have clarified that I do understand that part of the division of responsibility on every shift is you have a supervisor, right? In a cellhouse, a sergeant, yes?

A. Oh, I know I see. Yes.

Q. And then -- meaning an officer in charge -- a line officer who is a -- is given the responsibility of being in charge on a particular day when there may not be a sergeant on duty, right?

A. That's correct.

Q. So one person is in charge. And then that person has -- if I understand the situation correctly, typically, Tier 1 is their responsibility; is that right?

Page 100

A. Different supervisors do it different ways.

Q. And then the two individuals who are not in charge, each one is assigned to two tiers, right?

A. Usually. Yes.

Q. Okay. And what their assignment involves is doing the rounds on those tiers, right? Among other things.

A. Among other things.

Q. And that involves doing the checks every 30 minutes?

A. Yes.

Q. Okay. So I appreciate that. I'm asking you a different question. My question is: Have you ever given consideration to requiring one of the three staffers to remain continuously on one of the upper tiers throughout their shift? Not doing rounds, not going downstairs, but remaining continuously on the upper tiers as additional eyes on the unit?

A. Sir, I've tried to answer this question three times now. I mean -- and I'll try again. Have I ever told an officer to stay on the four and 500 ranges for the entire shift and never leave to -- to be additional eyes? It's not possible.

Q. Okay. Thank you. Do you want to tell me why it's not possible?

Page 101

A. They've got to go to the bathroom. They've got to make phone calls through, and then they can't stay on there for 12 hours a day.

Q. Okay. Any other reason?

A. That's the -- they do get a built in break period. I mean, that's the main reason.

Q. So I wanted to ask you some questions about the prisoner Fire Brigade. The -- the Fire Brigade predates your time at ISP, correct?

A. It does.

Q. And obviously, it is a somewhat unusual and beneficial program for a lot of reasons, right?

A. Yes. To my knowledge, it's the only offender fire department in the state, if not the country.

Q. It has rehabilitative value for the men who participate in it, yes?

A. Yes.

Q. Gives them a sense of purpose and is an improvement in their lives, hopefully, right?

A. Absolutely. Yes.

Q. And you have pointed out that the Fire Brigade is going to have a better response time than the Michigan City Fire Department if there's a fire in the prison, right?

A. By far. Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 102

Q.   Because they're there on site?

A.   Yes.

Q.   And already behind the walls.

A.   Yes.

MR. BOWMAN:  Now, have you -- like I said, let me just show you what I'm going to mark for identification as Exhibit 4 to your deposition.

(Exhibit 4 was marked for identification.)

BY MR. BOWMAN:

Q.   Just going to hand it to your counsel first. And while he's looking at it, I will state that Exhibit 4 is an e-mail that you sent to Richard Brown and James Basinger on February 6th, 2023.  And the subject is, "The Fire Brigade."  I'll show it to you after these folks have looked at it.  Take a minute to look that over, and then I'll have some questions for you.

A.   Okay.

Q.   Did I correctly describe this as an e-mail you sent to Mr. Brown and Mr. Basinger in early February of '23?

A.   That is correct.

Q.   And who is Brown?

A.   Dick Brown, or Richard Brown, at that time, was the Regional Director over me of Indiana State

Page 103

Prison.

Q.   You -- the person to whom you directly report?

A.   Yes.

Q.   And who is Mr. Basinger?

A.   He was Deputy Commissioner of Operations.

Q.   For Indiana State Prison?

A.   Indiana Department of Corrections.

Q.   He -- oh, for the entire department of corrections?

A.   Yes.

Q.   He was also your superior?

A.   Yes.

Q.   In the chain of command, does Brown report to Basinger or --

A.   Brown reports to Basinger, Basinger reports to the commissioner.

Q.   Thank you.  So you, in this e-mail, are running up the flagpole the idea that the chief of the Fire Brigade might be granted permission to be housed, actually, in the -- in the fire station.

A.   That's correct.

Q.   The idea is, it makes sense in terms of reducing response time to fire, correct?

A.   That was the thought behind it.

Q.   Yes.  Toward the end of the e-mail, you make

Page 104

the point, "If we allowed incarcerated individual, Fire Chief Stidham, to live inside the fire department on a full-time basis, the response time to any fire would be increased significantly with the right equipment in hand to extinguish the fire, and evacuate the smoke from the building."  That was your point, right?

A.   That's my statement.  Yes.

Q.   And you say that the response time would be increased.  And you mean the effectiveness of the response would be increased because the time to respond would be reduced?

A.   Correct.  He's already on the fire department.

Q.   What was the outcome of this?

A.   It was denied.

Q.   So where are the firefighters housed?

A.   The vast majority of them are housed in I cellhouse.

Q.   And some are housed elsewhere?

A.   I believe there's one that's in a general housing area.

Q.   And where is their equipment located?

A.   On the main street in the fire department.

Q.   Okay.  And the fire department is actually -- it's kind of remarkable.  It's a -- actually looks like a little fire station inside the prison --

Page 105

A.   Correct.  Yeah.

Q.   -- correct?  And so, that's what you're referring to when you refer to the fire department?

A.   Yes.

Q.   And what the firefighters need to do when a signal is called, is they need to be -- if they're in their housing unit, they need to be released from their locked living quarters, correct?

A.   Correct.

Q.   And that involves whatever's involved in unlocking the cell in I cellhouse, correct?

A.   Yes.  I -- I cellhouse is an honor dorm, so usually the cells are not secured on --

Q.   Okay.

A.   -- as much of a frequent basis as the other areas.  So that's why most of them live there, because they can get out quicker, and -- and they're better quality offenders.  So they qualify for honor dorm housing.

Q.   And then after they are out of I cellhouse, if that's where they live, they need to go to the fire department?

A.   Go to the fire department.

Q.   And that's where they connect to their equipment?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 106

A. Correct.

Q. And if they're not in I cellhouse, if they're in some place that's not in honor dorm, then there's the issue of unlocking the cell.

A. Correct.

Q. Those individuals also report to the fire department to connect with their equipment?

A. All of them eventually, yes, are released from whatever area they're in, depending on the time of day, to report to the fire department to get their turned out gear or equipment, and respond to the scene.

Q. And the trigger for this starting to happen is that the fire alarm goes off and the signal is called?

A. Yes.

Q. If there is a delay, for whatever reason, in the alarm going off and the signal being called, the folks in the Fire Brigade are unaware that there's an issue until after the passage of that delay, when that alarm sounds, correct?

A. Yes. They're notified by staff after the fire -- after the 10-70 or 10-71 is called over the radio for a fire, they're notified by staff that there's a fire in whatever location, and they let them out to respond.

Q. Okay. And then the response follows, as we just talked about it?

Page 107

A. Yes.

Q. And your point in Exhibit 4, in the e-mail that we just talked about, is that that response time could be significantly reduced if some or all of the firemen were in the station as their housing unit, correct?

A. Well, the request was for Fire Chief Stidham to reside in the fire station, but that was the intent, that he could respond faster.

Q. Right. Because he'd be there with his equipment and he'd skip a couple of steps, right?

A. Correct.

Q. Why was this denied?

A. For safety and security.

Q. Okay. So this delayed -- this delayed response is another factor, in terms of the set of factors that require diligence on the part of yourself and staff in making sure a fire is detected as soon as possible; is that fair?

MR. ARNOLD: Objection to form.

THE WITNESS: Do you mind repeating the question?

BY MR. BOWMAN:

Q. I think it probably deserves to be restated. The delay that is inherent in prisoner firefighters'

Page 108

response to a fire because of these circumstances is a factor that contributes to making it all the more important that you and your staff are vigilant in detecting and responding to fires as soon as possible; is that fair?

A. Because this was denied, this request that we're talking about on Exhibit 4, it basically kept things the same way they had always been. So it -- they have to be let out as we just discussed.

Q. Yes. And could you answer my question, please?

A. I really don't know how to answer your question, other than the way I've answered it. I mean, we're always to remain built if -- if that's what you're looking for. So of course.

Q. Right. You're operating within a system in a cellhouse that has got a bunch of built in risk factors that make diligence and on the spotness particularly important for you and your staff, in terms of detecting fire and respond; is that fair?

A. Yes. I would say that's true of any place. Yes.

Q. Okay. I think we should take a pause at this point. Oh, actually, before we do. I -- a couple of questions, so I don't forget. We talked about the cause

Page 109

and origin of the Smith fire at some length, and we'll talk more about it later on. But to be clear, you read reports, right?

A. Yes.

Q. But you are not a fire expert, you can't tell me with authority what's the reason that a fire started, right?

A. That is correct.

Q. That's up to folks with specific knowledge and training, right?

A. That's why we bring in the fire chief and other folks that have that background and training. Yes.

Q. And with respect to a cellhouse on the day of the Smith fire, it is true, is it not, that there were three staff assigned specifically to a cellhouse, correct?

A. I believe there were three staff and a lieutenant.

Q. Right. So that lieutenant has oversight of a cellhouse and then another location as well?

A. Usually, they have two housing units. Yes.

Q. So you've got four people on duty with responsibility for a cellhouse --

A. Yep.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 110

Q.  -- including a lieutenant, right?  I just need your answer.  Yes?

A.  Yes.

MR. BOWMAN:  Okay.  Now let's take a short break, if we could.

THE VIDEOGRAPHER:  We're going off the record. Time is now 12:49 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record for the deposition on Warden Neal.  My name is Steffi.  Today is August 29th, 2025.  And the time is 1:09 p.m.

BY MR. BOWMAN:

MR. BOWMAN:  I'm going to hand you actually next, so I don't forget it.  What I'm going to mark out of order, is Exhibit 6 to your deposition.  This is a collection of text messages, I believe, that we received yesterday from your counsel and they bear Bates number State 00 -- sorry.  I'll start over. State 044740 through 57.

(Exhibit 6 was marked for identification.)

THE REPORTER:  Did we already mark Exhibit 5?

MR. BOWMAN:  I'll get to it.

THE REPORTER:  Oh, I'm sorry.

MR. BOWMAN:  Yeah.  Do you need to see that?

Page 111

MR. ARNOLD:  No.

MR. BOWMAN:  Yeah.

MR. ARNOLD:  We're good.

BY MR. BOWMAN:

Q.  I just -- I -- the question I had for you about this is, could you please look through this document and tell me if any of these text messages are yours?  And if some of them are yours, I'll just ask you to specify which ones are?

A.  Does it start from the back, front, or...

Q.  It doesn't -- I don't know.

A.  You don't know.

Q.  I haven't got a clue.  It doesn't make a lick of sense to me.

A.  So the one at the very bottom on the last page, "Sorry, boss.  Michael Smith."  Giving him the DOC number of this cell location, "Summary coming shortly," is mine.  The next one is Chico -- Dr. Chico.  She was the psychologist -- lead psychologist.  The Christina Reagle is the next couple.  She was the commissioner.

Q.  I don't need to know -- I don't need you to --

A.  You --

Q.  -- I'm just interested in which ones are yours.  That's all I care about.

A.  Okay.  That might have been mine that says,

Page 112

"Yes.  The evening that it happened."  When they're asking if the next of kin had been notified.

Q.  Can you please specify the page number?  The page numbers are up at the top.

A.  At the top it says, "State 044753."

Q.  So the JB is Basinger?  Basinger?

A.  Basinger.  Yes, sir.

Q.  Basinger.  And then the response to him is, "Yes.  The evening that it happened."  That's your message to him indicating when the next of kin were contacted?

A.  I believe so.  I think on 044751, that DK, is Dick Brown.  Oh no, that's Dennis Koen, a lieutenant. I'm sorry.  I think the top one, "Some calls, texts, e-mails from central office staff checking on you.  I hope you're doing okay.  If you need anything, please let me know."  I think that's from me.  That's his response below.  "Thanks for the heads up, boss."  The next one, "You always seem to be in the middle of it, too.  It's okay to talk to therapist Susan, et cetera. We deal with a lot of crap in this line of work. Especially you on the front line.  Hang in there, brother."

I think that was me.  There's a story behind that if you care, buton 044750, it's the same

Page 113

conversation.  He responded, "Always, sir.  I'm actually holding up really well.  And yeah, I'm always in the middle of it, which is weird.  Thank you.  Do you think that we handled the situation well?"  The one with the cell fire, "I personally feel that given the situation, we handled it well."  I believe that next comment, "Yes, absolutely, based on all the video response times, evacuation of the cellhouse, you guys did a good job or a great job."

Q.  That's you?

A.  I believe that's my comment.

Q.  Do you -- is there any way to know when that conversation took place?  I mean, it -- did -- there's not a -- there's a March 3 --

A.  2023, 10:02 p.m.  I -- I would assume that's when it took place.

Q.  But then up above that, there's January 16.  I am going to suggest to you that if you look at Page 49 that precedes this, it may clarify that the conversation between you and Dennis took place on January 16, 2023. If you just look at the top of Page 49, it indicates that this sequence of texts back and forth were on that date.  Does that make sense to you?

A.  I -- I agree.  That's --

Q.  So with that clarification, we can agree that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 114

you said to Dennis on January 16, "Based on all video response times, evacuation of the cellhouse, you guys did a great job."

A. Agreed.

Q. Okay.

A. I think it might be easier to look the other way.

Q. And sorry -- well, before I forget, Dennis is -- his last name is?

A. It's spelled K-O-E-N. It's pronounced Kane.

Q. And what is his position?

A. He's a lieutenant.

Q. And he was one of the responders to this particular fire?

A. He was the assist -- assistant shift supervisor on that day, yes.

Q. Respond -- and he reported to McCann?

A. Yes.

Q. Thank you.

A. The very front Page, 044740, "Still trying to get a hold of people." That's Dr. Chico, I had asked her to bring in mental health staff to walk the ranges and talk to the offenders. "Thanks." Is my reply. She says, "I might need to send my friends home if no one answers. I don't want us to get in trouble, and I had

Page 115

other plans the rest of the weekend." "Sherri reached out to DeAngela as well. But I haven't heard anything from that either." That's me. She then says, "I think people try to disconnect over the weekends. No one will answer so I'll just need to come in. I need to get dressed and drive out there so it might be a little bit." I wrote, "No rush, Doc. Thank you." She says, "I don't want any more negativity thrown at us." I said, "Me either." I think that next page is her and I conversing back and forth. That's 741. 742, I think that's a continuation of the conversation.

Q. Right.

A. "Do we know if this was intentional?" I wrote, "Not sure yet. But believe so." "Okay. I might as well do the paperwork while I'm there." "A short circuit in an electrical device is what they're saying. He had multiple phones, tablets and TVs." "Wow. So it was an accident? Was he a guy who fixed stuff?" "That's what we think. He worked on other's electronics. Homemade power strip was also found along with wiring in the debris." That's our conversation.

Q. So --

THE REPORTER: Can you speak a little louder and clearer, Mr. Neal?

BY MR. BOWMAN:

Page 116

Q. Let me see if I can short-circuit this just a little bit, because I am just trying to get a sense of who's speaking. And what I'm gathering as I listen to you describing this exchange of text messages, is that you had a lengthy text exchange with Dr. Chico on the day of the Smith fire, in which you began by asking her to come in. Or to ask others to come in to assist her from the mental health staff; is that right?

A. That's correct.

Q. And then that conversation continued on and included some discussion as to the suspected cause and origin of the fire, correct?

A. Yeah, that's correct.

Q. And then this conversation with Chico ends at Page 45, and another thread picks up on Page 46?

A. Yeah. That's another thread on Page 46, right.

Q. I'm correct?

A. Yes. My conversation with Chico stops on 45, yes.

Q. And to be clear, the darkened responses, are you the gray, are lighter colored messages are from Dr. Chico?

A. That is correct.

Q. Okay. And then with respect to the thread

Page 117

that picks up on Page 46, is that someone other than you?

A. That's Kevin Orme. It starts at, as I mentioned, Kevin's the director of construction services. He's asking if I need --

Q. I don't need to know what he's asking. I'm just -- my question is, is this between you and Kevin?

A. That's between me and Kevin.

Q. Okay. All right. Got it. And that goes from Page 46 through Page 49, inclusive, right?

A. It stops on 48. And then it's a different conversation beginning on 49.

Q. Thank you. Is the -- and this conversation on 46, 47 and 48, this is on January 14, correct?

A. The conversation with Kevin Orme was January 14th.

Q. And again, the darker text messages are you speaking, the lighter ones are Mr. Orme?

A. That's correct.

Q. Okay. And then if we look at Page 49 --

A. The second part of that, though, Page 47 is a different date. That goes -- in January is when the previous conversation was taking place. The next one is October 24th, 2022.

Q. Two, right. Thank you for clarifying that.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 118

So the conversation on January 14 is just Page 46.

A. Yeah.

Q. And then if we look at Page 48, that's a continuation of the old October conversation it looks like. Is that --

A. That's correct.

Q. Thank you. And then moving ahead to Page 49, that starts the conversation with Mr. Koen that we were talking about earlier?

A. Yes.

Q. Okay. Then if we -- the conversation with Koen carries through Page 52, right?

A. Definitely 3 of 52, I'm asking him to bring in E-squad personnel and it ends in 52.

Q. And then on 53, there is a text exchange on a thread -- on a three-person thread, Basinger and Brown and yourself? And that's where you explained that you notified the next of kin the evening it happened?

A. Correct.

Q. Okay. I -- I don't think we have a date for that one. Do you have any recollection of when that text exchange took place?

A. I -- I have no idea. I would think it would've been right after the fire that we notified the next of kin. It's usually the next day at the latest.

Page 119

Q. Right. Well, your message says the day of, right?

A. Yeah. I mean, it's either the day of or the next day at the latest.

Q. Okay. So as we look through this, I think the answer to my question at the outset would be that all of these are text messages that you had back and forth with various individuals in which the subject of fire came up?

A. Most of them. I mean, I see some in here about cat ownership, so there's different conversations. But most of it's about the fire, yes.

Q. All right. And these are all pulled from your phone?

A. Okay.

Q. I'm asking.

A. I would assume so, yes.

Q. Thank you. You can set that aside. All right. So I wanted to turn now to a discussion with you of the Devine fire that took place on April 17 of 2017. You've gone back and looked at some materials relating to that fire. And has that refreshed your recollection a little bit?

A. A little bit. I reviewed some of that. But as I mentioned earlier, by no means all of it.

Page 120

Q. In your earlier deposition that was taken back in 2020 relating to that fire, you described receiving a call from Captain Dykstra when you were in your residence on the prison grounds in which you were notified of the fact that the fire had taken place or was occurring. You described it as a chaotic phone call, lots of background noise, hard to decipher what was up. But clearly there was an emergency. Is that a fair summary?

A. Yes.

Q. And you have described that after you got that phone call, you went to your office in the prison and set up a command center there?

A. Yes.

Q. Is that your responsibility in the event of a significant emergency in the prison? To go to your office and set up a command center?

A. If it's a significant emergency, yes.

Q. So for example, if there were a murder on the grounds, if there were an escape, if there were any number of -- a riot in one of the cellhouses, any number of untoward circumstances. Your responsibility would be to take charge of the situation from a command center set up in your prison office; is that right?

A. That's usually the case, yes.

Page 121

Q. Is there -- are there exceptions?

A. I mean, there are incidents that happen that are significant that the command centers will not always open. I mean, for example, in this case, a -- a death by fire, that was my choice to go open the command center. Sometimes -- sometimes I'll be asked to open the command center by central office. Most of the time I -- I will open the command center to handle the situation.

Q. And on this particular evening you remained on duty in your office from the time that you were called, at about 10:00 in the evening, all the way through the early morning of the next day?

A. I believe so.

Q. The command center does what?

A. The command center is a place to service the command post to not only my staff inside the facility but also coordinate with the command center at Central Office, Department of Correction. Sometimes their command center is connected with the governor's office or other entities.

Q. So you're receiving information, you're passing along information. You are coordinating responses and could be responses to instructions that you were given or instructions that you've initiated?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 122

A.  That's correct.

Q.  You are the center of operations in the prison?

A.  Yes.

Q.  Now, from that vantage point, it is your responsibility to know as much as you can, as early as you can, about what happened and why?

A.  Yes.  As you might imagine.  And my job is to gather as much details and facts as soon as I possibly can, because I have superiors who also want to be informed.

Q.  Whenever there's a death in a prison facility it's going to go up the chain of command.  And the people you report to are going to be involved and are going to want information?

A.  Yes.  For a case like this, a fire, absolutely.  If it's a death by natural causes, I always report the death, of course and there's reports.  But the command center's not always opened.  You know, that's the difference.

Q.  Okay.  Then subsequent to the incident, there are a series of required investigations when there's a serious fire?

A.  Yes.

Q.  That would include a fire marshal

Page 123

investigation?

A.  Yes.  For a situation like this, you have your internal affairs investigation.  You have -- you have fire marshal.  We always invite the state police to be a part of the investigation.

Q.  And when we say, "a situation like this," we're talking about the Devine fire?  So we're both straight on that.

A.  Devine fire and the Michael Smith fire, yes.

Q.  And I'm going to just focus on the Devine fire for the purpose of --

A.  Okay.

Q.  -- my questions going forward.  And when we shift subjects, I'll be sure and let you know.  But for the minute, that's our topic.  The internal affairs report that was done in the Devine fire was completed on May 1, 2017.  Does that sound about right?

A.  I would have to look at it.

Q.  Let me allow you to do so.

MR. BOWMAN:  This has been marked for identification as Exhibit 5.

(Exhibit 5 was marked for identification.)

THE WITNESS:  So your question, again, was what?

BY MR. BOWMAN:

Page 124

Q.  Well, my question was the date it was completed was May 1st?

A.  Yes.  The date it was completed was May 1st.

Q.  And the author of the report is Charles Whelan?  Yes?

A.  Yes.

Q.  And he was your head of internal affairs at the time?

A.  That is correct.

Q.  Then in addition, there was a fire marshal's report with respect to this fire, right?

A.  Yes.

Q.  And there was an after action review?

A.  Yes.

MR. BOWMAN:  I'm going to mark for identification next as Exhibit 7 to your deposition. A April 24, 2017, document that I believe is a report of the after action review that was performed in relation to the Devine fire.  I'll show this to your Counsel before I hand it to you.  Actually, I've got one for you and we will mark, gave to the witness.

(Exhibit 7 was marked for identification.)

BY MR. BOWMAN:

Q.  Did I describe Exhibit 7 correctly?

Page 125

A.  That's an after action review that was led by ERO, emergency response operators.

Q.  Right.  And who is that?  And what is that?

A.  Richard Curry, it says, Robert on here, which is incorrect.  He's the director of emergency response operations.  So in the DOC, emergency response operations encompasses a SERT Team, which is a special emergency response team, special weapons.  E-squads, SITCON, hostage negotiation and CISM, which is critical incident stress management.  So that all falls under Mr. Curry as the director of ERO for central office.

Q.  Thank you.  And he was in charge leading the after action review meeting?

A.  He was asked to lead this after action, yes.

Q.  So Mr. Whelan's report came first in time, correct?

A.  Correct.

Q.  Looking at Exhibit 5.  And at the end of his report, he -- on Page 9 of the exhibit, he reached the following conclusion, "Cannot find any violations of policy or procedure or misconduct of all staff and offender, firefighters, actions and response before or during the fire emergency."  I read that accurately, right?

A.  Well allow me to correct our last statement.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 126

This after action review was done on April 24th, 2017. The investigation wasn't concluded until May 1st.

Q. Thank you. I appreciate that clarification. I -- and I didn't mean to misstate the records. You're absolutely right. So Whelan completes his report following the after action review?

A. Correct.

Q. Was that by design?

A. I don't think so. No.

Q. Okay. Now, you remember from your depositions -- the two depositions in the Devine litigation, that there was a lot of back and forth and discussion about the fact that a correctional officer responding to shouts from prisoners came to Mr. Devine's cell front but did not have a key with him. Do you remember that whole controversy? And I'm not asking you to comment on it. I just want to ask you if you remember that?

A. I do.

Q. And you remember that some folks on my side of the table were taking the position that that was a bad thing that happened. That if the staffer had showed up with the keys, he would've been able to get Devine's cell open and get him out of the cell before we burned to death. Remember that was the basic proposition in that litigation, right?

Page 127

A. I can see where your side would think that, yes.

Q. Yeah. I am just asking if you recall that that was --

A. I mean, I don't remember them specifically saying that. I mean, I know that I do remember him not showing up with keys and that being an issue, yes.

Q. All right. And there was also some discussion in the Devine litigation about the fact that the majority of the correctional staff assigned to B cellhouse where Devine's fire took place were in the unit office filling out their time sheets at the time of the fire. Remember that that was an issue in the litigation and a point of controversy?

A. I do recall that, yes.

Q. Okay. But -- and Mr. Whelan and folks on his staff conducted a number of interviews that are documented in Exhibit 5 and without meaning to, you know, provoke an argument with you, the interviews confirmed the issues, namely first of all, that an officer by the name of Rodriguez initially came to Devine's cell front without a key. And also, that other staffers who were assigned to B cellhouse were in the unit office at the time of the fire, right?

A. Right.

Page 128

MR. ARNOLD: Objection as to form.

BY MR. BOWMAN:

Q. So and what Whelan decides is that there is not an issue of misconduct or failure of policy or procedure of any kind in terms of the facility's response to the Devine fire, notwithstanding these circumstances? That's basically what the last sentence of Whelan's report says, right?

A. That was his summary of opinion, yes.

Q. And you concur with that?

A. Yes.

Q. Okay. Now, you provided some -- you had some distinct recollections of the after-action review committee's meeting on April 24, 2017, when you testified in your deposition in the Devine case, correct?

A. I would have to review that record. I honestly don't recall.

Q. So specifically, as you sit here now, do you still remember that there was some back and forth between Mr. Curry from the central office and your staff about the manner in which the evacuation of prisoners had been handled during and after the fire?

A. I remember there was some back and forth in regard to that, yes.

Page 129

Q. And there had been a problem in the course of the evacuation, multiple problems, right?

A. Well, the problems from the perspective, Mr. Curry's contention was that he wanted the first responders and the weapons team to stage in the custody hall before they responded to the front of the cellhouse to begin the evacuation, which would've taken even longer to get men out of the cellhouse. That was the major point of contention between my staff and his review. It's always easy to come in in an after-action review and Monday morning quarterback the situation, if you will. But the staff, as I recall, their point of view was that we responded as quickly as we could to the situation. Our intention after the fire was put out was to get the men out of the cellhouse. There was issues --

Q. They said that?

A. -- getting the men out of the cellhouse and that they were upset. There were staff assaulted. They tore up a check point next to B cellhouse. So there -- yes, there were several issues.

Q. It was complicated?

A. And that was the big debate between my staff and Curry. Curry's contention was is if you would've used the weapons team, staged them, had them, you know,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 130

come as a group, that they would have had weapons to control the crowd better than what you guys did.  So that was the point of contention as I recall.

Q.  And Curry's point was, this is the procedure, you should have followed the procedure.  And your staff's position was respectfully, Mr. Curry, you weren't there.  You didn't understand what we were dealing with in order to address the situation.  We concluded that we needed to proceed in a different way. Do you understand?

A.  I would -- I would concur with that, yes.

Q.  And bottom line, you had the back of your staff in this conversation and supported their position?

A.  My staff's intention was to get the men out of the cellhouse as fast as possible to save lives.  So yes, I supported my staff.

Q.  Okay.  And agreed with their position?

A.  You could always do things better, but yes. And they did what they thought was best, yes.

Q.  Okay.  And your testimony in the earlier deposition reflected that this conversation back and forth between Mr. Curry and the folks on your staff got pretty energetic and heated at various points along the way.  Did I misread it or is that what happened?

A.  Oh, I -- I think there were some heated talks

Page 131

during that after-action review, yes.

Q.  In the after-action review, to the best of your recollection, was there any discussion of the fact that Rodriguez had showed up at the Devine fire without the proper key and of the fact that two staff who are the only staff in the unit in addition to Rodriguez were in the unit office, were you in time sheets at the time of this event?  Was there any discussion about that?

A.  Yeah, there was discussion about it, yes.

Q.  Okay.  And did anyone in that meeting pose the question if Rodriguez had had the right key and had been supported by other staff who were on the unit floor, that in that circumstance, Devine's life could have been saved or might have been saved?  Did anybody say this is an issue, let's think about this?

A.  I don't think it specifically came out in that -- in that way.  I don't see it listed as -- as an item of conversation in the after-action debriefing.  I can tell you that obviously there were some folks that I think believes that Rodriguez should have had keys on his possession when he responded to the 500 range.  And yes, if he would've had the keys on his body when he went to look at the fire or commotion, who knows, you know?  I mean --

Q.  It's entirely possible Devine wouldn't be dead

Page 132

today, right?

A.  It's possible.

Q.  So why isn't that addressed in the after-action review?

A.  Like I said, Mr. Curry was leading the after-action review.  Why he felt like that wasn't a point of contention, I don't know.  I mean, I can tell you what I think and -- and guess, but I don't know.

Q.  Who wrote Exhibit 7, the after-action review?

A.  I honestly don't know.

Q.  Not you?

A.  No.

Q.  Did you, Mr. Neal, during this after-action review, pose for discussion the question of whether Devine's life could have and should have been saved if Rodriguez had come to the cell front with the right key?

A.  Like I said, I knew it came up in several conversations after the fact of that was a possibility. I don't recall specifically whether or not I asked that question in the meeting or not.  I -- I don't know.

Q.  Did you consider whether Rodriguez should be if not disciplined, at the very least counseled, that it was an error for him to be responding to a cell front in the event of the disturbance without the ability to open the cell door?

Page 133

A.  You have to look at every side of the -- of the issue.  I can only go by what the investigation revealed and what the findings of the investigation were and, you know, it wasn't cited as dereliction of duty or anything of that nature in the investigation. Therefore, there was no disciplinary action.  I don't remember specifically what Rodriguez said.  I'm sure he probably said something to the effect of, I was trying to get there as soon as I could.  I -- things were hectic.  I was, you know, trying to do my best and I just forgot.  I didn't have the keys on me.  I mean, so I don't remember exactly.

Q.  All right.  The investigative report that Whelan prepared, that's routed to you by procedure, right?

A.  It is, yes.

Q.  And it is a report that you review?

A.  Yes.

Q.  And you review it with care?

A.  Yes.

Q.  And you sign off on it, right?

A.  Well, I review it and I -- yes, I do sign off on it.

Q.  And you have the authority, since Whelan reports to you, to say to Whelan, look, with respect to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 134

your conclusion that nobody did anything wrong whatsoever, I think we need to reconsider that because of this issue with the key.

MR. ARNOLD: Objection to form.

BY MR. BOWMAN:

Q. Do you have that authority?

A. I have the authority, yes, to ask him to look at additional issues or do additional follow-ups or give him my opinion, yes.

Q. And you didn't do that in this case?

A. I did not.

Q. With respect to the filling out of time sheets during duty hours, did that for you or anyone else in the after-action review process present a concern about the ability to respond to this fire when it happened?

A. It -- it was a concern because they were in the office. And then as we obviously looked into it further as to why the staff were in the office, I found out that they were instructed by -- I can't remember whether it was Koen or Dykstra, that they were told to go in the office and do your time sheets now, they've got to be turned in. So the staff were following instructions. In those days, that's how it was done. They had to take a break somewhere, sometimes to do their time sheets.

Page 135

Q. So there are different ways to handle that, right?

A. It has -- it's done a different way today, yes.

Q. All right, and Dykstra or the lieutenant or whoever instructed staff to disappear into the unit office to perform this administrative task during shift hours could have been counseled or instructed that that was not a good idea, right?

A. That was protocol --

MR. ARNOLD: Objection.

THE WITNESS: -- at that time, sir.

BY MR. BOWMAN:

Q. And it's changed now?

A. It has changed now.

Q. Who changed it?

A. The DOC as a whole.

Q. Did you initiate a change of that?

A. Not at that time. It was changed due to various conversations that this was a factor in that we decided to go with electronic timekeeping systems. So that's the way things operate today.

Q. Got it. So that's independent of the response to this file?

A. Yes.

Page 136

Q. Now I ask you a slightly different question. In the after-action review after the Devine fire, did you or anyone else there pose the issue for discussion that, because of the dynamics of fire and the confined nature of prison cells, that it is imperative in responding to a fire that Indiana State Prison staff have the ability to subdue a fire in a cell and remove the prisoner within the cell in an extremely short time frame. Did you guys talk about that issue in those terms?

A. I think we -- we always, as we've talked about it earlier, it's important that we get to the scene as fast as possible to save life. Obviously, that's our duty, that's our intention. Specifically, whether timeframes were discussed at length during this meeting eight years ago, I -- I can't recall. I don't know.

Q. You can't answer my question because you don't remember it is --

A. I don't recall.

Q. Okay. After the Devine fire, did you -- I think I know the answer to some of these questions, but I ask it any anyway. Here it comes again. After the Devine fire in response to that fire, did you change policy and forbid prisoners to place personal locks on their cells?

Page 137

A. That was not changed after the Devine fire.

Q. After the Devine fire, did you take any step to improve the response time of the prisoner fire brigade once a fire signal was called?

A. There's several things we did after -- after the Devine fire, if I can address those. One of the things we did was purchase new equipment.

Q. I'm going to cut you off because I need you to answer my question. I understand that you did certain things. I respect that and -- but in fairness to me, I'm entitled to have my questions answered, okay? My question related to fire brigade response time. After the Devine fire, did you take any step to improve the response time of the fire brigade once a fire was called?

A. There were meetings with staff -- supervisory staff at various meetings, captain's meetings, lieutenant's meetings, sergeant's meetings, department head's meetings to discuss getting offenders released from their cells as quickly as possible to get to the fires. Various meetings took place as that and with that being the topic of the conversation. I'm trying to think. I also talked to the fire department themselves at that time, after the Devine fire, trying to get those guys to move to the same housing unit so they would be

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 138

in the same location so that it would be easier and faster to get them out into a fire quicker.

They refused to do so. Their point was we're together all day long in the fire department and we don't want to live together. I didn't push the issue at the time because I've got a lot invested in those guys. Like I said, they're state certified, Homeland Security certified. They had the certifications. We put a lot of time, investment, and training into them. So at that time, I didn't make them move, but we did have a lot of discussions about getting them released from their cells as soon as possible.

Q. Okay. I appreciate that you had a number of conversations with people and that you undertook to address the issue and that you also raised a particular issue with the prisoner's fire brigade that they declined to follow up on. I've heard you. I get that. Did you do anything, effectuate any change in procedure or policy to reduce the response time for the prisoner fire brigade?

MR. ARNOLD: Objection to form.

THE WITNESS: Other than what I've described, what I've talked about and what I've asked of the fire department, other than updating equipment, no.

BY MR. BOWMAN:

Page 139

Q. Okay. At any -- in response to the Devine fire, did you institute a policy whereby one of the correctional officers assigned to the old Auburn-style cellhouses, including A and B and C and D, would be required to remain when the upper tiers at all times during a particular shift?

A. No. We discussed that during the previous line of questioning with Michael Smith and no, I haven't appointed someone to the four and five.

Q. Did you -- I think you said that after the Devine fire you changed the nature of the property boxes.

A. We changed from the Norix boxes, which were plastic to the steel boxes, yes.

Q. And that's because the steel boxes are less combustible?

A. Yes.

Q. Did you undertake any changes in procedure or policy or practice to limit personal property that prisoners would be allowed to keep inside their cells?

A. I believe that's actually the time that we put in policy, the 4.5 cubic feet of property that's allowed in the cells. We did a, I think, month-long lockdown after that fire and did a property purge of the entire Indiana State Prison to get everyone down to compliance.

Page 140

Shortly after that is when we exchanged out the plastic boxes with the metal boxes. We also put in place task sheets -- training task sheets for staff so that they got some education on fires, firefighting.

Q. We're on the subject of the property.

A. Okay.

Q. Not asking for a general answer. I'm asking question by question, as is my right. So you did the property purge in 2017, correct?

A. I believe so.

Q. Has that happened at any time since 2017?

A. The thing that has happened -- I don't think we've done a lockdown for a month to do a property purge to the extent that we did in 2017. What we are doing is the shakedown of the entire prison once a quarter.

Q. Right. Cell by cell?

A. Yes.

Q. Got it. Did you, after the Devine fire, issue any directive or in any way insist of your staff that the monitors in the officer's station that show the surveillance camera angles, that those monitors be continuously observed if an officer is not out on the range?

A. I can tell you that I had many conversations with director of technology that provided the funding

Page 141

for cameras and our camera systems at the facility to expand cameras throughout the prison. Cameras were put -- I mean, camera monitors were put in every officer's control room so that they could watch cameras. Was there an order put in place where one person always had to be in the control room watching cameras? No.

Q. So is it your testimony that following the Devine fire, the prevalence of surveillance cameras increased?

A. They increased in the -- not only did they increase in number, they increased in quality.

Q. Right. So the images are much sharper or crisper?

A. Yes.

Q. And was this a direct response to the Devine fire, or is this just something that happened in the ordinary course of things?

A. Both. I mean, I -- I think we got some expediency in getting what we asked for after the Devine fire because of the fire, but we had always had an request to upgrade camera surveillance systems.

Q. Because eyes on these old cells is critically important for a number of reasons including to respond to fires, right?

MR. ARNOLD: Objection to form.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 142

THE WITNESS:  Watching the cells and the well-being of the offender population is always a priority, yes.

BY MR. BOWMAN:

Q.  And can we agree that the surveillance cameras are only useful to the extent that they're being used, and the images are being observed by staff?

A.  Obviously, a camera's no good if no one's watching it, agreed, but it's not just the -- the staff in the housing unit that has access to the video as well.

Q.  Okay.  It's particularly valuable to the folks in the housing unit because they're the ones in the position to respond if they see something on the monitor, right?

A.  Well, they're the closest, obviously, to their housing unit.  But if the shift supervisor sees them as incident, if any one of the executive staff or supervisory staff sees a problem that a unit, they're going to make a quick phone call or get on the radio and have staff respond to the scene.  So camera coverage and camera surveillance is an important job for everyone.

Q.  Right.  It's critical for everyone, including the folks in the position to respond, right?

A.  Sure, yes.

Page 143

Q.  Okay.  And -- all right.  In response to the Devine fire, did you make a request that hydrant be installed in each of the old Auburn-style buildings so that there could be a fire hose within the unit?

A.  A request was made through construction services to upgrade the --

Q.  I'm not asking about sprinklers.  I'm asking about the hoses.

A.  Well, I'm trying to answer your question.

Q.  Right.  But we talked about the request you made as to the sprinklers that was denied.  I got that.

A.  It's not about the sprinklers.

Q.  Okay.  Very well.  Sorry for interrupting.  Did you make a request for hoses?

A.  Not hoses.  The request was made for fire hydrants to be upgraded and to be evaluated throughout the Indiana State Prison, which they were.  A lot of new fire hydrants was installed at the Indiana State Prison.  The training through the offender fire brigade was that they had enough hose to get to any location in the prison from the greater hydrants in their locations.

Q.  Did you -- I'm going to ask the question again.  Did you make a request that hydrants and hoses be installed inside, within the four walls of the old Auburn-style living units after the Devine fire?

Page 144

A.  In answer to your question, if I may, inside the four walls, no.  What I asked was the folks that have expertise in fire safety and firefighting to assess the need of fire hydrant location and being able to respond to fires.  And that's what was provided.

MR. BOWMAN:  I am going to hand you next what I'm marking for identification as Exhibit 8 to your deposition.

(Exhibit 8 was marked for identification.)

THE WITNESS:  Okay.

BY MR. BOWMAN:

Q.  Exhibit 8 is a collection of documents bearing Bates numbers State 008460383.  And they all relate to a fire that took place in D cellhouse on May the 8th of 2022.  Take whatever time you need to review that.  I'll be happy to give you a minute before I start asking questions.  I will just say that it gets a little bit repetitive.  These incident reports all start saying the same thing, but take all the time you need to --

A.  I have not reviewed them all, but they all seem to be very similar so --

Q.  Yeah, it gets repetitive, but the one -- and I -- I -- I don't think -- I'm not going to ask you about a lot of detail here.  If you're ready, I'll pose a question to you.

Page 145

A.  Okay.  Go ahead.

Q.  Thank you.  Do you have any recollection of this particular incident?

A.  Not specifically.  I do remember that -- that they believed that Mr. Filzen, I believe it was, was suicidal and had set his bed or mattress on fire and was found sitting there with, you know, wide awake with his bed burning, which caused the injury to his groin as in the various parts of the body as mentioned.  So I -- I vaguely remember that they thought this was a suicide attempt.

Q.  And according to, just to set the stage here, what is described in the reports that are contained within Exhibit 8, is that on this particular day, May 8, 2022, a fire initiated in Mr. Filzen's cell in D cellhouse, correct?

A.  Correct.

Q.  And Filzen is, whether he deliberately set the fire or had some other origin, Filzen is in the cell at the time this fire starts and -- and increases in magnitude, right?

A.  Yes.

Q.  The staff is alerted to the fire in Filzen's cell by shouts and yells coming from other prisoners in D cellhouse who were neighbors to Mr. Filzen, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 146

A.   That's what it appears.  That staff heard yelling from the west side of the cellhouse, yes.

Q.   And staff respond to the prisoners yelling and they get to Filzen's cell and they're able to remove him, but not before he has sustained burns?

A.   Correct.

Q.   And the burns are serious enough that, according to the documents, Filzen eventually has to be airlifted to a burn unit where he is -- where he remained for a period of time.

A.   Correct.

Q.   And while this is all going on, according to the documents you were notified of this situation.

A.   Okay.

Q.   I mean, I'm just saying that's what it says, right?

A.   Okay.  Yes.

Q.   Do you recall that?

A.   No.

Q.   Can we agree that this circumstance is obviously different?  It's not identical, but in certain respects, there are similarities between this Filzen and situation in 2022 and the Devine situation in 2017; can we agree to that?

MR. ARNOLD:  Objection to form.

Page 147

THE WITNESS:  I would agree that you had a fire and a cell in two different areas of the prison started in two entirely different ways.  But beyond that, I'm not sure what you're -- what you're getting at.

BY MR. BOWMAN:

Q.   Well, in both situations, the prisoner is in the cell with the fire, right?

A.   Prisoner is in the cell with the fire.  Difference being we believe Mr. Filzen started the fire and it was part of a suicide attempt.  And obviously, Mr. Devine's was a different scenario.

Q.   Right.  And I mean, don't want to again, provoke an argument, but we talked earlier in this deposition about the reality that whether a fire is set deliberately with an intention to harm property or to harm an individual on the one hand or whether it's the result of an accident as was the case in the Devine fire, the responsibility of you and the prison staff to respond is the same, right?

A.   Yes.

Q.   The object in the Filzen situation, just as in the Devine situation is for you -- is for your staff to get to Mr. Filzen as quickly as possible, put down the fire and extract him from the cell before he is injured

Page 148

or killed, right?

A.   That's the case at every situation with a fire inside of a cell, yes.

Q.   And there in the Filzen situation, nobody died, but this man sustained significant injuries before he could be removed from the situation, right?

A.   Yes.

Q.   Now my question for you is: Does that raise the issue again in 2022 of whether staff are performing that responsibility as effectively as possible?

A.   I think --

MR. ARNOLD:  Objection to form.

THE WITNESS:  I think so.

BY MR. BOWMAN:

Q.   In response to the Filzen fire, did you take any of the measures that we just talked about in relation to the Devine fire?

A.   The difference between the Filzen fire and the Devine fire --

Q.   Could you answer my question first, please?

A.   See you keep cutting me off.  You won't let me explain.

Q.   I --

A.   And you asked for that respect, but you never offer it.  Never.

Page 149

Q.   Well, I have to insist that you answered my questions, and you were -- I could tell by your answer that you're starting on a different path.

A.   It is --

Q.   I'm asking a simple question.  In response to the Filzen fire, did you take any of the steps that we talked about in relation to the Devine fire that you didn't take then?

A.   I'm not sure what you're referring to.

Q.   Specifically in response to the Filzen fire, did you require -- did you put an end to these prisoner locks on the cells?  The padlocks and the chains.

A.   Locking systems have not changed inside the state prison with the exception of they're not permitted in their restricted housing units.

Q.   Okay.

A.   So that doesn't happen in D cellhouse, which is what I was starting to explain.  The other thing about D cellhouse v. A or B, Devine or Michael Smith is there's eight to 12 staff assigned to D cellhouse.  So two to three times as many as there are to general population units, because it's a restrictive housing unit.

Q.   So --

A.   So they're escorted everywhere they go.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 150

Q.   Are you -- are -- in D cellhouse, do you expect that a staff member is on the range at all times?

A.   Yes.  And for the most part, they are.

Q.   Okay.  And in D cellhouse, do you have an expectation that your staff are reviewing security camera footage at all times?

A.   As best they can.  But like I said, we've put enough staff in D cellhouse so that we can keep an officer on every range at all times is our objective.

Q.   And that's imperative given the nature of the population there?

A.   That's how they vote.  Yeah.  I mean, now they have to escort nurses.  They have to escort psych staff. They have to take them to recommend, take them to showers.  So they're always on the move, but due to the number of staff I have in D cellhouse, they're a lot more prevalent on the units, on the ranges than they -- they are in general population units.

Q.   In response to the Filzen fire, did you ask Internal Affairs to become involved and do a report?

A.   I believe so, yes.

Q.   And I can't lay hands on that report.  Did you consider were any recommendations of staff failure addressed in that report, if you know?

A.   To my knowledge, there was no staff failure

Page 151

measured in that report.  My, I think intention at the time, was to find out how the -- the fire started and what was -- what was the mindset.  How did the fire happen and --

Q.   Your focus was on Filzen and what he did that was self-injurious as opposed to focusing in any respect on the response; is that fair?

MR. ARNOLD:  Objection to form.

THE WITNESS:  No, that's not fair.  I mean, the response is -- like I said, is -- is always first and foremost.  And I've just explained, we put two to three times the amount of staff in D for that very purpose because of the population that's in D. I also have a lot of guys in D cellhouse who have mental health issues.  Typically, they're there for protection because they're fearful in general population, because they're in debt, they're being threatened, they've applied for protective custody. There's a variety of reasons the -- the guys are in D.  It's not all behavioral.  So you deal with a lot of mental health issues as well.

BY MR. BOWMAN:

Q.   So in short, the Filzen fire raised no issue, no concern for you with respect to the staff response?

A.   Staff response was quick from everything I

Page 152

recall about the situation.  He had started the fire, to the best of my recollection, for self-injurious reasons. His life was saved.  It's a shame he suffered burns. That --

Q.   But no reason to look further?

A.   Well, I -- again, I mean, I asked for an investigation, so we did look at the cause.  You keep going back to make changes in the prison.  As far as locking systems, we've attempted to change -- to upgrade locking systems in the prison.  That's happened.  We've looked at adding sprinklers inside the prison.  A lot of things have happened that hasn't really come out here yet.  But you know, we seem to be glossing over those facts.

Q.   Mr. Neal, in response to the Filzen fire, it was your judgment that there was no need to consider specific changes in staffing, personnel policy as a result of these injuries --

A.   There --

Q.   -- is that not correct?

A.   -- there was no changes --

MR. ARNOLD:  Objection to form.

THE WITNESS:  -- made as a result of the Filzen fire.

BY MR. BOWMAN:

Page 153

Q.   All right.  So I want to turn now to the Smith fire.  And that's the one we're going to talk about going forward so there's no confusion between us.  So January 14, 2023, was the date of that fire, correct?

A.   Yes.

Q.   That was a very long and busy day for you; is that right?

A.   Yes.

Q.   All right.  The Smith fire occurs at about 11:00 in the morning, and it is well into the midnight hours of January 14 and 15 before you were finished dealing with that situation and then off duty; is that right?

A.   I can say that's accurate, yes.

Q.   You learned about the fire from Captain McCann; am I correct?

A.   I believe so, yes.

Q.   How did that come about?

A.   I believe I got a call from Captain McCann reporting the fire and the incident, what had taken place.

Q.   And when you got that call, you were in your office?

A.   I can't recall, to be honest.  I don't know whether I was in my office.  I don't know whether I was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 154

in march, but I honestly don't know.

Q.   All right.  After you -- at what point in the process were you informed?  Or was the whole thing over when they called you?

A.   It was over.  I mean, he -- staff had responded.  They tried to get him -- I mean, we could go over the report, but it was over.  He was dead.

Q.   So your responsibility was in the aftermath of the fire to address the safety of other prisoners in the A cellhouse?

A.   Right.  I was focused on the safety of other offenders, getting them out, getting them treated, getting mental health on scene.  Yes.

Q.   And your focus was also to obtain information, right?

A.   Always.

Q.   And you were particularly interested in how the fire had started, right?

A.   Always.

Q.   And in addition, you gathered information about what the response had been and how that had gone down, correct?

A.   Correct.  Yeah.

Q.   Did you, in the Michael Smith situation as you had done in Devine, set up a center of communications?

Page 155

A command center in other words.

A.   I'm trying to recall.  I mean, I know I was in my office, so -- after I was notified of the fire, so I would've been coordinating events from my office.  So I -- I would say yes.  I mean --

Q.   What means of communication were you using?

A.   I always have a radio, a desk phone, a cell phone.

Q.   So -- and we looked at some text messages that you generated on that day, right?

A.   Sure.  Yeah.

Q.   As well as text messages, you were also using e-mail to communicate?

A.   Usually, e-mail, yes.

Q.   And then you have your radio as well?

A.   Right.  And cameras.

Q.   And cameras.  And when you say "cameras," what exactly do you mean?

A.   I mean, I have access to cameras, at the camera and the prison in my office.

Q.   Did you, on January 14, review the camera footage of the fire that resulted in Mr. Smith's death?

A.   Yes.

Q.   So you saw everything right away?

A.   Yes.  After the fact.

Page 156

Q.   After the fact, I understand.  It's already gone down, but it's not yet January 15.

A.   Right.

Q.   You're looking at the footage at that point, correct?

A.   Right.

Q.   We've seen a number of e-mails that you authored on that day.  And I'm going to -- let me ask you questions about several.

MR. BOWMAN:  I'm marking for identification as Exhibit 9 to your deposition.

(Exhibit 9 was marked for identification.)

BY MR. BOWMAN:

Q.   It's a string of e-mails that I'm not exactly sure how they work.  Apparently, you were exchanging with someone named Michele Masley relating to this incident.  And I have some questions for you about this exchange.  So can you explain first of all who Bethany Stemmler is?

A.   Bethany --

Q.   Stemmler.

A.   -- Bethany Stemmler is an SPD, a State Personnel Department, employee that is assigned to the Indiana State Department.

Q.   You're going to need to keep your voice up so

Page 157

that --

A.   She's an SPD employee assigned to the Indiana State Prison or was at that time.

Q.   All right.  And you reached out for her, and she was unavailable; is that what's going on here?

A.   I'm trying to piece it together to be honest with you.  It looks like I -- I e-mailed her.  It says, "Critical incident."  Cindy Travis is what's got me confused.  And then I'm e-mailing Curry.  She works from 6:00 to 2:00.  So anytime Tuesday would be fine.  I think that's -- I'm asking for CISM, which is a Critical Incident Stress Management team.  I mentioned her not coming in today and the summary last night, it's in the stream below.  Masley says, "She's stubborn."  I said, "We had another one burn itself up in his cell."  So the best I can put together of this, that I had, I think she must have been involved.  She, being Cindy Travis.  And I was trying to get Critical Incident Stress Management activated to come to the prison to meet with Cindy.

Q.   Okay.  So in other words, this is in exchange with the personnel folks that you initiated in order to get assistance for Cindy Travis, an employee of the Indiana State prison; is that right?

A.   Yes.  I mean, my -- my -- my reaching out to state personnel would've been to get contact numbers for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 158

Cindy.

Q. Okay. And was Cindy affected by the Smith fire in some way?

A. You know, I -- I would say yes, based on this. I -- I -- I don't remember specifically what had happened. It could have been somebody told me she was really struggling, and I was asking for assistance, but it was for her well-being. So yes.

Q. And by way of explanation for your inquiry, as I review this, you explained to another individual in the personnel department, Michele Masley, and I quote, "We just had another one burn himself up inside of his cell, A cellhouse." Correct?

A. That's what it says. Yes.

Q. And what -- when you say "another one," what are you referring to?

A. Well, I'm assuming this would've been the Michael Smith situation.

Q. I'm assuming so, too, because this is -- this e-mail is at 6:21 p.m. on January 14th, 2023, the day of the Smith fire, right?

A. Correct. Yeah.

Q. Yeah. And so, Smith is another one who burned himself up in the -- inside of his cell?

A. Yes, he did.

Page 159

Q. Is this your assessment of basically what happens, Smith burned himself up inside of his cell?

A. Yes, he did.

MR. ARNOLD: Objection to form.

BY MR. BOWMAN:

Q. Is he another one who did that?

A. Yes, he is.

Q. And another one in addition to who?

A. The first one would've been Josh Devine.

Q. And anybody else between Smith and Devine?

A. Not to my knowledge, no.

Q. Okay. All right. Do -- do you wish that you had expressed yourself differently here or are you fine with this?

A. You know, sometimes some people, again, looking at something after the fact, it always looks worse than -- than what you meant it to be. My intention in this conversation was just to explain to Mrs. Masley why Cindy may have been upset, the severity of the incident. So it might sound a little cooler or cruder than it -- it could have been displayed. But you just have to understand your staff and the context of the situation.

Q. So is this gallows humor?

A. Is it what?

Page 160

Q. Gallows humor?

A. Well, yes. I mean, if you knew Michele, you would -- you would get it.

Q. So you were joking with her?

A. I'm not joking. I mean, the facts are the facts. I mean, you know, another man burned himself up inside of his cell, but she would've received it in the appropriate way.

Q. As a joke?

A. It wasn't a joke. Another man burned himself up inside his cell.

Q. So in any event, not a good situation. Cindy Travis needs some help.

A. It was getting assistance. I was getting assistance from the Critical Incident Stress Management team for Cindy Travis, yes.

MR. BOWMAN: Okay. I'm going to suggest we take a short break at this point.

MR. ARNOLD: Yeah.

THE VIDEOGRAPHER: We're off the record. Time is now 2:37 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record for the deposition of Warden Neal. My name is Steffi. Today is August 29th, 2025, and the time is

Page 161

3:07 p.m.

BY MR. BOWMAN:

Q. So I'm going to hand you next what I've marked for your identification as Exhibit 11 to your deposition. I want your counsel to see it first. Oh, I'm sorry. I answered the wrong -- that's the wrong one. I'm all messed up.

MR. BOWMAN: Taking back Exhibit 11, and I'm going to hand to your lawyer what I've marked for identification is as Exhibit 10 to your deposition.

(Exhibit 10 was marked for identification.)

BY MR. BOWMAN:

Q. Take a minute to review the e-mail, if you could, and I'll have questions for you. While you are reviewing it, I should say for the record that Exhibit 10 is an e-mail from you to Mr. Brown, Mr. Basinger and Mr. Orme that was sent apparently on January 14th, 2023, at about 7:13 p.m., and it's from you.

A. Okay.

Q. I correctly described this document, correct?

A. Correct.

Q. This appears to me, and you tell me if I have this right, to be your formal communication to your superiors in Indiana, in Indianapolis, as to the Smith

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 162

fire and the circumstances; is that correct?

A.   That's an initial summary that I sent to them of the incident of what I knew at that time.

Q.   Yeah.  Is this your first summary to your superiors in writing?

A.   I believe so.  I think there may have been a couple of e-mails prior to this about specific pieces of it.  I think this is probably the first attempt at a summary.  But it's even listed here that at this point, he's still gathering information and didn't have any details.  So we were still in the fact finding mode for sure.

Q.   And you say in the first sentence that you had received a call from Captain McCann at about 11:15; that was shortly after the fire, correct?

A.   Correct.

Q.   And McCann reported to you that Mr. Smith, who was assigned to a cellhouse, cell number 252 North had, quote, "Set a fire inside of his cell and was deceased." That's what you've written.

A.   That's what I wrote.

Q.   Now, McCann's information ends up being incorrect, right?

MR. ARNOLD:  Objection to form.

THE WITNESS:  Incorrect.  In that after the

Page 163

investigation came out, and we realized that he was using a grinding wheel and sparks likely -- likely set his sheet on fire, would be, I think the discerning differences between this comment and what we later found out.

BY MR. BOWMAN:

Q.   Right.  So the -- this was not a set fire, this was an accidental fire, correct?

A.   As we established earlier, I think this was an accidental fire.  Yeah.

Q.   Right.  So I'm going to hand you in a minute after your counsel looks at it, a copy of another e-mail.

MR. BOWMAN:  This is marked for identification as Exhibit 11 to your deposition.

(Exhibit 11 was marked for identification.)

BY MR. BOWMAN:

Q.   And this is collection of e-mails from some earlier in the day and some later in the day on January 14th.  You now have Exhibit 11 in front of you.  And the first question is whether I accurately describe the document?

A.   This is an e-mail from myself to Kevin Orme. It says, "A very brief summary regarding Smith."

Q.   And I want to focus your attention on the

Page 164

e-mail that you had received at 3:10 p.m. on January 14 from Mr. Lessner.  And Lessner is your Internal Affairs guy, right?

A.   Yes.

Q.   He, Lessner, has been in communication with the Michigan City Fire Marshal, Indiana State Police and state fire marshal along with his own investigative staff, right?

A.   He was on scene with the investigators, yes.

Q.   And he reports to you at 3:18 p.m., "Preliminary indication is that the fire was started by a short circuit in an electrical device," correct.

A.   Yeah.  "Preliminary indication is that the fire started by a short circuit and that electrical device." That's what it says.  Yeah.

Q.   Right.  And then your response to Mr. Lessner is to make an inquiry as to whether he had a homemade strip in his cell with multi plugs, right?

A.   That's correct.

Q.   You said you essentially asked Lessner to go check and see if that was the case?  Yes?

A.   Yeah.  I asked him if there was any homemade multi plugins in the cell.

Q.   Okay.  So that would indicate that some -- first of all, that Smith had had stuff in his cell that

Page 165

he wasn't supposed to have, right?

A.   Yes.  There were several electronic items in his cell that he was not supposed to have.

Q.   And it would also -- every indication was that this was an accidental fire based on the information that you learned on that same day at 3:00 in the afternoon?

A.   Right.  I -- I mean, it -- that's the initial appearance, yes.

Q.   Okay.  So why did you pass along to the bosses at 7:00 that night that this was a set fire?

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  Like I said, there's a lot of information coming in from different sources.  The investigation is still playing out.  The investigation itself wasn't concluded until long after.  So yeah, you -- I know throughout the day I got various stories from various people, and information was still being gathered.

BY MR. BOWMAN:

Q.   Sure.  I mean, nobody should be jumping to any conclusions about what happened here until the matter has been fully investigated, right?

A.   Well, that's why we go through everything.  We go through with a, you know, an after action review, a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 166

formal investigation, all the outside entities. I mean, but --

Q.   My question is: No one should be jumping to any conclusions about how this fire had started until there's been an investigation and results have been reached. Is that a fair statement?

MR. ARNOLD: Objection. Form.

THE WITNESS: I mean, I get your point, but a lot of times you're pressed for thoughts, answers. I mean, and at this point in time, I mean, when I sent the e-mail to them that evening, I simply didn't have all the information.

BY MR. BOWMAN:

Q.   Well, you had preliminary indications from your guy on staff responsible for conducting the investigation, right? That you had received at 3:00?

A.   I had what he wrote. The initial preliminary indication. Yes.

Q.   Right. And it was an informed indication in as much as Lessner had been at the scene of the fire with the fire experts, right?

A.   That was his opinion at that time.

Q.   And it was the opinion that he reported to you that he had been given by the fire marshals who were the experts in investigating fires?

Page 167

MR. ARNOLD: Objection. Form.

BY MR. BOWMAN:

Q.   Wouldn't you assume that to be the case?

A.   I think sometimes, knowing my staff, they write what they think. I mean, I don't know what they shared with Bill. I don't know what he knew. I knew it was still being investigated, so I didn't take this as this is it, this is the cause.

Q.   Okay. So you had different information from different people. McCann is telling you this was a deliberately set fire, right? But McCann, if we're being honest, has no idea at all, that's just an assumption that he jumped to, right?

MR. ARNOLD: Objection to form.

THE WITNESS: That's his opinion.

BY MR. BOWMAN:

Q.   It was a conclusion that he jumped to without information; is that not correct?

MR. ARNOLD: Objection.

THE WITNESS: That's what he reported.

BY MR. BOWMAN:

Q.   I asked you, I -- it's clearly what he reported. I asked you a different question. It -- can you answer my question?

A.   I mean, you're asking me if he jumped to

Page 168

conclusions. I don't know his state of mind. I don't know what he thought at the time. I don't know if he felt he had the answer. I don't know.

Q.   Well, you do know that he's not an expert in fire investigation, right?

A.   Neither is Lessner for that matter.

Q.   But Lessner is with the fire marshal, right?

A.   Well, that doesn't mean that the fire marshals have shared everything with him at this point. I mean, I don't know what he knows.

Q.   I think at this point, we're arguing with each other. But to be clear, and to answer my question, you knew that McCann was not an expert in investigating fires, right? That's just a yes or no question.

A.   I know he's not an expert. Right.

Q.   Right. And you also knew that whatever expertise, or lack of expertise McCann had, you knew that when he called you at 11:15, he had not done anything to investigate this fire, right?

MR. ARNOLD: Objection.

BY MR. BOWMAN:

Q.   How could he have?

A.   I -- I have no idea what McCann done up until that point in time.

Q.   All right.

Page 169

MR. BOWMAN: The next document that I'm going to hand you will be marked for identification as Exhibit 12 to your deposition. It's also an e-mail string involving yourself, Mr. Lessner and others.

(Exhibit 12 was marked for identification.)

BY MR. BOWMAN:

Q.   And I should add, as you take a minute to look over Exhibit 12, that at the top of the Exhibit 12 is an e-mail from you to Mr. Lessner that went out on January 14th, 2023, at 10:38 p.m. Let me know when you're ready to have me ask you some questions about this document.

A.   All set.

Q.   Yeah. So this is the same e-mail chain that we were looking at in the prior exhibit, except there's an additional communication at the top of it. Doesn't it appear that way to you?

A.   Correct.

Q.   Now, the information that you have about the fire from Mr. Lessner includes that there was a lot of stuff in Mr. Smith's cell that should not have been allowed to be in the cell, right?

A.   He had a lot of contraband in his cell. Yes.

Q.   Specifically, he had two cell phones, yes?

A.   Yes.

Q.   He had approximately four computer tablets,



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 170

right?

A. Along with four TVs.

Q. And he had four TVs, right?

A. Correct.

Q. And miscellaneous wiring, right?

A. That's what it says. Yes, sir.

Q. And that doesn't -- and that's according to Lessner's report that we were talking about a few minutes ago, correct?

A. Correct.

Q. And that does not even include everything, right?

A. That's not the total of what was found, correct.

Q. Right. There was a -- some kind of a grinding wheel that it was suspected might have produced a spark that started the fire, right?

A. Along with the motor and the light fixture and yeah, correct.

Q. Yeah. And also -- it turned out that your inquiry about a homemade multi plugin was also spot on, right?

A. Correct.

Q. He had that, too. Now, this raised a concern for you, had it not, about how it had come to be that

Page 171

this prisoner had so much stuff in his cell that he wasn't supposed to have, right?

A. Well, yeah. Of course it's a concern. I mean, I assumed, I -- I -- I thought I knew what he was doing and where the guy was came from.

Q. Well, what he was doing apparently was he was Mr. Fix-it for A cellhouse. If a prisoner had a problem with some electronics, go to Smith, he's the guy who can fix things.

A. Yeah. He seemed to be the dump site for everybody that wanted him to repair their electronics, or a lot of times, they'll try to jailbreak the tablets. They'll try to cut pieces out of a TV or a tablet to make a hiding spot for a cell phone. And apparently Mr. Smith was that guy.

Q. Okay. So we were talking before about the four and a half cubic feet.

A. Correct.

Q. And you made the point that certain things don't readily fit inside the property locks, right?

A. Correct.

Q. And one of the things that you listed was the TV, right?

A. Correct.

Q. This guy's got four TVs, right?

Page 172

A. And much more.

Q. And much more. So did this raise for you as the supervisor of the facility and the guy at -- where the buck stops, did this raise for you the question of how has it come to be that Mr. Smith has all this unauthorized property in his cell?

A. I mean, sir, like I said, I assumed I knew how that stuff came to be in his cell from other offenders.

Q. That's -- you're misunderstanding my question.

A. Fair enough.

Q. Let -- let me ask it in a better way. Did this raise for you a concern about how your staff in A cellhouse had allowed Mr. Smith to possess so much visible contraband in his cell without being reprimanded or otherwise told not to have it?

MR. ARNOLD: Objection to form.

THE WITNESS: It is a concern. And you hope that staff see the additional contraband in cells when they're doing security checks or counts or for whatever reason they're walking the ranges. And as we said earlier, that my hope is that they make note of those cells and go back to them so they can be shaken down and the excess property purged. Any given day you can -- I can walk the prison and find guys who are running stores have excess property,

Page 173

commissary. You name it, NSL. And I mean, it's not uncommon in a prison.

BY MR. BOWMAN:

Q. Right. I mean, we were talking about that before and that's why we were -- I was asking you the question. This rule about the limitations on personal property in the cell is as a practical matter honored in the breach, right?

MR. ARNOLD: Objection to form.

THE WITNESS: Again, sometimes you -- you would hope they would be more aggressive in dealing with those things when they find them. But sometimes they -- they have to wait or they overlook it.

BY MR. BOWMAN:

Q. And apparently in Mr. Smith's case it was overlooked?

A. Yeah. I don't know whether they were under a pillow, under a blanket. I don't know whether the items were hidden. I don't know whether they were in plain view until the fire burned everything up. I just don't know, you know?

Q. Right. Who knows? But it's certainly a question worth asking.

A. Sure. Yes.

Q. And eventually you did ask it --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 174

A.   Yeah.

Q.   -- right?  And we'll get to that.  Now, the other thing that is reflected on this e-mail chain is that you are asking Mr. Lessner to pay attention to the report that's going to need to be written with respect to this particular incident, right?

A.   Yes.

Q.   And in your 10:38 e-mail to Bill Lessner, you write, "We are going to need a detailed report of who was working in the unit."  I think you -- the -- it's a typo that you meant to say where they were at when the fire started, right?

A.   Where were they at when the fire started is the complete -- okay.

Q.   Right.  And so just a little glitch that the computer sometimes makes, right?  Where were they at when the fire started needed to be inquired into, right?

A.   Okay.

Q.   And -- and you say at the end of your message, timelines will be important, right?

A.   Of course.

Q.   And we've been talking about that in this deposition because of the reality that given the dynamics of fire, the circumstances of a prisoner confined in a cell in these old cellhouses, the timeline

Page 175

of the response is the key factor as to whether the individual is saved or perishes in the fire once the fire gets started, right?

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  Correct.  I think that the -- the sooner they get there, obviously the better chances they have to get someone out alive.  So yes, timelines is important.  I think what I was also referring to in timelines was where were the staff?  Did they respond in a timely manner?  What were they doing?  I wanted more detail, and I knew Bill knew what I -- what I was looking for.

BY MR. BOWMAN:

Q.   What you had in mind, because we -- you want your staff to have eyes on the situation, ideally at all times.  And we talked about that, right?  So the question from Mr. Lessner was to investigate were folks, where they were supposed to be, and were they responding in an appropriate way within the timeline that was required?

A.   Did they respond timely, absolutely.

Q.   All right.  And that's what you tasked Mr. Lessner with figuring out, yes?

A.   Yes.

MR. BOWMAN:  Exhibit 13 to your deposition will

Page 176

be the report of investigation that was prepared in relation to the Smith fire.  This is the Haskell report from March 7th, 2023, that we've used as an exhibit in a number of depositions already.

(Exhibit 13 was marked for identification.)

MR. BOWMAN:  Do you need to see this?

BY MR. BOWMAN:

Q.   I assume, Mr. Neal, that this is one of the documents that you looked over to prepare to testify today?

A.   It is, yes.

Q.   So the report is prepared by Larry Haskell, who works under the supervision or worked under the supervision of Mr. Lessner back in 2023, correct?

A.   Correct.

Q.   And it reflects the interviews that are conducted of the staff who were on duty in A cellhouse, right?

A.   Yes.

Q.   As well as the findings of the Michigan City Fire Department, right?

A.   Michigan City Fire Chief statement, yes.

Q.   I'm sorry.  The fire chief.  Thank you.  And then the autopsy finding use as well?

A.   That's correct.

Page 177

Q.   Bottom line, according to Mr. Haskell, this is an accidental death, and that's what he has to say about that.  And the report goes along to you for review, yes?

A.   That's what it says, yes.

Q.   Now, the request that you made for timeline information is honored on the first page of Exhibit 13, right?

A.   They tried to be very specific, yes.

Q.   The investigators went back, looked at the camera footage, determined what was visible on the camera, recorded the information as well as the times so that the timeline would be accurately reflected in their report; is that right?

A.   Correct.

Q.   And you've also looked at the camera footage yourself?

A.   That is correct.

Q.   And you were confident that the timeline that is reflected in Exhibit 13 on the first page of the document accurately describes what's visible on the camera at these various points in time, right?

A.   I believe so.

Q.   And the investigators discover that as of 10:58 a.m., flames are spreading out and upwards out of the cell.  That's what's recorded here, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 178

A.    That's correct.

Q.    That is the same time at which two correctional officers, Cross and Crockett, arrive at the cell with a water fire extinguisher, correct?

A.    That's correct.

Q.    And then they also report that as of 10:53 a.m., there are visible flickers of flame in the cell, correct?

A.    Correct.

Q.    And so, there is a five-minute interval between 10:53, the visible flickers of flame in the cell, and 10:58 when the -- the responders arrive, the first responders, correct?  Five-minute window?

A.    From the time that after reviewing the camera, they can see flick -- flickers in the cell at 10:53. Yes.

Q.    That's accurate, right?

A.    Reviewing the video, yes, that's accurate.

Q.    So -- okay.  And at the point, I mean, the reality here is that first of all, they arrive at the cell with a water fire extinguisher, right?

A.    That's what was reported, yes.

Q.    And that, obviously, is the incorrect tool for the job, right?

A.    Well, they grabbed a first fire extinguisher.

Page 179

I'm sure that they came to and ran to the cell, not knowing the type of fire, the extended fire, that it did not put the fire out.

Q.    As in -- I mean, they weren't intending to bring the wrong tool to the job, but as it happened, it was the wrong tool for the job, right?

A.    Well, yeah, you could say that, I mean.

Q.    And then they -- one of these guys needs to go back and get the chemical fire extinguisher at which point they can start to knock this fire down, right?

A.    A minute later it was followed with the ABC fire extinguisher, yes.

Q.    And the reality is that under the circumstances, they're there too late and unable to say that?

A.    Yeah.  It's always tragic.  And, you know, like I said in earlier e-mails and comments, they -- they came very close to saving his life in this case.  I think, you know, looking at it a different way, this is looking at video after the fact, when we talk about 10:53 flickers of flame in the cell, you know, but I think if we looked at when did the smoke alarm go off, I believe then you would find that the response time was more like two and a half minutes before you see staff in front of the cell with the initial fire extinguisher.

Page 180

So response time was very quick.  I mean, yeah.  Do I wish they would've taken both or brought the ABC instead of the water, of course, you know?

Q.    So the response is initiated because the alarm is activated, right?

A.    Well, I believe that's what happened in this case.

Q.    I believe that's what happened in this case. And that's why I'm asking you to confirm that that's right.  Yes?

A.    Yes.  I believe that's right.

Q.    And unfortunately, no one observed that there was a fire in progress until the fire had progressed to the point where smoke from the fire activated the smoke alarms on the -- above the fifth tier of the unit, right?

MR. ARNOLD:  Objection to the form.

THE WITNESS:  The fire alarm is what activated the staff response.  They did not see it before that, I would agree.

BY MR. BOWMAN:

Q.    Right.  So when you're doing a timeline, would that be an appropriate question to address why did no one see this fire prior to the activation of the smoke alarm?

Page 181

A.    You know, looking back, sure.  It -- it could be an appropriate question to ask, I mean, but

Q.    Did you ever ask that question?

A.    Why they didn't see it?  I -- I don't remember whether it came up or not, to be honest with you.

Q.    In Exhibit 13, the investigative report, there is no finding as to whether there was staff misconduct or deviation from policy, correct?

A.    Yes, that's correct.

Q.    When you -- you reviewed this report, I'm assuming after it was routed to you?

A.    Yes.

Q.    That was your responsibility to review it and sign off on it, correct?

A.    Yep.

Q.    Did you raise with Mr. Lessner or Mr. Haskell, look, this report is insufficient because you guys haven't made a finding as to whether there was any staff performance issue in the response to this file?

A.    Not at that time, because they were waiting on other reports to come in from the state fire marshal's office, you know, state police and those other entities to cross reference with their reports, so

Q.    Well, I mean, to be clear, the fire marshal has made findings that are preferred to in -- in this --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 182

in this report, right?  Bottom of Page 2, top of Page 3.

A.   This is the Michigan City fire chief statement.  This is not the State Fire Marshal's office.

Q.   I see.  So the State Fire Marshal is not responsible for supervising your folks, right?

A.   No, but he is the expert on scene when it comes to fire investigation.

Q.   He's not evaluating whether your staff adhered to policy or not, that's your job, right?

A.   Well, of course he's not evaluating my staff, he's evaluating the fire.

MR. BOWMAN:  I'm going to hand you back, so what I'm marking for identification as Exhibit 14 to your deposition.

(Exhibit 14 was marked for identification.)

BY MR. BOWMAN:

Q.   So Exhibit 14 is an e-mail that you forwarded to Mr. Brown and Mr. Basinger and Mr. Warren at 11:30 p.m. on January 14th, right?

A.   Correct.

Q.   And is you -- is this you correcting the inaccurate information that you had provided earlier in the evening?

MR. ARNOLD:  Objection to form.

THE WITNESS:  Note the second INI report below

Page 183

from the investigator for Larry Haskell.  Found it clear --

BY MR. BOWMAN:

Q.   If you could read it silently to yourself, please.

A.   Sure.  To answer your question, this is an updated report from Larry Haskell that I forwarded to them as the second report from INI, but I don't see where it corrected anything from previously.

Q.   Well, it states, Mr. Haskell states that the fire marshal who was going through the cell was able to find a partial homemade power strip that is in the investigator's possession.  And also, more electronic parts were found that could have been the cause of the fire, correct?

A.   Could have been, yes.

Q.   Could have been.  So this is at least updated information from what you passed along stating that it was a deliberately set fire, right?

MR. ARNOLD:  Objection to form.

THE WITNESS:  It's the latest information received from Internal Affairs, yes.

MR. BOWMAN:  Right.  Next, I'm going to hand to you another e-mail string that will be marked for identification as Exhibit 15 to your deposition.

Page 184

(Exhibit 15 was marked for identification.)

BY MR. BOWMAN:

Q.   Exhibit 15 is a series of e-mails that span the evening of January 14 into the -- the morning hours of Sunday, January 15.  E-mails between you and members of your staff, as I understand it.

A.   To clarify the last statement, if I may.  My initial report to my superiors was -- didn't say anything about it deliberately set a fire.  It said that Michael Smith, 8252 North, had set a fire inside of his cell and was deceased.  How that fire started, we didn't know at that time.  So again --

Q.   But you learned he didn't set the fire, right?

A.   Yeah.  We later learned we thought it was accident, but

Q.   Why don't you have a look at Exhibit 15, let me know when you're ready to answer questions or not.

A.   Okay.

Q.   Okay.  So in follow-up to the information that you obtained from the investigators that Mr. Smith's cell had a large amount of electronics inside of it, you made a request for further information, correct?

A.   I did, yes.

Q.   And specifically, on January 14 at about 4:50, you sent a note to Mr. Adam Bootz, correct?

Page 185

A.   Adam Bootz is a captain, yes.

Q.   And he's a custody guy?

A.   Yes.

Q.   And what you said to Mr. Bootz was, I need to know the last time his cell was shaken down.  If one of you could check and advise, I would appreciate it, right?

A.   Correct.

Q.   His referring to Michael Smith's cell?

A.   Correct.

Q.   So as we were discussing the issue in your mind on January 14 was how on earth does this man have all this stuff in this cell, right?

A.   Sure.  Yeah.

Q.   And so, the -- therefore your question is, when is the last time that somebody went in and did something about this guy's person property, right?

A.   When was his cell last shaken down, yes.

Q.   Okay.  And then Mr. Bootz reports back to you in the morning of the 15th, correct?

A.   Yes.

Q.   And I'll read his response into the record.  He says, "I checked the ops tracker."  The ops tracker I'm assuming is short for operations?

A.   Yeah.  It's an operations tracker, yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 186

Q.   Okay.  "I checked the operations tracker I used to keep track of the operations shakedowns, and his cell is not listed.  I'll check the actual ops sheets, but I have no record.  Since I started keeping records around September last year, that's given he has not moved recently because my sheet is -- just list cells, not names."  So in other words, he's saying that according to records in the institution and contrary to your policy and expectations, Mr. Smith's cell was not shaken down in the past quarter?

MR. ARNOLD:  Objection to form.

BY MR. BOWMAN:

Q.   Correct?

A.   That appears to be what he's reporting, yes.

Q.   Okay.  I'm assuming this displeased you?

A.   Yeah.  I'm not happy when they miss shakedowns, neither are my superiors.

Q.   So what did you --

A.   The one thing he says here is that he wasn't sure if he was listed.  How did he put it?  I'll check the actual op sheets, but I have no records since I started keeping records around September.  That's given. He was not moved recently because my chief just list cells and names.  So he's unsure if it was because if he had changed out locations, which off the top of my head

Page 187

today, I don't know if he had moved him or not, but

Q.   Well, it was going to be my next question. After you got this inconclusive report back, that was not satisfactory, what did you do to follow-up and get the answer?

MR. ARNOLD:  Objection to form.

THE WITNESS:  I mean, that probably is as definitive as we can -- I mean, they may have very well missed his cell in the last quarterly shakedown.  I think the thing to point out here is the things that were found in his cell, the four tablets, TV, cell phones, all those items mentioned in the report could be put in his cell in a single day.  I mean, it doesn't take that long to gather items.

BY MR. BOWMAN:

Q.   Yeah.  But the reality is that -- that's not what happened, right?

MR. ARNOLD:  Objection to form.

THE WITNESS:  I have no idea when he got those items in his cell.

BY MR. BOWMAN:

Q.   Well, you learned that Mr. Smith was quote, unquote, "The fix-it-man in A cellhouse for electronics," right?

Page 188

A.   He was, indeed, that was his reputation.  But when and how many items he got in his cell, who knows? We have no way of knowing.

Q.   And that's not a good thing, right?

A.   Excuse me?

Q.   It's not a good thing that he's the fix-it-man and you have no idea what he's got in his cell and what he's doing and what he's doing, right?

MR. ARNOLD:  Objection to form.

BY MR. BOWMAN:

Q.   Right?

A.   There's no way I, sir, I -- that I know what's in any offender cell at all times of -- of day, any given day, I mean.

Q.   That's why you've got staff, right?

A.   Well, of course, I mean.

Q.   Your expectation is that your staff will discharge the responsibility of controlling the property in individual offender cells, right?

A.   That's true.

MR. ARNOLD:  Objection to form.

BY MR. BOWMAN:

Q.   And what you were seeing in the Smith incident is that that was not happening as far as Smith was concerned, right?

Page 189

A.   It appears that -- that they missed his cell and the quarterly shakedown, yes.

Q.   And the reality is that if there had been control over Mr. Smith's property in his cell, this particular accident would not have happened, right?

MR. ARNOLD:  Objection to form.

THE WITNESS:  No.  I would not agree with that.

MR. BOWMAN:  Okay.  So you now have Exhibit 16 in front of you after your counsel's examination of it.

(Exhibit 16 was marked for identification.)

BY MR. BOWMAN:

Q.   And you'll confirm for me that you did learn and pass along to your investigative team and custody team that Smith was the fix-it-man in A cellhouse for electronics, right?

A.   Yeah.  This appeared -- appears to have come from Dr. Chico reporting that other offenders were telling her during her rounds that Mr. Smith was the fix-it-man.  Yeah, correct.

Q.   Now on January 14 at 6:47 p.m., and this is in -- within Exhibit 16, you sent an e-mail to Mr. Brown and Mr. Basinger and Mr. Orme in the central office, right?

A.   Which exhibit are we talking about?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 190

Q.   The one in front of you, Exhibit 16.

A.   This is from me to Lessner, Burke, Bootz.

Q.   No, down here.

A.   Later -- okay.  I see.

Q.   Sorry.  Down -- down -- down below.

A.   Okay.  Yeah.  Later I sent an e-mail at 6:47 p.m. to Mr. Brown, Mr. Basinger and Mr. Orme.

Q.   Right.  Yeah.  I'm going to read this e-mail into the record.  You say you address it all.  And then you write, "Attached is a photo of incarcerated individual Michael Smith, 48 years of age that passed away earlier today.  I also attached some incident reports, conduct reports, et cetera, showing that Smith has been caught with weapons, had a history with drugs, liked to mess around with electronics, et cetera.  As you will see in the photos and reports of contraband previously found in his cell."  That is an accurate reading of what you wrote to your superiors, right?

A.   That is accurate.

Q.   Now, what is the point of casting shade on Mr. Smith?

MR. ARNOLD:  Objection to form.

THE WITNESS:  Just the point the fact out that he had a history of not only doing this type of thing before, altering electronic devices or fixing

Page 191

electronic devices, but that he also had a drug history as well as a history with weapons.

BY MR. BOWMAN:

Q.   And you thought it was important for everybody to know that Mr. Smith was a bad guy?

MR. ARNOLD:  Objection to form.

THE WITNESS:  It has nothing to do with that.  It's the facts that are within his packet and the conduct history that he has.

BY MR. BOWMAN:

Q.   Yeah.  It has nothing to do with this fire, right?

MR. ARNOLD:  Objection to form.

THE WITNESS:  It's his conduct history.

BY MR. BOWMAN:

Q.   Yes.  So why are you concerned with the negative reports on Smith at this particular point in the process?

A.   Because my superiors want to know about the individual that died in the fire.

Q.   That he's a bad guy?

MR. ARNOLD:  Objection of form.

THE WITNESS:  They're all bad.  They -- they're all -- they all have histories.

BY MR. BOWMAN:

Page 192

Q.   They're all bad guys.

A.   They're all one of the routine things we report are conduct histories.

Q.   Okay.  And why do they want to know this?

A.   Because it gives insight --

MR. ARNOLD:  Objection to form.

THE WITNESS:  -- into their behavior, the type of offender that they are.

BY MR. BOWMAN:

Q.   And why -- I mean, Mr. Smith is dead at this point, right?

A.   Yes.

Q.   Why do they need insight into his behavior?

MR. ARNOLD:  Objection to form.

THE WITNESS:  It just tells you his history.

BY MR. BOWMAN:

Q.   Any other reason?

A.   I mean, it -- it tells you that he has done this type of thing before.

MR. BOWMAN:  I'm going to hand you next what I'm marking for identification as Exhibit 17 to your deposition.

(Exhibit 17 was marked for identification.)

BY MR. BOWMAN:

Q.   Exhibit 17 is another e-mail chain.

Page 193

A.   Okay.

Q.   This is between you and Mr. Basinger.  And this is on -- this exchange is on January 18 and January 19, so several days after the fire?

A.   Okay.

Q.   Okay.  So Lessner writes you a note saying, "During the investigation of the cell fire by State Police, State Fire Marshal, or Michigan City Fire Marshal, no mention of excessive property in the cell was said."  Do you have any understanding as to why Lessner is providing that information to you?

A.   I think Lessner is trying to find out that this was not a cell that was filled up with excess clothes and property, and that kind of thing, which has been the case in other fires.

Q.   And then you take it upon yourself to forward this information to Mr. Basinger?

A.   Sure.

Q.   And this covers you, was that the idea?

A.   Has nothing --

MR. ARNOLD:  Objection to form.

THE WITNESS:  Has nothing to do with covering me.  I mean, I -- as the appointing authority of the warden in the facility, I'm responsible for everything. There is no cover.  I'm reporting the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 194

facts as they're being shared with me.

BY MR. BOWMAN:

Q.   Well --

A.   He's my superior.

Q.   Right.  And --

A.   That's all it's about.

Q.   And you're giving him the assurance that he's not going to see anything in any of these reports to the effect that the guy had too much property in the cell?

A.   It's very obvious --

MR. ARNOLD:  Objection to form.

THE WITNESS:  -- what I'm sharing, I'm sharing what Mr. Lessner shared with me.

BY MR. BOWMAN:

Q.   To what end, sir?

A.   Exactly what he says.  "During the investigation of the cell fire by State Police, State Fire Marshal, and Michigan City Fire Marshal, no mention of excessive property in the cell was said."

Q.   Okay.  So that's good news, and you're passing it up the chain, fair summary?

MR. ARNOLD:  Objection to form.

THE WITNESS:  It's factual news that I'm passing up the chain.

MR. BOWMAN:  Okay.  Next I'm going to mark for

Page 195

identification another e-mail.

(Exhibit 18 was marked for identification.)

BY MR. BOWMAN:

Q.   This one from you to Mr. Brown does not have a date on it, but I believe from context that it is January 17, 2023.

A.   Okay.

Q.   Okay.  So this -- I was just curious why you wrote this e-mail to your supervisor?

A.   Because they generally asked us to report when the next of kin has been notified.

Q.   So this is just your -- as you put it for the record, this is your documentation that you performed that task?

A.   Who I spoke to and -- yes.

Q.   Okay.  Now, according to the last paragraph, you receive on January 17 a voice-mail message from Jennifer Smith, who advises that she is Michael Smith's sister and is also interested in receiving information.  You call her back, right?

A.   Correct.

Q.   And then you write, "I did call her back and briefly went over the situation with her brother's passing due to a cell fire which he had started."  I read that accurately, right?

Page 196

A.   Correct.

Q.   Why did you tell Michael's sister that Michael died after he started a fire?

A.   Well, again, first of all, I'd like to point out that this is January 14th '23.

Q.   No, this is actually January 17.  Sorry to interrupt you.

A.   January 17, okay.  Why did I tell her what?  That he --

Q.   Why did you tell Jennifer Smith that her brother, Michael, passed away in a fire that he started?

A.   Because he did start it.

Q.   Well, he didn't start it, it was an accident.  I thought we talked about that?

MR. ARNOLD:  Objection to form.

THE WITNESS:  We're just getting into semantics now.

BY MR. BOWMAN:

Q.   It's not really semantics, so --

A.   Well, it is, sir.  I mean, in my opinion.

Q.   So are you saying he did start the fire?

A.   He did, through grinding on electronic equipment that he should not have been working on.  By all appearances, we believe that caused the spark that started with fire.

Page 197

Q.   Okay.  So he started it by an accident, right?

A.   Yes.  But he still started the fire.

Q.   Right.  Okay.  So did you explain all that to Jennifer?

A.   I didn't get into the investigation with the family, no.

Q.   Okay.  So you just said he started the fire?

MR. ARNOLD:  Objection to form.

THE WITNESS:  Do you want to read it again, or going to change --

BY MR. BOWMAN:

Q.   I'm asking you, you had the conversation.

A.   I already explained.

Q.   You just said to her he started the fire?

MR. ARNOLD:  Objection to form.

BY MR. BOWMAN:

Q.   Is that correct?

A.   I've answered your question.

Q.   So how do you think it made her feel to hear that her brother died in a fire that he started?

MR. ARNOLD:  Objection to form.

THE WITNESS:  I have no idea how it made her feel.  The intent was not to make her feel bad in any way, shape, or form.  The intent is to notify her of her brother's passing, and let her know how

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 198

it happened.  In this case, he started a fire inside his cell.  Whether it was by accident or on -- purposefully, he still started a fire in his cell.

BY MR. BOWMAN:

Q.   And you wanted to make that clear to her?

A.   That -- that -- again, you're twisting my words.  I just clarified that was not the intent.

Q.   Well, did you want to make it clear to her that he started the fire, whether it was by accident or on purpose?

MR. ARNOLD:  Objection to form.

THE WITNESS:  Was there a question there?

BY MR. BOWMAN:

Q.   Yes.

A.   Do you mind repeating the question?

MR. BOWMAN:  Could you read the question back, please, Taylor?

THE REPORTER:  Yep.

(The requested question was played back.)

THE WITNESS:  Did I make it clear to her that he started the fire, whether it was on accident or on purpose, I believe was what was said.  Again, it says what it says.  I explained to her that a fire was started.  "I did call her back, briefly went over the situation with her brother's passing due to

Page 199

a cell fire, which he had started."  I stand by that.  He's still -- any way you spin it, he started the fire.

MR. BOWMAN:  Okay.  I'm going to hand you next what I'm marking for identification as Exhibit 19 to your deposition.  It is the minutes of a department head meeting held on January 18, 2023.  Did I give you my marked up copy? I hope not.

(Exhibit 19 was marked for identification.)

MR. ARNOLD:  I don't think so.  Nothing marked on the first page, at least.

MR. BOWMAN:  We're good.  I gave you the right one.

BY MR. BOWMAN:

Q.   Take a minute to look at Exhibit 19 that you now have in front of you.  My first question is whether I accurately described the document?

A.   It appears to be amendments from the Department Head Meeting on January 18th, 2023.

Q.   Does the minute report accurately list the attendees at the meeting?

A.   I have no way of knowing.

Q.   Do you --

A.   Normally a secretary or an admin assistant or different people take the minutes depending on who's

Page 200

available.

Q.   But these are the senior staff members, department leaders --

A.   Okay.

Q.   -- the department heads under your jurisdiction?

A.   Yeah, department heads.

Q.   And you meet once a month?

A.   Usually, yes.

Q.   The purpose for the meetings is what?

A.   To provide information to the few.  Dissemination of information.

Q.   And to receive reports from each department head?

A.   They typically report out as well, yes.

Q.   Among the things that Deputy Warden Nowatzke reported out was the fact of Mr. Smith's death on January 14, four days earlier, right?

A.   "Death of incarcerated individual 114, Michael Smith, fire in cellhouse 252."  Yeah.

Q.   Taylor's going to appreciate it if you don't read it out loud, I'm just asking a question.

A.   Okay.

Q.   He reported it out about that fact, right?

A.   He did.

Page 201

Q.   And can you tell me what the discussion was at this meeting on that subject, if any?

A.   I don't think it went beyond that.  I think he was just mentioning it as one of these significant incidents that it happened leading up to that department meeting.

Q.   And that was the sum and substance of it?

A.   Yeah.  There was no lengthy discussion or review or anything in the department head meeting.

MR. BOWMAN:  Okay.  I'm going to call a break at this point.  I have --

THE VIDEOGRAPHER:  Going off the record.  The time is now 4:15 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record for the deposition of Warden Neal.  My name is Steffi.  Today is August 29, 2025, and the time is 4:29 p.m.

MR. BOWMAN:  Okay.  I'm going turn with you now to another exhibit, which would be marked for identification as Exhibit 20 to your deposition.

(Exhibit 20 was marked for identification.)

BY MR. BOWMAN:

Q.   And Exhibit 20 is the Report of the Critical Incident Debriefing meeting that it appears took place

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 202

on February 21, '23, in relation to the Smith file.  And I -- I assume this is another document that you looked over before you came here, you testified, right?

A.   Yes.

Q.   Did I accurately describe it?

A.   Yeah.  This is a critical incident debriefing that's done at the facility.

Q.   Okay.  Do you need a minute to look this over, or can I talk to you?

A.   You -- you can go ahead.

Q.   So it begins with the name and IDOC number of the decedent, Mr. Smith, right?

A.   Right.

Q.   The date of the incident, and then it gives a brief description of what happened, correct?

A.   Okay.

Q.   And then there are ten items that are covered in the course of this debrief, right?

A.   Correct.

Q.   Does the list of attendees appear accurate to you?

A.   I believe so.  I remember Deputy Warden Nowatzke led this debriefing.

Q.   And that's what I was going to ask you next.  Why is he put in charge of the discussion?

Page 203

A.   I honestly can't remember.  I mean, he's next in command.  I was probably off that day, or somewhere else, and my deputy wardens often in act in my capacity when I'm away.

Q.   Okay.  So you were not there?

A.   No.

Q.   Okay.  And you can't tell me anything about what happened at the meeting?

A.   I was not there.

Q.   Were these minutes provided to you for review and approval?

A.   They were provided to me from Deputy Warden Nowatzke as proof that it was done and what the committee's recommendations were.

Q.   Is it fair to say -- and maybe it's not.  Is it fair to say that one important question for a debrief after Mr. Smith's death would be, "how did it happen that we, as the staff of the Indiana State prison, were not able to get Mr. Smith out of his cell in time to save his life from this fire?"

A.   I mean, it -- it kind of is discussed, review of staff and offender actions during the incident.  Specifically, that question, I think we all know the answer to that question.  And I routinely, you know, share this message with the offender population and

Page 204

offender dorm rep meetings.  I've done videos to the population.  And I'm not trying to dance around your question, I'm just trying to share with you that I oftentimes drive this point home with the offender population, that if you start a fire inside your cell while your cell is locked down, secured, that you're putting your life in jeopardy of someone noticing the fire, seeing it in time, responding with the right equipment to get you out before you're, you know, engulfed in flames.  So we all are very familiar.  I mean, we beat this in their heads as much as we can.

Q.   Okay.  So the -- what I hear you saying in response to my question is, the issue is not so much why staff didn't get Smith out of his cell before he was burned alive.  Rather, in your mind the issue is why was Smith so stupid as to accidentally start this fire and burn himself up?

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  Again, those are your words, not my words.  I mean --

BY MR. BOWMAN:

Q.   I'm trying to understand your position on this, because when I asked you that question, you gave me a speech about how the prisoners are responsible for not starting fires?

Page 205

A.   Well, of course they are.

Q.   Right.  Of course they're --

A.   I mean, if you start a fire inside your cell, you're playing Russian roulette with your life, essentially.  Does that put all the responsibility on them?  Of course not.  But your question was, do we -- is it -- is it fair that we discuss how do we -- how did we fail as a -- as a facility or as a staff of not getting out of -- him out of his cell before he passed away.  And I'm telling you that everyone that I see on this list has been with the Department of Corrections for decades, has seen multiple fires, multiple responses, and this was a good response.  This was -- like, as I said, by the time the fire alarm sounded, within two and a half minutes, staffer at his cell front trying to put out the fire.

Q.   Okay.  So from your standpoint, the response is excellent?

A.   Fantastic.

MR. ARNOLD:  Object.  Form.

BY MR. BOWMAN:

Q.   From your standpoint, nobody did anything wrong --

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  I think --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 206

BY MR. BOWMAN:

Q.    -- on your staff?

A.    I think staff did an excellent job in this case.

Q.    And nobody failed in any way?

A.    Could you get a fire department --

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  -- to your house in two-and-a-half minutes?

BY MR. BOWMAN:

Q.    I didn't -- I'm not going to answer your question, of course, but I'd appreciate your answering mine.  In your estimation, nobody failed in any respect whatsoever?

MR. ARNOLD:  Objection to form.

THE WITNESS:  We did not discipline staff in this case, therefore no one failed in their duties.

BY MR. BOWMAN:

Q.    Okay.  I wanted to ask you a question.  Remember we were talking -- and I'll show it to you again, if you need it.  I'm hoping you might not.  We were talking about an e-mail that you sent to your supervisors, describing misconduct reports against Mr. Smith.  Do you remember our discussion about that e-mail?

Page 207

A.    About conduct reports against Mr. Smith, his history?

Q.    Yeah.  Do you need to see it again?

A.    No.

Q.    All right.  You recall the discussion?

A.    I recall what --

Q.    It was just a few minutes ago between you and me.

A.    I recall what I reported, yes.

Q.    Yes.  And I had another question for you about that e-mail that I forgot to ask you.  Did the information about Mr. Smith's misconduct in the past, assist you in any way in making adjustments to procedures at the Indiana Department of Correction, at your state prison, to reduce the risk of fire?

A.    The report that we're referencing simply was factual reporting that I do in every death.

Q.    Okay.  So the answer is, no?

A.    It -- it wasn't meant for that purpose.

Q.    You talked earlier in this deposition about the fact that the fire in Mr. Smith's cell was not detected until the fire alarm went off at about 10:58 a.m.; remember that discussion?

A.    I do.

Q.    And that is the case, right?

Page 208

MR. ARNOLD:  Objection to form.

THE WITNESS:  Right.

BY MR. BOWMAN:

Q.    And it is a fair question -- well, is it a fair question, whether the fire should have been detected before the alarm went off?  Do you think that's a fair question?

A.    In hindsight, I think you can always ask that question and ask the staff, I mean, where were you?  Which is kind of why I did ask the question, where was the staff positioned?  Where were they post?  I mean, because you want to know those kinds of things.  But as we talked about early on today, these are very big, very long cellhouses.  You know, you can't see everything, depending on your vantage point in the settlements.

Q.    Yeah.  So just, mistakes happen, or unfortunate events happen?

A.    You're not going to see everything.

Q.    Now, one of the tools that assists staff to be in a position to see that which they can't see based on their location, are these surveillance cameras; you agree to that, right?

A.    Surveillance cameras are a tool that's helpful, yes.

Q.    Yes.  In your investigation of the Smith fire,

Page 209

did you find out whether anybody had been looking at the surveillance camera that showed the front of Smith's cell at any point between 10:53 a.m., when the flickers of flame become visible in his cell, until 10:58 when the alarm goes off?

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  To my knowledge, no one reported that they saw video between that time period.

BY MR. BOWMAN:

Q.    Do you think that's a bad thing or a good thing?

A.    I think you would love to have seen it before -- before then so that you could have responded to it faster.  But the reality is, I have, I think at last count, 563 cameras at the Indiana State Prison.  Sir, I've tried a lot of different things.  I've had full time camera people that sat in the room that we called the -- the camera surveillance room.  It was wall-to-wall cameras and monitors with every camera I had.  Even at that, that was 8:00 to 0400, and he still can't see everything.  Because you -- I mean, it's not possible.

Q.    So for the folks in A cellhouse, the officer in charge there, or sergeant, whoever it is, plus the staff, plus the lieutenant.  For them, looking at the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 210

monitor in A cellhouse, the cameras that are visible to them from that monitor in A cellhouse are those cameras that are physically located within that unit, correct?

A. Correct.

Q. So it's not a matter of looking at dozens or hundreds of cameras, it's a matter of looking at the cameras in their unit that they're responsible for, right?

A. In their unit, but it's probably somewhere in the neighborhood of 30 cameras in their cellhouse.

Q. Okay. So I'm going to raise now that we're focused on the cameras in A cellhouse, and monitoring that's supposed to be done by the staff in A cellhouse, okay? With that focus, do you believe that somebody should at least have been attempting to look at the cameras?

A. You would love for somebody to always be watching the cameras, but the reality --

Q. Well, whether you love to or not, do you believe that somebody should have been?

A. Somebody cannot watch the cameras --

MR. ARNOLD: Objection to form.

THE WITNESS: -- all the time.

BY MR. BOWMAN:

Q. Okay. And you don't expect that, or you

Page 211

don't care?

MR. ARNOLD: Objection to form.

THE WITNESS: Are you testifying? It seems you're --

BY MR. BOWMAN:

Q. I'm asking you questions.

A. You -- that wasn't a question.

Q. So are you going to answer my question, whether you care or not?

A. I didn't -- that wasn't a question. Of course, I care.

Q. Okay.

A. I care about every death. I take it very seriously, which is why I personally notify the families, because I want them to have an empathetic person on the other end of the line. Regardless of what you think, I do care.

Q. Okay. Now, did you, in your investigation of this particular death in custody, make a determination whether anybody had eyes on those cameras or not?

A. As I said two minutes ago, no one reported seeing those cameras during the time of fire.

Q. Did you make a determination of where staff were physically located at the time that the flickers of flame first became visible in Mr. Smith's cell, that

Page 212

being 10:53 a.m.?

A. The most clarity I received is what you see in the reports.

Q. Which is what?

A. I would have to go back through the reports, if you'd like to do that.

Q. No. Did you learn in your investigation of this death in custody, that every single one of the staff assigned to A cellhouse during that critical period of time when the fire began in Mr. Smith's cell, was located in the officer's station, all of them? Did you learn that?

A. No.

Q. Do you believe that that is untrue?

A. I don't think they were all in the control room, no. I mean --

Q. Where do you think Crockett was?

A. I think Crockett and Cross -- I'm trying to remember from their reports. Honestly, I can't remember.

Q. Can't remember where they were? In terms of assessing whether they were in the right place or not, does it matter to you whether all staff were located in the officers' station during the critical moments while this fire was in progress?

Page 213

MR. ARNOLD: Objection to form.

THE WITNESS: It matters because, yes, you never want them all hanging out in the officer station and not out on the unit walking the ranges. There are points during the day, such as after count time, for example, when they all walked their ranges and taken count, they have to come to the officers' station, they have to report count to their OIC or whoever's driving the unit who has to call in the count to the count desk. The unit has to get a clear count. So my point is, is that there are time periods where they all gathered in the officer station for that purpose, but that should not be a long period of time.

BY MR. BOWMAN:

Q. Okay. So you would agree with me that that's important to investigate, where these folks all were?

A. Yes.

Q. And do you --

A. You already asked that question.

Q. -- understand -- and do you understand that was or was not investigated?

MR. ARNOLD: Objection. Form.

THE WITNESS: As -- as -- as we referred to earlier in the timeline, I think it's as clear as

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 214

what I received in that regard.

BY MR. BOWMAN:

Q.   Okay.  Well, did -- we looked at Haskell's report, which was marked as a -- for identification as Exhibit 13 to your dep.

A.   Okay.

Q.   And he makes no finding with regard to where staff were at that critical moment in time at the end of his report.  One way or another, whether they were -- where they were supposed to be or not, correct?

A.   For example, Sergeant Walton was working A cellhouse, the count had just cleared.  She -- and she had conducted a security walk on the 100 North and South ranges.  She went back to the officer station --

Q.   I'm not asking you to read the report.  Okay.

A.   I'm just trying to share.  I mean, they all obviously weren't in the office --

Q.   We don't need you to read the report, I need you to answer my question.  Does Haskell make a finding as to where folks were during that period of time?  Timelines are important, right?  Those are your words, right?

A.   It's summarized in --

MR. ARNOLD:  Objection.

THE WITNESS:  -- in each of their interviews.

Page 215

BY MR. BOWMAN:

Q.   Summarized in each of their interviews.  Does he make a finding as to whether they were in the right place or not?

A.   That's not for him to decide.

Q.   So who is to decide that?

A.   Well, if someone was out of place entirely, he should have cited it as a concern in the investigation, and sent that up to me.

Q.   Okay.  And do you know whether he did that or not?

A.   Well, like I said, I mean, he talks about where the different staff people are in the interviews with those individual staff people.  There is no statement that says anyone was derelict hanging out in the office or anything of that nature.

Q.   Correct.  Now, do you have any information as to whether the monitor in A cellhouse was or was not functional in terms of having the ability to show the images on the surveillance cameras at the time of Mr. Smith's death?

A.   I -- I -- I don't recall.  I have no idea.

Q.   Okay.

A.   I mean --

Q.   That would be a concern if they were not

Page 216

functional, right?

A.   Yes.  I mean, because all they have to do is let us know if they're broke, and we have extra monitors to replace those with.  I mean --

Q.   Right.  Well, that's definitely something that's that matters, that's important.  And if it's not functional, that is something that should be corrected on an immediate basis.

A.   Absolutely.

Q.   And you have the capacity to do it?

A.   Absolutely.

Q.   And if it's not -- if it is -- that monitor is non-functional and that's not corrected, that's a problem?

MR. ARNOLD:  Objection.

BY MR. BOWMAN:

Q.   From your standpoint?

A.   Absolutely.

MR. ARNOLD:  Objection.

BY MR. BOWMAN:

Q.   All right.  One of the things that is documented in Mr. Haskell's report, is that Crockett brings the water extinguisher to Smith's cell front as opposed to the -- the chemical extinguisher.

A.   Right.

Page 217

Q.   And we talked about this earlier on the deposition, maybe Crockett didn't know how serious the fire was so he just grabbed the first extinguisher and mistakes happen, right?

A.   Yes.

Q.   Now, separate from whether Mr. Crockett should be disciplined, do you know if anyone called Mr. Crockett aside and said, you picked up the wrong extinguisher, you should default to the chemical extinguisher until you are confident that you are coming to a fire that does not -- that -- that can be addressed with a less powerful extinguisher?

MR. ARNOLD:  Objection to form.

BY MR. BOWMAN:

Q.   I don't think you're going to find the answer to my question in the documents that you are searching through.  And -- and I'd appreciate your directing your attention to my question and answering.

A.   I'm trying to answer your question by reviewing the interview with Mr. Crockett that you're asking about.

Q.   All right.

A.   It talks about what he did, the steps that they took.  It does not question him as to why he picked up the water extinguisher and not the ABC extinguisher.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 218

Q.   I will tell you that Mr. Crockett believes that he didn't do anything remotely wrong in responding to this fire, and that's his position on it.  Does that concern you?

A.   Yes and no.  I mean, sometimes staff have to ascertain what they're dealing with.  I mean, mistakes are going to happen.  You know, he didn't know whether it was a ABC or water.  He knew his backup was right behind him.  So I'm sure in his mind, both were going to be brought to the scene in a very quick manner.  He arrived there as fast as he could with the water extinguisher in hand, and tried to put out the fire to the best of his ability.  I mean, we can beat him up all day and say, you should have done this and not that, but in his mind, he did the best he could.

Q.   Well, that's clearly what's in his mind.  My question is different.  As a supervisor, as the person with the ultimate responsibility for the safety and security of everyone in the Indiana State Prison, do you believe that -- short of discipline, that this issue should have been raised with Mr. Crockett and he should have been provided instruction and training as to how to respond, and the recognition that his response turned out to be inappropriate, whether it was intentional or not?

Page 219

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  In hindsight.  I mean, it would've been probably nice to -- to get a better understanding of his train of thought at that time through a line of questioning.

BY MR. BOWMAN:

Q.   But nobody did that?

A.   It didn't happen, no.

Q.   Another factor in this particular fire, is that the fire brigade gets there long after Mr. Smith is deceased, and there's nothing that can be done in terms of your response.  You remember seeing that on the video, right?

A.   I remember the -- the fire brigade first responders got there after he had passed, but they were helpful in extinguishing the fire, ultimately getting him removed from the cell and other factors, like clearing the cell.

Q.   It was the same issue in Devine, right?  The fire brigade is there after the action is over and Mr. Devine is already dead.

MR. ARNOLD:  Objection.

THE WITNESS:  It will always be that way.

BY MR. BOWMAN:

Q.   Exactly.  And recognizing that it will always

Page 220

be that way, have you yourself, or have you directed anybody to instruct yourself -- your staff, that as a practical matter, they are the first and only line of defense a prisoner when a fire starts inside a prison cell at the Indiana State Prison?

A.   No.  And that's not realistic.  They're a good tool to have, if I may, I mean, they serve --

Q.   There's not a question pending.  Thanks.

A.   I appreciate that.

MR. BOWMAN:  Exhibit 21 to your deposition, will be an e-mail that you sent to a select group of your staff on January 16 at 5:39 p.m.

(Exhibit 21 was marked for identification.)

BY MR. BOWMAN:

Q.   Take a minute to read that over and I'll have a few questions for you.

A.   Okay.

Q.   This e-mail goes out on the Monday after this Saturday fire to a group of your colleagues, correct?

A.   Yes.

Q.   And specifically, it's addressed to the four staff members who are in A cellhouse, correct?

A.   The staff who were working A cellhouse as well as those that responded, yes.

Q.   Yes.  So the staff in A cellhouse who received

Page 221

this are Walton, Cross, Crockett, and Smith, right?

A.   Right.

Q.   And then all -- and then I'll get through everybody, trust me.  It's going to go to -- it goes also to Mr. Koen the guy you've been e-mailing with -- or texting with, right?

A.   Correct.

Q.   And Lee -- or Amon Lee.  Who is that?

A.   Sergeant Lee.

Q.   He is a Sergeant where?

A.   He's a sergeant at Indiana State Prison.  I believe his statement says he was in the PDR when the signal was called, and he responded from the PDR to A cellhouse.

Q.   And PDR is what?  Could you keep your voice up just a little bit?

A.   Prisoner dining room.

Q.   Got it.  Thank you.  And then Larry Pietrowski, who was that?

A.   A sergeant.

Q.   And he also responded?

A.   Yes.

Q.   And Ernest Williams?

A.   Also, a sergeant.

Q.   Who also responded to the fire?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 222

A.   One of the first responder, yes.

Q.   And Mike Everett, also the first responder?

A.   Yes, sir.

Q.   And then in addition, your e-mail went to Steve McCann, who was the shift commander for the shift when the fire happened?

A.   Shift supervisor, yes.

Q.   As well as to Christina Chico, the mental health professional, who we talked about earlier in the deposition?

A.   Lead psychologist.  Yes, sir.

Q.   And the point of your e-mail is essentially, this is an attaboy e-mail, right?

A.   Essentially.

     MR. ARNOLD:  Objection.

BY MR. BOWMAN:

Q.   Meaning, thank you, correct?  Congratulations. Job well done.  It was tough.  But everybody, your words, "Performed exceptionally well," right?

A.   It says that, "However, everyone performed exceptionally well," in part of this, yes.

Q.   And then among other factors that you identified in terms of the exceptional performance, is the response time to the scene, knocking down the fire, and then removing Mr. Smith as quickly as possible, and

Page 223

then you go on to identify other things in addition, yes?

A.   Yes.

Q.   And this is and remains your assessment of how this was handled?

A.   This -- this had a different purpose. Obviously, the purpose here was to -- after a dramatic event inside a prison, you're worried a lot about staff mental health, staff morale, things of that nature. Staff do you take these, you know, things very seriously, especially when someone dies.  This e-mail was met more as a letter of encouragement, a pat on the back to try to keep spirits up because morale has a tendency to spiral down after significant events like this.

Q.   Well, you weren't lying to these folks, right?

A.   It's a general overview.

Q.   You understood that any of them could produce this e-mail as substantiation and proof and justification for the actions that they took on that particular day.  Saying, you know, look, this is what my boss thought of how I handled myself, so don't bother me with any questions or complaints.  Wouldn't that be right?

     MR. ARNOLD:  Objection.  Form.

Page 224

     THE WITNESS:  I think that's a stretch.

BY MR. BOWMAN:

Q.   But it could happen?

A.   I guess different people can interpret things in different ways.  But if these staff were a part of any of the other debriefings or investigations or meetings we had, we all know that there were issues with, such as the evacuation of the cellhouse.  So you know, can I point out and beat them up on incident -- issues we know could have been done better?  Sure, I could have done that.  But that wasn't the intent of this e-mail.

Q.   Got it.  Now, you mentioned issues around the evacuation, and those include whether the proper evacuation route was followed, how promptly evacuation took place, and how well organized that evacuation process was, right?

A.   Mainly the organization and control of the offender population.

Q.   Right.  An issue that had also come up in the Devine fire?  Yes?

A.   I'm trying to remember.

Q.   You remember we were talking about the controversy between Mr. Curry and your staff, whether the evacuation had been too chaotic and not properly

Page 225

managed from the standpoint of Mr. Curry?

A.   Well, the issue with Mr. Curry was more about whether or not they followed policy, that the weapons team staged at the appropriate location, performed the evacuation according to policy, which is where it got heated.  In this case, the evacuation happened much more quickly than the Devine case.  We didn't have staff assaulted during the evacuation.  We didn't have staff burning down check -- or offenders burning down check points.  So this one happened much better than Devine.

Q.   Okay.  Another question.  Can you point to any corrective action that you took in response to the fire in which Mr. Smith passed away?

A.   Yes.  As I mentioned earlier, we -- not only after Mr. Devine, but after Mr. Smith, we've had several conversations.  I have had several conversations with my superiors, construction services staff, about the feasibility of adding fire suppression systems, sprinkler systems.  I have bought additional equipment. I have created additional training for staff.  As I mentioned previously, I have had the -- them, the professionals in fire safety, do a study of the fire hydrants around the prison, where they should be strategic -- strategically located.  New ones were added.  Old ones were replaced.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 226

They made sure that the fire brigade had enough hose to get to any location in the prison. And even though you don't see staff disciplined immediately after an incident like this, if you actually went back and looked at records as far as staff that were disciplined for failure to perform security checks, failure to take down curtains, you'll find hundreds of staff that were disciplined, up to and terminated, for failing to perform their duties. So action is taken every day.

Q.   Okay. Did you take any corrective action against any of the staff on duty in A cellhouse at the time of the Smith fire?

A.   No.

Q.   Did you impose any discipline on any of those individuals?

A.   No.

Q.   Did you counsel any of those individuals, that one of their performance in response to the fire did not merit discipline, that they needed additional direction and training based on how they respond to it?

A.   Those discussions happened during the after-action reviews and the critical incident reviews. And that's where you get a chance to critique one another's actions and things that they --

Page 227

Q.   Well, none of these staff were present at the action -- after action review, right?

A.   Well, there's formal meetings and there's informal meetings. Every day there's an incident review committee meeting that happens at 8:00 a.m. the day, that reviews the day prior to events.

Q.   Can you document --

A.   Those individuals are at that meeting, they're not --

Q.   Can you document any counseling, or training, or direction --

A.   There's no --

Q.   Sorry. I have to ask my question before you answer. Can you document, point to any documentation of any training, counseling, or other collective action that was taken against any of these staffers on duty in A cellhouse at the time of the Smith fire?

MR. ARNOLD: Objection. Form.

THE WITNESS: I can point to training that was created as a result of fires in the prison. Can I point to discipline of the staffers of A cellhouse? No.

BY MR. BOWMAN:

Q.   So -- all right. Have you made -- in response to the Smith fire, have you made any changes in policy

Page 228

with respect to ensuring that eyes are on surveillance cameras in A cellhouse at all times?

A.   No, it's not possible.

Q.   In response to the Smith fire, have you made any changes in policy as to ensuring that a corrections, staff A is on the range at all times?

A.   Many changes were made, as we discussed throughout this deposition. To say that staff would be on every range all the time, again, is not possible.

Q.   That's not what I asked you. I'll repeat the question.

A.   Please do.

Q.   As a response to the Smith fire, have you instituted a requirement that a staffer be located somewhere on the range at all times?

A.   Not in those words. But we have instituted, in addition to the six counts a day, 30-minute security checks on the ranges that they're assigned. Those are all in efforts to make sure they're on the range, on a routine basis, doing inspections, and that's how we were doing count.

Q.   In response to the Smith fire, did you discipline anyone for the oversight that caused Mr. Smith to have possession of a substantial amount of large, bulky electronic material in his cell?

Page 229

A.   No one was disciplined, because Mr. Smith -- Smith had additional electronic equipment in his cell.

Q.   We've discussed today all of the inquiries that you made with respect to that issue, correct?

A.   Correct.

MR. BOWMAN: I'm going to give you now a copy of what's going to be marked for identification as Exhibit 22 to your deposition.

(Exhibit 22 was marked for identification.)

BY MR. BOWMAN:

Q.   Exhibit 22 is e-mail from Callie Burke to you, that you forwarded to Steve McCann on the 14th at roughly 7:38 p.m., correct?

A.   It's not a report that I forwarded to McCann, it's a report that Lessner forwarded.

Q.   Lessner forwarded. Fair. Fair. Burke had sent it to you initially as well as to Lessner and to someone named Casie Klepiner, right?

A.   Correct.

Q.   And apparently, Lessner sent it along to Steve McCann, correct?

A.   Apparently, yes.

Q.   So this e-mail also includes a still from the surveillance camera, correct?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 230

Q.   The still it has a timestamp on it as 10:58:46 p.m., right?

A.   That's what it says.

Q.   All right.  So this is a matter of seconds after the alarm has gone off, right?

MR. ARNOLD:  Objection to form.

BY MR. BOWMAN:

Q.   Yes?

A.   Shortly after probably, yes.

Q.   And after -- it's very shortly after your staff's initial response, right?

A.   Right.

Q.   Do you think that it is okay that the fire -- and actually you can see in this photograph -- do you see Mr. Smith's figure at the bottom of his cell?

A.   I do.

Q.   And is -- he is slowly burning to death in his cell at this point, right?

A.   I see that.

Q.   And my question for you is do you think it's okay that Mr. Smith's cell was allowed to -- that the fire in his cell was allowed to progress to this condition before anyone responded?

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  Do I think it's okay?  I think

Page 231

it's tragic that it happened.  But --

BY MR. BOWMAN:

Q.   When you -- you saw this film that from the surveillance camera on January 14th, you testified, right?

A.   Yes, yes.

Q.   When you saw the January 14 -- on January 14, when you saw the film depicting the progression of this fire from 10:53, the flickers of flame, right, right?

A.   I believe that's what it said, yes.

Q.   And that's what you saw, yes?

A.   Yes.

Q.   And progressing to what we see in this photograph in Exhibit 20 --

A.   2.

Q.   2, did the idea occur to you, oh, my God. How was this allowed to happen, that nobody saw this progression of flame and responded sooner than 10:58?

MR. ARNOLD:  Objection.  Form.

BY MR. BOWMAN:

Q.   Did that occur to you?

A.   What occurred to me was here's another very tragic situation whereby a death occurred due to a fire being started inside of a cell.  Again, we could go back through the timeline.  The -- by the time the smoke

Page 232

alarm went off and staff were at the cell front and that crazy fire, trying to put out the fire, get the man out of his cell, was less than three minutes.  That's pretty impressive for a response time.  Do I wish this would never happen again?  Of course.  I wish this would never take place again.  I have tried to do things to prevent this from ever taking place again.  Those efforts have failed, okay?  This could happen at any time.

Q.   Okay.  So as you sit here today, you're sitting here with the recognition and the understanding that what's depicted in Exhibit 22 in this photograph is something that could happen anytime going forward at the Indiana State Correction?

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  It can happen at any time.

BY MR. BOWMAN:

Q.   And it's just -- from your standpoint, it's not preventable.  It is what it is.

MR. ARNOLD:  Objection.  Form.

THE WITNESS:  It -- it's not my standpoint. That's just the reality of the situation.

BY MR. BOWMAN:

Q.   And to return to my question, as you watched the progression of this fire from 10:53 to 10:58 to what we see in Exhibit 22, it did not occur to you that you

Page 233

needed to take some action to ensure that no fire was ever left unobserved and unresponded to in the way that Mr. Smith's fire was?

MR. ARNOLD:  Objection.  Form.

BY MR. BOWMAN:

Q.   Did not occur to you?

A.   Sir, you just don't have an understanding of the way corrections work.

Q.   Okay.  Now, understanding the way corrections work as you do, do you have any regret about anything that you or your staff did or did not do leading up to Mr. Smith's death or in the aftermath?

A.   My staff responded appropriately.  They responded quickly.  My intent was not to beat them up over the situation as far as their performance was concerned.  Do I think it's tragic that Mr. Smith lost his life after a fire took place in his cell?  Of course.  As far as what can I do to fix it?  I think we've talked about a lot of efforts that have taken place, including expanded cameras, additional cameras, better quality cameras, the fire hydrants, ongoing training and certification, new training for staff. I could go on and on and on.  But none of those things are going to stop a fire from breaking out in a cell. They're not.  Even if I had the staff, which I don't, to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Exhibit H

Page 234

put in front of a camera, a monitor in each cellhouse and do nothing but watch cameras all day, they won't see everything.

Q.   So it just is what it is?

MR. ARNOLD:  Objection.

THE WITNESS:  It's the reality of the -- what we have.

MR. BOWMAN:  Okay.  Thank you, sir.  I don't have any more questions of you today, unless I'm responding to anything that your counsel will ask.

CROSS-EXAMINATION

BY MR. ARNOLD:

Q.   I do have a few additional questions, Mr. Neal.

A.   Okay.

Q.   There was a lot of discussion about the -- at the -- towards the beginning of the deposition about the age of the facility and whether there was a need for a new prison.  Do you make the determination at all about when to build a new prison?

A.   No, I have no input on when new prison is built or founded or anything of that nature.

Q.   There was discussion about property rule -- enforcement and the property rules.  Is it difficult at the facility to enforce the limits on property?

Page 235

A.   Well, it's very difficult.  I think we discussed a little bit throughout this deposition how tough it is to not only recruit but retaining staff to work in a maximum security prison.  We've done things such as increase the pay, the starting wage of staff.  We've increased -- we've added an incentive pay, an additional dollar an hour above the pay increase to work in a maximum security environment.

We mentioned it's just not for everyone, and it's not.  If, you know, you think you're the type of person that can come and put on a uniform and walk five tiers of ranges for 12 hours a day and do 30-minute security checks and continually argue with offenders that are doing life sentences for very heinous crimes to take down your curtain and to, you know, do these, what they consider, trivial tasks when they're there incarcerated for the rest of their life and have no problem cussing you out, throwing urine or feces in your face or assaulting you.

It's not for everyone.  It's -- it's -- it's a tough job to maintain order, especially property compliance, because like I said, I've got many men that have been there for 40 years.  They see this as their home.  That that's where they live.  That's their life.  So things like putting up curtains for privacy, which

Page 236

they feel is their right, that they have a right to some privacy.  For us, it's a security violation.  Do they care if -- if my staff write them up? Not a bit.  I mean, because it's not going to affect them.  I mean, I can take away some minor privileges, but it just has no effect.  They don't -- they don't care, you know?  Do we still try to fight that fight? Every day.

I brought some printouts of conduct reports that we write, and one month alone we wrote over 300 conduct reports for hanging curtains, refusing to take down curtains.  And another month, which was very similar, believe it was 282.  That's every month that those conduct reports are written.  I brought down shakedown -- I brought shakedown records to fill, you know, what shake downs are being done, how frequently they're being done.  It's -- it's a very tough job to keep cells purged to 4.5 cubic feet.

Q.   About how many offenders are at the state prison?

A.   2,40 -- I want to say -- 3.  Behind the wall -- behind the wall is like 2,003, then I have another 400 and change in ISO, which is our sub facility.  It's minimum and medium security.  So that's where the 2,400 total is coming out of -- with.  But roughly 2,000 behind the wall.

Page 237

Q.   Okay.  So when you say "behind the wall," can you clarify that?

A.   Okay.  The Indiana State Prison, there's three levels.  Maximum security is those guys that are incarcerated behind the 40-foot brick wall.  That's the Indiana State Prison proper as far as classification is concerned.  Then down the street, our sub facility is ISO and that houses minimum security and medium security.  So that's outside of the brick wall.

Q.   Do you know about how many correctional -- well, let me rephrase that.  What would the -- are you able to approximate the ratio of offenders to staff on shift?

A.   Oh, it depends.  I mean, I have during the day, generally, 52 correctional officers on each bracket.  So during a given day on day shift, you have 52 staff.  So 52 staff and 2,000 population.  So I'd have to divide that, but --

Q.   Yeah.

A.   -- pretty thin odds.

Q.   There was also some discussion about Deborah Taylor, her qualifications and training.  Was Deborah Taylor the most -- in your opinion, the most qualified candidate who had applied for the safety hazard manager job at the time?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit H

Page 238

A.  Well, like I said, I wasn't part of that interview board.  That was done by Greg Lintz and Gordon Becher.  And I believe John Salyer, the safety manager at Westville who had been a long-term -- long-time safety manager.  So I believe they did the interviews and made the recommendation of who to select for that position.  But they certainly believed of those that applied she was the best qualified that had an interest in the job and they thought they could train.

Q.  Okay.  Are you aware of any fires at the prison being started by electrical irregularities?

A.  One -- no.  I mean, not on their own.  Every fire at the Indiana State Prison that I can recall has happened due to an offender doing something to create a fire.

Q.  Okay.

A.  So for example, there -- there are no self-combusting outlets that I hear often in some of these fire cases.  In 40 years, I've never seen an outlet spark on its own or catch fire on its own.  It's from -- it's from offender sticking items inside the outlets, is where 99 percent of the fires occur or so.

Q.  Okay.  I see.

MR. ARNOLD:  Can we take a break?

MR. BOWMAN:  Sure.  No problem.

Page 239

THE VIDEOGRAPHER:  Going off the record.  The time is now 5:27 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record for the deposition of Warden Neal.  My name is Steffi.  Today is August 29, 2025, and the time is 5:34 p.m.

MR. ARNOLD:  We have no further questions.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.  Okay.  I just have to ask you a question as long as I'm here with the ability to do it.  When I came to the prison a while ago to speak with prisoner witnesses about this case, I was told that because I have metal implants in each of my hips, that I would not be permitted into the prison without a doctor's note, and I was told that that policy issued directly from you.  And so, my question for you is, is that the case?

A.  What we require of visitors, it doesn't apply to attorneys.  We do ask attorneys and law enforcement that come into the prison to let us know if they have implants or devices in their body so that when they go through body scanner or metal detector, or they're wanded, we know if there's such things as a pacemaker, an artificial hip, knee, leg, whatever.

Page 240

Q.  Right.

A.  For visitors, we do ask that they provide something from their doctor saying that this person -- we don't ask for specifics.  We just ask something from your doctor saying that you have whatever.  An artificial device.

Q.  Okay, but given my status as an attorney, if I inform staff at the point of entry before, I am wanded that there is a metal implant inside of me, that is sufficient to fully comply with access procedures and allow me into the joint, correct?

A.  They're supposed to, yes.  They're supposed to wand you wherever you tell them that you have an implant.

Q.  Right.  Of course.  And there's also one of these --

A.  Body scanners.

Q.  -- body scanners that will also detect the implant and create an image of it, right?

A.  It'll show a picture, yes.

Q.  So all of that is good enough to get me into the prison with having any further questions being asked?

A.  Like I said, it's a lot simpler, a lot easier for attorneys, members of law enforcement, folks that we

Page 241

have a professional relationship with.  With offender visitors, we have to go to a little bit further extremes because of the efforts to bring drugs, weapons, and contraband into the prison.

Q.  Understood.  Thank you for that clarification.  I appreciate it.

MR. BOWMAN:  That's all I have.  Okay.

THE REPORTER:  Okay.  Signature?

MR. ARNOLD:  Yeah, we'll review.

THE REPORTER:  Reserve signature.  Okay.  And then Plaintiff's counsel, are we ordering today?

MR. BOWMAN:  Not today.

THE REPORTER:  Okay.  How about for Defense Counsel?  Would you --

MR. ARNOLD:  Yes.  Can we get an expedited copy?

THE REPORTER:  For sure.  And, oh, did you want a video?

MR. ARNOLD:  Just a transcript.

THE REPORTER:  Okay.

THE VIDEOGRAPHER:  All right.  We're going off the record.  The time is now 5:37 p.m.

(Deposition concluded at 5:37 p.m. CT)



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

Page 242

CERTIFICATE OF REPORTER

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to type written form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

TAYLOR R. WELSH,

COURT REPORTER / NOTARY

MY COMMISSION EXPIRES ON: 05/30/2028

SUBMITTED ON: 09/10/2025


Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit H**

**Exhibits**

**Exhibit 1_Neal** 17:4,11

**Exhibit 2_Neal** 17:8,12

**Exhibit 3_Neal** 85:13,15,21,22

**Exhibit 4_Neal** 102:7,8,12 107:2 108:7

**Exhibit 5_Neal** 110:22 123:21, 22 125:18 127:18

**Exhibit 6_Neal** 110:16,21

**Exhibit 7_Neal** 124:16,23,25 132:9

**Exhibit 8_Neal** 144:7,9,12 145:14

**Exhibit 9_Neal** 156:11,12

**Exhibit 10_ Neal** 161:10,11, 16

**Exhibit 11_ Neal** 161:4,8 163:15,16,20

**Exhibit 12_ Neal** 169:3,5,8

**Exhibit 13_ Neal** 175:25 176:5 177:6,19 181:6 214:5

**Exhibit 14_ Neal** 182:13,15, 17

**Exhibit 15_ Neal** 183:25 184:1,3,16

**Exhibit 16_ Neal** 189:8,11, 22 190:1

**Exhibit 17_ Neal** 192:21,23, 25

**Exhibit 18_ Neal** 195:2

**Exhibit 19_ Neal** 199:5,9,15

**Exhibit 20_ Neal** 201:21,22, 24 231:14

**Exhibit 21_ Neal** 220:10,13

**Exhibit 22_ Neal** 229:8,9,11 232:11,25

---

**0**

---

**00** 110:19

**008460383** 144:13

**0400** 209:20

**044740** 110:20 114:20

**044750** 112:25

**044751** 112:12

**044753** 112:5

---

**1**

---

**1** 17:4,11 99:24 123:17

**1,500** 40:3

**10** 161:10,11,16

**10-70** 106:21

**10-71** 106:21

**100** 19:4 20:11 214:13

**10:00** 121:12

**10:02** 113:15

**10:04** 8:7

**10:38** 169:10 174:8

**10:53** 178:7,11, 15 179:21 209:3 212:1 231:9 232:24

**10:58** 177:24 178:12 207:23 209:4 231:18 232:24

**10:58:46** 230:2

**11** 161:4,8 163:15,16,20

**114** 200:19

**11:00** 153:10

**11:15** 162:14 168:18

**11:24** 64:3

**11:30** 182:19

**11:38** 64:8

**12** 101:3 149:20 169:3,5,8 235:12

**12:49** 110:7

**13** 175:25 176:5 177:6,19 181:6 214:5

**134** 73:9

**14** 117:14 118:1 153:4,11 155:21 164:1 182:13,15,17 184:4,24 185:12 189:21 200:18 231:7

**14th** 117:16 158:20 161:18 163:20 169:10 182:19 196:5 229:12 231:4

**15** 153:11 156:2 183:25 184:1,3, 5,16

**15th** 17:6 185:20

**16** 113:17,20 114:1 189:8,11, 22 190:1

**10:53** 178:7,11, 15 179:21 209:3 212:1 231:9 232:24

220:12

**165** 20:9

**17** 119:20 192:21,23,25 195:6,17 196:6, 8

**18** 193:3 195:2 199:7

**1860** 20:25 21:1,3 80:16 85:6,9

**18th** 199:19

**19** 193:4 199:5, 9,15

**1930** 20:22 21:11

**1989** 43:4

**19th** 21:16 28:7

**1:09** 110:12

**1st** 124:2,3 126:2

---

**2**

---

**2** 17:8,12 182:1 231:15,16

**2,000** 236:24 237:17

**2,003** 236:21

**2,40** 236:20

**2,400** 236:23

**20** 201:21,22,24 231:14

**2007** 44:7,8,10 45:18

**2014** 45:25 46:24

**2017** 73:10 119:20 123:17 124:17 126:1 128:14 140:9, 11,14 146:23

**2020** 17:7,10 120:2

**2022** 117:24 144:15 145:15 146:23 148:9

**2023** 102:13 113:15,20 153:4 158:20 161:18 169:10 176:3,14 195:6 199:7,19

**2025** 8:6 64:7 110:11 160:25 201:17 239:6

**21** 202:1 220:10,13

**22** 229:8,9,11 232:11,25

**22nd** 17:10

**23** 73:11 102:21 196:5 202:1

**24** 124:17 128:14

**24th** 117:24 126:1

**252** 162:18 200:20

**282** 236:12

**29** 201:17 239:6

**29th** 8:6 64:7 110:11 160:25

**2:00** 157:10

**2:37** 160:21

---

**3**

---

**3** 85:13,15,21, 22 113:14 118:13 182:1 236:20

**30** 13:4 36:2 100:9 210:10

**30-minute** 82:3 228:17 235:12

**300** 236:9

**3:00** 165:6 166:16

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**3:07** 161:1

**3:10** 164:1

**3:18** 164:10

**3:24-CV-00185** 8:14

---

**4**

**4** 102:7,8,12 107:2 108:7

**4.5** 31:20,21 32:7 34:3 91:13 93:2,4,6 139:22 236:17

**40** 13:4 98:24 235:23 238:19

**40-foot** 237:5

**400** 99:9 236:22

**45** 116:15,19

**46** 116:15,16 117:1,10,14 118:1

**47** 117:14,21

**48** 117:11,14 118:3 190:11

**49** 113:18,21 117:10,12,20 118:7

**4:15** 201:13

**4:29** 201:18

**4:50** 184:24

---

**5**

**5** 110:22 123:21,22 125:18 127:18

**500** 99:9 100:21 131:21

**52** 118:12,13,14 237:15,17

**53** 118:15

**563** 209:15

**57** 110:20

**5:27** 239:2

**5:34** 239:7

**5:37** 241:22,23

**5:39** 220:12

---

**6**

**6** 110:16,21

**6:00** 157:10

**6:21** 158:20

**6:47** 189:21 190:7

**6th** 102:13

---

**7**

**7** 124:16,23,25 132:9

**741** 115:10

**742** 115:10

**7:00** 165:11

**7:13** 161:18

**7:38** 229:13

**7th** 176:3

---

**8**

**8** 144:7,9,12 145:14

**8,000** 79:25

**8252** 184:10

**85** 43:1

**89** 43:1

**8:00** 209:20 227:5

**8th** 144:14

---

**9**

**9** 125:19 156:11,12

**90** 31:9

**99** 74:15 238:22

---

**A**

**a.m.** 8:7 64:3,8 177:24 178:7 207:23 209:3 212:1 227:5

**Aaron** 49:22 50:7

**ABC** 179:11 180:2 217:25 218:8

**ability** 14:15 17:23 47:24 92:7 132:24 134:15 136:7 215:19 218:13 239:12

**Abram** 50:16

**absolute** 15:8

**absolutely** 78:4 101:20 113:7 122:17 126:5 175:21 216:9,11,18

**abundance** 34:8 36:16

**ACA** 22:18 24:1,9 68:2,6, 10 79:13

**accept** 63:1 76:3

**access** 90:23 142:10 155:19 240:10

**accessible** 24:16

**accident** 74:10 76:5,10,18 77:13 78:18 115:18 147:18 184:15 189:5 196:13 197:1 198:2,9,21

**accidental** 163:8,10 165:5

177:2

**accidentally** 204:16

**accord** 94:5,24

**accountable** 41:3

**accreditation** 67:21

**accumulating** 40:15

**accuracy** 18:9, 14 86:3

**accurate** 41:14 87:24,25 153:14 178:17, 18 190:17,19 202:20

**accurately** 17:16,22 125:23 163:21 177:12,20 195:25 199:17, 20 202:5

**acknowledge** 34:19 73:12

**act** 74:21 77:14 203:3

**action** 76:23, 25 124:13,18 125:1,13,14 126:1,6 133:6 165:25 219:20 225:12 226:9, 11 227:2,15 233:1

**actions** 78:2 125:22 203:22 223:20 226:25

**activated** 72:16 157:19 180:5,14,18

**activation** 180:24

**actual** 73:8 186:3,21

**ADA** 52:18

**Adam** 184:25 185:1

**add** 169:7

**add-on** 52:20, 21

**added** 94:22 225:25 235:6

**adding** 152:11 225:18

**addition** 11:4 35:2,12 60:17 65:13 87:8 124:10 131:6 154:20 159:8 222:4 223:1 228:17

**additional** 24:12,14 39:1 84:19 93:16 97:15 99:6 100:18,22 134:8 169:15 172:18 225:19, 20 226:20 229:2 233:20 234:13 235:7

**address** 130:8 137:6 138:15 154:9 180:23 190:9

**addressed** 71:18 132:3 150:24 217:12 220:21

**addressing** 25:9,14

**adhere** 35:16

**adhered** 182:8

**adherence** 77:15

**adjustments** 207:13

**admin** 199:24

**administration** 22:24 33:14

**administrative** 41:20 51:15

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

135:7

**administrator** 15:11

**advise** 185:6

**advises** 195:18

**affairs** 49:24 68:13,17 70:2 95:13 123:3,15 124:7 150:20 164:2 183:22

**affect** 236:4

**affected** 158:2

**affirm** 8:25

**affirmation** 10:2

**affixed** 24:12, 22 25:24

**afraid** 90:21

**after-action** 128:13 129:10 131:1,2,18 132:4,6,9,13 134:14 136:2 226:23

**aftermath** 70:6 154:8 233:12

**afternoon** 165:7

**age** 23:21 190:11 234:18

**agency** 45:23 67:3,6,8,22

**aggressive** 173:11

**agree** 12:23 32:12,14 54:1, 10 63:17 69:4,8 70:6 72:2 75:4, 5,20,24 76:1 77:4 78:8 83:23 93:8,11,21 94:21 113:24, 25 142:5 146:20,24 147:1 180:20 189:7 208:22

213:16

**agreed** 36:23 114:4 130:17 142:9

**ahead** 118:7 145:1 202:10

**airlifted** 146:9

**alarm** 52:14 59:22 60:23 61:11 63:12 73:7 106:13,16, 19 179:22 180:4,18,25 205:14 207:22 208:6 209:5 230:5 232:1

**alarms** 61:20 82:12 180:15

**alerted** 145:23

**alive** 36:8,12 175:7 204:15

**Allison** 8:20

**allowed** 31:8, 12 104:1 139:20,22 169:21 172:13 230:21,22 231:17

**altered** 34:1,2 35:6 75:2

**altering** 190:25

**alternative** 91:16 92:14

**ambiguity** 62:15

**amendments** 199:18

**American** 22:18 67:24

**Amon** 221:8

**amount** 33:11 53:2 91:8 151:12 184:21 228:24

**angles** 140:21

**announcement** 39:20

**another's** 226:25

**answering** 15:6 97:20 206:12 217:18

**answers** 38:6, 8 94:14 114:25 166:9

**antiquated** 22:6 84:25 91:11

**anytime** 157:10 232:12

**apparently** 156:15 161:17 171:6,14 173:15 229:20, 22

**appearance** 165:9

**appearances** 196:24

**appeared** 189:17

**appearing** 8:16,19,20

**appears** 146:1 161:23 186:14 189:1,17 199:18 201:25

**applied** 151:18 237:24 238:8

**apply** 239:19

**appointed** 139:9

**appointing** 193:23

**appropriately** 233:13

**approval** 203:11

**approximate** 237:12

**approximately** 19:4 46:5 73:9 169:25

**April** 73:10 119:20 124:17 126:1 128:14

**area** 26:14 55:8 58:4 59:1,20 87:16 104:20 106:9

**areas** 105:16 147:2

**argue** 34:16 235:13

**arguing** 168:11

**argument** 127:19 147:14

**Arnold** 8:18 13:10,14 22:8 26:1,3 30:9 32:20 33:16 36:25 37:2 38:8,12 39:14 40:1,18 41:9 47:19 53:15 54:4,13,24 55:17 58:9,13 60:18 62:20 63:20 80:6 85:1,16 91:6 95:4 96:13,25 98:5 107:20 111:1,3 128:1 134:4 135:11 138:21 141:25 146:25 148:12 151:8 152:22 159:4 160:19 162:24 165:12 166:7 167:1,14, 19 168:20 172:16 173:9 175:4 180:17 182:24 183:20 186:11 187:6, 19 188:9,21 189:6 190:22 191:6,13,22 192:6,14 193:21 194:11, 22 196:15 197:8,15,21

198:11 199:10 204:18 205:20, 24 206:7,15 208:1 209:6 210:22 211:2 213:1,23 214:24 216:15, 19 217:13 219:1,22 222:15 223:25 227:18 230:6, 24 231:19 232:14,19 233:4 234:5,12 238:24 239:8 241:9,15,19

**arrange** 50:22

**arrangement** 81:14

**arrangements** 14:21

**arrival** 44:20

**arrive** 178:3, 12,20

**arrived** 218:11

**arson** 74:21

**artifacts** 75:10

**artificial** 239:25 240:6

**arts** 45:2

**ascertain** 218:6

**aspect** 47:9

**assault** 90:24

**assaulted** 90:21 129:19 225:8

**assaulting** 235:19

**assess** 144:3

**assessing** 212:22

**assessment** 159:1 223:4

**assigned** 59:21 95:9



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

97:13,18 99:5,9 100:3 109:16 127:10,23 139:3 149:20 156:23 157:2 162:18 212:9 228:18

**assignment** 99:10 100:5

**assist** 10:22 44:3 62:8 114:15 116:7 207:13

**assistance** 157:22 158:7 160:14,15

**assistant** 44:15,23 45:7, 11 46:1,4 51:15 114:15 199:24

**assists** 51:11 208:19

**Association** 22:18 67:24

**assume** 15:19 20:10 51:9 113:15 119:17 167:3 176:8 202:2

**assumed** 171:4 172:7

**assuming** 158:17,19 181:11 185:24 186:15

**assumption** 167:13

**assurance** 194:7

**astronomical** 23:1

**attaboy** 222:13

**attached** 190:10,12

**attachment** 88:25

**attempt** 145:11

147:11 162:8

**attempted** 152:9

**attempting** 210:15

**attendees** 199:21 202:20

**attention** 78:14 163:25 174:4 217:18

**attorney** 50:24 240:7

**attorneys** 239:20 240:25

**attracting** 98:1

**Auburn-style** 20:17 28:1,4, 11,13,21 79:8 97:13 139:3 143:3,25

**audible** 55:21

**audit** 68:7

**audits** 67:25

**August** 8:6 64:7 110:11 160:25 201:17 239:6

**author** 124:4

**authored** 156:8

**authority** 60:14 62:1 109:6 133:24 134:6,7 193:23

**authorized** 30:24 75:7

**autopsy** 176:24

**awake** 145:7

**aware** 83:3 97:4 238:10

---

**B**

**BA** 45:1

**bachelor** 45:1, 3

**bachelor's** 43:23 44:21,23

**back** 18:17 21:3,15 43:1 50:12 58:16 64:5 83:4,24 85:5,9 94:8,12, 16 110:9 111:10 113:22 115:10 119:7, 21 120:1 126:12 128:20, 24 130:12,21 152:8 160:23 161:8 172:22 176:14 177:9 179:9 181:1 182:12 185:19 187:3 195:20, 22 198:16,19, 24 201:15 212:5 214:14 223:13 226:4 231:24 239:4

**backed** 28:12

**background** 53:13 54:2,6, 11,22 55:8,12, 15 56:19 57:3, 10 109:12 120:7

**backup** 218:8

**bad** 69:9 126:20 191:5, 21,23 192:1 197:23 209:10

**bags** 77:7

**bar** 87:9,14,15, 17,22 88:3,14

**barrier** 89:2

**bars** 88:18 89:17 91:4

**based** 28:5 113:7 114:1 158:4 165:5 208:20 226:21

**basic** 126:24

**bachelor** 45:1, 3

**basically** 10:7 12:10 31:10 36:11 47:11 108:7 128:7 159:1

**Basinger** 102:13,20 103:4,14,15 112:6,7,8 118:16 161:17 182:18 189:23 190:7 193:2,17

**basis** 40:14,21 62:9 84:12 104:3 105:15 216:8 228:20

**Bates** 110:19 144:13

**bathroom** 101:1

**bear** 110:18

**bearing** 144:12

**beat** 204:11 218:13 224:9 233:14

**Becher** 56:5 66:13 238:3

**bed** 145:6,8

**bedding** 31:5

**began** 41:17 116:6 212:10

**begin** 9:5 48:2, 3 129:7

**beginning** 117:12 234:17

**begins** 202:11

**behalf** 8:11,17, 19,20

**behavior** 72:23 75:21 192:7,13

**behavioral** 151:20

**believed** 145:5 238:7

**believes** 131:20 218:1

**belongings** 89:23

**Bend** 8:13

**beneficial** 101:12

**Bethany** 156:18,20,22

**big** 58:17 79:21 129:23 208:13

**bigger** 32:10

**Bill** 167:6 174:8 175:11

**binder** 9:12 10:18

**bit** 11:8 14:9 27:1 29:4 54:25 55:5 88:13 115:7 116:2 119:23,24 144:17 221:16 235:2 236:3 241:2

**blanket** 173:18

**board** 48:20 64:13 238:2

**body** 131:22 145:9 239:22, 23 240:17,18

**bolt** 90:1,6,7

**Bootz** 184:25 185:1,4,19 190:2

**boss** 111:16 112:18 223:22

**bosses** 165:10

**bother** 223:22

**bottom** 61:25 82:11 111:15 130:12 177:1 182:1 230:15

**bottom-line** 60:14 61:19 62:16 63:5



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**bought** 225:19

**Bowman** 8:16 9:7 11:14,18,19 16:12,17,21,23 17:2,13 22:12 23:8,12 25:13 30:18 32:24 33:19 37:3,25 38:11,13,15,17 39:16 41:6,10 47:21 53:9,25 54:7,18 55:6,19 58:11 61:4 62:22 63:24 64:9 80:9 85:4, 11,17,19 91:10 94:7,10 95:2,12 96:21 97:5 98:6 102:5,9 107:23 110:4,13,14,23, 25 111:2,4 115:25 123:20, 25 124:15,24 128:2 134:5 135:13 138:25 142:4 144:6,11 147:6 148:14 151:22 152:25 156:10,13 159:5 160:17 161:2,8,12 163:6,14,17 165:20 166:13 167:2,16,21 168:21 169:1,6 173:3,14 175:13,25 176:6,7 180:21 182:12,16 183:3,23 184:2 186:12 187:16, 22 188:10,22 189:8,12 191:3, 10,15,25 192:9, 16,20,24 194:2, 14,25 195:3 196:18 197:11, 16 198:4,13,16 199:4,12,14 201:10,19,23 204:21 205:21 206:1,10,18 208:3 209:9 210:24 211:5 213:15 214:2

215:1 216:16, 20 217:14 219:6,24 220:10,14 222:16 224:2 227:23 229:6, 10 230:7 231:2, 20 232:16,22 233:5 234:8 238:25 239:10 241:7,12

**box** 30:20 31:23 32:9 91:15,16,24 92:1,2,3,5,7,10, 18,21 93:2

**boxes** 31:25 32:3,6 80:1 91:13,21,22 92:24 139:12, 13,14,15 140:2

**bracket** 237:16

**Brandyn** 8:18

**breach** 32:13, 15 173:8

**break** 13:24 14:6 64:1 92:1, 2 101:5 110:5 134:24 160:18 201:10 238:24

**breaking** 233:24

**breaks** 14:2

**brick** 237:5,9

**briefly** 23:3 195:23 198:24

**brigade** 9:22 26:13 52:3 56:12,14,24,25 57:1,2,9 59:5, 10 72:10,15 73:9 101:8,21 102:14 103:19 106:17 137:4, 12,14 138:16, 20 143:19 219:10,14,20 226:1

**bring** 10:16

11:12 85:13 90:6,7 109:11 114:22 118:13 179:5 241:3

**brings** 216:23

**Brinks** 86:7

**broke** 216:3

**brother** 112:23 196:11 197:20

**brother's** 195:23 197:25 198:25

**brought** 9:11 11:9 180:2 218:10 236:8, 13,14

**Brown** 102:12, 20,23,24 103:13,15 112:13 118:16 161:16 182:18 189:22 190:7 195:4

**BS** 45:6

**buck** 47:13 172:4

**build** 32:5 234:20

**building** 20:8, 23 21:15 23:23 80:4,11 104:6

**buildings** 20:25 143:3

**built** 21:1 86:23 101:5 108:14, 17 234:22

**bulky** 228:25

**bunch** 108:17

**Burke** 190:2 229:11,16

**burn** 146:9 157:15 158:12 204:17

**burned** 126:23 158:23 159:2 160:6,10

173:20 204:15

**burning** 145:8 225:9 230:17

**burns** 79:18 146:5,7 152:3

**burnt** 32:2 78:1 92:3

**business** 15:12 96:16 98:25

**Buss** 49:9

**busy** 153:6

**buton** 112:25

**button** 87:2 93:19

———————

**C**

———————

**cages** 29:15

**call** 25:12 29:15 50:1 53:21 60:6 95:19 120:3,7, 12 142:20 153:19,22 162:14 195:20, 22 198:24 201:10 213:9

**called** 44:14 105:6 106:13, 16,21 121:11 137:4,15 154:4 168:18 209:17 217:7 221:13

**Callie** 229:11

**calls** 101:2 112:14

**camera** 140:21 141:1,3,21 142:21,22 150:6 155:20, 21 177:10,11, 15,21 178:14 209:2,17,18,19 229:24 231:4 234:1

**camera's** 142:8

**cameras** 141:1,2,4,6,8 142:5 155:16, 17,19 208:21, 23 209:15,19 210:1,2,6,7,10, 12,16,18,21 211:20,22 215:20 228:2 233:20,21 234:2

**campus** 26:19 27:7

**candidate** 53:22 237:24

**capability** 41:20

**capacity** 41:18 71:18 84:3 203:3 216:10

**capital** 22:9, 16,24

**captain** 120:3 153:16,19 162:14 185:1

**captain's** 137:17

**care** 111:24 112:25 133:19 211:1,9,11,13, 17 236:3,6

**carries** 118:12

**case** 8:14 9:18 10:1,15 11:10, 11 12:2,5,8,11, 12,13 13:7,18, 20 16:9 17:10 18:10,20,21,24 19:1,2 27:2 33:9 34:7,11 41:21 49:14,16 72:24 74:9 84:15 97:2 98:17,18 120:25 121:4 122:16 128:15 134:10 147:18 148:2 164:21 167:3 173:15 179:18 180:7,8

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

193:15 198:1 206:4,17 207:25 225:6,7 239:14,18

**cases** 17:19 74:11 238:19

**Casie** 229:18

**casting** 190:20

**Castle** 43:7

**cat** 119:11

**catch** 57:15 238:20

**caught** 74:13 76:8 190:14

**caused** 74:25 75:3 96:3,7 145:8 196:24 228:23

**ceiling** 82:16

**cell** 22:15 29:22,24,25 30:1 31:5,19,24 33:24,25 34:8, 23 35:13,18,23 36:7,9,12,16 39:6 65:1 75:6 76:6 78:13,24 79:12,14 80:7 83:6,7 84:6 86:1,6,9,10,14 87:6,9,20,23 88:1,7,10,14,25 89:3,7,15,19 90:4,24 91:4 93:15,17,20 94:19,24 96:3 97:4 105:11 106:4 111:17 113:5 126:14, 23 127:22 132:16,23,25 136:7,8 140:16 145:15,19,24 146:4 147:2,8, 9,25 148:3 155:7 157:15 158:13,24 159:2 160:7,11 162:18,19 164:18,23,25

165:3 169:20, 21,22,23 171:1, 14 172:6,8,14 173:7 174:25 177:25 178:4,8, 12,15,21 179:1, 21,25 183:11 184:11,21 185:5,9,13,18 186:3,9 187:9, 11,12,13,21 188:2,7,13 189:1,4 190:17 193:7,9,13 194:9,17,19 195:24 198:2,3 199:1 203:19 204:5,6,14 205:3,9,15 207:21 209:3,4 211:25 212:10 216:23 219:17, 18 220:5 228:25 229:2 230:15,18,21, 22 231:24 232:1,3 233:17, 24

**cellhouse** 20:14,17 21:2, 6,7,10 22:13, 21,22 23:5 24:3,11,22 25:5,24 26:8,9, 12,17,23 27:3, 13,14,15,16,17, 18,20,22 29:8, 11,16,18,19,21 30:7,23 33:6,12 35:23 70:21,23 80:4,11,22 81:24 82:5,21 84:16,18,21,24 85:9,25 93:10 95:8 97:15,19 98:15,17 99:5, 15 104:17 105:11,12,20 106:2 108:17 109:14,16,21, 24 113:8 114:2 127:11,23 129:6,8,15,18, 20 130:15 144:14 145:16,

25 146:2 149:17,19,20 150:1,4,8,16 151:14 154:10 158:13 162:18 171:7 172:13 176:17 187:24 189:15 200:20 209:23 210:1,2, 10,12,13 212:9 214:12 215:18 220:22,23,25 221:14 224:8 226:12 227:17, 21 228:2 234:1

**cellhouses** 20:13,16 23:17 25:1,4 28:11, 13,21 79:8 95:9 120:21 139:4 174:25 208:14

**cells** 28:11 30:11,24 33:12 38:22 39:20 40:6,7,15,16 60:25 79:3,8, 13,23 83:9,12 86:16,19,22,23 88:24 89:18 91:17,22 92:23 93:13,25 94:3 96:19 105:13 136:5,25 137:20 138:11 139:20,23 141:22 142:1 149:12 172:18, 22 186:6,24 188:19 236:17

**center** 43:2 81:17 120:13, 17,23 121:6,7, 8,15,16,18,20 122:2 154:25 155:1

**center's** 122:19

**centered** 70:20

**centers** 121:3

**central** 64:16 66:10,11,18,24

112:15 121:7, 18 125:11 128:21 189:23

**century** 21:16 28:7

**certification** 233:22

**certifications** 138:8

**certified** 138:7, 8

**cetera** 112:20 190:13,15

**chain** 88:15,19, 25 90:11,13,19 103:13 122:13 169:13 174:3 192:25 194:21, 24

**chains** 89:21 149:12

**chance** 95:11 226:24

**chances** 175:6

**change** 69:25 135:18 136:23 138:18 152:9 197:10 236:22

**changed** 31:24 48:16,18 69:25 135:14,15,16, 19 137:1 139:11,13 149:13 186:25

**chaotic** 120:6 224:25

**charge** 81:18 99:17,19,22 100:3 120:23 125:12 202:25 209:24

**charges** 70:3

**Charles** 124:4

**chart** 47:23 49:6

**check** 36:6,7, 10,11 129:20

164:21 185:6 186:3,20 225:9

**checked** 185:23 186:1

**checking** 112:15

**checks** 36:4,5, 15 37:14 82:4 97:9 100:9 172:19 226:6 228:18 235:13

**chemical** 179:9 216:24 217:9

**Chico** 111:18 114:21 116:5, 14,19,23 189:18 222:8

**chief** 56:5 103:18 104:2 107:7 109:11 176:22,23 182:2 186:23

**children** 43:24

**choice** 89:9 121:5

**choose** 31:18 89:8

**chooses** 89:9

**chow** 89:16

**Christina** 111:19 222:8

**Cindy** 157:8, 17,19,22 158:1, 2 159:19 160:13,16

**circuit** 115:16 164:12,14

**circumstance** 131:13 146:20

**circumstance s** 66:22 68:20 108:1 120:22 128:7 162:1 174:24 179:14

**CISM** 125:9 157:11



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

cite 92:19

cited 52:10,12 69:3 77:3 133:4 215:8

citing 75:14

City 101:23 164:6 176:20, 22 182:2 193:8 194:18

clarification 65:14 113:25 126:3 241:5

clarified 99:12 198:7

clarify 19:16 27:11 38:8 79:12 113:19 184:7 237:2

clarifying 117:25

clarity 61:24 212:2

classification 237:6

clear 15:6 24:19 38:10 56:24 81:23 109:2 116:21 168:12 181:24 183:2 198:5,8, 20 213:10,25

cleared 214:12

clearer 115:24

clearing 219:18

close 10:18 22:1 25:6 26:11 179:18

closest 142:16

closing 21:22

clothes 64:25 74:13 193:14

clothing 31:7 34:2 93:6

cloud 85:14

clue 111:13

code 55:2

coincidence 44:19

collaboration 52:25

colleagues 220:19

collection 110:17 144:12 163:18

collective 227:15

college 41:24 44:3

colored 116:22

combustible 139:16

command 47:25 81:17 103:13 120:13, 17,23 121:3,5, 7,8,15,16,17, 18,20 122:13, 19 155:1 203:2

commander 222:5

comment 113:6,11 126:16 163:4

comments 179:17

commissary 88:23 173:1

commissioner 45:19 103:5,16 111:20

commit 96:19

committee 9:24,25 40:5,10 227:5

committee's 128:14 203:14

commotion 131:23

communicate 155:13

communication 155:6 161:24 164:5 169:15

communications 154:25

company 33:7 35:21

compilation 9:19

complacency 78:22

complaints 223:23

complete 174:14

completed 22:10 123:16 124:2,3

completes 126:5

complex 22:7 42:5,12 43:5

compliance 37:13 52:19 139:25 235:22

complicated 129:22

comply 38:21 240:10

computer 169:25 174:16

concern 18:4 22:5 70:13 79:12,20 83:22 94:18,20,21 134:14,16 151:24 170:24 171:3 172:12, 17 215:8,25 218:4

concerned 57:14 188:25 191:16 233:16 237:7

concerns 18:13 92:19

concluded 126:2 130:9 165:16 241:23

conclusion 125:20 134:1 167:17

conclusions 165:22 166:4 168:1

concur 128:10 130:11

condition 230:23

conditions 22:17

conduct 10:3 31:8 36:2 40:21 74:6 190:13 191:9,14 192:3 207:1 236:8,10, 13

conducted 127:17 176:17 214:13

conducting 64:19,22 166:15

conducts 52:9 68:17

confident 177:18 217:10

confined 83:5 84:6,8,10 136:4 174:25

confinement 22:18 83:21

confirm 17:16 36:8 62:15 180:9 189:13

confirmed 127:20

confused 157:9

confusion 153:3

Congratulations 222:17

connect 105:24 106:7

connected 121:20

connection 11:22

consideration 24:10,20 25:22 26:6 97:11 99:3 100:14

considered 26:16

consistent 98:25

constructed 20:6,9,22,24

constructing 24:11

construction 21:14 22:23 24:21 28:9 56:4 66:15 81:13 117:4 143:5 225:17

contact 61:22 157:25

contacted 112:11

contained 145:13

container 31:22

contends 34:10

contention 129:4,9,24 130:3 132:7

context 79:6 159:22 195:5

continually 235:13

continuation 115:11 118:4



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

continued 41:24 116:10

continuously 97:14 99:5 100:15,17 140:22

contraband 34:1 169:22 172:14,18 190:16 241:4

contractor 35:18

contractors 47:11

Contrariwise 88:1

contrary 186:8

contrast 81:13

contributes 108:2

control 86:25 90:2 130:2 141:4,6 189:4 212:15 224:18

controlled 87:7

controlling 188:18

controversial 89:25 91:1,2

controversy 126:16 127:14 224:24

conversation 113:1,13,19 115:11,21 116:10,14,19 117:12,13,15, 23 118:1,4,8,11 130:13,21 131:18 137:22 159:18 197:12

conversations 119:11 132:18 135:20 138:14 140:24 225:16

conversing

115:10

cooler 159:20

coordinate 121:18

coordinates 44:20

coordinating 121:23 155:4

copies 85:14

copy 163:12 199:8 229:6 241:16

Cornejo 8:4

Coroner's 9:22

correct 18:5 24:1,6 28:2,3 29:1 32:19 33:5 35:1 36:3 39:7 41:11,16 48:1, 25 50:13,14 51:6 53:12,17 56:20 59:6 60:8 62:3 64:19 66:4,10 69:25 70:16 73:15 74:7,8 75:8,12, 19 78:5,17,19 81:25 83:19 86:6,12 87:4,11 88:4,5,9 89:1 98:3,12,20 99:21 101:9 102:22 103:21, 23 104:12 105:1,2,8,9,11 106:1,5,19 107:6,12 109:8, 17 116:9,12,13, 18,24 117:14, 19 118:6,19 122:1 124:9 125:16,17,25 126:7 128:16 140:9 145:16, 17,25 146:6,11 152:20 153:4, 16 154:22,23 156:5 158:13, 22 161:21,22 162:1,15,16

163:8 164:12, 19 167:18 169:17 170:4,9, 10,14,19,23 171:18,21,24 175:5 176:14, 15,25 177:14, 17 178:1,4,5,8, 9,13 181:8,9,14 182:20 183:15 184:22,25 185:8,10,20 186:13 189:20 195:21 196:1 197:17 202:15, 19 210:3,4 214:10 215:17 220:19,22 221:7 222:17 229:4,5,13,19, 21,24 240:11

corrected 183:9 216:7,13

correcting 182:21

correction 22:6 41:15 44:3 53:20 56:2,4,6 81:7 121:19 207:14 232:13

correctional 22:18 28:6 32:5 41:17 42:4,5, 10,11,17 43:4, 5,7,8,9,15 44:24 45:15 46:13,14 53:11 67:21,24 97:12 98:2 126:13 127:10 139:3 178:3 237:10, 15

corrections 32:4 43:4,17,25 67:15,17 103:7, 9 205:11 228:5 233:8,9

corrective 225:12 226:11

correctly 34:24,25 99:23 102:19 124:25

161:21

COS 49:1

counsel 8:14 9:4 102:10 110:18 124:20 161:5 163:12 226:18 234:10 241:11,14

counsel's 189:9

counseled 132:22 135:8

counseling 227:10,15

count 36:15 61:1 209:15 213:5,7,8,10,11 214:12 228:21

country 101:14

counts 172:19 228:17

couple 25:8 90:3 107:11 108:24 111:20 162:7

court 8:5,12,23 12:11,17 14:8 34:6

courtesy 14:14 25:14,16

cover 193:25

coverage 142:21

covered 202:17

covering 193:22

covers 52:23 193:19

crank 88:3

crap 112:21

crazy 232:2

create 238:14 240:19

created 74:24 225:20 227:20

crime 74:4

crimes 235:14

criminal 45:5,6 74:7

crisper 141:13

critical 125:9 142:23 157:8, 11,18 160:15 201:24 202:6 212:9,24 214:8 226:23

critically 141:22

criticism 67:19

critique 226:24

Crockett 178:3 212:17,18 216:22 217:2,6, 8,20 218:1,21 221:1

cross 178:3 181:23 212:18 221:1

CROSS-EXAMINATIO N 234:11

cross-training 56:9

crowd 130:2

cruder 159:21

CT 241:23

cubic 31:20,21 32:8 34:3 91:14 93:2,4,7 139:22 171:17 236:17

curious 195:8

current 21:21 46:25 55:9

Curry 125:4,11 128:21 129:24 130:6,22 132:5 157:9 224:24 225:1,2

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

**Curry's** 129:4, 24 130:4

**curtain** 235:15

**curtains** 35:7, 9,10 40:15,22 226:7 235:25 236:10,11

**cussing** 235:18

**custody** 36:17 41:23 46:11,12 48:21 51:16 53:1,18 58:1 59:3,11 61:10, 12 63:9 129:5 151:18 185:2 189:14 211:19 212:8

**cut** 137:8 171:13

**cutters** 90:1,6, 8

**cutting** 90:11, 13 148:21

— **D** —

**daily** 40:4,14 46:15

**damage** 65:7, 11,21

**dance** 204:2

**danger** 71:3,6 93:10

**darkened** 116:21

**darker** 117:17

**date** 16:20 21:2,14 85:5,9 113:23 117:22 118:20 124:1,3 153:4 195:5 202:14

**dates** 16:19 17:1 21:15

**Dawn** 49:9,13

**day** 8:6 14:21 33:13 36:15 39:24,25 61:1 62:10 73:20 97:9 99:10,19 101:3 106:9 109:14 114:16 116:6 118:25 119:1,3,4 121:13 138:4 145:14 153:6 155:10 156:8 158:20 163:19 165:6,17 172:24 187:14 188:13,14 203:2 213:5 218:14 223:21 226:10 227:4,5, 6 228:17 234:2 235:12 236:7 237:15,16

**days** 31:9 134:23 193:4 200:18

**dead** 131:25 154:7 192:10 219:21

**deadlines** 34:6

**deal** 30:3 50:22 112:21 151:20

**dealing** 49:15 51:8 84:15 130:8 153:12 173:11 218:6

**Deangela** 115:2

**death** 68:23 76:5 95:16,25 96:8,14,15,16 121:4 122:12, 17,18 126:24 155:22 177:2 200:17,19 203:17 207:17 211:13,19 212:8 215:21 230:17 231:23 233:12

**debate** 77:25 129:23

**Debbie** 50:16

**Deborah** 64:10,11 237:21,22

**debrief** 202:18 203:16

**debriefing** 131:18 201:25 202:6,23

**debriefings** 224:6

**debris** 115:21

**debt** 151:17

**decades** 205:12

**deceased** 162:19 184:11 219:11

**decedent** 202:12

**December** 44:10 45:19 46:24

**decide** 34:12 43:14 215:5,6

**decided** 135:21

**decides** 128:3

**decipher** 120:7

**decision** 64:14

**declined** 138:17

**default** 217:9

**defect** 76:24

**defendants** 8:19,21

**defense** 220:4 241:13

**deficiencies** 52:10,11

**deficiency** 59:24 61:13,15

**define** 64:23

**definitive** 187:8

**degree** 41:24 43:23 44:3,6, 21,23 45:7

**delay** 106:15, 18 107:25

**delayed** 107:15

**deliberate** 76:15 78:21

**deliberately** 70:22,24 74:2, 20 75:23 145:18 147:16 167:11 183:19 184:9

**denied** 104:14 107:13 108:6 143:11

**Denise** 17:6

**Dennis** 112:13 113:20 114:1,8

**dep** 214:5

**department** 10:6 22:6,24 32:4 41:15 43:4 44:2 46:17 49:24 51:11 52:8 53:20 56:2,4,6,25 58:1 60:6,24 101:14,23 103:7,8 104:2, 12,22,23 105:3, 22,23 106:7,10 121:19 137:18, 23 138:4,24 156:23,24 158:11 176:21 199:6,19 200:3, 5,7,13 201:5,9 205:11 206:6 207:14

**departments** 57:11

**depend** 68:19

**dependent** 84:10

**depending** 106:9 199:25 208:15

**depends** 66:21,22 72:22 81:8,10,12 237:14

**depicted** 232:11

**depicting** 231:8

**deposed** 18:10,12

**deposition** 8:8 16:13 17:5,8,9, 19 64:6 85:13 102:7 110:10, 16 120:1 124:16 128:15 130:21 144:8 147:15 156:11 160:24 161:5, 10 163:15 169:3 174:23 175:25 182:14 183:25 192:22 199:6 201:16, 21 207:20 217:2 220:10 222:10 228:8 229:8 234:17 235:2 239:5 241:23

**depositions** 16:9 18:1,2,3 126:10,11 176:4

**deputy** 44:16, 17 46:1,4,7,8 48:10,20 49:9 58:3 59:3 63:10 103:5 200:16 202:22 203:3, 12

**derelict** 215:15

**dereliction** 133:4

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**describe** 19:3 102:19 124:25 163:21 202:5

**describes** 177:20

**describing** 116:4 206:23

**description** 58:20 62:7 63:22 202:15

**descriptions** 62:11

**deserved** 78:1

**deserves** 107:24

**design** 29:6 82:14 87:6 92:9 126:8

**designed** 81:20 86:22

**desire** 45:21 90:17

**desk** 155:7 213:10

**detail** 144:24 175:11

**detailed** 174:9

**details** 122:9 162:11

**detect** 240:18

**detected** 82:24 107:18 207:22 208:6

**detecting** 108:4,19

**detection** 62:2 77:15 82:6,16

**detector** 239:23

**detectors** 83:1 84:20

**determination** 211:19,23 234:19

**determine** 68:25

**determined** 177:10

**developed** 9:23

**developing** 82:23

**developmental** 43:2

**deviation** 181:8

**device** 74:24 115:16 164:12, 15 240:6

**devices** 190:25 191:1 239:22

**Devine** 9:18 10:12,15 11:10 12:2,8,17 13:7, 17 16:9 18:10, 20,21 31:24 50:13 66:6 73:10 95:18 119:20 123:7,9, 10,16 124:19 126:11 127:9 128:6,15 131:4, 25 136:2,20,23 137:1,2,6,13,24 139:1,11 140:18 141:8, 15,19 143:2,25 146:23 147:18, 23 148:17,19 149:7,19 154:25 159:9, 10 219:19,21 224:21 225:7, 10,15

**Devine's** 126:14,22 127:11,22 131:13 132:15 147:12

**Dick** 102:24 112:13

**die** 78:1

**died** 148:5 191:20 196:3 197:20

**dies** 223:11

**difference** 75:20 122:20 147:10 148:18

**differences** 29:9,11 163:4

**differently** 97:7 159:13

**difficult** 14:23 234:24 235:1

**diligence** 107:17 108:18

**diligent** 97:9

**dining** 221:17

**direct** 9:6 48:7, 9,19 51:17 141:15

**directed** 220:1

**directing** 217:17

**direction** 226:20 227:11

**directions** 80:21

**directive** 140:19

**directives** 37:4,12,19 38:20

**directly** 46:11 49:5 50:10 103:2 239:17

**director** 22:23 28:9 47:2 51:10 56:1,3 66:13,15 102:25 117:4 125:5,11 140:25

**directors** 49:17

**disagree** 79:16

**disappear**

135:6

**discerning** 163:4

**discharge** 188:18

**disciplinary** 133:6

**discipline** 41:3 46:16 206:16 218:20 226:15, 20 227:21 228:23

**disciplined** 132:22 217:7 226:3,6,8 229:1

**disconnect** 115:4

**discover** 177:23

**discuss** 137:19 205:7

**discussed** 63:14 89:3 108:9 136:15 139:7 203:21 228:7 229:3 235:2

**discussing** 84:17 185:11

**discussion** 23:3 74:19 116:11 119:19 126:12 127:8 131:3,8,9 132:14 136:3 201:1,8 202:25 206:24 207:5, 23 234:16,23 237:21

**discussions** 21:20,24 138:11 226:22

**displayed** 159:21

**displeased** 186:15

**disregard** 34:15

**disregarded** 32:19 40:17

**Dissemination** 200:12

**distance** 80:23

**distinct** 128:13

**District** 8:12, 13

**disturbance** 132:24

**divide** 237:18

**division** 8:14 66:12 99:13

**DK** 112:12

**Doc** 66:14 111:16 115:7 125:6 135:17

**doctor** 240:3,5

**doctor's** 239:16

**document** 10:22,25 11:2 13:6,8,12 17:7 111:7 124:17 161:21 163:22 169:1,11 177:20 199:17 202:2 227:7,10, 14

**documentary** 11:6

**documentation** 68:1 195:13 227:14

**documented** 127:18 216:22

**documents** 11:4,10,12 12:16 17:17 40:1,3 50:24 72:25 73:6 74:18 144:12 146:8,13 176:9 217:16

**dollar** 235:7

**Donna** 51:14



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**door** 19:5 41:4 84:1,3 86:11,14 87:2,10,21,23 88:8,14,20,25 89:19 132:25

**dorm** 105:12, 18 106:3 204:1

**double** 15:1

**double-check** 25:4

**downs** 236:15

**downstairs** 100:16

**dozens** 210:5

**dramatic** 223:7

**dressed** 115:6

**drills** 52:24,25 62:9 63:10

**drive** 115:6 204:4

**driven** 40:19

**driving** 213:9

**dropped** 15:10

**drug** 191:1

**drugs** 34:1 190:14 241:3

**dryer** 74:13 76:22 77:5,7

**due** 43:24 96:10 135:19 150:15 195:24 198:25 231:23 238:14

**dump** 171:10

**duties** 47:6,8 63:21 206:17 226:9

**duty** 99:10,20 109:23 121:11 133:4 134:13 136:14 153:12 176:17 226:12 227:16

**Dwyer** 17:6 18:20

**Dykstra** 120:3 134:20 135:5

**dynamics** 71:13 136:4 174:24

—————————

**E**

—————————

**e-mail** 39:20 102:12,19 103:17,25 107:2 155:13, 14 158:20 161:13,16 163:13,23 164:1 166:11 169:3,9,13 174:3,8 182:17 183:24 189:22 190:6,8 192:25 195:1,9 206:22, 25 207:11 220:11,18 222:4,12,13 223:11,19 224:12 229:11, 23

**e-mailed** 157:7

**e-mailing** 157:9 221:5

**e-mails** 10:1 112:15 156:7, 14 162:7 163:18 179:17 184:3,5

**E-SQUAD** 118:14

**E-SQUADS** 125:8

**earlier** 18:24 79:2 95:1 118:9 119:25 120:1 130:20 136:12 147:14 163:9, 19 172:21 179:17 182:22 190:12 200:18 207:20 213:25 217:1 222:9

225:14

**early** 41:19 77:14 102:20 121:13 122:6 208:13

**earning** 44:3

**earth** 185:12

**easier** 68:13 114:6 138:1 240:24

**east** 80:25

**easy** 129:10

**educate** 83:8

**education** 49:19 54:2,6,10 140:4

**educational** 53:8

**effect** 40:9 133:8 194:9 236:6

**effective** 71:9, 22 77:15

**effectively** 32:2 148:10

**effectiveness** 104:9

**effectuate** 138:18

**efforts** 96:20 228:19 232:7 233:19 241:3

**electrical** 76:24 77:5 115:16 164:12, 14 238:11

**electronic** 76:8 135:21 165:2 183:13 190:25 191:1 196:22 228:25 229:2

**electronically** 87:7

**electronics** 35:19 74:25

115:20 171:8, 11 184:21 187:25 189:16 190:15

**emergency** 64:18 120:8,16, 18 125:2,5,6,8, 23

**empathetic** 211:15

**employed** 41:5

**employee** 156:23 157:2, 22

**employees** 70:1,4

**encompasses** 125:7

**encourage** 37:5,13

**encourageme nt** 223:12

**end** 88:2,4 93:19 96:23 103:25 125:18 149:11 174:19 194:15 211:16 214:8

**ends** 116:14 118:14 162:22

**energetic** 130:23

**enforce** 32:22 33:2 35:4 37:20 234:25

**enforced** 32:21 33:4

**enforcement** 35:14 43:21 234:24 239:20 240:25

**enforcing** 33:20,22 34:22 36:21

**engaging** 75:21

**engineering** 55:12

**engulfed** 204:10

**ensure** 94:2 233:1

**ensuring** 61:19 93:24 228:1,5

**entered** 29:19

**entire** 46:2 47:8 100:22 103:8 139:24 140:15

**entirety** 81:19

**entities** 121:21 166:1 181:22

**entitled** 38:5 137:11

**entity** 32:4

**entrance** 19:10,13

**entry** 89:2 91:4,5 240:8

**environment** 30:16 83:20 89:11,15 93:9 235:8

**equipment** 10:5 75:2 76:8 104:4,21 105:25 106:7, 11 107:11 137:7 138:24 196:23 204:9 225:19 229:2

**era** 20:6

**Ernest** 221:23

**ERO** 125:2,11

**error** 132:23

**escape** 120:20

**escort** 150:13

**escorted** 30:13,14 149:25

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

essential 73:23 91:5

essentially 30:3,4 32:7,8 164:20 205:5 222:12,14

established 20:25 62:13 94:17,25 163:9

estate 8:10

estimation 206:13

et al 8:11,12

evacuate 104:5

evacuation 113:8 114:2 128:22 129:2,7 224:8,14,15,16, 25 225:5,6,8

evade 61:8 62:4

evaluate 68:8

evaluated 143:16

evaluating 182:8,10,11

evaporate 78:16

evening 112:1, 9 118:18 121:10,12 166:11 182:23 184:4

event 64:18,23 120:15 131:8 132:24 160:12 223:8

events 155:4 208:17 223:14 227:6

eventually 33:8 106:8 146:8 173:25

Everett 222:2

evidence 75:9,

18

exact 56:1

exaggerate 72:8

examination 9:6 189:9 239:9

examined 38:22

examples 20:16 76:20

excellent 205:18 206:3

exception 32:10 94:4 149:14

exceptional 222:23

exceptionally 222:19,21

exceptions 121:1

excess 93:6 172:23,25 193:13

excessive 79:7 193:9 194:19

exchange 116:4,5 118:15, 22 156:18 157:20 193:3

exchanged 140:1

exchanging 156:15

Excuse 29:23 188:5

execution 51:5

executive 142:18

exhibit 16:14 17:4,8,11,12 85:12,13,15,21, 22 102:7,8,12 107:2 108:7 110:16,21,22

123:21,22 124:16,23,25 125:18,19 127:18 132:9 144:7,9,12 145:14 156:11, 12 161:4,8,10, 11,16 163:15, 16,20 169:3,5, 8,14 175:25 176:4,5 177:6, 19 181:6 182:13,15,17 183:25 184:1,3, 16 189:8,11,22, 25 190:1 192:21,23,25 195:2 199:5,9, 15 201:20,21, 22,24 214:5 220:10,13 229:8,9,11 231:14 232:11, 25

exist 39:12

existing 97:4

exists 23:11 25:5

expand 141:2

expanded 233:20

expect 33:21 35:3,9,13,15,21 38:2 69:23 70:1 150:2 210:25

expectation 37:14 38:21 150:5 188:17

expectations 186:9

expected 36:7

expediency 141:19

expedited 241:15

expedition 73:23

experience 53:13 73:5

experientially 30:6

expert 109:5 168:4,13,15 182:6

expertise 144:3 168:17

experts 166:21,25

explain 32:23 38:16 40:14 42:23 148:22 149:18 156:18 159:18 197:3

explained 59:1 63:9 118:17 151:11 158:10 197:13 198:23

explanation 32:25 158:9

exposed 87:16

expressed 159:13

extend 14:13 25:15

extended 179:2

extent 24:18 91:20 95:25 140:14 142:6

extinguish 104:5

extinguished 65:3

extinguisher 178:4,21,25 179:9,12,25 216:23,24 217:3,9,10,12, 25 218:12

extinguishers 52:16

extinguishing 219:16

extra 85:13 90:3 93:16 216:3

extract 147:25

extremely 136:8

extremes 241:2

eyes 83:11 93:24 97:15 99:6 100:18,23 141:22 175:15 211:20 228:1

---

**F**

face 235:19

facilitate 90:16

facilitates 91:3

facilities 24:7 55:3 56:8 81:20 82:18

facility 9:20 21:22 28:6 34:23 35:17 36:1 37:20 39:3 42:10,12,17,21, 22 43:7,8,9 44:25 45:15 47:8,12,15,16 48:24 50:19 52:5,6 53:14 61:22 66:3 67:25 73:24 80:16 82:15 87:6 121:17 122:12 141:1 172:3 193:24 202:7 205:8 234:18,25 236:22 237:7

facility's 128:5

fact 33:10 36:19 40:14 69:5 70:15,17 91:14 94:23 120:5 126:13 127:9 131:3,5 132:18 155:25 156:1 159:16 162:11 179:20 190:23 200:17, 24 207:21

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**factor** 79:17 84:21 93:13 107:16 108:2 135:20 175:1 219:9

**factors** 84:20 93:9 107:17 108:17 219:17 222:22

**facts** 98:21 122:9 152:14 160:5,6 191:8 194:1

**factual** 194:23 207:17

**fail** 205:8

**failed** 206:5,13, 17 232:8

**failing** 226:9

**failure** 41:7 96:10 128:4 150:23,25 226:6,7

**failures** 70:9

**fair** 14:7 38:1,2 47:13 54:10,23 57:15 72:8 94:1 107:19 108:5, 20 120:9 151:7, 9 166:6 172:10 194:21 203:15, 16 205:7 208:4, 5,7 229:16

**fairness** 15:4, 22 137:10

**fall** 63:21

**falls** 125:10

**familiar** 204:10

**families** 211:15

**family** 19:23 43:24 197:6

**fan** 93:3

**Fantastic** 205:19

**fashion** 88:20

**fast** 89:19 130:15 136:13 218:11

**faster** 107:9 138:2 209:14

**fatality** 65:11

**fault** 77:9

**favorite** 47:22

**favors** 81:13

**fearful** 89:18 151:16

**feasibility** 225:18

**feasible** 22:16, 25 23:14,19,20

**feature** 81:6 82:20

**features** 80:16 84:16

**February** 45:18 102:13, 20 202:1

**feces** 235:18

**feel** 96:9 113:5 197:19,23 236:1

**feet** 31:20,21 32:8 34:3 91:14 93:2,4,7 139:22 171:17 236:17

**felt** 132:6 168:3

**fence** 19:18

**fencing** 29:17

**field** 53:19

**fight** 24:16 236:7

**figure** 230:15

**figuring** 175:23

**file** 135:24 181:19 202:1

**filibustered**

90:10

**filings** 12:4 13:17

**fill** 53:21 236:14

**filled** 52:17 193:13

**filling** 127:12 134:12

**film** 231:3,8

**Filzen** 145:5, 18,19,25 146:8, 22 147:10,22, 24 148:4,15,18 149:6,10 150:19 151:5, 23 152:15,24

**Filzen's** 145:15,23 146:4

**final** 62:16 64:15

**financially** 23:1 24:5

**find** 35:22 82:15 125:20 151:2 172:24 173:12 179:23 183:12 193:12 209:1 217:15 226:7

**finding** 162:11 176:24 181:7, 18 214:7,19 215:3

**findings** 133:3 176:20 181:25

**fine** 16:15 157:10 159:13

**finish** 14:15 37:24 43:23

**finished** 14:10 41:24 153:11

**fire** 9:20,22 10:6,11,14 12:17 22:20 23:4,16 24:12,

14,22 25:23,25 26:13 31:24 32:2 39:9,10,18 40:6 52:3,14, 16,24,25 55:15 56:1,5,12,14, 24,25 57:1,2,3, 8,9,11,18,23 58:1,7,17,21,22 59:5,10,16,22 60:3,5,6,10,15, 16,23,24,25 61:11,20 62:1, 2,8,17 63:10,12 64:18,21,23 65:2,10,23 66:2,3,6,7,9,14, 16,23 67:4,6, 11,14,23 68:10, 18 71:4,10,13, 15,17 72:10,11, 15 73:7,8,10,11 74:12,14,20,22 75:1,3,10,22, 23,24 76:4,6,8, 9,15,22 77:1,5, 8,13,18,21 78:10,16,21 79:1,6,9,11,17, 18 82:21,22,23 83:4,6,24 84:2 92:4 93:11,14, 15,25 94:4,23 95:10,18 96:3, 16 97:4 101:8, 14,21,23 102:14 103:19, 20,23 104:1,2, 3,5,12,22,23,25 105:3,21,23 106:6,10,13,17, 20,22 107:7,8, 18 108:1,20 109:1,5,6,11,15 113:5 114:14 116:6,12 118:24 119:8, 12,20,22 120:2, 5 121:5 122:16, 23,25 123:4,7, 9,10,16 124:10, 11,19 125:23 127:11,13,24 128:6,23 129:14 131:4, 23 134:15

136:2,4,6,7,20, 23 137:1,2,3,4, 6,12,13,14,23, 24 138:2,4,16, 20,24 139:2,11, 24 140:18 141:8,16,20 143:2,4,15,18, 19,25 144:3,4, 14 145:6,15,19, 20,23 147:1,8, 9,10,15,19,25 148:2,15,17,18, 19 149:6,7,10 150:19 151:2,3, 23 152:1,15,24 153:2,4,9,15,20 154:9,18 155:3, 22 158:3,21 162:1,15,19 163:3,7,8,10 164:6,7,11,14 165:5,11 166:4, 20,21,24 167:11 168:5,7, 8,19 169:19 170:17 173:20 174:12,13,17, 24 175:2,3 176:2,21,22,23 178:4,21,25 179:2,3,9,10, 12,25 180:13, 14,18,24 181:21,24 182:2,3,4,7,11 183:11,15,19 184:9,10,11,13 191:11,20 193:4,7,8 194:17,18 195:24 196:3, 11,21,25 197:2, 7,14,20 198:1, 3,9,21,23 199:1,3 200:20 203:20 204:5,8, 16 205:3,14,16 206:6 207:15, 21,22 208:5,25 211:22 212:10, 25 217:3,11 218:3,12 219:9, 10,14,16,20 220:4,19 221:25 222:6,



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

24 224:21 225:12,18,22 226:1,13,19 227:17,25 228:4,13,22 230:13,22 231:9,23 232:2,24 233:1,3,17, 21,24 238:13, 15,19,20

**firefighters** 56:16 104:15 105:5 125:22

**firefighters'** 107:25

**firefighting** 140:4 144:3

**firemen** 60:25 107:5

**fires** 10:4,13 24:16 32:7 70:15,18,22,24 72:13,15,16 73:3,21 74:1, 10,15,16 76:13, 18,22 78:7 83:9,15,21,22 96:19 108:4 137:21 140:4 141:24 144:5 166:25 168:14 193:15 204:25 205:12 227:20 238:10,22

**fit** 31:22 32:9 91:15 92:24 171:20

**five-minute** 178:10,13

**five-year** 73:14

**fix** 16:17 171:9 233:18

**Fix-it** 171:7

**fix-it-man** 187:24 188:6 189:15,20

**fixed** 60:1 115:18

**fixing** 190:25

**fixture** 170:18

**flagpole** 103:18

**flame** 178:7,11 179:21 209:4 211:25 231:9, 18

**flames** 177:24 204:10

**flick** 178:15

**flickers** 178:7, 11,15 179:21 209:3 211:24 231:9

**floor** 131:12

**floors** 82:19

**flows** 49:5

**focus** 20:13 51:24 123:10 151:5 154:14 163:25 210:14

**focused** 154:11 210:12

**focusing** 151:6

**folder** 10:7 11:9 13:17

**folks** 18:23 48:24 56:13,23 57:9 59:19 60:22 61:2 70:7 92:9 102:15 106:17 109:9, 12 126:19 127:16 130:22 131:19 142:12, 24 144:2 157:21 175:17 182:5 209:23 213:17 214:20 223:16 240:25

**follow** 15:23 40:12 138:17

**follow-up** 184:19 187:4

**follow-ups** 134:8

**food** 49:19

**footage** 150:6 155:22 156:4 177:10,15

**forbid** 136:24

**foremost** 151:11

**forget** 56:1 108:25 110:15 114:8

**forgot** 16:13 133:11 207:11

**form** 22:8 30:9 32:20 33:16 37:2 39:14 40:18 41:9 47:19 53:15 54:4,13,24 55:17 58:9 60:18 62:20 63:20 80:6 85:1 91:6 95:4 96:13,25 98:5 107:20 128:1 134:4 138:21 141:25 146:25 148:12 151:8 152:22 159:4 162:24 165:12 166:7 167:1,14 172:16 173:9 175:4 180:17 182:24 183:20 186:11 187:6, 19 188:9,21 189:6 190:22 191:6,13,22 192:6,14 193:21 194:11, 22 196:15 197:8,15,21,24 198:11 204:18 205:20,24 206:7,15 208:1 209:6 210:22 211:2 213:1,23 217:13 219:1 223:25 227:18 230:6,24 231:19 232:14, 19 233:4

**formal** 25:12

65:5 68:1 161:24 166:1 227:3

**formed** 95:16

**forward** 123:13 153:3 193:16 232:12

**forwarded** 182:17 183:7 229:12,14,15, 16

**found** 52:10 115:20 134:18 145:7 163:5 170:13 183:1, 14 187:11 190:17

**foundation** 80:15

**founded** 234:22

**frame** 136:9

**frequent** 62:9 72:9 105:15

**frequently** 14:3 32:18,22 37:18 72:19 73:22 236:15

**Friday** 39:24 40:7,8

**friends** 114:24

**front** 9:15 19:5 21:10 40:15 64:25 65:1 86:9 87:8 88:7 111:10 112:22 114:20 126:14 127:22 129:6 132:16,23 163:20 179:25 189:9 190:1 199:16 205:15 209:2 216:23 232:1 234:1

**fronts** 29:22, 24,25 30:1 40:22

**frustrated**

58:12

**fuel** 79:11,17

**full** 81:18 209:16

**full-time** 104:3

**fully** 13:19 61:20 165:23 240:10

**function** 58:20 60:15 66:9

**functional** 52:15 60:23 61:12,20,23 63:13 215:19 216:1,7

**functioning** 25:15 59:23

**functions** 63:19

**funding** 22:24 140:25

**furnishes** 88:23

---

**G**

**gaining** 45:6

**gallows** 159:24 160:1

**Garrett** 51:14

**gate** 87:3

**gates** 29:17

**gather** 20:15 122:9 187:14

**gathered** 154:20 165:19 213:12

**gathering** 116:3 162:10

**gating** 29:20

**gave** 16:9 17:5 124:21 199:12 204:23

**gear** 106:11



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**GED** 53:7

**general** 18:1 29:9 30:12 31:3,4,13,17,18 36:1 37:23 38:24 39:1,6 62:18 84:1 98:16,24 104:19 140:7 149:21 150:18 151:16 223:17

**generally** 195:10 237:15

**generated** 155:10

**give** 9:1 26:6 38:7 47:23 69:24 134:8 144:16 199:7 229:6

**giving** 17:25 18:2 111:16 194:7

**glances** 58:13

**glitch** 174:15

**glossing** 152:13

**God** 18:4 231:16

**good** 8:3 14:19 16:8 31:8 40:23 62:6 111:3 113:8 135:9 142:8 160:12 188:4,6 194:20 199:12 205:13 209:10 220:6 240:21

**Gordon** 56:5 66:13 238:2

**governor's** 121:20

**grabbed** 178:25 217:3

**granted** 103:19

**gray** 87:12 116:22

**great** 113:9 114:3

**greater** 84:7,8 143:21

**Greg** 55:25 64:15 66:12 238:2

**grinding** 74:23 76:7 163:2 170:15 196:22

**groin** 145:8

**Ground** 13:23

**grounds** 18:25 20:21 120:4,20

**group** 130:1 220:11,19

**guess** 95:16 132:8 224:4

**guy** 41:19 69:14 93:20 115:18 164:3 166:15 171:5,8, 15 172:3 185:2 191:5,21 194:9 221:5

**guy's** 171:25 185:17

**guys** 30:12 113:8 114:2 130:2 136:9 137:25 138:6 151:14,19 172:25 179:8 181:17 192:1 237:4

----

**H**

----

**hale** 16:2

**half** 34:16 171:17 179:24 205:15

**halfway** 48:4

**hall** 129:6

**hammering** 40:13

**Hammond** 8:8

**Hampton** 8:7 60:10

**hand** 8:23 17:3 75:22,24 85:17, 20 102:10 104:4 110:14 124:20 144:6 147:17 161:3,9 163:11 169:2 182:12 183:23 192:20 199:4 218:12

**handle** 121:8 135:1

**handled** 113:4, 6 128:23 223:5, 22

**handling** 41:20 53:2

**hands** 150:22

**Hang** 112:22

**hanging** 40:22 88:15 213:3 215:15 236:10

**happen** 15:17 35:13,25 36:24 40:7 45:22 60:10 62:9 63:14 69:9 73:22 77:2 106:12 121:2 149:17 151:4 203:17 208:16, 17 217:4 218:7 219:8 224:3 231:17 232:5,8, 12,15

**happened** 66:6 68:22 70:8 74:17 75:17 77:6 112:1,9 118:18 122:7 126:21 130:24 134:15 140:11, 12 141:16 152:10,12 158:6 165:22 179:5 180:6,8 187:18 189:5

**198:1 201:5** 202:15 203:8 222:6 225:6,10 226:22 231:1 238:14

**happening** 188:24

**happy** 144:16 186:16

**hard** 14:18 69:19 70:7 94:24 98:1 120:7

**harder** 30:7,8, 10

**hardy** 16:3

**harm** 147:16, 17

**Haskell** 176:2, 12 177:1 181:16 183:1,7, 10 214:19

**Haskell's** 214:3 216:22

**hate** 96:14

**hazard** 50:17 51:25 64:12 237:24

**hazards** 39:10 40:6

**head** 48:21 53:9 95:13 124:7 186:25 199:7,19 200:14 201:9

**head's** 137:19

**heads** 112:18 200:5,7 204:11

**health** 42:22 114:22 116:8 151:15,21 154:13 222:9 223:9

**healthy** 16:7

**hear** 197:19 204:12 238:18

**heard** 78:6 115:2 138:17 146:1

**heated** 130:23, 25 225:6

**hectic** 133:10

**heightened** 83:19

**heightens** 93:14

**heinous** 235:14

**held** 43:6 44:18,22 49:10 199:7

**helpful** 208:24 219:16

**helps** 87:9

**hesitate** 24:24

**hidden** 173:19

**hiding** 171:14

**high** 83:7

**high-ranking** 33:14

**hindsight** 208:8 219:2

**hip** 239:25

**hips** 239:15

**hire** 64:10

**histories** 191:24 192:3

**history** 28:5 41:14 69:6 190:14,24 191:2,9,14 192:15 207:2

**hold** 31:2 41:2 114:21

**holding** 113:2

**holds** 54:3,12

**hole** 88:19

**home** 20:4 40:20 114:24



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

204:4 235:24

**Homeland** 56:16 138:7

**homemade** 74:23 115:20 164:17,22 170:21 183:12

**honest** 70:8 153:24 157:6 167:12 181:5

**honestly** 18:11 128:18 132:10 154:1 203:1 212:19

**honor** 105:12, 18 106:3

**honored** 32:13,15 173:7 177:6

**hook** 26:13 87:23 88:19

**hooked** 25:2

**hope** 14:21 112:16 172:17, 21 173:11 199:8

**hoping** 94:12 206:21

**horizontally** 87:13

**hose** 24:12,22 25:2,24 26:13 143:4,20 226:2

**hoses** 143:8, 14,15,23

**hospital** 43:1, 14 65:7

**hostage** 125:9

**hot** 78:8,10,13, 15,24,25 79:18

**hour** 14:3 34:16 235:7

**hours** 101:3 134:13 135:8 153:11 184:4 235:12

**house** 19:13, 15 20:5,10 26:14 29:5 206:8

**housed** 103:19 104:15,16,18

**housekeeping** 39:3,17 79:25

**houses** 237:8

**housing** 23:24 25:6 26:12,24 28:25 29:10,12 31:9 59:22 63:11 70:21 80:16 98:16 104:20 105:7, 19 107:5 109:22 137:25 142:10,13,17 149:15,22

**humor** 159:24 160:1

**hundreds** 40:20 210:6 226:7

**hydrant** 24:11, 21 25:23 26:7, 17,18,22 27:2,7 143:2 144:4

**hydrants** 24:14 25:1,6 26:11,24 143:16,18,21, 23 225:23 233:21

**hygiene** 31:4

**hypothetically** 82:11

_____

**I**

_____

**I&i** 50:3 64:19 65:5,25 68:12

**IA** 50:3

**ICI** 32:4

**idea** 14:19 20:23 92:16 97:17 103:18,

22 118:23 135:9 167:12 168:23 187:20 188:7 193:19 197:22 215:22 231:16

**ideal** 54:19

**ideally** 36:14 175:15

**identical** 146:21

**identification** 17:4,8,11,12 85:12,15 102:7, 8 110:21 123:21,22 124:16,23 144:7,9 156:10, 12 161:4,10,11 163:14,16 169:2,5 176:5 182:13,15 183:25 184:1 189:11 192:21, 23 195:1,2 199:5,9 201:21, 22 214:4 220:13 229:7,9

**identified** 35:21 41:19 222:23

**identify** 8:15 35:18 223:1

**identifying** 69:8

**IDO** 66:9

**IDOC** 57:7 64:16 66:12,18, 24 202:11

**illness** 16:3 68:23

**image** 240:19

**images** 141:12 142:7 215:20

**imagine** 122:8

**immediately** 71:18 226:3

**impact** 70:5

**impediments** 16:3

**imperative** 71:10 136:5 150:10

**implant** 240:9, 14,19

**implants** 239:15,22

**importance** 39:19 82:1

**important** 15:1,8,22 69:4, 9,13 79:17,22 80:3,7,10,14 93:23 108:3,19 136:12 141:23 142:22 174:20 175:8 191:4 203:16 213:17 214:21 216:6

**impose** 226:15

**impossible** 24:5

**impressive** 232:4

**improve** 22:10 137:3,13

**improvement** 101:19

**inaccurate** 182:22

**inadvertently** 75:22

**inappropriate** 218:24

**incarcerated** 104:1 190:10 200:19 235:17 237:5

**incentive** 235:6

**inch-and-a-half** 9:13

**incident** 9:24

10:12 40:4,10 64:21 67:6,11, 14,23 68:7,8, 11,18,20 70:7 73:2 122:21 125:10 142:18 144:18 145:3 153:20 156:17 157:8,12,18 159:20 160:15 162:3 174:6 188:23 190:12 201:25 202:6, 14 203:22 224:9 226:4,23 227:4

**incidents** 68:1 121:2 201:5

**include** 29:10 93:3 122:25 170:11 224:14

**included** 93:4 116:11

**includes** 169:19 229:23

**including** 27:14 33:8 73:2 98:15 110:1 139:4 141:23 142:23 233:20

**inclusive** 117:10

**inconclusive** 187:3

**incorrect** 33:3 125:5 162:23, 25 178:23

**increase** 93:10 141:11 235:5,7

**increased** 104:4,9,10 141:9,10,11 235:6

**increases** 79:18 145:20

**increasing** 79:9

**independent** 12:24,25

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

**Exhibit H**

135:23

**independently** 44:4,5

**Indiana** 8:13 18:25 19:5 21:21 22:5,7,11 23:17 24:15 27:8 32:5 33:24 35:7,13 41:15 42:6,8,9,16 43:7,10 44:2 45:19 47:7,25 59:15 60:4 66:2,17 67:13 70:16,17 71:10 72:3,6,11,13 76:14 78:7 79:8,13 80:17 86:17 87:1 88:22 91:22 102:25 103:6,7 136:6 139:25 143:17,18 156:24 157:2, 23 161:25 164:6 203:18 207:14 209:15 218:19 220:5 221:11 232:13 237:3,6 238:13

**Indianapolis** 57:7 66:10 161:25

**indicating** 112:10

**indication** 87:17 164:11, 13 165:4 166:18,19

**indications** 166:14

**individual** 34:23 36:8 71:7 76:24 93:5 94:23 104:1 147:17 158:10 175:2 188:19 190:11 191:20 200:19 215:14

**individual's** 76:25

**individuals** 100:2 106:6 119:8 226:16, 18 227:8

**Industrial** 42:5,12 43:5

**Industries** 32:5

**inference** 75:17

**inform** 240:8

**informal** 227:4

**information** 10:15 50:20 51:1,2,11 56:18 57:7,17 121:22, 23 122:15 154:14,20 162:10,22 165:5,14,19 166:12 167:9, 18 169:18 177:6,11 182:22 183:18, 21 184:19,22 193:11,17 195:19 200:11, 12 207:12 215:17

**informed** 122:11 154:3 166:19

**inhalation** 65:24

**inherent** 107:25

**INI** 182:25 183:8

**initial** 162:2 165:8 166:17 179:25 184:8 230:11

**initially** 44:11 127:21 229:17

**initiate** 135:18

**initiated** 121:25 145:15 157:21 180:4

**injured** 65:6 147:25

**injuries** 148:5 152:18

**injury** 65:11,17 68:23 71:25 145:8

**inmates** 78:11

**Inn** 8:7 60:10

**input** 234:21

**inquired** 23:15 174:17

**inquiries** 51:3, 8 229:3

**inquiry** 158:9 164:17 170:21

**inside** 9:13 19:16 25:3,5 26:7,14,24 30:7 31:5,19,22 32:9 40:7 83:9 90:24 91:21,24 93:15, 25 94:3,24 95:19 96:3 97:18 104:2,25 121:17 139:20 143:24 144:1 148:3 149:13 152:11 158:12, 24 159:2 160:7, 11 162:19 171:20 184:10, 21 198:1 204:5 205:3 220:4 223:8 231:24 238:21 240:9

**insight** 192:5, 13

**insist** 140:19 149:1

**inspect** 85:25

**inspecting** 35:6

**inspections** 52:6 55:3 228:20

**installed** 143:3,18,24

**installing** 25:23

**institute** 139:2

**instituted** 228:14,16

**institution** 186:8

**institutional** 70:9

**instruct** 220:2

**instructed** 33:23 134:19 135:6,8

**instruction** 218:22

**instructions** 121:24,25 134:23

**insufficient** 181:17

**Intelligence** 49:25

**intending** 179:4

**intent** 107:8 197:23,24 198:7 224:11 233:14

**intention** 129:14 130:14 136:14 147:16 151:1 159:18

**intentional** 76:15 77:14 115:13 218:24

**intentionally** 76:9

**interest** 53:19 55:11 58:17 238:8

**interested** 111:23 154:17 195:19

**interior** 29:20

**internal** 49:24 68:13,17 70:2

95:13 123:3,15 124:7 150:20 164:2 183:22

**interpret** 224:4

**interrupt** 196:7

**interrupted** 37:25

**interrupting** 67:18 143:13

**interval** 178:10

**interview** 64:13 217:20 238:2

**interviewed** 47:2 54:16

**interviews** 127:17,19 176:16 214:25 215:2,13 238:5

**introduced** 25:10

**intuit** 31:22

**invested** 138:6

**investigate** 66:18 68:20 168:19 175:17 213:17

**investigated** 65:8 165:23 167:7 213:22

**investigating** 166:25 168:13

**investigation** 64:20,22 65:5, 18,20,21,24,25 66:3 68:25 69:5 95:17 123:1,3,5 126:2 133:2,3,5 152:7 163:1 165:15,16 166:1,5,16 168:5 176:1 182:7 193:7 194:17 197:5 208:25 211:18 212:7 215:8

**investigations**



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

49:25 69:15,20 70:2 122:22 224:6

**investigative** 133:13 164:7 181:6 189:14

**investigator** 49:22 66:18,25 67:1,2,5 183:1

**investigator's** 183:13

**investigators** 75:11 164:9 177:9,23 184:20

**investment** 138:9

**invite** 123:4

**invited** 67:13 68:10

**involved** 21:20 68:22 105:10 122:14 150:20 157:17

**involves** 100:5,9 105:10

**involving** 169:4

**irregularities** 238:11

**ISO** 236:22 237:8

**ISP** 26:19 44:9, 10,12,20 45:24 56:25 57:2,6, 12,13,14,24 58:1,7,21 62:1, 16 63:4 70:19 101:9

**issue** 22:19 35:8 40:5 59:9, 14 83:4,21 106:4,18 127:7, 13 128:4 131:15 133:2 134:3 136:3,9 138:5,15,16 140:18 148:9

151:23 181:19 185:11 204:13, 15 218:20 219:19 224:20 225:2 229:4

**issued** 239:17

**issues** 34:5 69:11 127:20 129:16,21 134:8 151:15, 21 224:7,10,13

**item** 131:17

**items** 32:10 35:20,22 52:12 93:4 165:2 173:18 187:12, 15,21 188:2 202:17 238:21

---

**J**

---

**J-O-N-A-S** 50:7

**jailbreak** 171:12

**James** 50:19, 21 102:13

**January** 73:11 113:17,20 114:1 117:14, 15,22 118:1 153:4,11 155:21 156:2 158:20 161:18 163:19 164:1 169:9 182:19 184:4,5,24 185:12 189:21 193:3,4 195:6, 17 196:5,6,8 199:7,19 200:18 220:12 231:4,7

**Jason** 48:9

**JB** 112:6

**Jennifer** 195:18 196:10 197:4

**jeopardy**

204:7

**jimmy** 92:1

**job** 40:25 42:4 48:11 49:15 52:1 53:19 54:20 55:18,20, 22,23 58:20 62:7,11 63:22 75:14 97:10 98:4,8,11 113:8,9 114:3 122:8 142:22 178:24 179:5,6 182:9 206:3 222:18 235:21 236:16 237:25 238:9

**job-shadowed** 55:10

**jobs** 53:20 61:1

**John** 238:3

**joined** 11:15

**joint** 240:11

**joke** 160:9,10

**joking** 160:4,5

**Jonas** 49:23 50:7,10

**Josh** 95:18 159:9

**judgment** 13:4 54:19 95:15,16 152:16

**July** 17:6

**jumped** 167:13,17,25

**jumping** 165:21 166:3

**jurisdiction** 57:19,22 200:6

**justice** 45:5,6

**justification** 223:20

---

**K**

---

**K-O-E-N**

114:10

**Kane** 114:10

**keeping** 83:11 186:4,22

**Kevin** 56:3 66:14 117:3,7, 8,15 163:23

**Kevin's** 117:4

**key** 86:10 87:21 126:15 127:22 131:5, 11 132:16 134:3 175:1

**keys** 90:2,8 126:22 127:7 131:20,22 133:11

**kids** 19:25

**killed** 148:1

**kin** 112:2,10 118:18,25 195:11

**kind** 38:1 39:21 50:25 68:23 104:24 128:5 170:15 193:14 203:21 208:10

**kinds** 208:12

**Klepiner** 229:18

**knee** 239:25

**knew** 92:1 132:17 160:2 162:3 167:6 168:13,16,17 171:4 172:7 175:11 218:8

**knock** 179:10

**knocking** 222:24

**knowing** 167:4 179:2 188:3 199:22

**knowledge** 55:14 67:9 101:13 109:9

150:25 159:11 209:7

**Koen** 112:13 118:8,12 134:20 221:5

---

**L**

---

**L252** 85:22

**lack** 168:17

**lapses** 69:9

**large** 95:8 184:21 228:25

**larger** 72:16 93:4

**Larry** 176:12 183:1,7 221:18

**late** 179:14

**latest** 118:25 119:4 183:21

**laundry** 77:7,8

**law** 43:21,23 239:20 240:25

**lawyer** 25:15 161:9

**lay** 80:15 150:22

**lead** 49:22 111:19 125:14 222:11

**leaders** 200:3

**leading** 125:12 132:5 201:5 233:11

**learn** 69:5,11 189:13 212:7, 12

**learned** 54:25 55:4,20,21,22, 23,24,25 56:3, 5,6,9,11 153:15 165:6 184:13, 14 187:23

**leave** 43:14 100:22

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

led 125:1
202:23

Lee 221:8,9

left 19:14,15
78:23,24 233:2

leg 239:25

legal 12:4
13:17 25:12
31:11,12 34:8
50:24

length 13:5
78:24 109:1
136:15

lengthy 116:5
201:8

Lessner 50:8,
10 95:14,23
164:2,5,16,20
166:20 168:6,7
169:4,9,19
174:4,8 175:17,
23 176:14
181:16 190:2
193:6,11,12
194:13 229:15,
16,17,20

Lessner's
170:8

lethal 71:19
79:10

letter 223:12

letters 61:1

level 53:8
82:16

levels 82:10
237:4

liaison 50:20

lick 111:13

lid 91:23 92:20

lieutenant
59:21 63:11
109:19,20
110:1 112:13
114:12 135:5
209:25

lieutenant's

137:18

lieutenants
49:1

life 30:7 70:16,
17 83:17 89:13
94:18 95:6
96:5,18 98:21
131:13 132:15
136:13 152:3
179:18 203:20
204:7 205:4
233:17 235:14,
17,24

light 170:18

lighter 116:22
117:18

lighting 75:1

lights 95:9

limit 79:22,24
139:19

limitation
34:22 35:4
91:14 98:19
99:3

limitations
33:22 173:6

limited 30:15,
19,20 35:15
81:7 97:22,24

limits 234:25

Lintz 55:25
64:15 66:12
238:2

liquid 78:15

list 31:1 186:6,
23 199:20
202:20 205:11

listed 63:19
68:1 131:17
162:9 171:22
186:3,20

listen 94:11
116:3

literally 88:3

litigation 50:19
126:11,25

127:9,14

live 20:1 104:2
105:16,21
138:5 235:24

lived 19:20

lives 19:23
71:23 101:19
130:15

living 23:6,8,9
24:23 25:25
28:1 29:2 36:12
61:11 87:6
97:13 98:13
105:8 143:25

load 79:11,17

located 88:4
104:21 210:3
211:24 212:11,
23 225:24
228:14

location
106:23 109:21
111:17 138:1
143:20 144:4
208:21 225:4
226:2

locations
24:15,17
143:21 186:25

lock 86:5,8,11,
15 87:8,21,22
89:7,19 90:10,
11,13,20 91:9,
16 92:7 93:16

lockdown
139:23 140:13

Locke 8:16
24:24

locked 30:20
89:5,6 92:10
93:25 94:19
105:8 204:6

locking 84:22,
25 85:2,5,8,10
86:24 91:11
93:11 149:13
152:9,10

locks 29:17

86:7 88:23
93:12 136:24
149:12 171:20

lockup 29:14
30:11

long 16:12 23:2
32:25 36:8
41:19 51:5 56:8
80:17,18 84:18
138:4 153:6
165:16 187:14
208:14 213:14
219:10 239:12

long-term
238:4

long-time
238:4

longer 41:4
81:2 82:25
129:8

looked 11:12,
20 12:4,10 13:6
26:7 102:15
119:21 134:17
152:11 155:9
176:9 177:9,15
179:22 202:2
214:3 226:5

lost 233:16

lot 9:21 11:10
24:25 30:16,17
46:18 53:4,20
61:2 63:11
70:3,5 72:24
74:1 79:2 80:24
89:11,13 92:23
96:15,16
101:12 112:21
126:12 138:6,8,
10 143:17
144:24 150:16
151:14,20
152:11 165:13
166:9 169:19,
22 171:12
209:16 223:8
233:19 234:16
240:24

lots 120:7

loud 200:22

louder 115:23

lousy 98:4

love 22:10
97:16 209:12
210:17,19

lower 82:16
84:24

lying 33:15,17
223:16

_____

M

_____

mad 65:2

made 14:21
36:6 38:23
49:14 64:14
143:5,11,15
152:23 171:19
177:5 181:18,
25 184:22
197:19,22
226:1 227:24,
25 228:4,7
229:4 238:6

magnetic
86:23

magnitude
145:21

main 19:10,13
101:6 104:22

maintain
235:21

maintenance
46:16 52:8

major 46:11,14
48:19,21,23
51:15 59:2 62:7
129:9

majority 76:17
89:12 104:16
127:10

make 10:25
14:24,25 15:10
24:16 34:12
36:16 41:13
43:24 52:3,11,
14,16 58:14
60:9,22 61:23



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit H

63:12 65:9 94:20,22 101:2 103:25 108:18 111:13 113:23 138:10 142:20 143:2,14,23 152:8 164:17 171:14 172:21 197:23 198:5,8,20 211:19,23 214:19 215:3 228:19 234:19

**makes** 15:12 21:10 82:21 103:22 174:16 214:7

**making** 10:23 36:6 62:8 107:18 108:2 207:13

**man** 29:17 43:16,21 94:22 148:5 160:6,10 185:12 232:2

**man's** 94:19

**managed** 225:1

**management** 41:21 125:10 157:12,18 160:15

**manager** 50:17 51:25 52:19 55:10 62:8 64:12 237:24 238:3,5

**managers** 49:14 56:7

**managing** 53:14

**manner** 97:2 128:22 175:10 218:10

**march** 113:14 154:1 176:3

**margin** 9:14

**mark** 85:12 102:6 110:15,22 124:15,21

194:25

**marked** 17:11,12 85:15 102:8 110:21 123:20,22 124:23 144:9 156:12 161:4,9,11 163:14,16 169:2,5 176:5 182:15 183:24 184:1 189:11 192:23 195:2 199:8,9,10 201:20,22 214:4 220:13 229:7,9

**marking** 17:4,7 144:7 156:10 182:13 192:21 199:5

**marshal** 66:2 67:4 75:10 122:25 123:4 164:6,7 168:7 181:24 182:4 183:11 193:8,9 194:18

**marshal's** 9:20 10:11 124:10 181:21 182:3

**marshals** 166:24 168:8

**Masley** 156:16 157:14 158:11 159:19

**mass** 89:15

**master** 90:2

**material** 9:13 10:16 228:25

**materials** 11:5 13:16 119:21

**matter** 8:9 17:6 34:13 41:7 50:13 66:17 77:16,17,21 84:1 165:22 168:6 173:7 210:5,6 212:23 220:3 230:4

**matters** 41:20 50:23 213:2 216:6

**mattress** 75:1 145:6

**Mauk** 8:20

**maximum** 89:12 235:4,8 237:4

**Mccann** 114:17 153:16,19 162:14,17 167:10,11 168:13,17,23 222:5 229:12,14,21

**Mccann's** 162:22

**meaning** 51:3 99:17 127:18 222:17

**meaningful** 58:12

**means** 119:25 155:6

**meant** 159:17 174:11 207:19

**measured** 151:1

**measures** 84:19 148:16

**mechanism** 24:13,23 25:25 34:21 35:2,14 93:12

**medical** 49:19 65:19,22

**medium** 236:23 237:8

**meet** 79:13 157:19 200:8

**meeting** 40:10 125:13 128:14 131:10 132:20 136:15 199:7,19,21 201:2,6,9,25 203:8

227:5,8

**meetings** 137:16,17,18,19,21 200:10 204:1 224:7 227:3,4

**meets** 9:25

**Megan** 11:16

**member** 36:6 86:9 96:11 150:2

**members** 33:14 98:15 99:4 184:5 200:2 220:22 240:25

**memory** 9:18 10:20 12:25 17:25 20:20 24:25 73:4

**men** 89:11 90:18 96:18 101:15 129:8,15,18 130:14 235:22

**mental** 42:22 114:22 116:8 151:15,21 154:13 222:8 223:9

**mentally** 43:2

**mention** 92:3 193:9 194:18

**mentioned** 27:25 37:8 74:1 77:6 117:4 119:25 145:9 157:12 187:12 224:13 225:14,21 235:9

**mentioning** 201:4

**merit** 226:20

**mess** 190:15

**message** 112:10 119:1 174:19 195:17 203:25

**messages** 110:17 111:7 116:4,22 117:17 119:7 155:9,12

**messed** 161:7

**met** 25:11 54:15 223:12

**metal** 80:1 92:5,7,10,20 93:2 140:2 239:15,23 240:9

**method** 35:23 90:25

**Michael** 8:10 9:19 11:11 74:23 111:16 123:9 139:8 149:19 154:24 158:18 184:10 185:9 190:11 195:18 196:2,11 200:20

**Michael's** 196:2

**Michele** 156:16 158:11 160:2

**Michigan** 101:23 164:6 176:20,22 182:2 193:8 194:18

**mid-'80s** 43:1

**middle** 21:16 28:13 112:19 113:3

**midnight** 153:10

**midway** 28:12

**Mike** 222:2

**mind** 12:23 15:22 69:13 71:21 94:7 107:21 168:1 175:14 185:12 198:15 204:15

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

218:9,15,16

**mindset** 151:3

**mine** 111:18,25 206:13

**minimizing** 39:19

**minimum** 54:14,15 236:23 237:8

**minor** 236:5

**minute** 20:12 27:12 95:20 102:15 123:15 144:16 161:13 163:11 169:7 179:11 199:15, 20 202:8 220:15

**minutes** 36:2 100:10 170:9 179:24 199:6, 25 203:10 205:15 206:9 207:7 211:21 232:3

**miscellaneous** 170:5

**misconduct** 125:21 128:4 181:7 206:23 207:12

**misread** 130:24

**missed** 187:9 189:1

**missing** 51:23

**misstate** 126:4

**mistakes** 69:8, 12 208:16 217:4 218:6

**misunderstanding** 172:9

**mode** 162:11

**model** 80:16

**modern** 23:23 81:13 82:15

83:3

**modified** 35:7

**moment** 25:11 214:8

**moments** 212:24

**Monday** 39:24 40:7,8 129:11 220:18

**money** 23:18, 20

**monitor** 142:15 210:1,2 215:18 216:12 234:1

**monitoring** 82:2,4 210:12

**monitors** 140:20,21 141:3 209:19 216:3

**month** 72:18 140:13 200:8 236:9,11,12

**month-long** 139:23

**monthly** 40:21 52:9,11

**months** 45:17 46:5 72:20,21

**morale** 223:9, 13

**morning** 8:3 9:25 10:9 11:7, 25 13:20 16:4 60:11 121:13 129:11 153:10 184:4 185:20

**motor** 170:18

**move** 36:9 137:25 138:10 150:15

**moved** 20:1,3 41:21,23 186:6, 23 187:1

**movement**

29:20

**movements** 30:17 89:16

**moving** 118:7

**multi** 164:18,23 170:21

**multiple** 115:17 129:2 205:12

**murder** 120:19

**muster** 23:25

**Mysti** 8:9

---

**N**

---

**N-E-A-L** 9:10

**named** 156:16 229:18

**names** 186:7, 24

**narrow** 80:17, 19

**national** 79:14

**natural** 122:17

**nature** 21:13 22:6 34:7 74:14 83:20 133:5 136:5 139:11 150:10 215:16 223:9 234:22

**Neal** 8:8,11,22 9:10,11 17:6 64:6 110:10 115:24 132:13 152:15 160:24 176:8 201:16 234:14 239:5

**needed** 34:17 130:9 174:17 226:20 233:1

**negative** 191:17

**negativity** 115:8

**negligent** 78:14

**negotiation** 125:9

**neighborhood** 210:10

**neighbors** 145:25

**newer** 81:20 82:18

**news** 194:20, 23

**NIC** 67:10,12, 13,20

**nice** 75:14 219:3

**night** 157:13 165:11

**nighttime** 62:10

**noise** 120:7

**non-fire** 32:1

**non-functional** 216:13

**Norix** 31:25 32:3 91:21,22, 24 92:1,3 139:13

**normal** 68:7,11

**north** 80:21,22, 24 162:18 184:10 214:13

**Northern** 8:13

**note** 36:17 40:11 172:21 182:25 184:25 193:6 239:16

**notes** 40:5

**notice** 29:9

**noticing** 204:7

**notified** 106:20,22 112:2 118:18, 24 120:5 146:13 155:3 195:11

**notify** 197:24 211:14

**notwithstanding** 128:6

**Nowatzke** 48:10 200:16 202:23 203:13

**NSL** 173:1

**number** 8:14 25:9 29:3 43:11 73:11 93:8 110:19 111:17 112:3 120:21 127:17 138:13 141:11,23 150:16 156:7 162:18 176:4 202:11

**numbers** 16:23 112:4 144:13 157:25

**numerous** 24:17 37:19 77:7

**nurses** 150:13

---

**O**

---

**oath** 17:18

**object** 147:22 205:20

**objection** 22:8 30:9 32:20 33:16 36:25 39:14 40:18 41:9 47:19 53:15 54:4,13, 24 55:17 58:9, 14 60:18 62:20 63:20 80:6 85:1 91:6 95:4 96:13,25 98:5 107:20 128:1 134:4 135:11 138:21 141:25 146:25 148:12 151:8 152:22 159:4 162:24 165:12 166:7 167:1,14,19

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

168:20 172:16 173:9 175:4 180:17 182:24 183:20 186:11 187:6,19 188:9, 21 189:6 190:22 191:6, 13,22 192:6,14 193:21 194:11, 22 196:15 197:8,15,21 198:11 204:18 205:24 206:7, 15 208:1 209:6 210:22 211:2 213:1,23 214:24 216:15, 19 217:13 219:1,22 222:15 223:25 227:18 230:6, 24 231:19 232:14,19 233:4 234:5

**objective** 150:9

**observe** 88:15

**observed** 140:22 142:7 180:12

**obtain** 154:14

**obtained** 184:20

**obvious** 83:5 194:10

**occasion** 55:10 77:2,4

**occasionally** 34:5

**occur** 231:16, 21 232:25 233:6 238:22

**occurred** 68:24 231:22, 23

**occurrence** 66:19 72:9

**occurring** 120:6

**occurs** 153:9

**October** 117:24 118:4

**odds** 237:20

**offender** 10:5 31:23 34:9,10, 16 36:11 47:9 52:3,18 57:1 64:24 65:17,23 89:20 93:15 101:13 125:22 142:2 143:19 188:13,19 192:8 203:22, 25 204:1,4 224:19 238:14, 21 241:1

**offender's** 49:16 92:18

**offenders** 9:21 34:6 35:8 56:11 58:2,3 65:4,22 70:18 72:23 74:16 83:18 89:17 90:21,23 91:25 94:3 105:18 114:23 137:19 154:12 172:8 189:18 225:9 235:13 236:18 237:12

**offenders'** 74:25

**offer** 148:25

**office** 51:15 66:12 112:15 120:12,17,24 121:7,11,19,20 125:11 127:12, 24 128:21 131:7 134:17, 18,21 135:7 153:23,25 155:3,4,20 181:22 182:3 189:23 214:17 215:16

**officer** 30:14 41:17 42:4 43:5,15 46:13 50:20 53:11

90:1 95:10 97:13 99:17,18 100:21 126:13 127:21 140:22 150:9 209:23 213:3,12 214:14

**officer's** 140:20 141:3 212:11

**officers** 30:15 89:18 98:2 139:3 178:3 237:15

**officers'** 212:24 213:7

**official** 12:18

**offline** 21:22

**oftentimes** 76:15 204:4

**OIC** 213:8

**oil** 79:1

**old-fashioned** 86:5

**older** 20:8 23:6 24:6 85:2

**on-the-job** 53:24

**one's** 142:8

**ongoing** 35:8 233:21

**online** 28:7

**op** 186:21

**open** 9:15 29:18 86:8,11 87:2,18,19 88:1 90:4 121:4,5,6, 8 126:23 132:24

**open-bar** 29:25

**opened** 86:18, 19,24 88:11 89:17 122:19

**opening** 88:8 90:13

**operate** 135:22

**operating** 108:16

**operation** 46:6,15 58:3 90:9

**operations** 46:7,8 48:10,20 59:4 70:5 103:5 122:2 125:6,7 185:24,25 186:1,2

**operators** 125:2

**opinion** 13:4 95:24 96:23 128:9 134:9 166:22,23 167:15 196:20 237:23

**opportunity** 18:8 38:5 85:24 89:7

**opposed** 57:6 151:6 216:24

**ops** 185:23 186:3

**order** 10:9 11:6 23:25 50:22 71:19 82:11 90:16 110:16 130:8 141:5 157:21 235:21

**ordering** 241:11

**orders** 38:24 39:1,7,8,17 52:7,12

**ordinary** 141:17

**organization** 224:18

**organizational** 47:23 49:6

**organized** 224:16

**origin** 77:22

109:1 116:12 145:19

**original** 21:5,6, 8,14 85:10

**Orme** 56:3 66:14 117:3,15, 18 161:17 163:23 189:23 190:7

**OSHA** 52:7 54:23 55:1,2,3 67:2,4

**other's** 115:19

**outcome** 104:13

**outdoor** 29:15 30:14 89:16

**outlet** 74:16 238:20

**outlets** 74:14 238:18,22

**outset** 119:6

**outstanding** 40:24

**overheat** 78:25

**overheated** 74:13

**overloaded** 77:7

**overlook** 173:13

**overlooked** 173:16

**oversee** 47:8, 11 52:3

**oversight** 46:12,14 47:9 49:18 52:13,15 58:2,4 59:4 67:15 109:20 228:23

**overview** 223:17

**ownership** 119:11



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit H**

## P

**p.m.** 110:7,12 113:15 158:20 160:21 161:1, 18 164:1,10 169:10 182:19 189:21 190:7 201:13,18 220:12 229:13 230:2 239:2,7 241:22,23

**pacemaker** 239:24

**packet** 191:8

**padlock** 88:24 90:19 91:23 92:2

**padlocks** 89:22 90:3 149:12

**pages** 13:5

**Pam** 50:19,21

**paper** 39:12

**papers** 31:11 34:8,12

**paperwork** 53:3,4 93:6 115:15

**paragraph** 195:16

**part** 21:23 26:5 46:20 47:22 48:17 61:2 62:5 65:12 68:2 96:11 99:13 107:17 117:21 123:5 147:11 150:3 222:21 224:5 238:1

**partial** 183:12

**participate** 101:16

**partly** 42:21

**parts** 145:9 183:14

**pass** 23:25 165:10 189:14

**passage** 106:18

**passed** 183:18 190:11 196:11 205:9 219:15 225:13

**passing** 121:23 194:20, 24 195:24 197:25 198:25

**past** 37:5,13 38:20 39:21 61:5 69:11 70:20 186:10 207:12

**pat** 223:12

**path** 43:17 149:3

**patience** 42:19

**pause** 108:23

**pay** 78:14 174:4 235:5,6,7

**PDR** 221:12,13, 15

**pending** 8:12 220:8

**Pendleton** 42:5,8,9,10,13, 14,17 43:8,9

**people** 13:23 33:8 43:3 62:11 69:23 77:20,25 78:6 93:24 98:2 109:23 114:21 115:4 122:14 138:14 159:15 165:18 167:10 199:25 209:17 215:13,14 224:4

**percent** 74:15 238:22

**perfect** 34:18, 20

**perform** 89:7

135:7 226:6,9

**performance** 181:19 222:23 226:19 233:15

**performed** 90:10 124:18 195:13 222:19, 20 225:4

**performing** 148:9

**perimeter** 19:6,8,17,18 80:23,24

**period** 45:16 46:2 56:8 68:11 73:10,14 101:6 146:10 209:8 212:10 213:14 214:20

**periods** 213:12

**perished** 86:1 96:1

**perishes** 175:2

**permanently** 99:8

**permission** 103:19

**permitted** 149:14 239:16

**person** 16:13 34:9 54:20 58:24 60:19 61:18,25 62:13 63:3 81:17 91:4 99:22,23 103:2 141:5 185:17 211:16 218:17 235:11 240:3

**personal** 8:9 31:14 33:11 38:22 39:19 40:14 41:14 46:15 65:11 79:7,22,24 89:22 90:17 91:3,14,15,17 92:15,17,23 96:10 136:24 139:19 173:6

**personally** 21:4 113:5 211:14

**personnel** 118:14 152:17 156:23 157:21, 25 158:11

**perspective** 30:10 92:18 129:3

**phone** 14:19 101:2 119:14 120:6,12 142:20 155:7,8 171:14

**phones** 35:19 115:17 169:23 187:12

**photo** 190:10

**photograph** 85:24 86:3 87:14 230:14 231:14 232:11

**photos** 9:24 89:14 190:16

**phrased** 65:16, 17

**physical** 23:21 53:14 93:9

**physically** 210:3 211:24

**pick** 53:17

**picked** 53:18 56:21 57:3,7 217:8,24

**picking** 57:17

**picks** 56:13 116:15 117:1

**picture** 58:17 87:12 240:20

**piece** 157:6

**pieces** 162:7 171:13

**Pierce** 11:17

**Pietrowski** 221:19

**pillow** 31:6 173:18

**place** 10:5 20:7 68:22 106:3 108:21 113:13, 16,20 117:23 118:22 119:20 120:5 121:16 127:11 136:24 137:21 140:2 141:5 144:14 153:21 201:25 212:22 215:4,7 224:16 232:6,7 233:17,20

**places** 43:12

**plain** 173:19

**plaintiff** 8:17

**Plaintiff's** 241:11

**plan** 21:25 43:22 49:16

**planning** 75:23

**plans** 39:3,18 80:1 115:1

**plaque** 21:10

**plastic** 31:25 32:3 139:14 140:1

**play** 61:2

**played** 94:16 198:19

**playing** 95:6 165:15 205:4

**plugin** 170:21

**plugins** 164:23

**plugs** 164:18

**pod** 81:13,16, 17

**point** 11:15 19:25 36:10 37:5,12 38:1,2 40:13,19 61:22 64:1 73:16,21 75:5 79:16 83:23 88:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

104:1,6 107:2 108:24 122:5 127:14 129:9, 12,20 130:3,4 132:7 138:3 154:2 156:4 160:18 162:9 166:8,10 168:9, 11,24 171:19 178:19 179:10 180:14 187:10 190:20,23 191:17 192:11 196:4 201:11 204:4 208:15 209:3 213:11 222:12 224:9 225:11 227:14, 19,21 230:18 240:8

**pointed** 101:21

**points** 14:25 130:23 177:21 213:5 225:10

**police** 67:7 123:4 164:6 181:22 193:8 194:17

**policies** 10:1 39:9,12

**policy** 66:17 69:2 77:15 125:21 128:4 136:24 138:19 139:2,19,22 152:17 181:8 182:9 186:9 225:3,5 227:25 228:5 239:17

**popped** 86:24

**population** 29:10 30:12 31:14 47:10 89:13 98:16 142:2 149:22 150:11,18 151:13,17 203:25 204:2,5 224:19 237:17

**pose** 131:10 132:14 136:3 144:24

**position** 44:11, 18,22,24 45:10 47:2,4 48:15 49:10 50:6,12 51:25 52:2 53:2,4,10,23 54:3,6,12,14, 16,17 55:4,7,11 56:7,10 64:11 87:18 114:11 126:20 130:6, 13,17 142:14, 24 204:22 208:20 218:3 238:7

**positioned** 208:11

**positions** 43:6 53:21

**positive** 25:5

**possess** 172:13

**possession** 131:21 183:13 228:24

**possibility** 23:15 77:1 86:13 132:18

**possibly** 32:22 78:3 92:24 122:9

**post** 39:6,8,17 121:17 208:11

**posterity's** 68:21

**pot** 78:13,15, 24,25

**potentially** 71:19 74:4 93:12

**pots** 78:8,10

**power** 115:20 183:12

**powerful** 217:12

**practical** 173:7 220:3

**practice** 32:18 66:17 78:20 139:19

**practices** 77:16

**precedes** 113:19

**predates** 101:9

**prefer** 90:19

**preferred** 181:25

**preliminary** 164:11,13 166:14,17

**prepare** 176:9

**prepared** 10:9 11:6 13:19 133:14 176:1, 12

**preparing** 11:22

**presence** 33:13

**present** 50:23 134:14 227:1

**presented** 12:11

**press** 51:3,8 87:2 93:18

**pressed** 166:9

**pretty** 32:2 36:20 52:23 57:14 92:4 98:24,25 130:23 232:3 237:20

**prevalence** 141:8

**prevalent** 150:17

**prevent** 71:25 232:6

**preventable** 232:18

**prevention** 57:3,8,18,23 58:8,21 59:16 60:16 62:1,17

**previous** 63:14 92:4 117:23 139:7

**previously** 52:12 94:18 183:9 190:17 225:21

**pride** 89:13

**primarily** 10:14

**primary** 57:25 58:24 59:18 60:19 62:13

**printed** 9:17

**printouts** 236:8

**prior** 20:16 53:10 55:16,18 56:10 162:7 169:14 180:24 227:6

**priority** 72:3,5 73:24 142:3

**prison** 10:3,4,5 15:11 18:25 19:5,13,18 20:9,21,24 21:21 22:1,7,11 23:17,24 24:15, 17 27:8 33:7,24 35:8,14,19 42:15 43:10 45:19 46:15 47:7 48:1 49:18 52:15 59:16 60:4 66:17 67:13,23 69:15 70:16,18 71:10 72:4,6,12,14 74:12 76:14 78:8 79:9,13 80:17 83:4 84:11,13 86:17 87:1 88:22 91:22 101:24 103:1,6 104:25

120:4,12,16,24 122:3,12 136:5, 6 139:25 140:15 141:2 143:17,18,21 147:2,19 149:14 152:8, 10,11 155:20 157:3,19,23 172:24 173:2 203:18 207:15 209:15 218:19 220:4,5 221:11 223:8 225:23 226:2 227:20 234:19,20,21 235:4 236:19 237:3,6 238:11, 13 239:13,16, 21 240:22 241:4

**prisoner** 56:25 71:3 78:13 83:5 89:6 101:8 107:25 136:8 137:3 138:19 147:7,9 149:11 171:1,7 174:24 220:4 221:17 239:13

**prisoner's** 138:16

**prisoners** 29:3 30:7 56:23 59:10 70:22,23 71:7 74:2 76:12 88:23 126:14 128:22 136:24 139:20 145:24 146:3 154:9 204:24

**prisoners'** 90:17

**privacy** 35:9 235:25 236:2

**privileges** 236:5

**problem** 25:18 70:9,12,19 83:25 91:25 129:1 142:19 171:7 216:14



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

235:18 238:25

**problems** 65:4 129:2,3

**procedure** 14:20 73:23 125:21 128:5 130:4,5 133:14 138:18 139:18

**procedures** 207:14 240:10

**proceed** 130:9

**proceeding** 25:12

**PROCEEDINGS** 8:1

**process** 10:23 15:1 68:3,8 134:14 154:3 191:18 224:17

**produce** 223:18

**produced** 170:16

**professional** 222:9 241:1

**professionals** 225:22

**program** 49:16,17 101:12

**programs** 49:18

**progress** 180:13 212:25 230:22

**progressed** 12:14 180:13

**progressing** 231:13

**progression** 231:8,18 232:24

**progressive** 41:3

**project** 22:16

**projects** 22:9, 25

**promote** 41:24

**promoted** 44:1 46:24 47:1

**promotion** 47:3

**promptly** 224:15

**pronounced** 114:10

**proof** 203:13 223:19

**proper** 25:14 73:23 131:5 224:14 237:6

**properly** 224:25

**property** 19:19 30:15,19,24 31:15,18,20,21, 23,25 32:6,8,9 33:11,22 34:2, 4,14,22 35:4,6, 7,15,24 36:16 38:22 39:6,20 40:6,15 46:15 65:6,11,21 79:3,7,11,23,24 80:1 89:14,21 90:17 91:3,13, 14,15,17,24 92:15,17,18,20, 21,23 93:2,5 139:11,19,22, 24 140:5,9,13 147:16 171:20 172:6,23,25 173:7 185:17 188:18 189:4 193:9,14 194:9, 19 234:23,24, 25 235:21

**proposed** 27:12

**proposition** 76:3 126:24

**prosecution** 74:7

**prosecutor** 70:4

**protection** 55:15 57:8,18, 23 58:8,22 59:16 60:16 151:16

**protective** 151:18

**protocol** 135:10

**provide** 40:2,4 94:14 200:11 240:2

**provided** 128:12 140:25 144:5 182:22 203:10,12 218:22

**providing** 14:11 91:15 193:11

**provision** 14:4

**provoke** 127:19 147:14

**psych** 150:13

**psychologist** 111:19 222:11

**public** 50:20 51:1,2,10 83:18

**pull** 93:17

**pulled** 119:13

**purchase** 137:7

**purchased** 10:6

**purge** 139:24 140:9,13

**purged** 172:23 236:17

**purpose** 69:4 101:18 123:11 151:13 198:10, 22 200:10 207:19 213:13 223:6,7

**purposefully** 198:3

**purposes** 20:14

**push** 138:5

**put** 16:23 22:16 23:15 34:13 35:9 37:19,20 64:11 71:15 72:8,14 81:4,16 87:21 91:23 92:17,20 129:14 138:8 139:21 140:2 141:2,3,5 147:24 149:11 150:7 151:11 157:16 179:3 186:20 187:13 195:12 202:25 205:5,16 218:12 232:2 234:1 235:11

**putting** 12:22 22:20 26:7,17 98:10 204:7 235:25

---

**Q**

---

**qualifications** 54:15 237:22

**qualified** 237:23 238:8

**qualify** 45:7 105:18

**quality** 105:18 141:11 233:21

**quarrel** 86:2

**quarter** 33:24 34:24 140:15 186:10

**quarterback** 129:11

**quarterly** 35:12 187:9 189:2

**quarters** 105:8

**question** 14:5, 6,11,14 15:5,9, 17,20,21 17:17 20:15 24:20 25:19,20,21 26:16 28:14 37:9,22 38:14 54:9 58:5,15,16 61:7,9 62:4,14, 23,24 68:4,5 77:12 91:20 92:12 94:6,8, 11,13,16 95:22 96:22 97:20,21 99:2 100:13,19 107:22 108:10, 13 111:5 117:7 119:6 123:23 124:1 131:11 132:14,20 136:1,17 137:9, 12 140:8 143:9, 22 144:1,25 148:8,20 149:5 163:21 166:3 167:23,24 168:12,14 172:4,9 173:6, 23 175:17 180:23 181:2,3 183:6 185:15 187:2 197:18 198:12,15,16, 19 199:16 200:22 203:16, 23,24 204:3,13, 23 205:6 206:12,19 207:10 208:4,5, 7,9,10 211:7,8, 10 213:20 214:19 217:16, 18,19,24 218:17 220:8 225:11 227:13 228:11 230:20 232:23 239:11, 18

**questioning** 139:8 219:5

**questions** 13:11 15:9 37:11 38:2,4,5, 6 69:19 70:7 94:15 101:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

102:16 108:25 123:13 136:21 137:11 144:17 149:2 156:9,17 161:14 169:11 184:17 211:6 220:16 223:23 234:9,13 239:8 240:22

**quick** 142:20 151:25 180:1 218:10

**quicker** 16:18 105:17 138:2

**quickly** 65:3 77:21 129:13 137:20 147:24 222:25 225:7 233:14

**quote** 158:11 162:19 187:23

---

**R**

**radio** 106:21 142:20 155:7, 15

**raise** 8:23 148:8 172:2,4, 12 181:16 210:11

**raised** 138:15 151:23 170:24 218:21

**raises** 82:1

**ran** 179:1

**range** 41:1 64:25 65:1 72:15 81:1 82:6 88:3,4,10 93:19 131:21 140:23 150:2,9 228:6, 9,15,19

**ranges** 84:18, 24 95:7 97:18 99:9,11 100:21 114:22 150:17 172:20 213:4,6 214:14 228:18 235:12

**rank** 45:8

**ranks** 41:23 44:1 46:12

**rapid** 71:9,22

**rapidly** 79:18

**ratio** 237:12

**reach** 26:13 82:25

**reached** 115:1 125:19 157:4 166:6

**reaching** 157:24

**read** 11:25 16:8 18:9 109:2 125:23 183:4 185:22 190:8 195:25 197:9 198:16 200:22 214:15,18 220:15

**readily** 171:20

**reading** 18:8 94:8 190:18

**reads** 39:12,13 94:12

**ready** 13:19 16:3,7 52:18 144:24 169:10 184:17

**Reagle** 111:20

**realistic** 220:6

**reality** 72:9 79:6 92:22,25 93:1 147:15 174:23 178:20 179:13 187:17 189:3 209:14 210:18 232:21 234:6

**realized** 163:1

**reason** 10:25 15:4,13 68:17 79:21 81:22 90:25 91:2 101:4,6 106:15 109:6 152:5

172:20 192:17

**reasons** 101:12 141:23 151:19 152:2

**rebuilt** 22:14

**rec** 29:15

**recall** 13:12 74:11,16 127:3, 15 128:18 129:12 130:3 132:19 136:16, 19 146:18 152:1 153:24 155:2 207:5,6,9 215:22 238:13

**receive** 195:17 200:13

**received** 110:18 160:7 162:14 164:1 166:16 183:22 212:2 214:1 220:25

**receiving** 120:2 121:22 195:19

**recent** 10:4 74:17

**recently** 11:21 186:6,23

**recess** 64:4 110:8 160:22 201:14 239:3

**recognition** 218:23 232:10

**recognizing** 59:10 219:25

**recollection** 10:23,24 13:5 118:21 119:22 131:3 145:2 152:2

**recollections** 128:13

**recommend** 150:14

**recommendati on** 238:6

**recommendati ons** 150:23 203:14

**reconsider** 134:2

**record** 8:15 9:9 10:23 11:14 12:16 15:5,18 25:11 56:24 64:2,5 110:6,9 128:17 160:20, 23 161:15 185:22 186:4 190:9 195:13 201:12,15 239:1,4 241:22

**recorded** 177:11,25

**records** 126:4 186:4,8,21,22 226:5 236:14

**recovered** 75:11

**recreation** 30:15 49:19 89:16

**recruit** 235:3

**REDIRECT** 239:9

**reduce** 138:19 207:15

**reduced** 104:11 107:4

**reducing** 103:23

**reeled** 25:3

**reentry** 44:17 46:2,5 49:9,13

**refer** 18:20 31:1 38:19 68:12 105:3

**reference** 21:11 181:23

**referencing** 207:16

**referral** 74:7

**referred** 10:11 20:17 213:24

**referring** 13:9 37:23 38:23 39:2 43:8 105:3 149:9 158:16 175:9 185:9

**reflect** 11:14 39:7,8,10 40:5 73:6

**reflected** 130:21 174:3 177:12,19

**reflecting** 40:1

**reflects** 176:16

**Reformatory** 42:16

**refresh** 9:18 13:5 24:25

**refreshed** 10:24 119:22

**refreshing** 10:22

**refused** 138:3

**refusing** 236:10

**regard** 24:7 128:25 214:1,7

**regional** 47:1 102:25

**regret** 96:9 233:10

**regulations** 54:23

**rehabilitative** 101:15

**relate** 144:13

**related** 10:1 50:23 137:12

**relating** 73:2 119:21 120:2 156:16

**relation** 51:9 124:19 148:17

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

149:7 176:2 202:1

**relationship** 241:1

**released** 60:25 105:7 106:8 137:19 138:11

**remain** 97:9,13 100:15 108:14 139:5

**remained** 121:10 146:10

**remaining** 100:17

**remains** 223:4

**remarkable** 104:24

**remember** 18:2,11 50:2 80:20 90:5 126:10,15,17, 19,24 127:5,6, 13 128:20,24 133:7,12 134:19 136:18 145:4,10 158:5 181:4 202:22 203:1 206:20, 24 207:23 212:19,20,21 219:12,14 224:22,23

**remorse** 96:10

**remote** 86:13

**remotely** 86:18,20 218:2

**remove** 35:10, 22 93:16 136:7 146:4

**removed** 148:6 219:17

**removing** 35:24 222:25

**renovated** 21:12 22:14

**rep** 204:1

**repair** 171:11

**repaired** 52:13

**repeat** 70:19 95:21 228:10

**repeated** 65:15

**repeatedly** 40:20

**repeating** 107:21 198:15

**repetitive** 144:18,22

**rephrase** 237:11

**replace** 50:10 216:4

**replaced** 225:25

**replacing** 22:17

**reply** 114:23

**report** 9:20,22 10:11,12 48:19 51:18 52:9 59:23 61:13,15 67:2 74:6 103:2,13 106:6, 10 122:14,18 123:16 124:4, 11,18 125:15, 19 126:5 128:8 133:13,17 150:20,22,24 151:1 154:7 170:8 174:5,9 176:1,3,12 177:3,13 178:6 181:6,10,17 182:1,25 183:7, 8 184:8 187:3, 13 192:3 195:10 199:20 200:15 201:24 207:16 213:8 214:4,9,15,18 216:22 229:14, 15

**reported** 36:17 46:11 52:11

114:17 162:17 166:23 167:20, 23 178:22 200:17,24 207:9 209:7 211:21

**reporter** 8:6, 24,25 9:4 11:16 14:8 16:15,19, 22,25 23:7,9 94:9 110:22,24 115:23 198:18 241:8,10,13,17, 20

**reporting** 153:20 186:14 189:18 193:25 207:17

**reports** 10:3 40:21 48:8,9 73:2 103:15 109:3 122:18 133:25 144:18 145:13 164:10 181:21,23 185:19 190:13, 16 191:17 194:8 200:13 206:23 207:1 212:3,5,19 236:8,10,13

**represent** 85:23

**representative** 8:10

**reprimanded** 172:14

**reputation** 188:1

**request** 10:25 107:7 108:6 141:21 143:2,5, 10,14,15,23 177:5 184:22

**requested** 23:5 67:3 94:16 198:19

**require** 65:22 82:3 107:17 149:11 239:19

**required** 72:11 122:22 139:5 175:20

**requirement** 36:2,21 40:2,16 228:14

**requirements** 54:23

**requires** 65:18

**requiring** 97:12 99:4 100:14

**Reserve** 241:10

**reside** 107:8

**resided** 18:24

**residence** 19:3,4,10,20 120:4

**resistant** 32:2

**respect** 13:6 37:14 62:17 77:17 83:20 95:14 109:14 116:25 124:11 133:25 134:12 137:10 148:24 151:6,24 174:5 206:13 228:1 229:4

**respectfully** 54:8 97:21 130:6

**respects** 146:22

**respond** 72:11 73:9 83:15 84:11 104:10 106:11,23 107:9 108:20 114:17 134:15 141:23 142:14, 21,24 144:5 146:3 147:20 175:10,21 218:23 226:21

**responded** 97:2 113:1

129:6,13 131:21 154:6 209:13 220:24 221:13,21,25 230:23 231:18 233:13,14

**responder** 222:1,2

**responders** 114:13 129:5 178:12,13 219:15

**responding** 15:20 55:2 73:22 90:11 108:4 126:13 132:23 136:6 175:18 204:8 218:2 234:10

**response** 57:19,23 58:8, 22 59:17 60:16 62:2,17 68:6,9 71:9,22 77:15 101:22 103:23 104:3,8,10 106:24 107:3, 16 108:1 112:8, 18 113:7 114:2 125:2,5,6,8,22 128:6 135:23 136:23 137:3, 12,14 138:19 139:1 141:15 143:1 148:15 149:5,10 150:19 151:7, 10,24,25 152:15 154:21 164:16 175:1 179:23 180:1,4, 19 181:19 185:22 204:13 205:13,17 218:23 219:12 222:24 225:12 226:19 227:24 228:4,13,22 230:11 232:4

**responses** 37:25 73:3 116:21 121:24 205:13

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit H**

responsibilities 46:3,9,10 48:13 49:12 52:1,2 59:20 60:22 62:12 63:12,23

responsibility 47:17 58:7,21, 25 59:1,4,15, 18,23 60:9,15 61:13,19 62:1, 16 63:4,6,18 64:10 69:15 77:19,20,24 78:2 83:14,15, 18,19 99:14,18, 24 109:24 120:15,22 122:6 147:19 148:10 154:8 181:13 188:18 205:5 218:18

responsible 46:14 60:3 62:7 64:19,22 95:15, 25 166:15 182:5 193:24 204:24 210:7

responsive 25:19

rest 57:12 115:1 235:17

restated 107:24

restraints 30:13

restrict 29:20 31:16,19

restricted 149:15

restrictions 30:17 31:14

restrictive 28:25 29:12 31:9 70:21 149:22

result 65:5 74:23 76:7,14, 23 77:13 78:1 147:18 152:18,

23 227:20

resulted 76:5 155:22

results 166:5

retaining 235:3

retarded 43:2

retrofit 24:4

return 232:23

revealed 133:3

review 9:24 18:9 40:5,10 67:6,11,14,22 68:2,8,11,18 124:13,18 125:1,13 126:1, 6 128:13,17 129:10,11 131:1,2 132:4, 6,9,14 133:17, 19,22 134:14 136:2 144:15 155:21 158:10 161:13 165:25 177:3 181:13 201:9 203:10, 21 227:2,4 241:9

reviewed 10:8 11:5,8 73:3,6 119:24 144:20 181:10

reviewing 150:5 161:15 178:14,18 217:20

reviews 226:23 227:6

Richard 102:12,24 125:4

rid 32:3

riot 120:21

risk 70:25 79:9 83:6 84:7,8 93:14 108:17 207:15

risks 93:10

rob 89:20

Robert 125:4

Rodriguez 127:21 131:4,6, 11,20 132:16, 21 133:7

roll 87:9,14,15, 17,22 88:3,14 89:17

rolled 89:17

Ron 8:11 9:10 17:6

room 34:14 84:2 90:2 141:4,6 209:17, 18 212:16 221:17

roughly 229:13 236:24

roulette 95:6 205:4

rounds 36:2 38:23 95:7 100:6,16 189:19

route 224:15

routed 133:14 181:11

routes 97:10

routine 192:2 228:20

routinely 203:24

rule 15:23 32:12,14,18,21 33:2,3 34:22 35:15 36:1 173:6 234:23

rules 13:23 39:18 75:2 234:24

run 89:15

running 28:12 103:18 172:25

runs 29:15

rush 115:7

Russian 95:6 205:4

———

**S**

———

safe 93:24 94:3,20,22

safety 39:10,18 47:17 50:17 51:25 55:9 56:1,2,7 58:18 60:3 62:8,18 64:12 66:9,13, 14 70:10,25 83:17 91:3,17 92:15 107:14 144:3 154:9,11 218:18 225:22 237:24 238:3,5

sake 68:21

Salyer 238:3

sat 209:17

satisfactory 187:4

Saturday 220:19

save 71:23 78:2 94:18 96:5,18 130:15 136:13 203:20

saved 131:14 132:15 152:3 175:2

saving 179:18

say-so 62:16

scale 72:16

scanner 239:23

scanners 240:17,18

scans 35:17

scattered 33:11

scenario 61:10 147:12

scenarios 75:25 76:2

scene 106:11 136:12 142:21 154:13 164:9 166:20 182:6 218:10 222:24

scheme 61:3

school 21:18 43:23

Science 45:3

searching 217:16

seconds 90:3 230:4

secretary 199:24

secure 87:10, 20,24 88:20,24 89:22 90:17,22 91:16,23 92:14

secured 105:13 204:6

secures 86:6

security 36:4, 5,6,10,15 37:14 38:23 47:17 82:3 89:12 97:9 107:14 138:7 150:5 172:19 214:13 218:19 226:6 228:17 235:4,8,13 236:2,23 237:4, 8,9

Security-certified 56:16

sees 59:22 61:11 142:17, 19

segregation 28:25

select 220:11 238:6



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**selected** 47:3 54:17

**selection** 64:15

**self-combusting** 238:18

**self-injurious** 151:6 152:2

**semantics** 196:16,19

**send** 66:18,25 67:1,2 114:24

**sending** 40:8

**senior** 200:2

**sense** 15:10,12 96:9 101:18 103:22 111:14 113:23 116:2

**sensitive** 14:24 79:5

**sentence** 128:7 162:13

**sentences** 235:14

**separate** 42:14,16 217:6

**September** 17:10 186:5,22

**sequence** 113:22

**sergeant** 59:21 99:15,20 209:24 214:11 221:9,10,11,20, 24

**sergeant's** 137:18

**sergeants** 49:1

**series** 122:22 184:3

**SERT** 125:7

**serve** 220:7

**serves** 20:20

**service** 121:16

**services** 22:23 28:10 49:19,20 56:4 66:15 117:5 143:6 225:17

**set** 10:19 18:18 29:6 65:23 70:18,22,24 71:3 74:2,20 76:9 78:16 83:15 96:19 107:16 119:18 120:13,17,24 145:6,12,18 147:15 154:25 162:19 163:3,7 165:11 167:11 169:12 183:19 184:9,10,13

**sets** 65:2

**setting** 59:9,14 67:22 75:23 76:15 83:9

**settled** 12:11, 12

**settlements** 208:15

**setup** 30:4 81:25

**seven-year** 46:2

**severity** 66:23 159:19

**shade** 190:20

**shake** 33:23 236:15

**shakedown** 33:25 34:23 35:12 36:18 140:15 187:10 189:2 236:14

**shakedowns** 10:2 79:25 186:2,17

**shaken** 172:23 185:5,18

186:10

**shame** 152:3

**shape** 197:24

**share** 203:25 204:3 214:16

**shared** 167:6 168:9 194:1,13

**sharing** 194:12

**sharper** 141:12

**sheet** 75:1 76:8,9 163:3 186:6

**sheets** 9:23 10:2 127:12 131:7 134:12, 21,25 140:3 186:3,21

**Sherri** 115:1

**shift** 49:3 62:10 97:14 98:14 99:6,14 100:16, 22 114:15 123:14 135:7 139:6 142:17 222:5,7 237:13, 16

**short** 71:19 110:4 115:15 136:8 151:23 160:18 164:12, 14 185:24 218:20

**short-circuit** 116:1

**shortly** 111:17 140:1 162:15 230:9,10

**shouts** 126:14 145:24

**show** 85:11 102:6,14 124:19 140:20 206:20 215:19 240:20

**showed** 126:21 131:4

209:2

**shower** 30:13

**showers** 150:15

**showing** 127:7 190:13

**shown** 53:19

**shut** 87:21,24

**shy** 69:18,21 70:7

**side** 46:6 49:16 80:22,23,24 126:19 127:1 133:1 146:2

**sidestepped** 58:5

**sign** 133:21,22 181:14

**signal** 105:6 106:13,16 137:4 221:13

**signature** 241:8,10

**significant** 64:21,23 65:6, 10,20 66:3,16 68:1,18 95:11 120:16,18 121:3 148:5 201:4 223:14

**significantly** 104:4 107:4

**silence** 14:19

**silently** 183:4

**similar** 29:4 67:15 144:21 236:12

**similarities** 146:22

**simple** 36:20 72:15 149:5

**simpler** 240:24

**simply** 23:22 24:24 29:14 166:11 207:16

**single** 187:13 212:8

**sir** 9:9 12:14 27:15 36:4 37:16 41:17,25 42:2,18 43:13 44:8 46:22 47:15 49:2,4 50:4 51:4 59:8 60:8,12,19 61:23 62:4 64:13,22 66:1,5 70:24 71:8 76:17 79:20 80:2 81:3 82:4 84:13 85:3 87:15 90:14 94:15 97:16 100:19 112:7 113:1 135:12 170:6 172:7 188:12 194:15 196:20 209:15 222:3,11 233:7 234:8

**sister** 195:19 196:2

**sit** 128:19 232:9

**SITCON** 125:9

**site** 52:6 102:1 171:10

**sites** 81:23

**sitting** 145:7 232:10

**situation** 99:23 113:4,5 120:23 121:9 123:2,6 129:11,14 130:8 146:13, 23 147:22,23 148:2,4,6 152:1 153:12 154:24 158:18 159:23 160:12 175:15 195:23 198:25 231:23 232:21 233:15

**situations** 147:7



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**size** 29:2,5 84:18

**sizes** 79:12,14

**skip** 107:11

**slides** 87:2

**slightly** 48:16 136:1

**slow** 14:9

**slowly** 230:17

**small** 79:7

**Smith** 8:10 9:19 10:13,14 11:11 66:7 73:11 74:20,22, 23 75:6 76:4 86:1 95:14,15, 20,21,24 96:3 97:3 109:1,15 111:16 116:6 123:9 139:8 149:19 153:1,9 154:24 158:2, 18,21,23 159:2, 10 161:25 162:17 163:24 164:25 171:8, 15 172:5,13 176:2 184:10 187:23 188:23, 24 189:15,19 190:11,13,21 191:5,17 192:10 195:18 196:10 200:20 202:1,12 203:19 204:14, 16 206:24 207:1 208:25 219:10 221:1 222:25 225:13, 15 226:13 227:17,25 228:4,13,22,24 229:1,2 233:16

**Smith's** 76:6 155:22 169:20 173:15 184:20 185:9 186:9 189:4 195:18 200:17 203:17 207:12,21

209:2 211:25 212:10 215:21 216:23 230:15, 21 233:3,12

**smoke** 65:23 82:5,8,15 83:1 84:19,20 104:5 179:22 180:14, 24 231:25

**society** 43:3

**socks** 31:6

**solemnly** 8:25

**son** 20:1

**sooner** 175:6 231:18

**sort** 41:21

**sound** 123:17 159:20

**sounded** 205:14

**sounds** 106:19

**source** 56:18

**sources** 165:14

**south** 8:13 40:22 80:23,24 214:13

**space** 80:7

**span** 184:3

**spark** 170:16 196:24 238:20

**sparked** 74:16, 25

**sparks** 65:1 74:25 163:2

**SPD** 156:22 157:2

**speak** 115:23 239:13

**speaking** 116:3 117:18

**special** 125:7,8

**specific** 39:8 58:7 59:21

67:11,14,22 68:6,8,10 109:9 152:17 162:7 177:8

**specifically** 26:8 57:6 58:20 70:15 109:16 127:5 128:19 131:16 132:19 133:7 136:14 145:4 149:10 158:5 169:23 184:24 203:23 220:21

**specifics** 31:2 240:4

**speech** 14:10 38:7 204:24

**speed** 53:23

**spelled** 114:10

**spent** 79:2

**spin** 199:2

**spiral** 223:14

**spirits** 223:13

**spoke** 195:15

**spot** 170:21 171:14

**spotness** 108:18

**spreading** 177:24

**sprinkler** 23:16,25 27:10, 13 80:11 225:19

**sprinklers** 143:7,11,12 152:11

**staff** 9:21,23 33:21,23 34:9, 12,15 35:3,10, 15,22 36:2,6,14 37:4,8,12 38:21 40:23,24 41:7 47:10 49:13 56:9,11 57:10 59:3,12 63:12,

22 65:2,18 66:11 68:25 71:6 72:10,14 73:8,24 79:22 81:7 83:11,17 84:11 86:9 91:4,5 93:23 94:25 95:7,8 96:4,11,18 97:1,7,8,16,18, 22,24 98:15,22, 23 99:4,9 106:20,22 107:18 108:3, 19 109:16,18 112:15 114:22 116:8 121:17 125:21 127:10, 17 128:21 129:9,12,19,23 130:13,16,22 131:5,6,12 134:18,22 135:6 136:6 137:16,17 140:3,19 142:7, 9,18,19,21 145:23 146:1,3 147:19,23 148:9 149:20 150:2,5,8,13, 16,23,25 151:12,24,25 154:5 159:22 164:8 166:15 167:4 172:12, 18 175:9,15 176:17 179:24 180:19 181:7, 18 182:8,10 184:6 188:15, 17 200:2 203:18,22 204:14 205:8 206:2,3,16 208:9,11,19 209:25 210:13 211:23 212:9, 23 214:8 215:13,14 218:5 220:2,12, 22,23,25 223:8, 9,10 224:5,24 225:7,8,17,20 226:3,5,8,12 227:1 228:6,8

232:1 233:11, 13,22,25 235:3, 5 236:3 237:12, 17 240:8

**staff's** 130:6, 14 230:11

**staffer** 126:21 205:15 228:14

**staffers** 100:14 127:23 227:16, 21

**staffing** 98:24 99:1 152:17

**staffs** 98:14

**stage** 129:5 145:12

**staged** 129:25 225:4

**stand** 199:1

**standard** 67:22

**standard-type** 22:19

**standards** 24:9 55:2 68:2 79:14

**standpoint** 69:14 77:14 205:17,22 216:17 225:1 232:17,20

**stands** 81:12

**start** 14:11,14 42:3 67:18 68:16 74:1,10, 15 75:23 76:13, 22 77:1 78:7 110:19 111:10 144:16,18 179:10 196:12, 13,21 204:5,16 205:3

**started** 37:16 41:15 42:1 74:13,22 76:4, 7,18 95:18 109:6 147:3,10 151:2 152:1

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

154:18 164:11, 14 166:4 170:17 174:12, 13,17 175:3 184:11 186:4, 22 195:24 196:3,11,25 197:1,2,7,14,20 198:1,3,9,21,24 199:1,2 231:24 238:11

**starting** 14:22 75:22 94:4 106:12 149:3, 18 204:25 235:5

**starts** 15:6 83:6,24,25 84:2 93:15 94:23 117:3 118:8 145:20 220:4

**state** 9:8 18:25 19:5 21:21 22:7,11 23:3,17 24:15 27:8 33:24 34:1 35:8,13 42:25 43:2,10,14 45:19 47:7,25 59:15 60:4 66:2,17 67:7,13 70:16,17 71:10 72:3,6,11,13 74:12 75:3 76:14 78:8 79:8,13 80:17 83:5 86:17 87:1 88:22 91:22 101:14 102:11, 25 103:6 110:19,20 112:5 123:4 136:6 138:7 139:25 143:17, 18 144:13 149:14 156:22, 24 157:3,23,25 164:6,7 168:1 181:21,22 182:3,4 193:7,8 194:17 203:18 207:15 209:15 218:19 220:5 221:11 232:13

236:18 237:3,6 238:13

**State-certified** 56:15

**statement** 104:7 125:25 166:6 176:22 182:3 184:7 215:15 221:12

**statements** 9:21

**states** 8:12 183:10

**stating** 183:18

**station** 86:25 90:2 103:20 104:25 107:5,8 140:20 212:11, 24 213:4,8,13 214:14

**status** 29:12 240:7

**stay** 31:10 37:20 41:18 100:21 101:3

**stayed** 43:25

**steal** 89:20

**steel** 32:5 139:14,15

**Steffi** 8:4 64:7 110:11 160:25 201:17 239:6

**Stemmler** 156:19,21,22

**step** 83:4 137:2,13

**steps** 107:11 149:6 217:23

**Steve** 222:5 229:12,20

**stickers** 16:14

**sticking** 238:21

**sticks** 88:18

**Stidham** 104:2

107:7

**stolen** 92:20

**stop** 13:25 80:15 233:24

**stops** 47:13 116:19 117:11 172:4

**stored** 30:20

**stores** 172:25

**stories** 165:18

**story** 112:24

**straight** 123:8

**straightforward** 36:21

**strategic** 225:24

**strategically** 225:24

**stream** 157:14

**street** 104:22 237:7

**stress** 125:10 157:12,18 160:15

**stretch** 224:1

**strike** 68:16 76:12

**string** 156:14 169:4 183:24

**strip** 115:20 164:18 183:12

**structure** 21:6, 8 23:21 29:6 47:25 53:14 87:13 93:9

**structures** 21:5

**struggling** 158:7

**stubborn** 157:14

**study** 225:22

**stuff** 9:17,19

15:12 56:13 115:18 164:25 169:20 171:1 172:8 185:13

**stupid** 204:16

**subdue** 136:7

**subject** 34:22 79:5 102:14 119:8 140:5 201:2

**subjects** 10:1 14:24 123:14

**subsequent** 122:21

**substance** 201:7

**substantial** 33:11 228:24

**substantially** 22:14

**substantiation** 223:19

**succeed** 88:8

**suffered** 152:3

**sufficient** 26:19 27:8 78:25 240:10

**suggest** 13:3 73:5 113:18 160:17

**suggested** 23:13

**suggesting** 79:15

**suicidal** 145:6

**suicide** 96:19 145:10 147:11

**Suites** 8:8

**sum** 201:7

**summarize** 34:25

**summarized** 214:23 215:2

**summary** 13:4

26:21 111:17 120:9 128:9 157:13 162:2,4, 9 163:24 194:21

**Sunday** 184:5

**Super** 18:17

**superintendent** 44:24 45:7,11 46:1,5,25

**superintendents** 44:15

**superior** 103:11 194:4

**superiors** 122:10 161:25 162:5 184:8 186:17 190:18 191:19 225:17

**supervise** 49:17

**supervised** 46:16 51:5 59:11

**supervises** 48:23 49:13,17

**supervising** 59:3 182:5

**supervision** 176:13,14

**supervisor** 36:18 46:11 51:16 53:1 55:1 57:25 58:1 61:11,12 62:6 63:9 98:15 99:14 114:16 142:17 172:3 195:9 218:17 222:7

**supervisors** 49:3 100:1 206:23

**supervisory** 63:11,18 137:16 142:19

**supplement** 56:19



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

supplies 31:5 75:3

supported 130:13,16 131:12

supposed 32:9 34:2 35:5, 20 36:13 52:17 69:1,2 165:1,3 171:2 175:18 210:13 214:10 240:12

suppression 22:21 23:4,16 24:5,13,23 25:25 225:18

surrounds 19:19

surveillance 140:21 141:8, 21 142:5,22 208:21,23 209:2,18 215:20 228:1 229:24 231:4

Susan 112:20

susceptible 82:21,22,23

suspected 116:11 170:16

sustained 146:5 148:5

swear 8:25

sworn 8:23

system 23:4, 25 24:5 26:18 27:7,10,13 34:18,20 41:25 52:14 59:22 80:12 82:6,16 84:22,25 85:2, 5,8 91:11 108:16

systems 22:21 23:16 60:23 63:13 85:10 86:24 135:21 141:1,21 149:13 152:9,

10 225:18,19

———— T ————

tab 93:3

table 126:20

tablet 32:10 171:13

tablets 115:17 169:25 171:12 187:12

tabs 9:14

takes 82:25 84:19 91:7,8

taking 21:21 55:18 95:10 117:23 126:20 161:8 232:7

talk 14:9 20:12 39:4 109:2 112:20 114:23 136:9 153:2 179:20 202:9

talked 51:17 59:19 91:13 93:8 106:25 107:3 108:25 136:11 137:23 138:23 143:10 147:14 148:16 149:7 175:16 196:14 207:20 208:13 217:1 222:9 233:19

talking 14:23 18:21 27:12 40:6 61:5 68:14 78:6 79:3,6 108:7 118:9 123:7 170:8 171:16 173:4 174:22 189:25 206:20,22 224:23

talks 130:25 215:12 217:23

tall 82:14

task 9:22 10:2 135:7 140:2,3

195:14

tasked 175:22

tasks 235:16

Taylor 8:5 15:5 16:12 50:16 53:6 54:2,11 57:3,7,15,16,22 58:7,22,24 59:15,24 60:14, 17 61:15,18,25 62:12,15 63:18 64:11 94:7,12 198:17 237:22, 23

Taylor's 57:25 200:21

team 49:14 125:7,8 129:5, 25 157:12 160:16 189:14, 15 225:4

technology 140:25

telling 167:10 189:19 205:10

tells 58:15 192:15,18

ten 46:5 95:7 202:17

tendency 223:14

tenuous 34:9

term 12:18

terminated 226:8

termination 70:4

terms 31:3,4, 17,18 82:2 83:11 93:24 103:22 107:16 108:19 128:5 136:10 212:21 215:19 219:11 222:23

testified 13:18 17:19 18:19

34:21 70:20 76:16 95:14,24 128:15 202:3 231:4

testify 10:9,19 11:7,23 13:20 17:19,22 33:8, 10 176:9

testifying 211:3

testimony 9:1 11:1 12:1,25 17:9 18:14 20:16 42:20 130:20 141:7

text 110:17 111:7 116:4,5 117:17 118:15, 22 119:7 155:9, 12

texting 221:6

texts 112:14 113:22

that'll 49:5

theory 84:4 92:9

therapist 112:20

thin 237:20

thing 14:22 15:7 22:15 35:25 39:7,9 41:21 50:25 71:17 78:16 88:2,18 94:22 96:24 126:21 140:12 144:19 149:18 154:3 174:3 186:19 187:10 188:4,6 190:25 192:19 193:14 209:10, 11

things 12:22 13:18 18:19,23 25:8 35:17 37:7 40:21 52:5 56:21 57:19 61:20,23 63:13

68:24 69:3,9,25 71:14 75:15 78:6 89:14 97:17 100:7,8 108:8 130:18 133:9 135:22 137:5,7,10 141:17 152:12 171:9,19,22 173:12 187:11 192:2 200:16 208:12 209:16 216:21 223:1,9, 10 224:4 226:25 232:6 233:23 235:4, 25 239:24

thought 32:6 37:24 83:23 103:24 130:19 145:10 168:2 171:4 184:14 191:4 196:14 219:4 223:22 238:9

thoughts 166:9

thread 116:15, 16,25 118:16

threatened 151:18

three-person 118:16

three-year 68:7

throwing 235:18

thrown 115:8

throws 64:25

tier 36:8 85:8 99:24 180:15

tiers 28:11 29:6 83:1 97:14 99:6 100:3,6,15,17 139:5 235:12

tighter 30:17

time 8:7 14:9 18:24 24:10 25:21,22 40:25

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit H

42:25 43:16,20 44:14 46:7,10 47:1 50:13 55:4 56:8 64:3,7 73:14 78:25 79:2 84:19 91:8 93:16 96:5 98:1 101:9,22 102:24 103:23 104:3,8,10 106:9 107:3 110:7,11 121:7,11 124:8 125:15 127:12,24 131:7 134:12,21,25 135:12,19 136:8 137:3,12,14,24 138:6,9,10,19 139:21 140:11 144:15,19 145:20 146:10 151:2 157:3 160:20,25 162:3 166:10,22 168:2,24 177:21 178:2,14 179:23 180:1 181:20 184:12 185:5,16 201:13,17 203:19 204:8 205:14 209:8,17 210:23 211:22,24 212:10 213:6,11,14 214:8,20 215:20 219:4 222:24 226:13 227:17 228:9 231:25 232:4,8,15 237:25 239:2,6 241:22

**timeframes**
136:15

**timekeeping**
135:21

**timeline**
174:25 175:19 177:5,12,18 180:22 213:25 231:25

**timelines**
174:20 175:8,9 214:21

**timely** 97:2 175:10,21

**times** 36:15 60:20 73:9 83:22 96:17 100:20 113:7 114:2 139:5 149:21 150:2,6,9 151:12 166:9 171:12 175:16 177:11 188:13 228:2,6,15

**timestamp**
230:1

**title** 25:14 56:1

**today** 8:5,6 11:9,13 20:15 42:10,11 44:17 64:7 79:2 86:22,23 110:11 132:1 135:3,22 157:13 160:25 176:10 187:1 190:12 201:17 208:13 229:3 232:9 234:9 239:6 241:11,12

**told** 18:23 22:25 23:14 28:10 100:21 134:20 158:6 172:15 239:14,17

**tool** 178:23 179:5,6 208:23 220:7

**tools** 208:19

**top** 47:25 53:9 82:6 87:9,13,23 88:14 112:4,5,14 113:21 169:8,15 182:1 186:25

**topic** 123:15 137:22

**tore** 129:20

**total** 170:13 236:24

**tough** 222:18 235:3,21 236:16

**track** 13:22 186:2

**tracked** 38:22

**tracker** 185:23,25 186:1

**tragic** 96:2,15,17 179:16 231:1,23 233:16

**train** 219:4 238:9

**trained** 55:1

**training** 9:23 53:24 54:2,11,21 67:12 109:10,12 138:9 140:3 143:19 218:22 225:20 226:21 227:10,15,19 233:22 237:22

**transcript**
15:18 16:8 17:5,9 18:8 241:19

**transcripts**
12:1 17:3,18 18:9,15

**transferred**
43:3 45:18,21,23 46:6

**travel** 82:10

**travels** 82:8

**Travis** 157:8,17,22 160:13,16

**treated** 154:12

**treatment**
65:19,22

**trigger** 82:11

106:12

**trip** 65:7,19

**tripped** 73:7

**trivial** 235:16

**trouble** 114:25

**true** 91:20 108:21 109:15 188:20

**trust** 221:4

**truth** 9:2 13:12 39:11,15 69:24 70:1

**truthfully**
17:20

**Tuesday**
157:10

**turn** 86:10 87:22 119:19 153:1 201:19

**turned** 52:8,13 106:10 134:22 170:20 218:23

**TV** 31:8 32:11 93:3 171:13,23 187:12

**TVS** 115:17 170:2,3 171:25

**twisting** 198:6

**two-and-a-half**
206:9

**type** 179:2 190:24 192:7,19 235:10

**typed** 9:13

**typically** 87:5 98:17,18 99:24 151:15 200:15

**typo** 174:11

———————

**U**

———————

**ultimate** 47:16 69:14 218:18

**ultimately**

43:22 96:7 219:16

**unable** 179:14

**unauthorized**
75:21 172:6

**unavailable**
157:5

**unaware**
106:17

**uncommon**
173:2

**underneath**
69:23

**underqualified**
54:3,11

**underscore**
39:19

**underscoring**
40:2

**understaffed**
53:21

**understand**
12:25 13:15 15:9,16 26:5,15 27:1 28:24 33:1 35:11 42:20 47:24 58:6 65:9 68:14 71:21 75:5 90:15 97:22 99:13,23 130:7,10 137:9 156:1 159:22 184:6 204:22 213:21

**understanding**
41:14 61:9 193:10 219:4 232:10 233:7,9

**understood**
15:3,21 223:18 241:5

**undertake**
139:18

**undertaken**
39:18

**undertaking**
48:14

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

undertook 138:14

underwear 31:6

unfortunate 208:17

unhook 90:10

uniform 49:4 73:16 235:11

uniformed 48:23

unit 23:24 24:23 25:7 26:1,12,14 29:2,3,12,14 30:11,21 49:14 59:22 61:11 62:9 63:11 70:21 81:18,19 87:6 98:13 99:7 100:18 105:7 107:5 127:12, 24 131:6,7,12 135:6 137:25 142:10,13,17, 19 143:4 146:9 149:23 174:10 180:15 210:3,7, 9 213:4,9,10

United 8:12

units 23:6,7,8,9 26:24 28:1 29:10 30:24 31:14 97:13 98:16 109:22 143:25 149:15, 22 150:17,18

Unlike 84:6

unlocked 91:9

unlocking 86:13 105:11 106:4

unlocks 86:10

unobserved 233:2

unpack 27:1

unpainted 87:16

unquote 187:24

unresponded 233:2

unsure 186:24

untoward 120:22

untrue 212:14

unusual 101:11

unvarnished 69:24

updated 183:7, 17

updating 138:24

upgrade 141:21 143:6 152:9

upgraded 37:21 143:16

upper 97:14 99:6 100:15,17 139:5

upset 64:24 129:19 159:19

upwards 177:24

urgent 84:12

urgently 71:18

urine 235:18

**V**

vacancies 98:7,8

vaguely 145:10

Valencia 8:9

valuable 142:12

vantage 122:5 208:15

variety 49:17 151:19

vast 76:17 89:12 104:16

vendor 77:6

verbal 66:21

verify 26:23 27:5 34:3

vicinity 71:7

video 11:20 113:7 114:1 142:10 178:18 179:20 209:8 219:13 241:18

videos 204:1

view 26:18 27:1,7,9 74:19, 22 95:17,18 96:1 129:13 173:20

viewing 81:23

viewpoint 81:9

vigilant 82:2 83:10,11 93:23 94:20 108:3

violation 69:2 75:2 236:2

violations 52:7 55:3 125:20

visibility 81:7, 18

visible 172:14 177:10,20 178:7,11 209:4 210:1 211:25

visitors 239:19 240:2 241:2

visits 50:24

voice 15:10 156:25 221:15

voice-mail 195:17

volunteer 57:11

vote 150:12

vulnerability 93:14

**W**

wage 235:5

wait 173:13

waiting 181:20

waivers 24:6

walk 29:8 114:22 172:24 214:13 235:11

walked 87:3 213:6

walking 19:9, 12 172:20 213:4

walks 95:10

walkway 19:10,12

wall 26:22,24 236:20,21,25 237:1,5,9

wall-mounted 25:1

wall-to-wall 209:19

walls 19:18 24:21 25:23 26:8,17 47:18 102:3 143:24 144:2

Walton 214:11 221:1

wand 240:13

wanded 239:24 240:8

wanted 20:12 43:17,21,25 51:24 88:1 91:24 101:7 119:19 129:4 171:11 175:11 198:5 206:19

warden 8:8 19:21 44:16,17 45:24 46:2,4,7, 8,24 47:6,24 48:10 49:9 58:3 59:3 63:10 64:6 94:8 110:10 160:24 193:24 200:16 201:16 202:22 203:12 239:5

wardens 203:3

Wardlow 51:15

warranted 65:18,20,21

Warren 182:18

watch 99:11 141:4 210:21 234:2

watched 232:23

watching 141:6 142:1,9 210:18

water 178:4,21 180:3 216:23 217:25 218:8, 11

Waylon 50:12

ways 70:3 100:1 135:1 147:3 224:5

weapons 125:8 129:5,25 130:1 190:14 191:2 225:3 241:3

week 73:17,19 95:24

weekend 115:1

weekends 115:4

weeks 20:21 33:7 85:25

weird 113:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**

**well-being** 36:11 142:2 158:8

**Welsh** 8:5

**west** 80:25 146:2

**Westville** 42:1 43:9,10 44:24 45:13,14,16 238:4

**whatever's** 105:10

**whatsoever** 96:10 134:2 206:14

**wheel** 74:24 76:7 163:2 170:16

**Whelan** 124:5 126:5 127:16 128:3 133:14, 24,25

**Whelan's** 125:15 128:8

**white** 9:11

**who've** 60:22

**whoever's** 213:9

**wide** 145:7

**wider** 81:2

**wife** 19:24

**William** 47:1 95:13,23

**Williams** 221:23

**Wilson** 47:1

**window** 178:13

**windows** 22:17

**wiring** 115:21 170:5

**witnesses** 12:1 33:8,10 239:14

**word** 12:20

**words** 76:10 88:17 155:1 157:20 186:7 198:7 204:19, 20 214:21 222:19 228:16

**work** 31:12 41:4 43:21 49:14 52:7,12 57:11 66:11,14 74:24 77:20,25 98:19 112:21 156:15 233:8, 10 235:4,7

**worked** 42:21, 25 43:6 82:18 115:19 176:13

**workers** 37:23 49:15

**working** 34:6, 11,13 77:6 174:10 196:23 214:11 220:23

**works** 22:23 87:5 157:9 176:13

**worried** 223:8

**worry** 16:19

**worse** 159:17

**worth** 9:13 173:23

**would've** 26:23 90:7 118:24 126:22 129:7,24 131:22 155:4 157:25 158:17 159:9 160:7 180:2 219:3

**Wow** 115:17

**write** 167:5 174:9 190:10 195:22 236:3,9

**writes** 193:6

**writing** 16:20 39:21 40:20 162:5

**written** 10:4 37:12 38:20 62:11 162:20 174:5 236:13

**wrong** 78:5 96:23 134:1 161:6 179:5,6 205:23 217:8 218:2

**wrote** 115:7,14 132:9 162:21 166:17 190:18 195:9 236:9

---

### Y

---

**yards** 19:4

**year** 20:9 37:21 45:20 72:18 79:25 186:5

**years** 10:6 20:10,11 28:10 37:6,13 38:21 39:21 41:16 46:21 67:25 74:17 98:24 136:16 190:11 235:23 238:19

**yelling** 146:2,3

**yells** 145:24

**yes-or-no** 38:17

**yesterday** 110:18

**young** 43:16, 21



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
—COURT REPORTERS—

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit H**