

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

# CASE NO. 3:24-CV-00185

# MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE

# OF THE ESTATE OF MICHAEL SMITH, AND ON

# HER OWN BEHALF

# V.

# RON NEAL, ET AL.

# DEPONENT:

# DEBORAH TAYLOR

# DATE:

# June 27, 2025



a courtroom
**powerhouse**

schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

**Exhibit L**

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

JUDGE DAMON R. LEICHTY

MAGISTRATE JUDGE JOHN E. MARTIN

CASE NO. 3:24-CV-00185


MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE

OF THE ESTATE OF MICHAEL SMITH, AND ON

HER OWN BEHALF,

Plaintiff,


V.


RON NEAL, ET AL.,

Defendants


DEPONENT:  DEBORAH TAYLOR

DATE:      JUNE 27, 2025

REPORTER:  MEREDITH SARJENT

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

APPEARANCES


ON BEHALF OF THE PLAINTIFF, MYSTI VALENCIA, AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF MICAHEL SMITH, AND ON

HER OWN BEHALF:

Locke Bowman, Esquire

Loevy & Loevy

311 North Aberdeen

3rd Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: locke@loevy.com

(Appeared via videoconference)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, LT. DENNIS KOEN, CAPT. VINCENT MCCORMICK, SGT. AMON LEE, SGT. JENIENE WALTON, OFFICER DARNELL CROCKETT, STEVEN MCCANN, LT. LATRICE JONES, SGT. ERNEST WILLIAMS, SGT. MICHAEL EVERETT, OFFICER JAYLON SINGLETON, WARDEN RON NEAL, CHRISTOPHER BEAL, KEVIN CROSS, ART KAUFMAN, ANDREW KMITTA, JASON NOWATZKE, NADINE SMITH, DOUGLAS WARDLOW, DEBORAH TAYLOR, JANILLE WHITAKER, AND DANIELLE BROWN:

Gustavo Jimenez, Esquire

Office of the Indiana Attorney General

Indiana Government Center South

302 West Washington Street

5th Floor

Indianapolis, Indiana 46204

Telephone No.: (317) 232-6201

E-mail: gustavo.jimenez@atg.in.gov

(Appeared via videoconference)

Also present:  Carly Cato, law clerk from Attorney General's Office; Meredith Sarjent, videographer

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

INDEX

                                                Page

PROCEEDINGS                                      6

DIRECT EXAMINATION BY MR. BOWMAN                 7

CROSS-EXAMINATION BY MR. JIMENEZ                 168

REDIRECT EXAMINATION BY MR. BOWMAN               178


EXHIBITS

Exhibit                                          Page

1  - Subpoena To Testify in a Deposition in
     a Civil Action                              11

2  - Letter From the Office of the Attorney
     General                                     12

3  - Job Des For Safety Hazard Manager 2         51

4  - Work Orders for Electrical Issues           64

5  - Maintenance Requests 2022                   68

6  - Appendix C To ISP Emergency Manuel          74

7  - Fire Drills Evacuation Evaluation           90

8  - Report of Weekly Inspection                 100

9  - E-mail From Captain McCann                  131

10 - Photograph Of Fire                          139

11 - E-mail from Williams Lessner to
     Deborah Taylor                              155

12 - Critical Incident Debriefing               155



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

STIPULATION

The VIDEO 30(b)(6) deposition of DEBORAH TAYLOR was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUSIVILLE, KENTUCKY 40202, via videoconference in which all participants attended remotely, on FRIDAY the 27th day of JUNE 2025 at 10:00 a.m. (CT); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that MEREDITH SARJENT, being a Notary Public and Court Reporter for the State of INDIANA, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

PROCEEDINGS

THE REPORTER:  We are now on the record.  My name is Meredith Sarjent.  I'm the online video technician and court reporter today representing Kentuckiana Reporters.  Today is the 27th day of June 2025, and the current time is 10:00 a.m. Central.  We are convened by video conference to take the deposition of Deborah Taylor in the matter of Mysti Valencia, as personal representative of the estate of Michael Smith and on her own behalf v. Ron Neal, et al., pending in the United States District Court for the Northern District of Indiana.  Case number 3:24-CV-00185.  Will everyone, but the witness, please state your appearance, how you are attending, and the location you're attending from starting with Plaintiff's Counsel?

MR. BOWMAN:  My name is Locke Bowman.  I'm attending by Zoom from the Loevy offices in Chicago, Illinois.

MR. JIMENEZ:  And I'm Gustavo Jimenez on behalf of the defendants attending via Zoom and currently located at the Attorney General's Office in Indianapolis, Indiana.  And then just for the record, we have a law clerk from our office, Carly

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

Cato, who is also sitting in and attending remotely via Zoom as well.

THE REPORTER:  Thank you.  Ms. Taylor, will you please state your full name for the record?

THE WITNESS:  Deborah Taylor.

THE REPORTER:  Counsel, off record we did agree to stipulate as to Ms. Taylor's identity.  Do both parties still agree?

MR. BOWMAN:  This is Ms. Taylor.  We stipulate.

MR. JIMENEZ:  Yes.

THE REPORTER:  Ms. Taylor, will you please raise your right hand?  Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE REPORTER:  Thank you.  Counsel, you may begin.

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.   So you've already stated your name.  We'll skip that part.  And you've heard that my name is Locke Bowman.  Have you given a deposition before, Ms. Taylor?

A.   No, sir.

Q.   It's -- I am just going to go through a few

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

ground rules, which I do with everybody.  First of all, this is not intended to be a marathon or endurance contest.  If you need to take a break at any point, let us know.  We'll stop and give you an opportunity to attend to whatever is necessary.  The only limit on that is if I have asked you a question, I'll want you to provide the answer to that question before we stop. You are, speaking of questions, absolutely entitled to questions that you understand.  So if for any reason, something that I've asked you doesn't make sense because I've dropped my voice and you haven't heard me, because we've had a technical problem on the Zoom link, or because I've just asked something in a garbled way that doesn't make sense to you, I need to count on you to let me know that you don't understand the question. Will you do that?

A.    Yes.

Q.    If you've -- the reason it's important is if you don't say, I don't understand the question, we're going to be making a transcript of my questions and your answers.  Everybody who reads the transcript is going to assume that you understood the question and that the answer that you're providing is an answer to the question that I've asked, so that -- that's why this is important -- in fairness to everybody.  Does that make

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

sense?

A.   Yes.

Q.   You should, and you're already perfect at this, be sure to answer questions audibly and in words. The responses uh-huh or uh-uh are ambiguous.  So if the proper answer is yes or no, you should state that.  I trust that makes sense to you.

A.   Yes.

Q.   And then the last thing is that we need to do our best not to talk at the same time.  I'm a little bit slow of speech, so please be sure that I've finished asking my question before you start giving your answer. And then on my side, my job is to be respectful of your answers and let you complete them before I start asking the next question.  The reason this is always important for the sake of the transcript, but it's particularly important when we're on a Zoom link like we are this morning, because if two people are talking at once, it's just sound and there's no way Meredith can get it down. I -- we'll both do our best on this, and Meredith will remind us, I'm sure if we get in trouble, okay?

A.   Yes, sir.

Q.   And then finally, can you let me know what you have in front of you and where exactly it is that you're sitting today?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.    I am in my office at Indiana State Prison, and what I have in front of me is the Interrogatories and then the stuff that you guys had sent me.

Q.    Okay.  And when you say, "the stuff that you guys have sent me," what do you mean by that?

A.    The -- the subpoena.

Q.    The subpoena?

A.    Right.

Q.    Right.  And I'll ask you a few questions about that.  Anything else?

A.    No.  I pretty much cleared my desk off.

Q.    Great.  Perfect.  I'll have some exhibits and we'll both be able to look at them together.

A.    Okay.

Q.    And if we need help getting things to you, we'll -- I'm sure we'll be able to figure out a way to do that.  So could you tell me, first of all, what you did to prepare to testify today?

A.    I spoke with the attorney and tried to just go through the stuff that you guys had sent, the subpoena and stuff and just try to prepare and, kind of, refresh my memory on some of the things.

Q.    Okay.  So it was a matter of conversation with Mr. Jimenez?

A.    (No verbal response.)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Yes?

A.    Yes.

Q.    How long did you and he speak?

A.    About two hours.

Q.    When did the conversation take place?

A.    What's that?  Wednesday.

Q.    Did you and he look at documents together?

A.    Yes.

Q.    What documents did you look at?

A.    I don't recall which ones they were.  The subpoena.  He had just showed me like the subpoena and stuff.

Q.    The subpoena.  Were there other documents in addition to the subpoena?

A.    I don't believe so.

Q.    Okay.  All right.  So without further ado, I want to try and get a document in front of us.  So I'm hoping that on your screen, you can see a subpoena pursuant to Rule 30(b)(6) of the federal rules of civil procedure, which I have placed on the screen that I'm attempting to share with you.  Do you see it?

A.    Yes.

Q.    It's several pages long.  It'll be marked for identification as Exhibit 1 to your deposition.  We're going to go back to it in a minute.  But before doing

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

that, I want to show you another document.  Are you able to see a new document on the screen or do I need to re-share?

(Exhibit 1 was marked for identification.)

A.    I mean, it's small, but I mean, I can --

BY MR. BOWMAN:

Q.    Do you see it now?

A.    Yeah.

Q.    And is it visible to you?  Is it big enough for you to see?

A.    Yeah.  Yes.

Q.    Okay.  So the document that I placed on the screen is a May 21st, 2025, letter to us, the lawyers for the plaintiff, responding to the subpoena by designating folks to testify as to certain subjects within that subpoena.  Have you ever seen -- this will be Exhibit 2 to your deposition.  Have you ever seen it before, this letter?

(Exhibit 2 was marked for identification.)

A.    No.  The only thing that I had -- if it doesn't look familiar, the only thing that I had seen was just the schedule of who has to do what time for these.

BY MR. BOWMAN:

Q.    Yes.  The -- you see your name as the first

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

designee?

A.   Yes.

Q.   And you are designated to address Topics 1, 5, 6, and 7 in --

A.   Yes.

Q.   -- the subpoena, so --

MR. JIMENEZ:  Locke, sorry.  Just to -- sorry.  You said 1, 5, 6, and 7, but it's 10.  So just to clarify that.

MR. BOWMAN:  Thanks for saving me.  1 -- it's not the first time you've done it.

BY MR. BOWMAN:

Q.   1, 5, 6, and 10 are the numbered paragraph topics that's you're designated to address, correct?

A.   Yes.

Q.   Okay.  So with that, we're going to set that aside and return to Exhibit 1, which I trust you can see on the screen now?

A.   Okay.  Yes.

Q.   Okay.  So Topic 1 is the Indiana Department of Corrections' policies, practices, customs, rules, regulations, and/or systems in effect at ISP between January 2017 and the present relating to emergency preparedness and response, including to fire safety, prevention, response, and management.  And you are here

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

today prepared to address that topic?

A.    Yes.

Q.    Item five is IDOC's prisoner firefighter program in effect at ISP between the beginning of 2017 and the present, including policies, practices, customs, rules, regulations, and/or systems in effect during that time for activating the prisoner firefighters during an emergency, enabling them to physically respond, and obtaining reports or feedback from the prisoner firefighters following an emergency. You are prepared to address that topic?

A.    Yes.

Q.    So with respect to this topic, what is -- you're the safety hazard manager for the Indiana State Prison, correct?

A.    Yes.

Q.    What is the role or the interface between your position and the prisoner firefighter battalion?

A.    I mean, I deal with the matters of, like, the health and safety of the facility, doing inspections. We have a gentleman at Central Office who does the preparation, getting the information to the fireman. I'm kind of a middleman.  As far as them getting their Fire I and II certifications, I have somebody who actually comes from the Central Office to administer their

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Exhibit L

testing and things like that.  I also do the -- I accompany the outside agencies for inspections, making sure that inspections are completed.  And if there's deficiencies, getting somebody in to fix any deficiencies that there might be.

Q.   **So are we talking about inspection of the firefighter's station or some other kind of inspection?**

A.   Their equipment, the fire systems, the extinguishers, things like that.

Q.   **Okay.  So do you have any role in supervising the firefighters?**

A.   Yes, I'm their go-to if they need things.

Q.   **And what does it mean to be "their go-to if they need things"?**

A.   If they encounter any issues, they will come to me and then I solve the issues.  If I cannot solve the issues, then I will make contact with somebody who can help me.

Q.   **Okay.  So in other words, you're a conduit or a middle person between the firefighters and IDOC administration with respect to their ability to perform their duties?**

A.   I'm not sure how to answer that.  I oversee the fire department.  Technically, I oversee the fire department.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   So the -- did you not understand the question that I asked you?

A.   I guess, I just don't know how to answer it.

Q.   Well, let me ask you a more specific question. I'm just jumping ahead a little bit.  You recall that following the Smith Fire, some of the members of the prisoner fire battalion had concerns about how things were managed, which they reflected in their reports. You recall that?

A.   I wasn't here, so I can't -- I wasn't here that day when it happened, so I don't know how they were released.

Q.   Okay.  So you were not actually there?

A.   I was not at the facility.  I was off that day.

Q.   Okay.  All right.  Did you come into the facility?

A.   Yes.

Q.   You came into the facility in response to the fire, right?

A.   Correct.

Q.   And you came into the facility, and you met with the firefighters in the custody hall?

A.   No.  I did not meet them in the custody hall.

Q.   Did you meet them someplace else?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

A.    Fire station.

Q.    Okay.  And you talked with them about the fire and their response?

A.    I really don't recall.

Q.    You don't remember the conversation?

A.    No.

Q.    Did you look at their reports?

A.    Briefly.  I haven't looked at them for a while.  I know that I gathered the reports to give to you guys.

Q.    Well, you -- I -- we're not the only people for whom you gathered the reports, right?  There were others who were interested in the reports as well?

A.    Well, I gathered them for Ms. James who gave them to whoever needed them.

Q.    Right.  Did you read them?

A.    No.

Q.    Not really?

A.    Not -- not -- not fully.  No.

Q.    Was it not a concern of yours, what the report said?

A.    I'm not going to say it wasn't a concern.  I mean, I read some of them, yes.  Do I recall what they say right now?  No.

Q.    See, I just asked you, did you read the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

reports?  I -- I'm not trying to --

A.    I read --

Q.    -- have a debate or a fight with you, and I just need some answers to some questions.  So my question was just: Did you read the reports?

A.    I read some of them.

Q.    Either you did, or you didn't, or you don't recall?

A.    I read some of them.  I don't recall what is in all of them.  No.  I don't recall what's in them.  It's been two years.

Q.    Sure.  All right.  Here comes my next question: Is it part of your job to review firefighter reports, subject to a call out of the prisoner fire battalion?

A.    I don't know.

Q.    Okay.

A.    It -- it's not specified in my job title.

Q.    Got it.  All right.  So we got distracted here.  Paragraph 6 is IDOC's infrastructure in place at ISP between January 2017 and the present, relating to fire prevention detection, management and response, as well as policies, practices, customs, rules, and regulations for the use of that infrastructure.  This includes physical tools and equipment for preventing,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

detecting, managing, and/or responding to fires such as fire extinguishers.  You're prepared to testify on that topic?

A.  Yes.

Q.  And then finally, Paragraph 10, IDOC's practices, policies, customs, rules, regulations, and/or systems in effect at ISP from January 2017 through the present, relating to inspections of the cell houses at ISP, including A Cell House.  Are you the person to testify on that subject for the prison?

A.  Some of it, yes.

Q.  What -- is there some part of it that you're not prepared to testify about?

A.  Well, I wasn't in this position in 2017.  I just became into this position in 2022.

Q.  Okay.

A.  So I can't speak of things in 2017.

Q.  Okay.  And that would be generally true with respect to all of the subjects that we've talked about?

A.  Correct.

Q.  So when, in 2022, did you assume the position of safety hazard manager?

A.  February.

Q.  February.  So you had all of 2022 essentially before the Smith Fire to be in the position before that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

event?

A.    Correct.

Q.    Okay.  What -- did you do anything -- just going back through these paragraphs again.  The first paragraph relating to the emergency preparedness standards and rules, did you do anything specifically to prepare to testify on that subject this morning?

A.    I mean, I have reviewed things to the best of my ability.

Q.    See, I'm interested in the things, Ms. Taylor. What things have you reviewed?

A.    Well, I really looked over the emergency manuals, things like that.  I don't -- the emergency manual.

Q.    I'm sorry?  The emergency manual. Specifically, there is an appendix C to the emergency manual relating to fire.  Did you review that in anticipation of testifying on this subject today?

A.    I'm -- I'm going to say yes.

Q.    Do you specifically recall reviewing it or not so much?

A.    I'm pretty sure I reviewed it.  I mean, there's -- I -- yeah, I'm -- I'm pretty sure I reviewed it.

Q.    Okay.  Ms. Taylor, do you need to take a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

break?

A.    Possibly.  This is just a little -- this is a lot.

Q.    Right.

A.    This is a lot.

Q.    Okay.  So I -- we will -- we're going to go off the record in a minute.  Let me just say to you, I am -- you know, I'm here to do a job, and I can be a little prickly in that capacity, and it is not my intention to make you uncomfortable or to cause you any pain or stress unnecessarily.  And if I am doing that, I apologize.  That's not what I want to do.  That's not the purpose here.  The purpose is to exchange information full stop.  So I want you to understand that I am going to continue to do my job, but I -- I'm not here to be your enemy.

A.    I understand.

MR. BOWMAN:  Okay.  So why don't we take five minutes?  It's 10:25 now.  We'll resume at 10:30, and we'll continue with the questioning at that point.

THE REPORTER:  We are now off record at 10:25 a.m.

(A recess was taken.)

THE REPORTER:  We are back on the record for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

the deposition of Deborah Taylor being conducted by video conference.  My name is Meredith Sarjent.  Today is June 27th, and the current time is 10:31 a.m.  You may continue.

BY MR. BOWMAN:

Q.   Okay.  So we were talking, when we left off, about the specific preparation that you'd done to testify on these specified subjects in the 30(b)(6) notice.  We left off at Paragraph number 1, which relates to policies, practices, customs, rules, regulations, and/or systems in effect relating to fire safety prevention response and management.  And you specified that your familiarity with that subject begins in February 2022, which is when you assume the position of safety hazard manager, correct?

A.   Yes.  Yes.

Q.   And you said that with respect to this topic, you looked at the emergency manual along with the appendices there, too; is that correct?

A.   Yes.

Q.   And while you don't specifically recall it, your assumption is that you looked at Appendix C, the portion of the manual specifically relating to fire response and preparedness, correct?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.   Are there any other documents that you looked at specifically in anticipation of being asked questions on topic number one?

A.   I don't have a specific answer.  Again, I've looked at many different things, but they were referenced or policy number wise and stuff like that. I don't recall policy numbers and things, but yes, I've -- I've looked at -- at different policies, and procedures, and things.

Q.   Is there anything you can tell me about, the policies, procedures and things that you've looked at?

A.   Like what?

Q.   Like how to identify them?

A.   How -- what do -- I don't understand.  How do I identify them?

Q.   Yes.  I'm interested in knowing what you looked at, and you -- you've given a broad answer and I'm just trying to press for a little bit of specificity so I understand what the policies are.

A.   I don't -- I really don't know how to answer that.  I mean, just like we had -- you had stated, like the emergency manual for preparedness, I reviewed that and looked into those things.  I -- I don't know what else you want me to say.

Q.   Okay.  So the answer would be, you're not in a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

position to tell me any more about the other documents that you looked at beyond what you've testified to already?

A.   Yes.

Q.   Did you look at the general post orders?

A.   I haven't reviewed the general post orders in some time.

Q.   Okay.  So certainly, not specifically in anticipation of this deposition?

A.   No.

Q.   All right.  Paragraph 5, I'll just share the screen again, so that you -- we can both be looking at it.  Paragraph 5, you should have visible to you.  Do you now?

A.   Yes.

Q.   So this is about the firefighters.  Any documents that you looked at in relation to your oversight of the firefighters to be prepared to testify on this subject?

A.   Say that again?

Q.   Are there any documents that you looked at relating to your oversight of the firefighters in order to be prepared to testify on the subject set out in Paragraph 5 that we're both looking at?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.   Well, and what documents are those?

A.   Section 9 of the emergency manual, I've reviewed.  And then what we had discussed earlier with the fire plan with the Appendix C.  I also have the layout for the Indiana State Prison Firefighter I and II training.

Q.   Anything else?

A.   No.

Q.   I'm sorry, I didn't hear your answer.

A.   No.

Q.   Thank you.  And then Item 6 relates to infrastructure for fire response, including fire extinguishers.  Is there anything that you examined in order to become familiar and prepared to testify about this?

A.   No.

Q.   Are there any documents, diagrams, or the like that you are familiar with, relating to the placement of smoke detectors within the -- in the facility?

A.   I have not seen them.

Q.   So the answer would be not to your knowledge?

A.   Correct.

Q.   Same question with respect to fire extinguishers.  Are you aware of any inventory documents, charts, lists, or diagrams specifying the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

location of fire extinguishers within the facility?

A.    Yes.

Q.    Could you tell me what that document is, or documents?

A.    It's a spreadsheet.

Q.    When was it created?

A.    Before I became a safety manager.  We've -- it was in place when I became safety manager.

Q.    Has it been updated?

A.    Yes.

Q.    And who's responsible for updating that spreadsheet?

A.    The -- actually, the firemen update that.

Q.    Is it a spreadsheet on Excel that when it -- when it's updated, you -- the earlier iteration is overwritten?  Sorry.  I'll ask the question in a different way.  When the spreadsheet is updated, does the institution retain a record of the earlier version of the spreadsheet so that you can see before and after?

A.    Not to my knowledge.

Q.    So the spreadsheet that exists today is the current map in effect of fire extinguishers throughout the facility?

A.    Yes.

Q.    Are you aware of whether there is such a



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

document with respect to the fire extinguishers that were in place prior to January 14th, 2023?  And the reason I'm specifying that date is that that's the date of the Smith Fire.

A.    Can you ask that again?

Q.    Sure.  Is there a version of this spreadsheet that shows the location of fire extinguishers that existed prior to January 14th, 2023, the date that Michael Smith perished in a fire?

A.    Not to my knowledge.

Q.    Okay.  Is the spreadsheet Excel?

A.    I believe so.

Q.    Are there any other spreadsheets or documents that show the location of firefighting infrastructure, such as hydrants, for example?

A.    An inventory of hydrants?  Is that what you're asking?

Q.    What I'm asking is: If there are any other documents of any kind, charts, lists, diagrams that show the location of other firefighting infrastructure other than the fire extinguishers which we've talked about and the smoke detectors, which I also asked you about?

A.    I have an -- I have equipment inventory list that is inside the fire station.

Q.    Okay.  Anything else?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.    No.    Everything is kept at the fire station that's relating to fire.

Q.    Okay.    I am turning now to Paragraph 10.    This relates to inspections of cell houses.    And we talked about the fact that you're not familiar with the process of cell inspection prior to February 22nd when you became safety hazard manager; is that correct?

A.    Inspection of cell houses?

Q.    Right.

A.    No.    When I -- when I started, sergeants and lieutenants, every week, do weekly inspections, so that is a thing that is a known thing.    But when I took over in 2022 -- so yes, I was aware of weekly inspections that are to be done in cell houses.    Yes.

Q.    Okay.    And I think we have some of those reports.    We'll look at them.    Other than the weekly -- and those are checkoff documents, right?    There's a chart and a response for each location and each concern, right?

A.    Correct.

Q.    And I -- I'm assuming that as safety hazard manager, you're responsible for maintaining those records?

A.    Yes, sir.

Q.    With respect to the examination of individual

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

cells within the cell houses for the presence of materials that might constitute a fire hazard, for example, do you have any role in that process?

A.    No.

Q.    Who does that?

A.    Staff in the cell house.

Q.    Do you interface with staff in the cell house about that issue?

A.    I'm not sure what you mean.

Q.    Okay.  From your standpoint as -- and maybe I should just ask you a preparatory question.  From your standpoint as a safety expert, that's what you are, right?

A.    Safety manager.

Q.    From your standpoint as a safety manager, you have learned, have you not, that one of the issues that is a recurrent problem with respect to fire in the Indiana State Prison is the presence of combustible contraband within individual prison cells, right?

MR. JIMENEZ:  Objection to form.  You can answer.

THE WITNESS:  I'm sorry?

BY MR. BOWMAN:

Q.    Sometimes I ask questions that there's a legal issue as to whether it's a proper question for me to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

ask, and Gustavo's job is to make an objection to preserve the question of whether my question is okay for a judge to decide later on. We don't have a judge here now, so the procedure is, after Gustavo makes his objection, we go ahead and get your answer to the question. And then, you know, whether the whole thing was permissible or whether I made a mistake to make it impermissible is something that gets sorted out by a judge later on. So for now, all you need to do is give Gustavo the opportunity to make the objection, which he did, and then you answer the question. I think, since I've been babbling for a while, the best thing for me to do is ask the question again and then we'll proceed. So here comes my question a second time. You are aware, are you not, that one of the problems that has caused fires to occur repeatedly within the Indiana State Prison is the presence of combustible contraband in individual prisoners' cells, are you not?

A.   Yes.

Q.   So the way to address that is through examination of the individual cells by staff, if I understand your testimony, right?

A.   Correct.

Q.   So my question was: Do you interface -- do you go back and forth with staff, from your role as safety

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

hazard manager and their role providing this form of security in the prison, to address this particular safety problem, namely combustible contraband in the cells?

A.   Yes.

Q.   And how do you do that?

A.   If I see a cell that is not standardized, too much property, if they have things that are wrong with their cell, I will either report it.  If there's something that needs to be fixed in their cell that I see, I will do a work order for them.

Q.   Okay.  So you do your own survey of the cells?

A.   If I happen to be on the range and I see something wrong or somebody stops me and addresses something with their cell, I will look at it.  If there's something wrong, I will put in a work order --

Q.   Okay.

A.   -- or advise staff.

Q.   Or have your staff do it?

A.   Correct.

Q.   Okay.  Any other way that you interface with security staff on this issue?

A.   Such as?

Q.   I don't know.  I'm asking you.  You have the job, I don't.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.   I mean, anytime staff come to me with an issue, I will address it.

Q.   Okay.  And is that something that happens on a regular basis?

A.   Well, it happens with the weekly inspections. If there's anything on the weekly inspections, I review them all, and I will put work orders in accordingly if something has not been put in yet.  If there's an issue that I need to go look at, I will go and look at it and help staff resolve it or resolve it myself or, again, put in a work order if it needs a work order put in.

Q.   Okay.  So an example of an issue that needs to be addressed might be an electrical socket that's not functioning properly?

A.   Yes.

Q.   Or a light with the chain broken?

A.   Yes.

Q.   And in those kinds of situations, you're typically ensuring that the issue is addressed from your position as safety hazard manager?

A.   Yes.

Q.   And there's a procedure whereby anybody who has that kind of issue can put in a work order, and your job is to process it?

A.   I can put the work order in myself.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Lieutenants and above can put in work orders.  If -- if there's a staff member who cannot put a work order in because they don't have access to that, they can either e-mail me, call me, or let their lieutenant on the housing unit know as well, or their shift supervisor.

Q.   Okay.  So when we were talking about your interface with staff regarding safety issues in individual cells, that's basically the -- what you were referring to?

A.   Say that again?

Q.   When you were testifying a little while ago about your interface with staff around safety issues in individual cells, this process of identifying an issue, putting in a work order, and proceeding to have the issue resolved, that's what you were talking about?

A.   As far as what I do?  Yes.

Q.   Okay.  Is there any -- oh, okay.  All right. We'll leave it at that for now.  Thank you.  On these subjects that we've been talking about, the infrastructure for firefighting, the policies and the procedures for safety in relation to fire, the inspections of cell houses, and so forth, is there anyone other than you who is in a better position to address these issues?

A.   As far as, like, the work orders and things?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.   Well, let's take them one by one so that we're clear about it, okay?  Item number 1, looking at it again, is the policies and practices relating to emergency preparedness and fire response.  You see it on the screen?  Oh, you don't.  Let me share it again. Now you see it on the screen, right?

A.   I don't write those policies.

Q.   Is there anybody who would be better qualified than you to talk about these policies at Indiana State Prison?

A.   I mean, the major.

Q.   Which major is that?

A.   Wardlow.

Q.   Okay.  Well, we talked to him.  So he would be better qualified than you on this subject?

A.   On -- on policies?  Probably so.  Yes.

Q.   All right.  Anybody else who'd be better qualified than you?

A.   Deputy Warden Nowatzke, Warden Neal.

Q.   All right.  Moving to number 5, relating to the firefighter program.  Is your answer the same, that Wardlow, Nowatzke, and Neal would be better qualified than you to talk about these things?

A.   No.  That would have -- Warden Becker is from Central Office.  And again, he's the one who does the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

firefighter training programs, and the one who does their testing, and things like that.

Q.   Okay.  So he would be better than you on that particular aspect?

A.   Correct.

Q.   Yes.  And do you have a role to play in assessing the procedures for calling out the prisoner firefighters?

A.   It -- it is a -- it is a protocol.  Anytime there -- the fire alarm is going off, they call a signal.  Anytime they see smoke or a fire, they call a signal.  When that signal is called, the Indiana State Prison firemen are to be released to respond.

Q.   Right.  That's the procedure.  And the effectiveness of that procedure needs to be monitored and assessed on an ongoing basis.  Would you agree with that?

A.   Yes.

Q.   Right.  Do you have any role in doing that?

A.   Yes.

Q.   What is your role?

A.   If there were an incident that took place that firemen were not released, then I would address that issue with staff.  I mean, I -- I address any -- any issues that I see that -- that are reported to me, then



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

I address the issues.

Q.    Okay.  You're the go-to person for that purpose?

A.    Correct.

Q.    All right.  As a general matter, it's, you know -- for those of us who live in the community, it's -- in the free community, it's unusual to have firefighters who are inmates or prisoners in an institution subject to their movement being controlled, right?  That's an unusual circumstance.

A.    Are you asking me that?

Q.    I am.

A.    I mean, for me, it's not --

Q.    Yes.  I -- I'm asking you if you agree with that proposition.

A.    I don't know if I want to agree or disagree with that.  I -- I mean, this is the only facility I've ever worked at, so --

Q.    So let me try the question again.  Compared to the situation in the community where you live, in that community, the firemen are citizens like yourself, and they --

A.    Uh-huh.

Q.    There are no restrictions on their movement. Their ability to be called out and respond is



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

unconstrained by issues of custody status, right?

A.   (No verbal response).

Q.   Right?  I thought that was a simple question.

A.   Yes.

Q.   Okay.  In the Indiana State Prison where you work and operate, it's different, right?

A.   Yes.

Q.   I mean, the prisoners are prisoners, and one thing about prison is that it's very important to control the movement of all of the people in custody, right?

A.   Yes.

Q.   That's how you keep the institution safe, that's how you make sure everybody is accounted for, and that's one of the major jobs of the administrators of a prison, right?

A.   Yes.

Q.   And the firefighters are prisoners, yes?

A.   Yes.

Q.   So the firefighters, because they are prisoners, are also subject to the constraint that their movement must be controlled and monitored, right?

A.   Yes.

Q.   Right.  So that's a difference between the prison firefighter and the firefighter at your local

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

fire station in the community where you live, right?

A. Yes.

Q. And that's a difference that needs to be managed from your standpoint as safety hazard director; is that right?

A. What do you mean? I -- I'm not --

Q. Is that right or not right? Or you just don't understand the question?

A. I don't understand part of the question.

Q. Okay.

A. Like --

Q. Well, one of the things about the situation at the Indiana State Prison with respect to fire response that has come up, is the issue of getting prison firefighters to the scene of a fire on a timely basis. That's an issue, right?

MR. JIMENEZ: Objection to form. You can answer.

THE WITNESS: Our firemen will respond a whole lot faster than Michigan City Fire Department.

BY MR. BOWMAN:

Q. I didn't ask you that, okay? I -- please just -- again, I don't want to argue with you. I just would appreciate your listening to the question and answering the question. Isn't it true that, in your experience as

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

safety hazard manager, you have reviewed situations in which there was a concern expressed, if not, by anyone other than the firefighters, at least by them, about their ability to get to the scene of a fire on a prompt basis?

MR. JIMENEZ: Objections. But you can go ahead and answer, Deb, if you know.

THE WITNESS: So has there been an issue of them being released? Is -- is that basically what you're asking me? I --

MR. BOWMAN: Meredith, I'm going to have you read the question back for Ms. Taylor.

THE REPORTER: Give me just a moment.

MR. BOWMAN: Thank you.

(The requested question was read back.)

THE WITNESS: Yes.

BY MR. BOWMAN:

Q. Okay. So my question was -- when we started, was: In your position as safety hazard manager, do you address this particular issue about the call out of firefighters who are also prisoners?

A. Yes.

Q. And you're the best person to talk about that issue, or are there others who are more qualified?

A. I -- I mean, there's myself, and I'm sure

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

there's other people as well that are qualified to talk on it.

Q.    I'm asking if you would defer to somebody else or if you're as good as any person to speak on behalf of the prison with respect to this issue?

A.    I believe so.

Q.    Okay.  All right.  So could you give me your educational background, please?

A.    Some college.

Q.    Where did you go to college?

A.    Ivy Tech.

Q.    I didn't hear that.  Ivy Tech?  And where is Ivy Tech located?

A.    Valparaiso, Indiana.

Q.    Is it a four-year college?

A.    It's been over 30 years.  Well, not quite over 30 years, but it's -- it's been quite some time.  But I'm sure, yes, if not longer.  Now, I don't know.  I don't know what they are now.

Q.    When you attended Ivy Tech, was it a four-year college?

A.    I believe so.

Q.    All right.  Did you -- you attended for less than four years?

A.    Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Did you receive a degree?

A.    No.

Q.    How long did you attend Ivy Tech?

A.    I don't remember.

Q.    Okay.  Were you working at the same time you were going to college?

A.    Yes.

Q.    What were you doing?

A.    I was not working -- I -- probably working at a daycare at that time.  I -- I don't remember.  It's -- it's been a very long time.

Q.    Okay.  So did you go to college straight out of high school?

A.    No.

Q.    What did you do out of high school?

A.    I had a child.

Q.    What year did you graduate high school?

A.    I received my GED, I believe, in 2000 or 2001.

Q.    So you were going to Ivy Tech without a high school degree?

A.    No.  It was sometime -- it was -- I probably went to college -- I don't -- I really don't remember.

Q.    You don't remember when you went to college?

A.    I mean, I really don't.  I didn't graduate.  I -- I went for a couple semesters here and there.  I was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

a single mom, three kids.  I really don't remember.

Q.    Fair enough.  When you were in college, what courses did you take, just generally speaking?  What -- did you have an area --

A.    Just general -- just general courses.

Q.    Did you -- were you, like, interested in math or engineering or that kind of thing, or were you more literature and history?

A.    Definitely not literature.  I -- if it -- if I would've had it my way, I would've went to nursing school, but it just -- that didn't work in my favor.

Q.    Okay.  So my understanding is after you got the GED, you spent some time working possibly in daycare setting as well as part-time studies at Ivy Tech?

A.    Yes.

Q.    And how long did that go on?

A.    I don't remember.  I don't -- I -- I don't know.  I -- I really don't.  I --

Q.    Sure.  Did you have a full-time job in daycare?

A.    I work Monday through Friday.  Again, I had three kids, but I've also worked in the service industry as well.

Q.    And in the --

A.    I was a --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    In the service industry, what did you do?

A.    I was a server and a bartender.

Q.    Got it.  And was there, like, a period in your life where that was your job being a server and bartender?

A.    Yeah.

Q.    How long -- can you give me a sense of what years that was?

A.    I mean, I would say, probably -- I mean, on and off -- I worked on and off.  I had my -- '94.  Probably on and off for 12 years, maybe.  I don't know.

Q.    So I mean, I get it.  You're doing a lot.  You've -- you're -- you've got kids, you're single, and the bartending, and serving is something that you've got to manage in addition to a very full and complicated life, fair summary?

A.    Sure.

Q.    Did you move out of the service industry at a certain point?  I'm just trying to understand, you know, the background that you have before you went into your current position.  That's all.

A.    So like I said, server, bartender, worked as a daycare -- in a daycare while some of my kids were in school, because it worked around that schedule.  Went back to serving and bartending.  I also did -- I also

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit L

worked with individuals with disabilities. I forgot about that. So when I came to the DOC, I quit serving and bartending and working in waiver homes. And then I came to the DOC in 2013.

Q. Okay. Thank you.

A. If that helps at all? I hope it --

Q. It does. And I appreciate it. I -- I'm not trying to pry into your personal life or your past. I just need to have an understanding for purposes of the case of what your background is. That's the only reason I'm asking. So you -- let me make sure I understand. When you first joined IDOC in 2013, you came to the organization with a background working in the service industry, working in daycare, and also caregiving for adults with disabilities; is that correct?

A. Correct, yes.

Q. Did you have any other job experience other than what we've talked about?

A. No.

Q. That was a no? I just --

A. Yeah, no.

Q. Sorry. I have --

A. No.

Q. I -- I'm an old guy. I've got hearing aids, so sometimes it's -- I just don't hear the answer. The

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

next question I have is: Other than the coursework at Ivy Tech and your GED, when you joined IDOC in 2013, did you have any other educational or training background whatsoever?

A.   No.

Q.   When you joined IDOC in 2013, what was your initial position?

A.   Officer.

Q.   You were a CO?

A.   Correct.

Q.   And did you work at ISP or another facility?

A.   I've only been at ISP.

Q.   Got it.  How long were you a corrections officer at ISP?

A.   Until February of 2022.

Q.   Got it.  Were you a line officer or had you been promoted to Sergeant Lieutenant of the ranks?

A.   I never went up for Rank.  So Officer only.

Q.   So you went straight for -- from being a CO to being the safety hazard manager?

A.   Yes.

Q.   And can you tell me the process of your being -- it was a promotion, I'm assuming?

A.   Yes.

Q.   More money and more responsibility?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

**Exhibit L**

A.    Yes.

Q.    What was the process of your getting that promotion?

A.    Well, so as an officer, I worked in cell houses and then I also worked in sanitation.  And when I was working in sanitation, I helped -- inadvertently would help the other safety manager that was here before I took it over.  So I mean, I knew a lot about the role of sanitation, and -- and those types of issues, and those types of things.  I mean, I've -- I've had a few different positions with the DOC as an officer before receiving this position.

Q.    So maybe I should go back and ask you about your particular assignments as a CO.  You were -- were you assigned to A Cell House doing patrol on a particular living facility within the prison?

A.    I have done that, yes.

Q.    And what other assignments have you had -- did you have when you were a CO, other than being an officer in a living quarters?

A.    I worked in their clothing department, issuing offenders clothes.  I was also the operations officer where I would help with setting up their passes and getting passes to the units, setting up trips, things of that nature.  I used to escort contractors if they had

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

come into the facility and they needed someone to escort them, I would do that.  And then I also was the officer in sanitation.

Q.    So I wanted to ask you about sanitation.  What does that encompass?

A.    So we have a sanitation crew, they can go in and scrub ranges with scrubbers.  They help keep the -- kind of, what -- what the range tenders don't do, they kind of come in and do.  They schedule times to go into different cell houses to scrub ranges, scrub showers, power wash showers throughout the facility.  And are also giving cleaning supplies to the cell house workers to be able to keep their ranges clean.

Q.    So if I'm understanding correctly, the day-to-day sanitation of the particular ranges is handled by prisoners who get that work assignment; is that right?

A.    Correct.

Q.    And then when it comes to deep cleaning or periodic sanitation stuff --

A.    Details, yeah.

Q.    -- the prison uses outside contractors for that?

A.    No.  We use -- we have a sanitation department and then you have offenders that work.  That is their job to go in and do that.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   So is the sanitation crews that you would escort and manage, were they prisoners or were they -- or were they professional workers from outside the facility?

A.   They were offenders.  They're prisoners.

Q.   Got it.  And how long were you handling the sanitation function?

A.   I want to say a year-and-a-half, two years.

Q.   So what I'm understanding from your testimony, and you tell me if I have this wrong, is that what specifically qualified you for the position of safety hazard manager was that as a CO you had been -- you had become familiar with the cleansing and sanitation process for pretty much every area of the facility by virtue of escorting the crews and managing their operations?

A.   I can -- I mean, I don't want to say that's what qualified me.

Q.   Well, let me ask you a different way.  What are the experiences, training, education that qualify you to be the safety manager?

A.   I don't know that I have that answer.

Q.   Okay.  Fair enough.  What was the process of -- did you apply for the position when it came open?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.   I -- I'm not entirely clear on this, but could you give me the name of the safety manager who proceeded you?

A.   Danielle Brown.

Q.   Danielle Brown?  And prior to Mr. [sic] Brown, who was it?

A.   After her it -- Derric Boin, I believe.

Q.   I didn't catch that.  Sorry.

A.   Derric Boin.

Q.   Got it.  So did the position become open as a result of Ms. Brown moving on or --

A.   Yes.

Q.   And how did it come about that the position became an open position?  What happened to Ms. Brown?

A.   She resigned and went elsewhere.

Q.   At that point, did you express to anyone that you had an interest in the job -- or just, can you explain what the process was?

A.   When -- when Danielle resigned, there were certain duties that were asked of me to do such as -- certain duties that I was helping them out with.  And then it came open on the job bank, and I applied.

Q.   Then you put in for it?

A.   Correct.

Q.   Got it.  Were you interviewed for the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit L

position?  Who interviewed you?

A.    Greg Lentz.

Q.    **Anyone else?**

A.    I don't think so.

Q.    **All right.**

A.    I think it was just Mr. Lentz.

Q.    **Were there other applicants for the position?**

A.    I don't know.

Q.    **Sure.  Okay.**

A.    I don't think so.

Q.    **And you have been in the role since 2013 --** I'm sorry, since 2020.  Forgive me since February of 2020 --

A.    '22.  February of 2022.

Q.    **February of 2022?**

A.    Correct.

Q.    **Sorry about that.**

A.    That's okay.

Q.    **Thanks for your patience with me.  So what are your -- how would you define your job responsibilities?**

A.    How would I define my job responsibilities?

Q.    **Right.**

A.    I deal with matters of staff injuries, OSHA -- OSHA reports, making sure the OSHA 300 is completed at the end of the year.  I also, again, deal with the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Offender Fire Department, as well as any -- any time anybody comes to me with an issue or a problem. I also put in the work orders. I do, do monthly deficiency reports on things that I have found wrong and turn those in, reviewing the weekly inspections. I do walk units. Offenders do talk to me. I also deal with ADA things. I'm sure there's more that I can't think of off the top of my head, but I mean, there -- there -- there's quite a bit.

Q. Thank you. I'm going to have us look at another document. I've -- I'm just about to place on the screen what will be Exhibit 3 to your deposition, Ms. Taylor. This is the job description for safety hazard manager two at the Indiana State Prison. Is this the job description for the position that you hold? If you need me to scroll through any part of it, just let me know.

(Exhibit 3 was marked for identification.)

A. Yes.

BY MR. BOWMAN:

Q. Ms. Taylor, do you need to look at any other part of the document in order to answer my question? Just --

A. Just -- I said yes. I'm sorry.

Q. Sorry. I didn't hear you. I want to focus on

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

the paragraph that is -- that identifies the essential duties and responsibilities of your position.  I'll just read it into the record, so we all have it. "Ensures compliance with all federal and state rules and regulations, governing fire health and safety. Ensures that all fire health and safety equipment has been inventoried and is properly located.  Inspects all fire, health, and safety equipment for defects and damages, and monitors preventive maintenance schedules. Conducts routine inspections of work sites, both on and off the institutional grounds to assure compliance with all fire safety and health standards.  Surveys and evaluates physical facilities to recommend appropriate actions necessary to meet and or maintain compliance. Forms and overseas an institutional safety committee. Develops and conducts offender and staff safety, educational programs and performs related work as required."  Does that strike you as a fair summary of your duties and responsibilities?  And if you've answered, I haven't heard, Ms. Taylor.

A.   Yes.

Q.   The Institutional Safety Committee, did -- was that in existence when you came into the position in February 2022?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Who's on the safety committee?

A.    All department heads.

Q.    And so that would be a custody person, an administrative person and so forth?

A.    Uh-huh.  Yes.

Q.    And how often does the safety committee meet?

A.    Quarterly.

Q.    Are there minutes maintained of the safety committee meetings?

A.    Yes.

Q.    Has the safety committee ever talked about fire hazard in particular, in your experience?

A.    Not that I can recall.

Q.    Okay.  When there are -- there are many fires that unfortunately happen at the Indiana State Prison. Is that fair to say?

A.    Yes.

Q.    After a fire, is there ever any kind of after-action review as to whether and how it could have been prevented, and how if at all, it might have been better responded to?

A.    Yes.  There was.  For this one, yes there was.

Q.    I understand that.  And we will talk about that later on.  As a general matter, is that the case, in a non-fatal fire for example?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.   Not to -- since I've been in the position, not to my knowledge.  If there was, I just don't recall.

Q.   There was an after-action review in the -- in relation to the fire that caused Mr. Smith's death, right?

A.   Correct.

Q.   And you were part of that process?

A.   Yes.

Q.   Can you tell me why that happened in relation to Mr. Smith's death, but is not a typical response when a fire occurs?

A.   Why don't we -- every time there's a fire, why do we not do that?  Is that what you're asking me?

Q.   Yeah.

A.   Well, because that would probably -- I don't know why they don't.  I -- I don't know why.

Q.   When the safety -- the Institutional Safety Committee meets, are you the person who chairs the committee?

A.   Am I the person who talks?

Q.   No.  Well, usually when there's a committee, there's a chairperson and my question is: Are you the chairperson of the Institutional Safety Committee?

A.   No.

Q.   Who is?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.   I would -- I would say Mr. Neal.

Q.   Okay.  So he's at all of these meetings?

A.   Yes.

Q.   And he runs the meetings?

A.   Correct.  And then I -- then I -- I will speak on behalf of safety issues, if there are any.

Q.   Well, the -- it's the safety committee.  So there are issues about safety, right?

A.   Right.

Q.   Who is the person who keeps the minutes of the safety committee meetings?

A.   I have some.

Q.   Okay.  Do you, like make notes of the meetings and prepare the minutes?

A.   Yes.

Q.   We've talked about -- maybe we haven't, but I want to make sure we've covered it.  Also, on your list is -- your list of job responsibilities is to "survey and evaluate the physical facilities to recommend appropriate actions necessary to meet and/or maintain compliance."  You do this?

A.   Yes.

Q.   And does that consist of the process of looking at the inspection reports, being aware of work orders that come in for corrective action, and the stuff

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

we talked about earlier in the deposition?

A.    Yes.

Q.    Is anything else involved in that job function?

A.    No.

Q.    Your answer was no?

A.    Correct.

Q.    Okay.  You are responsible for developing and conducting offender and staff safety educational programs, according to the document?

A.    According to the document.

Q.    Okay.  Do you do that in practice?

A.    Actually, I do.  Actually, I do.  We do quarterly fire drills.  We talk to staff.  We educate staff.  We -- so yes.

Q.    Other than the quarterly fire drills, is there other offender and staff safety education that you perform?

A.    No.

Q.    As you look at the list of essential duties and responsibilities on this job description and consider the work that you do in practice, is there anything that's missing from the description that -- that's not covered?

A.    I don't believe so.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.    All right.  When you came into your position in February of 2022, as I understand it, you had already been assisting with many of the functions of the safety hazard manager in your capacity as corrections officer working in sanitation.  Do I have that right?

A.    Yes.

Q.    Was there any process of training, or review of materials, or job orientation that you went through when you first came into your position of safety hazard manager?

A.    Yes.

Q.    Could you tell me about that?

A.    Another safety manager from another facility would come here and assist me, helped me -- teach me. Also, Mr. Lentz at Central Office would help me and teach me things.  I also had our physical plant director who would help me with different things, maneuver, different things and teach me.

Q.    So you got some on-the-job training from Lentz and the plant manager and safety hazard manager from another IDOC facility?

A.    Correct.

Q.    Other than that, was there any formal training that you went through

A.    Such -- such as?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   Well, such as an orientation -- when you became a CO, you went to training, right?

A.   Correct.

Q.   Okay.  So I'm asking if there was anything like that for you when you became --

A.   No.

Q.   -- safety hazard manager?  No --

A.   No.

Q.   -- course that you had to take?

A.   No.

Q.   No process of assessing the current state of affairs and how you were going to handle the position differently?

A.   No.

Q.   When you took over the position, did you -- you're sitting in the desk of the safety hazard manager's office.  Did you inherit files that you went through and familiarized yourself with in order to be able to perform your new duties?

A.   Yes.

Q.   Could you tell me about those files?  Just in general terms, what they were?

A.   I mean, just specifically, no.  I mean, it -- not really.  There's -- I don't remember everything that I went through.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit L**

Q.    There -- we -- we've talked a couple of times about the fact that fires happen on a somewhat frequent basis at Indiana State Prison.  One question I have is whether you as safety hazard manager maintain a record in the form of a list, or a chart, or a set of incident reports, or in some other fashion of the fires that have occurred?

A.    Yeah.  There are sets of incident reports that the firemen do.

Q.    Right.  I know that.  I'm asking a different question.  Do you, in your office, serve as a clearing house or a central point of information about the fires that have occurred?

A.    No.

Q.    Do you have a file on the Smith Fire?

A.    Do I have a file on the Smith Fire?  I believe it was sent to me when I had asked for it.  I would have to go back and look.

Q.    There was a man named Joshua Devine who was killed by fire in the institution in 2017.  Do you recall that incident?

A.    Yes.

Q.    Do -- does your office of safety hazard manager, do you have a file on the Devine fire?

A.    I do not.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.   So it would not be the case that you maintain an inventory in the form of incident reports or some other set of documents relating to the fires as they happen one by one?

A.   No.

Q.   There are -- and we'll look at it in a minute. I -- one of the things about the Indiana State Prison, it's -- is a very old facility, right, physically?

A.   Yes.

Q.   The prison was built in 1860; is that right?

A.   Sounds about right.

Q.   And the buildings are old, and their lifespan is about to come to an end.  If I understand it correctly, right?

A.   I don't know.

Q.   Is there an intention to close the prison within the next several years, to your knowledge?

A.   To my knowledge, yes.

Q.   So my -- the point is that the prison is being closed because it's old and it would be a good idea from a correction standpoint to have a more up-to-date physical plant, fair statement?

MR. JIMENEZ:  I don't know if that has -- oh, sorry.  Didn't mean to cut you off.

MR. BOWMAN:  No, you're fine.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit L**

MR. JIMENEZ:  But I'm going to object to form and foundation, but you can go ahead and answer, Deb.

BY MR. BOWMAN:

Q.    Do you need the question back, Ms. Taylor?

A.    Yeah.  Kind of.

Q.    It wasn't -- it was kind of a garbled question.  Because the facility is as old as it is, it's being closed in order to upgrade the physical plant into a more modern facility, correct?

A.    Is that the reason they're closing it?  I don't believe that's the reason they're closing it.

Q.    What do you believe is the reason they're closing it?

A.    That would just, kind of, be speculation on my part.

Q.    Well, I -- there's a -- go ahead and speculate.  What's the reason you think it's closing?

A.    I -- I don't know.  I -- you know, we'll -- we'll just go with because it's old.  We'll go with that because I don't want to --

Q.    Sure.  I understand you don't want to be put in the position of speculating about matters that you don't -- you're not involved in that decision.

A.    100 percent involved in.  Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Okay.  Fair enough.

A.    Not really any involvement, really.

Q.    Fair enough.  One of the things that you are fully aware of and conversant in your position is that this old facility is beset by electrical problems, right?

MR. JIMENEZ:  Objection to form.  Foundation.  You can answer.

THE WITNESS:  You said answer?

MR. BOWMAN:  Yes.

MR. JIMENEZ:  You can answer.

BY MR. BOWMAN:

Q.    You can answer that question.  There are many, many electrical problems in the facility, right?

MR. JIMENEZ:  Many objections, but you can answer.

THE WITNESS:  I don't -- I -- I don't know what -- what you're referring to as far as electrical problems.  Like, as in just --

BY MR. BOWMAN:

Q.    Well, it frequently happens that electrical sockets are not working, and they have to be replaced, right?

MR. JIMENEZ:  Same objection.  Go ahead.

BY MR. BOWMAN:



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Look, --

A.    Yes, they have to --

Q.    Ms. Taylor, you testified that these work orders are in your jurisdiction, right?

A.    Yes.

Q.    And --

A.    Yes, we have -- we have multiple orders for new outlets to be replaced --

Q.    Right.

A.    -- as we see fit, yes.

Q.    Yes.  Literally hundreds and hundreds of such work orders, right, in your time?

A.    I mean, we put in lots of work orders for lots of issues, but yes.

Q.    And many, many work orders for lights that are not functioning properly, right?

A.    Correct.

Q.    Sometimes it's replacement of a bulb.  That's easy, right?

A.    Right.

Q.    But sometimes the entire fixture has to be replaced because it's not working correctly, right?

A.    Sometimes.

Q.    And electrical issues like malfunctioning outlets and sockets are -- you know this, are a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

potential fire hazard in any building, right?

A.  Anytime an electrical outlet is altered, it does become a fire hazard when they're altered.

Q.  Ms. Taylor, you're not answering the question that I've asked.  I get what you want to say.  I appreciate it.  And we'll talk about the Smith Fire in a minute, but my question is this: Any time an electrical outlet is malfunctioning such that a work order has to be put in to correct the functioning of that electrical outlet, that is a potential fire hazard in any building, right?

A.  It can be, yes.

MR. BOWMAN:  Can be.  So I just want to create a foundation for the questions that I've been asking you.  So let me do that now.  I believe, Meredith, we're at Exhibit 4?

THE REPORTER:  Correct.

(Exhibit 4 was marked for identification.)

BY MR. BOWMAN:

Q.  All right.  So I've placed before you, Ms. Taylor, a -- looks to be a 20-page document consisting of a series of work orders.  These are from before your time, to be fair, 2020.  And this particular one on top relates to the light over a certain location needing to be replaced, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.    Uh-huh.

Q.    That's a yes?

A.    Yes.

Q.    I mean -- I don't mean to be snarky.  I just need to be clear with you that you're answering yes.  Actually, the -- and then we move on.  There is another work order at Page 2 relating to light bulbs, right?

A.    Yes.

Q.    And then continuing, in a certain cell, a socket is not working and is burned, right, and that needs to be fixed and replaced, yes?

A.    Yes.

Q.    This is a work order, also from July 17th, 2020, right?

A.    Yes.

Q.    And then if we continue to the next one on page -- I believe it's Page 4 of the exhibit.  This one is July 13th.  A light fixture needs to be replaced, right?

A.    Yes.

Q.    Okay.  The document is many pages in length, and I'll represent to you that these all concern similar electrical issues.  And we'll put the document into the record.  This is -- just to be clear, this is a record that's made whenever these kinds of electrical issues

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

come up and work is required to replace or repair the electrical issue, correct?

A.   Yes.

Q.   And you do this in the ordinary course of your job, right?  You keep track of these work orders and you keep files of them and maintain them, right?

A.   No.

Q.   Who does?

A.   That would be maintenance.

Q.   Okay.  So these are kept by the maintenance department?

A.   Correct.

Q.   But they pass through your hands as safety director, right?

A.   Not all of them.  No.

Q.   Some of them do?

A.   The ones that I put in.

Q.   Okay.  So if somebody else puts it -- puts them in, it's -- it goes through somebody else?

A.   It goes -- it -- it's -- it's a computer system.  So it gets put in and it goes to maintenance. Maintenance prints them out, gives them to the foreman who is in charge of whatever the issue is.

Q.   And this is part of the ordinary operations of the facility, right?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.    Correct.

Q.    **Correct.  Okay.  All right.  So --**

MR. JIMENEZ:  Sorry.  Locke, just because I see there are other work orders.  Just to be clear on the record, the document that you marked as Exhibit 4 was the one that was Bates stamped State 7772, right, through --

MR. BOWMAN:  Yeah.  It's --

MR. JIMENEZ:  -- 7807?

MR. BOWMAN:  Sure.  I should be clear about that.  The initial Bates number on the first page of Exhibit 4 is State 007772.  And then the document proceeds in sequential Bates stamp order.  Actually, I indicated it's 20 pages.  It is a 38-page document. The final Bates number is 007807.  And these are, as I represented on the record, all work orders relating to replacement of electrical -- or addressing electrical defects.

MR. JIMENEZ:  Okay.  So just to be clear, the -- so the one that I have in that -- the Hightail system that you shared exhibits with is only 36 pages.

MR. BOWMAN:  Right.

MR. JIMENEZ:  So you said 38?

MR. BOWMAN:  Well then, I did it again.  I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

misspoke. It's as long as it is. Okay, Gustavo? We're not I don't want to argue with you about the document. It is what it is.

MR. JIMENEZ: I -- yeah, I'm not -- no, I'm not trying to --

MR. BOWMAN: You have it. I have it.

MR. JIMENEZ: I'm not --

MR. BOWMAN: Yeah.

MR. JIMENEZ: Locke, I'm not trying to argue with you either. I just want to make sure because if there were -- if there was a separate document, then obviously, I want to know. That's why I was saying, let's just put the Bates ranges in the record. I'm not trying to be difficult with you. I'm just trying to make it clear.

MR. BOWMAN: Okay. And I --

MR. JIMENEZ: Just want that to be clear.

MR. BOWMAN: And you -- and Gustavo to be clear with you, you're -- you have always been very gracious to me in these depositions. I appreciate it. And I appreciate your clarifying the record and thank you. I -- and I mean it sincerely.

BY MR. BOWMAN:

Q. Okay. So we're going to now move to Exhibit 5. Exhibit 5, for identification, is 163 pages in

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

length.  The Bates number that appears on Page 1 of Exhibit 5 is State 006013.  And the document continues with sequential Bates numbers all the way to 006175, which is a blank page.  6174 contains a record.  If we look at the final page of Exhibit 5, Ms. Taylor, you'll see that this is a work order requested on June 7th, 2022.  That's while you were safety hazard manager, right?

(Exhibit 5 was marked for identification.)

A.   Yes.

BY MR. BOWMAN:

Q.   And in this particular document, a light fixture needs to be installed, apparently, and it's a Lieutenant Wynn who has identified this problem, right?

A.   Correct.

Q.   Okay.  And then we'll go back to the top.  And this is a work order from May of 2022 relating to the monthly electrical inspection and work that needs to be done in relation to that inspection, and the details are specified apparently on another document, correct?

A.   That's my first time ever seeing that.

Q.   Does that appear to be the case?

A.   I don't know.

Q.   Okay.  You see the tasks are listed here.  Is this -- there's a set of tasks on a pre-printed form

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

looking at Pages 3 -- Page 3 of the exhibit, correct?

A.   That's my first time ever seeing that.  That would probably go through maintenance, Art Kaufman.

Q.   Okay.  Do -- in your role as safety hazard manager, do you interface at all with the correction of electrical problems, or is that completely outside of your sphere?

A.   As -- I'm not quite sure if I understand that question.  Like, are you asking me, do I go through and make sure everything is completed?

Q.   Well, I guess I'm asking this question, I thought we agreed later on -- or earlier on, that having an -- any kind of malfunction of a socket or an outlet or a light fixture creates a potential safety hazard in any building, prison or anywhere, right?

A.   Correct.

Q.   And you're the safety hazard manager.  So the reason I'm asking you these questions is as part of your job duties, do you keep track of electrical problems that arise in the facility and ensure that they're reported, and that the proper people get the information, and take the steps necessary to address the problem?  Is that you or does somebody else do that?

A.   No, that is not me.  I can only report what I see.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Got it.  So who does that, the plant manager?

A.    Correct.

Q.    Okay.  And so that's why I was asking you the question.  This issue of keeping track of electrical issues that require a fix, that is not your job as safety hazard manager, that is the job of the guy who essentially serves as the contractor for the facility?

A.    That would be the PPD, Art Kaufman, the Physical Plant Director.

Q.    Got it. Okay.  That's clarifying.  I am, with that information, going to stop at this point with these documents.  What I'm understanding you to tell me is, as the safety hazard manager, you do walk the ranges from time to time.  You might from time to time see an electrical issue that needs to be addressed, right?

A.    Uh-huh.

Q.    And that's a yes?  I'm sorry.  I have to --

A.    Yes.

Q.    -- ask for a yes or no.  And when you see issues like that, you recognize, because your job is safety, that any kind of electrical issue that needs to be fixed should be reported and should be addressed by the Physical Plant Department?

A.    Correct.

Q.    And you do that?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.   Yes.

Q.   And other people also do that.  The lieutenants on the ranges, the captain, the major, everybody who sees those issues reports them to the physical plant director?

A.   Yes.

Q.   And the physical director maintains the records of all the requests that come in from you and from other people to address these kinds of problems?

A.   Yes.  They keep a record of all of the work orders.

Q.   And while you may not be the keeper of all those records, you know from your familiarity with the institution working there since 2013, that electrical outlet problems, electrical socket problems are an ongoing issue in this very old facility; is that fair?

A.   Yes.

MR. BOWMAN:  All right.  I'm -- it's noon time.  I'm going to suggest that we take a ten-minute break and then reconvene at 12:10, if that's okay for you guys.

MR. JIMENEZ:  Perfect.

MR. BOWMAN:  Okay, great.  See you then.

THE REPORTER:  We are now off record at 11:59 a.m.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

(A recess was taken.)

THE REPORTER:  We are back on the record for the deposition of Deborah Taylor being conducted by video conference.  My name is Meredith Sarjent.  Today is June 27th, and the current time is 12:12 p.m.  You may continue.

MR. BOWMAN:  Thank you.

BY MR. BOWMAN:

Q.    Ms. Taylor, just a couple of descriptions about your job function.  Is it accurate to say that in your position as safety hazard manager, that with respect to operational planning inside the prison, you are the person who has final authority and responsibility for the safety of prisoners and staff within the facility?

A.    No.

Q.    Who is that person?

A.    I don't know.  Not me.

Q.    If I were to suggest Warden Neal, would that sound right?

A.    Warden Neal, Major Wardlow.  Yeah.

Q.    Another question.  In your capacity as safety hazard manager, are you the person in the Indiana State Prison with final responsibility for training prisoners and staff with respect to safety issues?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    No.

Q.    Who is?

A.    Training Department.

Q.    Okay.  And the Training Department is centrally located in Indianapolis?

A.    Correct.

Q.    Okay.  Is there anybody at ISP with the final responsibility in that regard?

A.    Warden Neal.

Q.    Okay.  Last question along these lines.  In your capacity as safety hazard manager, are you the person who has the final responsibility with respect to ensuring the safety of the physical plant for prisoners and for staff?

A.    No.

Q.    Who is?

A.    I would say our Construction Services Department.

Q.    Okay.

A.    I mean, I'm not 100 percent.

MR. BOWMAN:  Okay.  So I want to turn to a different issue and I'm going to share my screen again in just a minute.  Do you see that I've placed before you?  And this will be Exhibit 6 to your deposition. Right, Meredith?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

THE REPORTER:  Correct.

(Exhibit 6 was marked for identification.)

BY MR. BOWMAN:

Q.    I placed before you as Exhibit 6, Appendix C to the Indiana State Prison Emergency Manual.  We've used this exhibit before.  It is the -- 11 pages in length.  The Bates number at the bottom of the first page is State 020467 and the Bates stamps run consecutively to 477.  This is a document that you looked over in order to prepare to testify today?

A.    Yes.

Q.    So I want to -- is it accurate that this is the document that sets forth the expectations of everyone in the Indiana State Prison when there's a fire?

A.    Yes.

Q.    One of the things that the document does at the beginning is it makes a distinction between minor fires and major fires.

A.    Okay.

Q.    That's in the definitions portion, Section 2A and B, correct?

A.    Uh-huh.

Q.    I have to ask you to say yes or no.  I'm sorry.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

A.   Yes.  I'm sorry.

Q.   A minor fire, by definition, is an isolated fire that does not pose a threat to individuals or to property in the area, right?

A.   Correct.

Q.   So it's a local, contained situation that should be relatively easy to deal with, right?

A.   Correct.

Q.   The -- obviously, we all know that one of the things about minor fires is that they can become major fires if they're not contained very quickly, right?

A.   Correct.

Q.   One of the features of fire is that it spreads and that happens -- can happen at a rapid pace.  And therefore, responding to fires is a urgent seconds matter kind of situation, fair?

A.   Yes.

Q.   Major fires, in contrast to minor fires by definition, are fires that cannot be readily contained or extinguished, and that do threaten the safety of individuals in the area or have potential for property damage, right?

A.   Okay.  Yes.

Q.   So one of the things that the Emergency Manual does is it directs that the prison's response in the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

situation of major fires should be different than the response with respect to a minor fire, right?

A.    Okay.

Q.    Do you agree with that or are you just going along with it because I said it?

A.    I mean, agreed.

Q.    Okay.  I want to refer you to Page 10.  Well, actually, I want to refer you to Page 4.  And I've highlighted this section that I'd like to focus on with you and this is the Paragraph with number 4.  Arabic number 4 that appears at the top of page 4 of Exhibit 6. I'm going to read it into the record so we all have it. "Staff working in the immediate area of a fire and the first responders will attempt to extinguish the fire with the fire suppression equipment at hand, that is a fire extinguisher, if the fire is in the minor stage. If a fire progresses beyond the minor stages, all firefighting is to be done by the ISP fire brigade who have been trained and equipped in accordance with particular regulation," right?

A.    Yes.

Q.    Now, what this procedure requires is that in order to address a fire, it is imperative that the fire brigade, the prisoners, be in a position to get to a fire that has progressed beyond a minor fire on an

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

urgent and immediate basis; is that fair?

A.   Yes.

Q.   The reason for the distinction is that staff are not trained and are not equipped to respond to a major fire?

MR. JIMENEZ:  Objection.  Form.  You can answer.

THE WITNESS:  Correct.

BY MR. BOWMAN:

Q.   You are responsible for the training of staff with respect to fire response?

A.   Training Department.

Q.   The training -- you don't personally do that?

A.   At this time, no.

Q.   As the safety hazard manager, are you aware, generally speaking, of the training that staff receive with respect to fire response?

A.   Yes, we all receive the same training.

Q.   Okay.  And what is that training?

A.   It's in our 40-hour training and our computer-based training that we do every year in regards to calling signals, fire extinguishers, the type of fire extinguishers, what extinguisher they're used for, things like that.

Q.   So your training with respect to fire response

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

is the same as the training that everybody else on staff has received.  Is that what you're telling me?

A.    So are you asking specifically what my training is for that?

Q.    Well, I --

A.    I mean, I'm --

Q.    Following on your testimony, Ms. Taylor, maybe I misunderstood you.  You I asked you if you were familiar with the training that staff received and I understood your answer to be that you are familiar because you yourself have received the same training, correct?  Did I misunderstand?

A.    Correct.

Q.    Okay.

A.    Correct.  Correct.

Q.    Now, I want to ask you about the training that you and staff receive on fire response.  It's the same, right?

A.    Correct.

Q.    Okay.  And that consists of how to call a signal, among others?

A.    Yes.

Q.    And when we talk about calling a signal, we're talking about a particular code that alerts everyone in the facility that there is a fire?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.    Yes.

Q.    And the calling of that signal calls out the Fire Department, among other things?

A.    Yes.

Q.    And another thing you've been trained on is the basic operation of a fire extinguisher?

A.    Yes.

Q.    And that includes knowing the difference between a fire extinguisher that contains water and a fire extinguisher that contains a fire suppressant, chemical compound?

A.    Correct.

Q.    And you are trained on the location of fire extinguishers?

A.    Yes.

Q.    In terms of fire response, is there anything else that you and staff are trained on as a regular matter?

A.    I'm going to go with no for now because I -- no.

Q.    Okay.  I -- and to be fair -- to be clear, there are also fire evacuation drills that you and staff go through on a quarterly basis?

A.    Correct.

Q.    And you're well familiar with that process

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

because you're in charge of leading the fire drills?

A.   Correct.

Q.   **Have I missed anything?**

A.   I don't believe so.

Q.   **All right.  So the upshot of that is that when it comes to addressing a fire that's a threat to people or to property, the rule is that staff are to step aside because they don't have the training, they don't have the equipment, and they don't have the experience, fair summary?**

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  So once the -- the fire brigade arrive, yes, they need to step back and let them do their jobs.  Yes.

BY MR. BOWMAN:

Q.   **Right.  And the -- but the other piece of it is the fire brigade are supposed to be there for major fires, right?**

A.   So anytime the signal is called, the firemen are automatically released to go to the fire station and arrive to that unit.

Q.   **Right.  And that --**

A.   And most of the time -- most -- most of the time when they arrive to the unit, the fire's already put out, but they do respond when a signal is called.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

Q.   Right.   So we were talking about this before. You have firefighters who are prisoners, and they have living units where they live, right?

A.   Uh-huh.

Q.   That's a yes?  Sorry, I have to --

A.   Yes.  Yes.

Q.   And the process is that, when the fire signal is called, the -- in effect, that's a fire alarm, right?

A.   Correct.

Q.   And you have a procedure with respect to the firefighters at that time, yes?

A.   Yes.

Q.   And the procedure is the firefighters in their living units should be released from their living units so that they can congregate at the fire station, right?

A.   Congregate as in hang out?

Q.   No.  Congregate as in get their equipment on, and get to the fire.

A.   Correct.  Yes.

Q.   Okay.  So they can rally to the fire station, whatever word you prefer.  I'm not suggesting that they hang around.  These guys are professionals, and they're good at their job, right?

A.   Absolutely.

Q.   They're trained -- you actually look to them

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

for their expertise, right?

A. Yes.

Q. Because they know stuff you don't know?

A. Absolutely. I have firemen who are Fire I and II certified, and I have firemen who are working towards those certifications. I am not. So yes.

Q. Right. Yes. So they are the experts, and they are the guys with the experience, and the skill, yeah?

A. Yes, sir.

Q. Okay. So these guys are in confined living units, and the first step is they go to the fire station where they assemble and get their equipment?

A. Yes.

Q. And then from the fire station, they are to report to the location of the fire in order to do their job?

A. Correct.

Q. And that requires them getting into another secure area of the prison where that fire may have started, yes?

A. Another secure -- well, yes. I -- yes.

Q. Yeah, because movement gets controlled inside a prison. Everybody needs to stay where they are, and you've got a system of gates and locks, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    Well -- yes.  But -- yes, we will just go with yes.

Q.    Right.  All of that takes time?

A.    Correct.

Q.    And what you just said is that, you know, if it is a small fire that, you know, may be threatening to become a major fire, by the time the prisoners have gotten released from their living unit, have gotten to the fire station, have gotten their gear, and have been escorted to the location of the fire, it's typically already over, right?

A.    Yes.

Q.    Sometimes that's not the case?

A.    Correct.

Q.    And that was in the situation of the Michael Smith Fire, that's an example of the fire was still going on, right?

A.    Yes.

Q.    Right.  Because that fire had become a major fire at the point when the signal was first called, right?

A.    I wasn't there.

Q.    Well, you -- you're part of the examination of this situation and the aftermath, right?  Ms. Taylor?

A.    So the firemen, yes, they -- they did come and



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

finish extinguishing the fire.

Q.    Right.   My question was: It had become a major fire at the point -- at a point before the signal was called, right?

A.    I don't know.

Q.    Did you ever investigate to find out?

A.    When I arrived to the --

Q.    I'm not asking you when you arrived.   I'm asking you --

A.    I -- I know.

Q.    I -- I'm asking you whether you, after the fire, conducted an investigation or participated in an investigation to understand what happened.

A.    The Indiana State Police and the fire marshals did the investigation.

Q.    So you weren't involved?

A.    No, sir.

Q.    You didn't -- did you see that as part of your job as safety hazard manager, to investigate what had happened in this circumstance that had resulted in the death of a human being?

A.    I'm not quite sure I understand where you're getting -- I -- I don't -- I'm not an investigator.  I mean, I -- I understand what happened.  There was a fire, and he passed due to the fire, but I didn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

investigate it and state what the cause was on it.  In fact, they -- the fire marshals never even gave me the investigation.

Q.   So you've never even seen the fire marshals' report?

A.   I have not read the report.

Q.   Have you ever seen it?  Has it ever gotten to your desk as part of the process of you doing your job?

A.   I -- I believe -- like I said, and I said this earlier, I believe that I had received it to pass it on to somebody else.

Q.   But you yourself did not review it or concern yourself with it?

A.   I don't want to say I didn't concern myself with it.  That sounds horrible, because I know that I had asked for it to be sent to Mr. Becker, and I don't recall if they sent it to me too or not, or if they just sent it to him, or -- I -- I don't remember.  I don't. Again, this is two years ago.

Q.   In any event, the findings in that report, you don't recall, because you haven't reviewed the report?

A.   I don't remember the report.

Q.   Okay.  I guess, let me just ask you a more general question.  Am I correct in my understanding that the fire response procedure, that the Indiana State

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Prison has established, requires that whenever a fire has become a major fire, such that it is a threat to property or to a person, the response to the fire should be managed and conducted by the prisoner fire brigade as opposed to by staff?

A.    Correct.

Q.    And that's -- you know, we talked about it, because the firefighters know how to manage the situation in ways and with detail that staff do not have?

A.    Yes.

Q.    So if, hypothetically, the fire in Michael Smith's cell had become a major fire, in that it was a threat to property and to person, and to Mr. Smith, and to people around him, prior to the signal being called, that's a breach of procedure?

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  I don't understand that question at all.

BY MR. BOWMAN:

Q.    Well, the procedure is for the fire brigade to be called before a minor fire becomes a major fire, is that not the procedure?

A.    Correct.

Q.    Okay.  So if in the case of Mr. Smith's fire,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

there was -- it had developed to a major fire before anybody was called, that is a breach of procedure?

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  I don't know how to answer -- I wasn't there when they called it.  I don't know what -- where the fire was when they called it, or if the fire was already there, and if -- and when they realized, that they called, I don't -- I wasn't there.

BY MR. BOWMAN:

Q.    So you can't answer that question?

A.    No.

Q.    Do you think that that is a question that somebody should be able to answer, whether there had been a breach of procedure in connection with the Michael Smith Fire, because it had progressed to a major fire before the signal was called?  Do you think somebody should make an inquiry and find out about that?

MR. JIMENEZ:  Objection.

THE WITNESS:  I mean, I would think -- go ahead.

MR. JIMENEZ:  Oh, no, go ahead.  I objected, but go ahead, Deb.

THE WITNESS:  The people to answer that would be the staff that was there.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Exhibit L

BY MR. BOWMAN:

Q.    I'm going to try my question again.  If you can't answer it, I appreciate that, I'll move on.  Do you think that someone should determine whether procedure had been breached in connection with the Michael Smith Fire, because the fire progressed to a major fire before the signal was called.  Do you think somebody should investigate and find out?

MR. JIMENEZ:  Same objection.  Go ahead, Deb.

THE WITNESS:  Yes.

BY MR. BOWMAN:

Q.    Who would be the person to do that?

A.    I&I.

Q.    I&I.  So that would be Mr. Lessner?

A.    Yeah.

Q.    Do you think that it's ultimately Warden Neal's responsibility to figure out the answer to questions like that?

A.    I mean, ultimately, yes.

Q.    Right?

A.    Right.

Q.    I mean, he's not going to be the person doing the investigation, but it should travel up the chain to him, and he should know the answer to that question, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.   Yes.

Q.   It's not your job, but ultimately, it is his job to know the answer to a question like that, right?

A.   Correct.

Q.   With respect to any fire, whether the basic procedure had been breached in connection with the response to the fire?

A.   Yes.

Q.   All right.  Sorry for that delay.  Here we go. I'm handing -- or displaying to you on the screen, the exhibit that will be marked with our next number.

MR. BOWMAN:  Which I believe is 7, Meredith?

THE REPORTER:  Correct.

(Exhibit 7 was marked for identification.)

BY MR. BOWMAN:

Q.   These are reports of fire drills, and I believe with respect to -- there are three of them all together.  And it looks like you are the person who led each one.  This is part of your ongoing responsibilities, is to lead the fire drills, right?

A.   Correct.

Q.   So this particular drill took place on August the 8th of 2022, and it occurred in A Cell House, which happens to be the location where Mr. Smith was confined, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.   Yes.

Q.   So there are names printed at the bottom of the document and then their signatures.  Are those the staffers who were involved in executing the fire drill under your supervision?

A.   Yes.

Q.   And you're -- I'm imagining you're standing there watching the process.  You've got a stopwatch, among other things, to see how long it takes, right?

A.   Correct.

Q.   And you make a note as part of this report about that, right?

A.   Uh-huh.

Q.   That's a yes?  Sorry.

A.   Yes.

Q.   And in this particular instance, it took 12 minutes and 32 seconds to get five staff and 327 prisoners, a total of 333 people, out the door of A Cell House in response to a fire alarm going off?

A.   Correct.

Q.   And that's, in your estimation, good work?

A.   We would like to see better times.  We always want to see better times, but unfortunately, you know, we don't always have cooperation from the offenders to -- so I mean, we -- we do the best we can.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.    You do the best you can given that you're dealing with prisoners?

A.    Well, I mean, not just prisoners, but you just have individuals who are resistant.

Q.    Resistant?

A.    Who don't want to leave their cell house, yes.

Q.    Right.  Who wants to do a fire drill, in other words?

A.    Sometimes, yes.

Q.    Okay.  So you'd like to see the thing go a little bit faster than this?

A.    Oh, absolutely.

Q.    What's your ideal evacuation time?

A.    I mean, personally, I would like to see ten minutes or less, but --

Q.    Okay.  So this was a little bit over your expectation?

A.    Absolutely.

Q.    Having said that though, your overall comment here was that they did a good job?

A.    Well, as far as staff, I mean, look how many staff you had in there.  Go -- can you go back up, how many staff were in there?  Three.

Q.    It looks like you --

A.    So you have --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit L**

Q.   It looks like you're evacuating five, and you're evaluating three, do I have that right?

A.   Can you go back up to the top?  So we had five staff, 327, so 333 total.  There's five ranges, and there's two sides to every range.  So you had one person trying to get all of these gentlemen out.  And I mean, it's not horrible, but they did a good job.  They worked together, they did teamwork, you know, so yeah.

Q.   Now, there are a number of questions relating to fire.  And is it part of the fire drill that these questions are propounded to staff?

A.   Yes.

Q.   Do they give written answers, or is this just a -- like, a little gathering where you ask the questions and you ask somebody to respond?

A.   Yes, we -- it -- we -- all talk.  It's not written.  They don't write their answers down.  No.

Q.   It's a discussion, in other words?

A.   Yes.

Q.   The answers here, these are the standard answers that you're expecting to receive from staff in response to these questions?

A.   Yes.

Q.   This is not the record of the answers that were given, this is your notes as to what you're

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

expecting to hear?

A.  Yes.

Q.  Okay.  So if there is a fire, what do you do, is one of the questions, right?

A.  Yes.

Q.  And the answer that you expect is call a 10-70, 10-71, and release your firefighters from their unit.

A.  Correct.

Q.  What does that mean?

A.  So if there's a fire, they're going to call a 10-70 or a 10-71, which goes to the control room.  The control room is going to go on the radio, you know, control to all units, we have a 10-71 in A Cell House, release your firefighters, and they're released.

Q.  So we were talking about this before.  This is the first step of getting the firefighters to respond to the fire, when you have a situation where you might need them?

A.  Correct.

Q.  And the idea is that it's that radio call of 10-70 or 10-71 that starts the process?

A.  Correct.

Q.  Now, there's some discussion about fire alarm pull stations in the next question.  Where are your fire

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

alarm pull stations?  Where is the unit's fire alarm panel?  Can you explain for me what this refers to?

A.    The pull station to sound the alarm and your fire panel is what can turn your system off.

Q.    Got it.  So to sound a fire alarm, you have, like, a -- one of those little red fire alarm things on the wall that you can manually pull down, and it'll trigger a loud bell and alarm.  Is that the idea?

A.    Are you asking me if --

Q.    I'm asking -- yeah, because I don't know.  You do.  That's why I'm asking you.

A.    I know, but are you asking, is that how the alarm is going off?  Because if -- in the event of a fire, we have smoke detectors in there.  When it -- the smoke rises, it'll set that panel off.  I mean --

Q.    Right.  There's -- in other words, there's more than one way that the alarm can go off?

A.    Correct.

Q.    Correct.  So one way that the alarm can go off is that the smoke can travel up to the smoke detector, the smoke detector will sense the smoke, and when that happens, it'll send an electronic signature -- signal rather, to the fire alarm, and it'll go off automatically?

A.    Correct.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

Q.    Another possibility is that you can manually pull the alarm if you see, or smell, or otherwise observe something that hasn't yet triggered a fire alarm, that's the other possibility?

A.    Correct.

Q.    And what you're expecting here from your staff is that they will know the location of the fire alarm pull, so that they can set off the fire alarm if it hasn't gone off automatically via the smoke detector?

A.    Correct.

Q.    Okay.  Thank you for clarifying.  The other thing that you expect your staff to know are the primary and secondary exits from their living unit, correct?

A.    Yes.

Q.    There is an evacuation procedure that is on a -- there's a diagram, in effect, in A Cell House that shows the location of the tiers and the officers' stations, and the location of the exits, right?

A.    Yes.

Q.    And that diagram also depicts a path that you're expecting everyone to take outside of the building, right?

A.    Yes.

Q.    And the idea of doing a fire evacuation is that everybody evacuates in an orderly manner, and goes



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

through the primary exit according to the plan that's provided?

A. Right.

Q. There may be a situation where a secondary exit is necessary. For example, where fire has blocked the primary exit, right?

A. Yes.

Q. So that's why you have two exits?

A. Yes.

Q. But the preferable exit is always the primary exit, and that's what you're expecting people to do, right?

A. Yes, sir.

Q. And that's what you drill in the fire drill, that they get out the primary exit?

A. Yes.

Q. They have to know the difference between a 10-70 code and a 10-71 code?

A. Who?

Q. Well, I'm looking at the next question on the discussion.

A. Oh, okay. So what is the difference between a 10-70 and a 10-71? Yes, because the 10-70 is if the alarm is going off, the 10-71 is if there's -- if they actually see smoke or a fire.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   Okay.

A.   So that way they're -- but regardless, either signal, the firemen are released.

Q.   Okay.  And then you expect them to be able to distinguish between the chemical fire extinguisher and the water fire extinguisher, and to know where they are, right?

A.   Yes.

Q.   And the other expectation is that they know which to use in which circumstance?

A.   Yes.

Q.   And if there is a fire, and they're evacuated from the building, they need to take stuff with them as they're headed out?

A.   Yes.

Q.   And you give them a list of the stuff that needs to come with the officers, as they're accompanying the prisoners outside of the building?

A.   Yes.

Q.   Count board, post orders, radio, keys, and cuffs?

A.   Yes.

Q.   Now, on this particular drill, you felt like, as a group, they understood the answer to all of these questions, and you gave them a "good"?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.   Yes.

Q.   And that was based on the quality of the discussion after the fire drill, right?

A.   Yes.

Q.   And it was based on how well the actual evacuation drill worked, right?

A.   Correct.

Q.   Now, the purpose of these fire evacuation drills is to teach folks, and ensure that they have some kind of muscle memory of how to escape a fire in progress, right?

A.   Yes.

Q.   I -- it's -- I think it's -- actually, it's not just me.  I think it may be a mechanical thing, too. It's sometimes hard to hear your answers.  Did you say yes in answer --

A.   Yes.

Q.   -- to my question?

A.   Yes.

Q.   If you wouldn't mind keeping up your voice for my sake, I'd be grateful to you.  The fire evacuation drill is not a training exercise with respect to how to respond to a fire in the sense of fighting a fire, or taking a fire down, right?

A.   Correct.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    And because, as we said when we were talking a few minutes ago, that's outside the ability, the expertise, and the training of staff?

A.    Yes.

Q.    That is a job for the firefighters?

A.    Correct.

Q.    And you say these fire drills happen on a quarterly basis?

A.    Yes, sir.

Q.    So every quarter you need to do one in each area of the prison?

A.    Yes.

Q.    Do you provide training to officers on the proper operation of fire extinguishers, or is that provided through the 40-hour training that you referred to earlier?

A.    40-hour -- 40-hour training.

Q.    In other words, the actual, you know, what to do and how to make the thing work, that's -- you don't train folks on that, somebody else does?

A.    Yes, sir.

Q.    Okay.  Our next exhibit for identification is Exhibit number 8, and this is a report of weekly inspection.  The document is 63 pages in length.  The Bates number at the bottom of the first page is State

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

010808, and it's consecutively Bates numbered through State 010870.  We're not going to go through the whole thing, but I wanted to focus on the first page which relates to an inspection of A Cell House.  Do you see that that is indeed what the first page refers to?

(Exhibit 8 was marked for identification.)

A.   Yes.

BY MR. BOWMAN:

Q.   So earlier, when we were talking about your job duties, you were telling me that one of your responsibilities is to review and monitor the reports of the weekly inspections throughout the prison?

A.   Yes.

Q.   Are these -- is this document that we're looking just at the first page of it, I can scroll through more of it if you need me to, is this the report of weekly inspection that you were referring to in your earlier answer?

A.   Yes.

Q.   So it is a central function of your position that you keep track of these weekly inspections, that they are being performed, and then you review the reports of inspection, you keep a file of these documents, and you ensure that identified problems are addressed.  Is that a fair summary?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    Yes.

Q.    So can you tell me how you go about doing that?

A.    See where it says inspector's comments?

Q.    Yes.

A.    So if they say that there's something wrong, they're supposed to put it in the comments, or even if you scroll a little bit down, a little bit underneath there, where it's -- there's that blank space, people will also sometimes write their issues there as well. So with that, that's when I will go through and see if there's any issues.  Sometimes, I double-check the issues and -- and make sure that, you know, either it hasn't been fixed yet, or that it still needs to be fixed, or sometimes, I will call to get clarification.

Q.    I see.  So as you're reviewing these inspection reports, you are looking for the comments that you might see in the left column as to any particular issue?

A.    Yes.

Q.    All right.  So as you've been giving your answer, I've been scrolling through the 63 pages of the exhibit.

A.    Yeah.

Q.    And I'll continue doing so, so that we can,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

together, look quickly, just in a scan, sort of sense, at each of the pages.  So having looked through the 63 pages now, it appears that there are no handwritten comments anywhere on this particular set of reports, right?

A.  Correct.

Q.  And, to be fair to you, these are reports relating to an inspection that was done on October the 11th, 2021, about three or four months before you became the safety hazard manager, right?

A.  Yes.

Q.  But you've received reports like this on a weekly basis, with respect to the prison, every week since you've been in your position?

A.  Yes, I get them.

Q.  Yes.  And do you maintain a file of them?

A.  Yes.

Q.  And then as you testified a few minutes ago, if there were any handwritten comments, you make sure that whatever the issue that's identified is, that it gets addressed?

A.  Correct.

Q.  Typically, you would do that by addressing it with the Physical Plant Department?

A.  Correct.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    All right.  So if we look, somebody here at the top of the first page of the exhibit has written "Week 41" --

A.    Uh-huh.

Q.    -- and since this is the October 11th, 2021, date, we can be pretty confident that's the 41st week of 2021, right?

A.    Correct.

Q.    And that indicates that it is going to go into a file a file, sequentially, along with all the other reports?

A.    Correct.

Q.    Okay.  Now, if we look at the inspection of A Cell House on Page 1 of the exhibit, we see that the rating, straight down the line, is 3, correct?

A.    Uh-huh.  Yep.

Q.    And that's denoted by the checking of a box next to the number 3 with respect to each item that was rated in this particular inspection, right?

A.    Yes.

Q.    I mean, does it strike you as weird that it's the same rating with respect to every single item?

A.    I can't answer for Lieutenant Kane.  He looks like he filled those out.  I -- I can't answer for him.

Q.    Well, he checked all the boxes, but I mean --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.   He did.

Q.   -- does it strike you as the safety hazard manager as let's say puzzling that Lieutenant --

A.   Yes.

Q.   -- came up with the same rating for everything without exception?

A.   Yes.

Q.   In this kind of a situation, I recognize you didn't receive this particular report, but if you received a report like this, would you take it upon yourself to follow up with Lieutenant Kane and say, you know, what gives here?  This is --

A.   If I -- if I find something that doesn't look right to me on a report, like, sometimes, people will put a 1, like it's good rather than a 5.  You know what I mean?  So I will call --

Q.   I -- yeah, yeah.

A.   -- they -- they'll switch them --

Q.   Right.

A.   -- so I will -- so I will call, and I'm like, "Hey, I need to know what's wrong in all these areas", like, "What's wrong with this?  What's wrong with that?" You know, I -- I asked them, they're like, "Nothing." I'm like, but you put that.  It needed to be -- like, right now needed to be addressed.  Like, Oh, no, no, I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

didn't mean that.

Q.   Right.

A.   So I do -- I do talk to staff and -- and kind of reiterate, hey, you know, let -- let -- it -- it should have been this.

Q.   Well, in this particular situation, all of these are 3's.

A.   Yes.

Q.   And the definition of a rating of 3 is that it is below standard requires a plan of correction?

A.   Yep.

Q.   So it -- when you receive reports that identify any item as a 3, do you go and establish a plan of correction with respect to that item?

A.   Well, the problem, like, with this one here, like, what -- like, what -- what's wrong?  There's nothing on here that is wrong.  So I would call the individual, like, I explained and see, what is the issue?  Because you wrote nothing for me.  You know? And then again, they'll be like, oh, well.  No, it's fine. Now, will they redo their weekly inspections and get them to me?  Nine times out of ten, no.  Do I ask them to?  Yes.  But when you're dealing with how many weekly inspections, every week, making sure they're turned in -- I mean, sometimes, do I miss things? Absolutely.  I'm

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

human.

Q.    Right.  So what I'm hearing from you is that you -- you're not going to be able to perform your job effectively if you go out and try and follow this rating and establish a plan of correction for 25 items that have been rated 3, that's not what you're going to do?

A.    No, I do.

Q.    Okay.  So if you receive --

A.    I do follow up on that.

Q.    -- if you received this report, what would you do with respect to A Cell House?

A.    I -- I would follow up with Lieutenant Kane and ask him what's wrong.

Q.    Right.  And you would expect him to tell -- to identify something for you that was wrong?

A.    Yes.

Q.    You identified something specific that was wrong, that you could sink your teeth into and address, you would address it?

A.    Absolutely.

Q.    But your point is, receiving a report like this with just a box checked and no comment, it gives you nothing to work with.  And, apart from calling Lieutenant Kane and asking him, you know, what he meant by these ratings, you don't have anything that you can

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

do; is that fair?

A.   Right.  Unless I have a reason, there's nothing I can do unless I contact him.  Is that what you were saying?

Q.   Well, that's what I'm asking you.

A.   Yes.  Then, yes.  That's what you're asking, then, yes.

Q.   All right.  On this particular report, with respect to fire safety, Kane is looking to ensure that the fire extinguishers are in the proper place, correct?

A.   Uh-huh.  Yep.

Q.   And he's making sure that the sprinkler system is working?

A.   A Cell House does not have a sprinkler system.

Q.   Well, he's checked the --

A.   I mean --

Q.   -- box that says that --

A.   And that -- and that -- and that should not be checked again.

Q.   Yeah --

A.   That's --

Q.   -- okay.  So maybe whoever did this was, kind of, going through the motions here a little bit.  Yes?

MR. JIMENEZ:  Object to form, but go ahead.

THE WITNESS:  Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

BY MR. BOWMAN:

Q.   Then, he's checking that the fire alarm system is working, correct?

A.   Correct.

Q.   Does that involve activating the fire alarm by the manual pull?

A.   No.

Q.   What -- how does he do that?

A.   The fire panel.

Q.   Okay.  So he is just checking to make sure that the circuits are connected, and the fire -- the panel seems to be hooked up and functioned --

A.   Operational, yes.

Q.   Okay.  He's checking to make sure that the exit sign is in place and illuminated?

A.   Uh-huh, yes.

Q.   And then what is he doing with respect to the emergency line?

A.   You can test them.

Q.   And he's supposed to do that?

A.   Correct.

Q.   And then with respect to fire safety, he's also checking to make sure that the evacuation plans are properly posted?

A.   Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   And in my questions earlier, I was intending to refer to the evacuation plan.  That's the map of the living facility with the plan of evacuation denoted on the diagram, right?

A.   Yes, sir.

Q.   Okay.  And in terms of fire safety, that is the sum and substance of the weekly inspection responsibility, right?

A.   Yes.

Q.   Now, we were talking earlier about issues in particular cells that might create a need for remediation.  I'm sorry, that -- that's a terrible question.  Let me start that question over.  I apologize.  We were talking earlier about fire hazards that can arise in individual cells for various reasons, right?

A.   Okay.

Q.   And you understand that -- that's a factor.  There can be conditions in a particular cell that can create a fire hazard in that cell, right?

A.   Absolutely.

Q.   And there -- you could make a list one of the problems might be a screen that somebody has set up with a sheet or a blanket in front of the cell, right?

A.   Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    It's -- there are a number of problems with that.  One of the problems is it's a fire hazard, yes?

A.    Yes.

Q.    The sheet is combustible, and you don't want unnecessary fuel set up in front of a cell, right?

A.    Yes.

Q.    And it's also obstructs the view into the cell, which is a problem in terms of monitoring and responding to fire?

A.    Yes.

Q.    Sure.  There are electrical issues that can arise in a particular cell of various sorts, right?

A.    Yes.

Q.    One of the issues that you wanted to mention earlier is some prisoners, you know, set up extensions of their outlets so that they can, you know, sort of have like a surge protector that they jerry-rig inside the cell, right?  So they have more than one outlet?

A.    Yes.  They make their own.

Q.    Yeah.  And that's problematic because these guys are not electricians, and they don't know what they're doing, necessarily, when they start monkeying with the socket.  And it's a fire hazard, right?

A.    Yes.

Q.    Should not be allowed to happen, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.   Correct.

Q.   Another problem that can arise is, you can have defective electrical equipment that a prisoner is making use of inside of a cell, right?

A.   Yes.

Q.   That can be a fire hazard as well?

A.   Correct.

Q.   These hot pots, you know, from your experience in the prison as a CO and as the safety hazard manager, the hot pots, if the water evaporates or boils out of the hot pot and the hot pot is left plugged in, that it can melt, and it can start a fire, right?

A.   Yes.

Q.   And there are a number of situations where that has occurred, and -- it's not infrequent, right?

A.   Yes.

Q.   Other problems, in terms of fire hazard, is just having too much stuff, too many papers, and court materials, what have you accumulated in the cell that can be a fire hazard because it's potential fuel for a fire, right?

A.   Correct.

Q.   So from the standpoint of fire safety, another function that needs to occur is that the cells need to be inspected, monitored, shaken down if necessary, and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

all of these factors controlled for, right?

A.   Correct.

Q.   That is not your job?

A.   No.

Q.   That is the function of security staff.

A.   Custody, yes.

Q.   Custody staff.  Thank you.  And your job does not include keeping track of those cell inspections, keeping track of the shakedowns, evaluating the performance of custody staff in that regard?  That's completely outside of your cap?

A.   Correct?

Q.   Got it.  Thank you.  All right.  Another thing that -- that's not on this list is the smoke detectors. They're important, right?

A.   Yes.

Q.   Can you explain to me why ensuring that the smoke detector is properly placed and is functional is not on the list of fire safety items that are inspected on a weekly basis?

A.   Because that is something that is done through a contractor, because we would literally have to blow smoke in them every week, and we'd have to go to the tops of the ranges.  That is something that, like Corson, Shamba, Nowbud (phonetic) whoever we're

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

contracted with at that time, that who comes in and does those.

Q.   Okay.  So that's not your area, and you don't manage that?

A.   Yes.  I -- I make sure that those inspections are completed.

Q.   Got it.  But it's handled by people not under your supervision?

A.   I escort the contractors to do their inspections, whether it's the smoke alarms, whether it is the fire panels, whether it -- whatever sprinkler systems, dry systems, whatever systems they're here to look at, I -- I escort them.  I keep those records.

Q.   Okay.  So you have, in your file, the records of the maintenance of the smoke detectors?

A.   The inspections?  Yes.

Q.   Got it.  Now, one of the things about A Cell House, as of January 13th of -- sorry, January 14th of 2024, is that the smoke detector was located at the top of the range, correct?

A.   Yes.

Q.   Up above the fifth tier?

A.   Correct?

Q.   On the ceiling?

A.   No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

Q.    Where is it?

A.    It's not like on the ceiling.  It's -- they -- how do I explain it?  So you have your five ranges, and then you have, like, a -- what do you want to call it?  Like, the -- we -- we call it the top of the block.  So it's the top of the -- it's, like, the ceiling of the 500 range, like, the flooring, and then you have the ceiling.  So you have all this air -- space up here.  They're here.  Your smoke detectors are, like, hanging off the top of the 500 range, not on the ceiling itself.  Does that make sense?

Q.    It does.  Why --

A.    Okay.

Q.    -- are the smoke detectors not supplemented with additional smoke detectors lower down in the building?

A.    I can't answer that.

Q.    Do you think they should be?

A.    I don't know.

Q.    Okay.  Have you ever talked with anyone about whether the smoke detectors in A Cell House and in other locations of the prison are properly placed?

A.    No.

Q.    Okay.  We've been going for a little over an hour.  I need to take another short ten-minute break, if

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

folks will be willing to accommodate me on that.

MR. JIMENEZ:  Sounds good.

MR. BOWMAN:  Okay.  So it is 1:18.  Let's gather again at 1:30.

MR. JIMENEZ:  Okay.

THE REPORTER:  We are now off record at 1:18 p.m.

(A recess was taken.)

THE REPORTER:  We are back on the record for the deposition of Deborah Taylor being conducted by video conference.  My name is Meredith Sarjent.  Today is June 27th, and the current time is 1:30 p.m.  You may continue.

BY MR. BOWMAN:

Q.    Thank you.  Ms. Taylor, I never asked you this.  Who do you report to?

A.    Mr. Neal.

Q.    So you're direct report to the warden?

A.    Correct.

Q.    And with respect to your activities, Warden Neal is fully aware of what you're doing?

A.    Yes.

Q.    I mean, you do you meet with him on a regular basis to go over your job function, and your issues, anything that's come up?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    Yes.  Any issues that arise, I always meet with him.

Q.    He's accessible to you, and you're accessible to him on a routine basis?

A.    Absolutely.

Q.    So we talked about the inspections that you supervise on a weekly basis and looked at a report of an inspection that had happened in 2021.  You remember that?

A.    Yes.

Q.    And, in connection with that, we talked about the need for addressing fire safety from the standpoint of the condition of individual cells, and that is not covered by the weekly inspection.  You remember that?

A.    Yes.

Q.    And Warden Neal is aware of the fact that the conditions of the cells is not being managed by you, in terms of a fire hazard assessment, correct?

A.    Yes.

Q.    He understands that that's being handled by custody staff, as opposed to yourself?

A.    Correct.

Q.    We also talked about the fire plan, Appendix C to the safety manual?

A.    Okay.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

Q.    You remember that was marked as an exhibit, and we talked about that?

A.    Yes.

Q.    And you -- we testified about how response to fire is managed, and whether there are after-action reviews of the response to a fire, and, in effect, whether that plan is effective and whether it's being properly implemented.  Remember what I asked you some questions about that?

A.    Yes.

Q.    And your testimony, I think it's fair to say is that those issues are outside of your expertise and your bailiwick, correct?

A.    Say you -- you're asking about?

Q.    Whether the fire plan is effective, and whether the fire plan is being implemented properly, is not an issue that you manage in your job?

A.    I do not make them, no.

Q.    You don't make the plan, and you don't evaluate the way the plan has been implemented in any particular instance?

A.    No.

Q.    And Warden Neal is aware that that's not your job, it's somebody else's?

A.    Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   Just a minute.  Warden Neal is also aware of the training that you do and do not do, correct?

A.   Yes.

Q.   He understands that you do the fire drills, but, in terms of fire extinguisher training and the general information given to staff about fire response, Warden Neal understands that that's not your job, right?

A.   That comes from training, correct.

Q.   Right.  Okay.  In terms of the management of the risks of electrical sparking, electrical failure, sockets being modified or otherwise not functioning properly, Warden Neal understands that you're not monitoring that because that's not your job, correct?

MR. JIMENEZ:  Object to speculation, but go ahead and answer.

THE WITNESS:  I'm not going to say it's not my job, because if I see something, I'm going to report it.

BY MR. BOWMAN:

Q.   Right.  I'm asking.  I and I totally appreciate that.  Like --

A.   It's everybody's job.

Q.   Right.  But it's not your particular job to accumulate the data, keep the files, monitor how prevalent the problems are, and whether there are global

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

fixes that are necessary.  That sort of thing is beyond your account?

A.    Correct.

Q.    And Warden Neal understands that's not your job?

A.    Yes.

Q.    So we have talked about the fact that fires are a recurrent problem at the Indiana State Prison. You've acknowledged that they happen, unfortunately, with some frequency, right?

A.    Yes.

Q.    With respect to that issue as well, you are not -- and I think I established this before, I just want to make sure I have it right.  You are not the person who keeps track of each fire, keeps track of all of the incident reports relating to fire, and charts out or otherwise monitors fires, how they've happened, and, you know, what the patterns might be?

A.    I have records of them because the Fire Department -- this is what I was trying to explain earlier.  The firemen write reports, and I keep them. I have reports.  Do I write all of those reports?  No. Why?  Because I'm not hearsay.  I mean, I leave at 2:00 p.m. every day.  I work 6:00 to 2:00, Monday through Friday, so the firemen do those reports.  They turn them

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS
Exhibit L

in to me.

Q.    Understood.

A.    That's what I was trying to explain earlier.

Q.    Thank you for clarifying that.  When you receive the reports, you keep them in a file that's in your office?

A.    They're in a binder.

Q.    In a binder in your office.  So they're all there and available.  So somebody could go to your binder, and, you know, if they wanted to see how prevalent fires were in 2022, they could look through a section of your binder and see all the firefighters reports of fires that occurred in that year?

A.    Yes.

Q.    Okay.  Do you do anything with those reports by way of analysis, or summarization, or charting, or any other kind of activity?

A.    Not typically, no.

Q.    Do you do it sometimes?

A.    Depending on the situation, yes.

Q.    So can you give me an example of something that you might do in relation to the firefighters' reports as to a fire?

A.    It may not be so much as to the fireman's reports.  I mean, I do have, like, individuals who will

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

start something purposely, so I will, you know, either keep the incident report from the shift supervisors as -- and there are times where, when an offender starts the fire purposely. And I will write them up on arson, destruction of state property, that kind of thing. I -- I -- you know, because they have -- they're purposely starting a fire and burning our things. If that -- does that make sense?

Q. It does make sense. So there might be an example where, based on the firefighters' reports and an incident report that you might also have received in relation to a particular fire, that you would be the person responsible for writing up the prisoner for destruction of state property or potentially referring the individual for criminal prosecution for arson?

A. Well, I don't refer anybody for prosecution, but if -- again, it's based on a situational basis. Sometimes, the lieutenants in the cell houses will -- will write the individual up, or the sergeant, or the officer. But if it's not being done, then I will.

Q. Got it. So that's one thing that you might do in relation to the firefighters' reports by way of after-action or response?

A. Correct.

Q. Can you think of anything else that you would

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

do?

A.    No.

Q.    So from the standpoint of keeping track of trends, keeping track of recurrent problems, keeping track of possible solutions to problems that reemerge, that's not something that you're expected to do?

A.    No, I've never been asked.  Not if it's --

Q.    Yeah.

A.    -- something that, you know --

Q.    And Warden Neal understands that that's not what you're doing, and that's not part of your job?

A.    That I'm not tracking every fire's reasoning?

Q.    No.  Let me try and ask the question again, because I want to be clear with you about this.  Some -- someone might, for an example, keep track of each fire on a spreadsheet.  And on the spreadsheet, they would specify factors about the fire, where it happened, what time of day it happened, what the response to the fire was, whether the fire brigade was called, whether staff addressed it.  They might keep track of whether it was deliberately set by a prisoner or whether it was the result of an accident, and just understand how it comes about that fires are occurring in the prison.  Does that make sense?  Somebody could do that?

A.    Yeah.  So no, I do not keep a spreadsheet and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

I -- I've never known for it to be a requirement.

Q.    And you don't keep any other record like that?

A.    No.

Q.    Warden Neal understands that you're not doing that because you've not been asked and that's not part of your job?

A.    Yes.

Q.    Have you ever made a recommendation to Warden Neal with respect to fire safety?

A.    Possibly.  If I have, I don't recall.  I mean --

Q.    Does Warden Neal look to you for recommendations with respect to fire safety?  Does he come to you and say, you know, Ms. Taylor, or, Deb, I -- I'm seeing all of these fires occurring in the prison, do you have any recommendation as to how we should be dealing with this better, so it doesn't happen?

A.    No, he has not.

Q.    And he understands that you're not the person to go to with a question like that?

A.    I mean, he's never asked me that question. Not saying he never would or ask me my opinion, but he never has.

Q.    Are you responsible for ensuring that fire extinguishers are where they're supposed to be

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

throughout the prison?

A.   Yes.

Q.   How do you manage that function?

A.   Through my firemen.  They have -- again, we talked about this earlier with they -- them having the sheet that they keep up on -- we -- inside the wall. They check all the extinguishers making -- twice a month.  They check them, making sure that the pins are in, they're charged properly, that the offenders haven't cut the hoses off of them.  So they do checks and sign off on them every month.  And then they go in the middle of the month and check them a second time.

Q.   And there's, I'm assuming, documentation that's created with respect to that and you're the person who keeps the file on that and monitors it?

A.   Yeah.

Q.   After the Smith Fire, do you recall an effort to obtain additional fire extinguishers?

A.   Yes.

Q.   Could you tell me about that, please?

A.   We had -- we had water extinguishers on every range.  After this incident, I -- well, I guess I -- I do make suggestions because I suggested for the ABCs to actually be put up on the ranges now that we're talking about it.  So now it's an ABC and a water extinguisher

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

in the fronts of every ranges.

Q.    And what's the reason that you made that suggestion?

A.    Well, because sometimes -- and this is, again, my opinion.  But in my opinion, when these offenders start fires on the ranges, it's normally paper, wood, something that a water extinguisher can put out.  In my opinion, if we have the ABCs up there, because it's inside the cell and not outside the cell, in ABC, I encourage staff, when in doubt, grab that ABC because it's everything.

Q.    Right.  In particular with the response to the Smith fire, did you learn that an officer had responded to that fire with a water extinguisher as opposed to a chemical extinguisher, and that the water extinguisher was an ineffectual response given the magnitude of the fire?

A.    Yes.  I -- I know that the water extinguisher was originally used because that's what was on that range -- at the front of that range, like we had discussed.  But we do also have ABC extinguishers set in the officer stations as well.

Q.    So --

A.    And they have been there.  They've always been in place there.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit L**

Q.   So -- and so it was your idea in response as a corrective action after the Smith Fire to have the ABC extinguishers at the end of each range in each living unit?

A.   Correct.  Rather than just the officer station.

Q.   And rather than just having the water extinguishers at that one range location?

A.   Correct.

Q.   And that's a recommendation you made to the warden?

A.   Yes.

Q.   Can you think of any other fire safety recommendation that you've ever made to the warden?

A.   I mean, off the top of my head, no.  Off the top of my head, I can't think of anything.  Unless -- unless we start talking about something, it -- it might trigger something, but I'm not sure, honestly.

Q.   Okay.  So I want to ask you some questions now about the Smith Fire in particular and the response to it.  We talked about the fact that the fire occurred, was it, on a weekend day and it was one of your days off?

A.   Correct.

Q.   You were contacted at your residence and



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

informed about this situation?

A.    They called me on my state phone.

Q.    **And they asked you to come into the prison?**

A.    They -- correct.

Q.    **And when you came into the prison, what did you do?**

A.    Went to see Captain McCann to, kind of, see what was going on.  I know the state police were already here.  And I -- and I don't remember if the state fire marshals, they were either en route or they were already here.  I'm not 100 percent.

Q.    **So you went, and you spoke with McCann who was in a control room or in a --**

A.    He -- he was in -- he was in his office in the custody hall.

Q.    **In his office in the custody hall?**

A.    Uh-huh.

Q.    **He gave you a briefing?**

A.    He just told me that there had been a fire and, I mean, I think everybody was just, kind of, frazzled.  But he was busy writing reports and things like that, so the conversation wasn't, you know, some big, oh my gosh, what happened?  Give me all the details.  You know, because he was busy trying to -- you know, we had the state police there.  We had -- I - -

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

**Exhibit L**

the coroner was either there or was coming.  You know what I mean?  There was just so much going on.

Q.    Was the warden there?

A.    No.

Q.    Do you know why not?

A.    I don't believe he was here.  He may have came in and I didn't see him, but no, I can't speak for Mr. Neal.

Q.    After speaking with McCann, what did you do next?

A.    I just was, kind of, there.  I mean, there was really nothing for me to do because people were in place.  I was just -- I just, kind of, went to the -- I did go to the fire station.  I needed to check out my guys, make sure that they were okay, make sure, like, mentally they were okay.  Things like that.  And then I just, kind of, hung out to make sure nobody needed anything from me for a little while.

Q.    Were you contacted and requested to come in because of protocol where you're on the list of people who need to report to the prison when something like this happens?

A.    Yes.

Q.    And that's part of the fire safety plan?

A.    I don't have a definite answer for that.  I



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

just know that's -- I've never seen it in writing, I don't think, that I can recall. But if -- if it's a severe enough fire, they will call me. Do they call me for every range fire that somebody starts? No.

Q. This particular fire was sufficiently serious that protocol was triggered, and you were called on your state phone and reported to the facility?

A. Correct.

Q. The -- you get there and the long and short of it is a lot of people are dealing with a lot of stuff and there's basically nothing for you to do?

A. Correct.

Q. So what you took it upon yourself to do was to report to the fire station, and check out the status of the firefighters, make sure they were okay --

A. Uh-huh.

Q. -- and give them an opportunity to talk to you?

A. Absolutely.

Q. Did you learn anything from the firefighters in those conversations?

A. I really don't recall much of the conversations, to be very honest with you. Again, two-and-a-half years ago, two years ago. I have so many conversations with so many offenders, I -- I really

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

don't recall.  I mean, I -- I really just try to be there to listen to them.  If they need help, I'll help them.  Do I -- I don't -- I really don't remember. That was a while ago.

MR. BOWMAN:  Right.  I understand.  I'm going to show you another exhibit.  And I've now succeeded in losing track of the numbering, Meredith.  What is next?

THE REPORTER:  The next one will be 9.

(Exhibit 9 was marked for identification.)

BY MR. BOWMAN:

Q.    Thank you.  So I've placed on the screen for us Exhibit 9 to your deposition.

A.    Yes.

Q.    It's 29 pages.  And it starts with an e-mail from Captain McCann to a bunch of people, including yourself --

A.    Yes.

Q.    -- at the end of the day on January 14th.

A.    Uh-huh.

Q.    You recall this e-mail?

A.    Yes.

Q.    And among other things, he reports that you were contacted and arrived at the prison at exactly 11:52 a.m.?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

A.    Okay.

Q.    That's correct?

A.    Yes.

Q.    Then I'm going to scroll past a number of e-mails that I'm going to go back to in a minute, but I wanted to turn --

MR. BOWMAN:  Actually, you know what, Gustavo? I realize I didn't identify this document.  Yeah. Exhibit 9 for the record is a 29-page document.  I assume it all goes together because it was produced to us as one PDF.  It begins at Page State 000028 with the e-mail from McCann to others that I just spoke with the witness about and continues on sequentially numbered to State 000056.  And then attached after the e-mails and made part of the same document is a series of reports - - incident reports from the prisoner firefighters.

BY MR. BOWMAN:

Q.    And I'm going to want to talk with you about the report from Chief Stidham --

A.    Okay.

Q.    -- that was completed apparently the following day at 10:55 a.m.

A.    Okay.

Q.    Mr. Stidham is the chief of the prisoner fire



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

brigade, correct?

A.   At the time, yes, he was.

Q.   Knowledgeable and capable guy?

A.   Absolutely.

Q.   Okay.  On the second page of his report, which is Bates number State 41, he talks about a concern that he has regarding the evacuation of the building.  He says that he was in the officer's station working on the alarm panel.  That's a reference to turning off the fire alarm and resetting everything?

A.   I'm assuming.

Q.   And he says at that point, Lieutenant Jones, who was the ranking officer in A Cell House at this time, right?

A.   Yeah.  She was the assistant -- assistant shift supervisor that day.

Q.   And she was the ranking officer in A Cell House?

A.   She was the -- she -- so you have Captain McCann --

Q.   Right.

A.   -- who was running the shift.

Q.   Right.

A.   And then you have Lieutenant Jones right under him --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

Q.   Right.

A.   -- in the custody office helping him run the shift.

Q.   Okay.

A.   I believe the lieutenant that day was Lieutenant Smith, if I'm not mistaken, in that cell house.

Q.   Thank you for clarifying that.  In any event, Lieutenant Jones, according to Stidham, asks if the cell house needs to be evacuated.  And Stidham responds to her that that's not Stidham's decision to make.  The shift supervisor needs to make the decision, right?

A.   I mean, that is a correct statement.  That comes from the shift supervisor.

Q.   And that's because we can't have prisoners deciding whether to open the cell doors and let everybody out of the -- let everybody out of the living unit.  That -- that's a custody decision, not a prisoner decision, right?

A.   Correct.  Yes.

Q.   So he tells -- Stidham tells Jones that in his judgment, the north side of the living space, at a minimum, needs to be evacuated.  And it's after that conversation, according to Stidham, that the evacuation starts, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    I don't know.  I wasn't there for that conversation.

Q.    According to Stidham, it's after that point that the evacuation starts?

A.    Yes.

Q.    And he goes on to say at this time, the back door still had not been opened and the evacuation took place out the front door instead of the back door, which is the appropriate exit route in an evacuation, correct?  According to Stidham, this is what happened?

A.    That's what he stated.

Q.    So from your standpoint, as the person in charge of making sure everybody knows the evacuation plan, there -- assuming what Stidham says here is correct, there were problems, right?

A.    Yes.

Q.    Problem one is the doors should have been opened immediately when it was apparent that there was a fire with smoke all over the place, right?

A.    Should the doors have been immediately opened --

Q.    Right.

A.    -- once the fire started?  Is that what you're asking me?

Q.    That's what I'm asking you.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

A.    If staff are trying to fight that fire before the firemen get there, then no, because they should be fighting that fire, trying to get that fire out, not worried about opening the back door.

Q.    You know, Ms. Taylor, we looked at the fire plan a minute ago and we agreed that what staff should not be doing is fighting a major fire, right?

A.    Until the firemen get there, they should be. Once the firemen arrive, staff backs off and lets the firemen take care of the fire.

Q.    I see.  So if the fire plan says something different than that, then the fire plan is wrong?

A.    Hold on.

Q.    Are you looking at something that you have in front of you?

A.    Well, you -- the Appendix C that you had up, can you pull that back up for me?

Q.    Yeah.  Ms. Taylor, the way this has to work is that I have to be sure that you're not looking at stuff that I don't have access to.  That's --

A.    I understand.  It's just the Appendix C that we went through.  Can you -- if we can pull that up?

Q.    That's why I asked you at the beginning of the deposition to clarify whether you had anything in front of you.  And you told me that you had the subpoena in

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

front of you and that your desk was clear, otherwise.

A.    Uh-huh.

Q.    Can we keep it that way?

A.    Yes.

Q.    Thank you.  So I'm going to take this exhibit away and we're going to go back and look at the fire plan again.  So I am putting the fire plan in front of us.

MR. BOWMAN:  Meredith, can you remind us of the number of this exhibit?

THE REPORTER:  This is Exhibit 6.

MR. BOWMAN:  Thank you.

BY MR. BOWMAN:

Q.    So Exhibit 6, Page 4 is on the screen.  I'll read the paragraph into the record.  "Staff working the immediate area of the fire and the first responders will attempt to extinguish the fire with the fire suppression equipment at hand if the fire is in minor stage.  If fire progresses beyond the minor stage, all firefighting is to be done by the ISP fire brigade who have been trained and equipped in accordance with the regulation." I read that right, yes?

A.    Yes.

Q.    And isn't it true that according to the fire plan, you don't want to have staff responding to a major

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

fire because they don't know how to do it, right?

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  You said "answer"?

MR. JIMENEZ:  Yeah.

THE WITNESS:  Okay.  So yes, they -- they need to try to put the fire out.  If it becomes too much, then yes, of course they need to back off.  We don't -- we're not wearing fire equipment gear.  We don't have the gear.  We don't have the -- the -- the -- the tanks.  We don't have any of that stuff to protect staff.  So yes, the firemen have full fire gear with the SCBAs and your masks and everything else.  So yes, the firemen would need to take over in something -- in that type of situation, yes.

BY MR. BOWMAN:

Q.   Right.  That's what the plan clearly requires.  To repeat, the fire that has become a major fire is the responsibility of the fire brigade.  And by plan and by design, staff are not to be in the position of responding to it because they don't have the gear in particular, right?

A.   And the training.  Correct.

Q.   And the training.  So I'm going to place on the screen now a still from the surveillance camera showing this -- the fire in which Mr. Smith perished.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

This will be Exhibit 10 to your deposition.  And I will tell you that the timestamp up at the top here shows that we're looking at the fire at 10:58 a.m. on the morning of January 14, 2023, which is the -- January 13th -- January 14th.  Sorry.  January 14th, 2023. This is not a minor fire, right?

(Exhibit 10 was marked for identification.)

A.    Correct.

BY MR. BOWMAN:

Q.    This is not a fire that staff should be attempting to put down, right?

MR. JIMENEZ:  Objection to form.  You can answer.

BY MR. BOWMAN:

Q.    By design, by plan, by --

A.    So --

Q.    -- regulation and by the procedure --

A.    Okay.

Q.    -- of your organization --

A.    However --

Q.    -- this is -- sorry, I haven't finished answering -- asking my question yet.

A.    I'm sorry.

Q.    By design, by procedure, by plan, and by expectation, this fire that is depicted in Exhibit 10 is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

a major fire that should be fought by the fire brigade, not staff, right?

MR. JIMENEZ:  Same objections.  Go ahead.

THE WITNESS:  No.

BY MR. BOWMAN:

Q.  It's not.  Is -- are you saying this is a minor fire?

A.  No.

Q.  It is a major fire, is it not?

A.  It is a major fire.  However --

Q.  Did we not look a minute ago at Paragraph 4 of the fire plan, which you said is the definitive document with respect to dealing with fire, and establish that by rule in the fire plan, staff are not supposed to be responding to this fire.  The fire brigade is supposed to be responding.  Did we not establish that?

A.  We did establish that.  However, was this before any staff seen what was going on?  Because if they knew there was a fire, then they're going to take an extinguisher and they're going to try to -- to -- to extinguish it before they realized how bad that fire was.  And then they would probably back off.  In my opinion.  But I -- again, I wasn't there.  I wasn't staff.  I'm not -- I -- I'm -- I'm not there to make their judgment calls.  They are.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   Yeah.  I mean, the reality on the ground here is that this is a desperate situation, right?

A.   Absolutely.

Q.   I mean, if you look right here at the bottom of Cell 252, you can see a man burning to death, right?

A.   Yeah.

Q.   Right.  This is a situation that has spun completely out of control, right?

MR. JIMENEZ:  Objection to form.  Go ahead.

THE WITNESS:  Yes.  Yes.

BY MR. BOWMAN:

Q.   The reality is here that this fire should not have been allowed to progress to this state without any response, right?

MR. JIMENEZ:  Same objections.  Go ahead.

THE WITNESS:  I wasn't there.  I --

BY MR. BOWMAN:

Q.   I'm not asking you if you were there or not. I am asking you to look at this photograph and confirm that this situation should not have been permitted to occur without a response.

MR. JIMENEZ:  Same objections.  Go ahead.

THE WITNESS:  No.

BY MR. BOWMAN:

Q.   Right.  So your point is the people who were

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

on staff, when they did respond, they didn't have the firefighters there, right?

A.    At that -- no.  They had to -- no.

Q.    And they had -- and they --

A.    They were not in the cell house.

Q.    And they did what they could -- the staff members did what they could to respond to a desperate situation, right?

A.    Yes.

Q.    And you're not going to tell me that they should have walked away from the fire because they weren't firefighters.  They departed from procedure because of the desperate situation that they encountered when they saw this going on, right?

MR. JIMENEZ:  Object to form and to the extent it mischaracterizes the testimony.  But you can go ahead.

THE WITNESS:  It would be speculation to know what they were thinking.

BY MR. BOWMAN:

Q.    Well, I mean, as a human being, you can assume that what they were thinking was, we have to do what we can here and procedure be damned.  Let's try and put this fire out, right?

MR. JIMENEZ:  Same objections.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

BY MR. BOWMAN:

Q.   Human response under the circumstances?

A.   Yes.

Q.   Yeah.  And -- but when you go back and look at the procedure, it was contrary to procedure?

MR. JIMENEZ:  Same objections.  But go ahead.

THE WITNESS:  Yes.

BY MR. BOWMAN:

Q.   Yes.  And so what you can see as the safety manager here is that you have cascading failures in this situation, right?

MR. JIMENEZ:  Same objections.  Go ahead.

THE WITNESS:  Say that one more time?  I'm sorry.

BY MR. BOWMAN:

Q.   Cascading failures.  You have custody staff in A Cell House who are apparently not paying attention as this fire produces smoke billowing out of a cell, flames coming out of a cell, a man screaming as he's being burnt to death, and all of that is going on and they're paying no attention at all, right?

MR. JIMENEZ:  Same objections --

BY MR. BOWMAN:

Q.   That's what's happening?

MR. JIMENEZ:  -- for all the same reasons. But

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

go ahead.

THE WITNESS:  No, I don't know what staff were thinking.  I don't know what staff were doing.  I was not there.  I'm not going to speculate on that.

BY MR. BOWMAN:

Q.  **Okay.  Well, do you want to argue with me about that?  Do you think that what I just said is not true?**

A.  I don't want to argue, no.

Q.  **You can't disagree with what I just said, right?**

MR. JIMENEZ:  Hold on.  Objection to the whole -- form.  Speculation.  Lack of foundation.  But you can answer if you know, Deb.

THE WITNESS:  I don't know what staff were thinking.  I'm not going to speculate on what staff were doing, what they were thinking, or what was even going on in the cell house at that time.

BY MR. BOWMAN:

Q.  **Okay.  One of the realities, you found this out when you talked to the firefighters, was that they did not get to this fire until after Smith was deceased and nothing could be done to save him, right?**

A.  Correct.

Q.  **I mean, you don't remember a lot about the**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

conversation with the firefighters in the firehouse on the morning of January 14th, 2023, but that basic point got across to you, right?

A.    Correct.

Q.    And you know, for whatever reason, there was a disconnect between procedure and the reality on the ground with respect to this particular situation, right?

MR. JIMENEZ:  Same objections.  Go ahead, Deb.

THE WITNESS:  Possibly.  Yes.

BY MR. BOWMAN:

Q.    Yes.  And one of the problems was a problem that Chief Stidham is pointing out in that passage from Exhibit 9 that we were looking at a moment ago, which is that the living quarters is filled with smoke, the evacuation door is not open, staff is actually asking him what to do, and the evacuation has not been started as it should have been, right?

A.    Again, it's up to the shift supervisor on whether -- who determines that.  If that was according to Stidham and what was done, then no.

Q.    According to Stidham.  I mean, you --

A.    Right.

Q.    -- were there, but Stidham's criticism was this evacuation did not get started on time.  The door did not get open as it should have been.  And as a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

matter of fact, when they did start evacuating, they sent people out the wrong door, right?

A.   They -- yes.

Q.   All of those points were communicated by Stidham in his report, yes?

A.   Yes.

Q.   I want to go back to the -- to Exhibit 9. Give me just a minute.  I'm putting 9 on the screen again. I'm going to have you look with me at Page 21 of Exhibit 9.  This is the -- whoops.  I actually want you to look with me at Page 20 of the exhibit.  This is the report of a firefighter named Kelly Holland.  Do you know him?

A.   Yes.

Q.   Is he a capable fellow?

A.   I would say so, yes.

Q.   Okay.  He has a personal observation, which he shares in his report, about the problem that prisoners in their cells do not have adequate storage.  And the lack of storage can create a situation where there's a enhanced risk of fire, correct?

A.   Correct.

Q.   And he states that in his report.

A.   Okay.

Q.   Correct?  I don't want to read this whole thing into the record.  We've been going for a while.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

But this is the essence of his recommendation?

A.    Yes.

Q.    He says, "What I am getting at is this: If this man had a metal cabinet to store the majority of his combustible property, the fire may have been contained, and the outcome may have turned out differently.  When everything an inmate has in his cell is lying out, the more surface area you have as fuel load.  The cells need shelves to cabinets to be able to securely place our electronics, fan, hotpot, television, tablet.  As of now, many of the cells do not have a proper place to have their electronics."  So this is a problem that he sees from the standpoint of fire safety.

A.    Okay.

Q.    Do you disagree?

A.    Do I disagree with him?  No, I do not.

Q.    No.  Have you ever passed this recommendation along to the warden?

A.    It has been a topic of conversation for quite a few years, even before I was in this position.

Q.    And although it's been a topic of conversation, this has never been made; is that correct?

A.    Correct.

Q.    All right.  Now I want to go back to Page 11 of Exhibit 9.  This is the incident report of a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

firefighter by the name of David Milne.  Is he somebody you know?

A.    Yes.

Q.    Is he a capable guy?

A.    Yes.

Q.    He has an observation about this situation. And I will read this in the -- into the record.  He reports, "I asked the officers in A Cell House to turn off the power to the cell," meaning the cell in which Mr. Smith died.  Milton goes on and he says, "It should have been done immediately, but wasn't.  They told me that they didn't know how to do this.  Then they told me that they were told to do the de-energizing.  I asked by whom.  They wouldn't say.  I went back to the scene and noticed there was a lot of ABC extinguisher in the cells on both sides of the fire scene.  I believe that the fire was so bad that they couldn't get directly in front of the cell.  So my question is, how did it get so bad in the few minutes from the call?  I spoke with a few of the men on the range.  They said the fire had been going on 15 to 20 minutes before we got there," sound familiar?  And he goes on to say, "Fire Chief Stidham asked us to break down the lines and we did.  I had questions about why they just asked for the fire chief. In the couple of minutes it took for him to get there,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

the man was deceased, and fire was shooting out the cell.  In my opinion and by experience, it had been going on for a while.  I was the fire chief back in 2017 when Mr. Devine passed with similar circumstances.  I see that staff took it upon themselves and when it got too hard to deal with, they called for us.  And then it was too late.  The ISP firemen have been trained to deal with these types of situations.  ISP staff has not. This is a very true statement.  'If we don't learn from history, we will be doomed to repeat it.'"  And he says, "Something similar to that, it's very sad.  Lessons not learned leads to a life not fulfilled.  This is an accurate description of the events as I witnessed."  Did you -- I read that right, didn't I?

A.   Yeah.

Q.   Did you talk with the firefighters about this concern that --

A.   No.

Q.   -- they have been called to the scene too late?

A.   They always express that.  They always feel as -- not always.  They did express that, yes.

Q.   Yeah.  Did you disagree?

A.   I wasn't there.  Again, I -- I don't know. They -- this one here is stating they only called for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

the fire chief, but in other, they said there was a 1071 called.  So I don't know.  Again, I wasn't there. I can only speculate on what they're stating and what, you know -- and I -- I can't -- I don't know.

Q.    So did you communicate this concern to Warden Neal?

A.    I don't recall.  I very well possibly could have.  I -- I don't recall.  Again, it was -- it's been two years.

Q.    I understand.  You said a minute ago that, you know, this is the kind of thing that the prisoner firefighters always say, boy, we got called too late. Has this been a topic of discussion around the prison?

A.    It's always a topic of discussion.  I am always telling staff, I don't care what kind of fire it is, call the signal.

Q.    Have you communicated to Warden Neal this issue that the firefighters are raising about being called too late to the scene of a fire?

A.    I don't believe so.  I don't -- I don't know. I -- I don't know.  Not that I can recall.

Q.    And you didn't say anything about it to him in relation to this particular fire or maybe you did?

A.    Very possibly.  You know, this is my -- this here has been my very first and only thing like this

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

that has happened since, you know -- I was safety manager for a year.  Nothing like this had ever happened.  I don't think anything like this -- you can ever prepare for something like this, but it was my first experience with this.

Q.    Well --

A.    Something of this magnitude --

Q.    -- what conversation -- sorry.  I didn't mean to interrupt you.  Go ahead.

A.    No.  Just something of this magnitude was my -- this is the first time this had ever happened, with me in this position.

Q.    And did you talk with Warden Neal about this situation?

A.    I don't recall.

Q.    You have no memory of any conversation with him on this subject?

A.    No.

Q.    Did Warden Neal seek you out as the safety hazard manager and say, I -- I'd like to get your views about this fire, and how it happened, and whether there's something we should be doing differently?

A.    No, not that I recall.

Q.    Has Warden Neal ever had a -- ever called you asking to have that kind of a conversation with respect

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

to any incident in the prison during your tenure as fire -- as hazard safety manager -- safety hazard manager?

A.   We have had conversations regarding different things.  I mean, well -- I mean, really, as of recently, you know, clarification because we had a lockdown.  So I -- I would talk to them about clarification for making sure, hey, on lockdowns, we do release the firemen, correct?  Just so that we're there, I can make sure that staff know, hey, we are doing this.  You know, you are releasing your firemen on a lockdown or anything else.  So I do go to him and -- for extra clarification.  I mean, I knew that answer, but I wanted to make sure that it was still the same answer.  You know what I mean?

Q.   I want to look with you at another e-mail. This is to you from Mr. Lessner dated January 19th, 2023.  He asks, "Have you ever given us the statements from the firemen?  I am hearing stories about staff. If it is true, I need to know."  Do you recall receiving this message?

A.   I don't recall, but I'm sure that I responded and gave him what he needed.

Q.   So you got that and you, in fact, had the statements from the fireman, so you passed those statements along to him?

A.   I would have, yes.  Absolutely, I would have.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    You're confident that you did, even though you don't have a recollection?

A.    Any -- normally anything that is asked of me, I -- I will definitely get those things to the individuals.  I mean, Lessner has been gone for some time.  I don't even know if I can pull those e-mails.

Q.    Well, he says that he's been hearing stories about staff, and he needs to know if these stories are true.  And he's saying that in the context of wanting the statements from the firemen.  Do you understand what he's talking about?

A.    No.

Q.    Did you ask him?

A.    I don't recall.

Q.    Did you have any conversation with Lessner about the circumstances of this fire?

A.    Not that I can recall.  Again, this is the first incident that I've ever had, so it's, kind of, like, I -- I -- I knew that we had fire marshals here. Our I&I department, all -- all those things and the fire marshals, they -- they were -- they were investigating it.  So what -- what am I -- what am I supposed to do? You know what I mean?  And as far as those types of things, to me, that was just left up to, kind of, the State departments to do.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit L**

Q.    Right.  Essentially, you did not have a role?

A.    No.  No.  In my opinion?  No.  I -- like, I said, I was just, kind of, there in case anything was needed.

Q.    Well, we've looked at the statements from the firemen and those statements include that staff didn't call them quick enough, right?

A.    Okay.

Q.    I mean, we just looked at it, right?  It's there.

A.    Correct.

Q.    And they included the statement that the evacuation was not handled according to procedure, right?

A.    Correct.

Q.    And they include concern about accumulated material without adequate storage in the particular cell where this individual perished, right?

A.    Correct.

Q.    So those are statements from the firemen.  Did you talk with Lessner about those statements at all?

A.    No.

Q.    Were you part of the critical incident debriefing that took place in relation to the Smith fire on February 21st, 2023?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

A.    Yes.

Q.    Do you recall that meeting?

A.    Briefly.  I mean, I'm sure you have the notes from -- from it, but --

MR. BOWMAN:  This is a document that has been provided to us in discovery.  It will be, I believe, Meredith, Exhibit 12 to the deposition?

THE REPORTER:  This will be 11.

MR. BOWMAN:  11.

MR. JIMENEZ:  And Locke, I don't think you marked the previous e-mail from Mr. Lessner.  But Meredith, correct me if I'm wrong.  I don't know if it got marked.

MR. BOWMAN:  I didn't hear.  Sorry.  Say that again, Gustavo.

MR. JIMENEZ:  Oh, that I don't think you marked the previous e-mail you used, the one from Mr. Lessner.

MR. BOWMAN:  Yeah.  Yeah.  Yeah.  So let's go back and do that.  I think that's the reason for the confusion.  I am placing back on the screen -- whoops. No, I'm not.  I'm placing back on the screen a copy of an e-mail from Lessner to Taylor, dated Thursday, January 19th, 2023.  That will be, Meredith, Exhibit 11 to the deposition.  And then we

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

will replace that with the critical incident review, which is Exhibit 12 for identification to your deposition, Ms. Taylor.

(Exhibit 11 was marked for identification.)

(Exhibit 12 was marked for identification.)

THE WITNESS:  Okay.

BY MR. BOWMAN:

Q.    And you see that you are listed as one of the attendees at this critical incident debriefing, correct?

A.    Correct.

Q.    Do you recall the meeting?

A.    Briefly, yes.

Q.    What was your role in the meeting?

A.    Mr. Neal is the one, I believe, who headed that meeting up.  Don't quote me on that.

Q.    Now that was one of the things that I wanted to ask you about.  Deputy Warden Nowatzke, Major Wardlow, Captain Gillespie, Deputy Warden Buss, Lieutenant Jones, Lieutenant McCormick, yourself, and Lieutenant Wynn are all listed as in attendance.  Do you see at the top?

A.    Yes.

Q.    Is it your belief that Warden Neal was also there?

A.    I -- I believe he was.  Again, I could be



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

wrong.  This -- I mean, that was a long time ago for -- to know exactly who was in a meeting, but I was -- I was in the meeting.  Yes.

Q.    And your recollection -- your best recollection is that the meeting was led by Warden Neal?

A.    I believe so.

Q.    Can you tell me how the meeting unfolded? What the process was?

A.    I mean, normally they -- they talk in -- in a debriefing, we talk about the incident.  We talk about what happened, what could have went wrong, what could have went right, what -- what was right, what was wrong, what can we do better, those types of things. And -- and that's how most debriefings are.

Q.    The objective is to learn from history, right?

A.    Correct.

Q.    To figure out where mistakes happened, because you want to improve the -- you want to improve the situation and do better next time, right?

A.    Correct.

Q.    The other purpose is to reinforce things that were handled properly and make sure people get props for doing the right thing as well?

A.    Correct.

Q.    Does everybody go around the room and give

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

input?  How does the -- how is the meeting organized?

A.   Usually, it's just, kind of, asked and people are able to speak.

Q.   Did you speak at the meeting?

A.   Huh?

Q.   Did you speak at the meeting?

A.   I don't remember.  I really don't --

Q.   Would it be don't fair to say that you didn't really have much to say because you weren't there and really couldn't comment?

A.   Correct.  Well, yeah.

Q.   So who had the most to say at the meeting?

A.   I don't -- I don't know.

Q.   How long did the meeting last?

A.   I don't know.

Q.   Who prepared this report?

A.   This one here?

Q.   Yes.

A.   I have no idea.

Q.   You had no role in the preparation of this document?

A.   No.

Q.   We looked at a still from a video of the fire.  Did the participants in this meeting review that video?

A.   I don't know.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.    Well, you were there.  Was the video reviewed?

A.    No.

Q.    Did the participants in the meeting have the fire marshals report available to them?

A.    No, because I don't even think the fire marshal report was done at that time.  I don't know.  I don't know when the fire marshal report was completed.

Q.    Did the participants in the meeting have the benefit of the incident reports prepared by the individual prisoner firefighters, the documents that we looked at in part a few minutes ago?

A.    If -- I don't know if they reviewed them or not.  I mean, if they would've asked for them.

Q.    Was there discussion about them?

A.    Not to my knowledge.

Q.    Was there a discussion about the specific input from the particular firefighters that I focused on in my questioning to you?

A.    No.  Not to my knowledge.

Q.    Was it the general sense of the meeting that nothing had gone wrong and nothing was mishandled?

MR. JIMENEZ:  Object to form.  But go ahead, Deb.

THE WITNESS:  I -- I don't -- I -- I -- like I said, I don't recall.  I mean, I don't recall.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

BY MR. BOWMAN:

Q.   Well, it says here, "Staff response and actions were deemed within the scope of policy and procedures."

A.   Okay.

Q.   Did you sign off on that conclusion?

A.   I didn't -- I mean, I didn't -- we don't sign off on anything.  Do I agree with it?  Do I believe the staff and their actions?  I -- I -- I don't know.

Q.   Well, I mean, we talked about this, and I think we agreed that there was a big gap between what happened and what procedure called for, right?

A.   Agreed.

Q.   So this proposition here, that staff response and actions were within the scope of policy and procedures, is dead wrong, right?

MR. JIMENEZ:  Object to form.  Go ahead.

THE WITNESS:  I --

THE REPORTER:  Sorry.  Ms. Taylor, did you answer?

THE WITNESS:  No.  I didn't answer --

THE REPORTER:  Oh, sorry.

THE WITNESS:  -- because I -- I don't know how to really answer that.  Because I -- I mean, I feel like that's a double-edged question type -- yeah.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

BY MR. BOWMAN:

Q.   There's just not really a good answer to that question, is there?

A.   No, there's not.  I mean, if I say yes, you're going to tell me, I'm wrong.  If I say no, I mean, I am -- and again, like I said, I wasn't there per se.  At the time of this meeting, I mean, they may have felt that way.  I -- I don't know.  I --

Q.   Right.  Well, we talked about the fact that major fires like this one are supposed to be fought by the firefighters, not by staff, right?

A.   We did discuss that, yes.

Q.   According to the fire plan.  And that's not what happened here, right?

A.   No.

Q.   We talked about the -- I guess we haven't talked about this, but are you aware that the -- Ms. Taylor, your camera has kind of wandered up.  Do you think you could adjust it so we could see your face?  Thank you.  I appreciate that.  We talked about the fact -- we have not talked about the fact, but it is a fact is it not, that an officer by the name of Crockett responded to this fire with a water fire extinguisher as opposed to a chemical fire extinguisher, right?

A.   I don't know who the officer was, but I know

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

that an officer responded with the water extinguisher.

Q.   And this is actually what led you to recommend to the warden that going forward in the future, the extinguishers on the range should be both a water extinguisher and a chemical extinguisher, right?

A.   Yes.

Q.   The chemical extinguisher should not be just in the officer's station.  They should be in that other location as well, right?

A.   Correct.

Q.   So to respond to a fire of this nature with a water extinguisher is completely inconsistent with training, right?

MR. JIMENEZ:  Objection to form.  Go ahead.

THE WITNESS:  You want me to answer it, you said?

MR. JIMENEZ:  Yeah.  Go ahead.

THE WITNESS:  Again, staff is not -- we're not firefighters.  I think staff saw a fire, grabbed the first thing that they could grab to try to get that out and call for -- in my understanding is they were asking for more extinguishers.  Again, there were ABCs up there.  He grabbed -- he -- he probably just went for the first thing that was on that range and -- and -- and went for it to respond.  He -- he did

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

the best he could.  It would've taken him longer to be like, oh, what kind of fire is that?  And then go downstairs and get the ABC and come back up and put it out.  You -- so he -- in my opinion, he responded the best way that he knew how.

BY MR. BOWMAN:

Q.    I think he probably did and the best way that he knew how was wrong, right?

A.    No.  I'm not going to say that he was wrong because he grabbed what was there.

Q.    Ms. Taylor, the fire extinguisher that should have been brought to this fire is a chemical extinguisher.  I mean, we both know that, right?

A.    So if he's already up there rather -- okay. I --

Q.    I -- right?  I mean, that's -- I think that's pretty obvious, isn't it?

A.    I'm not going to agree with you or I -- I --

Q.    Do you think he should have brought the water extinguisher?  That he did the right thing to bring the water extinguisher?

A.    I think he grabbed what was right there at that moment rather than going back downstairs to the officer's station to grab the ABC.  And rather having somebody else bring that up there while he had a water

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

extinguisher, it would've taken him longer to be like, oh, let me stop here, let me go downstairs and grab an ABC and then go back up.

Q.   Well, what happened is he came up to the fire with the wrong extinguisher.

A.   Okay.

Q.   Spent some time trying futilely to address this fire with a spray of water.  Then determined that the water extinguisher was insufficient, returned back toward the officer station and somehow was connected with a chemical extinguisher.  And folks went back to try and extinguish the fire, right?  That's what happened.

A.   Yes.

Q.   Pardon me?

A.   I believe so.  Yes.

Q.   Yes.  Have you watched the video of this fire?

A.   I have seen bits and pieces of it.  That's just -- I -- I have seen bits and pieces of it, yes.

Q.   All right.  So the -- an operational problem here is that time was wasted because the wrong extinguisher was brought to the fire.  Is that not a true statement?

    MR. JIMENEZ:  Object to form.  But go ahead, Deb.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

THE WITNESS:  Yes.

BY MR. BOWMAN:

Q.   Right.  So that was an action -- I mean, I appreciate your point, Ms. Taylor, that the officer on the scene wasn't trying to harm anybody, he was doing the best that he could under the circumstances.  He just brought the wrong extinguisher, right?

A.   Yes.

Q.   So that -- his doing that was outside of policy and procedure.  That was a mistake.

MR. JIMENEZ:  Same objections.  Go ahead.

THE WITNESS:  No.  A mistake would've -- a mistake would've been to bring nothing with him and to look --

BY MR. BOWMAN:

Q.   I see.

A.   -- and see.  That would've been a mistake.

Q.   I see.  Okay.  All right.  Have you ever thought about the issue of whether a component of fire safety in the Indiana State Prison is to have officers on the range at all times?

A.   No.

Q.   Okay.  Again, that's not part of your job to consider that question?

A.   No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   I asked you a question in a bad way.  It is true that it is not part of your job to consider the question of whether officers should be on the range at all times?

A.   Correct.

Q.   Correct?  Okay.  So you haven't considered that, and you haven't thought about it?

A.   No.

Q.   Now, in your -- in the discussion at the critical incident review meeting that you attended, did anybody bring up the question of whether staff in A Cell House should have recognized sooner than they did that there was a major fire underway in Mr. Smith's cell?

A.   Not that I can recall.

Q.   Do you agree, based on your review of the video and other materials that you've looked at, and based on your status as safety hazard manager, do you agree or disagree with the proposition that staff in A Cell House should have recognized earlier that a major fire was underway in Mr. Smith's cell?

A.   I wasn't there.  I -- I can't speak for staff. I wasn't there.  I don't know at what point everything took place, so I can't answer that.

Q.   So you have no opinion on that?

A.   I don't.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

MR. BOWMAN:  Okay.  All right.  I'm going to suggest that we take a short break at this point.  I think I may be close to the end of my questioning. I just want to take a minute.  It is 2:50.  Can you give me until 3:05, please?

THE WITNESS:  Yes.

MR. BOWMAN:  Thank you.

THE REPORTER:  We are now off the record.  The current time is 2:50 p.m.

(A recess was taken.)

THE REPORTER:  We are back on the record for the deposition of Deborah Taylor being conducted by video conference.  My name is Meredith Sarjent. Today is June 27th, and the current time is 3:06 p.m.  You may continue.

MR. BOWMAN:  Thank you.

BY MR. BOWMAN:

Q.  **Ms. Taylor, you've been patient with me, and I appreciate it.  I have no further questions for you at this time.  I may have others after Gustavo questions you.**

MR. BOWMAN:  You're on mute, Gustavo.

THE REPORTER:  You're muted.

MR. JIMENEZ:  All right.  Thank you everyone. Sorry about that.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

CROSS-EXAMINATION

BY MR. JIMENEZ:

Q.    All right, Deb, I have just a couple of questions for you just to clarify a couple of things, so it shouldn't take me too long here.  I just want to clarify, in one of your prior answers, you used the term "inside the wall."  And just for the record, I just want to clarify, what did you mean when you said, "inside the wall"?

A.    Inside the facility.

Q.    In other words, when you get passed through the, like, security to go into the actual prison itself?

A.    There's -- there's a wall built around the whole perimeter of the facility.  So the facilities inside the wall.  Does that make sense?

Q.    So the -- like, the housing units would be inside -- within the facility?

A.    Yes.  Yes.

Q.    Okay.  And is your office, is it -- like, would it be "inside the wall," using that terminology?

A.    No.  It's an administration building.

Q.    Okay.  In one of your prior answers, you acknowledged that there are a lot of fires that happen at ISP.  Do you remember that?

A.    Uh-huh.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

Q.   Is that a yes?

A.   Yes.

Q.   A -- and with respect to the fires at ISP, are those fires most -- or let me re-ask that question. Are -- in your experience and time working at ISP, is there a common cause for the fires that occur within ISP?

MR. BOWMAN:  Objection.  Foundation.

BY MR. JIMENEZ:

Q.   You can answer.

A.   Yes.  So example, yesterday I responded to a fire because an inmate set a fire on the range because he wasn't getting the attention that he wanted.  So they -- they set fires for attention to get what they want. Or if they're not getting what they want, they will literally set fires on the ranges or even in their cell. It happens --

Q.   Okay.  And in your experience, what are the different ways that inmates start fires at ISP?

A.   They put metal in their electric socket.  They spark it to toilet paper, or something of that magnitude, that will ignite the fire.

Q.   Any other ways that you have seen inmates start fires at ISP?

A.   That's the most common way that I know.  I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

mean, they're pretty creative.  I'm sure there's other ways, but that's the -- most of the ways -- that -- that's the main way that I've seen it done.

Q.   All right.  And with respect to the fires, when inmates start fires, are they minor fires?  Are they small fires?  Can you describe the magnitude of those fires?

MR. BOWMAN:  Object -- sorry.  Objection to the lack of foundation for this.

BY MR. JIMENEZ:

Q.   You can answer.

A.   Okay.  Some of them are small.  Some of them can be large.  I mean, they sometimes will start the fire, and then they will just, kind of, feed it through papers or whatever it is that's in their cell.  They'll feed it until they get a response.

Q.   And so for instance, that fire that you mentioned that you responded to just yesterday.  For those types of fires, was it a small fire?  Was it something -- was it a large fire?

A.   It was a very small fire out on the range.  He probably used paper of some sort to start the fire.

Q.   And in those types of situations with those types of fires, in your experience, would there be a need for an after-action review to be conducted after

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

that?

A.   No.

Q.   And why is that?

A.   We'd be in after-action reviews every day, all day.  Well, not -- not really.  That's -- I'm being facetious.  I shouldn't say that.  Because we know what they're doing.  It's -- it's not because it's a fault of -- I -- I -- I don't know.  I -- you would just have a lot of them.

Q.   All right.  With respect to -- you mentioned earlier that there are times when you, you know, will walk the ranges, and you will just do some inspections of the cells that you are -- you know, within the ranges that you're walking through; is that correct?

A.   Yes.

Q.   And when you are doing those types of walkthroughs, and if you look in the cell and you find that the cell might have some -- you know, maybe an outlet that looks -- and is visible to you that is -- that looks like it's not -- that it's faulty, or a light fixture that might not -- that might need some repairs, is that something that you're able to visibly see when you're doing cell inspections?

A.   Usually.  Yes.

Q.   And in those situations, is that something

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

that you would then submit a work order for?

A.   Yes.

Q.   In your experience, have you ever known -- or have you ever become aware that there are electrical outlets within the cells at ISP that are malfunctioning or not working due to inmates messing with them or altering their outlets?

A.   Say that one more time.  I want to make sure I'm -- I'm hearing it right.

Q.   Yeah.  So in your experience, have you become aware of electrical outlets within the cells at ISP that may not be working or that may be malfunctioning due to inmates altering or messing with the outlets themselves?

A.   Yes.

Q.   All right.  When Mr. Bowman was showing you some of the exhibits that he referred to, he showed you what we looked at as Exhibit 7, which was the fire drill evacuations or -- let me make sure I have this right. The fire drill evacuations that was marked as Exhibit 7. Do you remember seeing that?

A.   Yes.

Q.   And you testified that -- with respect to the response time, you mentioned that, at times, there might -- that some of the inmates might not be fully cooperating or that they -- there might be a lack of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

cooperating -- or lack of cooperation from the inmates. Am I remembering that correctly?

A.   Yes.

Q.   Can you just elaborate a little bit more for me on what you meant by that?

A.   I mean, they don't want to come out of their cell.  This is stupid.  Why are we doing this?  This -- this doesn't make no difference.  They -- they just -- they don't want to -- they don't want to come out of their cells.  They don't want to get out of their bed because they're sleeping.  I mean, it just all -- there's just various of reasons of why they don't want to come out, or why they just want to resist.  I mean, they -- it's just, kind of, their MO sometimes.

Q.   And that lack of cooperation would, obviously, extend the time that it takes for the fire drills to be completed, correct?

A.   Absolutely.  When they're just moseying down the range as slow as they possibly can, slow walking, and -- yes.  Absolutely.  They're -- they have no sense of, oh my gosh, this is a fire drill.  We need to get out.  They -- they just slow walk.  And it's not all of them, but it's the ones that do that really can hold it up.

Q.   So in other words, there are inmates that take

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

it seriously, and other inmates that don't take the fire drill seriously?

MR. BOWMAN:  Objection --

THE WITNESS:  Absolutely.  Yes.

MR. BOWMAN:  Objection to the foundation for that.

BY MR. JIMENEZ:

Q.    Okay.  You were also shown a couple of -- a couple of the firefighter reports that were part of what was marked as Exhibit 9.  Do you remember seeing those reports?

A.    Yes.

Q.    And one of them was from Mr. Stidham that Mr. Bowman asked you some questions on.  Do you recall that?

A.    Yes.

Q.    And when you were answering his questions, with respect to those firefighter inmate reports, you were going off of what the inmates themselves were reporting within those statements and answering the questions, right?

A.    Correct.

Q.    And you, yourself -- you were not present in A Cell House from the time that the fire started to the time that the fire was put out on January 14th of 2023; is that right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    Correct.

Q.    Would it be fair to say that any knowledge that you have about what took place in A Cell House, in regard to the staff response, would come from reports that you might have read about what happened during that particular morning?

A.    Yes.

Q.    Okay.  And then I want to show you -- I'll pull up what was marked previously as Exhibit 6.  I'll share my screen here with you.  All right.  Ms. Taylor, can you see my screen?

A.    Yes.

Q.    All right.  So this is what was marked as Exhibit 6 previously.  This is the Indiana State Prison Emergency Manual Appendix C.  And I am going to refer you to Page 4.  So we're on Page 4 of the Exhibit, Paragraph 4 here.  And we talked about this.  You answered questions about this earlier in your deposition.  Do you recall?

A.    Yes.

Q.    And we were talking about the response to, you know, a minor fire versus what would be a major fire. Do you recall that?

A.    Yes.

Q.    So in looking at this particular paragraph,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit L

Paragraph 4, does it say anywhere in here -- does it -- does this plan prevent staff from trying to combat a fire prior to the inmate firefighters arriving on the scene?

A.    In my opinion, no.

Q.    And from your review of reports and records about the Smith Fire from January 14th of 2023, is it your understanding that the inmate -- that there was a fire signal that was called once it was -- once staff knew that there was a fire on -- in A Cell House?

MR. BOWMAN:  Objection.  Foundation.  Form for that one.

MR. JIMENEZ:  You can answer.

THE WITNESS:  Say that again.

MR. JIMENEZ:  Yeah.

THE WITNESS:  Thanks.

MR. JIMENEZ:  From your review of the records and reports related to the Smith Fire, right, from January 14th of 2023, is it your understanding that -- now I forgot the question.  I don't want to misstate it.  Meredith can -- sorry.  Can you read back the question for me?

THE REPORTER:  Yep.  Give me just a second here.

(The requested question was read back.)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

THE WITNESS:  Yes.  To my knowledge -- to my knowledge, that was called that 1071 was called.

BY MR. JIMENEZ:

Q.    And to your knowledge, is it your -- or is it your understanding that the firefighter -- that the inmate Firefighter squad in -- at the Indiana State Prison was -- that they were also notified about the fire to respond to the fire?

A.    Yes.

Q.    And as you mentioned previously -- or -- strike that.  You're -- as you mentioned, and as you testified earlier, that there was one of the officers who did respond with a fire extinguisher, the water fire -- oh, my gosh.  Let me start that question again. You testified earlier that you are aware that there was one officer who had a water fire fight -- water fire extinguisher who arrived on the scene, correct?

A.    Yes.

Q.    And in your opinion, was there anything wrong about staff trying to do what they could to combat this fire while the firefighter squad was being deployed or called?

A.    No.  I feel staff was doing what they were needing to do until the firemen got there.  Had they -- have staff -- had staff not have done anything, we would

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

still be in the same position that we're in right now. So I -- I -- in my opinion, staff did what they could with what they had until the firemen arrived

Q.    And as you mentioned before, once the firefighters arrived, then staff would step back and let the firefighters take care of what they needed to, correct?

A.    Correct.

Q.    All right.  Thank you, Ms. Taylor.  That is all I have for you.

A.    Okay.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Q.    So that, I'm sorry to say, raises a few questions for me.  You were asked a series of questions about what the common cause of fires are in the Indiana State Prison.

A.    Uh-huh.

Q.    And it's your view that the common cause is that prisoners deliberately set the fires?

A.    Yes.

Q.    But you haven't studied that question, right?

A.    What do you mean, I haven't studied that question?

Q.    I mean, you have not analyzed the reports of



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

fires to determine how frequently they're deliberately set fires and how frequently they're accidental, right?

A.   Do I have data for that?  No.

Q.   Yeah.  That's what I'm asking.  You don't have any data for that, right?

A.   No.

Q.   Okay.  I was interested in your testimony, which you said you responded to a fire yesterday.

A.   Yes.

Q.   Okay.  Is it your job to respond to fires when you're present in the --

A.   When I am here -- when I'm here, and they -- and they call a 1070 or a 1071, I always go to the cell house.

Q.   Got it.  So the reason you didn't respond to the fire on January 14th, 2023, is because you weren't in the facility?

A.   Correct.

Q.   But if you had been, you would've been a responder to that fire?

A.   I would've shown up.  Yes.

Q.   Got it.  Do you have any information as to how the Smith fire originated?

A.   No.

Q.   Whether it was an accident?  Or whether it had

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

some other cause?  That's something you have no knowledge about whatsoever?

A.    There was speculation, but --

Q.    I'm not asking you about speculation.  I get it that you folks like to speculate --

A.    I didn't --

Q.    -- but --

A.    -- I -- I -- I didn't -- I didn't read the -- the -- the fire report from the fire marshal, so I really don't know.

Q.    Right.  There's another thing that I wanted to make sure I understood.  When staff address a fire, however it comes about that they deal with it, is it part of your job to evaluate whether they responded consistent with policy or not?

A.    No.

Q.    Is that somebody else's job?

A.    I don't know.

Q.    And then a final question.  With respect to the Smith Fire, the issue, is it not, at bottom, is whether staff recognized that that fire was in progress appropriately, right?

A.    Say that again?

Q.    Isn't the issue -- I mean, there's no doubt that staff called the 1071, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    Okay.

Q.    I mean, there's no -- and you just testified they did that, right?

A.    According to the reports, yes.

Q.    According to report that happened.  And according to report, the 1071 was called after the fire alarm was triggered by smoke, right?  According to report?

A.    Yes.

Q.    And the issue is whether the staff should have recognized what was going on before the smoke alarm went off, right?

       MR. JIMENEZ:  Object to form.  But go ahead.

       THE WITNESS:  Repeat the question one more time.

BY MR. BOWMAN:

Q.    Sure.  The issue is whether staff should have recognized that the fire in Mr. Smith's cell had become a major out of control fire sooner than they did?

A.    I don't -- I don't know what staff was doing at the time.  I mean, I know what I -- what I think, but what I think and what they were doing at the time that it happened and those type of things, I -- I can't -- I can't say yes or no.

Q.    Right.  So bottom line is you have no

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

knowledge and no idea, as you're sitting here today, whether staff responded in a timely manner to the fire in Mr. Smith's cell, right?

A.   Once they realized there was a fire, do I feel that?

Q.   No, no, no.  No, no, no, no.

A.   Or from the time it started?

Q.   No.  You're -- I -- and -- that's the issue, whether they should have realized sooner.  That's what I was trying to address with you in my last question. You said you didn't want to get into that, right?

A.   I don't know what staff was doing, so I --

Q.   You don't know what the staff was doing?  You don't have any idea, and you haven't ever investigated it, right?

A.   No.

Q.   Is there any part of you, as the safety hazard manager for the Indiana State Prison, that says to yourself, you know, I want to understand whether staff responded to this fire on a timely basis or not?  I'd like to know the answer to that question.  Is there any part of you that feels that way?

A.   According to the reports that I've read, staff did respond appropriately, so --

Q.   So that's good enough for you?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    I don't know.

Q.    I didn't hear the answer.  I'm sorry.

A.    I don't know.

Q.    You don't know.

A.    Again, this is a -- this is the first major incident I've ever gone through.  God forbid anything ever were to happen again.  Would -- would I do all this differently?  Absolutely.

Q.    What would you do differently if it were to happen again?

A.    Well going through this today?  A lot of things.  So -- I mean -- so I -- again, I -- I -- I -- I -- I have -- I've -- I had never -- I've still -- I've never been through anything like this before.  Deposition, all of this stuff, I've never been through any of it.  So part of this is nerve -- it's very much nerve wracking.  But again, there -- there's things I think you learn and -- and you grow in a position.  So -- - I mean, we -- we definitely learn from different experiences and grow from it and try to make changes and all the things, so --

Q.    Sure.  I appreciate the point, in general. Can you point to anything specific that you would do differently in your role as safety hazard manager if something like the Smith fire were to happen again?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

A.    Well, I pray it never happens again.  But different -- the things that I would do differently is probably be more involved, as far as the investigation, and asking questions, and things like that, because that's just something I didn't do because, again, I'd never been through anything like this.  And I -- I would definitely ask more questions and probably investigate a little bit more -- well, a whole lot more on my own, as well.

MR. BOWMAN:  Okay.  I don't have anything further at this time.

MR. JIMENEZ:  I don't have anything further.

THE REPORTER:  All right.  Before we go off record, Mr. Bowman, how would you like your copy of the transcript today?

MR. BOWMAN:  I'm trying to decide if I want a copy.  I guess I'll take it.  And the other thing I wanted to make sure -- I see that we're recording, and I want to make sure that this video is preserved because we'll want this one if it goes to trial.

THE REPORTER:  Do you so you're not ordering the video today, but you'll want it --

MR. BOWMAN:  I want the video today, but I just want to know that it's safe and sound so I can grab it later.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

THE REPORTER:  Yes, sir.  Gustavo, would you like a copy of the transcript?

MR. JIMENEZ:  Yes, please.  And electronic is fine.  And I don't need a copy of the video at this time, either, but maybe in the future, we might.

THE REPORTER:  And then how do you want to handle signature today?

MR. JIMENEZ:  We will go ahead and reserve, please.

THE REPORTER:  All right.  Perfect.  We are now off the record.  The current time is 3:32 p.m.

(Deposition concluded at 3:32 p.m. CT)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typwritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability.  I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.





MEREDITH SARJENT,

COURT REPORTER/NOTARY

COMMISSION EXPIRES ON:  10/30/2031

SUBMITTED ON:  07/09/2025

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**Exhibits**

**Exhibit 1_**
**Taylor** 11:24
12:4 13:17

**Exhibit 2_**
**Taylor** 12:17,
19

**Exhibit 3_**
**Taylor** 51:12,
18

**Exhibit 4_**
**Taylor** 64:16,
18 67:5,6,12

**Exhibit 5_**
**Taylor** 68:24,
25 69:2,5,9

**Exhibit 6_**
**Taylor** 74:24
75:2,4 77:11
137:11,14
175:9,14

**Exhibit 7_**
**Taylor** 90:14
172:17,19

**Exhibit 8_**
**Taylor** 100:23
101:6

**Exhibit 9_**
**Taylor** 131:10,
13 132:9
145:13 146:7,9,
10 147:25
174:10

**Exhibit 10_**
**Taylor** 139:1,7,
25

**Exhibit 11_**
**Taylor** 155:25
156:4

**Exhibit 12_**
**Taylor** 155:7
156:2,5

---

**0**

---

**000028** 132:11

**000056** 132:14

**006013** 69:2

**006175** 69:3

**007772** 67:12

**007807** 67:15

**010808** 101:1

**010870** 101:2

**020467** 75:8

---

**1**

---

**1** 11:24 12:4
13:3,8,10,13,
17,20 22:9 34:2
69:1 104:14
105:15

**10** 13:8,13 19:5
28:3 77:7
139:1,7,25

**10-** 94:6 97:17

**10-70** 94:12,22
97:23

**10-71** 94:7,12,
14,22 97:18,23,
24

**100** 61:25
74:20 128:11

**1070** 179:13

**1071** 150:1
177:2 179:13
180:25 181:6

**10:00** 6:7

**10:25** 21:19,22

**10:30** 21:19

**10:31** 22:3

**10:55** 132:23

**10:58** 139:3

**11** 75:6 147:24
155:8,9,25
156:4

**11:52** 131:25

**11:59** 72:24

**11th** 103:9
104:5

**12** 43:11 91:16
155:7 156:2,5

**12:10** 72:20

**12:12** 73:5

**13th** 65:18
114:18 139:5

**14** 139:4

**14th** 27:2,8
114:18 131:19
139:5 145:2
174:24 176:7,
19 179:16

**15** 148:21

**163** 68:25

**17th** 65:13

**1860** 60:10

**19th** 152:15
155:24

**1:18** 116:3,6

**1:30** 116:4,12

---

**2**

---

**2** 12:17,19 65:7

**20** 67:14 146:11
148:21

**20-page** 64:21

**2000** 41:18

**2001** 41:18

**2013** 44:4,12
45:2,6 50:11
72:14

**2017** 13:23
14:4 18:21
19:7,14,17
59:20 149:3

**2020** 50:12,13
64:23 65:14

**2021** 103:9
104:5,7 117:8

**2022** 19:15,21,

**24** 22:14 28:13
45:15 50:14,15
52:24 57:2
69:7,17 90:23
121:11

**2023** 27:2,8
139:4,5 145:2
152:16 154:25
155:24 174:24
176:7,19
179:16

**2024** 114:19

**2025** 6:7 12:13

**21** 146:9

**21st** 12:13
154:25

**22** 50:14

**22nd** 28:6

**25** 107:5

**252** 141:5

**27th** 6:6 22:3
73:5 116:12
167:14

**29** 131:15

**29-page** 132:9

**2:00** 120:23,24

**2:50** 167:4,9

**2A** 75:21

---

**3**

---

**3** 51:12,18 70:1
104:15,18
106:9,13 107:6

**3's** 106:7

**30** 40:16,17

**30(b)(6)** 11:19
22:8

**300** 50:24

**32** 91:17

**327** 91:17 93:4

**333** 91:18 93:4

**36** 67:21

**38** 67:24

**38-page** 67:14

**3:05** 167:5

**3:06** 167:14

**3:24-CV-00185**
6:14

**3:32** 185:11,12

---

**4**

---

**4** 64:16,18
65:17 67:6,12
77:8,10,11
137:14 140:11
175:16,17
176:1

**40-hour** 78:20
100:15,17

**41** 104:3 133:6

**41st** 104:6

**477** 75:9

---

**5**

---

**5** 13:3,8,13
24:11,13,24
34:20 68:25
69:2,5,9 105:15

**500** 115:7,10

---

**6**

---

**6** 13:4,8,13
18:20 25:11
74:24 75:2,4
77:11 137:11,
14 175:9,14

**6174** 69:4

**63** 100:24
102:22 103:2

**6:00** 120:24

---

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**7**

**7** 13:4,8 90:12, 14 172:17,19

**70** 94:7 97:18

**7772** 67:6

**7807** 67:9

**7th** 69:6

**8**

**8** 100:23 101:6

**8th** 90:23

**9**

**9** 25:2 131:9,10, 13 132:9 145:13 146:7,8, 10 147:25 174:10

**94** 43:10

**A**

**a.m.** 6:7 21:23 22:4 72:25 131:25 132:23 139:3

**ABC** 125:25 126:9,10,21 127:2 148:15 163:3,24 164:3

**ABCS** 125:23 126:8 162:23

**ability** 15:21 20:9 36:25 39:4 100:2

**absolutely** 8:8 82:24 83:4 92:12,18 106:25 107:20 110:21 117:5 130:19 133:4 141:3 152:25 173:18,20 174:4 183:8

**access** 33:3 136:20

**accessible** 117:3

**accident** 123:22 179:25

**accidental** 179:2

**accommodate** 116:1

**accompany** 15:2

**accompanying** 98:17

**accordance** 77:19 137:21

**account** 120:2

**accounted** 37:14

**accumulate** 119:24

**accumulated** 112:19 154:16

**accurate** 73:10 75:12 149:13

**acknowledged** 120:9 168:23

**action** 53:19 55:25 127:2 165:3

**actions** 52:13 55:20 160:3,9, 15

**activating** 14:7 109:5

**activities** 116:20

**activity** 121:17

**actual** 99:5 100:18 168:12

**ADA** 51:6

**addition** 11:14 43:15

**additional**

**access** 115:15 125:18

**address** 13:3, 14 14:1,11 30:20 31:2 32:2 33:24 35:23,24 36:1 39:20 70:22 72:9 77:23 107:18, 19 164:7 180:12 182:10

**addressed** 32:13,19 71:15, 22 101:25 103:21 105:25 123:20

**addresses** 31:14

**addressing** 67:18 81:6 103:23 117:12

**adequate** 146:18 154:17

**adjust** 161:19

**administer** 14:25

**administration** 15:21 168:21

**administrative** 53:4

**administrators** 37:15

**ado** 11:16

**adults** 44:15

**advise** 31:18

**affairs** 58:12

**affirm** 7:13

**after-** 53:18

**after-action** 54:3 118:5 122:23 170:25 171:4

**aftermath** 84:24

**agencies** 15:2

**agree** 7:6,8

35:16 36:14,16 77:4 160:8 163:18 166:15, 18

**agreed** 70:12 77:6 136:6 160:11,13

**ahead** 16:5 30:5 39:6 61:2, 17 62:24 88:21, 22,23 89:9 108:24 119:15 140:3 141:9,15, 22 142:17 143:6,12 144:1 145:8 151:9 159:22 160:17 162:14,17 164:24 165:11 181:13 185:8

**aids** 44:24

**air** 115:8

**alarm** 35:10 82:8 91:19 94:24 95:1,3,5, 6,8,13,17,19,23 96:2,4,7,8 97:24 109:2,5 133:9,10 181:7, 11

**alarms** 114:10

**alerts** 79:24

**allowed** 111:25 141:13

**altered** 64:2,3

**altering** 172:7, 13

**ambiguous** 9:5

**analysis** 121:16

**analyzed** 178:25

**and-a-half** 130:24

**and/or** 13:22 14:6 19:1,6 22:11 55:20

**answering** 38:24 64:4 65:5 139:22 174:16, 19

**answers** 8:21 9:14 18:4 93:13,17,20,21, 24 99:15 168:6, 22

**anticipation** 20:18 23:2 24:9

**anytime** 32:1 35:9,11 64:2 81:19

**apologize** 21:12 110:14

**apparent** 135:18

**apparently** 69:13,20 132:22 143:17

**appearance** 6:15

**appears** 69:1 77:11 103:3

**appendices** 22:19

**appendix** 20:16 22:22 25:4 75:4 117:23 136:16, 21 175:15

**applicants** 50:7

**applied** 49:22

**apply** 48:24

**appropriately** 180:22 182:24

**Arabic** 77:10

**area** 42:4 48:14 76:4,21 77:13 83:20 100:11 114:3 137:16 147:8

**areas** 105:21

**argue** 38:23

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

68:2,9 144:6,9

**arise** 70:20 110:15 111:12 112:2 117:1

**arrive** 81:13, 21,24 136:9

**arrived** 85:7,8 131:24 177:17 178:3,5

**arriving** 176:3

**arson** 122:4,15

**Art** 70:3 71:8

**asks** 134:9 152:16

**aspect** 35:4

**assemble** 83:13

**assessed** 35:16

**assessing** 35:7 58:11

**assessment** 117:18

**assigned** 46:15

**assignment** 47:16

**assignments** 46:14,18

**assist** 57:14

**assistant** 133:15

**assisting** 57:3

**assume** 8:22 19:21 22:14 132:10 142:21

**assuming** 28:21 45:23 125:13 133:11 135:14

**assumption** 22:22

**assure** 52:11

**attached** 132:15

**attempt** 77:14 137:17

**attempting** 11:21 139:11

**attend** 8:5 41:3

**attendance** 156:20

**attended** 40:20,23 166:10

**attendees** 156:9

**attending** 6:16,19,22 7:1

**attention** 143:17,21 169:13,14

**attorney** 6:23 10:19

**audibly** 9:4

**August** 90:22

**authority** 73:13

**automatically** 81:20 95:24 96:9

**aware** 25:24 26:25 28:13 30:14 55:24 62:4 78:15 116:21 117:16 118:23 119:1 161:17 172:4, 11 177:15

---

**B**

---

**babbling** 30:12

**back** 11:25 20:4 21:25 30:25 39:12,15 43:25 46:13 59:18 61:5 69:16 73:2 81:13 92:22

93:3 116:9 132:5 135:6,8 136:4,17 137:6 138:7 140:22 143:4 146:7 147:24 148:14 149:3 155:20, 21,22 163:3,23 164:3,9,11 167:11 176:22, 25 178:5

**background** 40:8 43:20 44:10,13 45:3

**backs** 136:9

**bad** 140:21 148:17,18 166:1

**bailiwick** 118:13

**bank** 49:22

**bartender** 43:2,5,22

**bartending** 43:14,25 44:3

**based** 78:21 99:2,5 122:10, 17 166:15,17

**basic** 80:6 90:5 145:2

**basically** 33:8 39:9 130:11

**basis** 32:4 35:16 38:15 39:5 59:3 78:1 80:23 100:8 103:13 113:20 116:24 117:4,7 122:17 182:20

**Bates** 67:6,11, 13,15 68:13 69:1,3 75:7,8 100:25 101:1 133:6

**battalion** 14:18 16:7 18:15

**Becker** 34:24 86:16

**bed** 173:10

**begin** 7:18

**beginning** 14:4 75:18 136:23

**begins** 22:13 132:11

**behalf** 6:11,21 40:4 55:6

**belief** 156:23

**bell** 95:8

**benefit** 159:9

**beset** 62:5

**big** 12:9 128:23 160:11

**billowing** 143:18

**binder** 121:7,8, 10,12

**bit** 9:10 16:5 23:18 51:9 92:11,16 102:8 108:23 173:4 184:8

**bits** 164:18,19

**blank** 69:4 102:9

**blanket** 110:24

**block** 115:5

**blocked** 97:5

**blow** 113:22

**board** 98:20

**boils** 112:10

**Boin** 49:7,9

**bottom** 75:7 91:2 100:25 141:4 180:20 181:25

**Bowman** 6:18 7:9,20,23 12:6, 24 13:10,12 21:18 22:5 29:23 38:21 39:11,14,17

51:20 60:25 61:4 62:10,12, 20,25 64:13,19 67:8,10,23,25 68:6,8,16,18,23 69:11 72:18,23 73:7,8 74:21 75:3 78:9 81:15 87:20 88:10 89:1,11 90:12, 15 101:8 109:1 116:3,14 119:19 131:5, 11 132:7,18 137:9,12,13 138:15 139:9, 14 140:5 141:11,17,24 142:20 143:1,8, 15,23 144:5,19 145:10 155:5,9, 14,19 156:7 160:1 161:1 163:6 165:2,15 167:1,7,16,17, 22 169:8 170:8 172:15 174:3,5, 14 176:11 178:13 181:16 184:10,14,16, 23

**box** 104:17 107:22 108:17

**boxes** 104:25

**boy** 150:12

**breach** 87:16 88:2,15

**breached** 89:5 90:6

**break** 8:3 21:1 72:19 115:25 148:23 167:2

**briefing** 128:18

**Briefly** 17:8 155:3 156:12

**brigade** 77:18, 24 81:12,17 87:4,21 123:19 133:1 137:20 138:18 140:1, 15



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

**bring** 163:20, 25 165:13 166:11

**broad** 23:17

**broken** 32:16

**brought** 163:12,19 164:22 165:7

**Brown** 49:4,5, 11,14

**building** 64:1, 10 70:15 96:22 98:13,18 115:16 133:7 168:21

**buildings** 60:12

**built** 60:10 168:13

**bulb** 63:18

**bulbs** 65:7

**bunch** 131:16

**burned** 65:10

**burning** 122:7 141:5

**burnt** 143:20

**Buss** 156:18

**busy** 128:21,24

---

### C

**cabinet** 147:4

**cabinets** 147:9

**call** 18:14 33:4 35:10,11 39:20 79:20 94:6,11, 21 102:15 105:16,20 106:17 115:4,5 130:3 148:19 150:16 154:7 162:21 179:13

**called** 35:12 36:25 81:19,25 82:8 84:20 85:4 87:15,22 88:2,

5,6,8,17 89:7 123:19 128:2 130:6 149:6,19, 25 150:2,12,19 151:24 160:12 176:9 177:2,22 180:25 181:6

**calling** 35:7 78:22 79:23 80:2 107:23

**calls** 80:2 140:25

**camera** 138:24 161:18

**cap** 113:11

**capable** 133:3 146:14 148:4

**capacity** 21:9 57:4 73:22 74:11

**captain** 72:3 128:7 131:16 133:19 156:18

**care** 136:10 150:15 178:6

**caregiving** 44:14

**Carly** 6:25

**cascading** 143:10,16

**case** 6:13 44:10 53:24 60:1 69:22 84:13 87:25 154:3

**catch** 49:8

**Cato** 7:1

**caused** 30:15 54:4

**ceiling** 114:24 115:2,6,8,10

**cell** 19:8,9 28:4,6,8,14 29:1,6,7 31:7,9, 10,15 33:22 46:4,15 47:10, 12 65:9 87:13

90:23 91:18 92:6 94:14 96:16 101:4 104:14 107:11 108:14 110:19, 20,24 111:5,8, 12,18 112:4,19 113:8 114:17 115:21 122:18 126:9 133:13, 17 134:6,9,16 141:5 142:5 143:17,18,19 144:18 147:7 148:8,9,18 149:2 154:17 166:11,13,19, 20 169:16 170:15 171:17, 18,23 173:7 174:23 175:3 176:10 179:13 181:18 182:3

**cells** 29:1,19 30:18,21 31:4, 12 33:8,13 110:11,15 112:24 117:13, 17 146:18 147:9,11 148:15 171:13 172:5,11 173:10

**central** 6:8 14:21,25 34:25 57:15 59:12 101:20

**centrally** 74:5

**certifications** 14:24 83:6

**certified** 83:5

**chain** 32:16 89:23

**chairperson** 54:22,23

**chairs** 54:18

**charge** 66:23 81:1 135:13

**charged** 125:9

**chart** 28:18 59:5

**charting** 121:16

**charts** 25:25 27:19 120:16

**check** 125:7,8, 12 129:14 130:14

**checked** 104:25 107:22 108:15,19

**checking** 104:17 109:2, 10,14,23

**checkoff** 28:17

**checks** 125:10

**chemical** 80:11 98:5 126:15 161:24 162:5,7 163:12 164:11

**Chicago** 6:19

**chief** 132:20,25 145:12 148:22, 24 149:3 150:1

**child** 41:16

**circuits** 109:11

**circumstance** 36:10 85:20 98:10

**circumstances** 143:2 149:4 153:16 165:6

**citizens** 36:21

**City** 38:20

**civil** 11:19

**clarification** 102:15 152:5,6, 11

**clarify** 13:9 136:24 168:4,6, 8

**clarifying** 68:21 71:10

96:11 121:4 134:8

**clean** 47:13

**cleaning** 47:12,18

**cleansing** 48:13

**clear** 34:2 49:1 65:5,24 67:4, 10,19 68:15,17, 18 80:21 123:14 137:1

**cleared** 10:11

**clearing** 59:11

**clerk** 6:25

**close** 60:16 167:3

**closed** 60:20 61:9

**closing** 61:11, 12,14,18

**clothes** 46:22

**clothing** 46:21

**code** 79:24 97:18

**college** 40:9, 10,15,21 41:6, 12,22,23 42:2

**column** 102:18

**combat** 176:2 177:20

**combustible** 29:18 30:17 31:3 111:4 147:5

**comment** 92:19 107:22 158:10

**comments** 102:4,7,17 103:4,19

**committee** 52:15,22 53:1, 6,9,11 54:18, 19,21,23 55:7,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

11

**common**
169:6,25
178:16,19

**communicate**
150:5

**communicated** 146:4 150:17

**community**
36:6,7,20,21
38:1

**Compared**
36:19

**complete** 9:14

**completed**
15:3 50:24
70:10 114:6
132:22 159:7
173:17

**completely**
70:6 113:11
141:8 162:12

**compliance**
52:4,11,14
55:21

**complicated**
43:15

**component**
165:19

**compound**
80:11

**computer**
66:20

**computer-**
78:20

**concern** 17:20,
22 28:18 39:2
65:22 86:12,14
133:6 149:17
150:5 154:16

**concerns** 16:7

**concluded**
185:12

**conclusion**
160:6

**condition**
117:13

**conditions**
110:19 117:17

**conducted**
22:1 73:3 85:12
87:4 116:10
167:12 170:25

**conducting**
56:9

**conducts**
52:9,16

**conduit** 15:19

**conference**
6:8 22:2 73:4
116:11 167:13

**confident**
104:6 153:1

**confined** 83:11
90:24

**confirm** 141:19

**confusion**
155:21

**congregate**
82:15,16,17

**connected**
109:11 164:10

**connection**
88:15 89:5 90:6
117:11

**consecutively**
75:9 101:1

**considered**
166:6

**consist** 55:23

**consistent**
180:15

**consisting**
64:22

**consists** 79:20

**constitute**
29:2

**constraint**
37:21

**Construction**
74:17

**contact** 15:17
108:3

**contacted**
127:25 129:19
131:24

**contained**
76:6,11,19
147:6

**contest** 8:3

**context** 153:9

**continue**
21:15,20 22:4
65:16 73:6
102:25 116:13
167:15

**continues**
69:2 132:13

**continuing**
65:9

**contraband**
29:19 30:17
31:3

**contracted**
114:1

**contractor**
71:7 113:22

**contractors**
46:25 47:21
114:9

**contrary** 143:5

**contrast** 76:18

**control** 37:10
94:12,13,14
128:13 141:8
181:19

**controlled**
36:9 37:22
83:23 113:1

**convened** 6:8

**conversant**
62:4

**conversation**
10:23 11:5 17:5
128:22 134:24

135:2 145:1
147:19,22
151:8,16,25
153:15

**conversations**
130:21,23,25
152:3

**cooperating**
172:25 173:1

**cooperation**
91:24 173:1,15

**copy** 155:23
184:14,17
185:2,4

**coroner** 129:1

**correct** 13:14
14:15 16:21
19:20 20:2
22:15,19,24
25:22 28:7,20
30:23 31:20
35:5 36:4 40:25
44:15,16 45:10
47:17 49:24
50:16 54:6 55:5
56:7 57:22 58:3
61:10,25 63:17
64:9,17 66:2,12
67:1,2 69:15,20
70:1,16 71:2,24
74:6 75:1,22
76:5,8,12 78:8
79:12,13,15,19
80:12,24 81:2
82:9,19 83:18
84:4,14 86:24
87:6,24 90:4,
13,21,25 91:10,
20 94:9,20,23
95:18,19,25
96:5,10,13
99:7,25 100:6
103:6,22,25
104:8,12,15
108:10 109:3,4,
21,25 110:25
111:25 112:1,7,
22 113:2,12
114:20,23
116:19 117:18,
22 118:13,25
119:2,8,13
120:3 122:24

127:5,9,24
128:4 130:8,12
132:2 133:1
134:13,20
135:9,15
138:22 139:8
144:24 145:4
146:20,21,24
147:22,23
152:8 154:11,
15,19 155:12
156:9,10
157:16,20,24
158:11 162:10
166:5,6 171:14
173:17 174:21
175:1 177:17
178:7,8 179:18

**correction**
60:21 70:5
106:10,14
107:5

**corrections**
45:13 57:4

**Corrections'**
13:21

**corrective**
55:25 127:2

**correctly**
47:14 60:14
63:22 173:2

**Corson** 113:25

**Counsel** 6:17
7:6,17

**count** 8:14
98:20

**couple** 41:25
59:1 73:9
148:25 168:3,4
174:8,9

**courses** 42:3,5

**coursework**
45:1

**court** 6:5,13
112:18

**covered** 55:17
56:24 117:14

**create** 64:13

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

110:11,20 146:19

**created** 26:6 125:14

**creates** 70:14

**creative** 170:1

**crew** 47:6

**crews** 48:1,15

**criminal** 122:15

**critical** 154:23 156:1,9 166:10

**criticism** 145:23

**Crockett** 161:22

**CROSS-EXAMINATION** 168:1

**CT** 185:12

**cuffs** 98:21

**current** 6:7 22:3 26:22 43:21 58:11 73:5 116:12 167:9,14 185:11

**custody** 16:23, 24 37:1,10 53:3 113:6,7,10 117:21 128:15, 16 134:2,18 143:16

**customs** 13:21 14:5 18:23 19:6 22:10

**cut** 60:24 125:10

---

**D**

---

**damage** 76:22

**damages** 52:8

**damned** 142:23

**Danielle** 49:4, 5,19

**data** 119:24 179:3,5

**date** 27:3,8 104:6

**dated** 152:15 155:23

**David** 148:1

**day** 6:6 16:11, 15 47:15 120:24 123:18 127:22 131:19 132:23 133:16 134:5 171:4,5

**day-to-** 47:14

**daycare** 41:10 42:13,20 43:23 44:14

**days** 127:22

**de-energizing** 148:13

**dead** 160:16

**deal** 14:19 50:23,25 51:6 76:7 149:6,7 180:13

**dealing** 92:2 106:23 124:17 130:10 140:13

**death** 54:4,10 85:21 141:5 143:20

**Deb** 39:7 61:3 88:23 89:9 124:14 144:14 145:8 159:23 164:25 168:3

**debate** 18:3

**Deborah** 6:9 7:5 22:1 73:3 116:10 167:12

**debriefing** 154:24 156:9 157:10

**debriefings**

157:14

**deceased** 144:22 149:1

**decide** 30:3 184:16

**deciding** 134:16

**decision** 61:24 134:11,12,18, 19

**deemed** 160:3

**deep** 47:18

**defective** 112:3

**defects** 52:8 67:18

**defendants** 6:22

**defer** 40:3

**deficiencies** 15:4,5

**deficiency** 51:3

**define** 50:20, 21

**definite** 129:25

**definition** 76:2,19 106:9

**definitions** 75:21

**definitive** 140:12

**degree** 41:1,20

**delay** 90:9

**deliberately** 123:21 178:20 179:1

**denoted** 104:17 110:3

**departed** 142:12

**department** 13:20 15:24,25 38:20 46:21

47:23 51:1 53:2 66:11 71:23 74:3,4,18 78:12 80:3 103:24 120:20 153:20

**departments** 153:25

**Depending** 121:20

**depicted** 139:25

**depicts** 96:20

**deployed** 177:21

**deposition** 6:9 7:23 11:24 12:17 22:1 24:9 51:12 56:1 73:3 74:25 116:10 131:13 136:24 139:1 155:7,25 156:3 167:12 175:19 183:15 185:12

**depositions** 68:20

**Deputy** 34:19 156:17,18

**Derric** 49:7,9

**describe** 170:6

**description** 51:13,15 56:21, 23 149:13

**descriptions** 73:9

**design** 138:19 139:15,24

**designated** 13:3,14

**designating** 12:15

**designee** 13:1

**desk** 10:11 58:16 86:8 137:1

**desperate**

141:2 142:7,13

**destruction** 122:5,14

**detail** 87:9

**details** 47:20 69:19 128:24

**detecting** 19:1

**detection** 18:22

**detector** 95:20,21 96:9 113:18 114:19

**detectors** 25:19 27:22 95:14 113:14 114:15 115:9, 14,15,21

**determine** 89:4 179:1

**determined** 164:8

**determines** 145:19

**developed** 88:1

**developing** 56:8

**Develops** 52:15

**Devine** 59:19, 24 149:4

**diagram** 96:16, 20 110:4

**diagrams** 25:17,25 27:19

**died** 148:10

**difference** 37:24 38:3 80:8 97:17,22 173:8

**differently** 58:13 147:7 151:22 183:8,9, 24 184:2

**difficult** 68:14

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**direct** 7:19 116:18

**directly** 148:17

**director** 38:4 57:16 66:14 71:9 72:5,7

**directs** 76:25

**disabilities** 44:1,15

**disagree** 36:16 144:10 147:15, 16 149:23 166:18

**disconnect** 145:6

**discovery** 155:6

**discuss** 161:12

**discussed** 25:3 126:21

**discussion** 93:18 94:24 97:21 99:3 150:13,14 159:14,16 166:9

**displaying** 90:10

**distinction** 75:18 78:3

**distinguish** 98:5

**distracted** 18:19

**District** 6:12, 13

**DOC** 44:2,4 46:11

**document** 11:17 12:1,2,12 26:3 27:1 51:11,22 56:10, 11 64:21 65:21, 23 67:5,12,15 68:3,11 69:2, 12,20 75:9,13,

17 91:3 100:24 101:14 132:8,9, 16 140:12 155:5 158:21

**documentation** 125:13

**documents** 11:7,9,13 23:1 24:1,17,21 25:1,17,25 26:4 27:13,19 28:17 60:3 71:12 101:24 159:10

**doomed** 149:10

**door** 91:18 135:7,8 136:4 145:15,24 146:2

**doors** 134:16 135:17,20

**double-check** 102:12

**double-edged** 160:25

**doubt** 126:10 180:24

**downstairs** 163:3,23 164:2

**drill** 90:22 91:4 92:7 93:10 97:14 98:23 99:3,6,22 172:17,19 173:21 174:2

**drills** 56:14,16 80:22 81:1 90:16,20 99:9 100:7 119:4 173:16

**dropped** 8:11

**dry** 114:12

**due** 85:25 172:6,12

**duties** 15:22 49:20,21 52:2, 18 56:20 58:19 70:19 101:10

## E

**e-mail** 33:4 131:15,21 132:12 152:14 155:11,17,23

**e-mails** 132:5, 15 153:6

**earlier** 25:3 26:15,18 56:1 70:12 86:10 100:16 101:9, 18 110:1,10,14 111:15 120:21 121:3 125:5 166:19 171:11 175:18 177:12, 15

**easy** 63:19 76:7

**educate** 56:14

**education** 48:20 56:17

**educational** 40:8 45:3 52:16 56:9

**effect** 13:22 14:4,6 19:7 22:11 26:22 82:8 96:16 118:6

**effective** 118:7,15

**effectively** 107:4

**effectiveness** 35:15

**effort** 125:17

**elaborate** 173:4

**electric** 169:20

**electrical** 32:13 62:5,14, 18,21 63:24 64:2,7,9 65:23, 25 66:2 67:17, 18 69:18 70:6,

19 71:4,15,21 72:14,15 111:11 112:3 119:10 172:4, 11

**electricians** 111:21

**electronic** 95:22 185:3

**electronics** 147:10,12

**else's** 118:24 180:17

**emergency** 13:23 14:8,10 20:5,12,13,15, 16 22:18 23:22 25:2 34:4 75:5 76:24 109:18 175:15

**en** 128:10

**enabling** 14:8

**encompass** 47:5

**encounter** 15:15

**encountered** 142:13

**encourage** 126:10

**end** 50:25 60:13 127:3 131:19 167:3

**endurance** 8:2

**enemy** 21:16

**engineering** 42:7

**enhanced** 146:20

**ensure** 70:20 99:9 101:24 108:9

**Ensures** 52:3, 5

**ensuring** 32:19 74:13

113:17 124:24

**entire** 63:21

**entitled** 8:8

**equipment** 15:8 18:25 27:23 52:6,8 77:15 81:9 82:17 83:13 112:3 137:18 138:8

**equipped** 77:19 78:4 137:21

**escape** 99:10

**escort** 46:25 47:1 48:2 114:9,13

**escorted** 84:10

**escorting** 48:15

**essence** 147:1

**essential** 52:1 56:20

**essentially** 19:24 71:7 154:1

**establish** 106:13 107:5 140:13,16,17

**established** 87:1 120:13

**estate** 6:11

**estimation** 91:21

**et al** 6:12

**evacuated** 98:12 134:10, 23

**evacuates** 96:25

**evacuating** 93:1 146:1

**evacuation** 80:22 92:13

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

96:15,24 99:6, 8,21 109:23 110:2,3 133:7 134:24 135:4,7, 9,13 145:15,16, 24 154:13

**evacuations** 172:18,19

**evaluate** 55:19 118:20 180:14

**evaluates** 52:12

**evaluating** 93:2 113:9

**evaporates** 112:10

**event** 20:1 86:20 95:13 134:8

**events** 149:13

**everybody's** 119:22

**examination** 7:19 28:25 30:21 84:23 178:12

**examined** 25:13

**Excel** 26:14 27:11

**exception** 105:6

**exchange** 21:13

**executing** 91:4

**exercise** 99:22

**exhibit** 11:24 12:4,17,19 13:17 51:12,18 64:16,18 65:17 67:5,12 68:24, 25 69:2,5,9 70:1 74:24 75:2,4,6 77:11 90:11,14 100:22,23 101:6 102:23

104:2,14 118:1 131:6,10,13 132:9 137:5,10, 11,14 139:1,7, 25 145:13 146:7,9,11 147:25 155:7, 25 156:2,4,5 172:17,19 174:10 175:9, 14,16

**exhibits** 10:12 67:21 172:16

**existed** 27:8

**existence** 52:23

**exists** 26:21

**exit** 97:1,5,6, 10,11,15 109:15 135:9

**exits** 96:13,18 97:8

**expect** 94:6 96:12 98:4 107:14

**expectation** 92:17 98:9 139:25

**expectations** 75:13

**expected** 123:6

**expecting** 93:21 94:1 96:6,21 97:11

**experience** 38:25 44:17 53:12 81:9 83:8 112:8 149:2 151:5 169:5,18 170:24 172:3, 10

**experiences** 48:20 183:20

**expert** 29:12

**expertise** 83:1 100:3 118:12

**experts** 83:7

**explain** 49:18 95:2 113:17 115:3 120:20 121:3

**explained** 106:18

**express** 49:16 149:21,22

**expressed** 39:2

**extend** 173:16

**extensions** 111:15

**extent** 142:15

**extinguish** 77:14 137:17 140:21 164:12

**extinguished** 76:20

**extinguisher** 77:16 78:23 80:6,9,10 98:5, 6 119:5 125:25 126:7,14,15,18 140:20 148:15 161:23,24 162:1,5,7,12 163:11,13,20, 21 164:1,5,9, 11,22 165:7 177:13,17

**extinguishers** 15:9 19:2 25:13,24 26:1, 22 27:1,7,21 78:22,23 80:14 100:14 108:10 124:25 125:7, 18,21 126:21 127:3,8 162:4, 22

**extinguishing** 85:1

**extra** 152:11

---

**F**

---

**face** 161:19

**facetious** 171:6

**facilities** 52:13 55:19 168:14

**facility** 14:20 16:14,17,19,22 25:19 26:1,23 36:17 45:11 46:16 47:1,11 48:4,14 57:13, 21 60:8 61:8,10 62:5,14 66:25 70:20 71:7 72:16 73:15 79:25 110:3 130:7 168:10, 14,17 179:17

**fact** 28:5 59:2 86:2 117:16 120:7 127:21 146:1 152:22 161:9,20,21

**factor** 110:18

**factors** 113:1 123:17

**failure** 119:10

**failures** 143:10,16

**fair** 42:2 43:16 48:23 52:18 53:16 60:22 62:1,3 64:23 72:16 76:16 78:1 80:21 81:9 101:25 103:7 108:1 118:11 158:8 175:2

**fairness** 8:25

**familiar** 12:21 25:14,18 28:5 48:13 79:9,10 80:25 148:22

**familiarity** 22:13 72:13

**familiarized** 58:18

**fan** 147:10

**fashion** 59:6

**faster** 38:20 92:11

**fault** 171:7

**faulty** 171:20

**favor** 42:11

**features** 76:13

**February** 19:23,24 22:14 28:6 45:15 50:12,14,15 52:24 57:2 154:25

**federal** 11:19 52:4

**feed** 170:14,16

**feedback** 14:9

**feel** 149:21 160:24 177:23 182:4

**feels** 182:22

**fellow** 146:14

**felt** 98:23 161:7

**fight** 18:3 136:1 177:16

**fighting** 99:23 136:3,7

**figure** 10:16 89:17 157:17

**file** 59:15,16,24 101:23 103:16 104:10 114:14 121:5 125:15

**files** 58:17,21 66:6 119:24

**filled** 104:24 145:14

**final** 67:15 69:5 73:13,24 74:7, 12 180:19



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**finally** 9:23 19:5

**find** 85:6 88:18 89:8 105:13 171:17

**findings** 86:20

**fine** 60:25 106:20 185:4

**finish** 85:1

**finished** 9:11 139:21

**fire** 13:24 14:23 15:8,24 16:6,7, 20 17:1,2 18:14,22 19:2, 25 20:17 22:11, 23 25:4,12,23 26:1,22 27:1,4, 7,9,21,24 28:1, 2 29:2,17 33:21 34:4 35:10,11 38:1,13,15,20 39:4 51:1 52:5, 6,7,11 53:12, 18,25 54:4,11, 12 56:14,16 59:15,16,20,24 64:1,3,6,10 75:15 76:2,3,13 77:2,13,14,15, 16,17,18,23,25 78:5,11,17,22, 25 79:17,25 80:3,6,9,10,13, 16,22 81:1,6, 12,17,20 82:7, 8,15,18,20 83:4,12,15,16, 20 84:6,7,9,10, 16,19,20 85:1, 3,12,14,25 86:2,4,25 87:1, 2,3,4,12,13,21, 22,25 88:1,6,7, 16,17 89:6,7 90:5,7,16,20 91:4,19 92:7 93:10 94:3,11, 18,24,25 95:1, 4,5,6,14,23 96:3,7,8,24 97:5,14,25 98:5,6,12 99:3,

8,10,21,23,24 100:7,14 108:9, 10 109:2,5,9, 11,22 110:6,14, 20 111:2,9,23 112:6,12,17,20, 21,23 113:19 114:11 117:12, 18,23 118:5,6, 15,16 119:4,5,6 120:15,16,19 121:23 122:4,7, 12 123:15,17, 18,19 124:9,13, 24 125:17,18 126:13,14,17 127:2,13,20,21 128:9,19 129:14,24 130:3,4,5,14 132:25 133:9 135:19,23 136:1,3,5,7,10, 11,12 137:6,7, 16,17,18,19,20, 24 138:1,6,8, 11,17,18,25 139:3,6,10,25 140:1,7,9,10, 12,13,14,15,19, 21 141:12 142:11,24 143:18 144:22 146:20 147:5, 13 148:16,17, 20,22,24 149:1, 3 150:1,15,19, 23 151:21 152:1 153:16, 19,20 154:24 158:23 159:4,5, 7 161:13,23,24 162:11,19 163:2,11,12 164:4,8,12,17, 22 165:19 166:13,20 169:12,22 170:14,17,19, 20,21,22 172:17,19 173:16,21 174:1,23,24 175:22 176:3,7, 9,10,18 177:8, 13,16,21 179:8,

16,20,23 180:9, 12,20,21 181:6, 18,19 182:2,4, 20 183:25

**fire's** 81:24 123:12

**firefighter** 14:3,18 18:13 25:5 34:21 35:1 37:25 146:12 148:1 174:9,17 177:5,6,21

**firefighter's** 15:7

**firefighters** 14:7,10 15:11, 20 16:23 24:16, 18,22 35:8 36:8 37:18,20 38:15 39:3,21 82:2, 11,13 87:8 94:7,15,17 100:5 121:12 130:15,20 132:17 142:2, 12 144:21 145:1 149:16 150:12,18 159:10,17 161:11 162:19 176:3 178:5,6

**firefighters'** 121:22 122:10, 22

**firefighting** 27:14,20 33:20 77:18 137:19

**firehouse** 145:1

**fireman** 14:22 152:23

**fireman's** 121:24

**firemen** 26:13 35:13,23 36:21 38:19 59:9 81:19 83:4,5 84:25 98:3 120:21,25 125:4 136:2,8,

9,10 138:11,13 149:7 152:7,10, 17 153:10 154:6,20 177:24 178:3

**fires** 19:1 30:16 53:14 59:2,6,12 60:3 75:19 76:10,11,15,18, 19 77:1 81:18 120:7,17 121:11,13 123:23 124:15 126:6 161:10 168:23 169:3,4, 6,14,16,19,24 170:4,5,6,7,19, 24 178:16,20 179:1,2,10

**fit** 63:10

**fix** 15:4 71:5

**fixed** 31:10 65:11 71:22 102:14,15

**fixes** 120:1

**fixture** 63:21 65:18 69:13 70:14 171:21

**flames** 143:18

**flooring** 115:7

**focus** 51:25 77:9 101:3

**focused** 159:17

**folks** 12:15 99:9 100:20 116:1 164:11 180:5

**follow** 105:11 107:4,9,12

**forbid** 183:6

**foreman** 66:22

**Forgive** 50:12

**forgot** 44:1 176:20

**form** 29:20 31:1 38:17 59:5

60:2 61:1 62:7 69:25 78:6 81:11 87:17 88:3 108:24 138:2 139:12 141:9 142:15 144:13 159:22 160:17 162:14 164:24 176:11 181:13

**formal** 57:23

**Forms** 52:14

**forward** 162:3

**fought** 140:1 161:10

**found** 51:4 144:20

**foundation** 61:2 62:7 64:14 144:13 169:8 170:9 174:5 176:11

**four-year** 40:15,20

**frazzled** 128:21

**free** 36:7

**frequency** 120:10

**frequent** 59:2

**frequently** 62:21 179:1,2

**Friday** 42:21 120:25

**front** 9:24 10:2 11:17 110:24 111:5 126:20 135:8 136:15, 24 137:1,7 148:17

**fronts** 126:1

**fuel** 111:5 112:20 147:8

**fulfilled** 149:12

**full** 7:4 21:14 43:15 138:11

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**full-time** 42:19

**fully** 17:19 62:4 116:21 172:24

**function** 48:7 56:4 73:10 101:20 112:24 113:5 116:24 125:3

**functional** 113:18

**functioned** 109:12

**functioning** 32:14 63:16 64:9 119:11

**functions** 57:3

**futilely** 164:7

**future** 162:3 185:5

———

**G**

**gap** 160:11

**garbled** 8:13 61:7

**gates** 83:25

**gather** 116:4

**gathered** 17:9, 12,14

**gathering** 93:14

**gave** 17:14 86:2 98:25 128:18 152:21

**gear** 84:9 138:8,9,12,20

**GED** 41:18 42:13 45:2

**general** 24:5,6 36:5 42:5 53:24 58:22 86:24 119:6 159:20 183:22

**General's** 6:23

**generally**

19:18 42:3 78:16

**gentleman** 14:21

**gentlemen** 93:6

**get all** 93:6

**Gillespie** 156:18

**give** 7:13 8:4 17:9 30:9 39:13 40:7 43:7 49:2 93:13 98:16 121:21 128:23 130:17 146:7 157:25 167:5 176:23

**giving** 9:12 47:12 102:21

**global** 119:25

**go-to** 15:12,13 36:2

**God** 183:6

**good** 40:4 60:20 82:23 91:21 92:20 93:7 98:25 105:15 116:2 161:2 182:25

**gosh** 128:23 173:21 177:14

**governing** 52:5

**grab** 126:10 162:20 163:24 164:2 184:24

**grabbed** 162:19,23 163:10,22

**gracious** 68:20

**graduate** 41:17,24

**grateful** 99:21

**great** 10:12 72:23

**Greg** 50:2

**ground** 8:1 141:1 145:7

**grounds** 52:11

**group** 98:24

**grow** 183:18,20

**guess** 16:3 70:11 86:23 125:22 161:16 184:17

**Gustavo** 6:21 30:4,10 68:1,18 132:7 155:15 167:20,22 185:1

**Gustavo's** 30:1

**guy** 44:24 71:6 133:3 148:4

**guys** 10:3,5,20 17:10 72:21 82:22 83:8,11 111:21 129:15

———

**H**

**hall** 16:23,24 128:15,16

**hand** 7:12 77:15 137:18

**handing** 90:10

**handle** 58:12 185:7

**handled** 47:15 114:7 117:20 154:13 157:22

**handling** 48:6

**hands** 66:13

**handwritten** 103:3,19

**hang** 82:16,22

**hanging** 115:9

**happen** 31:13 53:15 59:2 60:4 76:14 100:7

111:25 120:9 124:17 168:23 183:7,10,25

**happened** 16:11 49:14 54:9 85:13,20, 24 117:8 120:17 123:17, 18 128:23 135:10 151:1,3, 11,21 157:11, 17 160:12 161:14 164:4, 13 175:5 181:5, 23

**happening** 143:24

**hard** 99:15 149:6

**harm** 165:5

**hazard** 14:14 19:22 22:15 28:7,21 29:2 31:1 32:20 38:4 39:1,19 45:20 48:12 51:14 53:12 57:4,9,20 58:7,16 59:4,23 64:1,3,10 69:7 70:4,14,17 71:6,13 73:11, 23 74:11 78:15 85:19 103:10 105:2 110:20 111:2,23 112:6, 9,17,20 117:18 151:20 152:2 166:17 182:17 183:24

**hazards** 110:14

**head** 51:8 127:15,16

**headed** 98:14 156:14

**heads** 53:2

**health** 14:20 52:5,6,8,12

**hear** 25:9 40:12 44:25 51:25

94:1 99:15 155:14 183:2

**heard** 7:22 8:11 52:20

**hearing** 44:24 107:2 152:17 153:7 172:9

**hearsay** 120:23

**helped** 46:6 57:14

**helping** 49:21 134:2

**helps** 44:6

**hey** 105:21 106:4 152:7,9

**high** 41:13,15, 17,19

**highlighted** 77:9

**Hightail** 67:20

**history** 42:8 149:10 157:15

**hold** 51:15 136:13 144:12 173:23

**Holland** 146:12

**homes** 44:3

**honest** 130:23

**honestly** 127:18

**hooked** 109:12

**hope** 44:6

**hoping** 11:18

**horrible** 86:15 93:7

**hoses** 125:10

**hot** 112:8,10,11

**hotpot** 147:10

**hour** 115:25

**hours** 11:4

**house** 19:9



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

29:6,7 46:15 47:12 59:12 90:23 91:19 92:6 94:14 96:16 101:4 104:14 107:11 108:14 114:18 115:21 133:13,18 134:7,10 142:5 143:17 144:18 148:8 166:12,19 174:23 175:3 176:10 179:14

**houses** 19:8 28:4,8,14 29:1 33:22 46:5 47:10 122:18

**housing** 33:5 168:16

**human** 85:21 107:1 142:21 143:2

**hundreds** 63:11

**hung** 129:17

**hydrants** 27:15,16

**hypothetically** 87:12

---

**I**

**I&i** 89:13,14 153:20

**idea** 60:20 94:21 95:8 96:24 127:1 158:19 182:1,14

**ideal** 92:13

**identification** 11:24 12:4,19 51:18 64:18 68:25 69:9 75:2 90:14 100:22 101:6 131:10 139:7 156:2,4,5

**identified**

69:14 101:24 103:20 107:17

**identifies** 52:1

**identify** 23:13,15 106:13 107:15 132:8

**identifying** 33:13

**identity** 7:7

**IDOC** 15:20 44:12 45:2,6 57:21

**IDOC's** 14:3 18:20 19:5

**ignite** 169:22

**II** 14:24 25:5 83:5

**Illinois** 6:20

**illuminated** 109:15

**imagining** 91:7

**immediately** 135:18,20 148:11

**imperative** 77:23

**impermissible** 30:8

**implemented** 118:8,16,20

**important** 8:18,25 9:15,17 37:9 113:15

**improve** 157:18

**inadvertently** 46:6

**incident** 35:22 59:5,8,21 60:2 120:16 122:2,11 125:22 132:16 147:25 152:1 153:18 154:23 156:1,9 157:10 159:9

166:10 183:6

**include** 113:8 154:6,16

**included** 154:12

**includes** 18:25 80:8

**including** 13:24 14:5 19:9 25:12 131:16

**inconsistent** 162:12

**Indiana** 6:13,24 10:1 13:20 14:14 25:5 29:18 30:16 34:9 35:12 37:5 38:13 40:14 51:14 53:15 59:3 60:7 73:23 75:5,14 85:14 86:25 120:8 165:20 175:14 177:6 178:16 182:18

**Indianapolis** 6:24 74:5

**individual** 28:25 29:19 30:18,21 33:8,13 106:18 110:15 117:13 122:15,19 154:18 159:10

**individuals** 44:1 76:3,21 92:4 121:25 153:5

**industry** 42:22 43:1,18 44:14

**ineffectual** 126:16

**information** 14:22 21:14 59:12 70:22 71:11 119:6 179:22

**informed** 128:1

**infrastructure** 18:20,24 25:12 27:14,20 33:20

**infrequent** 112:15

**inherit** 58:17

**initial** 45:7 67:11

**injuries** 50:23

**inmate** 147:7 169:12 174:17 176:3,8 177:6

**inmates** 36:8 169:19,23 170:5 172:6,13,24 173:1,25 174:1,18

**input** 158:1 159:17

**inquiry** 88:18

**inside** 27:24 73:12 83:23 111:17 112:4 125:6 126:9 168:7,8,10,15,17,20

**inspected** 112:25 113:19

**inspection** 15:6,7 28:6,8 55:24 69:18,19 100:24 101:4,17,23 102:17 103:8 104:13,19 110:7 117:8,14

**inspections** 14:20 15:2,3 19:8 28:4,11,13 32:5,6 33:22 51:5 52:10 101:12,21 106:21,24 113:8 114:5,10,16 117:6 171:12,23

**inspector's** 102:4

**Inspects** 52:7

**installed** 69:13

**instance** 91:16 118:21 170:17

**institution** 26:18 36:9 37:13 59:20 72:14

**institutional** 52:11,15,22 54:17,23

**insufficient** 164:9

**intended** 8:2

**intending** 110:1

**intention** 21:10 60:16

**interest** 49:17

**interested** 17:13 20:10 23:16 42:6 179:7

**interface** 14:17 29:7 30:24 31:21 33:7,12 70:5

**Interrogatories** 10:2

**interrupt** 151:9

**interviewed** 49:25 50:1

**inventoried** 52:7

**inventory** 25:24 27:16,23 60:2

**investigate** 85:6,19 86:1 89:8 184:7

**investigated** 182:14

**investigating** 153:21

**investigation**



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

85:12,13,15 86:3 89:23 184:3

**investigator** 85:23

**involve** 109:5

**involved** 56:3 61:24,25 85:16 91:4 184:3

**involvement** 62:2

**isolated** 76:2

**ISP** 13:22 14:4 18:21 19:7,9 45:11,12,14 74:7 77:18 137:20 149:7,8 168:24 169:3,5, 7,19,24 172:5, 11

**issue** 29:8,25 31:22 32:2,8, 12,19,23 33:13, 15 35:24 38:14, 16 39:8,20,24 40:5 51:2 66:2, 23 71:4,15,21 72:16 74:22 102:19 103:20 106:19 118:17 120:12 150:18 165:19 180:20, 24 181:10,17 182:8

**issues** 15:15, 16,17 29:16 33:7,12,24 35:25 36:1 37:1 46:9 55:6,8 63:14,24 65:23, 25 71:5,20 72:4 73:25 102:10, 12,13 110:10 111:11,14 116:24 117:1 118:12

**issuing** 46:21

**it.'** 149:10

**item** 14:3 25:11 34:2 104:18,22

106:13,14

**items** 107:5 113:19

**iteration** 26:15

**Ivy** 40:11,12,13, 20 41:3,19 42:14 45:2

---

**J**

**James** 17:14

**January** 13:23 18:21 19:7 27:2,8 114:18 131:19 139:4,5 145:2 152:15 155:24 174:24 176:7,19 179:16

**jerry-rig** 111:17

**Jimenez** 6:21 7:10 10:24 13:7 29:20 38:17 39:6 60:23 61:1 62:7,11,15,24 67:3,9,19,24 68:4,7,9,17 72:22 78:6 81:11 87:17 88:3,19,22 89:9 108:24 116:2,5 119:14 138:2,4 139:12 140:3 141:9,15,22 142:15,25 143:6,12,22,25 144:12 145:8 155:10,16 159:22 160:17 162:14,17 164:24 165:11 167:24 168:2 169:9 170:10 174:7 176:13, 15,17 177:3 181:13 184:12 185:3,8

**job** 9:13 18:13, 18 21:8,15 30:1 31:25 32:24

42:19 43:4 44:17 47:25 49:17,22 50:20, 21 51:13,15 55:18 56:3,21 57:8 66:5 70:19 71:5,6,20 73:10 82:23 83:17 85:19 86:8 90:2,3 92:20 93:7 100:5 101:10 107:3 113:3,7 116:24 118:17,24 119:7,13,17,22, 23 120:5 123:11 124:6 165:23 166:2 179:10 180:14, 17

**jobs** 37:15 81:14

**joined** 44:12 45:2,6

**Jones** 133:12, 24 134:9,21 156:19

**Joshua** 59:19

**judge** 30:3,9

**judgment** 134:22 140:25

**July** 65:13,18

**jumping** 16:5

**June** 6:7 22:3 69:6 73:5 116:12 167:14

**jurisdiction** 63:4

---

**K**

**Kane** 104:23 105:11 107:12, 24 108:9

**Kaufman** 70:3 71:8

**keeper** 72:12

**keeping** 71:4

99:20 113:8,9 123:3,4

**Kelly** 146:12

**Kentuckiana** 6:6

**keys** 98:20

**kids** 42:1,22 43:13,23

**killed** 59:20

**kind** 10:21 14:23 15:7 27:19 32:23 42:7 47:8,9 53:18 61:6,7,15 70:13 71:21 76:16 99:10 105:8 106:3 108:22 121:17 122:5 128:7,20 129:11,13,17 150:11,15 151:25 153:18, 24 154:3 158:2 161:18 163:2 170:14 173:14

**kinds** 32:18 65:25 72:9

**knew** 46:8 140:19 152:12 153:19 163:5,8 176:10

**knowing** 23:16 80:8

**knowledge** 25:21 26:20 27:10 54:2 60:17,18 159:15,19 175:2 177:1,2,4 180:2 182:1

**Knowledgeabl e** 133:3

---

**L**

**lack** 144:13 146:19 170:9 172:25 173:1, 15

**large** 170:13,20

**late** 149:7,20 150:12,19

**law** 6:25

**lawyers** 12:13

**layout** 25:5

**lead** 90:20

**leading** 81:1

**leads** 149:12

**learn** 126:13 130:20 149:9 157:15 183:18, 19

**learned** 29:16 149:12

**leave** 33:18 92:6 120:23

**led** 90:18 157:5 162:2

**left** 22:6,9 102:18 112:11 153:24

**legal** 29:24

**length** 65:21 69:1 75:7 100:24

**Lentz** 50:2,6 57:15,19

**Lessner** 89:14 152:15 153:5, 15 154:21 155:11,18,23

**Lessons** 149:11

**lets** 136:9

**letter** 12:13,18

**lieutenant** 33:4 45:17 69:14 104:23 105:3,11 107:12,24 133:12,24 134:5,6,9 156:19,20

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**lieutenants** 28:11 33:1 72:3 122:18

**life** 43:4,16 44:8 149:12

**lifespan** 60:12

**light** 32:16 64:24 65:7,18 69:12 70:14 171:20

**lights** 63:15

**limit** 8:5

**lines** 74:10 148:23

**link** 8:12 9:17

**list** 27:23 55:17,18 56:20 59:5 98:16 110:22 113:14,19 129:20

**listed** 69:24 156:8,20

**listen** 131:2

**listening** 38:24

**lists** 25:25 27:19

**literally** 63:11 113:22 169:16

**literature** 42:8,9

**live** 36:6,20 38:1 82:3

**living** 46:16,20 82:3,14 83:11 84:8 96:13 110:3 127:3 134:17,22 145:14

**load** 147:9

**local** 37:25 76:6

**located** 6:23 40:13 52:7 74:5 114:19

**location** 6:16

26:1 27:7,14,20 28:18 64:24 80:13 83:16 84:10 90:24 96:7,17,18 127:8 162:9

**locations** 115:22

**lockdown** 152:5,10

**lockdowns** 152:7

**Locke** 6:18 7:22 13:7 67:3 68:9 155:10

**locks** 83:25

**Loevy** 6:19

**long** 11:3,23 41:3,11 42:16 43:7 45:13 48:6 68:1 91:9 130:9 157:1 158:14 168:5

**longer** 40:18 163:1 164:1

**looked** 17:8 20:12 22:18,22 23:1,5,8,11,17,23 24:2,17,21 75:10 103:2 117:7 136:5 154:5,9 158:23 159:11 166:16 172:17

**losing** 131:7

**lot** 21:3,5 38:20 43:12 46:8 130:10 144:25 148:15 168:23 171:9 183:11 184:8

**lots** 63:13

**loud** 95:8

**lower** 115:15

**lying** 147:8

**M**

**made** 30:7 65:25 124:8 126:2 127:10,14 132:15 147:22

**magnitude** 126:16 151:7,10 169:22 170:6

**main** 170:3

**maintain** 52:14 55:20 59:4 60:1 66:6 103:16

**maintained** 53:8

**maintaining** 28:22

**maintains** 72:7

**maintenance** 52:9 66:9,10,21,22 70:3 114:15

**major** 34:11,12 37:15 72:3 73:21 75:19 76:10,18 77:1 78:5 81:17 84:7,19 85:2 87:2,13,22 88:1,16 89:7 136:7 137:25 138:17 140:1,9,10 156:17 161:10 166:13,19 175:22 181:19 183:5

**majority** 147:4

**make** 8:10,14,25 15:17 21:10 30:1,7,10 37:14 44:11 55:13,17 68:10,15 70:10 88:18 91:11 100:19 102:13 103:19 109:10,14,23 110:22 111:19 114:5

115:11 118:18,19 120:14 122:8,9 123:24 125:23 129:15,17 130:15 134:11,12 140:24 152:8,12 157:22 168:15 172:8,18 173:8 180:12 183:20 184:18,19

**makes** 9:7 30:4 75:18

**making** 8:20 15:2 50:24 106:24 108:12 112:4 125:7,8 135:13 152:6

**malfunction** 70:13

**malfunctioning** 63:24 64:8 172:5,12

**man** 59:19 141:5 143:19 147:4 149:1

**manage** 43:15 48:2 87:8 114:4 118:17 125:3

**managed** 16:8 38:4 87:4 117:17 118:5

**management** 13:25 18:22 22:12 119:9

**manager** 14:14 19:22 22:15 26:7,8 28:7,22 29:14,15 31:1 32:20 39:1,19 45:20 46:7 48:12,21 49:2 51:14 57:4,10,13,20 58:7 59:4,24 69:7 70:5,17 71:1,6,13 73:11,23 74:11 78:15 85:19 103:10 105:3

112:9 143:10 151:2,20 152:2 166:17 182:18 183:24

**manager's** 58:17

**managing** 19:1 48:15

**maneuver** 57:17

**manner** 96:25 182:2

**manual** 20:14,15,17 22:18,23 23:22 25:2 75:5 76:24 109:6 117:24 175:15

**manually** 95:7 96:1

**manuals** 20:13

**map** 26:22 110:2

**marathon** 8:2

**marked** 11:23 12:4,19 51:18 64:18 67:5 69:9 75:2 90:11,14 101:6 118:1 131:10 139:7 155:11,13,16 156:4,5 172:19 174:10 175:9,13

**marshal** 159:6,7 180:9

**marshals** 85:14 86:2 128:10 153:19,21 159:4

**marshals'** 86:4

**masks** 138:12

**material** 154:17

**materials** 29:2 57:8 112:19 166:16

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

math 42:6

matter 6:9 10:23 36:5 53:24 76:16 80:18 146:1

matters 14:19 50:23 61:23

Mccann 128:7, 12 129:9 131:16 132:12 133:20

Mccormick 156:19

meaning 148:9

meant 107:24 173:5

mechanical 99:14

meet 16:24,25 52:14 53:6 55:20 116:23 117:1

meeting 155:2 156:11,13,15 157:2,3,5,7 158:1,4,6,12, 14,24 159:3,8, 20 161:7 166:10

meetings 53:9 55:2,4,11,13

meets 54:18

melt 112:12

member 33:2

members 16:6 142:7

memory 10:22 99:10 151:16

men 148:20

mentally 129:16

mention 111:14

mentioned 170:18 171:10 172:23 177:10,

11 178:4

Meredith 6:4 9:19,20 22:2 39:11 64:15 73:4 74:25 90:12 116:11 131:7 137:9 155:7,12,25 167:13 176:21

message 152:19

messing 172:6,13

met 16:22

metal 147:4 169:20

Michael 6:11 27:9 84:15 87:12 88:16 89:6

Michigan 38:20

middle 15:20 125:11

middleman 14:23

Milne 148:1

Milton 148:10

mind 99:20

minimum 134:23

minor 75:18 76:2,10,18 77:2,16,17,25 87:22 137:18, 19 139:6 140:7 170:5 175:22

minute 11:25 21:7 60:6 64:7 74:23 119:1 132:5 136:6 140:11 146:8 150:10 167:4

minutes 21:19 53:8 55:10,14 91:17 92:15 100:2 103:18

148:19,21,25 159:11

mischaracteri zes 142:16

mishandled 159:21

missed 81:3

missing 56:23

misspoke 68:1

misstate 176:21

mistake 30:7 165:10,12,13, 17

mistaken 134:6

mistakes 157:17

misunderstan d 79:12

misunderstoo d 79:8

MO 173:14

modern 61:10

modified 119:11

mom 42:1

moment 39:13 145:13 163:23

Monday 42:21 120:24

money 45:25

monitor 101:11 119:24

monitored 35:15 37:22 112:25

monitoring 111:8 119:13

monitors 52:9 120:17 125:15

monkeying 111:22

month 125:8, 11,12

monthly 51:3 69:18

months 103:9

morning 9:18 20:7 139:4 145:2 175:6

moseying 173:18

motions 108:23

move 43:18 65:6 68:24 89:3

movement 36:9,24 37:10, 22 83:23

moving 34:20 49:11

multiple 63:7

muscle 99:10

mute 167:22

muted 167:23

Mysti 6:10

_____

**N**

named 59:19 146:12

names 91:2

nature 46:25 162:11

Neal 6:12 34:19,22 55:1 73:19,21 74:9 116:17,21 117:16 118:23 119:1,7,12 120:4 123:10 124:4,9,12 129:8 150:6,17 151:13,19,24 156:14,23 157:5

Neal's 89:17

necessarily 111:22

needed 17:15 47:1 105:24,25 129:14,17 152:21 154:4 178:6

needing 64:25 177:24

nerve 183:16, 17

non-fatal 53:25

noon 72:18

north 134:22

Northern 6:13

note 91:11

notes 55:13 93:25 155:3

notice 22:9

noticed 148:15

notified 177:7

Nowatzke 34:19,22 156:17

Nowbud 113:25

number 6:14 22:9 23:3,6 34:2,20 67:11, 15 69:1 75:7 77:10,11 90:11 93:9 100:23,25 104:18 111:1 112:14 132:4 133:6 137:10

numbered 13:13 101:1 132:14

numbering 131:7

numbers 23:7 69:3

nursing 42:10



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

**O**

**object** 61:1 81:11 87:17 88:3 108:24 119:14 138:2 142:15 159:22 160:17 164:24 170:8 181:13

**objected** 88:22

**objection** 29:20 30:1,5,10 38:17 62:7,24 78:6 88:19 89:9 139:12 141:9 144:12 162:14 169:8 170:8 174:3,5 176:11

**objections** 39:6 62:15 140:3 141:15, 22 142:25 143:6,12,22 145:8 165:11

**objective** 157:15

**observation** 146:16 148:6

**observe** 96:3

**obstructs** 111:7

**obtain** 125:18

**obtaining** 14:9

**obvious** 163:17

**occur** 30:16 112:24 141:21 169:6

**occurred** 59:7, 13 90:23 112:15 121:13 127:21

**occurring** 123:23 124:15

**occurs** 54:11

**October** 103:8 104:5

**offender** 51:1 52:16 56:9,17 122:3

**offenders** 46:22 47:24 48:5 51:6 91:24 125:9 126:5 130:25

**office** 6:23,25 10:1 14:21,25 34:25 57:15 58:17 59:11,23 121:6,8 128:14, 16 134:2 168:19

**officer** 45:8,14, 16,18 46:4,11, 19,22 47:2 57:4 122:20 126:13, 22 127:5 133:13,17 161:22,25 162:1 164:10 165:4 177:16

**officer's** 133:8 162:8 163:24

**officers** 98:17 100:13 148:8 165:20 166:3 177:12

**officers'** 96:17

**offices** 6:19

**on-the-job** 57:19

**ongoing** 35:16 72:16 90:19

**online** 6:4

**open** 48:24 49:10,14,22 134:16 145:15, 25

**opened** 135:7, 18,20

**opening** 136:4

**operate** 37:6

**operation** 80:6 100:14

**operational** 73:12 109:13 164:20

**operations** 46:22 48:16 66:24

**opinion** 124:22 126:5,8 140:23 149:2 154:2 163:4 166:24 176:5 177:19 178:2

**opportunity** 8:4 30:10 130:17

**opposed** 87:5 117:21 126:14 161:24

**order** 24:22 25:14 31:11,16 32:11,23,25 33:2,14 51:22 58:18 61:9 64:8 65:7,13 67:13 69:6,17 75:10 77:23 83:16 172:1

**ordering** 184:21

**orderly** 96:25

**orders** 24:5,6 32:7 33:1,25 51:3 55:25 63:4,7,12,13,15 64:22 66:5 67:4,17 72:11 98:20

**ordinary** 66:4, 24

**organization** 44:13 139:19

**organized** 158:1

**orientation** 57:8 58:1

**originally** 126:19

**originated**

**179:23**

**OSHA** 50:23,24

**outcome** 147:6

**outlet** 64:2,8, 10 70:13 72:15 111:18 171:19

**outlets** 63:8,25 111:16 172:5,7, 11,13

**overseas** 52:15

**oversee** 15:23, 24

**oversight** 24:18,22

**overwritten** 26:16

**P**

**p.m.** 73:6 116:7,13 120:24 167:9, 15 185:11,12

**pace** 76:14

**pages** 11:23 65:21 67:14,22 68:25 70:1 75:6 100:24 102:22 103:2,3 131:15

**pain** 21:11

**panel** 95:2,4,15 109:9,12 133:9

**panels** 114:11

**paper** 126:6 169:21 170:22

**papers** 112:18 170:15

**paragraph** 13:13 18:20 19:5 20:5 22:9 24:11,13,24 28:3 52:1 77:10 137:15 140:11 175:17,25 176:1

**paragraphs** 20:4

**Pardon** 164:15

**part** 7:22 18:13 19:12 38:9 51:16,22 54:7 61:16 66:24 70:18 84:23 85:18 86:8 90:19 91:11 93:10 123:11 124:5 129:24 132:15 154:23 159:11 165:23 166:2 174:9 180:14 182:17, 22 183:16

**part-time** 42:14

**participants** 158:24 159:3,8

**participated** 85:12

**parties** 7:8

**pass** 66:13 86:10

**passage** 145:12

**passed** 85:25 147:17 149:4 152:23 168:11

**passes** 46:23, 24

**past** 44:8 132:4

**path** 96:20

**patience** 50:19

**patient** 167:18

**patrol** 46:15

**patterns** 120:18

**paying** 143:17, 21

**PDF** 132:11

**pending** 6:12

**people** 9:18

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

17:11 37:10 40:1 70:21 72:2,9 81:6 87:15 88:24 91:18 97:11 102:9 105:14 114:7 129:12, 20 130:10 131:16 141:25 146:2 157:22 158:2

**percent** 61:25 74:20 128:11

**perfect** 9:3 10:12 72:22 185:10

**perform** 15:21 56:18 58:19 107:3

**performance** 113:10

**performed** 101:22

**performs** 52:17

**perimeter** 168:14

**period** 43:3

**periodic** 47:19

**perished** 27:9 138:25 154:18

**permissible** 30:7

**permitted** 141:20

**person** 15:20 19:9 36:2 39:23 40:4 53:3,4 54:18,20 55:10 73:13,17,23 74:12 87:3,14 89:12,22 90:18 93:5 120:15 122:13 124:19 125:15 135:12

**personal** 6:10 44:8 146:16

**personally** 78:13 92:14

**phone** 128:2 130:7

**phonetic** 113:25

**photograph** 141:19

**physical** 18:25 52:13 55:19 57:16 60:22 61:9 71:9,23 72:5,7 74:13 103:24

**physically** 14:8 60:8

**piece** 81:16

**pieces** 164:18, 19

**pins** 125:8

**place** 11:5 18:20 26:8 27:2 35:22 51:11 90:22 108:10 109:15 126:25 129:13 135:8, 19 138:23 147:10,12 154:24 166:23 175:3

**placement** 25:18

**placing** 155:21,22

**plaintiff** 12:14

**Plaintiff's** 6:17

**plan** 25:4 97:1 106:10,13 107:5 110:2,3 117:23 118:7, 15,16,19,20 129:24 135:14 136:6,11,12 137:7,25 138:16,18 139:15,24 140:12,14 161:13 176:2

**planning** 73:12

**plans** 109:23

**plant** 57:16,20 60:22 61:9 71:1,9,23 72:5 74:13 103:24

**play** 35:6

**plugged** 112:11

**point** 8:3 21:21 43:19 49:16 59:12 60:19 71:11 84:20 85:3 107:21 133:12 135:3 141:25 145:2 165:4 166:22 167:2 183:22, 23

**pointing** 145:12

**points** 146:4

**police** 85:14 128:8,25

**policies** 13:21 14:5 18:23 19:6 22:10 23:8,11, 19 33:20 34:3, 7,9,16

**policy** 23:6,7 160:3,15 165:10 180:15

**portion** 22:23 75:21

**pose** 76:3

**position** 14:18 19:14,15,21,25 22:14 24:1 32:20 33:23 39:19 43:21 45:7 46:12 48:11,24 49:10, 13,14 50:1,7 51:15 52:2,23 54:1 57:1,9 58:12,15 61:23 62:4 73:11 77:24 101:20 103:14 138:19

147:20 151:12 178:1 183:18

**positions** 46:11

**possibility** 96:1,4

**possibly** 21:2 42:13 124:10 145:9 150:7,24 173:19

**post** 24:5,6 98:20

**posted** 109:24

**pot** 112:11

**potential** 64:1, 10 70:14 76:21 112:20

**potentially** 122:14

**pots** 112:8,10

**power** 47:11 148:9

**PPD** 71:8

**practice** 56:12, 22

**practices** 13:21 14:5 18:23 19:6 22:10 34:3

**pray** 184:1

**pre-printed** 69:25

**prefer** 82:21

**preferable** 97:10

**preparation** 14:22 22:7 158:20

**preparatory** 29:11

**prepare** 10:18, 21 20:7 55:14 75:10 151:4

**prepared** 14:1, 10 19:2,13

24:18,23 25:14 158:16 159:9

**preparedness** 13:24 20:5 22:24 23:22 34:4

**presence** 29:1, 18 30:17

**present** 13:23 14:5 18:21 19:8 174:22 179:11

**preserve** 30:2

**preserved** 184:19

**press** 23:18

**pretty** 10:11 20:22,23 48:14 104:6 163:17 170:1

**prevalent** 119:25 121:11

**prevent** 176:2

**prevented** 53:20

**preventing** 18:25

**prevention** 13:25 18:22 22:12

**preventive** 52:9

**previous** 155:11,17

**previously** 175:9,14 177:10

**prickly** 21:9

**primary** 96:12 97:1,6,10,15

**printed** 91:2

**prints** 66:22

**prior** 27:2,8 28:6 49:5 87:15 168:6,22 176:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**prison** 10:1 14:15 19:10 25:5 29:18,19 30:17 31:2 34:10 35:13 37:5,9,16,25 38:13,14 40:5 46:16 47:21 51:14 53:15 59:3 60:7,10, 16,19 70:15 73:12,24 75:5, 14 83:20,24 87:1 100:11 101:12 103:13 112:9 115:22 120:8 123:23 124:15 125:1 128:3,5 129:21 131:24 150:13 152:1 165:20 168:12 175:14 177:7 178:17 182:18

**prison's** 76:25

**prisoner** 14:3, 7,9,18 16:7 18:14 35:7 87:4 112:3 122:13 123:21 132:17, 25 134:18 150:11 159:10

**prisoners** 36:8 37:8,18,21 39:21 47:16 48:2,5 73:14,24 74:13 77:24 82:2 84:7 91:18 92:2,3 98:18 111:15 134:15 146:17 178:20

**prisoners'** 30:18

**problem** 8:12 29:17 31:3 51:2 69:14 70:23 106:15 111:8 112:2 120:8 135:17 145:11 146:17 147:13 164:20

**problematic** 111:20

**problems** 30:15 62:5,14, 19 70:6,19 72:9,15 101:24 110:23 111:1,2 112:17 119:25 123:4,5 135:15 145:11

**procedure** 11:20 30:4 32:22 35:14,15 77:22 82:10,13 86:25 87:16,21, 23 88:2,15 89:5 90:6 96:15 139:17,24 142:12,23 143:5 145:6 154:13 160:12 165:10

**procedures** 23:8,11 33:21 35:7 160:4,16

**proceed** 30:13

**proceeded** 49:2

**proceeding** 33:14

**PROCEEDINGS** 6:1

**proceeds** 67:13

**process** 28:5 29:3 32:24 33:13 45:22 46:2 48:14,23 49:18 54:7 55:23 57:7 58:11 80:25 82:7 86:8 91:8 94:22 157:8

**produced** 132:10

**produces** 143:18

**professional** 48:3

**professionals** 82:22

**program** 14:4 34:21

**programs** 35:1 52:16 56:10

**progress** 99:11 141:13 180:21

**progressed** 77:25 88:16 89:6

**progresses** 77:17 137:19

**promoted** 45:17

**promotion** 45:23 46:3

**prompt** 39:4

**proper** 9:6 29:25 70:21 100:14 108:10 147:12

**properly** 32:14 52:7 63:16 109:24 113:18 115:22 118:8, 16 119:12 125:9 157:22

**property** 31:8 76:4,21 81:7 87:3,14 122:5, 14 147:5

**proposition** 36:15 160:14 166:18

**propounded** 93:11

**props** 157:22

**prosecution** 122:15,16

**protect** 138:11

**protector** 111:17

**protocol** 35:9 129:20 130:6

**provide** 8:7 100:13

**provided** 97:2 100:15 155:6

**providing** 8:23 31:1

**pry** 44:8

**pull** 94:25 95:1, 3,7 96:2,8 109:6 136:17, 22 153:6 175:9

**purpose** 21:13 36:3 99:8 157:21

**purposely** 122:1,4,6

**purposes** 44:9

**pursuant** 11:19

**put** 31:16 32:7, 8,11,23,25 33:1,2 49:23 51:3 61:22 63:13 64:9 65:23 66:17,21 68:13 81:25 102:7 105:15, 24 125:24 126:7 138:6 139:11 142:23 163:3 169:20 174:24

**puts** 66:18

**putting** 33:14 137:7 146:8

**puzzling** 105:3

---

**Q**

**qualified** 34:8, 15,18,22 39:24 40:1 48:11,18

**qualify** 48:20

**quality** 99:2

**quarter** 100:10

**quarterly** 53:7 56:14,16 80:23 100:8

**quarters** 46:20 145:14

**question** 8:6,7, 15,19,22,24 9:12,15 16:1,4 18:5,13 25:23 26:16 29:11,25 30:2,6,11,13, 14,24 36:19 37:3 38:8,9,24, 25 39:12,15,18 45:1 51:22 54:22 59:3,11 61:5,8 62:13 64:4,7 70:9,11 71:4 73:22 74:10 85:2 86:24 87:18 88:11,13 89:2, 24 90:3 94:25 97:20 99:18 110:13 123:13 124:20,21 139:22 148:18 160:25 161:3 165:24 166:1,3, 11 169:4 176:20,22,25 177:14 178:22, 24 180:19 181:14 182:10, 21

**questioning** 21:20 159:18 167:3

**questions** 8:8, 9,20 9:4 10:9 18:4 23:2 29:24 64:14 70:18 89:18 93:9,11, 15,22 94:4 98:25 110:1 118:9 127:19 148:24 167:19, 20 168:4 174:14,16,20 175:18 178:15 184:4,7

**quick** 154:7

**quickly** 76:11 103:1

**quit** 44:2

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

quote 156:15

**R**

radio 94:13,21 98:20

raise 7:12

raises 178:14

raising 150:18

rally 82:20

range 31:13 47:8 93:5 114:20 115:7, 10 125:22 126:20 127:3,8 130:4 148:20 162:4,24 165:21 166:3 169:12 170:21 173:19

ranges 47:7, 10,13,15 68:13 71:13 72:3 93:4 113:24 115:3 125:24 126:1,6 169:16 171:12, 13

Rank 45:18

ranking 133:13,17

ranks 45:17

rapid 76:14

rated 104:19 107:6

rating 104:15, 22 105:5 106:9 107:4

ratings 107:25

re- 12:2

re-ask 169:4

read 17:16,23, 25 18:2,5,6,9 39:12,15 52:3 77:12 86:6 137:15,22 146:24 148:7 149:14 175:5

176:21,25 180:8 182:23

readily 76:19

reads 8:21

realities 144:20

reality 141:1, 12 145:6

realize 132:8

realized 88:8 140:21 182:4,9

reason 8:9,18 9:15 27:3 44:10 61:11,12,13,18 70:18 78:3 108:2 126:2 145:5 155:20 179:15

reasoning 123:12

reasons 110:15 143:25 173:12

recall 11:10 16:5,9 17:4,23 18:8,9,10 20:20 22:21 23:7 53:13 54:2 59:21 86:17,21 124:10 125:17 130:2,22 131:1, 21 150:7,8,21 151:15,23 152:18,20 153:14,17 155:2 156:11 159:25 166:14 174:14 175:19, 23

receive 41:1 78:16,18 79:17 93:21 105:9 106:12 107:8 121:5

received 41:18 79:2,9,11 86:10 103:12 105:10 107:10 122:11

receiving 46:12 107:21 152:18

recently 152:4

recess 21:24 73:1 116:8 167:10

recognize 71:20 105:8

recognized 166:12,19 180:21 181:11, 18

recollection 153:2 157:4,5

recommend 52:13 55:19 162:2

recommendati on 124:8,16 127:10,14 147:1,17

recommendati ons 124:13

reconvene 72:20

record 6:3,25 7:4,6 21:7,22, 25 26:18 52:3 59:4 65:24 67:5,16 68:14, 21 69:4 72:10, 24 73:2 77:12 93:24 116:6,9 124:2 132:9 137:15 146:25 148:7 167:8,11 168:7 184:14 185:11

recording 184:18

records 28:23 72:8,13 114:13, 14 120:19 176:6,17

recurrent 29:17 120:8 123:4

red 95:6

REDIRECT 178:12

redo 106:21

reemerge 123:5

refer 77:7,8 110:2 122:16 175:15

reference 133:9

referenced 23:6

referred 100:15 172:16

referring 33:9 62:18 101:17 122:14

refers 95:2 101:5

reflected 16:8

refresh 10:21

regard 74:8 113:10 175:4

regular 32:4 80:17 116:23

regulation 77:20 137:21 139:17

regulations 13:22 14:6 18:24 19:6 22:11 52:5

reinforce 157:21

reiterate 106:4

related 52:17 176:18

relates 22:10 25:11 28:4 64:24 101:4

relating 13:23 18:21 19:8 20:5,17 22:11, 23 24:22 25:18

28:2 34:3,20 60:3 65:7 67:17 69:17 93:9 103:8 120:16

relation 24:17 33:21 54:4,9 69:19 121:22 122:12,22 150:23 154:24

release 94:7, 15 152:7

released 16:12 35:13,23 39:9 81:20 82:14 84:8 94:15 98:3

releasing 152:10

remediation 110:12

remember 17:5 41:4,10, 22,23 42:1,17 58:24 86:18,22 117:8,14 118:1, 8 128:9 131:3 144:25 158:7 168:24 172:20 174:10

remembering 173:2

remind 9:21 137:9

remotely 7:1

repair 66:1

repairs 171:21

repeat 138:17 149:10 181:14

repeatedly 30:16

replace 66:1 156:1

replaced 62:22 63:8,22 64:25 65:11,18

replacement 63:18 67:17

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

report 17:20 31:9 70:24 83:16 86:5,6, 20,21,22 91:11 100:23 101:16 105:9,10,14 107:10,21 108:8 116:16, 18 117:7 119:17 122:2, 11 129:21 130:14 132:20 133:5 146:5,11, 17,22 147:25 158:16 159:4,6, 7 180:9 181:5, 6,8

reported 35:25 70:21 71:22 130:7

reporter 6:3,5 7:3,6,11,17 21:22,25 39:13 64:17 72:24 73:2 75:1 90:13 116:6,9 131:9 137:11 155:8 160:19,22 167:8,11,23 176:23 184:13, 21 185:1,6,10

Reporters 6:6

reporting 174:19

reports 14:9 16:8 17:7,9,12, 13 18:1,5,14 28:16 50:24 51:4 55:24 59:6,8 60:2 72:4 90:16 101:11,23 102:17 103:4,7, 12 104:11 106:12 120:16, 21,22,25 121:5, 13,15,23,25 122:10,22 128:21 131:23 132:16 148:8 159:9 174:9,11, 17 175:4 176:6, 18 178:25

181:4 182:23

represent 65:22

representative 6:10

represented 67:16

representing 6:5

requested 39:15 69:6 129:19 176:25

requests 72:8

require 71:5

required 52:17 66:1

requirement 124:1

requires 77:22 83:19 87:1 106:10 138:16

reserve 185:8

resetting 133:10

residence 127:25

resigned 49:15,19

resist 173:13

resistant 92:4, 5

resolve 32:10

resolved 33:15

respect 14:13 15:21 19:19 22:17 25:23 27:1 28:25 29:17 38:13 40:5 73:12,25 74:12 77:2 78:11,17,25 82:10 90:5,17 99:22 103:13 104:18,22 106:14 107:11 108:9 109:17,

22 116:20 120:12 124:9, 13 125:14 140:13 145:7 151:25 169:3 170:4 171:10 172:22 174:17 180:19

respectful 9:13

respond 14:8 35:13 36:25 38:19 78:4 81:25 93:15 94:17 99:23 142:1,7 162:11, 25 177:8,13 179:10,15 182:24

responded 53:21 126:13 152:20 161:23 162:1 163:4 169:11 170:18 179:8 180:14 182:2,20

responder 179:20

responders 77:14 137:16

responding 12:14 19:1 76:15 111:9 137:25 138:20 140:15,16

responds 134:10

response 10:25 13:24,25 16:19 17:3 18:22 22:12,24 25:12 28:18 34:4 37:2 38:13 54:10 76:25 77:2 78:11,17, 25 79:17 80:16 86:25 87:3 90:7 91:19 93:22 118:4,6 119:6 122:23 123:18 126:12,16 127:1,20

141:14,21 143:2 160:2,14 170:16 172:23 175:4,21

responses 9:5

responsibilities 50:20,21 52:2, 19 55:18 56:21 90:20 101:11

responsibility 45:25 73:14,24 74:8,12 89:17 110:8 138:18

responsible 26:11 28:22 56:8 78:10 122:13 124:24

restrictions 36:24

result 49:11 123:22

resulted 85:20

resume 21:19

retain 26:18

return 13:17

returned 164:9

review 18:13 20:17 32:6 53:19 54:3 57:7 86:12 101:11, 22 156:1 158:24 166:10, 15 170:25 176:6,17

reviewed 20:8, 11,22,23 23:22 24:6 25:3 39:1 86:21 159:1,12

reviewing 20:20 51:5 102:16

reviews 118:6 171:4

rises 95:15

risk 146:20

risks 119:10

role 14:17 15:10 29:3 30:25 31:1 35:6,19,21 46:8 50:11 70:4 154:1 156:13 158:20 183:24

Ron 6:11

room 94:12,13 128:13 157:25

route 128:10 135:9

routine 52:10 117:4

rule 11:19 81:7 140:14

rules 8:1 11:19 13:21 14:6 18:23 19:6 20:6 22:10 52:4

run 75:8 134:2

running 133:22

runs 55:4

———————

S

sad 149:11

safe 37:13 184:24

safety 13:24 14:14,20 19:22 22:12,15 26:7,8 28:7,21 29:12, 14,15 30:25 31:3 32:20 33:7,12,21 38:4 39:1,19 45:20 46:7 48:11,21 49:2 51:13 52:5,6,8,12,15, 16,22 53:1,6,8, 11 54:17,23 55:6,7,8,11 56:9,17 57:3,9, 13,20 58:7,16 59:4,23 66:13 69:7 70:4,14,17 71:6,13,21

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

73:11,14,22,25 74:11,13 76:20 78:15 85:19 103:10 105:2 108:9 109:22 110:6 112:9,23 113:19 117:12, 24 124:9,13 127:13 129:24 143:9 147:13 151:1,19 152:2 165:20 166:17 182:17 183:24

**sake** 9:16 99:21

**sanitation** 46:5,6,9 47:3,4, 6,15,19,23 48:1,7,13 57:5

**Sarjent** 6:4 22:2 73:4 116:11 167:13

**save** 144:23

**saving** 13:10

**scan** 103:1

**SCBAS** 138:12

**scene** 38:15 39:4 148:14,16 149:19 150:19 165:5 176:4 177:17

**schedule** 12:22 43:24 47:9

**schedules** 52:9

**school** 41:13, 15,17,20 42:11 43:24

**scope** 160:3,15

**screaming** 143:19

**screen** 11:18, 20 12:2,13 13:18 24:12 34:5,6 51:12 74:22 90:10 110:23 131:12

137:14 138:24 146:8 155:21, 22 175:10,11

**scroll** 51:16 101:15 102:8 132:4

**scrolling** 102:22

**scrub** 47:7,10

**scrubbers** 47:7

**secondary** 96:13 97:4

**seconds** 76:15 91:17

**section** 25:2 75:21 77:9 121:12

**secure** 83:20, 22

**securely** 147:10

**security** 31:2, 22 113:5 168:12

**seek** 151:19

**sees** 72:4 147:13

**semesters** 41:25

**send** 95:22

**sense** 8:10,14 9:1,7 43:7 95:21 99:23 103:1 115:11 122:8,9 123:24 159:20 168:15 173:20

**separate** 68:11

**sequential** 67:13 69:3

**sequentially** 104:10 132:14

**sergeant** 45:17 122:19

**sergeants** 28:10

**series** 64:22 132:16 178:15

**serve** 59:11

**server** 43:2,4, 22

**serves** 71:7

**service** 42:22 43:1,18 44:13

**Services** 74:17

**serving** 43:14, 25 44:2

**set** 13:16 24:23 59:5 60:3 69:25 95:15 96:8 103:4 110:23 111:5,15 123:21 126:21 169:12,14,16 178:20 179:2

**sets** 59:8 75:13

**setting** 42:14 46:23,24

**severe** 130:3

**shakedowns** 113:9

**shaken** 112:25

**Shamba** 113:25

**share** 11:21 12:3 24:11 34:5 74:22 175:10

**shared** 67:21

**shares** 146:17

**sheet** 110:24 111:4 125:6

**shelves** 147:9

**shift** 33:5 122:2 133:16,22 134:3,12,14 145:18

**shooting** 149:1

**short** 115:25 130:9 167:2

**show** 12:1 27:14,19 131:6 175:8

**showed** 11:11 172:16

**showers** 47:10,11

**showing** 138:25 172:15

**shown** 174:8 179:21

**shows** 27:7 96:17 139:2

**sic** 49:5

**side** 9:13 134:22

**sides** 93:5 148:16

**sign** 109:15 125:10 160:6,7

**signal** 35:11,12 79:21,23 80:2 81:19,25 82:7 84:20 85:3 87:15 88:17 89:7 95:22 98:3 150:16 176:9

**signals** 78:22

**signature** 95:22 185:7

**signatures** 91:3

**similar** 65:22 149:4,11

**simple** 37:3

**sincerely** 68:22

**single** 42:1 43:13 104:22

**sink** 107:18

**sir** 7:24 9:22 28:24 83:10 85:17 97:13

100:9,21 110:5 185:1

**sites** 52:10

**sitting** 7:1 9:25 58:16 182:1

**situation** 36:20 38:12 76:6,16 77:1 84:15,24 87:9 94:18 97:4 105:8 106:6 121:20 128:1 138:14 141:2,7, 20 142:8,13 143:11 145:7 146:19 148:6 151:14 157:19

**situational** 122:17

**situations** 32:18 39:1 112:14 149:8 170:23 171:25

**skill** 83:8

**skip** 7:22

**sleeping** 173:11

**slow** 9:11 173:19,22

**small** 12:5 84:6 170:6,12,19,21

**smell** 96:2

**Smith** 6:11 16:6 19:25 27:4,9 59:15,16 64:6 84:16 87:14 88:16 89:6 90:24 125:17 126:13 127:2,20 134:6 138:25 144:22 148:10 154:24 176:7,18 179:23 180:20 183:25

**Smith's** 54:4, 10 87:13,25 166:13,20 181:18 182:3

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

smoke 25:19 27:22 35:11 95:14,15,20,21 96:9 97:25 113:14,18,23 114:10,15,19 115:9,14,15,21 135:19 143:18 145:14 181:7, 11

snarky 65:4

socket 32:13 65:10 70:13 72:15 111:23 169:20

sockets 62:22 63:25 119:11

solemnly 7:12

solutions 123:5

solve 15:16

someplace 16:25

sooner 166:12 181:19 182:9

sort 103:1 111:16 120:1 170:22

sorted 30:8

sorts 111:12

sound 9:19 73:20 95:3,5 148:21 184:24

sounds 60:11 86:15 116:2

space 102:9 115:8 134:22

spark 169:21

sparking 119:10

speak 11:3 19:17 40:4 55:5 129:7 158:3,4,6 166:21

speaking 8:8 42:3 78:16

129:9

specific 16:4 22:7 23:4 107:17 159:16 183:23

specifically 20:6,16,20 22:21,23 23:2 24:8 48:11 58:23 79:3

specificity 23:18

speculate 61:18 144:4,16 150:3 180:5

speculating 61:23

speculation 61:15 119:14 142:18 144:13 180:3,4

speech 9:11

spent 42:13 164:7

sphere 70:7

spoke 10:19 128:12 132:13 148:19

spray 164:8

spreads 76:13

spreadsheet 26:5,12,14,17, 19,21 27:6,11 123:16,25

spreadsheets 27:13

sprinkler 108:12,14 114:11

spun 141:7

squad 177:6, 21

staff 29:6,7 30:21,25 31:18, 19,22 32:1,10 33:2,7,12 35:24

50:23 52:16 56:9,14,15,17 73:14,25 74:14 77:13 78:3,10, 16 79:1,9,17 80:17,22 81:7 87:5,9 88:25 91:17 92:21,22, 23 93:4,11,21 96:6,12 100:3 106:3 113:5,7, 10 117:21 119:6 123:19 126:10 136:1,6, 9 137:15,25 138:11,19 139:10 140:2, 14,18,24 142:1, 6 143:16 144:2, 3,15,16 145:15 149:5,8 150:15 152:9,17 153:8 154:6 160:2,9, 14 161:11 162:18,19 166:11,18,21 175:4 176:2,9 177:20,23,25 178:2,5 180:12, 21,25 181:10, 17,20 182:2,12, 13,19,23

staffers 91:4

stage 77:16 137:18,19

stages 77:17

stamp 67:13

stamped 67:6

stamps 75:8

standard 93:20 106:10

standardized 31:7

standards 20:6 52:12

standing 91:7

standpoint 29:10,12,15 38:4 60:21 112:23 117:12

123:3 135:12 147:13

start 9:12,14 110:13 111:22 112:12 122:1 126:6 127:17 146:1 169:19, 24 170:5,13,22 177:14

started 28:10 39:18 83:21 135:23 145:16, 24 174:23 182:7

starting 6:17 122:7

starts 94:22 122:3 130:4 131:15 134:25 135:4

state 6:15 7:4 9:6 10:1 14:14 25:5 29:18 30:16 34:9 35:12 37:5 38:13 51:14 52:4 53:15 58:11 59:3 60:7 67:6,12 69:2 73:23 75:5,8,14 85:14 86:1,25 100:25 101:2 120:8 122:5,14 128:2,8,9,25 130:7 132:11, 14 133:6 141:13 153:25 165:20 175:14 177:6 178:17 182:18

stated 7:21 23:21 135:11

statement 60:22 134:13 149:9 154:12 164:23

statements 152:16,23,24 153:10 154:5,6, 20,21 174:19

states 6:12

146:22

stating 149:25 150:3

station 15:7 17:1 27:24 28:1 38:1 81:20 82:15,20 83:12, 15 84:9 95:3 127:6 129:14 130:14 133:8 162:8 163:24 164:10

stations 94:25 95:1 96:18 126:22

status 37:1 130:14 166:17

stay 83:24

step 81:7,13 83:12 94:17 178:5

steps 70:22

Stidham 132:20,25 134:9,10,21,24 135:3,10,14 145:12,20,21 146:5 148:22 174:13

Stidham's 134:11 145:23

stipulate 7:7,9

stop 8:4,7 21:14 71:11 164:2

stops 31:14

stopwatch 91:8

storage 146:18,19 154:17

store 147:4

stories 152:17 153:7,8

straight 41:12 45:19 104:15



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit L

stress 21:11

strike 52:18 104:21 105:2 177:11

studied 178:22,23

studies 42:14

stuff 10:3,4,20, 21 11:12 23:6 47:19 55:25 83:3 98:13,16 112:18 130:10 136:19 138:10 183:15

stupid 173:7

subject 18:14 19:10 20:7,18 22:13 24:19,23 34:15 36:9 37:21 151:17

subjects 12:15 19:19 22:8 33:19

submit 172:1

subpoena 10:6,7,20 11:11,13,14,18 12:14,16 13:6 136:25

substance 110:7

succeeded 131:6

sufficiently 130:5

suggest 72:19 73:19 167:2

suggested 125:23

suggesting 82:21

suggestion 126:3

suggestions 125:23

sum 110:7

summarization 121:16

summary 43:16 52:18 81:10 101:25

supervise 117:7

supervising 15:10

supervision 91:5 114:8

supervisor 33:5 133:16 134:12,14 145:18

supervisors 122:2

supplemented 115:14

supplies 47:12

supposed 81:17 102:7 109:20 124:25 140:14,15 153:22 161:10

suppressant 80:10

suppression 77:15 137:17

surface 147:8

surge 111:17

surveillance 138:24

survey 31:12 55:18

Surveys 52:12

swear 7:12

switch 105:18

system 66:21 67:21 83:25 95:4 108:12,14 109:2

systems 13:22 14:6 15:8 19:7 22:11 114:12

**T**

tablet 147:11

takes 84:3 91:9 173:16

taking 99:24

talk 9:10 34:9, 23 39:23 40:1 51:6 53:23 56:14 64:6 79:23 93:16 106:3 130:17 132:19 149:16 151:13 152:6 154:21 157:9, 10

talked 17:2 19:19 27:21 28:4 34:14 44:18 53:11 55:16 56:1 59:1 87:7 115:20 117:6,11,23 118:2 120:7 125:5 127:21 144:21 160:10 161:9,16,17,20, 21 175:17

talking 9:18 15:6 22:6 33:6, 15,19 79:24 82:1 94:16 100:1 101:9 110:10,14 125:24 127:17 153:11 175:21

talks 54:20 133:6

tanks 138:10

tasks 69:24,25

Taylor 6:9 7:3, 5,9,11,23 20:10,25 22:1 39:12 51:13,21 52:20 61:5 63:3 64:4,21 69:5 73:3,9 79:7 84:24 116:10, 15 124:14 136:5,18

155:23 156:3 160:19 161:18 163:11 165:4 167:12,18 175:10 178:9

Taylor's 7:7

teach 57:14,16, 18 99:9

teamwork 93:8

Tech 40:11,12, 13,20 41:3,19 42:14 45:2

technical 8:12

Technically 15:24

technician 6:5

teeth 107:18

television 147:10

telling 79:2 101:10 150:15

tells 134:21

ten 92:14 106:22

ten-minute 72:19 115:25

tenders 47:8

tenure 152:1

term 168:6

terminology 168:20

terms 58:22 80:16 110:6 111:8 112:17 117:18 119:5,9

terrible 110:12

test 109:19

testified 24:2 63:3 103:18 118:4 172:22 177:12,15 181:2

testify 10:18 12:15 19:2,10,

13 20:7 22:8 24:18,23 25:14 75:10

testifying 20:18 33:11

testimony 7:13 30:22 48:9 79:7 118:11 142:16 179:7

testing 15:1 35:2

thing 9:9 12:20,21 28:12 30:6,12 37:9 42:7 80:5 92:10 96:12 99:14 100:19 101:3 113:13 120:1 122:5,21 146:25 150:11, 25 157:23 162:20,24 163:20 180:11 184:17

things 10:15, 22 15:1,9,12,14 16:7 19:17 20:8,10,11,13 23:5,7,9,11,23 31:8 33:25 34:23 35:2 38:12 46:10,24 51:4,6 57:16, 17,18 60:7 62:3 75:17 76:10,24 78:24 80:3 91:9 95:6 106:25 114:17 122:7 128:21 129:16 131:23 152:4 153:4,20,24 156:16 157:13, 21 168:4 181:23 183:12, 17,21 184:2,4

thinking 142:19,22 144:3,16,17

thought 37:3 70:12 165:19 166:7



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

**threat** 76:3 81:6 87:2,14

**threaten** 76:20

**threatening** 84:6

**Thursday** 155:24

**tier** 114:22

**tiers** 96:17

**time** 6:7 9:10 12:22 13:11 14:7 22:3 24:7 30:14 40:17 41:5,10,11 42:13 51:1 54:12 63:12 64:7,23 69:21 70:2 71:14 72:18 73:5 78:14 81:23,24 82:11 84:3,7 92:13 114:1 116:12 123:18 125:12 133:2, 14 135:6 143:13 144:18 145:24 151:11 153:6 157:1,19 159:6 161:7 164:7,21 167:9, 14,20 169:5 172:8,23 173:16 174:23, 24 181:15,21, 22 182:7 184:11 185:5, 11

**timely** 38:15 182:2,20

**times** 47:9 59:1 91:22,23 106:22 122:3 165:21 166:4 171:11 172:23

**timestamp** 139:2

**title** 18:18

**today** 6:5,6 9:25 10:18 14:1 20:18 22:3

26:21 73:5 75:10 116:12 167:14 182:1 183:11 184:15, 22,23 185:7

**toilet** 169:21

**told** 128:19 136:25 148:11, 12,13

**tools** 18:25

**top** 51:7 64:24 69:16 77:11 93:3 104:2 114:19 115:5,6, 10 127:15,16 139:2 156:21

**topic** 13:20 14:1,11,13 19:3 22:17 23:3 147:19,21 150:13,14

**topics** 13:3,14

**tops** 113:24

**total** 91:18 93:4

**totally** 119:20

**track** 66:5 70:19 71:4 101:21 113:8,9 120:15 123:3,4, 5,15,20 131:7

**tracking** 123:12

**train** 100:20

**trained** 77:19 78:4 80:5,13,17 82:25 137:21 149:7

**training** 25:6 35:1 45:3 48:20 57:7,19,23 58:2 73:24 74:3,4 78:10,12,13,16, 18,19,20,21,25 79:1,4,9,11,16 81:8 99:22 100:3,13,15,17 119:2,5,8 138:22,23

162:13

**transcript** 8:20,21 9:16 184:15 185:2

**travel** 89:23 95:20

**trends** 123:4

**trial** 184:20

**trigger** 95:8 127:18

**triggered** 96:3 130:6 181:7

**trips** 46:24

**trouble** 9:21

**true** 19:18 38:25 137:24 144:8 149:9 152:18 153:9 164:23 166:2

**trust** 9:7 13:17

**truth** 7:14,15

**turn** 51:4 74:21 95:4 120:25 132:6 148:8

**turned** 106:24 147:6

**turning** 28:3 133:9

**two-** 130:23

**type** 78:22 138:14 160:25 181:23

**types** 46:9,10 149:8 153:23 157:13 170:19, 23,24 171:16

**typical** 54:10

**typically** 32:19 84:10 103:23 121:18

_____

**U**

**uh-huh** 9:5 36:23 53:5 65:1

71:16 75:23 82:4 91:13 104:4,16 108:11 109:16 128:17 130:16 131:20 137:2 168:25 178:18

**uh-uh** 9:5

**ultimately** 89:16,19 90:2

**uncomfortable** 21:10

**unconstrained** 37:1

**underneath** 102:8

**understand** 8:9,15,19 16:1 21:14,17 23:14, 19 30:22 38:8,9 43:19 44:11 53:23 57:2 60:13 61:22 70:8 85:13,22, 24 87:18 110:18 123:22 131:5 136:21 150:10 153:10 182:19

**understanding** 42:12 44:9 47:14 48:9 71:12 86:24 162:21 176:8, 19 177:5

**understands** 117:20 119:4,7, 12 120:4 123:10 124:4, 19

**understood** 8:22 79:10 98:24 121:2 180:12

**underway** 166:13,20

**unfolded** 157:7

**unit** 33:5 81:21,

24 84:8 94:8 96:13 127:4 134:18

**unit's** 95:1

**United** 6:12

**units** 46:24 51:5 82:3,14 83:12 94:14 168:16

**unnecessarily** 21:11

**unnecessary** 111:5

**unusual** 36:7, 10

**up-to-date** 60:21

**update** 26:13

**updated** 26:9, 15,17

**updating** 26:11

**upgrade** 61:9

**upshot** 81:5

**urgent** 76:15 78:1

_____

**V**

**Valencia** 6:10

**Valparaiso** 40:14

**verbal** 10:25 37:2

**version** 26:18 27:6

**versus** 175:22

**video** 6:4,8 22:2 73:4 116:11 158:23, 24 159:1 164:17 166:16 167:13 184:19, 22,23 185:4

**view** 111:7

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit L**

178:19

**views** 151:20

**virtue** 48:15

**visible** 12:9 24:13 171:19

**visibly** 171:22

**voice** 8:11 99:20

### W

**waiver** 44:3

**walk** 51:5 71:13 171:12 173:22

**walked** 142:11

**walking** 171:14 173:19

**walkthroughs** 171:17

**wall** 95:7 125:6 168:7,9,13,15, 20

**wandered** 161:18

**wanted** 47:4 101:3 111:14 121:10 132:6 152:12 156:16 169:13 180:11 184:18

**wanting** 153:9

**warden** 34:19, 24 73:19,21 74:9 89:16 116:18,20 117:16 118:23 119:1,7,12 120:4 123:10 124:4,8,12 127:11,14 129:3 147:18 150:5,17 151:13,19,24 156:17,18,23 157:5 162:3

**Wardlow**

34:13,22 73:21 156:18

**wash** 47:11

**wasted** 164:21

**watched** 164:17

**watching** 91:8

**water** 80:9 98:6 112:10 125:21, 25 126:7,14,15, 18 127:7 161:23 162:1,4, 12 163:19,21, 25 164:8,9 177:13,16

**ways** 87:9 169:19,23 170:2

**wearing** 138:8

**Wednesday** 11:6

**week** 28:11 103:13 104:3,6 106:24 113:23

**weekend** 127:22

**weekly** 28:11, 13,16 32:5,6 51:5 100:23 101:12,17,21 103:13 106:21, 23 110:7 113:20 117:7, 14

**weird** 104:21

**whatsoever** 45:4 180:2

**who'd** 34:17

**whoops** 146:10 155:22

**wise** 23:6

**witnessed** 149:13

**wood** 126:6

**word** 82:21

**words** 9:4 15:19 92:8 93:18 95:16 100:18 168:11 173:25

**work** 31:11,16 32:7,11,23,25 33:1,2,14,25 37:6 42:11,21 45:11 47:16,24 51:3 52:10,17 55:24 56:22 63:3,12,13,15 64:8,22 65:7,13 66:1,5 67:4,16 69:6,17,18 72:10 91:21 100:19 107:23 120:24 136:18 172:1

**worked** 36:18 42:22 43:10,22, 24 44:1 46:4,5, 21 93:7 99:6

**workers** 47:12 48:3

**working** 41:5,9 42:13 44:3,13, 14 46:6 57:5 62:22 63:22 65:10 72:14 77:13 83:5 108:13 109:3 133:8 137:15 169:5 172:6,12

**worried** 136:4

**would've** 42:10 159:13 163:1 164:1 165:12,13,17 179:19,21

**wracking** 183:17

**write** 34:7 93:17 102:10 120:21,22 122:4,19

**writing** 122:13 128:21 130:1

**written** 93:13,

17 104:2

**wrong** 31:8,14, 16 48:10 51:4 102:6 105:21, 22 106:16,17 107:13,15,18 136:12 146:2 155:12 157:1, 11,12 159:21 160:16 161:5 163:8,9 164:5, 21 165:7 177:19

**wrote** 106:19

**Wynn** 69:14 156:20

### Y

**year** 41:17 50:25 78:21 121:13 151:2

**year-and-a-half** 48:8

**years** 18:11 40:16,17,24 43:8,11 48:8 60:17 86:19 130:24 147:20 150:9

**yesterday** 169:11 170:18 179:8

### Z

**Zoom** 6:19,22 7:2 8:12 9:17

**Kentuckiana Reporters**
**110 North Wacker Drive, Suite 2500**
**Chicago, IL 60606**


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
**schedule@kentuckianareporters.com**
**www.kentuckianareporters.com**

**Exhibit L**