

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## COURT REPORTERS

## CASE NO.: 3:24-CV-00185

## MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL SMITH, AND ON HER OWN BEHALF

## V.

## RON NEAL, ET AL.

## DEPONENT:

## RICHARD BESSE

## DATE:

## FEBRUARY 20, 2026



a courtroom
**powerhouse**



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

**Exhibit O**

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

JUDGE DAMON R LEICHTY

MAGISTRATE JUDGE JOHN E MARTIN


MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF MICHAEL SMITH, AND ON HER OWN BEHALF,

      Plaintiff,


v.                    CASE NO.: 3:24-CV-00185


RON NEAL, ET AL.

               DEPOSITION OF

               RICHARD BESSE


            FEBRUARY 20, 2026

             12:54 p.m. CT

           Remote Proceeding


        Abigail Sweeney, NP0766266

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

APPEARANCES OF COUNSEL


On behalf of the Plaintiff, MYSTI VALENCIA, AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF MICHAEL SMITH, AND ON

HER OWN BEHALF:

    MEGAN PIERCE, ESQ.

    LOEVY + LOEVY

    311 North Aberdeen

    Third Floor

    Chicago, Illinois 60607

    megan@loevy.com

    APPEARED VIA VIDEOCONFERENCE

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



**Exhibit O**

APPEARANCES OF COUNSEL (CONTINUED)

On behalf of the Defendants, RON NEAL, JASON NOWATZKE, CHRISTOPHER BEAL, DANIELLE BROWN, DEBORAH TAYLOR, DOUGLAS WARDLOW, ART KAUFMAN, ANDREW KMITTA, JANILLE WHITAKER, LIEUTENANT NADINE SMITH, OFFICER KEVIN CROSS, DENNIS KOEN, VINCENT MCCORMICK, AMON LEE, JENIENE WALTON, DARNELL CROCKETT, STEVEN MCCANN, LATRICE JONES, ERNEST WILLIAMS, MICHAEL EVERETT, AND JAYLON SINGLETON:

     JULIA KWAIT, ESQ.

     EICHHORN & EICHHORN, LLP

     2929 Carlson Drive

     Suite 100

     Hammond, Indiana 46323

     jkwait@eichhorn-law.com

     APPEARED VIA VIDEOCONFERENCE

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

INDEX OF EXAMINATION

WITNESS:  RICHARD BESSE

EXAMINATION                                        PAGE

Direct By Ms. Pierce                                  7

Cross By Ms. Kwait                                   93

INDEX TO EXHIBITS

NO.                    DESCRIPTION              PAGE

Plaintiff's

1 - Mr. Besse's Curriculum Vitae                    8

2 - Mr. Besse's Report                             45

3 - Internal Affairs Report of Investigation

    Dated March 7th, 2023                          49

4 - Critical Incident Report                       50

5 - Mr. Roseboom's Report                          50

6 - Mr. Besse's Invoice                            91


Defendant's

1 - Video of Incident                             101

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

The deposition of RICHARD BESSE was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY 40202, via videoconference in which all participants attended remotely, on FRIDAY, FEBRUARY 20, 2026, commencing at 12:54 p.m. (CT); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.  THE OATH IN THIS MATTER WAS REMOTELY ADMINISTERED AS PERMITTED BY INDIANA SUPREME COURT CASE NO. 20S-CB-123.

It is agreed that ABIGAIL SWEENEY, being a Notary Public and Court Reporter for the State of INDIANA, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

THE REPORTER: We are now on the record. Will all parties, except for the witness, please state your appearance, how you are attending, and your location?

MS. PIERCE: It's Megan Pierce on behalf of the plaintiff, Mysti Valencia. Attending remotely via Zoom from Portland, Oregon.

MS. KWAIT: This is Julia Kwait. I am from Eichhorn and Eichhorn. I am counsel for the defendants. I am attending via Zoom, but in person with Mr. Besse, and we are in Hammond, Indiana.

THE REPORTER: Perfect. Mr. Besse, will you please state your full name for the record?

THE WITNESS: Richard Besse.

THE REPORTER: And then this is where I would typically ID the witness, but both parties have agreed to stipulate identity. Do they still agree to that at this time?

MS. PIERCE: Yes.

MS. KWAIT: Yes.

THE REPORTER: Perfect. Mr. Besse, will you raise your right hand for me? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

THE WITNESS:  Yes.

THE REPORTER:  You can begin, Counsel.

DIRECT EXAMINATION

BY MS. PIERCE:

Q.  Okay.  Mr. Besse, my name is Megan Pierce, and, as I said, I represent the plaintiff in this matter, Mysti Valencia.  Can you please state and spell your name for the record one more time?

A.  It's Richard Besse.  That's B, as in boy, E-S-S-E.

Q.  Okay.  And, Mr. Besse, I assume that you've been deposed before; is that fair?

A.  Yes.

Q.  Okay.  So I won't go over the ground rules of the deposition in too much detail, but I just want to emphasize that since we're on Zoom, it's really important to make sure that you wait until I finish my question until you begin your answer so that we can make sure the court reporter hears all of the audio and gets everything down clearly, okay?

A.  That's good.  That's fine.

Q.  And then if you can't hear me or you don't understand my question, please ask for clarification. Otherwise, I'll assume that you heard -- both heard me and understood me, okay; is that fair?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

A.   Yes.

Q.   And then if you need a break at any point, just let me know.  I'm happy to take a break.  I just ask that you answer the question that's pending and then we can take a break, all right?

A.   All right.

Q.   Okay.  Mr. Besse, I understand that you haven't testified in any cases since 2019; is that correct?

A.   Correct.

Q.   Are you still working full-time as an expert or are you semi-retired, or what's the reason that you haven't provided any testimony in the last few years?

A.   Because cases that have gone to, like, report stage of files have settled prior to depositions.  There have been, you know, ones scheduled, and then just canceled as because they settled out of court.

Q.   Okay.  All right.  Mr. Besse, I am going to share with you what I'll mark as Exhibit 1, which is your CV.  All right.  Mr. Besse, can you see this okay?

(Plaintiff's Exhibit 1 was marked for identification.)

A.   Yeah, the top half of it.

BY MS. PIERCE:

Q.   Yeah.  I'll have to scroll down at some point.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

Give me one second just to -- okay.  So this is -- again, this is Exhibit 1, your CV, which appears to be about nine pages long.  Does that seem right?

A.   Yes.

Q.   Okay.  I'm -- I'll just scroll through it somewhat quickly, but this looks like the copy of -- the most up-to-date copy of your CV that you provided in this case?

A.   Yes.

MS. KWAIT:  And, Megan, I hate to interrupt, but I just wanted to let you know that Mr. Besse does have a copy of his CV in front of him, so he can reference it if that's easier for you here on his --

MS. PIERCE:  Okay.

MS. KWAIT:  -- his paper copy.

MS. PIERCE:  Yeah.  Thank you, Julia.  That's helpful.

MS. KWAIT:  Yeah.

BY MS. PIERCE:

Q.   Okay.  So I think we have -- what you have in front of you then is -- looks to be the same as this copy, correct?

A.   Correct.

Q.   All right.  Okay.  So Mr. Besse, did you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

graduate from high school?

A.    Yes.

Q.    What year did you graduate from high school?

A.    1977.

Q.    Okay.  And then after that you went on to the University of Illinois Fire Service Institute; is that right?

A.    Yes.  Well, that is -- those are just seminars.  Those weren't, like, full college credit courses.

Q.    Okay.  And so just if I understand that correctly, so this is not like an accredited university or college, it's an institute specifically related to fire service; is that right?

A.    It is at the college, but they're like one-week seminars that they hold, you know, for firefighters and new fire investigators, too, just for general education on fire service.

Q.    Okay.  And do you have any college credits or any associate's degree or bachelor's degree?

A.    I have college credits, but no degrees.

Q.    And when did you acquire your college credits?

A.    I believe the last college course I took was probably in the early '80s.

Q.    And where did you take that course?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

A.    Those were at South Suburban College, Prairie State College, and I think there was one other.  It's a community of colleges together that each hold different classes in fire science and -- and law enforcement.  So like, they split up the courses amongst the -- the schools.

Q.    Okay.  So you took a handful of courses related to law enforcement and fire science; is that right?

A.    Correct.

Q.    About how many courses would you say you took at the college level?

A.    Approximately eight, maybe.

Q.    Okay.  Do you know how far away you were from getting any -- a degree?

A.    No.

Q.    And you don't have an associate's degree or a bachelor's degree, correct?

A.    Correct.

Q.    Have you taken any courses on what I'll call hard sciences, so like biology, chemistry, physics at the post-high school level?

A.    No.

Q.    And these courses that you took at the University of Illinois Fire Service Institute in 1978,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

did you get any sort of certificate of completion or, you know, any sort of certificate of graduation or anything like that?

A.    I believe they gave you a certificate at that point.  I'm not sure I still have it, but they gave them out at the -- after each one of those.

Q.    Okay.  And was there a certain amount of credits or grades you had to receive in order to get a certificate of completion?

A.    I don't recall.

Q.    Okay.  And so it looks like that course was no more than a year, correct?

A.    Oh, it was just a one-week -- each one of those were one-week schools.

Q.    Oh, okay.  When you say "each one of those," what do you mean?

A.    There was two of those schools that I attended, and they were just one-week schools.

Q.    Okay.  And so you attended two schools with basically one week each of education?

A.    Yes.

Q.    Okay.  Do you remember the name of the other school?

A.    No.  They were both at the University of Illinois at the Fire Service Institute.  I -- I believe

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

the -- I thought they were both on here, but, like, one was 1978, and it was probably 1979 or might -- maybe 1980, the exact same set up, just going a different year.

Q.   Okay.  And so it was one week, probably like eight-hour days or less than that.  Do you know?

A.   Probably eight-hour days.

Q.   Okay.  Five days a week?

A.   Yes.

Q.   All right.  So about 40 hours of instruction each in those two schools?

A.   I believe so.

Q.   Was there any sort of admission criteria to get in?  Did you have to take an admission test or apply?

A.   No.  It was -- they were sent there by the fire department.

Q.   Okay.  So did you already have a job at the fire department when you went to work -- or when you went to the fire institute?

A.   I was a paid on-call fireman for this -- Hazel Crest -- the town of Hazel Crest.

Q.   What is a paid on-call fireman?

A.   It's not a full-time position, it's -- but it's not just volunteer.  You get paid by the call



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

and -- you know.  So that's why they call it paid on-call.

Q.    And this was for the town of Hillcrest, is -- did you say?

A.    Hazel.  Yeah, it's Hazel Crest, H-A-Z-E-L C-R-E-S-T.

Q.    Okay.  So when you were a paid on-call firefighter at Hazel Crest, was everybody in the fire department at Hazel Crest paid on-call or were some people full-time firefighters?

A.    At one point -- I'm not sure when the transition became.  It was probably 1978-ish, because that's when I was in paramedic school.  So I was one of the paramedics that went -- I didn't go full-time there because I was going to a different town, but -- and my age requirements that, you know, you had to be 21, and I wasn't 21 at that point.  So -- but I -- so as they hired full-time firemen paramedics, I was a -- a fill-in guy because I couldn't be a full-time employee at that point.

Q.    Understood.  Okay.  So I'm going to look down at your certifications here.  You have various certifications from the Office of the State Fire Marshal; is that right?

A.    Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.    And how do you go -- is that from Indiana?

A.    Illinois.

Q.    Illinois.  Okay.  And how do you go about getting those certifications from the fire marshal?

A.    Those are all different schools that -- so they have -- like, say fire investigator was a -- like a two-week school.  And after you graduated that, after you passed the test, obviously, you become a fire investigator.  And in the third week of that school was arson investigations, but then you had to be certified by a -- a police department.  So, I went to the police academy, and once I graduated the police academy, then I was certified as an arson investigator.  Firefighters 1, 2, and 3 are, again, just -- there's several courses that you have to go through to get those certifications, and then the tests you have to challenge.  So the State of Illinois will have several classes that you have to go to and pass.  And then once you do that, then you can challenge -- the Firefighter 1 and 2 are together, then Firefighter 3 is advanced, more tactics and strategy for firefighting.  And then the Instructor I and II, again, were one and two-week schools to -- so you could teach the -- the classes.

Q.    Okay.  And the instructor schools, that was about instructing other people to fight fires, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

A.    Yeah.  And -- and so you could teach the -- the courses that were necessary to get your Firefighter 1, 2, and 3.

Q.    Okay.  So you had to teach those -- I see.  Okay.  So you were teaching other people to get their firefighter certifications, correct?

A.    Correct.  Correct.

Q.    Okay.  And the Firefighter 1, 2, and 3, those are about fighting fires and not investigating fires, right?

A.    Correct.

Q.    Okay.  And then the fire investigator and the arson investigator, to get those certifications did you actually -- was it mostly about going to the police academy and learning how to do investigation generally, or were you focused on doing the particular science of investigating a fire?

A.    Those three classes are strictly on fire investigations.  The -- you just couldn't -- you could go to all three of the modules.  That's what they called them back then, were modules, and you had to pass the -- the three modules.  But that would just get you your fire -- your fire investigator certificate. And that's where, like, most of the -- the municipality investigators were at least the -- our fire

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

investigator.  Very few got the arson investigator because they didn't have a lot of police officers doing them.  In our town, once you graduated all those and you were in the fire department, then you went to the police academy from there, but they were totally separate schools.  So that's where -- but there's three modules that go into the fire investigator portion of that.

Q.    There's -- okay.  So there's three modules. Are those computer-based or are they classroom-based?

A.    They're classroom and -- you know, and field. You know, they take -- there's classroom portions of it and then field portions of it where they actually have, you know, fires set up and stuff like that and -- to investigate.

Q.    And how long did those -- does the three modules for the fire investigator certification last?

A.    I believe each module was a 40-hour school.

Q.    Okay.  And who was teaching those?

A.    The Illinois State Fire Marshal.

Q.    Okay.

A.    Their office, I -- you know.

Q.    And then the arson investigator was separate and that was done through the police department, correct?

A.    Well, yeah.  You had to pass those three

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

modules and then you had to be a sworn officer to get the arson investigator because it is investigating the crime of arson.

Q. Okay. And would it be fair to say that the additional arson investigator certification was more focused on police skills and less focused on the actual investigation of a fire; is that fair?

A. Well, the -- because the three modules, you had to pass either way. So you had to have the three fire investigator modules, you just couldn't get the last certification. So it wasn't an additional school or anything, it was just that you are a certified police officer. But all of the classroom time was the three modules from the Illinois State Fire Marshal.

Q. I see. Okay. So the only difference -- the way you get an arson investigator certification in addition to a fire investigator is by being a certified police officer?

A. Correct.

Q. Understood. Okay. But there's no additional educational component to it?

A. No, there is not.

Q. Okay. And then the, "INS Investigation Bureau, Inc., hazardous materials technician." That certification, is that about investigating fires or is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

The Deposition of RICHARD BESSE, taken on February 20, 2026

USDC IN/ND case 3:24-cv-00185-DRL    document 147-17    filed 04/17/26    page 20 of 124

that more about how to handle hazardous materials?

A.    How to handle hazardous materials.  You have to have that because, when you go into these fires, a lot of times there are hazardous materials there.  So it was good to have a good base knowledge of hazardous materials.

Q.    Okay.  But that -- fair to say that that certification doesn't involve any education -- extra education about how to actually investigate a fire itself, correct?

A.    Correct.

Q.    Okay.  And then Office of the State Fire Marshal certification, what does that entail?

A.    The -- that's the apparatus engineer.  That's just the -- driving the apparatuses, fire trucks, and that type of thing, and being certified to do that.

Q.    Okay.  So again, no education about fire investigation in that certification?

A.    Correct.  Correct.  Sorry.

Q.    No, you're fine.  Thank you.  And then the National Association of Fire Investigators, the certified fire and explosion investigator instructor. How did you go about getting that certification?

A.    Well, after you go through the school for your fire investigator, you have to have the fire and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

explosion investigator first. And then you can go to the additional class and challenge the instructor's test.

Q. Okay. And how long is the school for the initial certified fire and explosion investigator?

A. It was a week.

Q. Okay.

A. A 40-hour week.

Q. And that's run specifically through the National Association of Fire Investigators?

A. Yes.

Q. Okay. And when did you get that certification?

A. I would believe it was in the early '90s.

Q. Okay. And then the additional instructor certification, how long did that take?

A. I believe it was one or two days. I don't recall. But then you just challenged the test and -- it's -- that's more of, again, teaching how to teach type of thing.

Q. Okay. And do you have to take a test at the end of the initial certified fire and explosion investigator course?

A. Yes.

Q. Do you know what the pass rate was on that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

test?

A.    Well, I have no idea.

Q.    And what is the certified vehicle fire investigator course?

A.    That's another school.  That one was with Eastern Kentucky University.  It was a three or four-day school, and alls it focused on was investigative -- excuse me, investigating car fires.

Q.    Okay.  Was that about a week as well?

A.    I think it was just a day short of a week and -- but then it was tested at the end of that, too.

Q.    Okay.  And then you are also a certified fire investigator from the International Association of Arson Investigators.  When did you get that certification?

A.    Trying to count back.  I re-certified in 2018, so it was five years before that.  So 2013, I believe.

Q.    Okay.  So if I'm understanding you correctly, you have to recertify every five years?

A.    Yes.

Q.    Okay.

A.    With both organizations.  I'm sorry.  Just so you understand, both organizations, you get certified, you have to recertify every five years and you have to have continuing education and -- and -- and be -- you know, put that through to be re-certified.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.   Okay.  And the initial certification, how long of a course does that require?

A.   It's not a course.  It's a -- it's a lot of -- a lot of schools, a lot of experience that -- they take all that into account.  And there's an application you have to fill out and it's on a point -- you know, a point kind of thing where you have so many points for education.  Like, you go to a school and you get a half a point per credited hour.  So if you're in a -- a three-hour school and it's tested, then you get a half a point per hour.  If it's not tested, you get a quarter of a point per hour.  And when I did it, I think you had to have 200 or 220 points to challenge the test.  And then once they agreed that you were qualified to challenge the test, then you have to take the test.  And then if you pass it, you pass it.  If you don't, then you get another crack at it.

Q.   Okay.  So if I understand correctly, to get the International Association of Arson Investigators certification, excuse me, you don't have to take any specific courses, you just tell them all the education you've had, and then they add up points.  If you've had enough, they'll let you take the test, and then if you pass the test, you're certified; is that right?

A.   Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

Q.   Okay.   So there's no specific educational component that is part of that certification process?

A.   Not a specific one, but it's all fire investigation classes that you have to take and -- and the same thing to recertify.

Q.   Okay.   So what is the recertification process? Do you have to take another test or do you just show that you've been doing continuing education?

A.   You have to have so much continuing education over the five years.  And I don't remember what the -- I know, again, it's a point system.  You have to have so many classes, so many points, so -- and -- to recertify. And then you send -- again send an application into the IAAI, and they say whether you've had enough points, you've had enough, you know, continuing education.  And it has to be so much each year, it can't be all in one year.  So they spread -- make it spread out, and then they tell you if you recertify or not.  And if not, they'll send your application back and say, hey, you need more classes or more whatever.

Q.   Okay.   But you don't have to retake a test for any of your certifications every time you recertify, right?

A.   Correct.  Each class will have a test, but not the -- the program in total.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.    Okay.  And then go on to page -- further down on Page 2.  So I think here, these are the two schools you were referencing in 1978 and 1980, the University of Illinois 54 Annual Fire College and 56 Annual Fire College; is that right?

A.    Yes.

Q.    Okay.  So those are the ones that you had discussed earlier at the top of your first page?

A.    Yes.

Q.    And then the -- we discussed that you had taken some college credit courses, correct?  Maybe about eight classes?

A.    I believe so, yes.

Q.    Okay.  And are those all listed on here?

A.    Just a couple of them at the Thornton Community College, basic photography.  And then, again, there was the Thornton Community College for Arson Investigation, but those were individual classes in the fire science program.  That fire science program -- and you can get a certificate in fire science by passing all the classes on the -- their agenda.  And then it -- obviously, then you can go to your associate's degree and bachelor's degree after that.

Q.    Okay.  I want to look at page -- sorry.  The -- I want to look here in 1978 to 1988, the Thornton

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

Community College Fire Science Program.  So you have that you were participating in that for ten years; is that right?

A.    Probably, through my --

Q.    Can you --

A.    -- career as a fireman.

Q.    Can you explain, like, what level of participation you were having in that every year?

A.    Well, you would just go -- again, it's a -- it's a college curriculum where they have, I don't know how many classes there were, but they have -- for your fire science certificate, there were multiple classes you had to take and pass.  And you could take them anytime you want, but, you know, with life, I didn't, you know, go back, so it kind of just got spread out.  The classes I took got spread out over the years as a fireman and having a family and stuff like that.

Q.    Got you.  Okay.  And so while you were doing this, you were also working as a firefighter, correct?

A.    Yes.

Q.    Okay.  And do you recall when you actually got your certificate from the fire science program?

A.    I did not.  I did not finish.

Q.    Oh, okay.  And just to make sure that I understand correctly, this fire science program at the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Thornton Community College, is that the same as this University of Illinois Fire College?

A.   No.  It's totally different.

Q.   Okay.  And you did get your certificate from the University of Illinois Fire College, correct?

A.   Yes.

Q.   Okay.  These seminars here in February 1988 to February 1999 [sic], do you remember how long those were?

A.   '98 -- no, I don't.

Q.   Okay.

A.   That's when all the -- when I was taking those classes.  So each one of those classes is a semester long at the college.  So you know, like I said, I just spread it out because I would do individual classes and -- and -- when I could and --

Q.   Okay.  And these ones that are just February 1989, that wouldn't be over the full semester, right, that would just be at some point in February?

A.   No.  The one in February 1989 -- yeah, those were just seminars, like, over the weekend or three or four-day seminars that they put on.  And so that's how you got continuing education.  You know, each area would put on a certain amount of classes for, you know -- and you'd go to that seminar and there could be three or

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

four different topics in there, you know -- you know, in -- in fire investigation.  So then you went to those classes and most of them were tested and then -- you know, so you took a test at the end of the seminar. So that was that.

Q.    Okay.  And again, did any of these classes, continuing education that you took, do you recall them -- any of them involving any, again, hard sciences like biology, physics, chemistry?

A.    No.

Q.    And were these all mostly classroom-based or was there field-based components as well?

A.    Most of them were classroom-based, but there were some that you would go out and do different burns or, you know, stuff out in the field.

Q.    Okay.  And then you wrote 40 hours or eight hours for some of them.  Is there a reason you wrote the hours for some and not others?

A.    Not sure which ones you're --

Q.    On the Page 3 you've written --

A.    Oh.

Q.    -- like 40 hours for the FBI --

A.    Oh, because -- yeah, some of them, again, were just weekend seminars or, you know, that.  But the FBI Post-Blast Crime Scene School and -- and the -- the --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

each -- those were 40-hour classes that you had to attend and have to be tested out of.

Q. Okay. So on this third page here, if it doesn't say 40 hours then it was more likely to be like a weekend seminar or something shorter, correct?

A. Correct.

Q. Okay. And you have included, it seems like, all of your continuing education on here?

A. Yes.

Q. Okay. All right. Would you agree with me that fire science has changed a lot over the years since you've been a -- involved in firefighting or fire investigating?

A. Yes.

Q. Okay. Are you aware of criticism of fire investigations that have stated that some of the burn patterns or indications of arson, a lot of -- there's been a lot of criticism that those aren't actually grounded in sound science? Are you aware of that?

MS. KWAIT: Objection. Form.

THE WITNESS: You have to ask that one more time.

BY MS. PIERCE:

Q. Yeah. Are you aware of some of the criticism that's been directed at parts of fire science or arson

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

investigation?

A.   Well, criticism -- but see, within the NFPA 921 Committee, it's a -- a consensus document, so the -- it's not like everybody agrees to every detail in the book.  But there have been a lot of changes because more and more science has come in to how the patterns are created and -- and that type of thing.  But there are always going to be someone that can criticize anything.

Q.   Sure.  And being a good fire investigator, one of the things you want to know is what criticism is out there, right?

A.   To a point.  I mean, some of it is just noise.

Q.   And how do you tell the difference between what's noise and what are valid criticisms that need to be taken into account when determining whether the techniques used to investigate a fire are sound?

A.   Well, if they're -- if they're sound, then it usually gets -- I mean, if you have a valid complaint or a valid where you believe that something isn't right, then you bring it to the NFPA Committee -- 921 Committee, and that -- they're all discussed.  And you can have -- you can make comments, you can -- during the process.  That's why the book changes every four years is because people will have different things and say, well, I don't agree with this, and this is why.  But

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit O

there's a lot of -- I mean, if you have a valid point, then you would bring it there.  You wouldn't just be -- I mean, I don't know who you're talking about or what you're talking about, so I -- I -- I can't dignify it with, you know, yeah -- that, yeah, this is, you know, good criticism.

Q.    Yeah.  So are you -- would it be fair to say that you're relying on the 921 guidelines to tell you what the current science is, rather than going out and looking at new studies or new papers from others involved in the field?

A.    I'll say that I have not seen any new studies that aren't, you know, connected to the 921, you know, Committee and the -- the -- the process that we go through to -- to make the document.

Q.    Yeah.  And are you involved in the process of making the document?

A.    No, I am not.

Q.    Have you ever commented on certain guidelines or components of the guidelines with criticism or feedback?

A.    In writing?  No.

Q.    Have you done that orally?

A.    No.  Well, too.  I mean, we talk about things that we see and do, but then they get put into the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

document.  I mean, they get brought up.  I mean, a lot of this is people talking to each other.  I mean -- so...

Q.    Sure.  But are you bringing anything directly to the committee that's making the 921 guidelines?

A.    No.

Q.    Okay.  Have you ever done that?

A.    No.

Q.    Have you ever participated in any submission to the 921 guidelines?

A.    No.

Q.    Okay.  And are you mostly relying on information either from the -- to make sure that your knowledge is up to date with changes and the science, are you relying predominantly on the 921 guidelines and the courses that are listed here in your seminar?

A.    Yes, because that's where --

Q.    CV.

A.    I'm sorry.  Go ahead.  My bad.

Q.    I'm sorry.  Let me ask the question again because I misspoke.  Are you mostly relying on the 921 guidelines and the courses that are listed in your CV to make sure that your knowledge of fire science is up to date?

A.    Yes.  That's why you go to continuing

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

education.  So as things change or that new things come up, you know, you -- there's continuing education.  That's what it's all about.

Q.   Okay.  And fair to say that you're not going out and looking for new studies that are done or other guidelines relating to fire investigation outside of the 921 guidelines?

A.   And seminars, yes.

Q.   Oh.  Have you read about or looked into any of the exonerations that have resulted from changes in or criticisms of arson investigations?

MS. KWAIT:  Objection.  Form.

THE WITNESS:  Exonerations as in what?

BY MS. PIERCE:

Q.   Yeah.  Are you aware that there's been a number of high-profile exonerations of individuals who are convicted of arson, but later it was determined that the fire investigation that was used to convict them was not grounded in sound science?

A.   Yes.

Q.   You're aware of that?

A.   Yes.

Q.   Have you read about any of those cases in detail?

A.   Yeah, I've read several cases, but I couldn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

recall what -- what is what, you know, at this point. I mean, you have the big high profile ones like the case in Texas where the guy was, you know, convicted and sentenced to death for starting a fire in his trailer. And I think he killed his -- they say he killed his children, but that -- that was rebuked later.

Q.    Okay.  And along with this, there have been significant changes in arson science, correct?

A.    In fire science, yes.

Q.    Yeah.  Fire science.  Thank you.  And you agree that it's important to stay up to date on all changes in fire science?

A.    Yes.

Q.    How long did you work -- for some period of your life you worked as a full-time firefighter, correct?

A.    Yes.

Q.    And how long did you work as a firefighter?

A.    From 1982 until officially 1984.

Q.    Okay.  And while you were a firefighter, that was mainly about fighting fires, right?  You weren't investigating the cause or the origin of fires, correct?

A.    No, it's not correct.

Q.    Okay.  Tell -- explain to me what involvement you had as a firefighter in investigating fires.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

A.   In 1986, I went through the -- the modules, and then I went to the police academy, and then I went into bomb and arson in the City of Harvey, and I investigated the fires through the City of Harvey Bomb and Arson Unit.

Q.   Okay.  And when was that?

A.   From 1986 until the time I retired.

Q.   Okay.  But I'm talking -- I was asking just about the time when you were a firefighter.  When you were a firefighter, you were just involved in fighting fires, right?

A.   No.  I did both.

Q.   Okay.  All right.  So when you were the fire lieutenant at the City of Harvey in 1982 and 1984, you were both fighting fires and investigating fires?

A.   Yes.

Q.   And then since 1984, have you -- been had any positions where you worked as a firefighter?

A.   Since -- no.

Q.   Okay.  And since then, you have just been working as a fire investigator; is that correct?

A.   Yes.

Q.   You've been working at Envista.  Is that -- am I pronouncing it correctly?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.    Envista Forensics since 2008; is that right?

A.    Yes.

Q.    And what is Envista?

A.    Envista Forensics is a forensic fire -- well, we have multiple units.  We have, you know, engineering staff.  We have, you know, the fire investigation.  But we have a fire investigation unit, and that's what we primarily do, is just do fire investigations.

Q.    And how many fire investigators would you estimate work -- have worked at Envista Forensics while you've been there at any given time?

A.    I have no -- at any given time?  Between 40 and 50.  Maybe more.  I'm not sure.  I -- because I've never kept track.

Q.    Is it a national company?

A.    Yes.

Q.    About how many fire investigators do you have in the Chicago office?

A.    In Chicago?  Two.

Q.    Two?

A.    Yes.

Q.    And are you responsible for supervising them?

A.    Yes.

Q.    As the regional technical leader, are you investigating many fires, or are you -- is that mostly a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

supervisor or managerial role?

A.   No.  I still investigate fires.

Q.   Are there any other -- since 2008 -- between 2008 and the present, are there any other entities that you work for, or do you, you know, do any work on your own as a fire investigator outside of your work with Envista?

A.   No.

Q.   And what is your salary at Envista Forensics?

A.   Approximately, like, around 143,000, I believe.

Q.   And are there bonuses that go along with that, or is it just a base salary?

A.   You can get bonuses.  It's mostly production based.

Q.   And how is -- how does compensation work?  Are you paid per case that you work on or hourly?

A.   I get a salary, and that's -- that's it.

Q.   Okay.  And then what are the general ranges for bonuses?

A.   Oh, I have no idea.  I don't get many of them.

Q.   Do you know what the metrics are for giving bonuses?

A.   There's a formula they have for production over a certain point.  I'm -- I'm not 100 percent sure,



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

so don't -- you know?  But it's -- if you are producing 80 percent of whatever their matrix is, then you get bonuses.  And if you're at 90 percent, you get a bigger bonus.  And, you know, if you're at 100 percent, you get a bigger bonus.  But it's based on production.

Q.    Okay.  And then what is the salary that's paid to a consultant at Envista Forensics?

A.    I'm not sure.  I'm not privy to that.

Q.    And what is TRC Solutions?

A.    TRC Solutions was a group that wanted to put a -- a forensic unit.  They're basically a hazardous materials group that did a lot of work in the Chicago area, and then they wanted to start a forensic unit doing fire investigations.  And so we went over there, and I worked there for a while.  And then they cut that section of it out, and then that's when I went back to -- I can't remember if I came here or -- I have to look where I went after that.

Q.    Okay. Yeah.  It looks like you came to Envista after TRC.

A.    Yeah.  I was working for EFI at that point, and we went to TRC.  And then when we left there, when they closed the program there, I went to Envista, which was -- oh, it was a different company name at that point.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

Q.    All right.  You have several guest lecture instructor positions listed on your -- last page of your resume.

A.    Yep.

Q.    Do you recall when you worked as a guest lecturer/instructor in these capacities?

A.    Most of that was when I was in the fire department in bomb and arson.  It was local municipalities and stuff that would -- I would teach at.

Q.    Have you done any of that in the last five or ten years?

A.    No, not since I've been at Envista.

Q.    Okay.  So this was all prior to 2008; fair to say?

A.    Yes, yes.

Q.    Okay.  And you haven't done any teaching since before 2008?

A.    Correct.

Q.    I didn't see any publications or any articles that you published.  Is it fair to say you haven't published anything related to fire science?

A.    No, I have not.

Q.    Okay.  Have you ever investigated a fire in a prison before?

A.    No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

Q.    Have you ever worked in or had been familiar with the inside of a prison other than when you went to look at the -- other than when you went to investigate this fire?

A.    Yes.

Q.    And when was that?

A.    In, I believe, 1978, 1979.  I worked at Cook County Jail.

Q.    Okay.  Were you a corrections officer?

A.    No.  I was a paramedic.

Q.    Okay.  And you worked specifically at the jail as a paramedic?

A.    Yes.

Q.    Okay.  Aside from that, have you had any other corrections experience?

A.    No.

Q.    When you go to investigate a fire, what are the questions that you are generally asked to answer?

A.    Where the fire starts, what are the potential causes, and how the fire spread.

Q.    Okay.  So those are the three main questions you answer?

A.    Yes.  It's origin and cause and, you know, that all entails that whole.

Q.    Okay.  So basically, you look at if you can

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

identify where specifically it started, what caused the fire to start, and then how it spread?

A.    Correct.

Q.    Okay.  And when you go to investigate a fire, there's an accepted methodology to use according to the guidelines, right?

A.    Yes.

Q.    Okay.  And explain that methodology to me.

A.    Well, the methodology, well, is basically the scientific method, which is you start with recognizing the problem.  Now, that's usually done before we -- I mean, we even get a call because they've had a fire, an explosion, or an incident, and they need to determine what happened.  So that's already determined prior to us getting the call.  And so is the next step, which is, you know, defining the need, is basically that we need to do an origin and cause investigation to determine what happened at the incident.

Then you -- excuse me, I need to -- you gather your information, data, and that data can be anything from interviews, electronic, you know, like, cameras, video, witness statements, burn patterns.  Everything that goes in the -- in -- you know, into your investigation, everything you see.  Fire department reports, police department reports, you know, what they

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

say, what they saw, all that goes into your data. And then you -- when you analyze that data, and then you -- from there you determine what your hypothesis is of what happened at the fire. So my hypothesis is A or B. And then you're -- the -- and the most important step is you try and disprove that. So you -- you don't want to try and prove yourself right because then you end up with confirmation bias. So the idea is to try and defeat the hypothesis that you've come up with. And once you've done that and examined your hypothesis or multiple hypothesis of what happened, then you determine your final hypothesis, and that's what we report on.

Q. Okay. And the hypothesis generally will be about the origin of the fire and the cause of the fire, right?

A. Yes.

Q. Okay. Those are the main things you're focused on usually, right?

A. Yes.

Q. Okay. Are there ever cases where you just can't identify the origin or cause of the fire?

A. Sure.

Q. Okay. And then there are -- fair to say there are other cases where you have a hypothesis, but, you know, it's -- you can't firmly say one way or the other

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

whether you identified the cause or the origin, correct?

A. Look, you have to kind of separate the origin and the cause. You can determine the origin, but you may not be able to determine the cause. So you know, they're separate.

Q. Sure. Sorry. I was lumping them together. But my question is: So sometimes you can identify an origin or a cause, either one or both, with a pretty reliable degree of certainty, correct?

A. Yes.

Q. And sometimes you're -- you just have no idea, really. You just say, it could be a lot of different things, and we don't have a good lead on what it is, right?

A. Yes.

Q. And then sometimes you're somewhere in the middle, and you're like, well, we've -- we think it's most likely this, but, you know, we can't tell for various reasons, right?

A. Correct.

Q. Okay. And it's important to document the level of certainty in any reports that you're giving, correct?

A. Yes. We don't put it in there, but there's some verbiage when we do, yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.   Okay.   And you talked about gathering data. Is that one of the steps after you define the need?

A.   Yes.

Q.   Okay.   And gathering data is an important step, right?

A.   Yes.

Q.   Okay.   And if I'm correct, according to the guidelines, one of the most important ways to gather data is to review the scene, right?

A.   Yes.

Q.   You want to make sure the scene is unaltered, right?

A.   Yes.

Q.   Because if things get moved around, you don't know exactly how -- that could interfere with your ability to determine the origin, cause, and movement of the fire, right?

A.   It can, yes.

Q.   Okay.   So would you agree with me that the -- generally the primary source of information about the fire is your own inspection of the scene, correct?

A.   It's one of -- one of the primary things, but yeah, I mean, there's so much data that goes into them, you know?  You know, witness statements and -- and that type of thing.  You know, video, photographs, you know,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

like I say, eyewitness statements, you know, police officers statement, all those things are part of the data.  You just can't, you know, discard it.  I mean, it's all part of the package that you put together when you're making your hypothesis.

Q.   Okay.  Understood.  So there's a lot that goes into it, and you want to consider all the relevant information, right?

A.   Correct.

Q.   But the best way to see exactly how the fire moved and things like that is to look at the scene.  Is that -- would you agree with that?

A.   Yes.

Q.   Okay.  You -- pictures of the scene are not quite as helpful as actually looking at it, right?

A.   Correct.

Q.   There can be problems with lighting and problems with seeing things clearly on a picture, right?

A.   Correct.

Q.   Different angles can distort how something looks, right?

A.   I don't know if it distorts it, but it, you know, can be harder to see.

Q.   Okay.  So -- but best evidence for you to do your most reliable investigation would be to actually go

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

look at the scene after the fire, right?

A.   Correct.

Q.   Okay.  And then if you don't have that, pictures can be helpful, but they're not as good as seeing the scene, right?

A.   Correct.

Q.   Okay.  I'm going to share what I will mark as Exhibit 2.  And this is your report, so I assume you have a copy of this in front of you as well?

(Plaintiff's Exhibit 2 was marked for identification.)

A.   Yes.

BY MS. PIERCE:

Q.   Okay.  That'll be easier.  You can -- I will refer to page numbers as well and also have it on the screen.

A.   Okay.

Q.   Okay.  So this is the report that you provided to Counsel for the defendants in this case, correct?

A.   Correct.

Q.   All right.  And you were asked to look into the possible origin and cause of the fire; is that fair?

A.   Yes.

Q.   Okay.  And this report should encompass all of your opinions about the investigation, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

A.    Correct.

Q.    Okay.  And you included all the opinions that you had in this report?

A.    Yes.

Q.    Okay.  I'm going to limit my questions about your report to what's actually in there, okay?  And I would like your answers also, you know, to be in response to what my questions are asking.

A.    Oh, I -- okay.

Q.    So in this case, the need that you had was to identify, if possible, the origin and the cause of the fire that killed Michael Smith; is that right?

A.    Yes.

Q.    Okay.  I didn't see in your report any opinions or explanations of how the fire progressed; is that correct?

A.    Correct.

Q.    Okay.  So that was not something you looked at here and not something that you're opining on in this report?

A.    In this report?  No.

Q.    Okay.  The -- as part of your work, I want to make sure I am looking at it correctly, you received several different sources of data, right?  So you went to the prison, and you looked at the evidence that had

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit O

been collected from the cell, correct?

A.    Correct.

Q.    And you physically inspected that, correct?

A.    Correct.

Q.    Did you actually touch it and, like, conduct any testing on it, or were you just photographing and examining it?

A.    I was just photographing and examining.  I wasn't allowed to touch anything.

Q.    Okay.  And so no testing or anything like that was done on the evidence that you looked at, right?

A.    Correct.

Q.    Okay.  So that was one source of data.  And then did you actually go to the cell block where the fire occurred?

A.    Yes.

Q.    Okay.  Obviously you couldn't -- the scene has been changed and cleaned up and repainted and all of that, correct?

A.    Yes.

Q.    Okay.  So you can't see any of the scorched marks or burns or anything like that that were there after the fire, right?

A.    Correct.

Q.    Okay.  And for that, you relied on the photos

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

that were taken by the fire marshal, correct?

A.    Correct.

Q.    All right.  And those photos are all included in your report, correct?

A.    Repeat that again, please.

Q.    The photos that you actually relied on are included in your report, correct?

A.    I think there were other photos in his report, but the -- the ones I -- there were ones I copied into my report, yes.

Q.    Okay.  And the ones you copied into your report are the ones that you feel support your conclusions in this report, correct?

A.    Correct.

Q.    Okay.  So if you didn't copy it in here, you might have reviewed it, but you didn't feel like it was needed to be included because it didn't support your opinion, correct?  Let me ask that differently.  When you created your report, you made sure to include the photographs that you thought were actually necessary to show and support your opinion, correct?

A.    Correct.

Q.    Okay.  So if you didn't include a picture, you reviewed it, but you didn't think it was necessary to support your opinion, correct?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

A.    Correct.

Q.    Okay.  And then did you look at any witness -- did you interview anyone, any witnesses to the fire?

A.    No, I did not.

Q.    Okay.  Did you look at any incident reports or any statements from any prisoners or any staff that were involved in responding to the fire?

A.    Yes.

Q.    And what statements did you look at?

A.    There was a report, I don't have it in front of me, from the state, you know, where the guards wrote statements of the events.

Q.    Let me pull it up and make sure we're on the same page.  This is -- this will be Exhibit 3.  It's the Internal Affairs Report of Investigation from March 7th, 2023.

(Plaintiff's Exhibit 3 was marked for identification.)

A.    Yes, I did review that.

BY MS. PIERCE:

Q.    Okay.  Aside from this document, did you review any other evidence that contained statements from witnesses to the fire?

A.    No.  Can I -- I just -- can I hold you one sec?  Can you scroll down so I make sure -- because I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

wanted to make sure that that's the entire report because there -- you know, I'm not sure if there was two of them or...

Q.    Yeah, absolutely.  I can --

A.    Yeah, yeah.  That -- that's -- that's the one with the statements from the -- from the guards.  So yes, that's the one I reviewed.

Q.    Okay.  And then -- so that is Exhibit 3.  And then I think based on what we received, you also reviewed what's called a critical incident report.  Let me share that.  I'll mark that as Exhibit 4.  Can you see that now?

        (Plaintiff's Exhibit 4 was marked for
         identification.)

A.    Yes.

BY MS. PIERCE:

Q.    Okay.  And so you received --

A.    Yeah.

Q.    -- this as well?

A.    Correct.  I did review that.

Q.    Okay.  This doesn't really contain witness statements per se, but it gives some description of the fire, correct?

A.    Correct.

Q.    Okay.  And then in addition I'll mark as

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Exhibit 5 the fire marshal's Report.  And I can scroll through this.  It's about 36 pages long.

(Plaintiff's Exhibit 5 was marked for identification.)

A.    Correct.

BY MS. PIERCE:

Q.    Do you recall reviewing this as well?

A.    Yes.

Q.    Okay.  Do you need me to screen -- I'm sorry.

A.    No.  No.  That's fine.

Q.    Do you need me to scroll through the whole thing?  Okay.

A.    No.

Q.    All right.  And this -- is there anything else that you reviewed or did when investigating this fire that gave you data to make your conclusions?

A.    The security video.

Q.    Okay.  The security video.  And you just reviewed one viewpoint of the fire, correct?

A.    Correct.

Q.    Okay.  Anything else that you reviewed?

A.    No, not that I recall.

Q.    Okay.  And while I have the fire marshal's report up, which again is Exhibit 5, did you review -- so the investigator who did this report is Jeffery

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

Roseboom, correct?

A.    Yes.

Q.    Okay.  Are you familiar with Jeffery Roseboom?

A.    Yes.

Q.    Have you worked with him before?

A.    He's been on scenes that I've been on, but I haven't worked one-on-one with him on, like, an investigation.  But there's been a couple of scenes that he was on that, like, I wasn't the lead on one of them, so I didn't have any interaction with him.  I saw him on the site.  And then a large fire where I was the lead on, he was there, but so was his supervisor, and his supervisor was actually the one doing the investigation for the state.

Q.    And do you have any -- based on your experience or his reputation, do you have any opinions about his work as a fire investigator?

A.    No, I do not.

Q.    Okay.  And you reviewed his report here, correct?

A.    Correct.

Q.    Do you have any criticisms of the methodology that he said that he used in this investigation?

A.    I don't know that he specifically stated methodology.  I don't recall it.  I mean, it might be in



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

there in, you know, whatever form, but I don't recall reviewing that particularly.

Q. Sure. Let me ask it a little differently. Did you -- do you have any criticism after reviewing his report of how he went about investigating the fire?

A. No.

Q. Okay. Do you have any criticisms or disagreements with his opinions?

A. No.

Q. Did you reach any opinions that you thought were contrary to his?

A. No.

Q. Did you provide any opinions that you thought he didn't provide in his report?

A. Say that again, please.

Q. Yeah. So he -- there seems to be a good amount of overlap between your reports; is that fair?

A. Correct.

Q. Okay. Did you reach any conclusions that you felt he did not reach or he omitted from his report?

A. No.

Q. Okay. So your -- for all intents and purposes, your conclusions are essentially the same as his, correct?

A. Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

Q.   Okay.  And you don't have anything additional to add or anything contrary to add; is that fair?

A.   That's fair.

Q.   Okay.  And you reviewed his entire report, correct?

A.   Correct.

Q.   Okay.  And Mr. Roseboom has a little bit better data than you in his investigation because he actually went and investigated the scene itself after the fire, right?

A.   Correct.

Q.   Okay.  So you would expect that his opinions would be slightly more reliable than yours if there were any differences just because he was able to actually go and get more data, he was able to see the scene?

A.   Can you -- because -- just because the reliable thing is kind of -- I -- just --

Q.   Yeah.  Sure.  He had more data to inform his opinions, correct?

A.   Yes.

Q.   Okay.  And so anytime you have more data to help your -- that helps make your opinions stronger and more reliable, right?

A.   Yes.

Q.   Okay.  You never want less data.  You want

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

more, right?

A.   Correct.

Q.   Okay.  And ideally, it's best for an investigator to be able to go in and see the scene after the fire?

A.   Correct.

Q.   Okay.  All right.  And we'll stop sharing Exhibit -- losing track -- Exhibit 5.  All right.  I'm going to --

THE WITNESS:  Well, can we take a break as long as you got a -- a lull in your action there?  Can we just take a break real quick?

MS. PIERCE:  Yeah, of course.  Of course.  Let's go off the record.

THE WITNESS:  (Inaudible).  Thank you.

THE REPORTER:  We're off the record.

(A recess was taken.)

THE REPORTER:  We're back on the record.  You can continue, Counsel.

BY MS. PIERCE:

Q.   Okay.  Mr. Besse, before we took a break, we were talking about your report, I believe so.  Or I was about -- excuse me.  I was about to pull that back up, so let me pull it up now.  I believe it's Exhibit 2. Okay.  So I want to ask you a few questions about the --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

what's written in your report. Do you have it in front of you now?

A. Yes.

Q. Okay. If you could turn to the first page, I think we'll start there. Okay. I want to look at the second paragraph in the overview section. You see where I'm pointing to?

A. Yes.

Q. Okay. So that section says, "Examination of the photographs of the incident report of the Indiana State Fire Marshal revealed that there was charring and mass loss to the combustible material in the center portion of the bed. Views from the underside of the bed showed discoloration and heat intensity patterns consistent with the fire originating in that area." Did I read that correctly?

A. Yes.

Q. And so when you say that the "discoloration and the heat intensity patterns are consistent with the fire originating in that area," are you able to conclude that that is where the fire originated?

A. From the examination of all the photographs, you -- yeah, you can determine that that -- that's the area where the fire originated, yes.

Q. And how -- what is the basis of that? Can you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

tell me how you reached that conclusion?

A.    Review of the photographs.  If you bring them up, we can -- I can show you, or I -- I can try and describe it to you.

Q.    No, no.  Let's look at the photographs.

A.    Okay.

Q.    So you included the photographs you were referring to here in the report, correct?  It's --

A.    That one right there.  Yep.

Q.    Okay.

A.    You can go to that one.  Well, that -- that, I put the area of origin, because there is burn material at the floor level right there, and on the bed.  And if you go to the next picture, you can see the burn on the bed, where that U-shape section, you can see on the back of it, all around that U-shaped piece, there's combustible material still there.  And then you see the -- the -- the fire itself consumed the material, and discolored the metal of the bed there.  That's why I say discoloration.  And you can see the discoloration also on the bottom of the bed right there, too, in the next photograph.

Q.    Okay.

A.    And I believe it's the next photograph.  Yes. So you can see underneath, and see the white area on

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

the -- the rail of the frame.  That's -- it's like a clean burn there, where all the soot burns off of that, because the area of origin's right there.  And it burns longer -- no matter how long this whole thing burns, that area burned longer than the rest of the unit did.  So that's why you have those clean burns, and that pattern like that underneath, and on top of the bed, that show that that fire originated in that area.

Q.    Okay.  When you watched the video --  Well, strike that.  The guidelines indicate that flashover of a fire can make it difficult to interpret burn patterns and colorations, correct?

A.    Yes.

Q.    Okay.  And that's because once there's flashover, there's an intense burn everywhere in the room, right?

A.    Yes.  But that doesn't always mean that all your burn patterns have been burned away.  Once it flashes over, it -- it -- you have to allow for the ventilation, you have to allow for the -- the burning of materials that continue, you know, that burn when the flashover occurs.  But still, again, you're also looking at how much material's left.  You have material left right there, and on top of the bed, you have material left. So even though it flashed over, and the surface of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

all that material on top of the bed was burning, that doesn't mean it just wiped out the burn patterns. They're still there.

Q.   Okay.  And was there a flashover in this fire, then, if I understand you correctly?

A.   Yes.

Q.   Okay.  And so I want to scroll back up to Page 2.  If I am understanding correctly, you're saying that the fire originated somewhere in this circle, correct?

A.   Correct.  Not -- it -- the circle itself is a little deceiving, because it does hit the toilet and that, and it didn't start in the toilet, or that far back.  I just couldn't make the circle more of an oblong area there.  But in that circle, you see at the bottom left-hand portion of the circle, is that melted mass that that power cord goes into, that was still attached to the outlet.  And you also see the front of the bed, where that burn pattern is, so that is all included.  I can't tell you 100 percent that it started on the edge of the bed right there, or on the floor right there, but it is definitely in that area.

Q.   Okay.  So you would say, excluding the toilet, if we could draw a line, and pulling the toilet out of that circle, it happened somewhere in that circle, then?

A.   Correct.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.   Okay.  And what degree of certainty do you -- would you put to that opinion about where the fire started?

A.   I have a high level of certainty in that.  And can I just show you one more thing while you're there?

Q.   Yeah.

A.   Look at the ceiling above that area, and you can see the -- the -- the spalling of the concrete, and the markings on the concrete.  Also, you get a clean burn, that's called a cone pattern when the fire comes up, and it hits the ceiling right there, and then it spreads out from there.  So that's another pattern that tells you, right at the ceiling level, that that fire starts in that area, and goes up to the ceiling.

Q.   Okay.  And does that look different in that part of the ceiling than other parts of the ceiling?

A.   Sure.  Look at the back left corner.  You can still see, you know, materials, you know, the, you know, the concrete, some of it had come down.  So you -- and you have that clean burn.  What a clean burn is when -- when the fire starts, soot starts attaching to everything, it's called smoke deposition.  And the -- as the -- because the surfaces are colder, so when the smoke comes up, it hits that -- that material, the walls and stuff like that.  But then as the fire progress,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

it'll actually burn off all the soot, even, and that's called a clean burn, because everything is burned off but the material itself.

Q. Okay. And so I just want to make sure that I understand the bases for all of your opinion about the area of origin of the fire. So you're talking about the -- if I have it right, the cone burns on the ceiling, right? And the differences between the burns on different parts of the ceiling, the way that the material seems to be burned off the side of the bed in a U-shaped pattern, and there's more material that still exists on other parts of the bed. And then the coloring, the darker spot underneath the bed, and the white spot on the side of the bed. Are those the things that supported your opinion about this area of origin?

A. Yes.

Q. Anything else that I missed?

A. I -- can you scroll down? Well, I can go through my report and my photos here.

Q. Sorry. You asked me to scroll down?

A. Yeah. I just wanted to look at my other photos. Yeah. Because you got -- yeah, the photos of the top of the bed, and the bottom of the bed. Yeah. That goes to the area of origin, and pretty well defines the area of origin.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.    Okay, great.  And if I understand correctly, you could not determine what actually ignited first, or what caused the fire; is that right?

A.    Correct.

Q.    Okay.  And I guess those are two different things.  Maybe I'll ask them separately.  So you could not determine what caused the fire, right?  The cause is undetermined?

A.    The cause as the ignition source, you mean?  Or -- because they're two separate things.  The cause -- the -- so, I -- I'll just -- if you can define what your ask -- want.

Q.    How do you -- so you talked about -- let me look back.  The questions you were answering were origin, and cause, right?

A.    Correct.

Q.    So how do you define origin?

A.    The -- the -- the origin is right there, where I showed you in the floor, and bed area, in the center of that bed area.

Q.    Okay.  And so I assume in some cases you can identify the origin with more specificity, you can identify the actual item that caught fire, but here you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

can't do that.  It's just a general area, correct?

A.   Correct.  And then you -- when you look at the materials that are there, there's cardboard boxes, there's clothing, there's the bed clothing, all those things.  You know, if you start the bed on fire, and the bed clothing starts to burn, it's going to quickly spread to clothing, or anything else that he's got in the area.

Q.   Okay.  And you don't know what caught fire first, you just think that -- you have identified some of the combustible things in the area, and -- but you can't say, this caught fire first, then this, then this, right?

A.   Correct.

Q.   Okay.  And then, so that is the origin, right? That is what you generally look at for origin, correct?

A.   Yes.

Q.   And then cause.  Tell me what -- how you would define cause?

A.   Well cause -- well, first you have ignition source, you have to have an ignition source, and all of that comes to the cause of the fire.  The cause is like if it's accidental, or if it was intentional or, you know, act of God, like lightning, or a earthquake, stuff like that.  So that's the causes of the fire.  The

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

actual ignition source is what we look for next, because once you find the area of origin, then you can go into what are all the potential competent ignition sources in the area.

Q.   Okay.  And so you identified some of the items that you believe you found there, but you couldn't determine what actually was the ignition source, correct?

A.   Correct.

Q.   Okay.  And then with regard to cause specifically, you know, whether it was accidental, arson, act of God, you could not determine the cause, correct?

A.   At the -- I mean, it would be speculation that -- whether he -- human act is not always an intention -- an -- an incendiary fire, or an -- an arson fire.  So if he's doing something that accidentally causes the fire, then it's still an accidental fire, but it's human made.  But then you have, you know, the other ignition sources that were in the area like that -- that tool that he had in there, and the, you know, the -- the computer equipment, and -- and we don't know what kind of smoking materials, if he had a lighter, or anything else like that in the area.  But those are all potential ignition sources, so -- but you -- you can't rule out,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

without having the material right there, and -- and you can't say, well, this one did it, and this one didn't, unless you have further studies into the electrical equipment and stuff like that there.

Q.   Okay.  Let me see if I can break that down a little bit.  So just to back up, and make sure, you didn't see anything that you would call a smoking device, right?

A.   No.

Q.   Okay.  I didn't see anything like that in your report.  I just wanted to confirm.  And did you -- could you determine whether the fire was intentionally or accidentally set?

A.   No.

Q.   Could you -- and you were unable to determine the specific ignition source, correct?

A.   There were competent ignition sources there, but which one failed, or if they failed, or how they failed, or if it was just that heating iron too close to combustibles, I mean, you -- you can't tell exactly what the ignition source is there.  We have to determine whether there was a competent ignition source in the area of origin, and there was.

Q.   Okay.  And you -- when you say heating iron, what are you referring to?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit O

A.    That little tool that he made.  If you go into -- well, you go to the bottom of my report. I don't think it's in -- well, it's in my -- yeah. The last page, Paragraph 11, or the photo of -- that's -- you just went past it there.

Q.    Sorry, Page 11?

A.    You can -- yeah, you can -- it's on -- it's on both that, and my report.  So --

Q.    What page of your report?

A.    Hold on.  It was Page 7.  I'm sorry.  Page 7 of my report.

Q.    Okay.  Page 7 of your report.

A.    Yeah.  One more down.  I'm sorry.  I moved the pages.  Page 8.  I lied.

Q.    Okay.

A.    That tool there.  If you look at it, it's got electrical conductors attached to each side.  So some of it's speculation, some of it's just -- but that appears to be a heat-producing advice -- device, I mean.  Most likely if he is this repair guy that everybody said, that he was melting solder joints with that in the circuit boards, and that type of thing.  So he would heat that up, and so if he heats that up to melt solder, even if the solder drips, that's an -- a competent ignition source.  If he sets that down, that's a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

competent ignition source.

Q.    Okay.

A.    If it's plugged in, even if he doesn't put it anywhere, and the cord fails, because it's being overheated by a non-manufactured heating device, the cord could fail from continual abuse of it.  So the cord laying in the clothing, or on the bed, or anything else is also a competent ignition source.

Q.    And where do you see a cord?

A.    It's not in that picture, but there are pictures of it with the cord.

Q.    Can you tell me what picture you're thinking of?

A.    Yeah, I'm -- I'm -- well, Photograph 16 in my report shows that with the cord going into it, and the photos before it follow the cord into that melted mass.  And that melted mass is -- when you see the fire marshal's photos, you see him holding the cord coming out of the outlet.  So it's attached to the outlet, and that cord comes down into that melted mass there.

Q.    Into this melted mass?

A.    Well, that -- pardon me?

Q.    Into this melted mass right there?

A.    That -- correct.  And when you -- you can see it in his photos, the fire marshal's, when he's standing

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

there, you can see the melted mass on the floor, and he's holding the cord.  And so you can follow it right from the melted mass, right up into the outlet, and it's still attached to the outlet.

Q.    Okay.

A.    Now --

Q.    And the cord, is that is coming from the melted mass, not this little tool right here, correct?

A.    No.  The -- the -- the cord comes out of the melted mass to that tool.  So the only thing we can't decide, unless you X-ray the -- the melted mass is, because there's two cords in it, which cord was plugged into what?  And did the cord fail?  So if you x-ray that, you might be able to see the cord failure, you may be able to see arcing in the cord if it failed that way, but you can't see.  But we can see that that cord goes into that melted mass, and the cord goes from the melted mass to the outlet.

Q.    Okay.  So you can see that this cord is like wrapped around this melted mass right here, correct?

A.    Well, it's melted into it.

Q.    Okay.  Are you confident that it is melted into it from looking at the picture?  Or did you actually try to touch it, and see if it was removable from that (Inaudible).

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

A.    No.  When you -- when you flip over the mass, if you look at the pictures before that, Picture 15 and 16, and -- and 14, that's all that cord coming out of that melted mass, and it is melted down into the mass. So we -- you couldn't remove it.

Q.    Is this -- is it the same -- that cord, to me, looks different than the one down here?

A.    No.  Well, there's -- well, that part is different, but you can see that there's a little connector there also.  So you know, this is a homemade device, a homemade cord, it's not going to be, you know, like you would think in a manufactured cord/device.

Q.    Okay.  And the cord that is plugged up into the outlet in the picture from the fire marshal, you don't know whether that is in any way connected to this tool, right?

A.    We don't know.

Q.    Okay.  All right.  And you don't know whether this tool caused the fire, right?

A.    I do not know.

Q.    And you don't know --

A.    I know it's --

Q.    -- if it was plugged into anything at the time, correct?

A.    Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.   Okay.  All right.  And this is another picture of that tool; is that right?

A.   Correct.

Q.   Okay.  All right.  I want to go back up to Page 1.  So I want to look at this paragraph about the outlet.  You did not see any evidence of tampering or anything with the outlet, correct?

A.   I don't know what you mean by tampering.

Q.   Sure.  You didn't note here that it looked like the outlet had been tampered with, or destroyed, or anything like that, correct?  Other than by burning in the fire?

A.   Well, one of the cords was pulled out of it. But -- so I --

Q.   When you say a cord was pulled out of it, you just mean one of the sockets was empty, right?

A.   No.  One of -- they're both -- the -- they're both occupied with plug material.  So there's a plug in both of them.  One of the conductors and the plug spades had been pulled out of the one side of the socket. See, I show right there, that there's two holes in the -- the -- the socket.  So if that thing burns up, and it just falls off of there, the cord would, one, would be in it, and two, it wouldn't have the two holes there.  So if -- the way it sits is those two holes

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

are from the plug spades being removed when -- most likely during firefighting efforts, and -- and getting into the -- and, you know, if the cord's extended, you know, they step on things, they pull things.  They don't, you know, it's not tampered.  They didn't intentionally pull the cord out, but the cord is out of that plug.  But the remains of that plug is still there.

Q.  Got you.  Okay.

A.  And the plug below it -- and the plug below it's still there with the cord, so --

Q.  Okay.

A.  -- and that's the cord that goes down to the mass.

Q.  Okay.  So if I understand you correctly, the plug is still there, but the cord is no longer intact.  And in your experience, that happens regularly during firefighting, and things like that; is that fair?

A.  Correct.  Yes.

Q.  Okay. Okay.  And you said -- sorry, I'm going to go back up, giving everybody whiplash.  You said at the bottom of this paragraph about the outlet, "The outlet was ruled out as a potential ignition source in this fire."  Did I read that correctly?

A.  Yes.

Q.  Okay.  And I want to (Inaudible) that I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

**Exhibit O**

understand this.  So you're saying that the outlet itself did not catch on fire, and start the fire, correct?

A.   Correct.

Q.   Would you agree with me that it's still possible for electrical systems to cause a fire without it actually igniting at the outlet itself?

MS. KWAIT:  Objection.  Form.  Foundation.

BY MS. PIERCE:

Q.   So let me give you an example.  So if there are electrical systems that are unstable, they have unstable levels of power, or they have regular surges of power, that can damage electrical equipment that's plugged into it, right?

A.   I'm not an electrical engineer, so I'd be just -- but yeah, I mean, problems with the power system can affect -- like if you have a computer plugged in, that does happen, but -- so I'm not sure exactly what you're looking for.

Q.   Sure.  And so do you know anything about whether or not surges, or unstable power can damage things plugged into it in a way that later causes a fire from the damage caused to the electrical item plugged into it?

A.   Kind of hypothetical, because it didn't start

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit O**

there in this case, so I'm just not sure which case you'd be, you know, thinking of, or look -- you know what I'm saying? Because it's not -- it's not here, so that's kind of a hypothetical, that the -- a power problem could cause an outlet to fail, but it didn't in this case. So I'm not sure (Inaudible) --

Q. And how do you know it didn't happen in this case, that there wasn't unstable power or a surge of power?

A. I don't know that there was a -- that's not the answer. That was my point. My point is it didn't start at the outlet.

Q. Sure. Sure. But I'm trying to figure out, even if a fire doesn't start at a outlet, if there are ways that an electrical system itself can contribute, or cause a fire, even if the fire doesn't start at the outlet.

A. Yeah. Well, then it would be like if you had a computer plugged in, and you have a power surge, or that type of thing, and I've seen it, you know, damage computers mostly, but I -- in some instances, it could start a fire in the kind of computer, or a small appliance like that.

Q. Okay. And if you had that kind of power surge, you wouldn't see any indication on the outlet,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

right?  You would just -- it would just surge through and damage the equipment that was actually attached to it, right?

A.    You'd have to ask an engineer that.  That's over my skis.

Q.    Okay.  But you don't have any reason to disagree with that, right?

A.    Agree or disagree.

Q.    Okay.  So based on your experience and training, you do understand that a power surge could at some point cause a fire to start in a computer, or something that's plugged into an outlet, right?

A.    Correct.

Q.    Okay.  And you don't have any expertise about whether that would show damage to the electrical outlet, or anything like that, right?

A.    That's, again, well past my, you know, my training and education.

Q.    Okay.  So you can't rule that out one way or another as the cause of the fire, right?

A.    Correct.

Q.    Okay.  On -- I'm going to go down to Page 2, if you could switch to Page 2 of your report.  So you wrote here, "An unknown homemade device," and -- describing the things that you observed in the cell.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

The last one you wrote is, "An unknown homemade device with conductors attached in the melted floor mass." Is that the item we've already been looking at?

A.    Yes.

Q.    Okay.  Okay.  And can you explain to me every basis you have to conclude that that device is a Heat-producing device?

A.    Sure.  You have opposing conductors coming into it, so -- and when it goes into metal, and you -- then it would get hot, and that makes sense why he's got a wood handle attached to it, because you -- if you plug that in, it's going to get hot.  It's pull -- it's the opposite sides of the electrical system, so you have a negative and a positive to a metal piece, and they have resistors, what appear to be resistors in there, so it doesn't arc across it.  So it's -- it -- it would be a heat-producing device.  Whether it -- it was an intentional or not, I don't know, but that's what it would appear to be.

Q.    When you say whether it was intentional or not, what do you mean?

A.    I don't know if he was intentionally trying to make a heat-producing device, but that's what he -- what was made there.

Q.    Okay.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

A.   Don't know if he made it.  That's what was made there.

Q.   I see.  Okay.  Have you ever encountered another device like that before?

A.   No.

Q.   Okay.  And again, you don't have any training in electrical engineering or any engineering training?

A.   No.

Q.   So I want to just look at the bottom of Page 2.  It says, "The cause classification of the fire is undetermined."

A.   Correct.

Q.   Okay.  So you are unable to determine the cause of the fire, correct?

A.   As to cause classification.  There are parts of -- that encompass, that includes first material ignited, and the potential ignition sources, and what brought them all together.  That's the cause of the fire.  Because I can't rule out one piece of the electrical system there, say that -- the heat-producing device, say it's not plugged in, but that doesn't mean that one of the other cords that are plugged in, or one of the devices he has there, or his little fan, you know, cord, one of those failed.  So you have -- you have competent ignition sources.  I just can't rule out

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

which one did it.  They're there at the area of origin and, you know, you can't rule out human interaction either, so...

Q.  Okay.  I get it.  So if I just want to make sure that I -- we're on the same page.  So you've identified a number of possible ignition sources, and you've identified combustible material, but you can't say what caused fire first, and what item actually failed, or caused the fire, right?

A.  Exactly.

Q.  Okay.  And you say you can't rule out human involvement, but you don't know whether anyone in the cell did something that actually ignited the fire, right?  It's possible that Mr. Smith was sleeping, and one of the devices failed, and the fire started, correct?

A.  Well, I'll say he wasn't sleeping, because in the video, he's up and down and, you know, moving around.  So he wasn't sleeping, and -- but I don't know what he was doing behind that curtain.

Q.  Okay.  Sure.  And so you don't have any -- you have not concluded here that he himself did something that started the fire, correct?

A.  Correct.  It is a possibility, just like the other things are possibilities.  They're there.  It's a,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

you know, it's a potential.  It just can't be ruled out.

Q.    Okay.  Understood.  Okay.  I want to just -- these notes with the photographs, where you provided this -- a description, those are things that you added, correct?  That's not a description that was provided by the fire marshal?

A.    Correct.  Those are my descriptions.

Q.    I wanted to -- see -- sorry, give me one second.

A.    Not a problem.

Q.    So here, this other item, you said there was a -- "a fan motor, and porcelain light fixture were recovered," and that the photographs, "Show that the fan motor was connected to the light fixture, and had lightweight conductors attached.  This is" --

A.    Correct.

Q.    -- "a possible homemade device."  Were you actually able to inspect these items, and see that they were connected?  Or did you get that just from the fire marshal's photograph?

A.    His photographs show it connected, all connected together.  When I examined the evidence, they were together in the bag together, but at that point, they had separated.

Q.    Okay.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

A.    The conductors were still there, fan motor was still there, the socket was still there, but the socket was dented up.  It was all there together.

Q.    Can you tell me what photograph you are relying on for this?  It's, I think -- let me see it. Is it 10117?

A.    Well, is this -- this on my -- well, this is -- well, if you look -- well, that's a different report.  It's not in the report.  It's in my Goodnotes. Oh, well, let me look through -- I didn't go through my photos yet, hang on, in my report.  Hang on.  Okay.  If you go down -- I don't know if it's -- it really doesn't have a page number, but my Photograph number 28, in the bottom of my report, there's a picture of what appeared to be like a grinder wheel, and the motor from the fan.

Q.    So Photograph 28.  Give me just a second to get there.

A.    No problem.

Q.    Okay.  So this is a picture of it when you went to inspect the evidence, correct?

A.    Correct.  And yeah, that's -- there's other photos in the Goodnotes thing, but that's it.  The -- and then the next photo, 29 is -- it looks like another one of those heat-producing devices that -- an earlier version, but it's the same configuration, but there's no

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

wood, or anything attached to that.

Q.    Where are you seeing that?

A.    Photograph number 29.  Next page.

Q.    Okay.  Okay.

A.    That one right there.

Q.    All right.  And the -- none of these were connected at the time that you went and inspected them, correct?

A.    Correct.

Q.    And then let me -- I have the photograph that you referenced from the fire marshal, so let me pull that up.  And again, the fire marshal's report is Exhibit 5.  So this is Page 19 of Exhibit 5.  So this is the photograph where you say the light fixture is plugged into the fan.

A.    Well, the fan motor is into the light's fixture.  In one of the earlier reports, it says that he was disciplined for destroying a light fixture in his room.  And -- and that's -- I can't swear to -- it's that, but I mean, that's the only place I know he would get one of those to plug that motor into.  So that way you can hold the motor, because it's in the light socket, and in the -- you can see the conductors coming out of the bottom of that.  And so that's the -- the light socket, and the fan with the -- the conductors

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

coming out of the bottom.

BY MS. PIERCE:

Q. Okay. So I want to back up. You are referencing some disciplinary reports. You didn't actually review any disciplinary reports, correct?

A. No, it was just mentioned in one of the state reports.

Q. Okay. And then here -- so this is a broken light fixture in his hand; is that right?

A. Yeah, it's like a porcelain light fixture.

Q. Okay.

A. Like -- exactly like the one he's got hanging on the wall in his unit.

Q. Okay. And you can't actually -- there's -- so is this the wire that you're referring to back here?

A. Yes.

Q. Okay. You can't actually tell from this photo whether that is plugged into a fan down there or whether it's plugged into the light fixture, right?

A. It won't plug into the light fixture. It'll -- it would plug into, like -- be attached to conductors and then plugged in in the -- the outlet.

Q. Okay. So you -- but you can't -- so I'm just trying to understand what exactly you see. I don't see any conductors here, do you?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

A.    Yeah, they're right down at the bottom.  I wish I could point them to you.  If you trace -- okay. You've got the very tip of the -- if you put your cursor on the tip of the -- the -- the spindle that goes around, and then go straight down, you will go -- yep. And keep going.  You'll go past that little -- that's the screw hole where the -- it screws into the wall. And just below that, you pass the white -- now right there, you're on the conductors.  You're on one of the conductors there.

**Q.    This wire?  This thin wire?**

A.    Yeah.  That's -- there's two wires there. One for -- like any other plug, one from each side.

**Q.    Okay.  And you are saying that that is connected to this light fixture, right?**

A.    Yes.  It's -- he is basically using it to hold it.

**Q.    Okay.  So it's this wire down here, you're saying that you can tell from the photo it's connected from the -- to this light fixture in his hand?**

A.    Yes.  Because when you go to my photos, they're still connected.

**Q.    I thought you said they weren't connected in your photos?**

A.    No, it's -- the -- the motor is not connected

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

to the -- the porcelain light fixture anymore, but the wires are still there on the motor in --

Q.    Okay.  And --

A.    -- Photo 28.

Q.    Okay.  All right.  But I want to be clear, in this picture alone, you cannot tell that whatever these conductors or -- it looks like a wire to me.  You're calling it a conductor.  You cannot tell just from this photo alone that it is connected in any way to that light fixture, right?

A.    Correct.

Q.    Okay.  And then can you identify the photo for me in your report that shows that the motor is connected to this light fixture?

A.    Photo 28.

Q.    Where is the light fixture?  Oh, I --

A.    Oh, the light fixture is not there.  I'm sorry.  That's the motor.  The light fixture, let's see if I have a picture of the light fixture.  It would be in my Goodnotes photos.  Does she have that at the end of -- do you have my Goodnotes photos at the end of my report?

Q.    I do.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

A.    Okay.  Okay.  So if you go down past the cover page.

Q.    I'm on Page 38 right now, and it looks like this is possibly the light fixture, but that doesn't look like it's connected to anything.

A.    I'm trying to get there.  Sorry.

Q.    Yeah.  I think 38 is the right page for that.

A.    Yeah.  I don't have page numbers on this, so it's on -- it's okay.  Okay.  Where it says -- okay. Scroll.  I just want to make sure I'm on the same page as you.  Can you scroll up?  It says, "Bag number two with cardboard boxes and miscellaneous parts."

Q.    Okay.

A.    Okay.  Yeah.  If you look in the picture in the bottom right corner, it's got the fan motor there and there's the metal -- there it is.  Do you see the big blob to the -- up in the upper right corner?

Q.    Yeah.

A.    Okay.  Now go straight down from that on the right side, and that's the porcelain fixture there.

Q.    Okay.  And --

A.    And then there --

Q.    And none of that stuff is connected, right?

A.    Right.  It's not connected.  And the metal is -- you'll see, I do closeups of it a few pages down.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

And there's the motor. And yeah, I -- I have the -- the fan -- the back of the fan, you know, that attaches to the motor. It just shows that it was removed from the fan. But I do not have a picture with the porcelain and the metal -- there, on the very last page. I'm sorry. It's not the last page. Pretty close to it. It says, "Light socket seen in fire marshal's photos with the fan motor." So the socket is there with the porcelain, but -- so you have them, but they're just all separated. There's the fan motor.

Q. So right here?

A. Nope. Keep going. Has the motor backing and the motor together. And keep going. That's the circuit board. That -- right there. Well, you can -- if you can scroll out, that -- that's the socket itself, the metal part of the socket, and the porcelain fixture that the state fire marshal was holding.

Q. Okay. And to be clear, they're not connected to anything, right?

A. Not at this time, no. They're separated. They -- I'm not sure when they got separated.

Q. Okay. And the only basis you have to say that they were connected is that photo we talked about from the fire marshal P10117, right?

A. When he was holding -- yeah, he's holding it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

and --

Q.   Okay.

A.   -- taking a picture of it.

Q.   And I said that I can't tell that anything is connected to that -- in that photo.  And I think you agreed, correct?

A.   Well, I agreed that the wires aren't connected to anything.  The -- the motor is definitely connected to the -- the light fixture in that photo.  I just can't tell you where -- what the cord was attached to because the cord was either broken off or melted off, burned off.  I don't know.

Q.   I see.  Okay.  So you're saying that motor in there is the fan motor.  Is that what you're saying?

A.   Yes.

Q.   Okay.  Have you ever had any experience with identifying or making homemade electrical devices like this?

A.   Not like that.

Q.   Okay.  When you say not like that, what do you mean?

A.   I mean, I just would never -- I've never -- I would have to go back and -- I mean, I don't make a lot of electrical devices.  So I would say no, I've never made an electrical device like that.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.   Okay.  And have you had much experience with, like, repairing fans or taking fans apart or building fans?

A.   I've taken them apart and we find them burned in fires a lot.  And so, you know, you trace the cords down and stuff like that.  So it's -- I mean, finding the back that I -- was in the other photos, that backing, that's how I could tell it was the backing of the -- the fan, because we see them all the time in fires.

Q.   Okay.  And that thing, that item that is in the fixture, you are 100 percent confident from your experience that that is a fan motor?

A.   Yes.

Q.   Okay.  And that's from seeing fan motors in other fires?

A.   Correct.  And -- and you look at -- in the photos inside, there was a picture of the melted -- the plastic part of the fan is still there.  So you have --

Q.   Can you tell if the motor is missing from that fan?

A.   Yeah, it's just a melt -- just a melted cage. So you have the melted cage in one photo.  Then you have the motor with the light socket in another one. So -- and the backing is still in all that.  So you have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

all the pieces of the fan.  They're just not together as a fan.

Q.    Okay.  And you can affirmatively tell from looking at the photos that the motor is not in the fan?

A.    From what I can see in the photos, no.

Q.    Okay.  So how did you determine that there is no motor in the fan after it's been melted?

A.    Because I look at the photo.  I mean, you can see pretty clearly the melted cage.  Let me see if I --

Q.    Can you tell me what photo you're looking at?

A.    I'm going to try.  My Photo 12 on Page 8 of my report.

Q.    Okay.  So you're able to tell this is the -- oh, sorry.  I'm not sharing it with you.

A.    That's all right.

Q.    You have Photo 12 in front of you?

A.    Yes.

Q.    Okay.  So looking at this photo here, that is the fan?

A.    Correct.  The fan cage, the plastic cage for it.

Q.    Okay.  And you are -- because, again, it just sort of looks like a melted heap of plastic to me. You're able to confirm that there's no motor in there?

A.    From visually inspecting it, no.  And then we

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

have the -- the back plate that's in other areas, too. It's not with the fan.  So when you have that fan, it -- that -- that metal backing is where the fan and everything attaches to, and the -- the plastic, all that, you know, attaches to that back plate.  And the motor goes through it, the shaft of the motor.

Q.    Okay.  I just want to make sure I understand. From this photo, you agree with me that you can't tell whether there are components of the fan missing, right?

MS. KWAIT:  Objection.  There's no -- which photo are we looking at because there's nothing up on the screen?

THE WITNESS:  12.

BY MS. PIERCE:

Q.    The same photo, Photo 12.

A.    Photo 12.  There -- there -- the only portion of the fan that is there is the plastic cage, the -- the -- around the fan itself.

Q.    And how can you determine that from looking at the photo?

A.    Because you can see it's right there.

Q.    But how can you determine there's nothing else in there?  It's a big blob of melted stuff, right?

A.    Yeah, but you can see through it.  I mean, you can see papers underneath it and stuff like that.  So

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

it's not like the fan is together, and the backing's there and the motor. I mean, it would all still be there together.

Q. Let me just share the photo.

A. Okay.

Q. It's here. So you're telling me this photograph here, Photo 12, you can see through it to see the other side of the paper?

A. No. No. That's the wrong photo.

Q. Okay. You said Photograph 12 of your photos, right?

A. It says -- go to Page 8 of my report, please.

Q. Oh.

A. There, that's Photo 12.

Q. This is Photo 12. So this is not your photo. This is the fire marshal's photo, correct?

A. Correct.

Q. Okay. All right. I'm glad we did this so we can confirm we're on the same page. Okay. So this is what you are basing on -- you're basing your opinion on the fact that the motor has been removed on this photo, correct?

A. Correct.

Q. Okay. And it -- your opinion is that you can see through and tell that the motor is missing?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

A.    It appears to be missing, yes.

Q.    Okay.  And that is the entire basis of your opinion, that the motor has been removed, correct?

A.    Yes.  Well, except for we have the motor.  I mean, it's not like he had -- well, there wasn't multiple fans in there.  You know what I'm saying?  There was -- wasn't multiple plates in there.  There was just one fan in disassembled pieces.

Q.    Okay.  We'll stop sharing that.  All right.  I'm going to share with you what I'll mark as Exhibit 6.  And this is your invoice in this case.  And this is -- does this reflect all the charges that you have sent to Defense Counsel in this case?

(Plaintiff's Exhibit 6 was marked for identification.)

A.    I would imagine to this point.

BY MS. PIERCE:

Q.    Okay.

A.    I mean, I just turned in the sheets.  The admin does all that.  I never see the invoices.

Q.    Okay.  And the amount you -- this amount that Defense Counsel pays is paid to Envista, right?  Not to you directly?

A.    Correct.

Q.    All right.  Were there any items that you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

asked to review or that you wanted to review, but you weren't able to?

A.   Yes.

Q.   And what was that?

A.   The digital photos from the state fire marshal.

Q.   Okay.  So you just had the fire marshal report, right?

A.   They're pretty good.  I mean, I excluded one of the outlet because it was blurry.  But, you know, out of the photos I got, they were pretty good, but I would always like to see the digitals in -- because there's always digitals that aren't -- like, I didn't put all his photos in my report.  I'm sure he didn't all his photos in his report.  So I'd like to see all the photos that were taken that day.

Q.   Anything else that you weren't able to see that you wanted to?

A.   Just the inside of that melted mass.

Q.   And that's the one with the fan in it that we were just talking about?

A.   No.  The -- the heat-producing device cords are in it.

Q.   Oh, the other one, you wanted to see the inside of that?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

A.    Correct.

Q.    Okay.  But you weren't able to do that because you weren't able to handle the evidence, correct?

A.    Correct.

MS. PIERCE:  Okay.

All right.  I don't have any additional questions.

MS. KWAIT:  Okay.  Can we take a bathroom break about ten minutes?

MS. PIERCE:  Sure.

THE REPORTER:  Yeah.  We're off the record.

(A recess was taken.)

THE REPORTER:  Okay.  We're back on the record.

You can continue.

CROSS-EXAMINATION

BY MS. KWAIT:

Q.    Mr. Besse, you were asked about whether or not you've ever had an experience investigating fires in prisons, and you answered no, that's correct?

A.    Correct.

Q.    I'm sorry.  Sorry.  You answered no, correct?

A.    Correct.

Q.    Yeah.  But have you ever investigated fires that are in enclosed spaces before?

MS. PIERCE:  Object to form.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

THE WITNESS:  For most -- pardon me?

MS. PIERCE:  Object to form.

Go ahead.

THE WITNESS:  Yeah.  They're -- the compartment fires are compartment fires, depending on the size of them.  Bedrooms are a compartment fire, kitchens. You know, most of them are enclosed, you know, compartments.  So it's the same basic thing except for this is all concrete instead of, you know -- and there's -- I'm not sure about paint on the wall, because paint is a combustible material, so there wouldn't be paint that -- as such on the walls.

BY MS. KWAIT:

Q.   And so this is -- this compartment fire that occurred in this prison cell is similar to previous compartment fires that you've investigated over the course of your career?

A.   Correct.

MS. PIERCE:  Object to form.

THE WITNESS:  Sorry, my bad.  I'll give you more time.  I'm sorry.

MS. PIERCE:  Thanks.

BY MS. KWAIT:

Q.   Okay.  And before you were talking about the way that the fire progressed, you were asked if you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit O**

didn't have -- if you -- whether or not you had any opinions on how the fire progressed; is that correct?

A.    In my report, there's not, but well, the video, I mean, you can see how the fire progressed.

Q.    Okay.  But --

MS. PIERCE:  Objection.  Hey, Julia, we talked about this last time.  You cannot put certain opinions in his report, and then expand his opinions at his deposition.  That is totally unfair.  We have no opportunity to respond to it, and it's just really improper.  I have a objection just as I did at the last deposition to you trying to expand his opinions that are not in his report.

MS. KWAIT:  I'm not trying to do that, Megan. I'm going to get to the -- his report so I can talk to him about it, what's in his actual report.  Can you just give me a second, and I'll get there?  And you'll see that's not what I'm trying to do, okay? That sound good?  Okay.

BY MS. KWAIT:

Q.    Just a moment.  I'm going to share my screen really quick.  Sorry.  I'm in the exact wrong place in my whole thing here.  Okay.  We're looking at your report, correct?

A.    Oh, yeah.  There it is.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

Q.    Okay.  And now, there is a -- in your report, there is an opinion that you put in Page -- this is Page 2, correct, of your report that I'm looking at?

A.    Yes.

Q.    Okay.  In this report, you state, "The first material ignited was the available combustible materials in the cell, including cardboard, clothing, papers, and bed clothing"; is that correct?  Did I read that right?

A.    Yes.

Q.    Okay.  And so as part of your opinions, you're discussing that there was a -- there was something that ignited the fire; is that correct?

A.    Yes.

Q.    But what -- but from the ignition source of the fire, there's something that -- there's combustible materials; is that correct?

        MS. PIERCE:  Object to form.

        THE WITNESS:  Yes.

BY MS. KWAIT:

Q.    Okay.  Can you explain that a little bit more about how this works from the ignition source to the combustible materials?

        MS. PIERCE:  Object to form.  And I'm going to object to this as, again, outside of the scope of his opinions.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

MS. KWAIT:  I'm asking questions about his report right now.

BY MS. KWAIT:

Q.    But please answer.

MS. PIERCE:  I made my objection on the record.

THE WITNESS:  Okay.  Yeah, you have -- and -- and there's -- that's why there's three parts of the fire investigation that -- well, parts of the report, because then you have -- where the fire is, you have what materials are there that could be ignited and the competent ignition source that could ignite those.  So in the cell, there are -- in the -- the photos in the -- the materials that I looked at, at the jail or the prison, excuse me, there were combustible materials in there, cardboard boxes.  There was parts of clothing.  Parts of clothing was stuck to some of the power cords.  So you -- you definitely had the -- there was available combustible materials there, the bedding's there, so we know that, and what amount of clothing or whatever he -- but he had to have some type of clothing and that but that's the -- the available combustible materials that I'm talking about in there.  You know, there's multiple ones in there. So you have a lot to choose from.  Any one of these

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

can be ignited by those ignition sources.

BY MS. KWAIT:

Q.    So once one of those is ignited.  That can actually start a fire going; is that correct?

A.    Well, it spreads from there through, you know -- you know, the closer or whatever the material is burns and then it ignites, you know, other things that are close to it, and it spreads.  And obviously you can see it spread through the unit to the point where it flashed over.  So there was enough material in there -- combustible material in there to progress the fire enough to get it to go to flashover.

        MS. PIERCE:  And I just -- I couldn't get my
    objection in there, but I was trying to object to
    form to that question.

        THE WITNESS:  Oh, I'm sorry.  I -- I promise
    I'll -- I'll try.

        MS. PIERCE:  Don't worry about it, Mr. Besse.
    If you could pause for a moment, that would help,
    but not a problem.

        THE WITNESS:  I'll try.  I'll --

        MS. PIERCE:  I'll just repeat it afterwards if
    I can't get it in before.

        THE WITNESS:  Sorry.  I -- I kind of look at
    you, but now I'm looking at the report instead of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit O

looking at you.  So it's harder to think about you -- that you're still there.  So I'm sorry.  Go ahead.

BY MS. KWAIT:

Q.  You were asked about the fact that you reviewed Mr. Roseboom's report.  Do you remember that?

A.  Yes.

Q.  Okay.  Did you have enough data to form your own opinions?

MS. PIERCE:  Object to form.

THE WITNESS:  Yes.

BY MS. KWAIT:

Q.  Did you have enough pictures to form your own opinions?

MS. PIERCE:  Object to form.

THE WITNESS:  Yes.

BY MS. KWAIT:

Q.  Okay.  And did you do your own analysis to form your own opinions?

MS. PIERCE:  Object to form.

THE WITNESS:  Yes.

BY MS. KWAIT:

Q.  Okay.  And previously, you were asked about a flashover.  What is a flashover?

A.  A flashover is where it -- it transitions from

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

just a -- a -- a fire of materials in the unit to it transitions to a -- a fire where all the available combustible -- the -- the combustible materials that it's exposed will ignite due to radiant heat.  So when you think about it, the things that are burning are -- are spreading to the ceiling, and the ceiling is starting to radiate heat down.  The walls are radiating heat down.  The burning material is radiating heat down.  So you get all this radiated heat and at some point -- and you can actually see it.  And if the videos are good enough, you can actually see the material on the floor start offgassing, and you can see the gases rise because you have to turn it to a gas to burn.  So those gases rise, and they ignite, and everything that's exposed in that unit will start on fire, and it definitely went to flashover here.

**Q.   Okay.  And you were asked whether or not a flashover occurred in this case.  Do you recall that?**

A.   Yes.

**Q.   Okay.  How do you know a flashover occurred in this case?**

A.   You can see it in the video.

**Q.   Okay.  And do you recall when in the video it occurs?**

A.   Not exactly.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

Q.   It would help to look?

A.   Yeah.  Well, let me look at it and --

Q.   And I'm going to admit this is Defendant's Exhibit -- I think we're on --

A.   7.

Q.   This is -- this is Defendant's Exhibit 1.

A.   Oh, sorry.

Q.   I didn't know if we were A, B or 1, 2, 3. So this is Defendant's Exhibit 1.  And I'm hoping you can tell me where you see the flashover occur. Let's -- let me put it to --

(Defendant's Exhibit 1 was marked for identification.)

MS. PIERCE:  I'm going to object again to this question as it's outside the scope of his report.

BY MS. KWAIT:

Q.   Okay.  So I'm going to start.  Do you know -- did it start -- the flashover occur before 10:57:19?

MS. PIERCE:  Object to form.  Foundation.

THE WITNESS:  I don't remember the times on there.  I remember in -- in the video, you can see -- you can see part -- parts of the room start to light up, and you can see the very bright light of the fire behind him.  And then as he's moving, he blocks it. But when he lifts his leg, you can see

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit O

that the whole floor and everything on the floor had -- had been ignited at that point.  So that's post-flashover at that point.

BY MS. KWAIT:

Q.   Okay.  So I'm going to play the video starting at 10:57:19.  And can you just tell me when you see the flashover occur?

A.   Okay.

MS. PIERCE:  I'll object again.  This is outside the scope of his report and, again, to his testimony on this topic.

THE WITNESS:  I still see my report.

BY MS. KWAIT:

Q.   Oh, you do?  I'm sorry.  It should be --

A.   That's all right.

Q.   -- screen sharing this.  I apologize.  I'm going to pause.  Let's try this.  Okay.  So now we're at 10:57:32.  I'm going to play the video from there.  You could just tell me when you see the flashover occurred.

MS. PIERCE:  There's still no video on the screen.

BY MS. KWAIT:

Q.   You're not seeing it?

A.   No.  No.  I still have my report.

Q.   This is very odd.  Let me try again.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

A.    I see Megan now.  No, she disappeared.

Q.    **Do you see anything now?**

A.    Right now, it's a blank screen.  Oh, there it is.

Q.    **Okay.**

A.    Okay.  Wow.  Can we blow that up?

Q.    **I think this is as big as it goes.**

(Video recording played.)

(Video recording stopped.)

A.    Wow.  Okay.  Now, it hasn't flashed over there.  You can still see him moving in there, and you'll see what they call a flame rollover or a flameover as it occurs.  It's starting now, as you can see the flames rolling out the top of the cell.  And there's a walkway above it, so the flames are rolling above it, but that's the fire increasing and venting out of the doorway more, so -- And you can see, like, right behind them, back in the -- to the right, you can see where it starts to get real bright back there.  You can continue on and move, you know, with the --

BY MS. KWAIT:

Q.    **And I just want to -- you talked about a rollover.  What timestamp are you looking at right now for the rollover?**

A.    Sorry, I got to squint a little bit.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

10:58:02.

MS. PIERCE:  And I'm just going to object again to all this testimony about the progression of the fire and the rollover, which is completely absent from his report, and is improper to include at this stage.

(Video recording played.)

(Video recording stopped.)

THE WITNESS:  Now right in there, you start to see the materials -- if you stop it right there, you can see the materials on the floor are -- are on fire, and you have that rollover.  So this is probably at the beginning of the flashover, but if we can continue on --

BY MS. KWAIT:

Q.   What's --

A.   -- that's --

Q.   What's the timestamp there?

A.   10:58:14.

Q.   Okay.

MS. PIERCE:  Make the same objection that this is a description of the progression of the fire.  That is completely absent from his report and is improper to include at this point in the expert discovery two days before the -- or one week before

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

the close of expert discovery.

BY MS. KWAIT:

Q.    Okay.  And Ms. Pierce asked you about when the flashover occurs, whether or not it would burn all the materials in the cell that -- do you recall that?

A.    Yes.

Q.    Okay.  And so why are some materials not -- in the cell not burned fully after that flashover occurs at 10:58:14?

MS. PIERCE:  Object to form.

THE WITNESS:  Because -- I'm sorry.

MS. PIERCE:  That misrepresents his testimony. I believe he said this may have been the start of the flashover, and asked you to continue.  You did not.  So object again that that misrepresents his testimony.

BY MS. KWAIT:

Q.    But we can continue if that would help.  Would that help you?

A.    It -- it goes to flashover, and it is flashover so -- but the question still be the same because not everything's going to burn in the cell. What happens is all the surface material is going to burn.  Like that plastic piece of the fan, it's sitting back there because it's covered with something, you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

know.  And like where he's lying down, there's going to be stuff underneath him that may not have -- you look in the back corner underneath the bed.  There's a lot of material back there that never burned.  You know, the surface of it burned, but that's why I could see the boxes.  When we went to the prison to look at the evidence, you can see the boxes are there because the material on top of it had burned off, but the bottom that's up against the concrete is not going to burn.  If it continues to burn and continues to burn, and once it's post flashover and you get that kind of burn rate, then everything eventually will be consumed.  But because the fire is put out and it -- you know, it doesn't burn that long, there's still a lot of material in that room that did not burn.

     Q.   Okay.  And so I understand your testimony correctly, even if not everything is burned, you can still tell the area of origin of the fire; is that correct?

     A.   Yes.

          MS. PIERCE:  Object to form.

          THE WITNESS:  I'm sorry.  My bad.

          MS. PIERCE:  You're fine.

BY MS. KWAIT:

     Q.   Okay.  You were asked about any materials that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

you wished that you had, and you mentioned that you wished you had the fire marshal, his digital photos; is that correct?

A. Yes.

Q. Are you still able to form your opinions to a reasonable degree of certainty even without those?

A. Yes.

MS. PIERCE: Object to form.

THE WITNESS: Oh, my bad. Sorry.

BY MS. KWAIT:

Q. I -- what -- can you say your answer again?

A. Say your question again. How about that?

Q. Sure. Even not having Mr. Roseboom's digital photos, can you still form your opinions to a reasonable degree of certainty?

MS. PIERCE: Object to form.

THE WITNESS: Yes.

MS. KWAIT: Okay. I have no further question.

MS. PIERCE: Okay. I think we're all done.

THE REPORTER: Okay. Mr. Besse, would you like to read your transcript and review it?

THE WITNESS: Yeah, I'd like a copy of it, please.

THE REPORTER: Okay. Should I send that to you, Ms. Kwait, or do you want me to send it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Exhibit O

directly to you, Mr. Besse?

MS. KWAIT:  Send it to me, please.  Thank you.

THE REPORTER:  Okay, perfect.  And then Ms. Pierce, would you like to order the transcript?

MS. PIERCE:  Not at this time.

THE REPORTER:  Okay.  Ms. Kwait?

MS. KWAIT:  Yes, we will order.  Thank you.

THE REPORTER:  Do you want the -- an electronic copy?

MS. KWAIT:  Yes, that's fine.

THE REPORTER:  Okay, perfect.  Let me get us off the record.

(Deposition concluded at 3:26 p.m. CT)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

CERTIFICATE OF REPORTER

STATE OF INDIANA

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability.  I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.



ABIGAIL SWEENEY,

COURT REPORTER/NOTARY

COMMISSION EXPIRES: 10/02/2033

SUBMITTED ON: 03/03/2026



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

**Exhibits**

**Exhibit 1_ Besse** 8:19,21 9:2 101:6,9,12

**Exhibit 2_ Besse** 45:8,10 55:24

**Exhibit 3_ Besse** 49:14, 17 50:8

**Exhibit 4_ Besse** 50:11, 13

**Exhibit 5_ Besse** 51:1,3, 24 55:8 80:13

**Exhibit 6_ Besse** 91:10, 14

**1**

**1** 8:19,21 9:2 15:14,19 16:3,8 70:5 101:6,8,9, 12

**100** 36:25 37:4 59:19 87:12

**10117** 79:6

**10:57:19** 101:18 102:6

**10:57:32** 102:18

**10:58:02** 104:1

**10:58:14** 104:19 105:9

**11** 66:4,6

**12** 88:11,16 89:13,15,16 90:7,10,14,15

**14** 69:3

**143,000** 36:10

**15** 69:2

**16** 67:14 69:3

**19** 80:13

**1977** 10:4

**1978** 11:25 13:2 24:3,25 39:7

**1978-ish** 14:12

**1979** 13:2 39:7

**1980** 13:3 24:3

**1982** 33:19 34:14

**1984** 33:19 34:14,17

**1986** 34:1,7

**1988** 24:25 26:7

**1989** 26:18,20

**1999** 26:8

**2**

**2** 15:14,19 16:3, 8 24:2 45:8,10 55:24 59:8 74:22,23 76:10 96:3 101:8

**200** 22:13

**2008** 35:1 36:3, 4 38:13,17

**2013** 21:16

**2018** 21:15

**2019** 8:8

**2023** 49:16

**21** 14:16,17

**220** 22:13

**28** 79:13,16 83:6,17

**29** 79:23 80:3

**3**

**3** 15:14,20 16:3, 8 27:20 49:14,

**17** 50:8 101:8

**36** 51:2

**38** 84:3,7

**3:26** 108:13

**4**

**4** 50:11,13

**40** 13:10 27:16, 22 28:4 35:12

**40-hour** 17:17 20:8 28:1

**5**

**5** 51:1,3,24 55:8 80:13

**50** 35:13

**54** 24:4

**56** 24:4

**6**

**6** 91:10,14

**7**

**7** 66:10,12 101:5

**7th** 49:15

**8**

**8** 66:14 88:11 90:12

**80** 37:2

**80s** 10:24

**9**

**90** 37:3

**90s** 20:14

**921** 29:3,20 30:8,13 31:5,

**10,15,21** 32:7

**98** 26:10

**A**

**ability** 43:16

**absent** 104:4, 23

**absolutely** 50:4

**abuse** 67:6

**academy** 15:12 16:15 17:5 34:2

**accepted** 40:5

**accidental** 63:23 64:11,18

**accidentally** 64:17 65:13

**account** 22:5 29:15

**accredited** 10:12

**acquire** 10:22

**act** 63:24 64:12,15

**action** 55:11

**actual** 18:6 62:25 64:1 95:16

**add** 22:22 54:2

**added** 78:4

**addition** 18:17 50:25

**additional** 18:5,11,20 20:2,15 54:1 93:6

**admin** 91:20

**admission** 13:13,14

**admit** 101:3

**advanced**

**15:20**

**advice** 66:19

**Affairs** 49:15

**affect** 72:17

**affirm** 6:23

**affirmatively** 88:3

**age** 14:16

**agenda** 24:21

**agree** 6:17 28:10 29:25 33:11 43:19 44:12 72:5 74:8 89:8

**agreed** 6:17 22:14 86:6,7

**agrees** 29:4

**ahead** 31:19 94:3 99:3

**allowed** 47:9

**alls** 21:7

**amount** 12:7 26:24 53:17 91:21 97:20

**analysis** 99:18

**analyze** 41:2

**angles** 44:20

**Annual** 24:4

**answering** 62:14

**answers** 46:7

**anymore** 83:1

**anytime** 25:14 54:21

**apologize** 102:16

**apparatus** 19:14

**apparatuses** 19:15

**appearance** 6:3



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA** COURT REPORTERS

**Exhibit O**

appeared 79:14

appears 9:2 66:18 91:1

appliance 73:23

application 22:5 23:13,19

apply 13:15

Approximately 11:13 36:10

arc 75:16

arcing 68:15

area 26:23 37:13 56:15,20, 24 57:12,25 58:3,5,8 59:14, 21 60:7,14 61:6,15,24,25 62:21,22 63:1, 8,11 64:2,4,20, 24 65:23 77:1 106:18

areas 89:1

arson 15:10,13 16:13 17:1,22 18:2,3,5,16 21:13 22:19 24:17 28:17,25 32:11,17 33:8 34:3,5 38:8 64:12,16

articles 38:19

associate's 10:20 11:17 24:22

Association 19:21 20:10 21:13 22:19

assume 7:11, 24 45:8 62:23

attached 59:16 66:17 67:19 68:4 74:2 75:2, 11 78:15 80:1 81:21 86:10

attaches 85:2

89:4,5

attaching 60:21

attend 28:2

attended 12:18,19

attending 6:3, 6,10

audio 7:19

aware 28:15, 19,24 32:15,21

_____

**B**

bachelor's 10:20 11:18 24:23

back 16:21 21:15 23:19 25:15 37:16 55:18,23 57:15 59:7,13 60:17 62:14 65:6 70:4 71:20 81:3,15 85:2 86:23 87:7 89:1,5 93:13 103:18,19 105:25 106:3,4

backing 85:12 87:8,25 89:3

backing's 90:1

bad 31:19 94:20 106:22 107:9

bag 78:23 84:11

base 19:5 36:13

based 36:15 37:5 50:9 52:15 74:9

bases 61:5

basic 24:16 94:8

basically 12:20 37:11 39:25 40:9,16

82:16

basing 90:20

basis 56:25 75:6 85:22 91:2

bathroom 93:8

bed 56:13 57:13,15,19,21 58:7,24 59:1, 17,20 61:10,12, 13,14,23 62:21, 22 63:4,5,6 67:7 96:8 106:3

bedding's 97:19

Bedrooms 94:6

begin 7:2,18

beginning 104:13

behalf 6:5

Besse 6:11,12, 14,21 7:5,9,11 8:7,18,20 9:11, 25 55:21 93:17 98:18 107:20 108:1

bias 41:8

big 33:2 84:17 89:23 103:7

bigger 37:3,5

biology 11:21 27:9

bit 54:7 65:6 96:20 103:25

blank 103:3

blob 84:17 89:23

block 47:14

blocks 101:25

blow 103:6

blurry 92:10

board 85:14

boards 66:22

bomb 34:3,4 38:8

bonus 37:4,5

bonuses 36:12,14,20,23 37:3

book 29:5,23

bottom 57:21 59:14 61:23 66:2 71:21 76:9 79:14 80:24 81:1 82:1 84:15 106:8

boxes 63:3 84:12 97:16 106:6,7

boy 7:9

break 8:2,3,5 55:10,12,21 65:5 93:8

bright 101:23 103:19

bring 29:20 30:2 57:2

bringing 31:4

broken 81:8 86:11

brought 31:1 76:18

building 87:2

Bureau 18:24

burn 28:16 40:22 57:12,14 58:2,11,15,18, 21 59:2,18 60:10,20 61:1,2 63:6 100:13 105:4,22,24 106:9,10,11,14, 15

burned 58:5,18 61:2,10 86:11 87:4 105:8 106:4,5,8,17

burning 58:20 59:1 70:11 100:5,8

burns 27:14 47:22 58:2,3,4, 6 61:7,8 70:22 98:7

_____

**C**

C-R- 14:5

cage 87:22,23 88:9,20 89:17

call 11:20 13:25 14:1 40:12,15 65:7 103:12

called 16:20 50:10 60:10,22 61:2

calling 83:10

cameras 40:21

canceled 8:17

capacities 38:6

car 21:8

cardboard 63:3 84:12 96:7 97:15

career 25:6 94:17

case 9:8 33:2 36:17 45:19 46:10 73:1,6,8 91:11,13 100:18,21

cases 8:8,14 32:23,25 41:20, 24 62:23

catch 72:2

caught 62:25 63:9,12

caused 40:1 62:3,7 69:19 72:23 77:8,9

ceiling 60:7, 11,13,14,16 61:8,9 100:6

cell 47:1,14



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

74:25 77:13 94:15 96:7 97:12 103:14 105:5,8,22

**center** 56:12 62:21

**certainty** 42:9, 22 60:1,4 107:6,15

**certificate** 12:1,2,4,9 16:23 24:20 25:12,22 26:4

**certification** 17:16 18:5,11, 16,25 19:8,13, 18,23 20:13,16 21:14 22:1,20 23:2

**certifications** 14:22,23 15:4, 15 16:6,13 23:22

**certified** 15:10, 13 18:12,17 19:16,22 20:5, 22 21:3,12,22 22:24

**challenge** 15:16,19 20:2 22:13,15

**challenged** 20:18

**change** 32:1

**changed** 28:11 47:18

**charges** 91:12

**charring** 56:11

**chemistry** 11:21 27:9

**Chicago** 35:18,19 37:12

**children** 33:6

**choose** 97:25

**circle** 59:9,10, 13,14,15,24

**circuit** 66:22 85:13

**City** 34:3,4,14

**clarification** 7:23

**class** 20:2 23:24

**classes** 11:4 15:17,23 16:18 23:4,12,20 24:12,18,21 25:11,12,16 26:13,15,24 27:3,6 28:1

**classification** 76:10,15

**classroom** 17:10,11 18:13

**classroom-based** 17:9 27:11,13

**clean** 58:2,6 60:9,20 61:2

**cleaned** 47:18

**clear** 83:7 85:18

**close** 65:19 85:6 98:8 105:1

**closed** 37:23

**closer** 98:6

**closeups** 84:25

**clothing** 63:4, 6,7 67:7 96:7,8 97:16,17,20,22

**colder** 60:23

**collected** 47:1

**college** 10:9, 13,15,19,21,22, 23 11:1,2,12 24:4,5,11,16,17 25:1,10 26:1,2, 5,14

**colleges** 11:3

**colorations**

58:12

**coloring** 61:13

**combustible** 56:12 57:17 63:11 77:7 94:11 96:6,15, 22 97:15,19,23 98:11 100:3

**combustibles** 65:20

**commented** 30:19

**comments** 29:22

**committee** 29:3,20,21 30:14 31:5

**community** 11:3 24:16,17 25:1 26:1

**company** 35:15 37:24

**compartment** 94:4,5,6,14,16

**compartments** 94:8

**compensation** 36:16

**competent** 64:3 65:17,22 66:24 67:1,8 76:25 97:11

**complaint** 29:18

**completely** 104:4,23

**completion** 12:1,9

**component** 18:21 23:2

**components** 27:12 30:20 89:9

**computer** 64:22 72:17 73:19,22 74:11

**computer-based** 17:9

**computers** 73:21

**conclude** 56:20 75:6

**concluded** 77:22 108:13

**conclusion** 57:1

**conclusions** 48:13 51:16 53:19,23

**concrete** 60:8, 9,19 94:9 106:9

**conduct** 47:5

**conductor** 83:10

**conductors** 66:17 70:19 75:2,8 78:15 79:1 80:23,25 81:22,25 82:9, 10 83:9

**cone** 60:10 61:7

**confident** 68:22 87:12

**configuration** 79:25

**confirm** 65:11 88:24 90:19

**confirmation** 41:8

**connected** 30:13 69:15 78:14,19,21,22 80:7 82:15,19, 22,23,25 83:11, 15 84:5,23,24 85:18,23 86:5, 7,8

**connector** 69:10

**consensus** 29:3

**consistent** 56:15,19

**consultant** 37:7

**consumed** 57:18 106:12

**contained** 49:22

**continual** 67:6

**continue** 55:19 58:21 93:14 103:20 104:14 105:14,18

**continues** 106:10

**continuing** 21:24 23:8,9,15 26:23 27:7 28:8 31:25 32:2

**contrary** 53:11 54:2

**contribute** 73:15

**convict** 32:18

**convicted** 32:17 33:3

**Cook** 39:7

**copied** 48:9,11

**copy** 9:6,7,12, 16,23 45:9 48:15 107:22 108:9

**cord** 59:16 67:4,6,9,11,15, 16,18,20 68:2, 7,9,12,13,14, 15,16,17,19 69:3,6,11,13 70:15,23 71:6, 10,12,15 76:24 86:10,11

**cord's** 71:3

**cord/device** 69:12

**cords** 68:12 70:13 76:22

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

87:5 92:22 97:17

**corner** 60:17 84:15,17 106:3

**correct** 8:9,10 9:23,24 11:10, 18,19 12:12 14:25 16:6,7,11 17:24 18:19 19:10,11,19 22:25 23:24 24:11 25:19 26:5 28:5,6 33:8,16,22,23 34:21 38:18 40:3 42:1,9,20, 23 43:7,21 44:9,16,19 45:2,6,19,20,25 46:1,16,17 47:1,2,3,4,12, 19,24 48:1,2,4, 7,13,14,18,21, 22,25 49:1 50:20,23,24 51:5,19,20 52:1,20,21 53:18,24,25 54:5,6,11,19 55:2,6 57:8 58:12 59:9,10, 25 62:4,18 63:1,2,14,16 64:8,9,13 65:16 67:24 68:8,20 69:24,25 70:3, 7,11 71:18 72:3,4 74:13,21 76:12,14 77:16, 23,24 78:5,7,16 79:20,21 80:8,9 81:5 83:13 86:6 87:17 88:20 90:16,17,22,23 91:3,24 93:1,3, 4,19,20,21,22 94:18 95:2,24 96:3,8,12,16 98:4 106:19 107:3

**corrections** 39:9,15

**correctly** 10:12 21:17

22:18 25:25 34:24 46:23 56:16 59:5,8 62:1 71:14,23 106:17

**counsel** 6:9 7:2 45:19 55:19 91:13,22

**count** 21:15

**County** 39:8

**couple** 24:15 52:8

**courses** 10:10 11:5,7,11,20,24 15:14 16:2 22:21 24:11 31:16,22

**court** 7:19 8:17

**cover** 84:1

**covered** 105:25

**crack** 22:17

**created** 29:7 48:19

**credit** 10:9 24:11

**credited** 22:9

**credits** 10:19, 21,22 12:8

**Crest** 13:22 14:5,8,9

**crime** 18:3 27:25

**criteria** 13:13

**critical** 50:10

**criticism** 28:15,18,24 29:2,10 30:6,20 53:4

**criticisms** 29:14 32:11 52:22 53:7

**criticize** 29:8

**CROSS-EXAMINATION** 93:15

**CT** 108:13

**current** 30:9

**curriculum** 25:10

**cursor** 82:3

**curtain** 77:20

**cut** 37:15

**CV** 8:20 9:2,7, 12 31:18,22

---

**D**

**damage** 72:13, 21,23 73:20 74:2,15

**darker** 61:13

**data** 40:20 41:1,2 43:1,4,9, 23 44:3 46:24 47:13 51:16 54:8,15,18,21, 25 99:8

**date** 31:14,24 33:11

**day** 21:7,10 92:16

**days** 13:6,7,8 20:17 104:25

**death** 33:4

**deceiving** 59:11

**decide** 68:11

**defeat** 41:9

**defendant's** 101:3,6,9,12

**defendants** 6:10 45:19

**Defense** 91:13, 22

**define** 43:2 62:11,19 63:19

**defines** 61:24

**defining** 40:16

**degree** 10:20 11:15,17,18 24:22,23 42:9 60:1 107:6,15

**degrees** 10:21

**dented** 79:3

**department** 13:17,19 14:9 15:11 17:4,23 38:8 40:24,25

**depending** 94:5

**deposed** 7:12

**deposition** 7:15 60:22 95:9,12 108:13

**depositions** 8:15

**describe** 57:4

**describing** 74:25

**description** 50:22 78:4,5 104:22

**descriptions** 78:7

**destroyed** 70:10

**destroying** 80:18

**detail** 7:15 29:4 32:24

**determine** 40:13,17 41:3, 11 42:3,4 43:16 56:23 62:2,7 64:7,12 65:12, 15,21 76:13 88:6 89:19,22

**determined** 32:17 40:14

**determining** 29:15

**device** 65:8 66:19 67:5 69:11 74:24 75:1,6,7,17,23 76:4,21 78:17 86:25 92:22

**devices** 76:23 77:15 79:24 86:17,24

**difference** 18:15 29:13

**differences** 54:14 61:8

**differently** 48:18 53:3

**difficult** 58:11

**digital** 92:5 107:2,13

**digitals** 92:12, 13

**dignify** 30:4

**DIRECT** 7:3

**directed** 28:25

**directly** 31:4 91:23 108:1

**disagree** 74:7, 8

**disagreements** 53:8

**disappeared** 103:1

**disassembled** 91:8

**discard** 44:3

**disciplinary** 81:4,5

**disciplined** 80:18

**discoloration** 56:14,18 57:20

**discolored** 57:19

**discovery** 104:25 105:1



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

discussed 24:8,10 29:21

discussing 96:11

disprove 41:6

distort 44:20

distorts 44:22

document 29:3 30:15,17 31:1 42:21 49:21

doorway 103:17

draw 59:23

drips 66:24

driving 19:15

due 100:4

**E**

E-S-S-E 7:10

E-S-T 14:6

earlier 24:8 79:24 80:17

early 10:24 20:14

earthquake 63:24

easier 9:13 45:14

Eastern 21:6

edge 59:19

education 10:18 12:20 19:8,9,17 21:24 22:8,21 23:8,9, 15 26:23 27:7 28:8 32:1,2 74:18

educational 18:21 23:1

efforts 71:2

EFI 37:21

Eichhorn 6:9

eight-hour 13:6,7

electrical 65:3 66:17 72:6,11, 13,15,23 73:15 74:15 75:13 76:7,20 86:17, 24,25

electronic 40:21 108:8

emphasize 7:16

employee 14:19

empty 70:16

enclosed 93:24 94:7

encompass 45:24 76:16

encountered 76:3

end 20:22 21:11 27:4 41:8 83:22,23

enforcement 11:4,8

engineer 19:14 72:15 74:4

engineering 35:5 76:7

entail 19:13

entails 39:24

entire 50:1 54:4 91:2

entities 36:4

Envista 34:23 35:1,3,4,10 36:7,9 37:7,20, 23 38:12 91:22

equipment 64:22 65:4 72:13 74:2

essentially

53:23

estimate 35:10

events 49:12

eventually 106:12

everything's 105:22

evidence 44:24 46:25 47:11 49:22 70:6 78:22 79:20 93:3 106:7

exact 13:3 95:22

examination 7:3 56:9,22

examined 41:10 78:22

examining 47:7,8

excluded 92:9

excluding 59:22

excuse 21:8 22:20 40:19 55:23 97:14

Exhibit 8:19,21 9:2 45:8,10 49:14,17 50:8, 11,13 51:1,3,24 55:8,24 80:13 91:10,14 101:4, 6,9,12

exists 61:12

exonerations 32:10,13,16

expand 95:8, 12

expect 54:12

experience 22:4 39:15 52:16 71:16 74:9 86:16 87:1,13 93:18

expert 8:11 104:24 105:1

expertise 74:14

explain 25:7 33:24 40:8 75:5 96:20

explanations 46:15

explosion 19:22 20:1,5,22 40:13

exposed 100:4,14

extended 71:3

extra 19:8

eyewitness 44:1

**F**

fact 90:21 99:5

fail 67:6 68:13 73:5

failed 65:18,19 68:15 76:24 77:9,15

fails 67:4

failure 68:14

fair 7:12,25 18:4,7 19:7 30:7 32:4 38:13,20 41:23 45:22 53:17 54:2,3 71:17

falls 70:23

familiar 39:1 52:3

family 25:17

fan 76:23 78:12,13 79:1, 15 80:15,16,25 81:18 84:15 85:2,4,7,10 86:14 87:9,13, 15,19,21 88:1,

2,4,7,19,20 89:2,3,9,17,18 90:1 91:8 92:20 105:24

fans 87:2,3 91:6

FBI 27:22,24

February 26:7, 8,17,19,20

feedback 30:21

feel 48:12,16

felt 53:20

field 17:10,12 27:15 30:11

field-based 27:12

fight 15:25

fighting 16:9 33:21 34:10,15

figure 73:13

files 8:15

fill 22:6

fill-in 14:18

final 41:12

find 64:2 87:4

finding 87:6

fine 7:21 19:20 51:10 106:23 108:10

finish 7:17 25:23

fire 10:6,14,17, 18 11:4,8,25 12:25 13:17,19, 20 14:8,23 15:4,6,8 16:12, 17,18,23,25 17:4,7,16,19 18:7,10,14,17 19:9,12,15,17, 21,22,25 20:5, 10,22 21:3,12 23:3 24:4,19,20 25:1,12,22,25

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

26:2,5 27:2 28:11,12,15,25 29:9,16 31:23 32:6,18 33:4,9, 10,12 34:13,21 35:4,6,7,8,9,17 36:6 37:14 38:7,21,23 39:4,17,19,20 40:2,4,12,24 41:4,14,21 43:17,21 44:10 45:1,22 46:12, 15 47:15,23 48:1 49:3,7,23 50:23 51:1,15, 19,23 52:11,17 53:5 54:10 55:5 56:11,15,20,21, 24 57:18 58:8, 11 59:4,9 60:2, 10,13,21,25 61:6 62:3,7,25 63:5,9,12,22,25 64:16,17,18 65:12 67:17,25 69:14,19 70:12 71:23 72:2,6,22 73:14,16,22 74:11,20 76:10, 14,19 77:8,9, 13,15,23 78:6, 19 80:11,12 85:7,17,24 90:16 92:5,7 94:6,14,25 95:2,4 96:12,15 97:8,9 98:4,11 100:1,2,15 101:24 103:16 104:4,12,22 106:13,18 107:2

**firefighter** 14:8 15:19,20 16:2, 6,8 25:19 33:15,18,20,25 34:9,10,18

**firefighters** 10:17 14:10 15:13

**firefighting** 15:21 28:12 71:2,17

**fireman** 13:21, 23 25:6,17

**firemen** 14:18

**fires** 15:25 16:9 17:13 18:25 19:3 21:8 33:21,22,25 34:4,11,15 35:25 36:2 87:5,10,16 93:18,23 94:5, 16

**firmly** 41:25

**fixture** 78:12, 14 80:14,17,18 81:9,10,19,20 82:15,20 83:1, 12,16,18,19,20, 21 84:4,20 85:16 86:9 87:12

**flame** 103:12

**flameover** 103:13

**flames** 103:14, 15

**flashed** 58:25 98:10 103:10

**flashes** 58:19

**flashover** 58:10,15,22 59:4 98:12 99:24,25 100:16,18,20 101:10,18 102:7,19 104:13 105:4,8, 14,20,21 106:11

**flip** 69:1

**floor** 57:13 59:20 62:21 68:1 75:2 100:11 102:1 104:11

**focused** 16:16 18:6 21:7 41:18

**follow** 67:16

68:2

**forensic** 35:4 37:11,13

**Forensics** 35:1,4,10 36:9 37:7

**form** 28:20 32:12 53:1 72:8 93:25 94:2,19 96:17,23 98:15 99:8,10,13,15, 19,20 101:19 105:10 106:21 107:5,8,14,16

**formula** 36:24

**found** 64:6

**Foundation** 72:8 101:19

**four-** 21:6

**four-day** 26:22

**frame** 58:1

**front** 9:12,22 45:9 49:10 56:1 59:17 88:16

**full** 6:13 10:9 26:18

**full-time** 8:11 13:24 14:10,14, 18,19 33:15

**fully** 105:8

───────
**G**
───────

**gas** 100:13

**gases** 100:12, 13

**gather** 40:19 43:8

**gathering** 43:1,4

**gave** 12:4,5 51:16

**general** 10:18 36:19 63:1

**generally**

16:15 39:18 41:13 43:20 63:16

**get all** 100:9

**give** 6:23 9:1 72:10 78:8 79:16 94:20 95:17

**giving** 36:22 42:22 71:20

**glad** 90:18

**God** 63:24 64:12

**good** 7:21 19:5 29:9 30:6 42:13 45:4 53:16 92:9,11 95:19 100:10

**Goodnotes** 79:9,22 83:22, 23

**grades** 12:8

**graduate** 10:1, 3

**graduated** 15:7,12 17:3

**graduation** 12:2

**great** 62:1

**grinder** 79:15

**ground** 7:14

**grounded** 28:19 32:19

**group** 37:10,12

**guards** 49:11 50:6

**guess** 62:5

**guest** 38:1,5

**guidelines** 30:8,19,20 31:5,10,15,22 32:6,7 40:6 43:8 58:10

**guy** 14:19 33:3 66:20

───────
**H**
───────

**H-A-Z-E-L** 14:5

**half** 8:23 22:8, 10

**Hammond** 6:11

**hand** 6:22 81:9 82:20

**handful** 11:7

**handle** 19:1,2 75:11 93:3

**hang** 79:11

**hanging** 81:12

**happen** 72:18 73:7

**happened** 40:14,18 41:4, 11 59:24

**happy** 8:3

**hard** 11:21 27:8

**harder** 44:23 99:1

**Harvey** 34:3,4, 14

**hate** 9:10

**hazardous** 18:24 19:1,2,4, 5 37:11

**Hazel** 13:21,22 14:5,8,9

**heap** 88:23

**hear** 7:22

**heard** 7:24

**hears** 7:19

**heat** 56:14,19 66:23 100:4,7, 8,9

**heat-producing** 66:19 75:7,17, 23 76:20 79:24



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

92:22

**heating** 65:19, 24 67:5

**heats** 66:23

**helpful** 9:18 44:15 45:4

**helps** 54:22

**hey** 23:19 95:6

**high** 10:1,3 33:2 60:4

**high-profile** 32:16

**Hillcrest** 14:3

**hired** 14:18

**hit** 59:11

**hits** 60:11,24

**hold** 10:16 11:3 49:24 66:10 80:22 82:16

**holding** 67:18 68:2 85:17,25

**hole** 82:7

**holes** 70:21,24, 25

**homemade** 69:10,11 74:24 75:1 78:17 86:17

**hoping** 101:9

**hot** 75:10,12

**hour** 22:9,11, 12

**hourly** 36:17

**hours** 13:10 27:16,17,18,22 28:4

**human** 64:15, 19 77:2,11

**hypothesis** 41:3,4,9,10,11, 12,13,24 44:5

**hypothetical** 72:25 73:4

**I**

**IAAI** 23:14

**ID** 6:16

**idea** 21:2 36:21 41:8 42:11

**ideally** 55:3

**identification** 8:22 45:11 49:18 50:14 51:4 91:15 101:13

**identified** 42:1 63:10 64:5 77:6,7

**identify** 40:1 41:21 42:7 46:11 62:24,25 83:14

**identifying** 86:17

**identity** 6:17

**ignite** 97:12 100:4,14

**ignited** 62:2 76:17 77:13 96:6,12 97:11 98:1,3 102:2

**ignites** 98:7

**igniting** 72:7

**ignition** 62:9 63:20,21 64:1, 3,7,20,25 65:16,17,21,22 66:25 67:1,8 71:22 76:17,25 77:6 96:14,21 97:11 98:1

**II** 15:21

**Illinois** 10:6 11:25 12:25 15:2,3,17 17:19 18:14 24:4 26:2,5

**imagine** 91:16

**important** 7:17 33:11 41:5 42:21 43:4,8

**improper** 95:11 104:5,24

**Inaudible** 55:15 68:25 71:25 73:6

**incendiary** 64:16

**incident** 40:13, 18 49:5 50:10 56:10

**include** 48:19, 23 104:5,24

**included** 28:7 46:2 48:3,7,17 57:7 59:18

**includes** 76:16

**including** 96:7

**increasing** 103:16

**Indiana** 6:11 15:1 56:10

**indication** 73:25

**indications** 28:17

**individual** 24:18 26:15

**individuals** 32:16

**inform** 54:18

**information** 31:13 40:20 43:20 44:8

**initial** 20:5,22 22:1

**INS** 18:23

**inside** 39:2 87:18 92:19,25

**inspect** 78:18 79:20

**inspected** 47:3 80:7

**inspecting** 88:25

**inspection** 43:21

**instances** 73:21

**institute** 10:6, 13 11:25 12:25 13:20

**instructing** 15:25

**instruction** 13:10

**instructor** 15:21,24 19:22 20:15 38:2

**instructor's** 20:2

**intact** 71:15

**intense** 58:15

**intensity** 56:14,19

**intention** 64:16

**intentional** 63:23 75:18,20

**intentionally** 65:12 71:6 75:22

**intents** 53:22

**interaction** 52:10 77:2

**interfere** 43:15

**Internal** 49:15

**International** 21:13 22:19

**interpret** 58:11

**interrupt** 9:10

**interview** 49:3

**interviews** 40:21

**investigate** 17:14 19:9 29:16 36:2

39:3,17 40:4

**investigated** 34:4 38:23 54:9 93:23 94:16

**investigating** 16:9,17 18:2,25 21:8 28:13 33:22,25 34:15 35:25 51:15 53:5 93:18

**investigation** 16:15 18:7,23 19:18 23:4 24:18 27:2 29:1 32:6,18 35:6,7 40:17,24 44:25 45:25 49:15 52:8,13,23 54:8 97:8

**investigations** 15:10 16:19 28:16 32:11 35:8 37:14

**investigative** 21:7

**investigator** 15:6,9,13 16:12,13,23 17:1,7,16,22 18:2,5,10,16,17 19:22,25 20:1, 5,23 21:4,13 29:9 34:21 36:6 51:25 52:17 55:4

**investigators** 10:17 16:25 19:21 20:10 21:14 22:19 35:9,17

**invoice** 91:11

**invoices** 91:20

**involve** 19:8

**involved** 28:12 30:11,16 34:10 49:7

**involvement** 33:24 77:12



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

**involving** 27:8

**iron** 65:19,24

**item** 62:25 72:23 75:3 77:8 78:11 87:11

**items** 64:5 78:18 91:25

**J**

**jail** 39:8,11 97:14

**Jeffery** 51:25 52:3

**job** 13:18

**joints** 66:21

**Julia** 6:8 9:17 95:6

**K**

**Kentucky** 21:6

**killed** 33:5 46:12

**kind** 22:7 25:15 42:2 54:17 64:22 72:25 73:4,22,24 98:24 106:11

**kitchens** 94:6

**knowledge** 19:5 31:14,23

**Kwait** 6:8,20 9:10,16,19 28:20 32:12 72:8 89:10 93:8,16 94:13, 23 95:14,20 96:19 97:1,3 98:2 99:4,12, 17,22 101:16 102:4,13,22 103:21 104:15 105:2,17 106:24 107:10, 18,25 108:2,6, 7,10

**L**

**large** 52:11

**law** 11:4,8

**laying** 67:7

**lead** 42:13 52:9,11

**leader** 35:24

**learning** 16:15

**lecture** 38:1

**lecturer/ instructor** 38:6

**left** 37:22 58:23,25 60:17

**left-hand** 59:15

**leg** 101:25

**level** 11:12,22 25:7 42:22 57:13 60:4,13

**levels** 72:12

**lied** 66:14

**lieutenant** 34:14

**life** 25:14 33:15

**lifts** 101:25

**light** 78:12,14 80:14,18,22,25 81:9,10,19,20 82:15,20 83:1, 12,16,18,19,20, 21 84:4 85:7 86:9 87:24 101:23

**light's** 80:16

**lighter** 64:23

**lighting** 44:17

**lightning** 63:24

**lightweight** 78:15

**limit** 46:5

**listed** 24:14 31:16,22 38:2

**local** 38:8

**location** 6:4

**long** 9:3 17:15 20:4,16 22:1 26:8,14 33:14, 18 51:2 55:10 58:4 106:14

**longer** 58:4,5 71:15

**looked** 32:9 46:18,25 47:11 70:9 97:14

**losing** 55:8

**loss** 56:12

**lot** 17:2 19:4 22:3,4 28:11, 17,18 29:5 30:1 31:1 37:12 42:12 44:6 86:23 87:5 97:25 106:3,14

**lull** 55:11

**lumping** 42:6

**lying** 106:1

**M**

**made** 48:19 64:19 66:1 75:24 76:1,2 86:25 97:5

**main** 39:21 41:17

**make** 7:17,18 23:17 25:24 29:22 30:15 31:13,23 43:11 46:23 49:13,25 50:1 51:16 54:22 58:11 59:13 61:4 65:6 75:23 77:4 84:10 86:23 89:7 104:21

**makes** 75:10

**making** 30:17 31:5 44:5 86:17

**managerial** 36:1

**manufactured** 69:12

**March** 49:15

**mark** 8:19 45:7 50:11,25 91:10

**marked** 8:21 45:10 49:17 50:13 51:3 91:14 101:12

**markings** 60:9

**marks** 47:22

**marshal** 14:24 15:4 17:19 18:14 19:13 48:1 56:11 69:14 78:6 80:11 85:17,24 92:6,7 107:2

**marshal's** 51:1,23 67:18, 25 78:20 80:12 85:7 90:16

**mass** 56:12 59:15 67:16,17, 20,21,23 68:1, 3,8,10,11,17, 18,20 69:1,4 71:13 75:2 92:19

**material** 56:12 57:12,17,18 58:23,24 59:1 60:24 61:3,10, 11 65:1 70:18 76:16 77:7 94:11 96:6 98:6,10,11 100:8,11 105:23 106:4,8, 14

**material's** 58:23

**materials** 18:24 19:1,2,4, 6 37:12 58:21

60:18 63:3 64:23 96:6,16, 22 97:10,13,15, 19,23 100:1,3 104:10,11 105:5,7 106:25

**matrix** 37:2

**matter** 7:7 58:4

**Megan** 6:5 7:5 9:10 95:14 103:1

**melt** 66:23 87:22

**melted** 59:15 67:16,17,20,21, 23 68:1,3,8,10, 11,17,20,21,22 69:4 75:2 86:11 87:18,22,23 88:7,9,23 89:23 92:19

**melting** 66:21

**mentioned** 81:6 107:1

**metal** 57:19 75:9,14 84:16, 24 85:5,16 89:3

**method** 40:10

**methodology** 40:5,8,9 52:22, 25

**metrics** 36:22

**Michael** 46:12

**middle** 42:17

**minutes** 93:9

**miscellaneous** 84:12

**misrepresents** 105:12,15

**missed** 61:17

**missing** 87:20 89:9 90:25 91:1

**misspoke** 31:21

**module** 17:17

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


**KENTUCKIANA**
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

modules 16:20,21,22 17:6,8,16 18:1, 8,10,14 34:1

moment 95:21 98:19

motor 78:12,14 79:1,15 80:16, 21,22 82:25 83:2,15,20 84:15 85:1,3,8, 10,12,13 86:8, 13,14 87:13,20, 24 88:4,7,24 89:6 90:2,21,25 91:3,4

motors 87:15

move 103:20

moved 43:14 44:11 66:13

movement 43:16

moving 77:18 101:24 103:11

multiple 25:12 35:5 41:11 91:6,7 97:24

municipalities 38:9

municipality 16:24

Mysti 6:6 7:7

**N**

national 19:21 20:10 35:15

needed 48:17

negative 75:14

NFPA 29:2,20

noise 29:12,14

non-manufactured 67:5

note 70:9

notes 78:3

number 32:16 77:6 79:13 80:3 84:11

numbers 45:15 84:8

**O**

object 93:25 94:2,19 96:17, 23,24 98:14 99:10,15,20 101:14,19 102:9 104:2 105:10,15 106:21 107:8, 16

objection 28:20 32:12 72:8 89:10 95:6,11 97:5 98:14 104:21

oblong 59:13

observed 74:25

occupied 70:18

occur 101:10, 18 102:7

occurred 47:15 94:15 100:18,20 102:19

occurs 58:22 100:24 103:13 105:4,8

odd 102:25

offgassing 100:12

office 14:23 17:21 19:12 35:18

officer 18:1,13, 18 39:9

officers 17:2 44:2

officially 33:19

omitted 53:20

on-call 13:21, 23 14:2,7,9

one-on-one 52:7

one-week 10:16 12:13,14, 18

opining 46:19

opinion 48:18, 21,25 60:2 61:5,15 90:20, 24 91:3 96:2

opinions 45:25 46:2,15 52:16 53:8,10,13 54:12,19,22 95:2,8,13 96:10,25 99:9, 14,19 107:5,14

opportunity 95:10

opposing 75:8

opposite 75:13

orally 30:23

order 12:8 108:4,7

Oregon 6:7

organizations 21:21,22

origin 33:22 39:23 40:17 41:14,21 42:1, 2,3,8 43:16 45:22 46:11 57:12 61:6,15, 24,25 62:15,19, 20,24 63:15,16 64:2 65:23 77:1 106:18

origin's 58:3

originated 56:21,24 58:8 59:9

originating

56:15,20

outlet 59:17 67:19 68:3,4,18 69:14 70:6,7,10 71:21,22 72:1,7 73:5,12,14,17, 25 74:12,15 81:22 92:10

overheated 67:5

overlap 53:17

overview 56:6

**P**

p.m. 108:13

P10117 85:24

package 44:4

pages 9:3 51:2 66:14 84:25

paid 13:21,23, 25 14:1,7,9 36:17 37:6 91:22

paint 94:10,11, 12

paper 9:16 90:8

papers 30:10 89:25 96:7

paragraph 56:6 66:4 70:5 71:21

paramedic 14:13 39:10,12

paramedics 14:14,18

pardon 67:22 94:1

part 23:2 44:2,4 46:22 60:16 69:8 85:16 87:19 96:10 101:22

participated 31:9

participating 25:2

participation 25:8

parties 6:2,16

parts 28:25 60:16 61:9,12 76:15 84:12 97:7,8,16 101:22

pass 15:18 16:21 17:25 18:9 20:25 22:16,24 25:13 82:8

passed 15:8

passing 24:20

past 66:5 74:17 82:6 84:1

pattern 58:7 59:18 60:10,12 61:11

patterns 28:17 29:6 40:22 56:14,19 58:11, 18 59:2

pause 98:19 102:17

pays 91:22

pending 8:4

people 14:10 15:25 16:5 29:24 31:2

percent 36:25 37:2,3,4 59:19 87:12

perfect 6:12,21 108:3,11

period 33:14

person 6:10

photo 66:4 79:23 81:17 82:19 83:6,11, 14,17 85:23 86:5,9 87:23 88:8,10,11,16,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

18 89:8,11,15, 16,20 90:4,7,9, 14,15,16,21

**photograph** 57:22,24 67:14 78:20 79:4,13, 16 80:3,10,14 90:7,10

**photographing** 47:6,8

**photographs** 43:25 48:20 56:10,22 57:2, 5,7 78:3,13,21

**photography** 24:16

**photos** 47:25 48:3,6,8 61:19, 22 67:16,18,25 79:11,22 82:21, 24 83:22,23 85:7 87:7,18 88:4,5 90:10 92:5,11,14,15 97:13 107:2,14

**physically** 47:3

**physics** 11:21 27:9

**picture** 44:18 48:23 57:14 67:10,12 68:23 69:2,14 70:1 79:14,19 83:8, 21 84:14 85:4 86:3 87:18

**pictures** 44:14 45:4 67:11 69:2 99:13

**piece** 57:16 75:14 76:19 105:24

**pieces** 88:1 91:8

**Pierce** 6:5,19 7:4,5 8:24 9:15, 17,20 28:23 32:14 45:13 49:20 50:16

51:6 55:13,20 72:9 81:2 89:14 91:17 93:5,10, 25 94:2,19,22 95:6 96:17,23 97:5 98:13,18, 22 99:10,15,20 101:14,19 102:9,20 104:2, 21 105:3,10,12 106:21,23 107:8,16,19 108:4,5

**place** 80:20 95:22

**plaintiff** 6:6 7:6

**plaintiff's** 8:21 45:10 49:17 50:13 51:3 91:14

**plastic** 87:19 88:20,23 89:4, 17 105:24

**plate** 89:1,5

**plates** 91:7

**play** 102:5,18

**played** 103:8 104:7

**plug** 70:18,19 71:1,7,9,15 75:11 80:21 81:20,21 82:13

**plugged** 67:3 68:12 69:13,23 72:14,17,22,23 73:19 74:12 76:21,22 80:15 81:18,19,22

**point** 8:2,25 12:5 14:11,17, 20 22:6,7,9,11, 12 23:11 26:19 29:12 30:1 33:1 36:25 37:21,25 73:11 74:11 78:23 82:2 91:16 98:9 100:9 102:2,3 104:24

**pointing** 56:7

**points** 22:7,13, 22 23:12,14

**police** 15:11,12 16:14 17:2,4,23 18:6,12,18 34:2 40:25 44:1

**porcelain** 78:12 81:10 83:1 84:20 85:4,8,16

**portion** 17:7 56:13 59:15 89:16

**portions** 17:11,12

**Portland** 6:7

**position** 13:24

**positions** 34:18 38:2

**positive** 75:14

**possibilities** 77:25

**possibility** 77:24

**possibly** 84:4

**post** 106:11

**Post-blast** 27:25

**post-flashover** 102:3

**post-high** 11:22

**potential** 39:19 64:3,24 71:22 76:17 78:1

**power** 59:16 72:12,13,16,21 73:4,8,9,19,24 74:10 97:17

**Prairie** 11:1

**predominantly** 31:15

**present** 36:4

**pretty** 42:8 61:24 85:6 88:9 92:9,11

**previous** 94:15

**previously** 99:23

**primarily** 35:8

**primary** 43:20, 22

**prior** 8:15 38:13 40:14

**prison** 38:24 39:2 46:25 94:15 97:14 106:6

**prisoners** 49:6

**prisons** 93:19

**privy** 37:8

**problem** 40:11 73:5 78:10 79:18 98:20

**problems** 44:17,18 72:16

**process** 23:2,6 29:23 30:14,16

**producing** 37:1

**production** 36:14,24 37:5

**profile** 33:2

**program** 23:25 24:19 25:1,22, 25 37:23

**progress** 60:25 98:11

**progressed** 46:15 94:25 95:2,4

**progression** 104:3,22

**promise** 98:16

**pronouncing** 34:24

**prove** 41:7

**provide** 53:13, 14

**provided** 8:13 9:7 45:18 78:3, 5

**publications** 38:19

**published** 38:20,21

**pull** 49:13 55:23,24 71:4,6 75:12 80:11

**pulled** 70:13, 15,20

**pulling** 59:23

**purposes** 53:23

**put** 21:25 26:22,24 30:25 37:10 42:24 44:4 57:12 60:2 67:3 82:3 92:13 95:7 96:2 101:11 106:13

---

**Q**

**qualified** 22:14

**quarter** 22:11

**question** 7:18, 23 8:4 31:20 42:7 98:15 101:15 105:21 107:12,18

**questions** 39:18,21 46:5,8 55:25 62:14 93:7 97:1

**quick** 55:12 95:22

**quickly** 9:6 63:6

---

**R**

**radiant** 100:4

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

**radiate** 100:7

**radiated** 100:9

**radiating** 100:7,8

**rail** 58:1

**raise** 6:22

**ranges** 36:19

**rate** 20:25 106:11

**re-certified** 21:15,25

**reach** 53:10, 19,20

**reached** 57:1

**read** 32:9,23,25 56:16 71:23 96:8 107:21

**real** 55:12 103:19

**reason** 8:12 27:17 74:6

**reasonable** 107:6,14

**reasons** 42:19

**rebuked** 33:6

**recall** 12:10 20:18 25:21 27:7 33:1 38:5 51:7,22 52:25 53:1 100:18,23 105:5

**receive** 12:8

**received** 46:23 50:9,17

**recertification** 23:6

**recertify** 21:18,23 23:5, 12,18,22

**recess** 55:17 93:12

**recognizing** 40:10

**record** 6:1,13 7:8 55:14,16,18 93:11,13 97:5 108:12

**recording** 103:8,9 104:7,8

**recovered** 78:13

**refer** 45:15

**reference** 9:13

**referenced** 80:11

**referencing** 24:3 81:4

**referring** 57:8 65:25 81:15

**reflect** 91:12

**regard** 64:10

**regional** 35:24

**regular** 72:12

**regularly** 71:16

**related** 10:13 11:8 38:21

**relating** 32:6

**relevant** 44:7

**reliable** 42:9 44:25 54:13,17, 23

**relied** 47:25 48:6

**relying** 30:8 31:12,15,21 79:5

**remains** 71:7

**remember** 12:22 23:10 26:8 37:17 99:6 101:20,21

**remotely** 6:6

**removable** 68:24

**remove** 69:5

**removed** 71:1 85:3 90:21 91:3

**repainted** 47:18

**repair** 66:20

**repairing** 87:2

**repeat** 48:5 98:22

**report** 8:14 41:12 45:8,18, 24 46:3,6,14, 20,21 48:4,7,8, 10,12,13,19 49:10,15 50:1, 10 51:1,24,25 52:19 53:5,14, 20 54:4 55:22 56:1,10 57:8 61:19 65:11 66:2,8,9,11,12 67:15 74:23 79:9,11,14 80:12 83:15,24 88:12 90:12 92:8,14,15 95:3,8,13,15, 16,24 96:1,3,5 97:2,9 98:25 99:6 101:15 102:10,12,24 104:5,23

**reporter** 6:1, 12,15,21 7:2,19 55:16,18 93:11, 13 107:20,24 108:3,6,8,11

**reports** 40:25 42:22 49:5 53:17 80:17 81:4,5,7

**represent** 7:6

**reputation** 52:16

**require** 22:2

**requirements** 14:16

**resistors** 75:15

**respond** 95:10

**responding** 49:7

**response** 46:8

**responsible** 35:22

**rest** 58:5

**resulted** 32:10

**resume** 38:3

**retake** 23:21

**retired** 34:7

**revealed** 56:11

**review** 43:9 49:19,22 50:20 51:24 57:2 81:5 92:1 107:21

**reviewed** 48:16,24 50:7, 10 51:15,19,21 52:19 54:4 99:6

**reviewing** 51:7 53:2,4

**Richard** 6:14 7:9

**rise** 100:12,14

**role** 36:1

**rolling** 103:14, 15

**rollover** 103:12,23,24 104:4,12

**room** 58:16 80:19 101:22 106:15

**Roseboom** 52:1,3 54:7

**Roseboom's** 99:6 107:13

**rule** 64:25 74:19 76:19,25 77:2,11

**ruled** 71:22 78:1

**rules** 7:14

**run** 20:9

---

**S**

---

**salary** 36:9,13, 18 37:6

**scene** 27:25 43:9,11,21 44:11,14 45:1,5 47:17 54:9,15 55:4

**scenes** 52:6,8

**scheduled** 8:16

**school** 10:1,3 11:22 12:23 14:13 15:7,9 17:17 18:11 19:24 20:4 21:5,7 22:8,10 27:25

**schools** 11:6 12:14,17,18,19 13:11 15:5,22, 24 17:6 22:4 24:2

**science** 11:4,8 16:16 24:19,20 25:1,12,22,25 28:11,19,25 29:6 30:9 31:14,23 32:19 33:8,9,10,12 38:21

**sciences** 11:21 27:8

**scientific** 40:10

**scope** 96:24 101:15 102:10

**scorched** 47:21

**screen** 45:16 51:9 89:12 95:21 102:16, 21 103:3

**screw** 82:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

screws 82:7

scroll 8:25 9:5 49:25 51:1,11 59:7 61:18,20 84:10,11 85:15

sec 49:25

section 37:16 56:6,9 57:15

security 51:17, 18

semester 26:13,18

semi-retired 8:12

seminar 26:25 27:4 28:5 31:16

seminars 10:9, 16 26:7,21,22 27:24 32:8

send 23:13,19 107:24,25 108:2

sense 75:10

sentenced 33:4

separate 17:5, 22 42:2,5 62:10

separated 78:24 85:9,20, 21

separately 62:6

service 10:6, 14,18 11:25 12:25

set 13:3 17:13 65:13

sets 66:25

settled 8:15,17

shaft 89:6

share 8:19 45:7 50:11 90:4 91:10 95:21

sharing 55:7 88:14 91:9

102:16

sheets 91:19

short 21:10

shorter 28:5

show 23:7 48:21 57:3 58:8 60:5 70:21 74:15 78:13,21

showed 56:14 62:21

shows 67:15 83:15 85:3

sic 26:8

side 61:10,14 66:17 70:20 82:13 84:20 90:8

sides 75:13

significant 33:8

similar 94:15

site 52:11

sits 70:25

sitting 105:24

size 94:5

skills 18:6

skis 74:5

sleeping 77:14,17,19

slightly 54:13

small 73:22

Smith 46:12 77:14

smoke 60:22, 24

smoking 64:23 65:7

socket 70:20, 22 79:2 80:23, 25 85:7,8,15,16 87:24

sockets 70:16

solder 66:21, 23,24

solemnly 6:22

Solutions 37:9,10

soot 58:2 60:21 61:1

sort 12:1,2 13:13 88:23

sound 28:19 29:16,17 32:19 95:19

source 43:20 47:13 62:9 63:21 64:1,7 65:16,21,22 66:25 67:1,8 71:22 96:14,21 97:11

sources 46:24 64:3,20,25 65:17 76:17,25 77:6 98:1

South 11:1

spaces 93:24

spades 70:19 71:1

spalling 60:8

specific 22:21 23:1,3 65:16

specifically 10:13 20:9 39:11 40:1 52:24 64:11

specificity 62:24

speculation 64:14 66:18

spell 7:7

spindle 82:4

split 11:5

spot 61:13,14

spread 23:17 25:15,16 26:15 39:20 40:2 63:7

98:9

spreading 100:6

spreads 60:12 98:5,8

squint 103:25

staff 35:6 49:6

stage 8:15 104:6

standing 67:25

start 37:13 40:2,10 56:5 59:12 63:5 72:2,25 73:12, 14,16,22 74:11 98:4 100:12,15 101:17,18,22 104:9 105:13

started 40:1 59:19 60:3 77:15,23

starting 33:4 100:7 102:5 103:13

starts 39:19 60:14,21 63:6 103:19

state 6:3,13 7:7 11:2 14:23 15:16 17:19 18:14 19:12 49:11 52:14 56:11 81:6 85:17 92:5 96:5

stated 28:16 52:24

statement 44:2

statements 40:22 43:24 44:1 49:6,9,12, 22 50:6,22

stay 33:11

step 40:15 41:6 43:5 71:4

steps 43:2

stipulate 6:17

stop 55:7 91:9 104:10

stopped 103:9 104:8

straight 82:5 84:19

strategy 15:20

strictly 16:18

strike 58:10

stronger 54:22

stuck 97:17

studies 30:10, 12 32:5 65:3

stuff 17:13 25:17 27:15 38:9 60:25 63:24 65:4 84:23 87:6 89:23,25 106:2

submission 31:9

Suburban 11:1

supervising 35:22

supervisor 36:1 52:12,13

support 48:12, 17,21,25

supported 61:15

surface 58:25 105:23 106:5

surfaces 60:23

surge 73:8,19, 25 74:1,10

surges 72:12, 21

swear 6:22 80:19

switch 74:23

sworn 18:1

system 23:11

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

72:16 73:15 75:13 76:20

**systems** 72:6, 11

---
**T**
---

**tactics** 15:20

**taking** 26:12 86:3 87:2

**talk** 30:24 95:15

**talked** 43:1 62:13 85:23 95:6 103:22

**talking** 30:3,4 31:2 34:8 55:22 61:6 92:21 94:24 97:23

**tampered** 70:10 71:5

**tampering** 70:6,8

**teach** 15:22 16:1,4 20:20 38:9

**teaching** 16:5 17:18 20:19 38:16

**technical** 35:24

**technician** 18:24

**techniques** 29:16

**telling** 90:6

**tells** 60:13

**ten** 25:2 38:11 93:9

**test** 13:14 15:8 20:3,18,21 21:1 22:13,15,23,24 23:7,21,24 27:4

**tested** 21:11 22:10,11 27:3 28:2

**testified** 8:8

**testimony** 6:23 8:13 102:11 104:3 105:12,16 106:16

**testing** 47:6,10

**tests** 15:16

**Texas** 33:3

**That'll** 45:14

**thin** 82:11

**thing** 19:16 20:20 22:7 23:5 29:7 43:25 51:12 54:17 58:4 60:5 66:22 68:10 70:22 73:20 79:22 87:11 94:8 95:23

**things** 29:10, 24 30:24 32:1 41:17 42:13 43:14,22 44:2, 11,18 61:14 62:6,10 63:5,11 71:4,17 72:22 74:25 77:25 78:4 98:7 100:5

**thinking** 67:12 73:2

**Thornton** 24:15,17,25 26:1

**thought** 13:1 48:20 53:10,13 82:23

**three-hour** 22:10

**time** 6:18 7:8 18:13 23:22 28:22 34:7,9 35:11,12 69:24 80:7 85:20 87:9 94:21 95:7 108:5

**times** 19:4 101:20

**timestamp** 103:23 104:18

**tip** 82:3,4

**toilet** 59:11,12, 22,23

**tool** 64:21 66:1, 16 68:8,10 69:16,19 70:2

**top** 8:23 24:8 58:7,24 59:1 61:23 103:14 106:8

**topic** 102:11

**topics** 27:1

**total** 23:25

**totally** 17:5 26:3 95:9

**touch** 47:5,9 68:24

**town** 13:22 14:3,15 17:3

**trace** 82:2 87:5

**track** 35:14 55:8

**trailer** 33:4

**training** 74:10, 18 76:6,7

**transcript** 107:21 108:4

**transition** 14:12

**transitions** 99:25 100:2

**TRC** 37:9,10, 20,22

**trucks** 19:15

**truth** 6:24,25

**turn** 56:4 100:13

**turned** 91:19

**two-week** 15:7,22

**type** 19:16

20:20 29:7 43:25 66:22 73:20 97:21

**typically** 6:16

---
**U**
---

**U-SHAPE** 57:15

**U-SHAPED** 57:16 61:11

**unable** 65:15 76:13

**unaltered** 43:11

**underneath** 57:25 58:7 61:13 89:25 106:2,3

**underside** 56:13

**understand** 7:23 8:7 10:11 21:22 22:18 25:25 59:5 61:5 62:1 71:14 72:1 74:10 81:24 89:7 106:16

**understanding** 21:17 59:8

**understood** 7:25 14:21 18:20 44:6 78:2

**undetermined** 62:8 76:11

**unfair** 95:9

**unit** 34:5 35:7 37:11,13 58:5 81:13 98:9 100:1,15

**units** 35:5

**university** 10:6,12 11:25 12:24 21:6 24:3 26:2,5

**unknown** 74:24 75:1

**unstable** 72:11,12,21 73:8

**up-to-date** 9:7

**upper** 84:17

---
**V**
---

**Valencia** 6:6 7:7

**valid** 29:14,18, 19 30:1

**vehicle** 21:3

**ventilation** 58:20

**venting** 103:16

**verbiage** 42:25

**version** 79:25

**video** 40:22 43:25 51:17,18 58:9 77:18 95:4 100:22,23 101:21 102:5, 18,20 103:8,9 104:7,8

**videos** 100:10

**viewpoint** 51:19

**Views** 56:13

**visually** 88:25

**volunteer** 13:25

---
**W**
---

**wait** 7:17

**walkway** 103:15

**wall** 81:13 82:7 94:10

**walls** 60:24 94:12 100:7

**wanted** 9:11 37:10,13 50:1 61:21 65:11

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**

78:8 92:1,18,24

**watched** 58:9

**ways** 43:8 73:15

**week** 12:20 13:5,8 15:9 20:6,8 21:9,10 104:25

**weekend** 26:21 27:24 28:5

**wheel** 79:15

**whiplash** 71:20

**white** 57:25 61:14 82:8

**wiped** 59:2

**wire** 81:15 82:11,18 83:9

**wires** 82:12 83:2 86:7

**wished** 107:1,2

**witnesses** 49:3,23

**wood** 75:11 80:1

**work** 13:19 33:14,18 35:10 36:5,6,16,17 37:12 46:22 52:17

**worked** 33:15 34:18 35:10 37:15 38:5 39:1,7,11 52:5, 7

**working** 8:11 25:19 34:21,23 37:21

**works** 96:21

**worry** 98:18

**Wow** 103:6,10

**wrapped** 68:20

**writing** 30:22

**written** 27:20 56:1

**wrong** 90:9 95:22

**wrote** 27:16,17 49:11 74:24 75:1

---

**X**

---

**x-ray** 68:11,13

---

**Y**

---

**year** 10:3 12:12 13:4 23:16,17 25:8

**years** 8:13 21:16,18,23 23:10 25:2,16 28:11 29:23 38:11

---

**Z**

---

**Zoom** 6:7,10 7:16

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit O**