

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 3:24-CV-00185

# MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE

# OF THE ESTATE OF MICHAEL SMITH, AND ON

# HER OWN BEHALF

# V.

# RON NEAL, ET AL.

# DEPONENT:

# STEVEN MCCANN

# DATE:

# January 30, 2025



a courtroom
**powerhouse**

schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

**Exhibit P**

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

JUDGE DAMON R. LEICHTY

MAGISTRATE JUDGE JOHN E. MARTIN

CASE NO. 3:24-CV-00185


MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE

OF THE ESTATE OF MICHAEL SMITH, AND ON

HER OWN BEHALF,

Plaintiff


V.


RON NEAL, ET AL.,

Defendants


DEPONENT: STEVEN MCCANN

DATE:    JANUARY 30, 2025

REPORTER: SYDNEY LITTLE

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
KENTUCKIANA
— COURT REPORTERS —

**Exhibit P**

APPEARANCES


ON BEHALF OF THE PLAINTIFF, MYSTI VALENCIA, AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF MICHAEL SMITH, AND ON

HER OWN BEHALF:

Locke Bowman, Esquire

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: locke@loevy.com

(Appeared via videoconference)



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

APPEAARANCES (CONTINUED)


ON BEHALF OF THE DEFENDANTS, LT. DENNIS KOEN, CAPT. VINCENT MCCORMICK, SGT. AMON LEE, SGT. JENIENE WALTON, OFFICER DARNELL CROCKETT, STEVEN MCCANN, LT. LATRICE JONES, SGT. ERNEST WILLIAMS, SGT. MICHAEL EVERETT, OFFICER JAYLON SINGLETON, WARDEN RON NEAL, CHRISTOPHER BEAL, KEVIN CROSS, ART KAUFMAN, ANDREW KMITTA, JASON NOWATZKE, NADINE SMITH, DOUGLAS WARDLOW, DEBORAH TAYLOR, JANILLE WHITAKER, AND DANIELLE BROWN:

Gustavo Jimenez, Esquire

Office of the Indiana Attorney General

Indiana Government Center South

302 West Washington Street

Fifth Floor

Indianapolis, Indiana 46204

Telephone No.: (317) 232-6201

E-mail: gustavo.jimenez@atg.in.gov

(Appeared via videoconference)

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit P**

INDEX

|  | Page |
| --- | --- |
| PROCEEDINGS | 7 |
| DIRECT EXAMINATION BY MR. BOWMAN | 8 |

EXHIBITS

| Exhibit | Page |
| --- | --- |
| 1 - Indiana Department of Corrections Post Orders General Post Orders - STATE 020182 (AEO) | 33 |
| 2 - Indiana State Prison A.M. Shift Roster January 14, 2023 | 46 |
| 3 - Indiana State Prison I-Group Roster Recapitulation Report - STATE 021614 | 52 |
| 4 - Emergency Situation Chain of Command and Responsibilities - STATE 020933 (AEO) | 67 |
| 5 - Indiana State Prison Emergency Manual Appendix C - STATE 020467 (AEO) | 86 |
| 6 - Incident Report April 28, 2021 - STATE 007920 | 86 |
| 7 - Incident Report May 17, 2018 - STATE 006799 | 130 |

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

EXHIBITS (CONTINUED)

Exhibit                                                          Page

 8 - Report Of Conduct May 12, 2021 -

    STATE 008201                                                 132



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

STIPULATION

The VIDEO deposition of STEVEN MCCANN was taken at KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on THURSDAY the 30th day of JANUARY 2025 at 10:00 a.m. (CT); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. THE OATH IN THIS MATTER WAS SWORN REMOTELY PURSUANT TO FRCP 30.

It is agreed that SYDNEY LITTLE, being a Notary Public and Court Reporter for the State of INDIANA, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

PROCEEDINGS

THE REPORTER:  We are on the record.  My name is Sydney Little.  I'm the online video technician and court reporter today representing Kentuckiana Court Reporters, located at 110 North Wacker Drive, Chicago, Illinois 60606.  Today is the 30th day of January 2025. The time is 10:00 a.m. Central.  We are convened by video conference to take the deposition of Steven McCann in the matter of Mysti Valencia, as personal representative of the Estate of Michael Smith and on her own behalf v. Ron Neal, et al., pending in the United States District Court for the Northern District of Indiana South Bend Division, Case number 3:24-CV- 00185.  Will everyone, but the witness, please state your appearance, how you attending and location you're attending from starting with Plaintiff's Counsel?

MR. BOWMAN:  My name is Locke Bowman.  I am here on behalf of the family of Mr. Smith, plaintiff in the case, and I'm attending remotely from my office in Chicago.

MR. JIMENEZ:  Gustavo Jimenez with the Attorney General's office, representing the defendants, including the deponent.  And I am attending remotely

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit P**

from the Attorney General's Office in Indianapolis, Indiana.

THE REPORTER:  Thank you.  Mr. McCann, will you please state your name for the record?

THE WITNESS:  My name's Steven McCann.

THE REPORTER:  Thank you.

THE WITNESS:  And I'll --

THE REPORTER:  Oh, go ahead.

THE WITNESS:  Oh, go ahead.  I'm sorry.

THE REPORTER:  You're okay.  Do all parties stipulate that the witness is, in fact, Steven McCann?

MR. BOWMAN:  We stipulate.

MR. JIMENEZ:  Yes.

THE REPORTER:  Great.  And, Mr. McCann, will you please raise your right hand?  Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  Thank you.  Counsel, you may begin.

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.   Good morning, Mr. McCann.  How are you today?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

A.   Good.

Q.   My name, as you just heard is Locke Bowman, and you are Steven McCann, correct?

A.   Yes, sir.

Q.   The -- I understand that our time is limited today.  I hope that we finish in time for you to leave for your childcare responsibilities.  And I understand that you'll be leaving in any event because you have to, and if we need to take this up at a later time, we will, but hopefully that won't be necessary.  I wanted to start by just asking if you've given a deposition before?

A.   Yes.

Q.   On how many occasions?

A.   I believe just once.

Q.   Did it relate to your work at the Indiana Department of Correction?

A.   Yes.

Q.   And when was it?

A.   It was, I believe, in 1999, maybe.  It was a while back.

Q.   So quite some time ago.

A.   And it was -- it was a written deposition; it wasn't like a formal thing.

Q.   Okay.  Well, this'll be, you know, obviously

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

we're talking, and Sydney is taking down what I say and what you say.  And if your Counsel needs to say something to protect his record, what he says.  So just a couple of ground rules.  It's very important that we not talk at the same time.  I'm slow of speech, so please make sure that I've finished asking you a question before you start giving an answer.  That'll give Mr. Jimenez an opportunity to lodge an objection if he thinks that's necessary, and it'll ensure that Sydney isn't in the position of having to take down two people talking at the same time.  Does that make sense?

A.    Yes.

Q.    I owe you the same courtesy.  So my job is to not start asking a new question before you finish answering the one that I just asked.  So I'll try and do the same, then hopefully working together, we'll make a clean -- make a clean record.

The other thing that's important is that you understand what I've asked you.  So if for any reason I ask you a question and it doesn't make sense, because I don't understand what you do and I'm not using the right words because I garble something up or because we have some kind of technical glitch and you can't hear me, I need to count on you to let me know that you haven't understood my question.  Will you do that?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Yes.

Q.    This is important because there is eventually going to be a transcript of everything that is said during the course of this deposition.  People reading the transcript are going to assume that you understood the question that I've asked you and that you are in fact answering that question.  So it's just critical to be careful.  I assume that makes sense to you as well, right?

A.    Yes.

Q.    And I think that's -- I think that's it.  If you need to take a break for any reason at any point, let us know.  I like to stop for a couple of minutes every hour just to give us an opportunity to stretch our legs, but it's not an endurance case, and if you need to take a bio break or pause for any reason, just let us know and we'll accommodate that.  I will ask that you finish answering the question that is pending before we before we take a pause.  Can you tell me where you are this morning?

A.    I'm in my home in Michigan City, Indiana.

Q.    And is anyone there with you?

A.    No.

Q.    Do you have any papers or anything in front of you?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Just a notebook with the dates of my different promotions.  That's it.

Q.    Okay.  Well, eventually we'll get to that, I promise.  The -- what did you do to get ready for your deposition this morning?

A.    I just had one -- I -- what do you -- phone call with Mr. Jimenez yesterday morning.

Q.    About how long did that phone call last?

A.    About 40 minutes.

Q.    Have you looked over any documents or any video?

A.    I looked over the documents that was sent to me, which was some reports that I have written.  And the video, I was not able to open the video for whatever reasons.

Q.    Okay.  So you haven't seen the video, but you have looked at the incident report that you prepared?

A.    Yes.

Q.    And then there's an e-mail that you wrote, which comes up over and over again in the documents.  I assume you looked at that as well?

A.    I believe I did.

Q.    Have you looked at -- there's an e-mail that Warden Neal wrote, did -- do -- have you seen that?

A.    I -- I'm not sure if I did or not.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.   Okay.  Well, as things come up, I'll ask you if you had a chance to look at them before the dep.  No impediment, I'm assuming, to your proceeding this morning.  Your health is fine, your memory is sound, and you're ready to go?

A.   Yes.

Q.   You're not taking any medications that interfere with your ability to remember and give answers?

A.   No.

Q.   Great.  Have you talked with -- you understand that you're named as a defendant in this case.  Have you talked with any of the other people named as defendants?

A.   No.

Q.   Have you talked with any of the witnesses who've already given depositions in the past couple of weeks?

A.   No.

Q.   Have you talked with Warden Neal?

A.   No.

Q.   And then if I expand the question, not just in relation to preparing for your deposition, but at any point since Mr. Smith was killed in January of 2023, have you sat down and had conversations with any of the others who were involved on that day?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.    No.  Other than the day that it actually happened.  Other than that, no.

Q.    Okay.  Could you tell me how old you are?

A.    55.

Q.    Where did you grow up?

A.    I grew up, kind of, all over at first.  My father was in the military, so we moved around every other year or so.  And for the later part of my life, I grew up here in Michigan City.

Q.    Did you go to high school in Michigan City?

A.    Yes.

Q.    After -- what year did you graduate high school?

A.    1987.

Q.    When you got out of High School in '87, did you pursue any higher education?

A.    I did, but it didn't last very long.

Q.    Where did you go?

A.    Purdue North Central.

Q.    What did you study?

A.    It was business management.

Q.    How long did you stay in college?

A.    Just a couple months.

Q.    Why did you leave?

A.    I guess I decided it wasn't for me.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

Q.   And then what did you do?

A.   After that, I pursued some employment here locally.

Q.   Can you explain what it was?

A.   I worked at a place called Jaymar Ruby.  They manufactured slacks here in Michigan City.

Q.   Like pants?

A.   Yes.

Q.   And how long did you do that for?

A.   I did it three or four years.

Q.   What was your position?

A.   I guess you could call it a Gerber operator.  It was a machine that actually cut out the parts of the pants on a big, long table.

Q.   Did you leave for another job?

A.   Yes.

Q.   And what was that?

A.   That was correctional officer.

Q.   So I'm thinking you started with IDOC -- I saw something indicating you started in '89; is that right, or was it later?

A.   It -- it was '94.

Q.   '94?

A.   Yeah.

Q.   Okay.  So if you're out of college in '87 and



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

you start at IDOC in '94, that's seven years, other than stitching pants or cutting out pants, what else did you do in that period of time?

A.    Well, I had a job at a pizza -- pizza restaurant for a little bit?

Q.    Manager?

A.    Yeah.  Well, assistant manager.  I -- that's what I worked up to, so.  And I held both that job and the Jaymar Ruby job full-time for a little bit.

Q.    Did you have other positions.

A.    Just -- you mean in the -- the -- at the pizza place or?

Q.    No.  I got the pizza place.  I -- I'm just trying to get a -- trying to get a sense for, you know, the various experiences that you had.

A.    Well, besides Gerber operator, I was a part of a -- a cutting module there towards the end.  And they did all -- it was a little group of us, and we did everything by hand, hand cutters and spreaders and whatnot.

Q.    Any other things?

A.    No, that's it.

Q.    Okay.  So what prompted you in 1994 to apply to become a correctional officer?

A.    The job at Jaymar Ruby, they were starting to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

send their work to Mexico, and they cut the hours down to only, like, three days a week and I couldn't pay my bills, so I had to find other employment.

Q.   Did -- was there something drawing you to corrections as a career, or were you thinking of it more as just this is steady work, a fair amount of security?

A.   Well, my father had worked there at the time, and he was trying to talk me into going there for years and I -- I really didn't want to do it honestly, but there in the end I didn't have -- really have a choice, so...

Q.   So when your dad got out of the service, he became a CO?

A.   Yes.

Q.   What was the deal that -- he was discharged from the military.  You folks settled in Michigan City. He went to work at ISP.  And then after a little while you came on as well?

A.   Yes.

Q.   Fair summary?

A.   Yes.

Q.   Were you and your dad employed in prison at the same time?

A.   Yes.

Q.   When did your dad retire?  Assuming he did

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

retire.

A.   He left in 2003, I believe.

Q.   So I'd like to ask you if you could -- and you're welcome to refer to the notebook, if you could kind of walk me through -- I guess one thing, you're at ISP now; is that right?

A.   No.

Q.   I see.  When did you leave employment there?

A.   I retired in July 1st of last year.

Q.   Well, congratulations.  You have a pension?

A.   Yes.

Q.   And then are you working in addition or is the -- is it just the pension?

A.   No, it's just a pension.

Q.   So any -- I'm -- I don't want to guess.  You -- did you put in your 25 years?  You were eligible for the pension and that was the reason, or were there other circumstances that prompted you to retire?

A.   No, I did -- I worked there 30 years, and it was just things are changing.  It was just time for me to go.

Q.   Can you be more specific about that?

A.   I mean, the staffing there was not what it used to be.  You had to do more with less.  And I just -- like I said, it felt it was time for me to go.  Let

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

the younger kids take care of it.

Q.   I can sympathize with that feeling.  When you say you had to do more with less, are you saying that you experienced some job frustration because of staffing shortages?

A.   Oh, every day.

Q.   And did that affect your enjoyment of the position?

A.   Yes.

Q.   Can you explain why?

A.   Just the stress of trying to find people to fill the slots on the roster, you know.

Q.   Other reasons?

A.   That's -- that's probably the main reason.

Q.   Did you retire exactly on the 30th anniversary of your hire?

A.   No.  My 30th anniversary would've been June the 6th.

Q.   So 24 more days then you were finished?

A.   Yes.

Q.   Got it.  Okay.  I was asking you to walk me through your positions and I asked a question about whether you were still at ISP, which led us to explain your current circumstances.  When you were working with the Indiana Department of Correction, were you assigned



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

to the state prison in Michigan City the entire time?

A.    Yes.

Q.    Could you give me a rundown of the positions that you held?  I don't, you know, need to know individual assignments.  I'll have a few questions about that, but just, kind of, your promotions and when they happened and then I'll have some follow-ups for you?

A.    Well, of course, when I started, I was an officer, and I was -- held that position for four years.  And then 1998, I was promoted to sergeant, and I held that position until 2008.  I'm going to say '08 -- '08-ish, '09-ish when I was record -- promoted to lieutenant.  And then 2015, I was promoted to captain.

Q.    I lost when you became a lieutenant?

A.    Around 2008, 2009.

Q.    I see.  And then about six, seven years later, you were promoted to captain?

A.    Yes.

Q.    And you retired as a captain?

A.    Yes.

Q.    When you were initially taken on as a CEO, did you go through a basic training?

A.    Yes.

Q.    Can you explain what that involved?

A.    Oh, it was probably four weeks.  We did some

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit P**

on -- on-the-job training where we did shakedowns in the cellhouse. You went through the personal protection and it'd just be general correctional officer rules, I guess you could say.

Q.   Was there a classroom component as well as a hands-on component?

A.   Yeah.  The first few weeks were classroom.

Q.   And then as a correctional officer, were you mostly assigned to a living unit or did you have some of the other area of the prison where you were -- where you typically worked?

A.   Mostly housing units.

Q.   Did you work in a cellhouse?

A.   I started -- I was placed on a shift from 1:30 p.m. to 9:30 p.m.  And from 1:30 p.m. till 4:00, I worked in one place.  And then from 4:00 to 9:30, I worked somewhere else.  But there were generally housing units, and I worked all the cellhouses, A, B, C, D, wherever they put me at.  That's where I was assigned.

Q.   Got it.  What were the -- did -- were you encouraged by someone to take an exam to become a sergeant or was this your initiative or a combination? How did that happen?

A.   It was my initiative, because I saw people getting promoted that I didn't want to be my boss.  So

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

that's what -- that's what prompted me to do it. That's what prompted me to go through all the ranks pretty much.

Q.    Okay.  Okay.  It gets -- I mean, there are fewer people at each level.  I'd like to ask you about becoming a captain.  That took place in the teens, you said around 2015 or did it --

A.    2015, yes.

Q.    So what is the process to become a captain?

A.    You would have to go through an interview process, just as you would for any of the ranks.  I tried, I don't know, several times before I actually got promoted.  But there's -- yeah, there's a set -- set interview you have to go through.

Q.    Is there a test?

A.    No.  There used to be when I first started in -- for sergeant.  I had to go to La Porte, which is a neighboring town, to their unemployment department and take test there.  And then I don't know whatever became of that, but that's the last time I had to take a test for any of the actual promotions.

Q.    Who made the decision that you would become a captain?

A.    I believe it was a combination between the major and the assistant warden, and then the warden

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

himself.

Q.   Would it be fair to say that when you become a captain and thinking of police departments, they refer sometimes to the exempt ranks.  The folks who are in management, who the boss gets to pick and choose who they want in the position as opposed to civil service. What -- was the promotion to captain along those lines that the folks running the organization saw you as somebody they'd like to work with, or was it more just a merit based kind of thing, to the extent you can answer?

A.   I believe it was probably a combination of both.  I mean, I've been there enough years that they knew who I was as a person, you know, and my work ethic, and that's how it became.

Q.   So being in the same institution for 30 years, there were probably prisoners in the facility who you knew for a long time, like, through decades.  Do I have that right?

A.   Oh, absolutely.

Q.   And be fair to say that in a prison, like a maximum joint, like ISP, you're not going to have a whole lot of turnover, there's a certain stability in the population; is that right?

A.   Yes.

Q.   So you get to know people.  I mean, obviously

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

not in a, you're friends kind of way, but you get to know who they are and what to expect of them, and they get to know a little bit about you.  And it's not a friendly relationship, but you have a relationship with folks; is that a fair summary?

A.    Sure.

Q.    So I wanted to ask you about Michael Smith. Did you know him?

A.    No.

Q.    Did you ever have an issue with Michael Smith?

A.    No.

Q.    Did you ever personally have to discipline Mr. Smith?

A.    No.

Q.    Do you have any -- I'll ask you a really broad question, any direct or indirect information that Smith was a problem as a prisoner?

A.    No, I -- I don't even recall ever speaking with him.

Q.    Would it be fair to say that if he were a problem kind of guy, you probably would remember him specifically and know exactly who he was?

A.    Yes, probably.

Q.    So as far as you could say, and as far as anything you know, Smith was, you know, reasonably well-

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

behaved, appropriate guy, given the circumstances of his life?

MR. JIMENEZ:  And I object to form and object to foundation, given his prior answers.  But you can go ahead and answer, if you know.

BY MR. BOWMAN:

Q.    Yeah.  You know, I should have mentioned that at the beginning.  These objections are going to happen from time to time given who I am and who Mr. Jimenez is.  And what we do in the deposition is, the objection gets made and later on a judge may have to decide whether the objection was well-founded or not.  But since we don't have the judge here today, you go ahead and answer the question and then we'll sort it out later.  I'll ask the question again, since I take the point.

From everything you knew and had been informed of in your capacity as a senior officer at Indiana State Prison, Michael Smith was reasonable appropriately behaved prisoner; is that fair?

MR. JIMENEZ:  Same objections to that.  But Steve, you can answer, if you know.

THE WITNESS:  I would say, if you had -- it was an issue or they had an issue with him at any time, then it wasn't brought to my attention.

BY MR. BOWMAN:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Exhibit P

Q.    And you'd expect it would've been; is that fair?

A.    Yes.

Q.    Before I leave the preliminaries, I wanted to ask you one thing.  You have an arrangement because this lawsuits relates to your work at the state prison. You have the opportunity for representation, as we understand it, by the Indiana Attorney General's office. Is it your intention to keep with the Attorney General's office as your Counsel throughout the case?

A.    Yes.

Q.    Okay.  So it's my understanding from the materials, that on January 14th of 2023, you were the shift supervisor for the day shift at the ISP; is that correct?

A.    Yes.

Q.    So stepping back from that, when you became a captain, did you then -- was your job then immediately the position of shift supervisor?

A.    Yes.

Q.    Were you shift supervisor on the day shift for your entire time as a captain?

A.    No.  The first three years, I want to say, I was on the night shift.  And then after that I went to the day shift for approximately five years.  Right

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

before I retired, I went back to the night shift.

Q.    Okay.  And of course, in the -- on the day that we're interested in, you were in the daytime position from 6:00 a.m. to 6:00 p.m.?

A.    Yes.

Q.    Any reason that you are aware of as to why you were moved between days and nights?

A.    There's only so many of us.  I think there's, like, seven captains, and every so often the major decides he wants to change positions.  Like, I was on day shift, maybe he thought it was too long in five years, so he put me back on nights.  I don't know.

Q.    What are the duties of the shift supervisor?

A.    Pretty much to run the basic day-to-day operations.

Q.    The -- I wanted to try out an idea on you, you tell me if this is right or not.  Is it the responsibility of the shift supervisor to ensure safety and security of the prisoners and the staff for that 12-hour period when you're in charge?

A.    Yeah, that's one of the -- I don't know what you call it.  One of the parts of the job.

Q.    Mission statement, maybe?

A.    Yeah.

Q.    And that's -- you know, there's a lot of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

components to that, but that's the basic idea?

A.   Yeah.  I mean, it's everybody's responsibility, so.

Q.   And as the shift supervisor, who reports to you?

A.   Oh, I have an assistant shift supervisor that would report to me.  And the other cellhouse lieutenants that are assigned to certain cellhouses, if they have any issues, then they would come to me as well.

Q.   Okay.  The assistant shift supervisor is a lieutenant?

A.   Yes.

Q.   And that individual is not assigned to a specific location, but is a troubleshooter in effect who handles things at your specific direction?

A.   Yes.

Q.   And then is there a direct line of report from the living unit lieutenants to you, or do they report to you through the assistant shift supervisor?

A.   It would be either way.  I mean, if they had an issue and they needed the assistant shift supervisor to go to their unit, then they would go there and then he or she would give me a call and let me know what was going on.

Q.   In addition to the living units, as shift

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

supervisor, do you have oversight responsibility for other areas in the prison, such as you know, the -- I don't know.  I mean, I'm not -- it's not my thing, but in, like, the control room or the recreational operation, counseling, those kinds of things?  What are -- if you could answer my question by just, kind of, explaining the limits of your authority and whether there are other captains on duty as -- at the same time as you who have responsibility for other areas?  Just to clarify for me.

A.    Yes.  As far as the shift goes, that was -- I was over the shift.  They have a -- a -- a shelter captain who the -- the housing lieutenants report to, actually.  Then you have what we call a utility captain, that is -- basically worked side by side with the major and is, like, his troubleshooter.  That would be my boss, would be the utility captain.

Q.    And then the major -- is the major a direct report to the warden?

A.    He would directly report to the deputy warden of operations.

Q.    Got it.  And then your line of duty is security staff.  And there are other folks doing other kinds of operations in the facility, such as, I don't know, maintenance, counseling, those sorts of things.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Where does all that fit in?

A.   Well, you mentioned recreation, before they have their own recreation leaders, rec coordinator. They take care of all the recreation needs.  We have the physical plant, which is a maintenance.  They take care of the maintenance.  Then you have the different counselors and unit managers on the units that deal with the actual offenders and their yearly reports on -- I think they deal with that, each individual offender, I guess you could say in their case -- whatever their case is.

Q.   Are those folks sworn?  Maintenance, RAC counseling?  The -- are those sworn or un-sworn positions?

A.   I would say un-sworn.

Q.   So I guess I'm a -- the utility captain and the shelter captain.  And so there are three captains on every shift or on every day shift, maybe?  How --

A.   Yeah.  Yes.  Every day shift.

Q.   And how -- and then at night, there's probably just a shift captain?

A.   Yes.

Q.   Because everything else is, kind of, shut down for 12 hours?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Q.    So as a day shift captain, sorry to be frustrating and under headed, but as a day shift captain, how -- explain to me what the shelter captain and the utility captain do and how they relate to you, your work?

A.    Well, the utility captain, I mean, if the major has an issue with something or puts out a different policy or procedure or whatever, then the -- the utility captain would make sure that the shift supervisors knew about it.  And the shelter captains were in charge of, like, the sanitation ultimately with the cellhouses and the daily running of the cellhouses. I mean, he works with the shelter lieutenants and then he reports anything that -- out of the ordinary, whatever to the major.  I mean, I never held those positions, so I can't specifically give you complete details, so...

Q.    And what were your specific areas of oversight?

A.    I oversaw the -- the -- just the running of the shift.  I mean, I came in in the morning.  Did the roster, put people where -- in the different cellhouses and whatnot and then just a daily running of the shift.

Q.    And can you walk me through what that entailed on a typical day's basis?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.   I mean, I kept the shift log.  I mean, anything that happened that was reported to me that I reported up the chain to the major and the warden.  I mean, the warden, he wants to know everything so I -- so I spoke with him quite a bit.

Q.   So let's take as an example the kind of thing that brings us here talking today.  There's a fire in one of the cellhouses.  All the paperwork says that that information was reported directly to you; is that right?

A.   Yes.

Q.   There's a shelter captain who also is on duty. What's that person's responsibility in relation to an event like this one?

A.   I never held that position, so I couldn't say.

Q.   Well, got that, but you worked side by side with the person, right?

A.   I mean, I -- he was -- I didn't work side by side with him.  We touched bases every once in a while. If he had an issue in one of the cellhouses, he would let me know.

Q.   What would be an issue that would be under that person's purview?

A.   I mean, somebody wasn't letting offenders out at night to take a shower, for example, then he would let me know what was going on.  I mean, he -- either he

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

would, or he wouldn't.  He didn't have to let me know. He could take care of it himself.  But as far as the staff -- I mean, when I worked nights, if he communicated that to me then I would talk to the staff working in the cell.

Q.   Would the -- would you expect that an incident like this one, a fire incident, would be reported to the shelter captain as well as to you?

A.   Yes.

Q.   As well as to the major and on up to the deputy warden and the warden?

A.   Yes.

Q.   I think there's a document that might help us here.  Here we are.  So I'm going to share my screen with you.  Can you see the document that I've put on the screen?

A.   Yes.

Q.   Let me see if I can make it a little larger for us.  So here's -- I mean, maybe it's just confusing, but we'll call this document Exhibit 1 to your deposition.  It is the Indiana Department of Correction Post Orders, and these are general post orders.  I think I see the warden's signature at the top of the first page.  It's a 17-page document, but I'm just interested for the minute in what we see at the bottom of the first

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

page, which is supposed to be organizational chart of some kind. So we see a warden at the top of the chart with the deputy warden of operations reporting directly to him. In my understanding from what you've said, Mr. McCann, is that in addition to the deputy warden of operations, there's -- there are other deputy wardens who have different responsibilities in the institution; is that accurate?

(Exhibit 1 was marked for identification.)

A. There's only one other deputy warden that would be a reentry.

BY MR. BOWMAN:

Q. Okay. So when we're looking at operations, the -- there are two lines of reporting to the deputy warden, counselors, case managers, and unit managers. And I think what you were telling me earlier in your answers, Mr. McCann, is that those are the folks who deal with the prisoners one by one?

A. Yes.

Q. And those are un-sworn officers, at least so far as you understand it, correct?

A. Yes.

Q. I'm sorry. Was that a yes?

A. Yes.

Q. And I -- I'm not being snarky by asking you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

that.  It's just -- and I should have mentioned it at the beginning.  It's important for our record that it's clear whether you're saying yes or no.  And so that -- I just wanted to clarify and that's the reason I asked you that question.  Then on the other side of the chart, there is a custody supervisor, utility captain, shift supervisor, shelter captain, then zone lieutenants, unit sergeants, and officers.  In terms of the -- and the way this chart shows it is -- it's a line of reporting.  Custody supervisor is at the top. Is that a major?

A.   Yes.

Q.   Then the utility captain reports directly to the custody supervisor.  And you described that person as a -- essentially a right-hand person or an assistant to the custody supervisor?

A.   Yes.

Q.   And then your position is shift supervisor.  You indicated that your direct report to the utility captain, correct?

A.   Yes.

Q.   Does the shelter captain report to you?

A.   According to this, it does, but he has an office right with the major and the utility captain so I'm assuming that he would probably discuss any discrepancies or whatnot to those two individuals.  And

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

if he decided to take it up with me, then he would.

Q.   Okay.  So here's what's not clear to me from your testimony and maybe you can't answer the questions. I realize you're -- you've been retired for a little while.  I'm not trying to make your life miserable, but I've got a job to do, and I'm going to try and do it. The -- what is the division of responsibility between the person in your role and the shelter captain?  Where does your responsibility leave off and that person's responsibility start?  Can you describe that?

A.   Well, he is responsible -- like I said before, he's responsible for all sanitation and whatever issues that come around in the -- in the shelters.

Q.   So it's sounding to me like that person is responsible for the physical plant and to, you know, literally make sure that the locks are working and the doors are shutting and opening, and that the physical operation is moving along during the course of any day. And if something comes up in that regard, that's the guy you call.  Am I right or am I wrong?

A.   Yes.  That's -- that's correct.

Q.   Is that part of it or is that the whole thing?

A.   I guess that would be part of it.  I mean, he -- he takes care of a -- like, he arranges everything. Like, if cells need to be painted, he takes care of



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

that, meaning he takes care, makes sure the sanitation is held up in the cellhouse, makes sure the cellhouse is running efficiently to the best of his knowledge.

Q.   Okay.  And then you're the people person and you make sure that staff is assigned appropriately and that everybody is doing their jobs, and when there's drama for whatever reason you're the guy who gets called?

A.   Yes.

Q.   Got it.  And then you talked about the reports to yourself.  I appreciate that clarification.  Thank you.  So we talked a little bit ago about the idea that the overriding objective on every shift is safety and security for everybody in the facility.  Would it be fair to say that in order to achieve that objective, it's important to know what's going on in every nook and cranny of the facility?

A.   Yes.

Q.   How do you do that?

A.   I mean, just communication.  Before every shift, we have a roll call and I would let them know the incidents or whatever happened on the shift before, if anybody has any questions, and we would tell them what we expected of them if there anything unusual at the beginning of the shift.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    In terms of eyes on, how does that get accomplished?

A.    The -- I guess, I mean, the shelter lieutenants would take care of that for the most part, the shelter captain.  Like I said, if they had anything, any issues or whatever that needed to be reported up the line, they would call me.

Q.    Is it an expectation within each living unit that the officers, the sergeant and the overseeing lieutenant, keep vigilance as to anything out of the ordinary or any developments in the -- in that particular unit?

A.    Yes.

Q.    The reason for that is something can go wrong in a prison at any moment, and you want to be prepared for it and reacting promptly instead of being driven by events, fair?

A.    Yes.

Q.    And is that a principle that correctional officers are supposed to understand?

A.    Yes.

Q.    So in terms of exercising that vigilance, one thing is security checks that are supposed to happen on a periodic basis, correct?

A.    Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Q.    Is there an idea -- or let me strike that and start over.  Is there a requirement or an expectation that security staff will be present to the greatest degree possible on the living unit ranges to monitor potential problems and to ensure that everything is moving along without incident?

A.    Yes.

Q.    How is that expectation fulfilled?  What -- how does that work?

A.    Besides the actual daily running of the units for the line movement and whatnot, they had what was called a guard one pipe that had certain things on each range.  I don't know, buttons on each range where they would take the pipe and hit that and it would beep, and they were doing that approximately every half an hour.

Q.    Is there an expectation that if you -- I've learned a little bit about the operation of A Cellhouse and we'll talk in detail about it in a minute, but you have five tiers in that particular building, correct?

A.    Yes.

Q.    And then when you're running it with a staff of three, you have COs assigned, one to 4 and 5, one to 2 and 3, and then a sergeant running the first tier; is that your understanding?

A.    If it was a case of me being in the cellhouse,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

that's the way I would run it.  But ultimately, I mean, excuse me, the sergeant or lieutenant in the cellhouse, they can put somebody on one range and have somebody work three ranges if they needed -- if need be.  I mean, that's -- that was up to them.

Q.    That might depend on the particular circumstances or a situation that was existing at the time?

A.    Right.

Q.    So obviously you need to have flexibility and make adjustments in order to maximize security and safety at all times?

A.    Yes.

Q.    Are those security checks that happen every 30 minutes by requirement, are they supposed to be staggered or does -- is everybody doing that at the same time?

A.    They're supposed to be staggered.  I mean, it -- you didn't want to do them at the same exact time every time because the offender population would see that and if they wanted to start an issue or do whatever they're going to do, they would know not to do it at that certain time.  So you kind of wanted to stagger things.

Q.    So that's -- that -- that's a reason that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

you've just explained to have somebody out there all the time. If a staff member is on tiers 4 and 5 in the first 15 minutes, maybe you'd have somebody on tiers 2 and 3 in the next 15 minutes and so forth, so you have the -- you have eyes on the -- eyes on the environment the whole 30 minutes in my example. Does that make sense?

A.    Yeah, it makes sense.

Q.    Is that the way it's supposed to be handled?

A.    Yes. Whether they did it like that, I'm not for sure, but they had to do their -- their rounds.

Q.    There are a number of reasons why it's important to have somebody out there at all times; is that fair?

A.    Yes.

Q.    And we'll go into them a little bit later. Another way in which eyes are on a living environment is through surveillance cameras; is that correct?

A.    Yes.

Q.    So I wanted to ask you a few questions about that. Is there a central location in the Indiana State Prison? I'm going to back up. I'm asking you a bunch of questions in the present tense as if you were just there yesterday and obviously you've been gone for a while. The questions that I'm asking you are all

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

directed at January of 2023, which is the, you know, the period of time when you were there and when this event happened.  So can we be clear that that's what I'm asking you about?

A.    Yes.

Q.    In January of 2023, was there a central location at the Indiana State Prison where one person or a team of person -- persons would be able to view all of the surveillance camera monitors?

A.    There was no central area per se.  I mean, I had access in my office.  The assistant shift supervisor had access in his office.  The custody supervisor has access in his office and so on.  The deputy warden has access in his office.  I'm sure the warden did, too.  I mean, there was no actual central area.

Q.    So there are a number of places where upper management can tune in to any area of the prison that's under surveillance by camera?

A.    Yes.

Q.    How many monitors -- again talking about January of 2023, how many monitors were in the shift supervisor's office?

A.    Monitors?  There were two.

Q.    So there's a ton of surveillance cameras in a big facility like ISP, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Yes.

Q.    And you got two monitors.  What's happening on those monitors?

A.    Usually it was -- I was pulling up my daily paperwork, but if an issue came up, I was able to pull up the cameras on one of the monitors.

Q.    I see.  So if, for example, somebody reported something to you, you know, there's a fight in B cellhouse on, you know, the west end or whatever, you'd be able to pull up a camera and observe what was going on?

A.    I could -- I could pull up the camera and observe what was going on at that moment or I could rewind the cameras and try to figure out what happened.

Q.    And is that something that you would do -- have to do from time to time as part of your duties?

A.    Oh, sure.  Somebody came up to an officer in the cellhouse and said I -- that they were robbed, they would call me and then I would try to pull up -- they would give me as many details as they could and I would try to pull up the camera footage and go back in time, see if I could figure out who was involved and what -- what happened.

Q.    So from your standpoint, the surveillance camera was an investigative tool and a way to zero in on

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

a particular issue rather than a tool that you would use to sort of generally keep abreast of what was going on?

MR. JIMENEZ:  Objection to the form.  You can answer.  You can go ahead and answer.

THE WITNESS:  I would use it in both cases.

BY MR. BOWMAN:

Q.    Were there points during your shift when you -- you'd turn the camera on in your office and just observe what was happening?

A.    Sure.  Make sure everything was going -- was running like it's supposed to.

Q.    And you'd flip between camera to camera to camera and just do kind of a survey?

A.    Yes.

Q.    Got it.  There were also, were there not, monitors in each cellhouse, correct?

A.    I believe there were at the time.  Whether they all were in working order, that I don't know.

Q.    Would you say that it's important that they be in working order?

A.    Oh, sure.

Q.    Why is that?

A.    So we can monitor what was going on in the cellhouse.

Q.    We -- again, there are a host of reasons why

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

monitoring is a critical function, correct?

A.   Yes.

Q.   And the cameras are pretty useful for that purpose, particularly when you're short-staffed, correct?

A.   Yes.

Q.   If a camera was -- if a monitor was not functioning in an officer's station in a particular cellhouse, would you expect that that situation would be brought to your attention?

A.   Yes.  It -- it possibly would be.  It could be reported to the shelter captain or the shelter lieutenants who would make contact with the physical plant department and report a camera that wasn't working.

Q.   As you explained to me earlier, a few minutes ago, the shelter captain is the individual with responsibility for making sure stuff works.  And so maybe that would be the logical individual to report that situation to?

A.   That would be, yeah.

Q.   So your expectation would be that a staff sergeant or a lieutenant, if they found out that a particular monitor in a cellhouse had stopped working, that that would be reported on an urgent basis to the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

appropriate individual so it could be fixed, correct?

A.    Yeah, I would assume so.  Yes.

Q.    I mean, that's not a back burner issue.  It's important, right?

A.    Sure.

Q.    Okay.  I had a couple of other things I want to look at with you.  Give me just a minute.  Sorry to keep you waiting here.  I've got to find it someplace else.  Okay.  So I'm showing you now what will be Exhibit 2 to your deposition.  It's a two-page document.  I'll scroll down on the screen so you can look at both pages.  And I can make this a little bigger, for my sake if not yours.  It is labeled Indiana State Prison a.m. Shift Roster January 14, 2023.  This Exhibit 1 [sic] is something that you have seen I'm guessing hundreds of times?

(Exhibit 2 was marked for identification.)

A.    Yes.

BY MR. BOWMAN:

Q.    Do you -- you talked about your job is -- included making sure that you had your correction staff assigned where they needed to be.  Were you the person at the beginning of each of your shifts who filled out this roster and put people where they were supposed to go?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.   Yes.

Q.   A number of these positions are listed as closed.  Just kind of scrolling through, there's a section, looks like 5 and 2 staff and there's nobody staffing those positions.  Then we have yourself as supervisor -- shift supervisor on this particular day.  Others reporting up through the chain that we just talked about earlier as well as folks in various other locations.  First of all, the 5 and 2 staff, who were they?  What is that?

A.   That's Monday through Friday.  This apparently was a weekend roster because they weren't here.

Q.   Got it.  Okay.  So this is a Saturday or a Sunday?

A.   Yes.

Q.   Okay.

A.   Or a holiday.

Q.   And then we have going down in the first column to the left, your name lifted -- listed as shift supervisor.  And then we have various folks assigned to various locations, all of them reporting directly or indirectly to you; is that correct?

A.   Yes.

Q.   I want to focus on A Cellhouse.

MR. JIMENEZ:  And, Locke, just for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

clarification, I think you mentioned earlier that this was Exhibit 1.  I think you meant Exhibit 2; is that right?

MR. BOWMAN:  I did.  I certainly did.  Thank you for saving me again, Gustavo.  This is Exhibit 2 for identification to the McCann deposition.

BY MR. BOWMAN:

Q.    You have a zone lieutenant who is over A Cellhouse and one other location, correct?

A.    Yes.

Q.    That's Lieutenant Smith, E dorm and A Cellhouse, correct?

A.    Yes.

Q.    She is -- what are her duties and responsibilities?  What are your expectations of her?

A.    She would make sure that the cellhouse is running according to the post orders.

Q.    And she's got to keep eyes on two locations?

A.    Yes.

Q.    Why do you have -- I mean, in each cellhouse, you have a sergeant who is making sure that that living area is running according to the post orders, correct?

A.    Yes.

Q.    So why do you have a lieutenant supervising that individual as a report to you?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.    That's the way the manning chart is set up.

Q.    Did you find over the years that it had any particular value or was it just an extra position?

A.    I mean, that's -- that's not my call.  I mean --

Q.    Okay.  And in A Cellhouse, in addition to Lieutenant Smith, who is overseeing, you have a sergeant in charge.  That's the A Cellhouse sergeant, Jeniene Walton, correct?

A.    Yes.

Q.    And then you have -- you're supposed to have, looks like a total of four range officers in that particular living unit?

A.    That would ultimately be correct, but due to staffing issues, that wasn't the case.

Q.    I'm sorry.  I didn't hear the last part of your answer.

A.    I mean, due to the -- the staffing levels at that particular time, we couldn't put the four officers in the cellhouse.

Q.    So this is an issue that you had to deal with on a shift by shift basis; is that fair?

A.    Yes.  Daily.

Q.    What I'm picking up from your testimony is that one of the frustrations of your job was that you'd

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

walk into the prison at some point.  What time in the morning -- if you were on the 6:00 a.m. shift, at what point in the morning were you expected to arrive?

A.   At 4:00 a.m.

Q.   And in those two hours, you'd figure out who showed up and you had what you had, and you had to allocate those staff among various positions?

A.   Yes.

Q.   And some days it would be really bad because you'd be extremely short-staffed?

A.   Yes.  And to go along with that, even after the shift started, you would have people that never showed up.  So then you would have to further adjust it.

Q.   In other words, you'd fill out a roster on the assumption that you had Mr. Jones filling a position and then come 6:00 Mr. Jones isn't there and you've got to make adjustments?

A.   Exactly.

Q.   It would be -- I mean, obviously this is not something that you personally can do anything about. Is it your understanding that staff shortages were caused by absenteeism to some extent?

A.   By some extent, yes.

Q.   And to some extent they were caused by vacant positions that weren't filled for whatever reason?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.   Yes.

Q.   You may not know the answer and I'm not trying to make you say stuff that you don't know the answer to, but if you know, I'd appreciate your testimony. Were positions vacant because of a lack of funding or vacant because it -- there were problems recruiting, that you had the position available, but there wasn't anybody who was interested in taking it?

MR. JIMENEZ:  I'm going to object to the extent it calls for speculation.  But you can answer, if you know.

BY MR. BOWMAN:

Q.   I'm not -- and to be clear, I'm not asking you to speculate, Mr. McCann.  "I don't know" is a fair answer.  But if the truth is something else, I'd appreciate your testimony.  Thank you.

A.   I mean, I could say 100 percent, people just don't want to work at the prison.

Q.   Even though there's a job available, they don't want it?

A.   I'm assuming, yes.

Q.   Was it typical, with respect to A Cellhouse, that when you filled out the roster, that you'd have less than the full number of correctional officers?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Q.    Looking down on this particular day that Exhibit 2 pertains to, looking down at B Cellhouse, it looks like, for that particular location, there are two closed positions, whereas in A Cellhouse, there's only one.  Is there -- to the extent you recall, and you may well not, is there a rationale for that?  How -- what was your thinking about where you short-staffed and where you shored up?

A.    My thinking on that situation is B Cellhouse is pretty much half the size of C and A.  So I had to take a person from -- that was originally signed to B and put them either in A or C.

Q.    Got it.  Although, to be clear, as we look further down at C Cellhouse, we've got -- it looks like we've got two closed positions there as well.

A.    Yes.

Q.    Again, these are just problems and constraints that you had to deal with in terms of filling out this roster every day?

A.    Yes.

Q.    I wanted to show you another document.  It'll take me just a minute to find this.  Bear with me. I've placed on the screen what will be Exhibit 3 for identification.  Exhibit 3 is a one-page document. It's Indiana State Prison I Group Roster Recapitulation

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Report.  This is for the date of the Smith fire, January 14th, 2023.  You were listed as the shift supervisor, Captain Bootz is the utility captain, and Major Wardlow is the custody supervisor on this particular date.  Do I have that right?

(Exhibit 3 was marked for identification.)

A.    Yes.

BY MR. BOWMAN:

Q.    And is this a report that you filled out on a daily -- or each time you supervised a shift?

A.    Yes.

Q.    Can you walk me through what it shows?

A.    On the left side, where it says, "Authorized shift roster," that is the ideal amount that we have on the shift.  I mean, if all the positions were filled, that would be the numbers we had.  On the right side is the actual staffing we had for that day.

Q.    So this tells a pretty grim story?

A.    Yes.

Q.    You're supposed to have 90, and you're down by more than 50 percent, to only 41 officers on duty?

A.    Yes.

Q.    You're also down two supervisors?

A.    Yes.

Q.    And do you -- does this show that you make up

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

those deficiencies -- I'm not sure about the "scheduled day off" entry and the "loan position" entry.  Can you explain what those mean?

A.   The scheduled day off were people that would be off on vacation, compensatory time, they had a death in their family, that nature.  And the loan positions are -- I don't even know if I remember correctly for that, but it's officers on other shifts, that they put on my roster for whatever reason.

Q.   Okay.

A.   But they're not actually on my shift.

Q.   Okay.  So the way it works out -- off is you -- you've got 40 non-hired positions, that is, you have 40 vacant positions.  You've got seven positions where the individual has a scheduled day off.  And then you have two positions where folks have showed up, even though they're not assigned to your shift.  And that gives you two individuals?

A.   Well, they're assigned to my roster, but they're actually on another shift, doing other duties, or whatever the major assigned them.

Q.   Got it.  Got it.  So they're a part of the -- they're a part of the group of 49 who are not there?

A.   Actually, yes.  Yes.

Q.   Yeah.  And when it says 41 present on duty,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

that's it, that's the full, exact total of the bodies that you have?

A.    Well, I would have the 15 supervisors as well, so --

Q.    Correct.

A.    -- that would be --

Q.    Plus the 15.

A.    -- 56.

Q.    So I should have been more specific in my question.  You have 41 line officers available to you on this particular shift, even though the expectation is that you would have 90?

A.    Yes.

Q.    You have 15 supervisors available to your shift -- to you on this shift, even though the expectation is you would have 17?

A.    Yes.

Q.    So it is a grave situation?

A.    Yes.

Q.    It is a problem for safety, a problem for security, and a problem for the personal safety of each of those 40 line officers and 15 supervisors who you're responsible for, correct?

A.    Yes.  Yes.

MR. JIMENEZ:  Object to form.  You can answer.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

BY MR. BOWMAN:

Q.    Would it be fair to say that, with this constraint, that you can do nothing about, that it becomes all the more important, for you and for everybody working under your supervision, to exercise the vigilance that we were talking about earlier in the deposition?

A.    Yes.

Q.    It's all the more important that there be eyes on each of the living areas at all times, correct?

A.    Yes.

Q.    All the more important that there be somebody on the range, observing what's happening there at all times, correct?

A.    Yes.

Q.    And all the more important that monitors be working at all times, and that staff in the living units take full advantage of them to assist them in keeping track of what's going on in the living units; is that also fair?

A.    Yes.

MR. BOWMAN:  This would be a good time to take a short break.  It's 20 past the hour.  Could we reconvene at 11:25 my time, Central Time?

THE REPORTER:  Okay.  We're off the record. The

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

time is 11:19 on my computer.

(A recess was taken.)

THE REPORTER:  We are back on the record for the deposition of Steven McCann, being conducted by videoconference.  Today is January 30th, 2025.  The time is 11:25 a.m. Central.

BY MR. BOWMAN:

Q.    I had a couple of questions for you about whether you, when you were a shift supervisor, had any role in training.  Did you?

A.    As far as training other staff?

Q.    Yes.

A.    Not really, no.

Q.    Did you have the responsibility for discipline?

A.    Yes.  Some -- somewhat, I would say.

Q.    Can you explain what your role in that was?

A.    People that didn't show up for work, without an excuse or whatever, I would do the discipline on that.  If I was in the cellhouse or happened to be -- observed something on video that was done -- being done un-correctly, then I could do that.

Q.    And was it your supervisory style, in imposing discipline, to try and help people understand the reason for the discipline and foster an environment in which

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

people would, hopefully, correct their misbehavior?

A.  Sure.  Depending on the situation, I would sit them down and have a discussion with them.  I wouldn't just go ahead and write them up.  But it depends on what -- what the -- the case may be, you know.

Q.  When you were describing your initial training way back in the '90s, when you started at IDOC, you said that part of the training was, I think you used the word "on-the-job training," where you might get hands-on instruction about how to shake down a cell, or engage in personal protection or the like.  Did I get that right?

A.  Yes.

Q.  Is that still part of the training -- or was that, in January 2023, still part of the training process for new recruits?

A.  It -- it -- a lot had changed since the time I started.  Now they actually have a on-the-job -- or OJT manager that goes around with the new employees and helps them understand what -- what their duties are, and gives them a hand, and show them -- shows them what to do.  I'm sure they still do some of it in the academy, but as far as the extent of it, I don't know.

Q.  Did you have any role -- did -- I mean, did you -- were you asked to come in and speak to the new recruits, or check in with them when they were being

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

walked around, that sort of thing?

A.   The only time I can recall was when I was in yearly -- my yearly training, they had a new class up there, and I was asked to speak to them.  Other than that, no, I -- I didn't do that.

Q.   Okay.  Were you, when you started in IDOC, given any training at all about how to respond to a fire?

A.   I'm sure there was.  I can't really recall.

Q.   It was a long time ago?

A.   Yeah.

Q.   Do you have -- again, as of January 2023, did you have, in terms of continuing education, or required annual training, or computerized training, in any of those modules or components, did you get instruction on fire response?

A.   We had a computer-based training, our yearly training.  We had a module in it that dealt with fires. I can't recall if it actually explained how to respond to one, but I -- I can recall that it went through the different types of fires, and the different types of fire extinguishers that you could use on a certain type of fire.

Q.   Did you participate in fire drills personally?

A.   No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
—COURT REPORTERS—

**Exhibit P**

Q.    Were you aware of staff participation in fire drills?

A.    Yes.

Q.    Did you have any role in scheduling fire drills, supervising them, or the like?

A.    No.

Q.    Who did?

A.    That would be the safety manager.

Q.    Okay.  All right.  I -- you gave an answer, and I -- as I'm kind of playing it back in my head, I'm not sure I understood it.  You said that there was a module on fire response as part of the -- is -- was that part of the annual training that you were required to take when you were at IDOC?

A.    I don't know if you would call it fire response, but yes, it was part of the modules for our yearly training.

Q.    If fire response isn't a good name for the module, what would be a better name?

A.    I don't know, honestly.  Fire safety?

Q.    So it would be -- was this an hour, or longer, less?

A.    It would be less.

Q.    And was it like a computer training, that you sat in front of a monitor and played it, and confirmed

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

your attendance, and you had -- you checked that off?

A.   Yes.  They would play a video for whatever the module was.  And then at the end of the video, they would have, like, a five or ten-question quiz.

Q.   **And you'd take that quiz on the computer and get a score?**

A.   Yeah.  How many ever times you need to pass it, you know.

Q.   **And your best recollection is that it covered different types of fires, fire extinguishers, and possibly other things that aren't coming to mind at the moment?**

A.   It probably also covered how to put out a fire.  Like, spray towards the bottom, towards the top, or -- but an actual response to a fire, it did not cover that.

Q.   **Do you recall any other training on the issue of responding to a fire, other than this module that we've just been talking about?**

A.   That would be covered, possibly, with the QRT, which is the Quick Response Team training.  But I can't recall.

Q.   **Were you QRT-certified?  I'm assuming so.**

A.   At that time, no.

Q.   **But at some point in your career, you were?**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.   Yes.

Q.   And what did the QRT training involve?

A.   It involved in training to -- or, I mean, responding to different situations.  Offender fights.  Say for instance, they would not go to work, or something along those lines.  Fires in the cellhouse, we -- we responded to those.  And just different situations that would happen on a daily basis. Emergency situations, say.

Q.   What I understand from other witnesses, and please tell me if I have this wrong, is that QRT training was generally available to COs.  And if you were interested in it, you could request it, and, most likely, you'd get it?

A.   Well, I would submit, or the major would ask me to submit names that I thought would be interested in going.  Then I would submit him the names.  And ultimately, he would approve it.

Q.   Okay.  And the person you're thinking about for QRT training is going to be an individual who has good head on their shoulders, certain amount of physical courage, is not going to be intimidated, and is willing to run in the direction of danger as opposed to running away from it?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    So it's a little bit of an honor, within ISP, to be proposed for QRT certification, to get the training, and to be part of that group?

A.    Yes, you could say that.

Q.    It's an elite group?

A.    Yes.

Q.    Out of -- and again, I -- you know, I -- I'm not asking for speculation.  If you don't know, you don't know.  But just as a matter of an estimate, out of the total population of COs, about what percent would be QRT-certified?

A.    I could not say.  The -- the -- the -- they were -- it -- the -- the staffing was different at -- all the time, so I couldn't tell you what percentage for any time.

Q.    Another thing that I want to be clear that I understand.  What I'm gathering is that QRT certification does not result in a different assignment, it just results in your having -- your being called upon to respond to emergency situations within your assignment?

A.    Yes.

Q.    Do I have that right?

A.    Yes.

Q.    So if we were to look back at the roster for A

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Cellhouse on January 14, 2023. And I'm not going to do it, but when you're filling out the roster, are you thinking, among other things, of, you know, I want one QRT-certified officer in each cellhouse, or two, or did -- was that a factor in your assignments?

A. It was, because I didn't want to place two people on the QR team in -- QRT team in one cellhouse, where two people would have to leave, and that just left one person on the unit. I would have to try to spread them out.

Q. Got it. So if there were an emergency, as part of your response to the emergency, you would be needing to call out a QRT team?

A. No. As soon as it -- it came over the radio, then they would respond on their own.

Q. Okay. How would they -- would -- I mean, it wouldn't be every QRT-certified individual who would respond, right?

A. No.

Q. How would they sort out who was going to take this particular assignment?

A. At the beginning of the shift, I would place four people on the team. You have a supervisor, and then three other people on the team.

Q. Got it. Is that reflected on the roster?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

A.   I believe it was.  I'm not sure if that particular day it was.

Q.   Then let me go back and pull up Exhibit 2 so we could take another look at it.  It'll take me just a minute to find it again.  So I put Exhibit 2 on our screen, and I'll just kind of scroll through here.  Actually, I think daily operations, you've got a QRT team, and a weapons team, and a cell extraction team?

A.   Yes.

Q.   So it turns out that on this particular day, your QR team consists of four sergeants?

A.   Yes.

Q.   Is that typical, or is that just the way it shook out on this particular day?

A.   That's just the way it shook out.  Usually, for the supervisor, I would have the -- the number one on the QRT, I would have a lieutenant, usually my assistant, on it.

Q.   Okay.  But in any event, these are the four individuals who are on the bubble if something goes wrong?

A.   Yes.

Q.   Got it.  We started down this path because we were talking about fire response training.  When you became QRT-certified, when was that?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.    That was probably '95 or '96.  That's when it first -- first -- they first created the actual QRT teams.

Q.    And then how long did you retain that certification?

A.    Until approximately 2018.

Q.    You gave it up because you became a lieutenant at that point, or captain?

A.    I think the major decided that he didn't want the captains on the teams to respond, and to stay where they're -- the -- the control area, pretty much.

Q.    The idea being that, as a captain, you have overall oversight responsibilities for the entire facility, and you don't want to have your attention and your energy focused on a particular situation when other things might pop someplace else and somebody needed to be in charge?

A.    Yes.

Q.    When you got the QRT training in the teens, what did it include in relation to fire response?

A.    I don't recall that it included anything with the actual fire response.  I mean --

Q.    Is it your -- I'm sorry, I didn't mean to cut you off.  Go ahead.

A.    No, you're fine.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    Is it your understanding that as of January 2023, the QRT-certified individuals had had fire response training as part of their QRT certification?

A.    I don't recall if that was part of the training at that time.  I think it's more of like a hands-on experience, where you would respond with other responders, if you were newer, that had experience doing that, and then you would just learn in that --

Q.    Learn by doing as opposed to learn by training?

A.    Yes.

MR. BOWMAN:  Okay.  There is a document that I needed some help with.  And I'm going to mark it as our Exhibit 4 now, right, Sydney?

THE REPORTER:  Yes.

(Exhibit 4 was marked for identification.)

BY MR. BOWMAN:

Q.    It's going to take me just a minute to find it.  Sorry.  Here we go.  So Exhibit 4 to your deposition, Mr. McCann, will be a document that I'm placing on the screen now, called "Emergency Situation Chain of Command and Responsibilities."  This is a nine-page document that was produced to us as part of our document request in the case.  I -- I'm just going to kind of, sort of medium-slow scroll through this for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit P**

you, and then I'm going to have some specific questions. Okay. So we've kind of -- I -- I've just given you an opportunity to sort of page through the exhibit. My first question is whether this is something that you're familiar with?

A.   Yeah, I've seen it before.

Q.   The main question I have is whether this applies to our case. Is a serious fire in the prison something that would qualify as an emergency situation and would be subject to this directive as to chain of command and responsibilities?

A.   I would say so.

Q.   Was the Michael Smith fire on January 14, 2023 an emergency situation that was subject to this chain of command?

A.   I would say yes.

Q.   So I'm going to take us ahead to Page 7. There are various positions. And in each position, this particular document lists out the things that that individual in that position is responsible for doing; is that a fair summary of the document?

A.   Yes.

Q.   And there's a section for the shift supervisor. I'll just read it into the record. "The shift supervisor is responsible for command of



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

disturbance control emergency operations until relieved by the incident commander, who is also the facility head.  The shift supervisor is responsible for notification of a disturbance or emergency to the facility head incident commander and to facility administrative staff.  During an emergency situation, the shift supervisor reports directly to the custody supervisor."  Can you tell me what that means?

A.   That means I would report my findings, or whatever the incident, whatever happened, to the shift supervisor -- I mean, the custody supervisor, and then he would report up the line.  Also, I had to get in touch with the warden and -- directly and let him know what was going on.

Q.   And that's, basically, the sum and substance of it?

A.   Yes.

Q.   There's also this sentence here.  "The shift supervisor is responsible for command of emergency operations until relieved by the by the warden."  What does that mean specifically?

A.   I mean, when the incident initially happens, then I would be responsible for that.  And then when I found out what was going on, I would report it to the warden, and he would let me know what he wanted to do.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Q.   Okay.   So it -- would it be fair to say that the expectation is -- I mean, we've agreed that this set of responsibilities applied to you during the Michael Smith fire?

A.   Yes.

Q.   And did this set of responsibilities require you to notify anyone other than the warden about what was going on?

A.   Yes.   I also notified the investigations team and the safety manager.   And that was at the -- that was -- I was told to do so by the warden.

Q.   By the warden?   And you're talking about this specific situation?

A.   Yes.

Q.   As a general matter, you would be responsible for notifications as directed by the warden?

A.   Yes.

Q.   To discharge these responsibilities, was there a physical location where you were expected to remain?

A.   I remained in the captain's office.

Q.   And was -- is that by design?

A.   Yeah.

Q.   That's at the vantage point from which you can command emergency operations?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

Q.   Can you explain why that's so?

A.   It's a secure location.  I mean, nobody can get into me without staff letting them in.

Q.   Other than that, is there a reason why you remained in the captain's office in order to command emergency response?

A.   I'm not a responder.  I wasn't qualified to be one, so I had no business responding with the team.

Q.   In other words, what I'm understanding you to say is you had a defined set of responsibilities.  They did not include reporting to the scene of the fire.  In fact, you needed to be somewhere else in order to discharge those defined responsibilities; is that fair?

A.   Yes.

Q.   Got it.  All right.  I think that's enough with that document.  I am going to need to look for something else.  It'll take me just a minute to find it, so bear with me here for just a second.  Okay.  So I want to take you back to a document that we looked at earlier in your deposition.

MR. BOWMAN:  This -- these are the general post orders that I believe, Sydney, we marked for identification as Exhibit 1; is that correct?

THE REPORTER:  It is.

BY MR. BOWMAN:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    I want to take you forward.  Well, first of all, when we look at the general post orders, the purpose that's stated in Paragraph I, is to give everybody the information that they need to know in order to make the environment safe and secure.  And everybody's supposed to do their best to abide by these general post orders; fair summary, and is that accurate?

A.    Yes.

Q.    So I want to go forward here to the guidelines and procedures, and specifically to Paragraph P.  And Paragraph P as you see, has to do with fire.  Take a minute to have a look at it and then I'll have some questions.  And let me know when you're ready for me to ask.

A.    Okay.

Q.    So does Paragraph P list the steps that a staffer -- a corrections officer is supposed to follow when there is a fire?

A.    Yes.

Q.    Are staff trained on this particular set of requirements?

A.    They are supposed -- supposed to review the post orders every 30 days.

Q.    Other than -- sorry, go ahead.  I didn't mean to cut you off.  Please go ahead.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.    And then they would sign off as they did so.

Q.    Other than reviewing the post orders every 30 days, including Exhibit 1, is there any other training that officers receive as to discharging their duties in relation to response to a fire?

A.    When the safety manager did their quarterly fire drills, the staff in the cellhouse, I'm assuming, went through the motions stated here.

Q.    So I'll ask the question again, because I want to make sure I understand the complete process.  Other than reviewing the post orders on a monthly basis and signing off, and participating in fire drills when they occurred, is there any other training that officers received as to how to respond to a fire?

A.    Not that I'm aware of.

Q.    So I want to ask about these items, one by one.  The first thing to do is to -- according to the document, is contact control room via radio or telephone to report a 10-70.  What is the control room and who is there?

A.    The control room consists of a sergeant who works the gates, lets people in and out of the facility.  And the second part would be an officer who manages the radio and the telephone.

Q.    So when I walk into the Indiana State Prison

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

as a visitor, the first thing I do is I go through a series of metal detectors, and then there's a gate that opens.  And as I'm walking in, to my right, there's a guy in a secure location, who's shutting one gate, checking me out, and then opening another gate and allowing me into the facility.  Is that person in the control room?

A.    Yes.

Q.    So he's the individual who receives the radio call of a 10-70?

A.    He has access to the radio, but the officer that's assigned with him would be -- is the responsible person that takes down the -- the calls and also has a log they keep.

Q.    And then what happens next, in terms of the information being transmitted?

A.    The control room officer would call out a 10-71 to all units, and then the first responder -- excuse me, first responders would go to where the situation was.

Q.    The 10-71 call, how is that different from the 10-70 call?

A.    A 10-71 would be a fire alarm, I believe.

Q.    So -- and a 10-70 is what?

A.    A fire.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    So 10-70 is, I see a fire.  10-71 is, the alarm has gone off?

A.    Right.  The respondent would respond to either -- either one.

Q.    Right.  But the distinction is, 71 means a smoke detector has tripped an alarm?

A.    Yes.

Q.    So that is in theory, at least an escalated situation?

A.    Yes.

Q.    Okay.  Then the next thing that's supposed to happen is a -- actually I should ask, just to be clear, when the control room officer sends out the radio message to all units, that includes you as shift supervisor, and you pick it up?

A.    Yeah, I have my own radio.  I -- I can hear the radio tracking.

Q.    And is that the first that you become aware of a fire situation?

A.    Yes.

Q.    And that's what happened on January 14, 2023, in relation to the Smith Fire?

A.    Yes.

Q.    And then that 10-71 call, does that trigger your responsibility to notify the warden?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.   No, not at that time.

Q.   What triggers your responsibility to notify the warden?

A.   The -- usually the first responder supervisor would contact me and let me know what was going on. But I would also look at the cameras and see if I could pull up the -- or, you know, what was happening.  So I can kind of make up a timeline of my own stuff, but I --

Q.   Can -- and it's not -- it's a judgment call on your part.  When you either get a report from a first responder or see on -- a situation on video that the fire is of sufficient magnitude, that this is an emergency situation and the warden needs to be notified?

A.   Yes.

Q.   Got it.  And then -- and you went through that thought process with respect to this?

A.   Yes.

Q.   So Item 2 on the list is bolt cutters.  And the idea or the requirement of Paragraph 2 here, is that the bolt cutters are supposed to be in a certain location, and obviously outside of the range of any prisoner.  And the bolt cutters need to go to the -- need to go to the cell location where a fire is on an immediate basis?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.   Yeah, they're kept in a special locked box on the units, a small set.

Q.   And that locked box is in the officer's station?

A.   Yes.

Q.   And in theory, everybody in the prison who has reviewed this general post order and participated in a fire drill, understands what this requires, unlock that box, get the bolt cutters to the scene, if the fire is within a cell?

A.   Yes.

Q.   And what is the reason for that?

A.   Each cell has a chain where the offender can wrap it around there with the padlock, just to keep the cell secure when they're out of the cell.  But a lot of them like to wrap it around there and lock it while they're in there, just in case their cell is opened when they didn't want it to be, I guess you could say.

Q.   Well, it's, you know, it's a -- it -- it's a -- it's just like you lock your house or you lock your apartment when you go to the store, it's sort of the same deal for the prisoner under the rules.  He has that opportunity to in effect lock his door when he's out on assignment or whatever.

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.   And similarly, when you might lock your door before you go to sleep at night, the offender might wish to have some personal security of having that chain and lock engaged, just for a feeling of personal safety?

A.   Yes, for instance, in the morning when they went to breakfast, the officers in the cellhouse would unlock each individual cell.  Maybe that offender decided that he didn't want to go to breakfast, and just for his security, put the chain on his cell.

Q.   Got it.  So that he could relax and not have to watch his back.

A.   Right.

Q.   And to be clear, this process of padlocking and chains, that was available to any prisoner.  They could purchase the padlock at the commissary, and it was -- this was all legit and on the up and up.  It was perfectly permissible for this procedure to be followed.

A.   Yes.

Q.   On the other hand, if there's an emergency for some reason, you got to be able to engage the bolt cutters to release that lock or cut that chain and disengage that lock so you can get somebody out of a cell.

A.   You could do it that way, or the cellhouse is on their ring -- their key rings in the cellhouse had a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

-- master keys to the locks.

Q.   Is there a master key to those purchased commissary padlocks?

A.   The combination locks, yes.  Now some of the old school ones have a regular padlock, which they're trying to do away with at that time.  But the combination locks, yes, they had a master key to them.

Q.   Got it.  So there are two ways to get that -- get rid of that lock, either use a master key to override the combination, or use the bolt cutters?

A.   Yes.

Q.   Got it.  And to be clear, the reason for ensuring that the bolt cutters are on scene, is if there is a fire in a cell that is potentially a life-threatening situation?

A.   Yes.

Q.   Reasons for that are number one, fire can spread very rapidly?  Yes?

A.   Yes.

Q.   And it can spread in a matter of seconds, from a small seemingly contained fire to a fire that completely engulfs a small space?

A.   Yes.

Q.   Almost immediately, right?

A.   Right.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.   And in addition, when you are a prisoner by definition, you are dependent on staff to release you from a potentially extremely dangerous environment because you can't get out yourself?

A.   Yes.

Q.   So it becomes a responsibility of staff in responding to a fire, to have the means at hand to -- on an immediate basis, remove the incarcerated person from the location -- the confined location where a fire has the potential to become life-threatening?

A.   Yes.

Q.   And that's part of what everybody should understand when they respond to a fire; is that fair?

A.   Yes.

Q.   The next item on the list is to assess the scene?

A.   Yes.

Q.   And what does that entail?

A.   That would -- to see how big the fire is.  A lot of times, for instance, the offender would be upset with the staff.  So they would tear up paper in little pieces and throw it out in front of their cell and light it on fire.  I mean, that's -- that's a minor fire there.  And then you would have some other people that like to set their cells on fire with them inside.  I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

don't understand that, but -- and then there would be accidental fires.

Q.   So assessment of the situation involves assessing the magnitude of the fire and the severity of the threat?

A.   Yes.

Q.   And then you want to get incarcerated folks away from the immediate location of the fire, that's self-evident, right?

A.   Yes.

Q.   And ideally, the procedure is, do that first and then begin efforts to extinguish the fire with the available fire extinguisher?

A.   Well, you could try to extinguish the fire first, and -- depending on the magnitude, and then you would evacuate the offenders.  You wouldn't do them both at the same time.

Q.   Extinguishment comes first, or evacuation comes first?

A.   Extinguishment comes first.  And if you're talking about evacuation of offenders around the area, that would come second.

Q.   But I mean, the general post order makes a distinct -- distinction between evacuating individuals in the immediate area of the fire, versus individuals in

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

the general area.

A.    Oh, in the immediate -- I see it now.  In the immediate area, yes.

Q.    Yeah.  So that would -- the -- those -- that would in a --

A.    So if there was --

Q.    Sorry, go ahead.

A.    If there was a fire in a cell, you would try to extinguish that fire before evacuating the offenders in the immediate area, that's what I'm -- I was trying to say.

Q.    Okay.  And then Item 7 is something that I didn't completely understand and wanted you to help me work through it.  It reads as follows: "If you work a unit with firefighters, their tag will be labeled on the population control board.  Firemen are to be released from their unit anytime a 10-70 or 10-71 is called, unless there is a lockdown, in which case you or the custody supervisor has to be contacted for guidance.  And the firefighters are to report to the fire station.  A member of the first responders will call Checkpoint 2 via the radio to request firemen if needed."  Can you walk me through how that works?

A.    Yes.  The firefighters are -- I can't recall at that time, they were in -- spread out in different

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

cellhouses or are all in one cellhouse. But yeah, they would have their tag labeled as a fireman on the population control board. And also they would have a tag that was taped to the edge of their cell door stating that they were a firefighter. And then if there was a fire, then each shelter would hear it on the radio and they would go release the firefighters, who would report to the fire station. And then the team supervisor, the QRT team, if they needed the firefighters, would call Checkpoint 2, and then he would escort them to where they needed to go.

Q. Okay. So that's a process that happens as I understand it, in three stages. Stage one is staff are supposed to know who the firefighters are based on a tag on their cell and based on an identification of them as such on their population control board tag. That -- so the first issue is those people with that identification get released from their cells?

A. Yes.

Q. What is the population control board and who has access to it?

A. That would be an officer station, and it's just a board that lists everybody's name, DOC number, and their job, on little cards.

Q. And that's part of the equipment and material

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

that's in that location where the living unit COs and the supervising sergeant have their center of operations?

A.   Yes.

Q.   Then -- so after you've identified the firefighters, somebody's got to go and pop those cells?

A.   Yes, depending on what time of day it was. They could be running a certain line or whatever, where all the cells would be open already, and they would just make an announcement for all the firefighters to report to the fire station, or they would have to go individually and let -- let them out.

Q.   Okay.  And then after they've been identified and released, step two is the firefighters go to a central location, called the fire station, and assemble there?

A.   Yes.

Q.   Presumably at that location, they put on their gear and they're ready to be called out?

A.   Yes.

Q.   And then unless there's a lockdown, the first responder has the authority to call for the firemen to be released?

A.   Yes.

Q.   And again, released from that fire station to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

the location of the fire.

A.   Yes.

Q.   And that's step three.  So all of that takes a while, right?

A.   It usually takes just a few -- a few minutes at the most.

Q.   But again, when we're dealing with fire, a few minutes, it can be an eternity, right?

A.   Well, depending on the magnitude of the fire, yes.

Q.   Indeed it does.  And as you testified before, fires can grow from being apparently a small contained harmless fire to being a very dangerous situation in an extremely short period of time, even seconds.  We agree on that, right?

A.   Yes.

Q.   So in that context, it takes a while for the firefighters to go through this process of being released and dispatched to the scene of a fire, as a general matter, right?

A.   I don't like the word a while because I --

Q.   No, that's fair.  What word would you use? Minutes?

A.   Yes.

Q.   Where -- so it would be fair to say that while

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

fire can become dangerous in seconds, it unfortunately takes minutes for the firefighters to go through the process of being dispatched to the location of a fire; is that a fair summary?

A.   Yes.

Q.   And everybody understood that, right?

A.   Yes.

Q.   Okay.  There's another document that I want you to look at with me.

MR. BOWMAN:  This will be -- Sydney, is it Exhibit 6 now?

THE REPORTER:  We are on five.

MR. BOWMAN:  Five.

BY MR. BOWMAN:

Q.   I've placed on our screen what will be marked for identification as Exhibit 5 to your deposition, Mr. McCann.  It is the emergency manual, Appendix C, that we understand was in effect in January of 2023. Appendix C constitutes the ISP Fire Plan.  This document is 11 pages long.  I'm not going to make us go through all of it, but there are a couple of things I wanted to focus on.  Obviously, in order to deal with an emergency situation like a fire, you have to have a plan, right?

(Exhibit 5 was marked for identification.)

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

BY MR. BOWMAN:

Q. And this document constitutes the ISP plan that was in effect at the time of the Smith fire, right?

A. Yes, I believe so.

Q. All right. It makes a distinction, the fire plan does, between a minor fire and a major fire. A minor fire is an isolated fire that does not pose a threat to individuals or property. A major fire is the opposite, cannot be readily contained or extinguished, and does threaten safety of individuals in the area, and has a potential for property damage. Obviously, the Smith fire very rapidly became a major fire, right?

A. Yes.

Q. It was at the time, the 10-70 -- or actually 10-71 code was called, was already a major fire, right?

A. Yes.

Q. So there are various aspects of response that are talked about in the fire plan. And Paragraph 1, sentence one says, "The most important element of fire safety is prevention. Staff should be continually vigilant to elements that contribute to a fire, including excess papers, altered electrical outlets and wiring, missing fire extinguishers, and so forth." And it goes on to say, it's the job of all staff and a knowledgeable staff benefits everybody. And so it's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit P**

important to keep the place clean, right?

A.   Yes.

Q.   And as we have discussed earlier in this deposition, it is also important, in terms of fire prevention, to be aware of whether a fire has started at the earliest possible time, right?

A.   Yes.

Q.   And you guys do that by having boots on the ground and eyes on the living area at all times, that's -- at least that's what's supposed to happen, right?

A.   Yes.

Q.   As well as having the opportunity for closed circuit video surveillance of all areas of the living areas, right?

A.   Yes.

Q.   And this is a critical component, can we agree, of ensuring that if a fire does start, it stays a minor fire and doesn't become a major fire, right?

A.   Yes, it's possible, yes.

Q.   Because being prompt and preventing spread is essential, right?

A.   Yep.  Yes.

Q.   And this is -- I think it's fair to say for everybody, is -- was a well-known fact, in January of 2023; is that right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Yes.

Q.    Okay.  Then the fire plan goes on to provide notifications that need to be made in the event of a fire emergency.  One of the notifications is to the shift supervisor, and then the list goes on from there, right?

A.    Yes.

Q.    So I'm not going to pause on this.  When you are informed of a fire, you need, as the shift's supervisor, to make judgements as to who else should be called, correct?

A.    Yes.  The first person I would call would be the warden and he would ultimately tell me who else needed to be contacted.

Q.    Got it.  And then there are requirements as to evacuation?

A.    Yes.

Q.    This is practiced by fire drills, at least in theory, correct?

A.    Yes.

Q.    And then staff are instructed to do what they can to control a fire, correct?

A.    Yes.

Q.    So the instruction here on Page 7 of the plan, Paragraph G, "Staff should try to extinguish the fire

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

with available fire suppression equipment located on the unit." And that includes, we've been told, two kinds of fire extinguishers. Are you familiar with those two fire extinguisher types and their uses?

A.   Yes.

Q.   They are a water fire extinguisher that might be used in those situations that you described a minute ago in your testimony, in which there were a few pieces of paper on fire on a tier walkway somewhere and the fire can be easily extinguished, right?

A.   Yes.

Q.   And then the more effective fire extinguisher is a chemical fire extinguisher known as an ABC extinguisher, right?

A.   Yes.

Q.   And you knew, and you had been trained that the ABC extinguisher is necessary when you're talking about a serious or a major fire?

A.   A major fire, yes.

Q.   Now staff response to the fire is particularly important because of the delays in release and arrival of the firemen, as we talked about a few minutes ago, right?

A.   Yes.

MR. JIMENEZ:  Object to the form.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

MR. BOWMAN:  I'm sorry, I didn't hear you.

MR. JIMENEZ:  Just objecting, but he already answered.

MR. BOWMAN:  Okay.

BY MR. BOWMAN:

Q.  So the plan goes on to provide a set of procedures to be followed.  First of all, ISO emergency situations, west one, and then emergency situations, west two and then emergency situations east to dorm. And I guess those are the three.  It's pretty much the same. Can you tell me what the differences are, or the -- what's being referred to in those three sections?

A.  Those three sections refer to a completely different facility, not the Indiana State Prison itself. That's for the -- that's for the minor security one that's outside the walls.

Q.  Got it.  Okay.  So in terms of the physical response to the fire, the section that we looked at a minute ago, on Page 7, measures to control a fire, that -- that's what applies within the walls of the Indiana State Prison?

A.  Yes.

Q.  Okay.  Those are the -- that's the summon substance of the instruction as to how to respond.

A.  Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    Is it fair to say that the prisoner firefighters are the only personnel within the Indiana State Prison who are specifically retrain -- trained in how to respond to a fire?

A.    Yes.

Q.    I asked you this question earlier, and I want to go back and ask the same question again, now that you've had the opportunity to look at these materials. First of all, is it accurate that Exhibit 1, Paragraph P, that was the general post orders that had the numbered list of things to do.  We talked about a few minutes ago, that that document as well as the Appendix C to the emergency manual, which we've marked for identification as Exhibit 5, that those are the only two documents describing how staff are supposed to respond to a fire in the Indiana State Prison?

A.    Yes, I believe so.

Q.    And you said, in answer to an earlier question, that in terms of training in fire response, that staff are instructed to review the general post orders on a monthly basis, and that staff are required to participate in fire drills as organized by the safety person on a periodic basis, and that there is no other training.  Do I have that right?

A.    As far as I'm aware, yes.  I -- I can't recall

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

a specific training class where I had to actually make

as if I was responding to a fire and what would happen,

I mean.

Q.    It just wasn't -- it just wasn't training that you ever experienced?

A.    They may do something different now, I don't know, but I don't --

Q.    I appreciate that.  And to be clear, my questions are always directed to that point of time, January 2023, when the Smith fire happened.  As of that point, you yourself had not experienced any training other than the requirement to review the post orders, and in your case, being aware of fire drills, but not directly participating; is that correct?

A.    Yes.

Q.    With respect to staff, to your knowledge as the shift supervisor, the training that staff had received on fire response consisted of the requirement that they review the post orders and participating in fire drills as organized on a periodic basis?

A.    Yes.

Q.    And that was it?

A.    Yes.

Q.    We spoke earlier in the week in another deposition with Lieutenant Latrice Jones, who was also

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

on duty on the day of Mr. Smith's death.  She summarized that, to the best of her understanding and recollection, what she had been told in relation to fire response was three things.  She needed to participate in fire drills as organized on a periodic basis, she needed to understand the difference between the two types of fire extinguishers that we've discussed, she needed to know what 10-70 and 10-71 meant and when to make a 10-70 or a 10-71 call, and she needed to ensure that the firefighters were released as soon as possible.  And that was the sum and substance of the training and the understanding of her training that she'd taken away. Does it sound to you like Lieutenant Jones had it about right?

A.   Yes.

MR. BOWMAN:  All right.  It's been another hour.  It's 12:29.  I'm going to suggest that we go off the record and take another six-minute conference break.

THE REPORTER:  We are off the record.  The time is 12:29 p.m. Central.

(A recess was taken.)

THE REPORTER:  We are back on the record for the deposition of Steven McCann being conducted by video conference.  My name is Sydney Little.  Today

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Exhibit P

is January 30th, 2025, the time is 12:36 p.m.

Central.

BY MR. BOWMAN:

Q.   Mr. McCann, we were looking before the break at the documents, the policy documents that apply to fire response and fire prevention.  And I did not see anywhere in them any statement that as part of fire prevention and safety and fire response, it is imperative to keep eyes vigilantly on all areas of the housing units at all times.  Do you disagree with me about that?  Did you see that anywhere?

A.   No.

Q.   Did you ever receive specific training that keeping eyes on a housing unit at all times is an important component of fire prevention?

A.   I think it would be an important proponent, but when you have three staff in a cellhouse that big, it's hard to keep eyes on everything at the same time.

Q.   I appreciate that, and we'll talk about that in a minute, but my question was slightly different. Did you see any reference in the documents to that concept?

A.   No.

Q.   Did you ever receive any training on that specific proposition?

A.   No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    In the Indiana State Prison, there -- it's an old facility.  The prisoners do not have emergency buttons in their cells; is that your understanding?

A.    Yes.

Q.    You are aware -- or are you aware that there are modern prisons where prisoners do have that safety device?

A.    I'm not aware, but I'm sure there is.

Q.    It would make sense, right?

A.    Yes.

Q.    Because there can arise situations where it's essential that a prisoner be able to summon help?

A.    Yes.

Q.    And I mean, you can think of the list, a medical emergency?

A.    Yes.  You can go down the line.  Yeah.

Q.    You can go down the line.  A safety issue would be another example, right?

A.    Yes.

Q.    And certainly we can agree that a fire within a cell would be an example where a prisoner would need to summon help?

A.    Yes.

Q.    It might be a fire that started by accident without any intention of the -- on the part of the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit P**

prisoner where the prisoner would need help, correct?

A.   Yes.

Q.   Or it might be that the prisoner had intended to start a fire and then things got out of hand and all of a sudden he found him in a -- himself in a situation where he needed help because he's not trying to kill himself.  That's another possibility, right?

A.   Yeah.  Yes.

Q.   So in a situation where a prisoner can't summon help using a call button, what options does a prisoner have?

A.   He would either holler out for help, maybe one of the offenders in the cell close to his that smelled smoke or could see what was happening, they would call for help, you have the smoke -- smoke alarms in the cellhouse, they would -- or alert staff.

Q.   The problem with the smoke alarms was that they were -- if we talk about a cellhouse in particular where this fire started, the problem with the smoke alarm is that it's way up above the fifth tier, right?

A.   Yeah.  It's on the ceiling.

Q.   And it -- it's a high ceiling.  So if you've got a fire on the second tier, it's going to take a minute for the smoke to rise up and trigger that alarm?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.   Different than the situation would be in the office where I'm sitting or in the home where you're sitting, where presumably that smoke detector is just a few feet above your head, right?

A.   Oh, yes.

Q.   The delay, it can be substantial in terms of the smoke detector being triggered.

A.   Yes.

Q.   Everybody understood that, right?

MR. JIMENEZ:  Object to form.  You can answer.

BY MR. BOWMAN:

Q.   My question was --

MR. JIMENEZ:  You can answer.

BY MR. BOWMAN:

Q.   My question -- there's an objection.  I -- which I note the objection.  I'm just going to restate the question, so you'll have it in mind.  Everybody understood that the smoke detectors had limited utility because of how high they were, correct?

A.   Yes.

Q.   So in terms of an immediate response, and again, with respect to fire, an immediate response is really, really important for reasons we've talked about, right?

A.   Yes.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.    And in terms of an immediate response and summoning help for an immediate response, other than the smoke detectors and prisoners calling out for help, is there any other way for prisoners at a cellhouse in the Indiana State Prison to get help on an immediate basis?

A.    Unless staff on the unit happened to see it at the time it was happening, that's the only other thing I could think of.

Q.    Right.  If you had a staffer on -- boots on the ground, on the unit, that staffer might see the fire, and more likely they might smell the fire, right?

A.    If they were on that range, yes.

Q.    And of course, the staffer might also hear cries of fire, or help, or there's smoke, or we need somebody up here, or words to that effect, right?

A.    I would assume so.

Q.    You would hope so, right?

A.    Yes.

Q.    And that, in fact, is among the reasons why your expectation as a supervisor was that to the maximum extent possible there be boots on the ground on the range at all times in every living unit; is that fair?

A.    There would be boots on the ground, but like I said, you only have so many people covering a shelter and they can't see everything or be everywhere at once.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Q. Right. And that is one of the reasons why having working surveillance monitors available in the officers' station is another important method of vigilance and observation that needs to be employed, right?

A. Yeah, that would be helpful.

Q. Right. So if you have no call buttons, you have smoke detectors high above the lower ranges, you have monitors that are not working effectively, you have staff shortages, and you have staff who don't appreciate that they need to be on the ground in the cell at all times, or in the cell ranges at all times, you have a cascading problem, right?

MR. JIMENEZ: Objection to form. You can answer.

THE WITNESS: I would say yes.

BY MR. BOWMAN:

Q. Okay. I mean, it's a series of known factors that increase risk and they're all operating in combination to create a problematic risk of fire, right?

A. Yes.

MR. JIMENEZ: Same objection.

BY MR. BOWMAN:

Q. I didn't hear the answer, I'm sorry.

A. I would say yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.   So I mentioned staff congregating in the officers' station.  As the shift supervisor in charge, what, if any, expectations did you have regarding officers use of the officers' station?

A.   I mean, in between when they're doing their rounds, or performing their regular duties, they could go into the officers' station.  That's where they keep their food and whatever other materials they brought with them.

Q.   Was there an expectation that not all supervisors and correctional officers assigned to a particular unit congregate in the officers' station at the same time?

A.   I mean, they -- they did upon once -- I mean, I wouldn't expect them to do it all day long, but like I said, in between their rounds, they're -- they take little breaks or whatever, that's where they would take them at.

Q.   Okay.  So from your standpoint as a supervisor, it was okay for everybody to be in the officers' station at the same time?

A.   If that's what -- if that's what the situation was.  I mean, maybe they wanted to take a break and eat their lunch.  I mean, I wasn't there.  I can't say for sure.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

Q.   Okay.  If the officers are all in the officer station at the same time, taking a break or eating their lunch as the case may be, would you expect that somebody be reviewing the surveillance monitors to keep eyes on the living area as they were engaging in these other activities?

A.   I believe -- I can't say for sure, but I believe the monitors are always on.  I mean, they have access to the cameras, let -- look down the range and they're sitting right on the -- the sergeant's desk. So I would assume they would be looking at them.

Q.   You would expect that; is that fair?

A.   Yes.

Q.   As a supervisor, right?

A.   Yes.

Q.   Because it's, again, important for a variety of reasons.  We don't need to go through it all again, right?

A.   Yes.

Q.   So one thing that is talked about in the fire plan is the importance of housekeeping as a fire prevention tool.  That excess material, paper, electronics, whatever within a cell can create a risk of fire.  And you remember we looked at that a little while ago?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Exhibit P

A.    Yes.

Q.    So I wanted to ask you some questions about how that objective is achieved.  What is the process for monitoring the accumulation of material within an individual prisoner's cell and ensuring that the accumulation of stuff, particularly electronics, does not occur so as to create a fire risk?

A.    I mean, there's a list of the amounts that the offenders can have of their property in their cell.  Every so often, I can't give any exact time period, they would have a facility shake down and they would go through each cell and take the excess property.

Q.    And you said you couldn't be sure how often that happened?

A.    No, that was up to the custody supervisor, so...

Q.    Okay.  So it happened as frequently or as infrequently as the custody supervisor directed?

A.    Yes.  Also, the staff were supposed to do at least two shakedowns of cells in their unit per shift.  And when they do those shakedowns, if they saw excess property or prohibited property or whatnot, they would confiscate it.

Q.    What about -- you were talking about the PIPE rounds.  Is it okay to refer to those as security

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

checks, the 30-minute checks?  Is that --

A.    Yeah, that's fine.

Q.    Okay.  During security checks, is it the responsibility of the officer to make note of excess material in a cell?

A.    I wouldn't say while they were doing their rounds.  They had to do their rounds in a certain amount of time, and if they took the time to stop and look in everybody's cell and see how many newspapers they had that -- that's not even a possibility, so...

Q.    Got it.  But that is supposed to happen when inspections occur?

A.    Yes.

Q.    Is there a record to your knowledge that's made of inspections when they're ordered by the custody supervisor?

A.    Yes.  They keep a log of it.

Q.    And is that log kept unit by unit?

A.    It depends on what units they're shaking down. I can't even remember at this time what the actual report was called, but every time there's a shake down, they would have a team, and some there would be a recorder that recorded the name of the offender, the property that was confiscated, and that would all go into the log and then it would all go to the custody

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

supervisor.

Q. Was the idea that in a cellhouse there might be a certain day when the custody supervisor would direct that staff were to conduct full scale inspections of every cell in that particular living unit, or would this happen on a rolling basis? How was that managed?

A. That would happen -- like I stated before, that would be periodically when they went cellhouse by cellhouse and shook down every offender in the cell. But most of the time we did targeted shakedowns.

Q. When there's a targeted shakedown, are you referring to the two cells that are supposed to be shaken down on a particular shift?

A. No, those are random.

Q. Those are random.

A. Yeah.

Q. So the targeted shakedowns, those would be the shakedowns that would be recorded in this custody supervisor's walk?

A. Yes. Those were shakedowns that were mostly looking for prohibited property.

Q. And prohibited property would include excess paper and cardboard, it would include excess electronics and the like?

A. It would include weapons, drugs, that sort of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

thing.  I -- I'm not sure -- I'm not sure they were -- during those shakedowns they were looking for excess cardboard.  It was mostly stuff that they couldn't have.

Q.  Well, what I'm trying to understand -- I -- obviously, weapons and contraband are going to be identified and removed and would be the target of a cell shakedown, right?

A.  Yes.

Q.  So my question is: How, if at all, I mean, maybe it didn't happen and maybe that's the answer, I just want to know, how did people on staff control for the kinds of things that might not constitute a safety threat in the sense of being a weapon, but would nonetheless be a potential fire hazard in the sense of being too much stuff accumulated in a particular prisoner's cell?  How would that be policed?

A.  I mean, if -- if the officer or whoever the staff member was observed excess property in the cell, I would hope that they would go in there and -- and confiscate what they could.  I mean, it's not like -- I don't think they actually went looking for that, but --

Q.  Well -- I -- this is what I'm asking.  I mean, I -- I'm not asking you to, you know, make up how something might have happened.  I'm actually under -- wanting to understand what happened.  Did anybody on a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

periodic basis examine the cells of individual prisoners for items within the cell that constituted a fire hazard?

A.    I'm going to say yes.

Q.    Okay.  And was that -- was a record made of that?

A.    I can't say.

Q.    Are you aware --

A.    I -- I -- I don't know.  I don't know.

Q.    Are you aware of any record of the examination of cells to ensure that there wasn't a fire hazard in the cells?

A.    Like I said, on a periodic basis, when they shook down cellhouse by cellhouse by cellhouse, they kept a log of that.  They -- every -- every cell, every individual offender was placed in a log and whatever they confiscated, three sheets, five newspapers, six books, I mean, that would all be in that log.

Q.    Okay.  So you did a bunch of shakedowns over the course of your long career at IDOC, right?

A.    Yes.

Q.    And you would shake down cells every shift. When you were a CO, that was part of your job?

A.    Yes.

Q.    You are well familiar with how shakedowns

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

work?

A.   Yes.

Q.   Okay.  When you went into a cell to shake it down, what was the procedure?

A.   You would first remove the offender from the cell, of course, and go in there, and then you would just go through all their property.  I mean, if they had a bunch of excess cardboard, for instance, you would take all that and you would take it.  They keep, for instance, bowls, they buy off of commissary that contain peanut butter or whatnot.  After that is consumed, they don't need that anymore, but they like to stockpile some things like that in their cell.  So you would confiscate all that.  You would go through the mattress, you would go through their cabinet, go through their clothing, even if they had excess clothing, you would confiscate that as well.

Q.   Other than -- and obviously you're looking for shanks.

A.   Oh, yeah.

Q.   And you're looking for anything --

A.   Checking phones, drugs, whatever.

Q.   -- that can be used as a weapon?

A.   Yeah.

Q.   You're looking for a cell phone if there's a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

cell phone?

A.    Yes.

Q.    You're looking for illegal substances, drugs?

A.    Yes.

Q.    And when you shake down a cell, other than -- what I'm understanding the record would be anything that was confiscated, did you have to inventory it?  Or could you just throw it out?

A.    Just throw it out.  We didn't -- we'd have to give them a confiscation slip for whatever we took. But just as far as logging it in the actual log, I -- I didn't do that.  I don't know if they do it now or what.

Q.    So there would be a confiscation slip that you would need to give to the prisoner saying, I shook down your cell and I took, you know, three empty cans of peanut butter, I took 15 newspapers, and I took your cell phone, and here's your slip.  And you know, you're not getting these items back.

A.    Yes.

Q.    What other record was made of the cell shakedowns?

A.    We -- it would be in the -- the unit log that you shook down this offender at a certain time.

Q.    So that -- the unit -- you know, you go back to the unit log day by day, and you know, they would

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

identify the cells that were the targets for that particular shift?

A.    Yeah, I believe there was a section on the actual log that had the shakedown --

Q.    **Yeah.**

A.    -- section on there.  You would put the names and whatnot on there.

Q.    **But that's just an identification of -- that's just an identification of the particular cell?**

A.    Right.

Q.    **And what I'm -- what I think I'm hearing is, and if I've got this wrong, you tell me, but I think that what you're saying is that as far as you were concerned as a correctional officer and as a supervisor of correctional officers, you did not supervise a process of examining living -- specific living units within the prison for fire safety, in particular, as an objective?**

A.    As an objective?  No.

Q.    **Okay.  That -- that's what I was trying to get at.  Your objective in shaking down a cell was security and identifying specific items of contraband?**

A.    Yes.

Q.    **Such as a specifically prohibited item as opposed to too much paper?**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.    Correct.

Q.    And if I wanted to talk to somebody about what was done in terms of examining individual cells for fire safety, the person I should be talking to is not the shift supervisor, which is yourself, but instead the shelter captain?

A.    Yes.

Q.    And that would be within that person's line of responsibility?

A.    Yes.

Q.    Got it.  Thanks.  And I just want to be clear about this.  You assume that the shelter supervisor would have the records of any steps that were taken in this regard?

A.    Yes.

Q.    And you as the shift supervisor don't have any paper and don't have any knowledge about how fire safety inspections, if there were any, were handled?

A.    No, I don't keep a record of what was taken out of the cells or anything like that.

Q.    To the extent any fire safety was happening as a result of shakedowns of cells, it was an incidental benefit, it wasn't the purpose of shaking down cells?

A.    Yes.  If they were shaking down a cell and found -- found some contraband or whatnot, then they

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

would notify me, because we would have to transfer them to a different unit, possibly a disciplinary unit. For fire safety, I mean, that wouldn't happen.

Q. Right. Okay. Another thing that bears on fire safety is the practice that prisoner had -- prisoners had of -- putting up blankets or sheets in front of their cells for privacy. You were aware that happened on a routine basis, correct?

A. Yes.

Q. The idea from the prisoner's perspective is, you know, I like a little bit of privacy when I'm using the toilet or you know, doing whatever I'm doing in my living unit, and I realize I'm a prisoner and I've lost a lot, but I'd like just this little bit of privacy. And that's basically what a prisoner would tell you if you asked him about it, right?

A. Yes.

Q. Now, from your standpoint as a security officer, these sheets and blankets are a problem, right?

A. Yes.

Q. Point being that in addition to providing legitimate privacy, they can also provide illegitimate privacy and enable a prisoner to engage in activity that's a threat to the safety and security of the institution without your ability to monitor it, fair

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

assumption?

A.   Yes.

Q.   So therefore, there was a rule in the facility that banned any kind of privacy screen in front of a cell?

A.   Yes.

Q.   Now, there has been testimony in this case that as a practical matter, being a correctional officer and getting through your daily duties, it was not uncommon to let things slide a little bit in this regard.  Is that something that -- I mean, does that sound right to you?  Or am I saying something that doesn't make sense?

A.   I mean, I -- I can't speak for each individual person, whether they did it or whether they didn't.  I mean, I just can't.

Q.   Got it.  Were you aware that despite the rule against privacy screens in the front of cells, private -- privacy screens existed in many cells on a daily basis?

A.   Oh, yeah.  I can't tell you how many times I walked the unit and confiscated 50 sheets when I walked down the range, you know what I'm saying?  So yeah, I -- I understand it was a problem.

Q.   And it was one of these things where, you



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

know, it was like whack-a-mole.  You know, you'd take down the privacy screen and an hour later, something else would be up in its place.

A.   Yes.

Q.   So I mean, did you guys ever talk about, you know, how the hell do we deal with this issue?

A.   I mean, it was -- it was brought up at roll call at the beginning of the shift and everything.  You spoke on how it was important that they take the blankets down or sheets down or coats that they had tied up in the bars or whatever.  And when they got to the cellhouse, I'm sure it's like you said they'd go up there, they pull them down, they put something else up. It's just, like you said, a whack-a-mole type deal.

Q.   I mean, you could make the argument that in some prisons, there's a solid front on cells and prisoners get that privacy and life goes on, right?

A.   Oh, I'm sure.  Yes.

Q.   So I mean, what was your personal attitude as a supervisor in relation to the privacy screens?  Was it -- you know, on a scale of 1 to 10, was it a problem of great magnitude?  Or just, you know, a problem of, let's try and enforce the rules, but it's not a priority and not that big a deal.  Was it a 10 or a 1?

A.   I mean, it was probably a 10.  I mean, you get

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

frustrated at it.  I mean, a lot of the offenders, you -- you write conduct reports for them obstructing the view into the cell by putting up these curtains, sheets, blankets, and whatnot.  And they -- they don't care, they just put it right back up again.  And the only time they want to see a problem with it is when you confiscate every sheet they had and every blanket they had and they couldn't put anything else up on the bars, so...

Q.    Right.  So I mean, it -- it's a -- it's a problem in -- it's a 10 in the sense that it's pervasive, is that what you're saying?

A.    Yes.

Q.    And it's also a fact of life, was -- when you were a supervisor at Indiana State Prison, that these privacy screens were going to be popping up everywhere, every day, despite the best efforts of staff, right?

A.    Yes.  It also depended on the person.  Say for instance, I came in the cellhouse, if they yelled, captain in the cellhouse, a lot of them people, they would yank down their blankets because they knew I was going to take them.  So I mean, to some people, it was more of an issue than -- than I had with it.

Q.    Right.  And it -- as a supervisor, you understood, and were aware that the degree of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

enforcement with respect to this particular rule was going to be a matter of discretion and the habit of particular COs under your supervision?

A. Yes.

Q. And the result of that discretion, was that many times in a cellhouse, there'd be privacy screens, more or less all up and down the tier?

MR. JIMENEZ: Object to form. You can answer.

THE WITNESS: Yes.

BY MR. BOWMAN:

Q. In addition to the problems that we have talked about, another issue with respect to the privacy screens is that's another factor in terms of eyes on the unit and monitoring fire risk, right?

A. Yes.

Q. I mean, the smoke can escape the privacy screens, but you might not immediately see a live fire behind a privacy screen?

A. That's possible, yes.

Q. And so this was, you know, if we're going through the list of cascading factors, the privacy screens would have to be on the list as a factor that increases the risk of fire and the need for vigilance; is that right?

A. I would say so, yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

Q.   We've talked about the fire, the smoke detectors.  In A Cellhouse, and the other old buildings at Indiana State Prison, there were no -- there was not a sprinkler system, correct?

A.   I -- no, not there.  No.

Q.   And there was, at the prison, and particularly in the -- I mean -- let me stop, then start over again. The A Cellhouse was a very old building, correct?

A.   Oh, yes.

Q.   Over 100 years old?

A.   Yes.

Q.   Dating all the way back into the late 1800s. Do I have that right?

A.   I wouldn't say that far back.  I would say early 1900s.  But yeah, it was old.

Q.   Early 1900s?

A.   Yeah.

Q.   Over 100 years old by the time Mr. Smith was killed?

A.   Yes.

Q.   And it was a fact of life, was it not, that there were electrical problems with the outlets?

A.   Yes.

Q.   Can -- you chuckled a minute before you answered that question.  Can you explain why you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

responded the way you did?

A.   That was -- seemed like it on a daily basis, whether it be something that actually physically happened with the outlet for it to short out or whatever, or else the offenders were using them to stick paper clips in there to light their cigarettes, you know.  I mean -- I mean, it was just a daily basis.

Q.   So --

A.   As soon as they would tell me that the cell didn't have an outlet, I would notify the maintenance department, and then they would try to get over there as soon as they could.

Q.   And that's -- a malfunctioning outlet is a fire hazard?

A.   Oh, yeah.

Q.   And a tampered-with outlet is also a fire hazard?

A.   Yeah.

Q.   And this is -- this was on a daily basis, a well-known fact of life for you and everybody else, to your knowledge, in the prison, that this additional fire risk existed?

A.   If it wasn't on a daily basis, it seemed like it.  I can put it that way.

Q.   The answer to my question is yes?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Yes.

Q.    Another issue, Mr. McCann, that comes up in relation to the Smith fire, is the locking system on Tier 2 in A Cellhouse.  It was antiquated, correct?

A.    What do you mean by antiquated?

Q.    It was -- there was something called a roll bar that needed to be rolled in order to unlock the cells?

A.    There was a roll bar in there and some of the cells in A Cellhouse were electronically -- you could lock them and unlock them electronically.  I'm not sure. I don't remember if the -- the second range was either rolled by the bar or electronic.

Q.    We've heard testimony from at least one CO assigned to A Cellhouse that the old roll bar manual unlock system existed on the first and second tiers. On the higher-up tiers, they had the electronic unlocking system.  Do you -- did -- does it surprise you to hear that?

A.    No.

Q.    Is it --

A.    I -- I -- I will agree with that.

Q.    I didn't hear.  I'm sorry?

A.    I'll agree with that.

Q.    Okay.  So when you have a cumbersome prospect

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

-- or cumbersome process for unlocking each individual cell, your ability to extract or evacuate a prisoner from a specific cell, that becomes more complicated, right?

A.   Yes.

Q.   And it becomes more time-consuming, right?

A.   Yes.

Q.   And this is another reason why immediate response to a fire is critically important, because you're going to have to spend extra time getting the person out of the prison if there's a serious situation; is that fair?

A.   Yeah, that's fair.

Q.   Okay.  So were you aware of the fire that took place in April of 2017, that resulted in the death of a prisoner by the name of Joshua Devine in B Cellhouse?

A.   I was aware of it.  I didn't work that night, but yeah, I was aware of it.

Q.   Obviously, any time there's a fatality within the prison, no matter who the victim is, it's a issue of concern for everybody there, right?

A.   Yes.

Q.   Right.  I mean, you know, there are people who are locked up, and there are people who are keeping the people who are locked up, but, you know, in a weird way,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

you're all part of the same community, right?

A.    Right.

Q.    And so when there is a fatality as a result of fire, can we agree that it is important for everybody within the prison to conduct an after action review and take away lessons to prevent this kind of thing from happening in the future?

A.    Yes.

Q.    Are you aware -- and I mean, the other thing about the fire that killed Mr. Devine, I appreciate you weren't on duty at the time, but it was a scenario not unlike Mr. Smith's death, right?

MR. JIMENEZ:  Object to form, but you can go ahead and answer.

THE WITNESS:  As far as I know they were -- I -- I can't say specifically if they were similar or not.  I don't know what started the fires or anything like that.

BY MR. BOWMAN:

Q.    Sure.  I -- and, I mean, they happened in different cellhouses.  That's a difference, right?

A.    Right.

Q.    And one of them happened on the night shift and Mr. Smith's death occurred on the day shift, right, that's a difference?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Right.

Q.    And as to the particular mechanism that started the fire, I mean, nobody really knows in either case, right?

A.    I don't know, unless the fire marshal did their investigation and they determined what started the fire.  I don't know, but they don't have to discuss that with me, so...

Q.    But there are also similarities between the two fires, can we agree to that?

A.    Yeah.  They started in the cell.

Q.    Right.  Each of these is a fire that started in the cell, right?

A.    Right.

Q.    Each of these is a fire that resulted in a fatality, right?

A.    Right.

Q.    Each of these is a scenario in which the victim of the fire was a prisoner inside a cell, who gets burned to death in his cell, because he can't get out, right?

A.    Right.

Q.    And in each of these scenarios, there was an issue about how rapidly staff responded to the situation.  I mean, isn't that fair?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

A.    That's fair.  Yeah.

Q.    So we can agree that while there are some differences, there are also strong similarities between these two scenarios?

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  Yes.

BY MR. BOWMAN:

Q.    Are you aware of any changes in policy, procedure, training, protocol, or planning that were implemented at the Indiana State Prison in response to the death of Joshua Devine, by fire, in April of 2017?

A.    I don't recall offhand.

Q.    Did anybody communicate to you in your official capacity, following the Joshua Devine death, any changes in practice that you should adhere to?

A.    No.  Not that I remember, anyways.

Q.    Did anybody communicate any additional requirements in terms of vigilance, in terms of cell inspection, in terms of firefighter release, in terms of any of these factors that we've been talking about today, that you should adhere to as a result of the Devine fire, going forward?

A.    I mean, that's possible, but I can't recall right offhand.

Q.    What steps, to your knowledge, did the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

administration at the Indiana State Prison take following the Joshua Devine fire to reduce the risk that a similar situation would occur in the future?

A.   I'm not positive, but I'm sure after that, they had one of the -- their shakedowns.  Like I said, when they shake -- go cell -- cellhouse by cellhouse and shake each individual down.  I -- I'm sure property was discussed.  And probably the curtains that you mentioned, I'm sure they were discussed, as well. Other than that, there -- there -- there possibly was other things, but I -- I can't be specific.  I don't know.  I don't remember.

Q.   All right.  Are you able to point to any written directive documenting anything that you just described?

A.   No.  If -- if they changed -- if they changed anything, they would have changed it in the post orders or they would have changed it as an executive directive or whatnot.  And I can't recall.  Like I said, I can't remember specifically of any -- anything.

Q.   Are you assuming this happened or are you confident that it did happen?

A.   I'm assuming it did.  I can't remember for sure.  I mean, that was what, eight years ago, nine years ago?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
— COURT REPORTERS —

**Exhibit P**

Q.   Would it be fair to say that at the Indiana State Prison fires were a routine occurrence?

A.   Could you repeat that?

Q.   Yes.  Would it be fair to say that at the Indiana State Prison fires were a routine occurrence?

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  I wouldn't say it happened every day, but it happened periodically.

BY MR. BOWMAN:

Q.   There -- there's a -- an expression, as rare as a pigeon in the park.  Have you ever heard that expression?

A.   Actually, no.

Q.   Well, I mean, I take it that the point of saying something is as rare as a pigeon in the park is that, you know, the pigeons aren't everywhere in the park, but you can't really walk through the park without seeing a pigeon, you know what I mean?

A.   I got you.  Yeah.

Q.   Yeah.  So would it be fair to say that fires at the Indiana State Prison during the years that you worked there were as rare as a pigeon in the park?

MR. JIMENEZ:  I object to form.  You can answer.

THE WITNESS:  It depended on -- in, like, A

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Cellhouse, B Cellhouse, C Cellhouse, it was more of a rare occurrence than it would be in, say, D Cellhouse. That was the disciplinary unit, where they stayed in their cells 23 hours a day. They got mad at the staff, so they were constantly setting fires over there. That's a little different. But as far as the regular housing units, I would say it was a -- not a rare occurrence, but it didn't happen that often.

BY MR. BOWMAN:

Q. I want to make sure I understood your answer. I think I did. In your experience, fires were a particular problem in D Cellhouse, which was a disciplinary unit on lockdown, and you had intentional fires as a recurring problem?

A. Yes, but they were minor, mostly. 90 percent of the time, minor fires.

Q. Yeah. And -- but, you know, again, as we've talked about every fire that starts as a minor fire has the potential to become a major fire --

A. Oh, sure. Yes.

Q. -- if it isn't responded to on an immediate basis, agreed?

A. Yes.

Q. And based on your general recollection, in

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibit P**

other areas, other housing units in the prison, B, C, and A, fires tended not to be intentionally set, they didn't happen as often.  And your summary would be, it's not like it's frequent, and it's not like it's very rare, they happened occasionally.  Is that what you're saying, or am I misinterpreting?

A.   No.  Right.  Most were accidental, like a hot pot melted, or an outlet sparked, or something to that nature.

Q.   You've identified two causes of accidental fires that everybody was aware that those things happened from time to time?

A.   Yes.

Q.   And those are both causes internal to a cell, right?

A.   Yes.

Q.   And that's where you have the scenario, like what killed Mr. Devine and what killed Mr. Smith, where the individual is at extreme risk because of the rapidity with which fire can spread and the fact that the guy can't get out of the cell, right?

A.   Yeah.

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  Yeah.  I'll agree with that.

BY MR. BOWMAN:



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

Q.   You'll agree with that?

A.   Yes.

MR. BOWMAN:  So just a couple of examples that we found in the documents, I just wanted to share with you.

MR. JIMENEZ:  And Locke, just while you're pulling that up, I'll just remind you of the time.

MR. BOWMAN:  Yeah, I see the time.  I got five minutes left.  I -- here's the deal, Mr. McCann.  I -- I'm -- I -- I'm not trying to mess with you.  I'm -- your schedule is going to be respected.  I promised Gustavo that I would respect it.  I got, like, ten to 15 minutes left.  What do you want to do?

THE WITNESS:  If you have ten -- if you have 15 minutes at the most, I can do that.

BY MR. BOWMAN:

Q.   All right.  Let's get this done.  I want to show you just a few of these reports.  I'm going to share my screen and put up for you, so you can look at it, what is going to be identified as Exhibit 6 to your deposition.  It's an incident report form dated April 28th, 2021, and it relates to a fire issue that occurred on that date.  Just take a minute to look at this report.  Let me know when you're ready for me to ask you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

just a couple of questions about it.

(Exhibit 6 was marked for identification.)

A.   Okay.  Okay.

BY MR. BOWMAN:

Q.   So what we have here is a sergeant making rounds, smelling smoke, and because he was on the range, able to detect the fire.  The response is very rapid. The individual offender is removed from the cell, taken to the medical unit for treatment of presumably minor injuries, and everything is handled exactly the way you would hope and expect, right?

A.   Yes.

Q.   This comes about as a result of boots on the ground, yes?

A.   Yes.

Q.   And can we agree that this is a specific example of how being out on the range, being alert to sights and to smells, ends up being an important way to ensure safety from fire?

A.   Now to me, this says that Sergeant Teague was -- just happened to be on the range at that time and smelled the smoke.  Had he been in an office or whatever in between rounds, it might have taken him longer to respond.  I can't say for sure.  I wasn't there.

Q.   Right.  Yeah, I mean, we don't know that this

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

is evidence that somebody was on the range the whole time, which is what would be ideal, correct?

A.    Yes.

Q.    It -- this could be just the result of good luck, right?

A.    Right.

Q.    And this is also, therefore, an example of where, if the systems -- (phone rings) sorry -- if the systems had not been followed, that we've talked about, this could have resulted in a fatality as well, and what happened here is just the result of good luck --

MR. JIMENEZ:  Objection.  You can answer, if you know.

THE WITNESS:  No, I wouldn't say if it was good luck or not.  I mean, like I said, he just happened to be doing the rounds and then smelled the smoke.

BY MR. BOWMAN:

Q.    Fair enough.  I'm going to show you another similar situation.  Exhibit 7 to your deposition will be, for identification, a report dated May 17, 2018, relating to the discovery of a fire in cell DW-504. You want to take just a quick second and look at that narrative?

(Exhibit 7 was marked for identification.)

BY MR. BOWMAN:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

A.    Okay.  Okay.

Q.    This is a cell in D Cellhouse?

A.    Yes.

Q.    Yeah.  So this is potentially a set fire.  You can't tell from the report, correct?

A.    No.  You can't tell.

Q.    But in any event, we have another situation of an officer running the pipe on this particular tier, doing his rounds, happening to smell smoke, and addressing a situation on an immediate basis, right?

A.    Right.

Q.    Here again, the immediate response is what prevents the potential for a fatality, like the death of Mr. Devine and the death of Mr. Smith, right?

A.    Right.

Q.    Would you agree with me -- I -- and I don't want to argue with you about whether this is an example of a perfect response or not, or whether it's just good luck, but would you agree with me that there can be a takeaway from a situation like this, that death or serious injury is preventable when there is an immediate response?

A.    Yeah, I'll agree with that.

Q.    And I got one other I want to have you look at.  This will be Exhibit 7 to your deposition.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

THE REPORTER:  It's actually going to be 8.

MR. BOWMAN:  Sorry, Exhibit 8 to your deposition.

BY MR. BOWMAN:

Q.   Let me just enlarge this for you quickly. This is a report that you made relating to an event on May 12th, 2021.  It's just one sentence.

(Exhibit 8 was marked for identification.)

A.   Okay.

BY MR. BOWMAN:

Q.   So this is -- if I have this correctly, based on your testimony, this is you, sitting in your office, and you're scanning the monitors, and you actually see a guy set a fire.  Is that what happened?

A.   It was either -- I can't recall exactly, I could have been monitoring the -- the video and saw this particular thing happen at that moment, or somebody, one of the offenders, could have thrown something out of a cell in front of another cell, and the staff asked me to look at the camera and roll it back and see which individual actually started the fire.

Q.   But we can certainly agree that Exhibit 7 presents an example of how it may be that the use of the monitors is a very good way to identify a fire starting at a early point in time, and address it again on an

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

immediate basis; is that fair?

A.   Yeah.  Yes.

Q.   And it's another opportunity, is it not, to take away a lesson, yes?

A.   Yes.

MR. BOWMAN:  All right.  I'm concerned about your time, and I can see that I'm not moving as fast as I had hoped I would.  I've got another 15 minutes potentially.  I'm really sorry to do this to you.  Can we identify a time, possibly next week, when we can borrow you for 15 minutes and finish this up?

THE WITNESS:  Sure.  That's fine.

MR. BOWMAN:  You want to do that?  Can we go off the record and just get this done now, Gustavo, when we have the witness (inaudible) --

THE REPORTER:  Before we go off the record, really quick, how would you like to handle signature?

MR. JIMENEZ:  We'll go ahead and reserve.

THE REPORTER:  Reserve?  Okay.  And then Locke, would you like a copy of the transcript?

MR. BOWMAN:  I'm not going to order at this point --

THE REPORTER:  Not at this time?

MR. BOWMAN:  -- not until we finish up.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

THE REPORTER:  Of course.  Yeah.

MR. BOWMAN:  Let's -- if we can --

THE REPORTER:  Gustavo, same for you?

MR. JIMENEZ:  Yeah.

THE REPORTER:  Okay.  Let me take us off the record then.

(Deposition concluded at 1:37 p.m. CT)



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

CERTIFICATE OF REPORTER

STATE OF INDIANA

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skills and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.



SYDNEY LITTLE,

COURT REPORTER/NOTARY

COMMISSION EXPIRES ON: 12/09/2029

SUBMITTED ON: 08/18/2025

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

**EXHIBITS**

| | |
|---|---|
| EXHIBIT 020182 (AEO) | 33 |
| EXHIBIT (AEO) | 67 |
| EXHIBIT Appendix C - STATE 020467 (AEO) | 86 |
| EXHIBIT January 14, 2023 | 46 |
| EXHIBIT Recapitulation Report - STATE 021614 | 52 |
| EXHIBIT STATE 007920 | 86 |
| EXHIBIT STATE 006799 | 130 |
| EXHIBIT STATE 008201 | 132 |

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**Exhibit 1_ McCann** 33:20 34:9 46:14 48:2 71:23 73:3 92:9

**Exhibit 2_ McCann** 46:10, 17 48:2,5 52:2 65:3,5

**Exhibit 3_ McCann** 52:23, 24 53:6

**Exhibit 4_ McCann** 67:14, 16,19

**Exhibit 5_ McCann** 86:16, 24 92:14

**Exhibit 6_ McCann** 86:11 128:21 129:2

**Exhibit 7_ McCann** 130:19,24 131:25 132:22

**Exhibit 8_ McCann** 132:2, 8

---

**0**

**00185** 7:15

**08** 20:11

**08-** 20:11

**09-ish** 20:12

---

**1**

**1** 33:20 34:9 46:14 48:2 71:23 73:3 87:18 92:9 114:21,24

**10** 114:21,24,25 115:11

**10-** 74:17

**10-70** 73:19 74:10,22,24

**75:1** 82:17 87:14 94:8

**10-71** 74:21,23 75:1,24 82:17 87:15 94:8,9

**100** 51:17 117:10,18

**10:00** 7:8

**11** 86:19

**110** 7:6

**11:19** 57:1

**11:25** 56:24 57:6

**12** 30:24

**12-** 27:19

**12:29** 94:17,21

**12:36** 95:1

**12th** 132:7

**14** 46:14 64:1 68:13 75:21

**14th** 26:13 53:2

**15** 41:3,4 55:3, 7,14,22 109:16 128:13,15 133:8,11

**17** 55:16 130:20

**17-page** 33:24

**1800s** 117:12

**1900s** 117:15, 16

**1987** 14:14

**1994** 16:23

**1998** 20:10

**1999** 9:20

**1:30** 21:14,15

**1:37** 134:7

**1st** 18:9

---

**2**

**2** 39:23 41:3

46:10,17 47:4,9 48:2,5 52:2 65:3,5 76:19,20 82:21 83:10 119:4

**20** 56:23

**2003** 18:2

**2008** 20:11,15

**2009** 20:15

**2015** 20:13 22:7,8

**2017** 120:15 123:11

**2018** 66:6 130:20

**2021** 128:23 132:7

**2023** 13:23 26:13 42:1,6,21 46:14 53:2 58:14 59:12 64:1 67:2 68:13 75:21 86:18 88:25 93:10

**2025** 7:8 57:5 95:1

**23** 126:4

**24** 19:19

**25** 18:16

**28th** 128:23

---

**3**

**3** 39:23 41:4 52:23,24 53:6

**30** 18:19 23:15 40:14 41:6 72:23 73:2

**30-minute** 104:1

**30th** 7:7 19:15, 17 57:5 95:1

**3:24-CV-** 7:15

---

**4**

**4** 39:22 41:2 67:14,16,19

**40** 12:9 54:13, 14 55:22

**41** 53:21 54:25 55:10

**49** 54:23

**4:00** 21:15,16 50:4

---

**5**

**5** 39:22 41:2 47:4,9 86:16,24 92:14

**50** 53:21 113:22

**55** 14:4

**56** 55:8

---

**6**

**6** 86:11 128:21 129:2

**60606** 7:7

**6:00** 27:4 50:2, 16

**6th** 19:18

---

**7**

**7** 68:17 82:12 89:24 91:19 130:19,24 131:25 132:22

**71** 74:18 75:5

---

**8**

**8** 132:1,2,8

**87** 14:15 15:25

**89** 15:20

---

**9**

**90** 53:20 55:12 126:16

**90s** 58:7

**94** 15:22,23 16:1

**95** 66:1

**96** 66:1

**9:30** 21:15,16

---

**A**

**a.m.** 7:8 27:4 46:13 50:2,4 57:6

**ABC** 90:13,17

**abide** 72:6

**ability** 13:8 112:25 120:2

**abreast** 44:2

**absenteeism** 50:22

**absolutely** 23:19

**academy** 58:21

**access** 42:11, 12,13,14 74:11 83:21 102:9

**accident** 96:24

**accidental** 81:2 127:7,10

**accommodate** 11:17

**accomplished** 38:2

**accumulated** 106:15

**accumulation** 103:4,6

**accurate** 34:8 72:7 92:9



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

**Exhibit P**

achieve 37:15

achieved 103:3

action 121:5

activities 102:6

activity 112:23

actual 22:21 30:8 39:10 42:15 53:17 61:15 66:2,22 104:20 109:11 110:4

addition 18:12 28:25 34:5 49:6 80:1 112:21 116:11

additional 118:21 123:17

address 132:25

addressing 131:10

adhere 123:15, 21

adjust 50:13

adjustments 40:11 50:17

administration 124:1

administrative 69:6

advantage 56:18

affect 19:7

affirm 8:17

agree 85:14 88:17 96:20 119:22,24 121:4 122:10 123:2 127:24 128:1 129:16 131:16,19,23 132:22

agreed 70:2 126:23

ahead 8:8,9 25:5,13 44:4 58:4 66:24 68:17 72:24,25 82:7 121:14 133:19

alarm 74:23 75:2,6 97:20,24

alarms 97:15, 17

alert 97:16 129:17

allocate 50:7

allowing 74:6

altered 87:22

amount 17:6 53:14 62:21 104:7

amounts 103:8

anniversary 19:15,17

announcement 84:10

annual 59:14 60:13

answering 10:15 11:7,18

answers 13:9 25:4 34:17

antiquated 119:4,5

anymore 108:12

anytime 82:17

apartment 77:21

apparently 47:11 85:12

appearance 7:17

Appendix 86:17,18 92:12

applied 70:3

applies 68:8

91:20

apply 16:23 95:5

appropriately 25:18 37:5

approve 62:18

approximately 26:25 39:15 66:6

April 120:15 123:11 128:22

area 21:10 42:10,15,17 48:22 66:11 81:21,25 82:1, 3,10 87:10 88:9 102:5

areas 29:2,9 31:18 56:10 88:13,14 95:9 127:1

argue 131:17

argument 114:15

arise 96:11

arrangement 26:5

arranges 36:24

arrival 90:21

arrive 50:3

aspects 87:17

assemble 84:15

assess 80:15

assessing 81:4

assessment 81:3

assigned 19:25 21:9,19 28:8,13 37:5 39:22 46:22 47:20 54:17,19, 21 74:12

101:11 119:15

assignment 63:18,21 64:21 77:24

assignments 20:5 64:5

assist 56:18

assistant 16:7 22:25 28:6,10, 19,21 35:14 42:11 65:18

assume 11:5,8 12:21 46:2 99:16 102:11 111:12

assuming 13:3 17:25 35:24 51:21 61:23 73:7 124:21,23

assumption 50:15 113:1

attendance 61:1

attending 7:17,18,21,25

attention 25:24 45:10 66:14

attitude 114:19

Attorney 7:23 8:1 26:8,9

authority 29:7 84:22

Authorized 53:13

aware 27:6 60:1 73:15 75:18 88:5 92:25 93:13 96:5,8 107:8,10 112:7 113:17 115:25 120:14, 17,18 121:9 123:8 127:11

—————

B

back 9:21 26:17 27:1,12 41:22 43:21 46:3 57:3 58:7 60:10 63:25 65:3 71:19 78:11 92:7 94:23 109:18, 24 115:5 117:12,14 132:20

bad 50:9

banned 113:4

bar 119:7,9,13, 15

bars 114:11 115:8

based 23:10 83:14,15 126:25 132:11

bases 32:18

basic 20:22 27:14 28:1

basically 29:15 69:15 112:15

basis 31:25 38:24 45:25 49:22 62:8 73:11 76:25 80:8 92:21,23 93:20 94:5 99:5 105:6 107:1,13 112:8 113:20 118:2,7,19,23 126:23 131:10 133:1

bear 52:22 71:18

bears 112:4

beep 39:14

begin 8:22 81:12

beginning 25:8 35:2 37:25

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

46:23 64:22 114:8

**behalf** 7:12,20

**behaved** 25:1, 19

**Bend** 7:14

**benefit** 111:23

**benefits** 87:25

**big** 15:14 42:25 80:19 95:17 114:24

**bigger** 46:12

**bills** 17:3

**bio** 11:16

**bit** 16:5,9 24:3 32:5 37:12 39:17 41:16 63:1 112:11,14 113:10

**blanket** 115:7

**blankets** 112:6,19 114:10 115:4, 21

**board** 82:16 83:3,16,20,23

**bodies** 55:1

**bolt** 76:19,21, 23 77:9 78:20 79:10,13

**books** 107:18

**boots** 88:8 99:9,21,23 129:13

**Bootz** 53:3

**borrow** 133:11

**boss** 21:25 23:5 29:17

**bottom** 33:25 61:14

**bowls** 108:10

**Bowman** 7:19 8:13,24 9:2 25:6,25 34:12

44:6 46:19 48:4,7 51:12 53:8 56:1,22 57:7 67:12,17 71:21,25 86:10, 13,14 87:1 91:1,4,5 94:16 95:3 98:11,14 100:17,23 116:10 121:19 123:7 125:9 126:10 127:25 128:3,8,17 129:4 130:17, 25 132:2,4,10 133:6,13,22,25 134:2

**box** 77:1,3,9

**break** 11:12,16 56:23 94:19 95:4 101:23 102:2

**breakfast** 78:6,8

**breaks** 101:17

**brings** 32:7

**broad** 24:15

**brought** 25:24 45:10 101:8 114:7

**bubble** 65:20

**building** 39:19 117:8

**buildings** 117:2

**bunch** 41:22 107:19 108:8

**burned** 122:20

**burner** 46:3

**business** 14:21 71:8

**butter** 108:11 109:16

**button** 97:10

**buttons** 39:13 96:3 100:7

**buy** 108:10

---

**C**

**cabinet** 108:15

**call** 12:7,8 15:12 27:22 28:23 29:14 33:20 36:20 37:21 38:7 43:19 49:4 60:15 64:13 74:10,17,21,22 75:24 76:10 82:21 83:10 84:22 89:12 94:9 97:10,14 100:7 114:8

**called** 15:5 37:8 39:12 63:19 67:21 82:17 84:15,19 87:15 89:11 104:21 119:6

**calling** 99:3

**calls** 51:10 74:13

**camera** 42:9, 18 43:10,12,21, 25 44:8,12,13 45:7,14 132:20

**cameras** 41:18 42:24 43:6,14 45:3 76:6 102:9

**cans** 109:15

**capacity** 25:17 123:14

**captain** 20:13, 17,19 22:6,9,23 23:3,7 26:18,22 29:13,14,17 30:16,17,21 31:1,3,4,6,9 32:11 33:8 35:6,7,12,19, 21,23 36:8 38:5 45:12,17 53:3 66:8,12 111:6 115:20

**captain's** 70:20 71:5

**captains** 27:9 29:8 30:17 31:10 66:10

**cardboard** 105:23 106:3 108:8

**cards** 83:24

**care** 19:1 30:4, 5 33:2 36:24,25 37:1 38:4 115:4

**career** 17:5 61:25 107:20

**careful** 11:8

**cascading** 100:13 116:21

**case** 7:15,21 11:15 13:12 26:10 30:10 34:15 39:25 49:15 58:5 67:24 68:8 77:17 82:18 93:13 102:3 113:7 122:4

**cases** 44:5

**caused** 50:21, 24

**ceiling** 97:21, 22

**cell** 33:5 58:10 65:8 76:24 77:10,13,15,17 78:7,9,23 79:14 80:22 82:8 83:4,15 96:21 97:13 100:11, 12 102:23 103:5,9,12 104:5,9 105:5,9 106:6,16,18 107:2,15 108:3, 6,13,25 109:1, 5,15,17,20 110:9,21 111:24 113:5 115:3 118:9 120:2,3 122:11,

13,19,20 123:18 124:6 127:14,21 129:8 130:21 131:2 132:19

**cellhouse** 21:2,13 28:7 37:2 39:17,25 40:2 43:9,18 44:16,24 45:9, 24 47:24 48:9, 12,16,20 49:6, 8,20 51:22 52:2,4,9,14 57:20 62:6 64:1,4,7 73:7 78:6,24,25 83:1 95:17 97:16,18 99:4 105:2,8,9 107:14 114:12 115:19,20 116:6 117:2,8 119:4,10,15 120:16 124:6 126:1,3,13 131:2

**cellhouses** 21:18 28:8 31:12,22 32:8, 19 83:1 121:21

**cells** 36:25 80:25 83:18 84:6,9 96:3 103:20 105:12 107:1,11,12,22 110:1 111:3,20, 22,23 112:7 113:18,19 114:16 119:8, 10 126:4

**center** 84:2

**central** 7:8 14:19 41:21 42:6,10,15 56:24 57:6 84:15 94:21 95:2

**CEO** 20:21

**certification** 63:2,18 66:5 67:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

chain 32:3 47:7 67:22 68:10,14 77:13 78:3,9,21

chains 78:14

chance 13:2

change 27:10

changed 58:16 124:16,17,18

changing 18:20

charge 27:20 31:11 49:8 66:17 101:2

chart 34:1,2 35:5,9 49:1

check 58:25

checked 61:1

checking 74:5 108:22

Checkpoint 82:21 83:10

checks 38:23 40:14 104:1,3

chemical 90:13

Chicago 7:7, 22

childcare 9:7

choice 17:10

choose 23:5

chuckled 117:24

cigarettes 118:6

circuit 88:13

circumstances 18:18 19:24 25:1 40:7

City 11:21 14:9, 10 15:6 17:16 20:1

civil 23:6

clarification

37:11 48:1

clarify 29:10 35:4

class 59:3 93:1

classroom 21:5,7

clean 10:17 88:1

clear 35:3 36:2 42:3 51:13 52:13 63:16 75:12 78:13 79:12 93:8 111:11

clips 118:6

close 97:13

closed 47:3 52:4,15 88:12

clothing 108:15,16

coats 114:10

code 87:15

college 14:22 15:25

column 47:19

combination 21:22 22:24 23:11 79:4,7,10 100:20

command 67:22 68:11,15, 25 69:19 70:24 71:5

commander 69:2,5

commissary 78:15 79:3 108:10

communicate 123:13,17

communicated 33:4

communication 37:20

community 121:1

compensatory 54:5

complete 31:16 73:10

completely 79:22 82:13 91:13

complicated 120:3

component 21:5,6 88:16 95:15

components 28:1 59:15

computer 57:1 60:24 61:5

computer-based 59:17

computerized 59:14

concept 95:21

concern 120:21

concerned 110:14 133:6

concluded 134:7

conduct 105:4 115:2 121:5

conducted 57:4 94:24

conference 7:9 94:19,25

confident 124:22

confined 80:9

confirmed 60:25

confiscate 103:23 106:20 108:13,16 115:7

confiscated 104:24 107:17 109:7 113:22

confiscation 109:10,13

confusing 33:19

congratulations 18:10

congregate 101:12

congregating 101:1

consisted 93:18

consists 65:11 73:21

constantly 126:5

constitute 106:12

constituted 107:2

constitutes 86:19 87:2

constraint 56:3

constraints 52:17

consumed 108:11

contact 45:13 73:18 76:5

contacted 82:19 89:14

contained 79:21 85:12 87:9

context 85:17

continually 87:20

continuing 59:13

contraband 106:5 110:22

111:25

contribute 87:21

control 29:4 66:11 69:1 73:18,19,21 74:7,17 75:13 82:16 83:3,16, 20 89:22 91:19 106:11

convened 7:9

conversations 13:24

coordinator 30:3

copy 133:21

correct 9:3 26:15 34:21 35:19 36:21 38:24 39:19 41:18 42:25 44:16 45:1,5 46:1 47:22 48:9,12,22 49:9,14 55:5,23 56:10,14 58:1 71:23 89:11,19, 22 93:14 97:1 98:19 111:1 112:8 117:4,8 119:4 130:2 131:5

correction 9:17 19:25 33:21 46:21

correctional 15:18 16:24 21:3,8 38:19 51:24 101:11 110:14,15 113:8

corrections 17:5 72:17

correctly 54:7 132:11

COS 39:22 62:12 63:10 84:1 116:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

**Counsel** 7:18
8:21 10:2 26:10

**counseling**
29:5,25 30:13

**counselors**
30:7 34:15

**count** 10:24

**couple** 10:4
11:13 13:16
14:23 46:6 57:8
86:21 128:3
129:1

**courage** 62:22

**court** 7:5,6,13

**courtesy**
10:13

**cover** 61:15

**covered** 61:9,
13,20

**covering**
99:24

**cranny** 37:17

**create** 100:20
102:23 103:7

**created** 66:2

**cries** 99:14

**critical** 11:7
45:1 88:16

**critically** 120:9

**CT** 134:7

**cumbersome**
119:25 120:1

**current** 19:24

**curtains** 115:3
124:8

**custody** 35:6,
10,13,15 42:12
53:4 69:7,11
82:19 103:15,
18 104:15,25
105:3,18

**cut** 15:13 17:1
66:23 72:25
78:21

**cutters** 16:19
76:19,21,23
77:9 78:21
79:10,13

**cutting** 16:2,17

—————

**D**

—————

**dad** 17:12,22,
25

**daily** 31:12,23
39:10 43:4
49:23 53:10
62:8 65:7
113:9,19 118:2,
7,19,23

**damage** 87:11

**danger** 62:23

**dangerous**
80:3 85:13 86:1

**date** 53:1,4
128:24

**dated** 128:22
130:20

**dates** 12:1

**Dating** 117:12

**day** 7:7 13:25
14:1 19:6
26:14,21,25
27:2,11 30:18,
19 31:1,2 36:18
47:6 52:1,19
53:17 54:2,4,15
65:2,10,14 84:7
94:1 101:15
105:3 109:25
115:17 121:24
125:8 126:4

**day's** 31:25

**day-to-day**
27:14

**days** 17:2
19:19 27:7 50:9
72:23 73:3

**daytime** 27:3

**deal** 17:15
30:7,9 34:18

**dealing** 85:7

**dealt** 59:18

**death** 54:5
94:1 120:15
121:12,24
122:20 123:11,
14 131:13,14,
20

**decades** 23:17

**decide** 25:11

**decided** 14:25
36:1 66:9 78:8

**decides** 27:10

**decision** 22:22

**defendant**
13:12

**defendants**
7:24 13:13

**deficiencies**
54:1

**defined** 71:10,
13

**definition** 80:2

**degree** 39:4
115:25

**delay** 98:6

**delays** 90:21

**dep** 13:2

**department**
9:17 19:25
22:18 33:21
45:14 118:11

**departments**
23:3

**depend** 40:6

**depended**
115:18 125:25

**dependent**
80:2

**depending**
58:2 81:15 84:7
85:9

**depends** 58:4
104:19

**deponent** 7:25

**deposition**
7:10 9:11,23
11:4 12:5 13:22
25:10 33:21
46:10 48:6 56:7
57:4 67:20
71:20 86:16
88:4 93:25
94:24 128:22
130:19 131:25
132:3 134:7

**depositions**
13:16

**deputy** 29:20
33:11 34:3,5,6,
10,14 42:13

**describe** 36:10

**describing**
58:6 92:15

**design** 70:21

**desk** 102:10

**detail** 39:18

**details** 31:17
43:20

**detect** 129:7

**detector** 75:6
98:3,7

**detectors** 74:2
98:18 99:3
100:8 117:2

**determined**
122:6

**developments**
38:11

**device** 96:7

**Devine** 120:16
121:10 123:11,
14,22 124:2
127:18 131:14

**depending**

**difference**
94:6 121:21,25

**differences**
91:11 123:3

**direct** 8:23
24:16 28:17
29:18 35:18
105:4

**directed** 42:1
70:16 93:9
103:18

**direction**
28:15 62:23

**directive** 68:10
124:14,18

**directly** 29:20
32:9 34:3 35:12
47:21 69:7,13
93:14

**disagree** 95:10

**discharge**
70:18 71:13

**discharged**
17:15

**discharging**
73:4

**disciplinary**
112:2 126:3,14

**discipline**
24:12 57:15,19,
24,25

**discovery**
130:21

**discrepancies**
35:25

**discretion**
116:2,5

**discuss** 35:24
122:7

**discussed**
88:3 94:7
124:8,9

**discussion**
58:3

**disengage**
78:22



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**dispatched** 85:19 86:3

**distinct** 81:24

**distinction** 75:5 81:24 87:5

**District** 7:13, 14

**disturbance** 69:1,4

**division** 7:15 36:7

**DOC** 83:23

**document** 33:13,15,20,24 46:10 52:21,24 67:12,20,23,24 68:19,21 71:16, 19 73:18 86:8, 19 87:2 92:12

**documenting** 124:14

**documents** 12:10,12,20 92:15 95:5,21 128:4

**door** 77:23 78:1 83:4

**doors** 36:17

**dorm** 48:11 91:9

**drama** 37:7

**drawing** 17:4

**drill** 77:8

**drills** 59:24 60:2,5 73:7,12 89:18 92:22 93:13,20 94:4

**Drive** 7:6

**driven** 38:16

**drugs** 105:25 108:22 109:3

**due** 49:14,18

**duties** 27:13 43:16 48:14 54:20 58:19

73:4 101:6 113:9

**duty** 29:8,22 32:11 53:21 54:25 94:1 121:11

**DW-504** 130:21

---

**E**

---

**e-mail** 12:19,23

**earlier** 34:16 45:16 47:8 48:1 56:6 71:20 88:3 92:6,18 93:24

**earliest** 88:6

**early** 117:15,16 132:25

**easily** 90:10

**east** 91:9

**eat** 101:23

**eating** 102:2

**edge** 83:4

**education** 14:16 59:13

**effect** 28:14 77:23 86:18 87:3 99:15

**effective** 90:12

**effectively** 100:9

**efficiently** 37:3

**efforts** 81:12 115:17

**electrical** 87:22 117:22

**electronic** 119:13,17

**electronically** 119:10,11

**electronics** 102:23 103:6 105:23

**element** 87:19

**elements** 87:21

**eligible** 18:16

**elite** 63:5

**emergency** 62:8 63:20 64:11,12 67:21 68:9,14 69:1,4, 6,19 70:24 71:6 76:14 78:19 86:17,22 89:4 91:7,8,9 92:13 96:2,15

**employed** 17:22 100:4

**employees** 58:18

**employment** 15:2 17:3 18:8

**empty** 109:15

**enable** 112:23

**encouraged** 21:21

**end** 16:17 17:10 43:9 61:3

**ends** 129:18

**endurance** 11:15

**energy** 66:15

**enforce** 114:23

**enforcement** 116:1

**engage** 58:10 78:20 112:23

**engaged** 78:4

**engaging** 102:5

**engulfs** 79:22

**enjoyment** 19:7

**enlarge** 132:5

**ensure** 10:9 27:18 39:5 94:9

107:11 129:19

**ensuring** 79:13 88:17 103:5

**entail** 80:18

**entailed** 31:24

**entire** 20:1 26:22 66:13

**entry** 54:2

**environment** 41:5,17 57:25 72:5 80:3

**equipment** 83:25 90:1

**escalated** 75:8

**escape** 116:16

**escort** 83:11

**essential** 88:21 96:12

**essentially** 35:14

**Estate** 7:11

**estimate** 63:9

**et al** 7:13

**eternity** 85:8

**ethic** 23:13

**evacuate** 81:16 120:2

**evacuating** 81:24 82:9

**evacuation** 81:18,21 89:16

**event** 9:8 32:13 42:2 65:19 89:3 131:7 132:6

**events** 38:17

**eventually** 11:2 12:3

**everybody's** 28:2 72:6 83:23 104:9

**evidence** 130:1

**exact** 40:19 55:1 103:10

**exam** 21:21

**examination** 8:23 107:10

**examine** 107:1

**examining** 110:16 111:3

**examples** 128:3

**excess** 87:22 102:22 103:12, 21 104:4 105:22,23 106:2,18 108:8, 16

**excuse** 40:2 57:19 74:18

**executive** 124:18

**exempt** 23:4

**exercise** 56:5

**exercising** 38:22

**exhibit** 33:20 34:9 46:10,14, 17 48:2,5 52:2, 23,24 53:6 65:3,5 67:14, 16,19 68:3 71:23 73:3 86:11,16,24 92:9,14 128:21 129:2 130:19, 24 131:25 132:2,8,22

**existed** 113:19 118:22 119:16

**existing** 40:7

**expand** 13:21

**expect** 24:2 26:1 33:6 45:9 101:15 102:3, 12 129:11

**expectation** 38:8 39:2,8,16 45:22 55:11,16



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

70:2 99:20 101:10

**expectations** 48:15 101:3

**expected** 37:24 50:3 70:19

**experience** 67:6,7 126:12

**experienced** 19:4 93:5,11

**experiences** 16:15

**explain** 15:4 19:10,23 20:24 31:3 54:3 57:17 71:1 117:25

**explained** 41:1 45:16 59:19

**explaining** 29:7

**expression** 125:10,12

**extent** 23:10 50:22,23,24 51:9 52:5 58:22 99:21 111:21

**extinguish** 81:12,14 82:9 89:25

**extinguished** 87:9 90:10

**extinguisher** 81:13 90:4,6, 12,13,14,17

**extinguishers** 59:22 61:10 87:23 90:3 94:7

**Extinguishment** 81:18,20

**extra** 49:3 120:10

**extract** 120:2

**extraction** 65:8

**extreme** 127:19

**extremely** 50:10 80:3 85:14

**eyes** 38:1 41:5, 17 48:18 56:9 88:9 95:9,14,18 102:4 116:13

---

**F**

**facility** 23:16 29:24 37:14,17 42:25 66:14 69:2,5 73:22 74:6 91:14 96:2 103:11 113:3

**fact** 8:11 11:7 71:12 88:24 99:19 115:14 117:21 118:20 127:20

**factor** 64:5 116:13,22

**factors** 100:18 116:21 123:20

**fair** 17:6,20 23:2,20 24:5,20 25:19 26:2 37:15 38:17 41:14 49:22 51:14 56:2,20 68:21 70:1 71:13 72:7 80:13 85:22,25 86:4 88:23 92:1 99:22 102:12 112:25 120:12, 13 122:25 123:1 125:1,4, 20 130:18 133:1

**familiar** 68:5 90:3 107:25

**family** 7:20 54:6

**fast** 133:7

**fatality** 120:19 121:3 122:16

130:10 131:13

**father** 14:7 17:7

**feeling** 19:2 78:4

**feet** 98:4

**felt** 18:25

**fewer** 22:5

**fight** 43:8

**fights** 62:4

**figure** 43:14,22 50:5

**fill** 19:12 50:14

**filled** 46:23 50:25 51:23 53:9,15

**filling** 50:15 52:18 64:2

**find** 17:3 19:11 46:8 49:2 52:22 65:5 67:18 71:17

**findings** 69:9

**fine** 13:4 66:25 104:2 133:12

**finish** 9:6 10:14 11:18 133:11,25

**finished** 10:6 19:19

**fire** 32:7 33:7 53:1 59:8,16, 22,23,24 60:1, 4,12,15,18,20 61:10,14,15,18 65:24 66:20,22 67:2 68:8,13 70:4 71:11 72:11,18 73:5, 7,12,14 74:23, 25 75:1,19,22 76:13,24 77:8,9 79:14,17,21 80:7,9,13,19, 23,25 81:4,8, 12,13,14,25 82:8,9,20 83:6,

8 84:11,15,25 85:1,7,9,13,19 86:1,3,19,23 87:3,5,6,7,8,12, 15,18,19,21,23 88:4,5,17,18 89:2,4,9,18,22, 25 90:1,3,4,6,9, 10,12,13,18,19, 20 91:18,19 92:4,16,19,22 93:2,10,13,18, 20 94:3,4,6 95:6,7,8,15 96:20,24 97:4, 19,23 98:22 99:11,14 100:20 102:20, 21,24 103:7 106:14 107:2, 11 110:17 111:3,17,21 112:3,5 116:14, 17,23 117:1 118:14,16,21 119:3 120:9,14 121:4,10 122:3, 5,7,12,15,19 123:11,22 124:2 126:19, 20 127:20 128:23 129:7, 19 130:21 131:4 132:14, 21,24

**firefighter** 83:5 123:19

**firefighters** 82:15,20,24 83:7,10,14 84:6,10,14 85:18 86:2 92:2 94:10

**fireman** 83:2

**firemen** 82:16, 22 84:22 90:22

**fires** 59:18,21 61:10 62:6 81:2 85:12 121:17 122:10 125:2,5, 20 126:6,12,15, 17 127:2,11

**fit** 30:1

**fixed** 46:1

**flexibility** 40:10

**flip** 44:12

**focus** 47:24 86:21

**focused** 66:15

**folks** 17:16 23:4,8 24:5 29:23 30:12 34:17 47:8,20 54:16 81:7

**follow** 72:17

**follow-ups** 20:7

**food** 101:8

**footage** 43:21

**form** 25:3 44:3 55:25 90:25 98:10 100:14 116:8 121:13 123:5 125:6,23 127:23 128:22

**formal** 9:24

**forward** 72:1,9 123:22

**foster** 57:25

**found** 45:23 69:24 97:5 111:25 128:4

**foundation** 25:4

**frequent** 127:4

**frequently** 103:17

**Friday** 47:11

**friendly** 24:4

**friends** 24:1

**front** 11:24 60:25 80:22 112:7 113:4,18 114:16 132:19

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**frustrated** 115:1

**frustrating** 31:2

**frustration** 19:4

**frustrations** 49:25

**fulfilled** 39:8

**full** 51:24 55:1 56:18 105:4

**full-time** 16:9

**function** 45:1

**functioning** 45:8

**funding** 51:5

**future** 121:7 124:3

### G

**garble** 10:22

**gate** 74:2,4,5

**gates** 73:22

**gathering** 63:17

**gave** 60:9 66:7

**gear** 84:19

**general** 21:3 33:22 70:15 71:21 72:2,7 77:7 81:23 82:1 85:20 92:10,20 126:25

**General's** 7:24 8:1 26:8,9

**generally** 21:17 44:2 62:12

**Gerber** 15:12 16:16

**give** 8:18 10:8 11:14 13:8 20:3 28:23 31:16

43:20 46:7 72:3 103:10 109:10, 14

**giving** 10:7

**glitch** 10:23

**good** 8:25 9:1 56:22 60:18 62:21 130:4,11, 14 131:18 132:24

**graduate** 14:12

**grave** 55:18

**great** 8:15 13:11 114:22

**greatest** 39:3

**grew** 14:6,9

**grim** 53:18

**ground** 10:4 88:9 99:10,21, 23 100:11 129:14

**group** 16:18 52:25 54:23 63:3,5

**grow** 14:5 85:12

**guard** 39:12

**guess** 14:25 15:12 18:5,15 21:3 30:10,16 36:23 38:3 77:18 91:10

**guessing** 46:15

**guidance** 82:19

**guidelines** 72:9

**Gustavo** 7:23 48:5 128:12 133:14 134:3

**guy** 24:21 25:1 36:19 37:7 74:4 127:21 132:14

**guys** 88:8 114:5

### H

**habit** 116:2

**half** 39:15 52:10

**hand** 8:16 16:19 58:20 78:19 80:7 97:4

**handle** 133:17

**handled** 41:9 111:18 129:10

**handles** 28:15

**hands-on** 21:6 58:9 67:6

**happen** 21:23 25:8 38:23 40:14 62:8 75:12 88:10 93:2 104:11 105:6,7 106:10 112:3 124:22 126:8 127:3 132:17

**happened** 14:2 20:7 32:2 37:22 42:3 43:14,23 57:20 69:10 75:21 93:10 99:6 103:14,17 106:24,25 112:8 118:4 121:20,23 124:21 125:7,8 127:5,12 129:21 130:11, 15 132:14

**happening** 43:2 44:9 56:13 76:7 97:14 99:7 111:21 121:7 131:9

**hard** 95:18

**harmless** 85:13

**hazard** 106:14 107:3,11 118:14,17

**head** 60:10 62:21 69:3,5 98:4

**headed** 31:2

**health** 13:4

**hear** 10:23 49:16 75:16 83:6 91:1 99:13 100:24 119:18, 23

**heard** 9:2 119:14 125:11

**hearing** 110:11

**held** 16:8 20:4, 9,10 31:15 32:14 37:2

**hell** 114:6

**helpful** 100:6

**helps** 58:19

**high** 14:10,12, 15 97:22 98:19 100:8

**higher** 14:16

**higher-up** 119:17

**hire** 19:16

**hit** 39:14

**holiday** 47:17

**holler** 97:12

**home** 11:21 98:2

**honestly** 17:9 60:20

**honor** 63:1

**hope** 9:6 99:17 106:19 129:11

**hoped** 133:8

**host** 44:25

**hot** 127:7

**hour** 11:14 27:20 39:15 56:23 60:21 94:17 114:2

**hours** 17:1 30:24 50:5 126:4

**house** 77:20

**housekeeping** 102:21

**housing** 21:12, 17 29:13 95:10, 14 126:7 127:1

**hundreds** 46:15

### I

**idea** 27:16 28:1 37:12 39:1 66:12 76:20 105:2 112:10

**ideal** 53:14 130:2

**ideally** 81:11

**identification** 34:9 46:17 48:6 52:24 53:6 67:16 71:23 83:15,17 86:16, 24 92:14 110:8, 9 129:2 130:20, 24 132:8

**identified** 84:5,13 106:6 127:10 128:21

**identify** 110:1 132:24 133:10

**identifying** 110:22

**IDOC** 15:19 16:1 58:7 59:6 60:14 107:20

**illegal** 109:3

**illegitimate** 112:22

**Illinois** 7:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com


KENTUCKIANA
COURT REPORTERS

**Exhibit P**

immediately 26:18 79:24 116:17

impediment 13:3

imperative 95:9

implemented 123:10

importance 102:21

important 10:4,18 11:2 35:2 37:16 41:13 44:19 46:4 56:4,9,12, 16 87:19 88:1,4 90:21 95:15,16 98:23 100:3 102:16 114:9 120:9 121:4 129:18

imposing 57:23

inaudible 133:15

incarcerated 80:8 81:7

incident 12:17 33:6,7 39:6 69:2,5,10,22 128:22

incidental 111:22

incidents 37:22

include 66:20 71:11 105:22, 23,25

included 46:21 66:21

includes 75:14 90:2

including 7:25 73:3 87:22

increase 100:19

increases 116:23

Indiana 7:14 8:2 9:16 11:21 19:25 25:17 26:8 33:21 41:21 42:7 46:13 52:25 73:25 91:14,20 92:2,16 96:1 99:5 115:15 117:3 123:10 124:1 125:1,5, 21

Indianapolis 8:1

indicating 15:20

indirect 24:16

indirectly 47:22

individual 20:5 28:13 30:9 45:17,19 46:1 48:25 54:15 62:20 64:17 68:20 74:9 78:7 103:5 107:1,16 111:3 113:14 120:1 124:7 127:19 129:8 132:21

individually 84:12

individuals 35:25 54:18 65:20 67:2 81:24,25 87:8, 10

information 24:16 32:9 72:4 74:16

informed 25:16 89:9

infrequently 103:18

initial 58:6

initially 20:21 69:22

initiative 21:22,24

injuries 129:10

injury 131:21

inside 80:25 122:19

inspection 123:19

inspections 104:12,15 105:4 111:18

instance 62:5 78:5 80:20 108:8,10 115:19

institution 23:15 34:7 112:25

instructed 89:21 92:20

instruction 58:10 59:15 89:24 91:24

intended 97:3

intention 26:9 96:25

intentional 126:14

intentionally 127:2

interested 27:3 33:24 51:8 62:13,16

interfere 13:8

internal 127:14

interview 22:10,14

intimidated 62:22

inventory 109:7

investigation 122:6

investigations 70:9

investigative 43:25

involve 62:2

involved 13:25 20:24 43:22 62:3

involves 81:3

ish 20:12

ISO 91:7

isolated 87:7

ISP 17:17 18:6 19:23 23:21 26:14 42:25 63:1 86:19 87:2

issue 24:10 25:23 28:21 31:7 32:19,21 40:21 43:5 44:1 46:3 49:21 61:17 83:17 96:17 114:6 115:23 116:12 119:2 120:20 122:24 128:23

issues 28:9 36:12 38:6 49:15

item 76:19 80:15 82:12 110:24

items 73:16 107:2 109:18 110:22

_____

**J**

January 7:8 13:23 26:13 42:1,6,21 46:14 53:1 57:5 58:14 59:12 64:1 67:1 68:13 75:21 86:18 88:24 93:10 95:1

Jaymar 15:5 16:9,25

Jeniene 49:8

Jimenez 7:23 8:14 10:8 12:7 25:3,9,20 44:3 47:25 51:9 55:25 90:25 91:2 98:10,13 100:14,22 116:8 121:13 123:5 125:6,23 127:23 128:6 130:12 133:19 134:4

job 10:13 15:15 16:4,8,9,25 19:4 26:18 27:22 36:6 46:20 49:25 51:19 83:24 87:24 107:23

jobs 37:6

joint 23:21

Jones 50:15,16 93:25 94:13

Joshua 120:16 123:11,14 124:2

judge 25:11,13

judgements 89:10

judgment 76:10

July 18:9

June 19:17

_____

**K**

keeping 56:18 95:14 120:24

Kentuckiana 7:5

key 78:25 79:2, 7,9

keys 79:1

kids 19:1

kill 97:6

killed 13:23 117:19 121:10

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

127:18

**kind** 10:23 14:6 18:5 20:6 23:10 24:1,21 29:6 30:23 32:6 34:2 40:23 44:13 47:3 60:10 65:6 67:25 68:2 76:8 113:4 121:6

**kinds** 29:5,24 90:2 106:12

**knew** 23:13,17 25:16 31:10 90:16 115:21

**knowledge** 37:3 93:16 104:14 111:17 118:21 123:25

**knowledgeable** 87:25

**L**

**La** 22:17

**labeled** 46:13 82:15 83:2

**lack** 51:5

**larger** 33:18

**late** 117:12

**Latrice** 93:25

**lawsuits** 26:6

**leaders** 30:3

**learn** 67:8,9

**learned** 39:17

**leave** 9:6 14:24 15:15 18:8 26:4 36:9 64:8

**leaving** 9:8

**led** 19:23

**left** 18:2 47:19 53:13 64:8 128:9,13

**legit** 78:16

**legitimate**

**legs** 11:15

**lesson** 133:4

**lessons** 121:6

**lets** 73:22

**letting** 32:23 71:3

**level** 22:5

**levels** 49:18

**lieutenant** 20:13,14 28:11 38:10 40:2 45:23 48:8,11, 24 49:7 65:17 66:7 93:25 94:13

**lieutenants** 28:7,18 29:13 31:13 35:7 38:4 45:13

**life** 14:8 25:2 36:5 114:17 115:14 117:21 118:20

**life-** 79:14

**life-threatening** 80:10

**lifted** 47:19

**light** 80:22 118:6

**limited** 9:5 98:18

**limits** 29:7

**lines** 23:7 34:14 62:6

**list** 72:16 76:19 80:15 89:5 92:11 96:14 103:8 116:21, 22

**listed** 47:2,19 53:2

**lists** 68:19 83:23

**literally** 36:16

**live** 116:17

**living** 21:9 28:18,25 38:8 39:4 41:17 48:21 49:13 56:10,17,19 84:1 88:9,13 99:22 102:5 105:5 110:16 112:13

**loan** 54:2,6

**locally** 15:3

**located** 7:6 90:1

**location** 7:17 28:14 41:21 42:7 48:9 52:3 70:19 71:2 74:4 76:22,24 80:9 81:8 84:1,15,18 85:1 86:3

**locations** 47:9, 21 48:18

**lock** 77:16,20, 23 78:1,4,21,22 79:9 119:11

**lockdown** 82:18 84:21 126:14

**Locke** 7:19 9:2 47:25 128:6 133:20

**locked** 77:1,3 120:24,25

**locking** 119:3

**locks** 36:16 79:1,4,7

**lodge** 10:8

**log** 32:1 74:14 104:17,18,25 107:15,16,18 109:11,22,25 110:4

**logging** 109:11

**logical** 45:19

**long** 12:8 14:17,22 15:9, 14 23:17 27:11 59:10 66:4 86:20 101:15 107:20

**longer** 60:21 129:23

**looked** 12:10, 12,17,21,23 71:19 91:18 102:24

**lost** 20:14 112:13

**lot** 23:22 27:25 58:16 77:15 80:20 112:14 115:1,20

**lower** 100:8

**luck** 130:5,11, 15 131:19

**lunch** 101:24 102:3

**M**

**machine** 15:13

**mad** 126:5

**made** 22:22 25:11 89:3 104:15 107:5 109:20 132:6

**magnitude** 76:13 81:4,15 85:9 114:22

**main** 19:14 68:7

**maintenance** 29:25 30:5,6,12 118:10

**major** 22:25 27:9 29:15,18 31:7,15 32:3 33:10 35:10,23 53:3 54:21 62:15 66:9 87:6,8,12,15 88:18 90:18,19

126:20

**make** 10:6,11, 16,17,20 31:9 33:18 36:5,16 37:5 40:11 41:6 44:10 45:13 46:12 48:16 50:17 51:3 53:25 72:5 73:10 76:8 84:10 86:20 89:10 93:1 94:8 96:9 104:4 106:23 113:13 114:15 126:11

**makes** 11:8 37:1,2 41:8 81:23 87:5

**making** 45:18 46:21 48:21 129:5

**malfunctioning** 118:13

**managed** 105:6

**management** 14:21 23:5 42:17

**manager** 16:6, 7 58:18 60:8 70:10 73:6

**managers** 30:7 34:15

**manages** 73:23

**manning** 49:1

**manual** 86:17 92:13 119:15

**manufactured** 15:6

**mark** 67:13

**marked** 34:9 46:17 53:6 67:16 71:22 86:15,24 92:13 129:2 130:24 132:8



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
— COURT REPORTERS —

**Exhibit P**

marshal 122:5

master 79:1,2, 7,9

material 83:25 102:22 103:4 104:5

materials 26:13 92:8 101:8

matter 7:10 63:9 70:15 79:20 85:20 113:8 116:2 120:20

mattress 108:14

maximize 40:11

maximum 23:21 99:20

Mccann 7:10 8:3,5,12,15,25 9:3 34:5,17 48:6 51:14 57:4 67:20 86:17 94:24 95:4 119:2 128:9

meaning 37:1

means 69:8,9 75:5 80:7

meant 48:2 94:8

measures 91:19

mechanism 122:2

medical 96:15 129:9

medications 13:7

medium-slow 67:25

melted 127:8

member 41:2 82:21 106:18

memory 13:4

mentioned 25:7 30:2 35:1 48:1 101:1 124:9

merit 23:10

mess 128:10

message 75:14

metal 74:2

method 100:3

Mexico 17:1

Michael 7:12 24:7,10 25:18 68:13 70:3

Michigan 11:21 14:9,10 15:6 17:16 20:1

military 14:7 17:16

mind 61:11 98:17

minor 80:23 87:6,7 88:18 91:15 126:16, 17,19 129:9

minute 33:25 39:18 46:7 52:22 65:5 67:18 71:17 72:12 90:7 91:19 95:20 97:24 117:24 128:24

minutes 11:13 12:9 40:15 41:3,4,6 45:16 85:5,8,23 86:2 90:22 92:12 128:9,13,16 133:8,11

misbehavior 58:1

miserable 36:5

misinterpreting 127:6

missing 87:23

Mission 27:23

modern 96:6

module 16:17 59:18 60:12,19 61:3,18

modules 59:15 60:16

moment 38:15 43:13 61:12 132:17

Monday 47:11

monitor 39:4 44:23 45:7,24 60:25 112:25

monitoring 45:1 103:4 116:14 132:16

monitors 42:9, 20,21,23 43:2, 3,6 44:16 56:16 100:2,9 102:4,8 132:13,24

monthly 73:11 92:21

months 14:23

morning 8:25 11:20 12:5,7 13:4 31:21 50:2,3 78:5

motions 73:8

moved 14:7 27:7

movement 39:11

moving 36:18 39:6 133:7

Mysti 7:10

___

**N**

___

name's 8:5

named 13:12, 13

names 62:16, 17 110:6

narrative 130:23

nature 54:6 127:9

Neal 7:12 12:24 13:19

needed 28:21 38:6 40:4 46:22 66:16 67:13 71:12 82:22 83:9,11 89:14 94:4,5,7,9 97:6 119:7

needing 64:13

neighboring 22:18

newer 67:7

newspapers 104:9 107:17 109:16

night 26:24 27:1 30:20 32:24 78:2 120:17 121:23

nights 27:7,12 33:3

nine- 67:22

non-hired 54:13

nonetheless 106:14

nook 37:16

North 7:6 14:19

Northern 7:14

note 98:16 104:4

notebook 12:1 18:4

notification 69:4

notifications 70:16 89:3,4

notified 70:9 76:14

notify 70:7 75:25 76:2 112:1 118:10

number 7:15 41:12 42:16 47:2 51:24 65:16 79:17 83:23

numbered 92:11

numbers 53:16

___

**O**

___

object 25:3 51:9 55:25 90:25 98:10 116:8 121:13 123:5 125:6,23 127:23

objecting 91:2

objection 10:8 25:10,12 44:3 98:15,16 100:14,22 130:12

objections 25:8,20

objective 37:13,15 103:3 110:18,19,21

observation 100:4

observe 43:10, 13 44:9

observed 57:21 106:18

observing 56:13

obstructing 115:2

occasionally



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

127:5

**occasions**
9:14

**occur** 103:7
104:12 124:3

**occurred**
73:13 121:24
128:23

**occurrence**
125:2,5 126:2,8

**offender** 30:9
40:20 62:4
77:13 78:2,7
80:20 104:23
105:9 107:16
108:5 109:23
129:8

**offenders** 30:8
32:23 81:16,21
82:9 97:13
103:9 115:1
118:5 132:18

**offhand**
123:12,24

**office** 7:22,24
8:1 26:8,10
35:23 42:11,12,
13,14,22 44:8
70:20 71:5 98:2
129:22 132:12

**officer** 15:18
16:24 20:9
21:3,8 25:17
43:17 64:4
72:17 73:23
74:11,17 75:13
83:22 102:1
104:4 106:17
110:14 112:19
113:8 131:8

**officer's** 45:8
77:3

**officers** 34:20
35:8 38:9,20
49:12,19 51:24
53:21 54:8
55:10,22 73:4,
13 78:6 101:4,
11 102:1
110:15

**officers'** 100:3
101:2,4,7,12,21

**official** 123:14

**OJT** 58:17

**on-the-job**
21:1 58:9,17

**one-page**
52:24

**online** 7:4

**open** 12:14
84:9

**opened** 77:17

**opening** 36:17
74:5

**opens** 74:3

**operating**
100:19

**operation** 29:5
36:18 39:17

**operations**
27:15 29:21,24
34:3,6,13 65:7
69:1,20 70:24
84:3

**operator** 15:12
16:16

**opportunity**
10:8 11:14 26:7
68:3 77:23
88:12 92:8
133:3

**opposed** 23:6
62:23 67:9
110:25

**opposite** 87:9

**options** 97:10

**order** 37:15
40:11 44:18,20
71:5,12 72:5
77:7 81:23
86:22 119:7
133:22

**ordered**
104:15

**orders** 33:22

48:17,22 71:22
72:2,7,23 73:2,
11 92:10,21
93:12,19
124:17

**ordinary** 31:14
38:11

**organization**
23:8

**organizational**
34:1

**organized**
92:22 93:20
94:5

**originally**
52:11

**outlet** 118:4,
10,13,16 127:8

**outlets** 87:22
117:22

**override** 79:10

**overriding**
37:13

**oversaw** 31:20

**overseeing**
38:9 49:7

**oversight** 29:1
31:19 66:13

**owe** 10:13

---

**P**

**p.m.** 21:15 27:4
94:21 95:1
134:7

**padlock** 77:14
78:15 79:5

**padlocking**
78:13

**padlocks** 79:3

**pages** 46:12
86:20

**painted** 36:25

**pants** 15:7,14
16:2

**paper** 80:21
90:9 102:22
105:23 110:25
111:17 118:6

**papers** 11:24
87:22

**paperwork**
32:8 43:5

**Paragraph**
72:3,10,11,16
76:20 87:18
89:25 92:9

**park** 125:11,15,
17,22

**part** 14:8 16:16
36:22,23 38:4
43:16 49:16
54:22,23 58:8,
13,14 60:12,13,
16 63:3 64:12
67:3,4,23 73:23
76:11 80:12
83:25 95:7
96:25 107:23
121:1

**participate**
59:24 92:22
94:4

**participated**
77:7

**participating**
73:12 93:14,19

**participation**
60:1

**parties** 8:10

**parts** 15:13
27:22

**pass** 61:7

**past** 13:16
56:23

**path** 65:23

**pause** 11:16,19
89:8

**pay** 17:2

**peanut** 108:11
109:16

**pending** 7:13
11:18

**pension** 18:10,
13,14,17

**people** 10:10
11:4 13:13
19:11 21:24
22:5 23:25
31:22 37:4
46:24 50:12
51:17 54:4
57:18,24 58:1
64:7,8,23,24
73:22 80:24
83:17 99:24
106:11 115:20,
22 120:23,24,
25

**percent** 51:17
53:21 63:10
126:16

**percentage**
63:14

**perfect** 131:18

**perfectly**
78:17

**performing**
101:6

**period** 16:3
27:20 42:2
85:14 103:10

**periodic** 38:24
92:23 93:20
94:5 107:1,13

**periodically**
105:8 125:8

**permissible**
78:17

**person** 23:13
32:16 35:13,14
36:8,14 37:4
42:7,8 46:22
52:11 62:19
64:9 74:6,13
80:8 89:12
92:23 111:4
113:15 115:18
120:11

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**person's** 32:12,22 36:9 111:8

**personal** 7:11 21:2 55:21 58:11 78:3,4 114:19

**personally** 24:12 50:20 59:24

**personnel** 92:2

**persons** 42:8

**perspective** 112:10

**pertains** 52:2

**pervasive** 115:12

**phone** 12:6,8 108:25 109:1, 17 130:8

**phones** 108:22

**physical** 30:5 36:15,17 45:13 62:21 70:19 91:17

**physically** 118:3

**pick** 23:5 75:15

**picking** 49:24

**pieces** 80:22 90:8

**pigeon** 125:11, 15,18,22

**pigeons** 125:16

**pipe** 39:12,14 103:24 131:8

**pizza** 16:4,11, 13

**place** 15:5 16:12,13 21:16 22:6 64:6,22 88:1 114:3 120:15

**places** 42:16

**placing** 67:21

**plaintiff** 7:20

**Plaintiff's** 7:18

**plan** 86:19,23 87:2,6,18 89:2, 24 91:6 102:21

**planning** 123:9

**plant** 30:5 36:15 45:14

**play** 61:2

**played** 60:25

**playing** 60:10

**point** 11:12 13:23 25:15 50:1,3 61:25 66:8 70:23 93:9,11 112:21 124:13 125:14 132:25 133:23

**points** 44:7

**police** 23:3

**policed** 106:16

**policy** 31:8 95:5 123:8

**pop** 66:16 84:6

**popping** 115:16

**population** 23:23 40:20 63:10 82:16 83:3,16,20

**Porte** 22:17

**pose** 87:7

**position** 10:10 15:11 19:8 20:9,11 23:6 26:19 27:4 32:14 35:17 49:3 50:15 51:7 54:2 68:18,20

**positions** 16:10 19:22 20:3 27:10 30:14 31:16

**47:2,5** 50:7,25 51:5 52:4,15 53:15 54:6,13, 14,16 68:18

**positive** 124:4

**possibility** 97:7 104:10

**possibly** 45:11 61:11,20 112:2 124:10 133:10

**post** 33:22 48:17,22 71:21 72:2,7,23 73:2, 11 77:7 81:23 92:10,20 93:12, 19 124:17

**pot** 127:8

**potential** 39:5 80:10 87:11 106:14 126:20 131:13

**potentially** 79:14 80:3 131:4 133:9

**practical** 113:8

**practice** 112:5 123:15

**practiced** 89:18

**preliminaries** 26:4

**prepared** 12:17 38:15

**preparing** 13:22

**present** 39:3 41:23 54:25

**presents** 132:23

**pretty** 22:2 27:14 45:3 52:10 53:18 66:11 91:10

**prevent** 121:6

**preventable** 131:21

**preventing** 88:20

**prevention** 87:20 88:5 95:6,8,15 102:22

**prevents** 131:13

**principle** 38:19

**prior** 25:4

**priority** 114:23

**prison** 17:22 20:1 21:10 23:20 25:18 26:6 29:2 38:15 41:22 42:7,17 46:13 50:1 51:18 52:25 68:8 73:25 77:6 91:14,21 92:3, 16 96:1 99:5 110:17 115:15 117:3,6 118:21 120:11,20 121:5 123:10 124:1 125:2,5, 21 127:1

**prisoner** 24:17 25:19 76:23 77:22 78:14 80:1 92:1 96:12,21 97:1, 3,9,11 109:14 112:5,13,15,23 120:2,16 122:19

**prisoner's** 103:5 106:16 112:10

**prisoners** 23:16 27:19 34:18 96:2,6 99:3,4 107:1 112:6 114:17

**prisons** 96:6 114:16

**privacy** 112:7, 11,14,22,23 113:4,18,19

**114:2,17,20** 115:16 116:6, 12,16,18,21

**private** 113:18

**problem** 24:17,21 55:20, 21 97:17,19 100:13 112:19 113:24 114:21, 22 115:6,11 126:13,15

**problematic** 100:20

**problems** 39:5 51:6 52:17 116:11 117:22

**procedure** 31:8 78:17 81:11 108:4 123:9

**procedures** 72:10 91:7

**proceeding** 13:3

**PROCEEDING S** 7:1

**process** 22:9, 11 58:15 73:10 76:17 78:13 83:12 85:18 86:3 103:3 110:16 120:1

**produced** 67:23

**prohibited** 103:22 105:21, 22 110:24

**promise** 12:4

**promised** 128:12

**promoted** 20:10,12,13,17 21:25 22:13

**promotion** 23:7

**promotions** 12:2 20:6 22:21



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

prompt 88:20

prompted 16:23 18:18 22:1,2

promptly 38:16

property 87:8, 11 103:9,12,22 104:24 105:21, 22 106:18 108:7 124:7

proponent 95:16

proposed 63:2

proposition 95:24

prospect 119:25

protect 10:3

protection 21:2 58:11

protocol 123:9

provide 89:2 91:6 112:22

providing 112:21

pull 43:5,10,12, 19,21 65:3 76:6 114:13

pulling 43:4 128:7

purchase 78:15

purchased 79:2

Purdue 14:19

purpose 45:4 72:3 111:23

pursue 14:16

pursued 15:2

purview 32:22

put 18:16 21:19 27:12 31:22 33:15 40:3

46:24 49:19 52:12 54:8 61:13 65:5 78:9 84:18 110:6 114:13 115:5,8 118:24 128:20

puts 31:7

putting 112:6 115:3

### Q

QR 64:7 65:11

QRT 61:20 62:2,11,20 63:2,17 64:7,13 65:7,17 66:2,19 67:3 83:9

QRT-CERTIFIED 61:23 63:11 64:4,17 65:25 67:2

qualified 71:7

qualify 68:9

quarterly 73:6

question 10:7, 14,20,25 11:6, 7,18 13:21 19:22 24:16 25:14,15 29:6 35:5 55:10 68:4,7 73:9 92:6,7,19 95:20 98:12,15,17 106:9 117:25 118:25

questions 20:5 36:3 37:23 41:20,23,25 57:8 68:1 72:13 93:9 103:2 129:1

quick 61:21 130:22 133:17

quickly 132:5

quiz 61:4,5

### R

RAC 30:12

radio 64:14 73:18,24 74:9, 11 75:13,16,17 82:22 83:6

raise 8:16

random 105:14,15

range 39:13 40:3 49:12 56:13 76:22 99:12,22 102:9 113:23 119:12 129:6,17,21 130:1

ranges 39:4 40:4 100:8,12

ranks 22:2,11 23:4

rapid 129:7

rapidity 127:20

rapidly 79:18 87:12 122:24

rare 125:10,15, 22 126:2,8 127:5

rationale 52:6

reacting 38:16

read 68:24

readily 87:9

reading 11:4

reads 82:14

ready 12:4 13:5 72:13 84:19 128:25

realize 36:4 112:13

reason 10:19 11:12,16 18:17 19:14 27:6 35:4 37:7 38:14 40:25 50:25 54:9 57:24 71:4

77:12 78:20 79:12 120:8

reasonable 25:18

reasons 12:15 19:13 41:12 44:25 79:17 98:23 99:19 100:1 102:17

rec 30:3

recall 24:18 52:5 59:2,9,19, 20 61:17,22 66:21 67:4 82:24 92:25 123:12,23 124:19 132:15

Recapitulation 52:25

receive 73:4 95:13,23

received 73:14 93:18

receives 74:9

recess 57:2 94:22

recollection 61:9 94:2 126:25

reconvene 56:24

record 7:3 8:4 10:3,17 20:12 35:2 56:25 57:3 68:24 94:18,20, 23 104:14 107:5,10 109:6, 20 111:19 133:14,16 134:6

recorded 104:23 105:18

recorder 104:23

records 111:13

recreation

30:2,3,4

recreational 29:4

recruiting 51:6

recruits 58:15, 25

recurring 126:15

reduce 124:2

reentry 34:11

refer 18:4 23:3 91:13 103:25

reference 95:21

referred 91:12

referring 105:12

reflected 64:25

regard 36:19 111:14 113:11

regular 79:5 101:6 126:7

relate 9:16 31:4

relates 26:6 128:23

relating 130:21 132:6

relation 13:22 32:12 66:20 73:5 75:22 94:3 114:20 119:3

relationship 24:4

relax 78:10

release 78:21 80:2 83:7 90:21 123:19

released 82:16 83:18 84:14,23, 25 85:19 94:10

relieved 69:1, 20

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

remain 70:19

remained 70:20 71:5

remember 13:8 24:21 54:7 102:24 104:20 119:12 123:16 124:12,20,23

remind 128:7

remotely 7:21, 25

remove 80:8 108:5

removed 106:6 129:8

repeat 125:3

report 12:17 28:7,17,18 29:13,19,20 35:18,21 45:14, 19 48:25 53:1,9 69:9,12,24 73:19 76:11 82:20 83:8 84:10 104:21 128:22,25 130:20 131:5 132:6

reported 32:2, 3,9 33:7 38:6 43:7 45:12,25

reporter 7:3,5 8:3,6,8,10,15, 21 56:25 57:3 67:15 71:24 86:12 94:20,23 132:1 133:16, 20,24 134:1,3,5

Reporters 7:6

reporting 34:3, 14 35:9 47:7,21 71:11

reports 12:13 28:4 30:8 31:14 35:12 37:10 69:7 115:2 128:19

representation

26:7

representative 7:11

representing 7:5,24

request 62:13 67:24 82:22

require 70:6

required 59:13 60:13 92:21

requirement 39:2 40:15 76:20 93:12,18

requirements 72:21 89:15 123:18

requires 77:8

reserve 133:19,20

respect 51:22 76:17 93:16 98:22 116:1,12 128:12

respected 128:11

respond 59:7, 19 63:20 64:15, 18 66:10 67:6 73:14 75:3 80:13 91:24 92:4,15 129:24

responded 62:7 118:1 122:24 126:22

respondent 75:3

responder 71:7 74:18 76:4,12 84:22

responders 67:7 74:19 82:21

responding 61:18 62:4 71:8 80:7 93:2

response

59:16 60:12,16, 18 61:15,21 64:12 65:24 66:20,22 67:3 71:6 73:5 87:17 90:20 91:18 92:19 93:18 94:3 95:6,8 98:21,22 99:1,2 120:9 123:10 129:7 131:12, 18,22

responsibilitie s 9:7 34:7 48:15 66:13 67:22 68:11 70:3,6,18 71:10,13

responsibility 27:18 28:3 29:1,9 32:12 36:7,9,10 45:18 57:14 75:25 76:2 80:6 104:4 111:9

responsible 36:11,12,15 55:23 68:20,25 69:3,19,23 70:15 74:12

restate 98:16

restaurant 16:5

result 63:18 111:22 116:5 121:3 123:21 129:13 130:4, 11

resulted 120:15 122:15 130:10

results 63:19

retain 66:4

retire 17:25 18:1,18 19:15

retired 18:9 20:19 27:1 36:4

retrain 92:3

review 72:22 92:20 93:12,19

121:5

reviewed 77:7

reviewing 73:2,11 102:4

rewind 43:14

rid 79:9

right-hand 35:14

ring 78:25

rings 78:25 130:8

rise 97:24

risk 100:19,20 102:23 103:7 116:14,23 118:22 124:2 127:19

robbed 43:18

role 36:8 57:10, 17 58:23 60:4

roll 37:21 114:7 119:6,9,15 132:20

rolled 119:7,13

rolling 105:6

Ron 7:12

room 29:4 73:18,19,21 74:7,17 75:13

roster 19:12 31:22 46:14,24 47:12 50:14 51:23 52:19,25 53:14 54:9,19 63:25 64:2,25

rounds 41:11 101:6,16 103:25 104:7 129:6,23 130:16 131:9

routine 112:8 125:2,5

Ruby 15:5 16:9,25

rule 113:3,17 116:1

rules 10:4 21:3 77:22 114:23

run 27:14 40:1 62:23

rundown 20:3

running 23:8 31:12,20,23 37:3 39:10,21, 23 44:11 48:17, 22 62:23 84:8 131:8

---

**S**

---

safe 72:5

safety 27:18 37:13 40:12 55:20,21 60:8, 20 70:10 73:6 78:4 87:10,20 92:22 95:8 96:6,17 106:12 110:17 111:4, 17,21 112:3,5, 24 129:19

sake 46:12

sanitation 31:11 36:12 37:1

sat 13:24 60:25

Saturday 47:13

saving 48:5

scale 105:4 114:21

scanning 132:13

scenario 121:11 122:18 127:17

scenarios 122:23 123:4

scene 71:11 77:9 79:13 80:16 85:19



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit P

schedule 128:11

scheduled 54:1,4,15

scheduling 60:4

school 14:10, 13,15 79:5

score 61:6

screen 33:14, 16 46:11 52:23 65:6 67:21 86:15 113:4 114:2 116:18 128:20

screens 113:18,19 114:20 115:16 116:6,13,17,22

scroll 46:11 65:6 67:25

scrolling 47:3

seconds 79:20 85:14 86:1

section 47:4 68:23 91:18 110:3,6

sections 91:12,13

secure 71:2 72:5 74:4 77:15

security 17:6 27:19 29:23 37:14 38:23 39:3 40:11,14 55:21 78:3,9 91:15 103:25 104:3 110:21 112:18,24

seemingly 79:21

self-evident 81:9

send 17:1

sends 75:13

senior 25:17

sense 10:11,20 11:8 16:14 41:7,8 96:9 106:13,14 113:13 115:11

sentence 69:18 87:19 132:7

sergeant 20:10 21:22 22:17 38:9 39:23 40:2 45:23 48:21 49:7,8 73:21 84:2 129:5,20

sergeant's 102:10

sergeants 35:8 65:11

series 74:2 100:18

service 17:12 23:6

set 22:13 49:1 70:2,6 71:10 72:20 77:2 80:25 91:6 127:2 131:4 132:14

setting 126:5

settled 17:16

severity 81:4

shake 58:10 103:11 104:21 107:22 108:3 109:5 124:6,7

shakedown 105:11 106:7 110:4

shakedowns 21:1 103:20,21 105:10,17,18, 20 106:2 107:19,25 109:21 111:22 124:5

shaken 105:13

shaking 104:19 110:21 111:23,24

shanks 108:19

share 33:14 128:4,20

she'd 94:12

sheet 115:7

sheets 107:17 112:6,19 113:22 114:10 115:3

shelter 29:12 30:17 31:3,10, 13 32:11 33:8 35:7,21 36:8 38:3,5 45:12,17 83:6 99:24 111:6,12

shelters 36:13

shift 21:14 26:14,19,21,24, 25 27:1,11,13, 18 28:4,6,10, 19,21,25 29:11, 12 30:18,19,21 31:1,2,9,21,23 32:1 35:6,17 37:13,21,22,25 42:11,21 44:7 46:14 47:6,19 49:22 50:2,12 53:2,10,14,15 54:11,17,20 55:11,15 57:9 64:22 68:23,25 69:3,7,10,18 75:14 89:5 93:17 101:2 103:20 105:13 107:22 110:2 111:5,16 114:8 121:23,24

shift's 89:9

shifts 46:23 54:8

shook 65:14, 15 105:9 107:14 109:14, 23

shored 52:8

short 56:23 85:14 118:4

short-staffed 45:4 50:10 52:7

shortages 19:5 50:21 100:10

shoulders 62:21

show 52:21 53:25 57:18 58:20 128:19 130:18

showed 50:6, 13 54:16

shower 32:24

showing 46:9

shows 35:9 53:12 58:20

shut 30:23

shutting 36:17 74:4

sic 46:14

side 29:15 32:15,17,18 35:5 53:13,16

sights 129:18

sign 73:1

signature 33:23 133:18

signed 52:11

signing 73:12

similar 121:16 124:3 130:19

similarities 122:9 123:3

similarly 78:1

sir 9:4

sit 58:2

sitting 98:2,3 102:10 132:12

situation 40:7 45:9,20 52:9 55:18 58:2 66:15 67:21 68:9,14 69:6 70:13 74:19 75:9,19 76:12, 14 79:15 81:3 85:13 86:23 97:5,9 98:1 101:22 120:11 122:25 124:3 130:19 131:7, 10,20

situations 62:4,7,9 63:20 90:7 91:8,9 96:11

six-minute 94:18

size 52:10

slacks 15:6

sleep 78:2

slide 113:10

slightly 95:20

slip 109:10,13, 17

slots 19:12

slow 10:5

small 77:2 79:21,22 85:12

smell 99:11 131:9

smelled 97:13 129:22 130:16

smelling 129:6

smells 129:18

Smith 7:12,20 13:23 24:7,10, 13,16,25 25:18 48:11 49:7 53:1 68:13 70:4 75:22 87:3,12 93:10 117:18 119:3 127:18 131:14

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**Smith's** 94:1 121:12,24

**smoke** 75:6 97:14,15,17,19,24 98:3,7,18 99:3,14 100:8 116:16 117:1 129:6,22 130:16 131:9

**snarky** 34:25

**solemnly** 8:16

**solid** 114:16

**somebody's** 84:6

**someplace** 46:8 66:16

**sort** 25:14 44:2 59:1 64:20 67:25 68:3 77:21 105:25

**sorts** 29:25

**sound** 13:4 94:13 113:12

**sounding** 36:14

**South** 7:14

**space** 79:22

**sparked** 127:8

**speak** 58:24 59:4 113:14

**speaking** 24:18

**special** 77:1

**specific** 18:22 28:14,15 31:18 55:9 68:1 70:13 93:1 95:13,24 110:16,22 120:3 124:11 129:16

**specifically** 24:22 31:16 69:21 72:10 92:3 110:24 121:16 124:20

**speculate** 51:14

**speculation** 51:10 63:8

**speech** 10:5

**spend** 120:10

**spoke** 32:5 93:24 114:9

**spray** 61:14

**spread** 64:9 79:18,20 82:25 88:20 127:20

**spreaders** 16:19

**sprinkler** 117:4

**stability** 23:22

**staff** 27:19 29:23 33:3,4 37:5 39:3,21 41:2 45:22 46:21 47:4,9 50:7,21 56:17 57:11 60:1 69:6 71:3 72:20 73:7 80:2,6,21 83:13 87:20,24,25 89:21,25 90:20 92:15,20,21 93:16,17 95:17 97:16 99:6 100:10 101:1 103:19 105:4 106:11,18 115:17 122:24 126:5 132:19

**staffer** 72:17 99:9,10,13

**staffing** 18:23 19:4 47:5 49:15,18 53:17 63:13

**Stage** 83:13

**stages** 83:13

**stagger** 40:23

**staggered** 40:16,18

**standpoint** 43:24 101:19 112:18

**start** 9:11 10:7,14 16:1 36:10 39:2 40:21 88:17 97:4 117:7

**started** 15:19,20 20:8 21:14 22:16 50:12 58:7,17 59:6 65:23 88:5 96:24 97:19 121:17 122:3,6,11,12 132:21

**starting** 7:18 16:25 132:24

**starts** 126:19

**state** 7:16 8:4 20:1 25:17 26:6 41:21 42:7 46:13 52:25 73:25 91:14,21 92:3,16 96:1 99:5 115:15 117:3 123:10 124:1 125:2,5,21

**stated** 72:3 73:8 105:7

**statement** 27:23 95:7

**States** 7:13

**stating** 83:5

**station** 45:8 77:4 82:20 83:8,22 84:11,15,25 100:3 101:2,4,7,12,21 102:2

**stay** 14:22 66:10

**stayed** 126:4

**stays** 88:17

**steady** 17:6

**step** 84:14 85:3

**stepping** 26:17

**steps** 72:16 111:13 123:25

**Steve** 25:21

**Steven** 7:10 8:5,11 9:3 57:4 94:24

**stick** 118:5

**stipulate** 8:11,13

**stitching** 16:2

**stockpile** 108:12

**stop** 11:13 104:8 117:7

**stopped** 45:24

**store** 77:21

**story** 53:18

**stress** 19:11

**stretch** 11:14

**strike** 39:1

**strong** 123:3

**study** 14:20

**stuff** 45:18 51:3 76:8 103:6 106:3,15

**style** 57:23

**subject** 68:10,14

**submit** 62:15,16,17

**substance** 69:15 91:24 94:11

**substances** 109:3

**substantial** 98:6

**sudden** 97:5

**sufficient** 76:13

**suggest** 94:17

**sum** 69:15 94:11

**summarized** 94:1

**summary** 17:20 24:5 68:21 72:7 86:4 127:3

**summon** 91:23 96:12,22 97:10

**summoning** 99:2

**Sunday** 47:14

**supervise** 110:15

**supervised** 53:10

**supervising** 48:24 60:5 84:2

**supervision** 56:5 116:3

**supervisor** 26:14,19,21 27:13,18 28:4,6,10,19,21 29:1 35:6,7,10,13,15,17 42:11,12 47:6,20 53:2,4 57:9 64:23 65:16 68:24,25 69:3,7,8,11,19 75:15 76:4 82:19 83:9 89:5,10 93:17 99:20 101:2,20 102:14 103:15,18 104:16 105:1,3 110:14 111:5,12,16 114:20 115:15,24

**supervisor's** 42:22 105:19

**supervisors** 31:10 53:23 55:3,14,22 101:11

**supervisory** 57:23

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

supposed 34:1 38:20,23 40:15,18 41:9 44:11 46:24 49:11 53:20 72:6,17,22 75:11 76:21 83:14 88:10 92:15 103:19 104:11 105:12

suppression 90:1

surprise 119:18

surveillance 41:18 42:9,18, 24 43:24 88:13 100:2 102:4

survey 44:13

swear 8:17

sworn 30:12, 13

Sydney 7:4 10:1,9 67:14 71:22 86:10 94:25

sympathize 19:2

system 117:4 119:3,16,18

systems 130:8,9

**T**

table 15:14

tag 82:15 83:2, 4,14,16

takeaway 131:20

takes 36:24,25 37:1 74:13 85:3,5,17 86:2

taking 10:1 13:7 51:8 102:2

talk 10:5 17:8 33:4 39:18

95:19 97:18 111:2 114:5

talked 13:11, 13,15,19 37:10, 12 46:20 47:8 87:18 90:22 92:11 98:23 102:20 116:12 117:1 126:19 130:9

talking 10:1,11 32:7 42:20 56:6 61:19 65:24 70:12 81:21 90:17 103:24 111:4 123:20

tampered-with 118:16

taped 83:4

target 106:6

targeted 105:10,11,17

targets 110:1

Teague 129:20

team 42:8 61:21 64:7,13, 23,24 65:8,11 70:9 71:8 83:8, 9 104:22

teams 66:3,10

tear 80:21

technical 10:23

technician 7:4

teens 22:6 66:19

telephone 73:18,24

telling 34:16

tells 53:18

ten 128:13,15

ten-question 61:4

tended 127:2

tense 41:23

terms 35:8 38:1,22 52:18 59:13 74:15 88:4 91:17 92:19 98:6,21 99:1 111:3 116:13 123:18, 19

test 22:15,19, 20

testified 85:11

testimony 8:17 36:3 49:24 51:4,16 90:8 113:7 119:14 132:12

That'll 10:7

theory 75:8 77:6 89:19

there'd 116:6

thing 9:24 10:18 18:5 23:10 26:5 29:3 32:6 36:22 38:23 59:1 63:16 73:17 74:1 75:11 99:7 102:20 106:1 112:4 121:6,9 132:17

things 13:1 16:21 18:20 28:15 29:5,25 39:12 40:24 46:6 61:11 64:3 66:16 68:19 86:21 92:11 94:4 97:4 106:12 108:13 113:10,25 124:11 127:11

thinking 15:19 17:5 23:3 52:7, 9 62:19 64:3

thinks 10:9

this'll 9:25

thought 27:11 62:16 76:17

threat 81:5 87:8 106:13 112:24

threaten 87:10

threatening 79:15

throw 80:22 109:8,9

thrown 132:18

tied 114:10

tier 39:23 90:9 97:20,23 116:7 119:4 131:8

tiers 39:19 41:2,3 119:16, 17

till 21:15

time 7:8 9:5,6, 9,22 10:5,11 16:3 17:7,23 18:20,25 20:1 22:20 23:17 25:9,23 26:22 29:8 40:8,17, 19,20,23 41:2 42:2 43:16,21 44:17 49:19 50:1 53:10 54:5 56:22,24 57:1,6 58:16 59:2,10 61:24 63:14,15 67:5 76:1 79:6 81:17 82:25 84:7 85:14 87:3,14 88:6 93:9 94:20 95:1,18 99:7 101:13,21 102:2 103:10 104:8,20,21 105:10 109:23 115:5 117:18 120:10,19 121:11 126:17 127:12 128:7,8 129:21 130:2 132:25 133:7, 10,24

time-consuming

120:6

timeline 76:8

times 22:12 40:12 41:13 46:16 56:10,14, 17 61:7 80:20 88:9 95:10,14 99:22 100:12 113:21 116:6

today 7:5,7 8:25 9:6 25:13 32:7 57:5 94:25 123:21

toilet 112:12

told 70:11 90:2 94:3

ton 42:24

tool 43:25 44:1 102:22

top 33:23 34:2 35:10 61:14

total 49:12 55:1 63:10

touch 69:13

touched 32:18

town 22:18

track 56:19

tracking 75:17

trained 72:20 90:16 92:3

training 20:22 21:1 57:10,11 58:6,8,9,13,14 59:3,7,14,17,18 60:13,17,24 61:17,21 62:2, 3,12,20 63:3 65:24 66:19 67:3,5,10 73:3, 13 92:19,24 93:1,4,11,17 94:11,12 95:13, 23 123:9

transcript 11:3,5 133:21

transfer 112:1



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**transmitted** 74:16

**treatment** 129:9

**trigger** 75:24 97:24

**triggered** 98:7

**triggers** 76:2

**tripped** 75:6

**troubleshooter** 28:14 29:16

**truth** 8:18,19 51:15

**tune** 42:17

**turn** 44:8

**turnover** 23:22

**turns** 65:10

**two-page** 46:10

**type** 59:22 114:14

**types** 59:21 61:10 90:4 94:6

**typical** 31:25 51:22 65:13

**typically** 21:11

___

**U**

**ultimately** 31:11 40:1 49:14 62:18 89:13

**un-correctly** 57:22

**un-sworn** 30:13,15 34:20

**uncommon** 113:10

**understand** 9:5,7 10:19,21 13:11 26:8 34:21 38:20 57:24 58:19

62:10 63:17 73:10 80:13 81:1 82:13 83:13 86:18 94:6 106:4,25 113:24

**understanding** 26:12 34:4 39:24 50:21 67:1 71:9 94:2, 12 96:3 109:6

**understands** 77:8

**understood** 10:25 11:5 60:11 86:6 98:9,18 115:25 126:11

**unemployment** 22:18

**unit** 21:9 28:18, 22 30:7 34:15 35:7 38:8,12 39:4 49:13 64:9 82:15,17 84:1 90:2 95:14 99:6,10,22 101:12 103:20 104:18 105:5 109:22,24,25 112:2,13 113:22 116:14 126:3,14 129:9

**United** 7:13

**units** 21:12,18 28:25 30:7 39:10 56:17,19 74:18 75:14 77:2 95:10 104:19 110:16 126:7 127:1

**unlike** 121:12

**unlock** 77:8 78:7 119:7,11, 16

**unlocking** 119:17 120:1

**unusual** 37:24

**upper** 42:16

**upset** 80:20

**urgent** 45:25

**utility** 29:14,17 30:16 31:4,6,9 35:6,12,18,23 53:3 98:18

___

**V**

**vacant** 50:24 51:5 54:14

**vacation** 54:5

**Valencia** 7:11

**vantage** 70:23

**variety** 102:16

**versus** 81:25

**victim** 120:20 122:19

**video** 7:4,9 12:11,14,16 57:21 61:2,3 76:12 88:13 94:25 132:16

**videoconference** 57:5

**view** 42:8 115:3

**vigilance** 38:10,22 56:6 100:4 116:23 123:18

**vigilant** 87:21

**vigilantly** 95:9

**visitor** 74:1

___

**W**

**Wacker** 7:6

**waiting** 46:8

**walk** 18:5 19:21 31:24 50:1 53:12 73:25 82:23 105:19 125:17

**walked** 59:1 113:22

**walking** 74:3

**walkway** 90:9

**walls** 91:16,20

**Walton** 49:9

**wanted** 9:10 24:7 26:4 27:16 35:4 40:21,23 41:20 52:21 69:25 82:13 86:21 101:23 103:2 111:2 128:4

**wanting** 106:25

**warden** 12:24 13:19 22:25 29:19,20 32:3,4 33:11 34:2,3,5, 10,15 42:13,14 69:13,20,25 70:7,11,12,16 75:25 76:3,14 89:13

**warden's** 33:23

**wardens** 34:6

**Wardlow** 53:3

**watch** 78:11

**water** 90:6

**ways** 79:8

**weapon** 106:13 108:23

**weapons** 65:8 105:25 106:5

**week** 17:2 93:24 133:10

**weekend** 47:12

**weeks** 13:17 20:25 21:7

**weird** 120:25

**well-** 24:25

**well-founded** 25:12

**well-known** 88:24 118:20

**west** 43:9 91:8, 9

**whack-a-mole** 114:1,14

**whatnot** 16:20 31:23 35:25 39:11 103:22 108:11 110:7 111:25 115:4 124:19

**who've** 13:16

**wiring** 87:23

**witnesses** 13:15 62:10

**word** 58:8 85:21,22

**words** 10:22 50:14 71:9 99:15

**work** 9:16 17:1, 6,17 21:13 23:9,13 26:6 31:5 32:17 39:9 40:4 51:18 57:18 62:5 82:14 108:1 120:17

**worked** 15:5 16:8 17:7 18:19 21:11,16,17,18 29:15 32:15 33:3 125:22

**working** 10:16 18:12 19:24 33:5 36:16 44:18,20 45:15, 24 56:5,17 100:2,9

**works** 31:13 45:18 54:12 73:22 82:23

**would've** 19:17 26:1



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**

**wrap** 77:14,16

**write** 58:4
115:2

**written** 9:23
12:13 124:14

**wrong** 36:20
38:14 62:11
65:21 110:12

**wrote** 12:19,24

---

**Y**

---

**yank** 115:21

**year** 14:8,12
18:9

**yearly** 30:8
59:3,17 60:17

**years** 15:10
16:1 17:8
18:16,19 20:9,
16 23:12,15
26:23,25 27:12
49:2 117:10,18
124:24,25
125:21

**yelled** 115:19

**yesterday**
12:7 41:24

**younger** 19:1

---

**Z**

---

**zone** 35:7 48:8

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibit P**