**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **MYSTI VALENCIA,** | ) | |
| **PERSONAL REPRESENTATIVE OF THE** | ) | |
| **ESTATE OF MICHAEL SMITH,** | ) | |
| **Plaintiff,** | ) | **No. 3:24-cv-00185-DRL** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NEAL, *et al.*,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, Ron Neal, Jason Nowatzke, Deborah Taylor, Douglas Wardlow, Nadine Smith, Kevin Cross, Jeniene Walton, Darnell Crockett, and Steven McCann, submit the following Memorandum in Support of their Motion for Summary Judgment:

### I.      Introduction

On the morning of January 14, 2023, in A Cell House ("ACH") at Indiana State Prison ("ISP"), surveillance video documents that the first flickers of fire in Cell 252 took place at 10:54:49. The surveillance video provides undisputable evidence that Officers Cross and Crockett arrived at Cell 252 with a fire extinguisher three minutes and thirty-one seconds after the first flickers of flame, at 10:58:20. Sgt. Walton radioed the signal for a fire in ACH, thereby activating the ISP Quick Response Team ("QRT") and ISP's offender firefighter brigade. Tragically, the fire raged quickly out of control, and despite best efforts to save Mr. Smith, he perished in the fire.

This case arises from a sudden, unpredictable fire and the Constitution does not impose liability for such an event, even given the tragic outcome. Critically, there is no evidence that any Defendant had advance notice of a substantial risk of fire specific to Mr. Smith or his cell. Absent such notice, the Plaintiff cannot establish the actual knowledge required to support her Eighth

Amendment claim. The defendants are therefore entitled to qualified immunity because the Plaintiff cannot establish that the defendants' alleged actions or inaction were the actual cause of Mr. Smith's injuries, nor can the Plaintiff identify any clearly established right requiring prison officials to anticipate and prevent all possible ways an incarcerated individual might misuse items in his cell.

The undisputed evidence further shows that Warden Ron Neal, Major Jason Nowatzke, Captain Steve McCann, Captain Wardlow, and Safety Hazard Manager Deborah Taylor took reasonable measures to address fire safety at ISP. Once the fire began, Officer Kevin Cross, Officer Darnell Crockett, Sergeant Jeniene Walton, and Lieutenant Nadine Smith followed their training and responded immediately, making every reasonable effort to rescue Mr. Smith.

Additionally, the evidence presents a clear picture of Mr. Smith's activities as the start of the fire. Because Mr. Smith was contributorily negligent, his state law claim of negligence fails pursuant to the Indiana Tort Claims Act. Summary judgment should be entered in the defendants' favor on all counts in the Plaintiff's complaint.

## II.      Statement of Material Facts

The Defendants adopt and incorporate by reference the material facts set forth in their Statement of Material Facts, filed contemporaneously herewith.  N.D. Ind. L.R. 56-1(a)(3).

## III.     Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment if the party can demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 621 (7th Cir. 1995). The moving party bears the initial burden

of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). The substantive law underlying the claim defines which facts are material, and the Court should only refrain from granting the motion where there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

### IV. Argument – § 1983 claims

Under the Eighth Amendment, prison officials must "take reasonable measures" that are available to them to "guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish an Eighth Amendment failure to protect claim, a plaintiff must establish (1) that the deprivation alleged was "objectively, sufficiently serious" and (2) that "the mental state of the prison official" was "one of deliberate indifference to inmate health or safety." *Est. of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012). Prison officials "must have actual, and not merely constructive, knowledge of the risk." *Id*.

Importantly, under the subjective component, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Instead, "[t]he prison official must have actual, not merely constructive, knowledge of the risk to be liable." *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw that inference." *Gevas v. McLaughlin*, 798 F.3d 475, 479 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837).

Furthermore, "[d]eliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022)(quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). "Negligence, or even objective recklessness, is insufficient to satisfy deliberate indifference." *Stockton*, 44 F.4th at 615. A prison official that takes "reasonable steps" to prevent harm to a prisoner is not liable for subsequent injuries, even if the official acted negligently or did not act as quickly as possible to abate all risks. *Bagola v. Kindt*, 11 F.3d 632, 647 – 48 (7th Cir. 1997); see also *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023)(as long as prison officials take measures "reasonably calculated" to address the risk faced by an inmate, he cannot be held liable under § 1983, even though he ultimately failed to prevent the injury). Unwise decisions do not rise to the level of an Eighth Amendment violation, nor does failing to perceive a risk that a prison official should have perceived. *Christensen v. Weiss*, 145 F.4th 743, 752 (7th Cir. 2025).

A failure to intervene claim is established where an official has the opportunity to act but fails to do so. *Fillmore v. Page*, 358 F.3d 496, 505 – 506 (7th Cir. 2004). However, an underlying constitutional violation must first be proven in order to establish that a failure to intervene has occurred. *Id*.

### A.     The Defendants are Entitled to Qualified Immunity

As a threshold matter, Defendants are entitled to qualified immunity, which protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Court must determine "whether a reasonable [government actor] could have believed that [his] conduct was constitutional in light of the clearly established law and the information [he] possessed at the time." *Frazell v. Flanigan*, 102 F.3d 877, 886 (7th Cir. 1996). The two aspects to the inquiry are: (1) whether the officials' actions violate the Constitution, and (2) whether the constitutional right was clearly established at the time of the officials' alleged misconduct. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).

The Plaintiff bears the burden of demonstrating the violation of a clearly established right. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). A violation is only "clearly established where: (1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution." *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)

The second prong of the qualified immunity inquiry is "whether, in light of precedent existing at the time, [the officials were] plainly incompetent" in their actions. *Stanton v. Sims*, 571 U.S. 3, 6 (2013). Since qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," courts must determine whether a defendant is entitled to qualified immunity as early as possible during the proceedings. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

There is absolutely no evidence that any defendant had advance notice of a substantial risk of fire specific to Mr. Smith or his cell, nor is there any evidence that any such risk even existed

prior to the fire. This absence of notice is dispositive of the Plaintiff's Eighth Amendment claim. Furthermore, the Plaintiff cannot show that it was the Defendants' actions (or inaction) that caused the fire that led to Mr. Smith's death. To establish liability under § 1983, the Plaintiff must "produce evidence ... that [his] injuries had a causal connection with the alleged [Section 1983] . . . violation." *See Berman v. Young,* 291 F.3d 976, 982 (7th Cir. 2002). More specifically, the Plaintiff must demonstrate that the Defendants' actions (or inaction) were the actual and legal causes of his injuries. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 640 n. 1 (7th Cir. 2008). Actual causation exists where an injury would not have occurred *but for* the Defendants' conduct. *See Hibma v. Odegaard,* 769 F.2d 1147, 1155 (7th Cir. 1985).

In considering the Defendants' motion, the Court is entitled to rely on video surveillance footage: "When there is video evidence in the record, the Court may rely on the video "to the extent that it establishes the events with confidence and beyond reasonable question." *Romano v. Roundy's Illinois, LLC*, No. 21-CV-1463, 2022 WL 4356926, at *2 (N.D. Ill. Sept. 20, 2022)(citations and internal quotations omitted). As is plainly shown in the video, Mr. Smith is moving around continuously in his cell from the time Officer Crockett conducts his count check at 10:09:45 through 10:54:49, when the first flickers of flame are visible in Cell 252. (Ex. A-1). During that time, three separate bright white flashes are visible in Mr. Smith's cell at 10:13:48, 10:37:40, and 10:40:10. (Ex. A-1). A sudden yellow glow appears in the lower left-hand corner of Cell 252 at 10:40:59. (Ex. A-1).

These flashes and glow, Mr. Smith's movements, and the competent ignition sources found in Mr. Smith's cell in the area of origin, the area in front of the bed, following the fire - energized power cords, tablets, and an "unknown heat producing device" (Ex. N, Report of Besse, p. 2, p. 4) - plainly belie any suggestion by the Plaintiff that Mr. Smith was passively resting in his cell when

a spontaneous fire occurred. This is especially true because the electrical outlet in Mr. Smith's cell played no role in the fire. (Ex. N, p. 1; Ex. O, 71:10 – 74:5). After the fire occurred, Warden Neal learned that Mr. Smith fixed electronics for other incarcerated individuals. (Ex. H, 171:6 – 15). These facts all present a strong inference that Mr. Smith's own actions – most likely associated with his altering of or "fixing" electronic devices - were the cause of the fire. This fails to satisfy the requirement that it was the *defendants* who exposed him to objectively serious conditions, where the serious conditions were caused by Mr. Smith himself.

Furthermore, "Prison officials cannot be expected to eliminate the possibility of all dangers." *Thomas v. Owens*, No. 3:07-CV-315, 2007 WL 2225925, *2 (N.D. Ind., Aug. 1, 2007)(citing *McGill v. Duckworth*, 944 F.2d 344, 345 (7th Cir. 1991)). Likewise, "[d]eliberate indifference can be inferred only where defendants know there is a strong likelihood rather than a mere possibility that [harm] will occur." *Thomas*, 2007 WL 2225925 at*2 (citing *Watts v. Laurent,* 774 F.2d 168, 172 (7th Cir. 1985)). In the cell fire context, the Constitution requires specific knowledge of the particular fire risk posed to (or in this case, by) an incarcerated individual: "To say that [prison officials] actually knew of the risk of fire . . . based on other fire incidents in other cells related to other causes where these officials weren't personally involved is a speculative reach. The law won't permit juries to speculate." *Miles v. Dorre*, 3:19-CV-456 DRL, 2022 WL 59540, *4 (N.D. Ind., January 6, 2022).

All of the defendants appreciated fire safety and the need for reasonable fire safety measures. And in response, the defendants enacted many fire safety measures (discussed in detail throughout this brief) to prevent the possibility of dangers from fire. However, there is no evidence of any kind that would suggest that any of the defendants knew that there was a strong likelihood that Mr. Smith was uniquely in imminent danger of harm from fire due to his own activities.

*LaBrec*, 948 F.3d at 841. Even failing to appreciate the danger that Mr. Smith presented to himself is not enough to establish a constitutional violation. *Christensen*, 145 F.4th at 752.

Even if the Plaintiff could establish that the defendants violated Mr. Smith's constitutional rights, the defendants are entitled to qualified immunity because their actions were not clearly unconstitutional. Simply put, there is no controlling authority that requires prison officials to anticipate and prevent all possible ways an incarcerated individual might misuse items in his cell to create a fire hazard that places the constitutional question "beyond debate". *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In the absence of precedent addressing this type of unpredictable risk created by an incarcerated individual, no reasonable official would have understood that the Constitution required different or additional measures.

This case arises from a tragic but unforeseeable event, not a constitutional violation. The Plaintiff cannot establish that Defendants were deliberately indifferent to a known risk of serious harm, and there is no clearly established precedent requiring the defendants to anticipate any and all possible fire risks Mr. Smith could pose to himself in his cell. Accordingly, Defendants are entitled to qualified immunity, and judgment should be entered in their favor.

> B.     *Cross, Crockett, Walton, and Smith Responded to the Fire as Soon as They Were Aware of It*

The evidence plainly shows that the earliest visible reaction from incarcerated individuals in A Cell House was at 10:56:49, when the occupant of Cell 248 moves his curtain and appears at the front of his cell. (Ex. A-1; Ex. A-2). He retreats into his cell shortly thereafter and does not appear on video to be shouting. (Ex. A-1). Even the occupants directly next to Mr. Smith (Cells 250 and 254) do not visibly react until 10:57:21 and 10:57:22, respectively. (Ex. A-1). Assuming that the occupant of Cell 248 began shouting from the first possible moment he appears at his cell door at 10:56:49 (though the video does not depict him doing so), Officers Cross and Crockett

arrived at Mr. Smith's cell by 10:58:20 to render aid approximately ninety seconds later. This includes travel time from the officers' station to Cell 252, which was one range below and twenty-six cells away. (Ex. A-7).

The surveillance video of the side view of the ranges in ACH tells a similar story. On the 200 range, the first visible reaction of an incarcerated individual on the range occurs at or around 10:57:46, when a hand sticks out of a cell with a mirror. (Ex. A-3). Defendants Crockett and Cross appear on the range just seconds later, at 10:58:05 with a silver fire extinguisher. (Ex. A-3). On the 400 range, a hand sticks out of the cell at 10:58:07 (A-4); on the 500 range, a hand is visible starting at 10:58:18. (A-5). Per Defendant Major Wardlow, in his experience, incarcerated individuals also yell while sticking their mirrors out during an emergency. (Ex. I, 129:6 – 10).

Officers Cross and Crockett all respond as a matter of practice when incarcerated individuals shout for help in cell houses. (Ex. B, 160:5 – 14; Ex. C, 46:21 – 25). But Officer Cross, Officer Crockett, Sgt. Walton, and Lt. Smith all testified that they did not hear any shouts from any incarcerated individuals until the fire alarm sounded. (Ex. B, 112:11 – 13; Ex. C, 139:10 - 13, 19 – 21; Ex. D, 122:13 – 15; Ex. F, 165:16 – 23). These defendants simply cannot respond to an emergency they are not aware of; however, immediately responding to the fire upon becoming aware of it does not even approach the constitutional standard for an Eighth Amendment violation, conduct reflecting a complete lack of concern for Mr. Smith's welfare. *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).

While the actual time the fire alarm sounded and when incarcerated individuals first shouted are not known, the undisputed evidence establishes that once these defendants became aware of the fire in Cell 252, their rescue efforts were immediate. From the first flicker of flame to Officers Cross and Crockett's arrival at Cell 252 with a fire extinguisher was three minutes and

thirty-one seconds. (Ex. A-1). As a matter of law, it cannot be said that a response time of approximately three-and-a-half minutes clears the "high hurdle" necessary to establish that Officers Cross and Crockett displayed a "total unconcern" for Mr. Smith's welfare. *Stockton*, 44 F.4th at 615; *see also Miles*, 3:19-CV-456 DRL, 2022 WL 59540at *4 (finding that a response time of a "few minutes" was not sufficient to establish deliberate indifference).

Furthermore, the time between the first visible reaction of an incarcerated individual on the 200 range and response by Officers Cross and Crockett is one minute and thirty-one seconds. (Ex. A-1). Because Sgt. Walton immediately called a 10-71 fire signal over the radio upon learning of the fire, the QRT responded within five and a half minutes of the first flickers of flame. (Ex. A-1). The first member of the offender fire brigade, Matthew Stidham, arrived within seven minutes of the first flickers of flame; firefighters in full gear arrived within nine minutes. (Ex. A-1). Officer Cross, Officer Crockett, Sgt. Walton, and Lt. Smith worked together to render aid to Mr. Smith and put forth valiant efforts to try to save his life; no reasonable jury could find this emergency response as constitutionally inadequate.

It is well settled that even where rescue efforts fail, or are potentially not the best course of action in the face of an emergency, those efforts are not evidence of a constitutional violation:

> Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference. *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002); *see also Sinn v. Lemmon*, 911 F.3d 412, 423–24 (7th Cir. 2018) (holding that no reasonable juror could infer deliberate indifference where prison officials took sensible steps to address unsafe prison conditions). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate*, 294 F.3d at 882.

*Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022). Therefore, the relevant inquiry is only whether Officer Cross, Officer Crockett, Sgt. Walton, and Lt. Smith reasonably responded to the fire in Cell 252; Mr. Smith's very unfortunate death as a result of that fire is not *per se* evidence of deliberate indifference.

        C.        *The Responding Defendants Followed Prison Protocol in Responding to the Fire*

Per Lt. Smith, the protocol in the event of a fire is the following: First, correctional officers are instructed to contact the control room via radio. (Ex. F, 96:12 – 14). Correctional officers are to call a Signal 1070 if a fire alarm is going off, and a Signal 1071 if fire is visible. (Ex. F, 97:7 – 23). Either of these signals will activate the ISP offender fire brigade, which is comprised of incarcerated individuals. (Ex. G, 52:18 - 24). It will also activate the prison's QRT, or Quick Response Team, which is comprised of correctional officers trained to address emergencies in the cell houses. (Ex. G, 52:18 - 24). The next item is to get the bolt cutters for the individual cell lock. (Ex. F, 96:15 – 18). Until the QRT or the ISP fire fighters arrive, cellhouse staff are responsible for responding to the fire, including efforts to put the fire out. (Ex. F, 98:11 – 16). Next, a correctional officer is to assess the scene of the fire. (Ex. F, 97:1 – 3). Then, a correctional officer should remove offenders from the immediate area of the fire. (Ex. F, 97:4 – 6).

The record establishes that the correctional officers present in ACH on the day of the fire responded in accordance with this protocol immediately upon learning that there was a fire. Officer Crockett checked on Mr. Smith during count, as Officer Crockett was assigned to the 200 and 300 ranges of A Cell House. He testified that Mr. Smith was resting, and he did not observe anything out of the ordinary about Mr. Smith or his cell. (Ex. B, 90:2 – 8, 90:9 – 16). Importantly, Officer Crockett did not observe any electronics, hotpots, contraband, or modification of the outlet in Cell 252. (Ex. B, 187:8 – 10; 187:13 – 19; 90:20 – 91:8). This is in line with Defendant Warden Neal's

directive for custody staff to conduct security checks, checking on the well-being of the individual in the cell and to make sure that incarcerated individuals are not violating prison rules. (Ex. H, 35:25 – 36:4; 36:10 – 14).

Once Officer Cross learned of the fire, it was reasonable for Officer Cross to quickly grab an extinguisher when he became aware of the fire; in his experience, most cell fires were paper or small fires that could be extinguished by a water extinguisher and he did not know what type of fire he was facing. (Ex. C, 152:18 – 25; 153:3 – 11). Accordingly, Officer Cross brought the water extinguisher, which was the first one he could grab. (Ex. C, 130:17 – 19). After the water extinguisher was out of water, Officer Cross ran back and got the ABC extinguisher and gave it to Officer Crockett for use.  (Ex. C, 141:9 – 11; 142:12 – 19; 143:6 – 13). Officer Cross then left the fire scene, because the ISP first responders had arrived, and he assisted with evacuation efforts. (Ex. C, 147:21 – 22; 147:25 – 148:1).

Officer Crockett testified that when became aware of the fire, he and Officer Cross immediately responded by leaving the officers' station and heading up the stairs. (Ex. B, 116:23 – 117:4). Officer Crockett knew that Officer Cross had grabbed a fire extinguisher, but he did not know that it was a water fire extinguisher until they got to Cell 252. (Ex. B, 117:10 – 19; 118:2 – 25). Furthermore, Officer Crockett did not appreciate the magnitude of the fire until they got onto the range. (Ex. B, 123:7 – 14). Officer Crockett was not able to get close to Cell 252 on his first approach because it was too dangerous. (Ex. B, 139:19 – 23). Officer Crockett recalls that he and Officer Cross left the scene of the fire after deploying the water extinguisher, and he then "rolled the bar". (Ex. B, 146:3 - 4).

Per Warden Neal, "rolling the bar" is a necessary step in opening a cell door on the 200 range of ACH North. That is because on that range, there are "Brinks" locks on every cell door,

but there is additionally a roll "bar" that slides over the top of each cell. (Ex. H, 86:5 – 12; 87:8 – 25). In order to open a cell door, staff must roll the bar by turning a crank at the end of the range, then unlock the cell door with a key. (Ex. H, 88:1 – 5; 87:20 – 25). Therefore, Officer Crockett's "retreat" had a rescue purpose: to complete the first step in opening Mr. Smith's cell door and to begin evacuation procedures for the incarcerated individuals at risk on the 200 range.

Officer Crockett then immediately returned to Cell 252, undeterred by the very large flames that continued to emerge out of the cell, and sprayed the fire with the ABC fire extinguisher. (Ex. B, 137:20 – 25; 178:5 – 179:9). The fire would subside but kept reigniting. (Ex. B, 138:5 – 8). Once Officer Crockett was able, he began trying to open the cell door with his keys. (Ex. A-1; Ex. B, 181:2 - 20). Lt. Koen (part of the QRT team) observed Officer Crockett next to the cell, trying to open the cell door even with flames and smoke still coming out of the cell. (Ex. A-1; Ex. G, 65:6 – 9; 75:15 – 18).  Lt. Koen was able to open the door with the cell keys, which he testified was possible because the bar had already been "rolled". (Ex. G, 65:14 – 16; 76:14 – 18).

After learning of the fire on January 14, 2023, Sgt. Walton immediately got on her radio, called for control, and called a Signal 1071. (Ex. E, 122:19 – 25). Sgt. Walton then went directly to the front door of ACH and unlocked it. (Ex. E, 126:23 – 127:15). Sgt. Walton recalls that the QRT team arrived relatively quickly, and she told them where the fire was located. (Ex. E, 127:6 – 17, 128:2 – 5). Once the incarcerated individual firefighters arrived, Sgt. Walton evacuated the 100 ranges on each side of ACH. (Ex. E, 131:2 – 3).

Lt. Smith was in the officers' station on the morning of the fire. (Ex. F, 160:8 – 17).  When she became aware of the fire, she grabbed a fire extinguisher and stayed on the 100 range in the hopes that she could spray up to the 200 range with her fire extinguisher. (Ex. F, 166:20 – 21; 170:4 – 9).  However, when she got there, Lt. Smith was worried that spraying would spread the

fire. (Ex. F, 170:12 – 21). Lt. Smith then headed to the 200 range. (Ex. F, 171:14 – 15). Per her recollection, she handed her fire extinguisher to either Officer Cross or Officer Crockett, and they continued to spray. (Ex. F, 171:16 – 18).

Accordingly, the evidence is undisputed that these correctional staff responded to the fire in accordance with prison protocol and their training. If Officer Crockett's case, he went above and beyond what prison protocol required; even after the QRT team arrived, Officer Crockett steadfastly remained at the scene of the fire, crouching under the flames in Mr. Smith's cell in order to try to open the lock of his cell with a key. (Ex. A-1). Officer Cross, Sgt. Walton, and Lt. Smith remained in the cell house and evacuated the incarcerated individuals in ACH to remove them from a dangerous situation. Given these swift and precise responses, the Plaintiff cannot meet her high burden of showing that Officer Cross, Officer Crockett, Sgt. Walton, and Lt. Smith displayed "'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton*, 44 F.4th at 615.

> D. *Meaningful Rescue May Have Been Impossible Given the Fast, Raging Fire*

Unfortunately, even given the swift response time from Officers Cross and Crockett, the fire raged out of control extremely quickly making a successful rescue impossible. As is plainly seen in the surveillance video of ACH, the fire is first visible at 10:54:49. (Ex. A-1). However, the fire subsides and glows again until 10:55:45, when the glowing orange on the walls of Cell 252 becomes visible and steady. (Ex. A-1). It is reasonable to infer that Mr. Smith was attempting to put out the fire himself during this time period, in order to avoid detection of any impermissible activities he was undertaking in his cell. Indeed, he is *never* pictured at the front of his cell yelling for help during this time period.

A little over two minutes later, by 10:58:10, the fire in Cell 252 suddenly produces a very strong flash of fire, which engulfs Mr. Smith and his entire cell in flames. (Ex. A-1). By the time Lt. Koen (a member of the Quick Response Team (QRT)) arrived at 11:00:07, approximately thirty seconds after Officer Crockett had obtained and deployed the ABC fire extinguisher at 10:59:34, Lt. Koen testified that he observed that Mr. Smith was already deceased, as he was unresponsive and not screaming. (Ex. A-1; Ex. G, 77:1 – 3; 77:2 – 3). Even after the cell door was opened, Lt. Koen was not able to pull Mr. Smith's body out of the cell because he did not have the proper equipment to safely do so. (Ex. G, 65:18 – 23; 81:8 – 14). Per Lt. Koen, even the offender fire brigade struggled to put out the fire; eventually, the firefighters, who had full gear, were able to safely pull Mr. Smith's body out. (Ex. G, 65:23 – 66:1; Ex. A-1).

So, even if Officers Cross and Crockett had brought an ABC fire extinguisher with them and deployed it when they first arrived at 10:58:20, at least one of them would have needed to run back to the stairwell to "roll the bar" in order to open Cell 252. It is pure speculation to suggest that it would have been possible for Officers Cross and Crockett to touch Mr. Smith in order to pull him out of the cell in that scenario. Like Lt. Koen, they lacked the appropriate gear to safely assist in doing so. Correctional officers are not required to put themselves in harm's way in order to rescue an incarcerated individual. *Shields v. Dart,* 664 F.3d 178, 181 (7th Cir. 2011); *Guzman v. Sheahan,* 495 F.3d 852, 858 (7th Cir. 2007); *Peate v. McCann,* 294 F.3d 879, 883 (7th Cir. 2002). And it is likewise purely speculative to suggest, having suffered the fire exposure that is plainly seen on the video from 10:58:10 and onward, that Mr. Smith would have been able to move his body enough to move away from the fire himself or even survive his injuries had the cell door been opened upon the officers' first approach. In short, and unfortunately, the record compels the

15

conclusion that this fire turned deadly without any hope of meaningful rescue once the large burst of flames erupts in Cell 252 at 10:58:10, as pictured on the video.

### E. Even If Operational, the Monitors May Not Have Shown Mr. Smith's Cell

The monitors located in the officers' station in ACH were out of service on the date of the fire. However, only sergeants are responsible for watching the monitors in the officers' station, and even then, continuous monitoring was not required. (Ex. I, 78:8 – 10, 80:24). Per Sgt. Walton, the real time video surveillance monitors in all the cell houses, even when working, usually show only the front view of each range that shows down the range "hallway" (like the views displayed in Exs. A-3, A-4, and A-5). (Ex. E, ¶ 5). On occasion, the side view (that shows into the cells) of the range might be accessible on the monitors, but the monitors do not have access to all cameras in the cell house. (Ex. E, ¶ 5). Sergeants have no control over which camera feeds are accessible on the monitors. (Ex. E, ¶ 6).

Accordingly, Plaintiff's contention that had the surveillance video been in operation on the day of the fire, the outcome would have been different, is pure speculation because those live-feed video surveillance monitors may not have shown Cell 252 such that the fire could have been detected sooner. Speculation cannot defeat summary judgment. *Flowers v. Kia Motors Finance*, 105 F.4th 939, 946 – 947 (7th Cir. 2024)(citations omitted).

### F. A Break in the Officers' Station was Reasonable

Officer Cross, Officer Crockett, Sgt. Walton, and Lt. Smith were all in the officers' station after Officer Cross and Officer Crockett had completed count. Correctional officers are required to walk the ranges every thirty minutes. After he completed his count, at about 10:30 a.m., Officer Crockett, who was assigned to the 200 and 300 ranges, would have needed to conduct another

security walk approximately thirty minutes later, or 11:00 a.m., just a few minutes after the fire started at 10:54:49. (Ex. B, 143:1 – 5, 142:18 – 25, 143:3 – 5; Ex. A-1).

Per Sgt. Walton and Lt. Smith, this time after count was turned in until security walks were required thirty minutes later was an appropriate time for correctional officers to take a break to use the restroom or eat their food. (Ex. D, 118:4 – 14; Ex. F, 230:18 – 25, 231:1 – 22). It is not against policy for staff to sit together in the officers' station. (Ex. I, 78:8 – 10).  Correctional officers work twelve-hour shifts. (Ex. C, 47:10 – 13). When the 10 a.m. count was completed, these four defendants had been working for approximately four and a half hours. Correctional officers cannot reasonably be expected to work twelve-hour shifts without breaks. (Ex. H, 100:12 – 101:3; 100:24). Count is a very appropriate time to use the restroom, eat, and drink water, because, as is shown in the surveillance video, incarcerated individuals are not walking around during that time and have all been accounted for as secure in their cells.

Furthermore, it is pure speculation that a correctional officer continuously walking the ranges could have prevented Mr. Smith's death due to the layout of the cell houses at ISP. *Flowers*, 105 F.4th at 946 – 947; (Ex. A-7). A correctional officer continuously walking the ranges could have been on the south side of ACH, completely unaware of an emergency occurring on the north side. Or a correctional officer could have been walking the 500 range of the north side, not aware of the emergency three floors below, as the range floors are solid as pictured in the surveillance footage. Even supposing a correctional officer was walking near Cell 252 around the time that the fire started, he or she still would have had to obtain a fire extinguisher in order to safely open the cell door. To do so would require either running down to the officers' station to obtain an ABC fire extinguisher or radioing for one to be brought up. Arguably, either of these scenarios could result in a *slower* response time.

17

G.    *Prison Officials Took Reasonable Steps to Address the Issue of Prison Curtains*

The facts of this case contradict any suggestion that the curtain over Mr. Smith's cell delayed detection of the fire in his cell or that it contributed to the quick progression of fire in his cell. Whether or not ISP adequately enforced its policies is not at issue in this case where the curtain cannot be established as a contributing factor to the outcome.

First, during Officer Crockett's count, Mr. Smith's curtain was pulled to the side. (Ex. A-1). Mr. Smith did not move his curtain over his cell until 10:43:32. (Ex. A-1). As discussed above, the monitors in the officers' station usually only show the side view of the ranges, Mr. Smith's curtain likely would not have delayed detection of the fire even if the monitors were operable on the day of the fire. Officers Cross, Officer Crockett, Sgt. Walton, and Lt. Smith were in the officers' station handling count and taking care of other functions when the fire started; therefore, the curtain did not impede or delay detection. And while a curtain could in theory pose a fire hazard if it caught fire, there is no evidence – video or otherwise - that Mr. Smith's curtain was anywhere near the origin of the fire or accelerated the fire in any way. Mr. Smith's curtain can only be seen catching fire when Mr. Smith pulls it down at 10:57:38. (Ex. A-1). By this time, Cell 252 was already entirely engulfed in flames.

"Curtains" hanging in front of cells at ISP are a problem that most staff try to actively address. Warden Neal instructs his staff to confiscate the curtains. (Ex. H, 35:7 – 10). Staff "writes up" incarcerated individuals who are caught with these makeshift curtains with a conduct violation. (Ex. H, 236:2 – 12). The problem is that incarcerated individuals put the curtains right back up. (Ex. H, 236:2 – 12). If staff do not comply with writing up conduct reports for curtains, staff is disciplined up to and including termination of employment. (Ex. H, 41:2 – 5).

18

While curtains are a problem, staff at ISP have other duties besides continuously confiscating sheets and blankets used as curtains and writing incarcerated individuals up for their violation of the policy. The curtains continue to be addressed, but as the curtains are makeshift from materials available to the incarcerated individuals, the problem is not one that is easily solved. However, given all of these measures to address the issue of curtains, it cannot be said that the Defendants failed to reasonably respond to any safety risks the curtains might pose to incarcerated individuals at ISP.

### H. Prison Officials Took Reasonable Steps to Address Fire Safety

Warden Neal has taken several measures to address fire safety at ISP. Warden Neal requested installation of sprinkler/fire suppression systems in all cellhouses, including ACH. (Ex. H, 22:20 – 22). Warden Neal learned that the request was denied because retrofitting the buildings was "financially astronomical" and not feasible given the structure and age of ISP, which was built in 1860. (Ex. H, 20:20 – 25, 22:25 – 23:1, 23:13 – 22). Warden Neal also pursued upgrading fire hydrant infrastructure across the prison, resulting in installation of additional hydrants on ISP property. (Ex. H, 24:14–18; 143:22 144:5). The offender fire brigade is trained to deploy hoses from these hydrants and reach any location in the prison. (Ex. H, 143:13 – 21).

Since 2017, Warden Neal eliminated plastic property boxes and replaced them with steel property boxes specifically designed to perform better in fires. (Ex. H, 31:21 – 32:11). Inmates are limited to 4.5 cubic feet of property confined to that designated property box. (Ex. H, 31:21 – 32:11). Staff are instructed to enforce these limits during inspections and cell shakedowns. (Ex. H, 34:2 – 4). Every cell is subject to quarterly shakedowns to remove contraband, enforce property limits, and identify any potential hazards. (Ex. H, 33:23 – 24). Staff are also expected to identify

19

excess property during routine security checks and report any violations to the custody supervisor for a shakedown. (Ex. H, 36:10 – 19).

The Incident Review Committee meets Monday through Friday. (Ex. H, 40:4 – 7). These meetings specifically track Property accumulation in cells and Fire hazards inside cells. (Ex. H, 40:4 – 7). Staff issues hundreds of conduct reports monthly for violations such as prohibited curtains. (Ex. H, 236:2 – 12). Additionally, staff who fail to enforce policies are subject to progressive discipline, up to and including termination. (Ex. H, 41:2 – 5).

Deborah Taylor is responsible for ensuring that fire extinguishers are in their proper place. (Ex. L, 124:24 – 125:2). She works with the offender fire brigade at ISP to ensure that these fire extinguishers are checked and inspected monthly. (Ex. L, 125:4 – 12). On the day of the fire, water extinguishers were on every range in the cell houses, because incarcerated individuals typically set fire to paper, wood, and other items that are easily extinguished with water. (Ex. L, 125:21 – 22). ABC fire extinguishers were located in the officers' station. (Ex. L, 126:21 – 25).

I.      *The Individual Lock on Mr. Smith's Cell Was Not Locked*

Defendants anticipate that the Plaintiff will argue that Mr. Smith should not have been permitted to have an individual lock on his cell door as this impeded ISP staff from getting into his cell during the fire. But the evidence clearly shows that Mr. Smith's individual lock played no role in this case. As plainly seen in the video, Mr. Smith places a loose individual lock on his door at 10:00:22. (Ex. A-1). He does not lock it, and it remains loose on his door for the duration of the surveillance video. (Ex. A-1). Lt. Koen is likewise depicted unlocking the Brinks lock on Cell 252 at approximately 11:00:37 and is able to open the door immediately afterwards without the need to unlock Mr. Smith's individual lock or break it open with bolt cutters. (Ex. A-1). Therefore, Mr.

Smith's individual lock is not at issue in this case, nor is ISP's policy regarding the same. (Ex. A-1).

> J. *Fire Drills and Training Were Consistent and Structured*

ISP maintained a consistent and structured fire drill program across all housing units, including ACH. Fire drills were conducted regularly throughout 2021 and 2022, including drills in October 2021, January 2022, May 2022, August 2022, and November 2022. (Ex. A-6, pp. 1 – 8, 9 – 16, 10 – 25, 26 – 34, 35 – 42, respectively). During the fire drills, correctional staff practiced evacuating cell houses while prison fire personnel responded with equipment, which simulated actual emergency procedures. (Ex. B, 59:2 – 9). The evidence further shows that Defendants Crockett, Cross, and Walton personally participated in these drills and successfully completed them, achieving passing or perfect scores on associated evaluations. (Ex. A-6, pp. 3 – 4, 5 – 6, 7 – 8, 19 – 20, and 28 – 29).

Beyond drills, staff also received formal fire-response training upon hire and annually thereafter, including instruction on responding to fires, calling appropriate signals, using fire extinguishers, and evacuating inmates. (Ex. J, 38:4 – 13; Ex. Q, 69:19). It cannot be said that the defendants failed to take "reasonable steps" to adequately train correctional staff in fire preparedness, when fire drills and training were mandatory. *Bagola*, 11 F.3d at 647 – 48 (7th Cir. 1997). This is particularly true because at ISP, correctional staff in cell houses are responsible only for the initial emergency response to a fire, until the QRT and offender fire brigade arrive. (Ex J, 114:21 – 115:4). Officers Cross and Crockett followed their training by deploying two fire extinguishers and "rolling the bar" prior to the QRT's arrival. Sgt. Walton called the fire signal exactly as trained.

Furthermore, the undisputed evidence establishes that none of the named defendants had any direct responsibility or authority over establishing the training curriculum, including the curriculum pertaining to fire response. Per Christopher Beal, who was the training coordinator for ISP, training curriculum is set at the Correctional Training Institute at Newcastle Correctional Facility. (Ex. Q, 32:10 – 18).  Christopher Beal and training staff would then teach the curriculum to staff at ISP. (Ex. Q, 32:10 – 18).   Prison officials at ISP could recommend changes to the curriculum, but staff had no control over whether those changes were implemented. The defendants cannot be held liable for decisions outside the purview of their job responsibilities:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules . . . along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). The Plaintiff may not hold the named defendants liable for any issues related to the training curriculum, as curriculum decisions are made by another division within the Indiana Department of Correction.

> K.      *Staffing Issues Were Continually Addressed by Warden Neal*

Recruiting and retaining staff at ISP, a maximum-security prison, per Defendant Neal, is challenging. (Ex. H, 235:1 – 4). Per Warden Neal, the job is "not for everyone". (Ex. H, 235:9 – 10). This was echoed by Defendant Steve McCann, formerly the captain and day shift supervisor, who put it simply: "people do not want to work in a prison." (Ex. H, 51:13 – 21).  Correctional officers must walk ranges for twelve hours a day doing security checks every thirty minutes. (Ex. H, 235:10 – 19). Correctional officers must argue with incarcerated individuals to enforce rules, enduring being cussed at, having urine or feces thrown at them, or being assaulted by incarcerated individuals. (Ex. H, 235:9 – 19). Even though these challenges exist, Warden Neal has taken

measures to recruit and retain staff, including offering incentive pay for existing employees and increasing the starting wage of staff. (Ex. H, 235:4 –8).

On January 14, 2023, ISP was not running with full staff capacity, due to vacant positions and scheduled time off. (Ex. P, 53:25 – 54:21). There were forty-one correctional officers and fifteen supervisors on staff that day. (Ex. P, 54:25 – 55:8). Accordingly, in addition to a lieutenant (Lt. Smith) and a sergeant (Sgt. Walton), Steven McCann (a former captain at ISP) assigned two correctional officers to ACH (Officers Cross and Crockett). (Ex. P, 49:6 – 20). Per Major Wardlow, however, this is typical for ACH, which usually runs with a sergeant, two correctional officers, and a lieutenant if one is on shift. (Ex. I, 71:17 – 22). And even with staffing shortages, a prison still must run – it was reasonable for Mr. McCann to assign two correctional officers to ACH instead of four. If Mr. McCann had assigned four officers to ACH, there could have been a cell house at ISP that day with no officers at all.

But even assuming *arguendo* that ACH was understaffed, on January 14, 2023, Officer Crockett still conducted his security checks and count on the 200 range as required. And when the correctional staff was alerted to a fire, both Officer Cross and Crockett physically responded to the fire, while Sgt. Walton called the signal and let emergency responders into ACH. As a practical matter, understaffing did not delay detection of or response to the fire. To the extent that Plaintiff argues that more staffing would have allowed for continual walking of the ranges, Warden Neal's directive was for security walks every thirty minutes. It is not the Court's role to make decisions regarding the everyday operation of the prison: "[F]ederal courts must avoid becoming enmeshed in the minutiae of prison operations, and should decline to second-guess prison administrators in the operation of correctional facilities." *Coniglio v. Thomas,* 657 F.Supp. 409, 414 (S.D.N.Y.1987)(citing *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

23

*L. Conclusion – § 1983 claim*

There is no evidence that any defendant had notice of or disregarded the particular risk that Mr. Smith posed to himself. Furthermore, the fire in Cell 252 that resulted in Mr. Smith's unfortunate death was a sudden and unforeseeable event, not a constitutional violation. Because the Plaintiff cannot overcome qualified immunity and cannot satisfy the elements of her Eighth Amendment claims, the defendants are entitled to judgment as a matter of law.

## V.    Argument – State Law Negligence/Wrongful Death Claim

Plaintiff also asserts a state law negligence/wrongful death claim. As Plaintiff's claims are against prison officials, who are public employees, the Plaintiff's negligence claim falls within the purview of the Indiana Tort Claims Act. Ind. Code § 34-13-3-3. However, the Comparative Fault Act does not apply to tort claims against public employees. Therefore, should the Court find that Mr. Smith was even 1% contributorily negligent, his claim is barred entirely:

> Under the common-law defense of contributory negligence, even the slightest negligence by the plaintiff barred the plaintiff from recovery. To lessen the harsh effect of contributory negligence, our General Assembly enacted the Comparative Fault Act in 1986. Under the Comparative Fault Act, a plaintiff whose own negligence contributes as much as 49 percent to her injury may recover from a defendant whose acts provided 51 percent. . . .
>
> When adopting the Comparative Fault Act, however, our General Assembly excluded certain claims from this alteration, including tort claims against governmental entities, such as the City. Thus, for claims against governmental entities, any amount of negligence by the plaintiff still acts as a complete bar to recovery under the theory of contributory negligence.

*Areche v. Indianapolis Dep't of Public Works*, 264 N.E.3d 84, 89 – 90 (Ind. Ct. App. 2025)(internal citations omitted). "Contributory negligence is defined as 'the failure of a person to exercise for his own safety that degree of care and caution which an ordinarily reasonable prudent person in a similar situation would exercise.'" *Town of Highland v. Zerkel*, 659 N.E.2d 1113, 1121 (Ind. Ct.

App. 1995)(citing *Pugh's IGA v. Super Food Services, Inc.*, 531 N.E.2d 1194, 1199 (Ind. Ct. App. 1998).

As discussed in greater detail above, Mr. Smith moves around continuously in his cell following the "count" security check conducted by Officer Crockett. Three separate bright white flashes and a glow are all visible after Officer Crockett's security check for count. The competent ignition sources in the area of origin were energized power cords, tablets, and an "unknown heat producing device." (Ex. N, Report of Besse, p. 2, p. 4). Mr. Smith fixed electronics for other incarcerated individuals. (Ex. H, 171:6 – 15). As a matter of law, Mr. Smith's actions just prior to the fire were contributorily negligent, as all reasonable people know or should know that manipulating electronic devices in an enclosed and locked space creates a grave safety risk:

> All plaintiffs owe a duty of reasonable care to themselves. In *Brown v. City of Indianapolis*, we noted that the plaintiff "failed to exercise, *for his own safety*, that degree of care and caution which an ordinary, reasonable, and prudent person in a similar situation would have exercised." 113 N.E.3d 244, 252 (Ind. Ct. App. 2018) (emphasis added) . . . *See McSwane*, 916 N.E.2d at 911 ("A court should find a plaintiff contributorily negligent if her conduct falls below the standard to which she is required to conform for her own protection.") (citing *Faulk v. Nw. Radiologists, P.C.*, 751 N.E.2d 233, 239 (Ind. Ct. App. 2001)) (emphasis added).

*Areche*, 264 N.E.3d at 90. The Court should grant summary judgment on the Plaintiff's negligence/wrongful death state law claim.

## VI. Conclusion

For the foregoing reasons, summary judgment in favor of the Defendants is appropriate and should be granted on all of the Plaintiff's claims.

Respectfully submitted,

**EICHHORN & EICHHORN, LLP**

By: _/s/_ Julia M. Kwait

     David J. Beach, #18531-45
     Julia M. Kwait, #28474-71
     One of the Attorneys for Defendants, Ron Neal,
     Jason Nowatzke, Deborah Taylor, Douglas
     Wardlow, Nadine Smith, Kevin Cross, Jeniene
     Walton, Darnell Crockett, Steven McCann

EICHHORN & EICHHORN, LLP
2929 Carlson Drive, Suite 100
Hammond, Indiana 46323
Telephone: (219) 931-0560
dbeach@eichhorn-law.com
jkwait@eichhorn-law.com

26

## <u>CERTIFICATE OF SERVICE</u>

I, Julia M. Kwait, certify that on the 17th day of April, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Julia M. Kwait

Julia M. Kwait
