IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

JUDGE DAMON R. LEICHTY

MAGISTRATE JUDGE JOHN E. MARTIN

CASE NO. 3:24-CV-00185

MYSTI VALENCIA, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF MICHAEL SMITH, AND ON HER OWN BEHALF,

Plaintiff

V.

RON NEAL, ET AL.,

Defendants

DEPONENT:  STEVEN MCCANN

DATE:      FEBRUARY 5, 2025

REPORTER:  KORTNEY CHASE

**Kentuckiana Reporters**
**30 South Wacker Drive, 22nd Floor**
**Chicago, Illinois 60606**


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

APPEARANCES


ON BEHALF OF THE PLAINTIFF, MYSTI VALENCIA, AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF MICHAEL SMITH, AND ON

HER OWN BEHALF:

Locke Bowman, Esquire

Loevy & Loevy

311 North Aberdeen Street

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: locke@loevy.com

(Appeared via videoconference)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

APPEARANCES (CONTINUED)


ON BEHALF OF THE DEFENDANTS, LT. DENNIS KOEN, CAPT. VINCENT MCCORMICK, SGT. AMON LEE, SGT. JENIENE WALTON, OFFICER DARNELL CROCKETT, STEVEN MCCANN, LT. LATRICE JONES, SGT. ERNEST WILLIAMS, SGT. MICHAEL EVERETT, OFFICER JAYLON SINGLETON, WARDEN RON NEAL, CHRISTOPHER BEAL, KEVIN CROSS, ART KAUFMAN, ANDREW KMITTA, JASON NOWATZKE, NADINE SMITH, DOUGLAS WARDLOW, DEBORAH TAYLOR, JANILLE WHITAKER, AND DANIELLE BROWN:

Gustavo Jimenez, Esquire

Office of the Indiana Attorney General

Indiana Government Center South

302 West Washington Street

Fifth Floor

Indianapolis, Indiana 46204

Telephone No.: (317) 232-6201

E-mail: gustavo.jimenez@atg.in.gov

(Appeared via videoconference)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

4

                          INDEX

                                              Page

PROCEEDINGS                                      6

DIRECT EXAMINATION BY MR. BOWMAN                 7

CROSS-EXAMINATION BY MR. JIMENEZ                71

REDIRECT EXAMINATION BY MR. BOWMAN              78

RECROSS-EXAMINATION BY MR. JIMENEZ              83


                         EXHIBITS

Exhibit                                        Page

9 - E-mail to IDOC Ops Center                   25

10 - Collection of E-mails                      45

11 - Daily Shift Report                         51

12 - Incident Report                            54

13 - Picture of Fire in Cell at 10:58 a.m.      58

14 - Picture of Fire in Cell at 10:57 a.m.      62

15 - Picture of Fire in Cell at 10:56 a.m.      64

16 - Internal Affairs Report                    67

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

5

STIPULATION

The VIDEO deposition of STEVEN MCCANN was taken at KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on WEDNESDAY the 5th day of FEBRUARY 2025 at 11:02 a.m. (CT); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.  The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that KORTNEY CHASE, being a Notary Public and Court Reporter for the State of INDIANA, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

PROCEEDINGS

THE REPORTER:  We are now on the record.  My name is Kortney Chase.  I'm the online video technician and court reporter today representing Kentuckiana Reporters, located at 110 North Wacker Drive, suite 2500, Chicago, Illinois, 60606.  Today is the 5th day of February, 2025, and the time is 11:02 a.m. Central Time.  We are convened by video conference to take the deposition of Steven McCann in the matter of Mysti Valencia, as personal representative of the estate of Michael Smith, and on her own behalf, v. Ron Neal, et al., pending in the United States District Court for the Northern District of Indiana, South Bend Division, Case number 3:24-CV-00185.  Will everyone, but the witness, please state your appearance, how you are attending, and location you are attending from, starting with plaintiff's counsel?

MR. BOWMAN:  My name is Locke Bowman, here on behalf of plaintiff.  I am attending remotely from my office in Chicago, Illinois.

MR. JIMENEZ:  Gustavo Jimenez on behalf of the defendants, including the witness, and I'm attending remotely from my home in Carmel, Indiana.

THE REPORTER:  Thank you.  And Mr. McCann,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

7

will you please state your full name for the record?

THE WITNESS:  Yes, Steven Joseph McCann.

THE REPORTER:  And do all parties agree that the witness is Steven McCann?

MR. BOWMAN:  We do.

MR. JIMENEZ:  Yes.

THE REPORTER:  Thank you.  Mr. McCann, will you please raise your right hand?  Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  Thank you.  You may begin.

DIRECT EXAMINATION

BY MR. BOWMAN:

Q.   So good morning, Mr. McCann.  How are you today?

A.   Good.

Q.   Good, I wanted to start quickly, just recapping what I think we established in the first session of your deposition last week.  Can we agree that there are factors in terms of the physical plant and other aspects that elevated the risk of death or serious injury as a result of in-cell fires at the Indiana State

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

Prison?

A.   Yes.

Q.   And you know, we talked about these, that would include the absence of a sprinkler system in A Cell House, correct?

A.   Yes.

Q.   It would include the lack of in-cell emergency call buttons, correct?

A.   Yes.

Q.   Also, would include the fact that the smoke alarms that were in A Cell House were up above the fifth tier, substantially above the floor of the cell house?

A.   Yes.

Q.   And so that would be a problem with respect to fires that would originate low down in the building, in terms of the timing of the smoke detected -- being detected by those detectors, correct?

A.   Yes.

Q.   And another factor, at least on the first and second tiers of A Cell House, was an antiquated locking system for individual cells, right?

A.   Yes.

Q.   Specifically, the roll bar apparatus, which was a precondition to getting any cell open, correct?

A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

Q.   As well as the need to individually unlock cells manually with a key, as opposed to being able to pop the cells remotely, right?

A.   Yes.

Q.   In addition, there was a known problem of electrical defects in the building, outlets sparking from time to time, and that creating a risk of fire, correct?

A.   From time to time, I can't recall if anybody -- any specific ones were a problem that day, but yeah, it happens time to time.

Q.   Right, and I'm not suggesting that that's what was responsible for the fire that killed Mr. Smith.  I -- you know, that's a subject for somebody else, and I'm not trying to pin you down on that.  What I do think that we established in the last session of your deposition, and you correct me if I'm wrong, is that as a general matter, the outlets in the old -- in these old buildings would spark from time to time?

A.   Yeah, that's correct.

Q.   There was also a problem from a fire prevention and fire response standpoint of the behavior of prisoners, specifically the fact that at least in D Cell House, if not elsewhere, prisoners sometimes would deliberately set fires?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.   That's correct.

Q.   So that created an elevated risk, right?

A.   Yes.

Q.   And then in addition to deliberately set fires, there were also occasions, to your knowledge, where fires would start accidentally, correct?

A.   Yes.

Q.   One example that I believe you mentioned in the first session of your deposition is that these hot plates that were sold in the commissary could sometimes catch fire and would, correct?

A.   Yes.

Q.   In addition, and we talked about this last time, the only trained fire responders at Illinois State prison, were the prisoner fire brigade, correct?

A.   At the Indiana State Prison?

Q.   Yes, sir.

A.   You said Illinois.

Q.   Oh, I misspoke.  Let me state the question again.  At the Indiana State Prison in Michigan City, Indiana, the only trained fire responders were the prisoner fire brigade, correct?

A.   Yes.

Q.   And we talked about the fact that the process of releasing these individuals from their confinement,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

getting them to the scene of a fire, was a somewhat time-consuming process?

A.   Yes.

Q.   So it would be fair to say, would it not, Mr. McCann, that as a result of all of these circumstances and knowing how fast fire can spread, that preventing fires in the Indiana State Prison required vigilance to detect the onset of fire at the earliest possible times; is that fair?

A.   Yes.

Q.   There -- all of these factors reduce the margin for error, right, in terms of fire detection?

A.   Yeah, sure.

Q.   And of course, as a proposition of fire safety, prevention requires early detection, is that a fair summary?

A.   Yes.

Q.   So what did you do to ensure that surveillance cameras, which we also talked about last time, that the monitors for those cameras in the living areas in the prison were always functioning properly?

A.   Just somebody brought it to my attention that there was a camera that was not working, or when I monitored the surveillance system and I saw a camera that wasn't working, I would report it to the physical

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

plant and whether or not they got over there at that time or later on at another time, they would take care of it.

Q.   So my question was not only about the cameras, but also about the monitors that would be used to observe what the cameras were seeing.  What did you do to ensure that those monitors were functional in the cell house at all times?

A.   That I would -- really didn't have any -- unless I couldn't pull it up on my screen, unless somebody from the cell house reported it to me, I wouldn't know if the monitor was down or not.

Q.   Did you communicate to staff in the living units, an expectation that a defective surveillance camera monitor be reported to you or to someone else at the earliest possible time?

A.   Sure.

Q.   How did you do that?

A.   Just -- I don't know, on my rounds in the cell houses, I would tell them to make sure they monitored the cameras.  If they weren't physically walking on the ranges, they needed to monitor the cameras and make sure they were working.

Q.   Because you got to do one or the other, right? You --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

A.   Correct.

Q.   -- if you're not able to be out on the ranges, you've got to be looking at the cameras.

A.   Right, I mean, they don't walk the ranges 24/7.  I mean, once in a while, like we've talked about before, they have lunch or something, they need to -- at that time, they need to monitor the camera if they're not physically on the ranges.

Q.   So did you make a record, like, did you send out e-mails or messages of any kind, raising this issue of the monitors have got to be functional at all times?

A.   No.

Q.   Do you have any explanation for a report that we've received from other witnesses that the monitors in A Cell House were not functioning, and had not been functioning for a period of time, prior to the fire that killed Mr. Smith?

A.   No, not at that time, I didn't, but I would say that it -- it had -- I'm not going to say it was, but it should have been reported to maintenance or somebody should have let me know.

Q.   Well, how would -- my question is, other than mentioning it from time to time, how would you go about communicating that it should be reported to maintenance?

A.   I would speak with the staff in the cell

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

house, or the shelter captain would report it to me, or then he would -- he would take care of it and report it to the physical plant himself.

Q.    Did you personally make a point of examining the monitors in the individual living unit officers' station to ensure that they were functional?

A.    No, I wasn't in A Cell House that day.

Q.    I'm not asking about that day.  I'm asking, generally speaking, did you do that?

A.    Yes.

Q.    When, prior to Mr. Smith's death, had you last checked the monitors in A Cell House?

A.    It had -- it had been a while.  I -- I hadn't been over there in a few days.

Q.    Is there anywhere that you can tell me any kind of written policy, procedure, or protocol, or order, anything in writing, communicating to staff in A Cell House and elsewhere that these monitors need to be functional at all times?

A.    No, I don't recall.

Q.    Same question with respect to the proposition that you just gave me in your answer a minute ago, that if you aren't out on the tiers, you have to be watching the monitors.  Did you -- how was that communicated to staff?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.   They would know that already.  If the monitors weren't working, they need to report it so they can be fixed.

Q.   **Well, you're saying they would know that --**

A.   But I don't know how long the physical plant would take to fix them.  Once it's reported to them, they can -- they can tell me about it all they want, but unless they report it, or I report it to the physical plant, then I mean, I don't go over there and fix the monitors myself.

Q.   **I understand that.  And we can be clear that this was not reported to you, right?**

A.   It must not have, especially that day.  No, I had no knowledge of the problem.

Q.   **At any time -- at any time in the six months prior to Mr. Smith's death, had anyone in A Cell House reported to you, any time in that window, that the monitors in that officer station were not working?**

A.   I -- I can't -- I don't recall.

Q.   **You don't recall that?**

A.   No.

Q.   **You couldn't honestly say that that happened then, correct?**

A.   No.

Q.   **The -- I am correct, right?  Yes?**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

16

A.   Yeah.  Yes.

Q.   Now, if there's nothing in writing directing staff to ensure that the monitors are functional, how would you expect staff to know that?

A.   When the monitors -- they -- they should just know.  Like I said, when they're -- they need to pay attention to the monitors if they're not physically walking on the ranges.

Q.   And if they're not doing that --

A.   But that -- that's what they're there for.

Q.   If they're not doing that, they're screwing up; is that fair?

A.   I would say so, yes.

Q.   Okay.  So had you, at any time in the six months prior to Mr. Smith's death, made a point of communicating just that, what you just said, to the staff in A Cell House?

A.   Not particularly in A Cell House.

Q.   Well, how about anywhere in the prison?

A.   I'm sure I did.

Q.   And what documentation exists of that?

A.   Yeah.  I don't recall any specific incident, but yeah, I have reported monitors being down.

Q.   I again, I'm now asking about communicating the proposition to staff.  You guys need to have eyes on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

the cell house at all time, either by being out on the tiers or by observing the monitors.  That's my question. How did you communicate that to your staff?

A.   When I was doing my rounds, I would -- if I noticed that they weren't on the ranges, or not monitoring the cameras when they were in the cell -- I mean, in the officers' station, then that's -- I would communicate with them then.

Q.   Okay.  Did you ever write anybody up for failure to keep eyes on the cell house at all times, either by being on the tiers or by watching the monitors?

A.   I don't remember particularly disciplining anybody for not watching the monitors, but I did disciplinary -- or discipline people for not doing their rounds.

Q.   Did you ever discipline officers for not staggering rounds in such a way as to ensure that at least one person was out on the ranges at all times?

A.   No, I don't recall that.

Q.   Did you ever communicate that to supervisory staff in the living units?

A.   Yes.

Q.   How did you do that?

A.   I would, once again, when I did my rounds, if

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

I didn't see them doing their job as they're supposed to do it, I would communicate it with them at that time.

Q.   Was any -- was that ever communicated -- was that ever communicated in writing to staff in any way?

A.   No, I -- I don't think so, no.

Q.   Was -- the need to have the monitors functional at all times, was that ever communicated to staff in writing in any way?

A.   No, I don't believe so.

Q.   Was the proposition that either by being on the ranges or by watching the monitors, somebody had to be out on the ranges at all times -- sorry, I'll start the question over.  Was the proposition that either by watching the monitors or being out on the ranges, eyes needed to be on the living unit at all times, was that ever communicated in writing?

A.   In writing?

Q.   In writing.

A.   It would be in the post orders.

Q.   Where in the post orders?

A.   Somewhere in the post order.  I don't know exactly what paragraph or what section, but it should be in their post orders that they have -- I believe that it should be in the post orders that they --

Q.   Well, did you -- did you decline to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

communicate this in writing because you believed this proposition was in the post orders?

MR. JIMENEZ:  Object to form.  You can answer.

THE WITNESS:  No.

BY MR. BOWMAN:

Q.   Well, is there -- is there some place other than the post orders where you think this might be?

A.   No, we would have a roll call at the beginning of the morning and I would make sure to tell them they need to do their rounds, make sure there's no blankets because other than that, we have other situations other than the fires, where people could attempt suicide or whatnot, they need to remove the blankets off the front of the cells and make sure they're doing their rounds and look -- make sure they have -- everybody is breathing when they do their counts.

Q.   Right.  And was that -- I mean, you've just provided a description of what you would communicate at roll call from time to time.  Are the words you're -- you used, is that the proposition that you communicated?

A.   Yes.

Q.   Okay, so I'm asking a slightly different question.  Did you communicate in any way, at any time, either orally or in writing, that eyes needed to be on the cell house at all times, either by doing rounds or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

20

by watching the monitor?

A.    Yeah, I just told you I did.

Q.    That's how you -- that's how you communicated that proposition?

A.    Most of the time, yes.

Q.    In other words by saying, do your rounds, make sure the blankets are down when you do your rounds, that's what you told them?

A.    Yes.

Q.    Did you tell them anything else in this regard?

A.    I don't recall, no.

Q.    Okay.  Did you ever discipline an officer for failing to report an inoperable monitor?

A.    No.

Q.    Did you ever communicate to officers that they should not all congregate in the officers' station at the same time?

A.    Yes.

Q.    How did you communicate that?

A.    By being in the cell house and seeing them all in the office at one time, maybe.

Q.    All right.  So if it were true, that all of the officers assigned to A Cell House, at the time that the fire first started in Mr. Smith's cell, up until the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

21

point that the fire alarm went off, that in that window of time, every officer assigned to A Cell House had congregated in the officers' station, that would be a violation of your instructions, correct?

MR. JIMENEZ:  Objection to form.  You can answer.

THE WITNESS:  I would say yes, but I -- I mean, I don't know why they were in the office altogether at one time.  I mean, I heard somebody say they were eating lunch or whatnot, but no, they -- technically, they shouldn't be in -- all in the officer station at the same time.

BY MR. BOWMAN:

Q.   Okay.  Well, is this technical, or is this actual factual that they should not be all in the officer station?

A.   I mean, there's nothing in writing that says you can't be in the officer station at the same time.

Q.   But you know, that that that's not good practice, right?

A.   It -- no, it's not good practice.

Q.   And you attempted to communicate that to your staff; is that correct?

A.   I had before, yes.

Q.   And you gave them a little slack on that if

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

22

they all were eating lunch, is that your testimony?

A.   Yes.

Q.   Okay.

A.   Because they should be able to monitor the screens.  Now, I didn't know they weren't working that day, because they probably should be doing their work.

Q.   Well, let me ask you this, if the monitors weren't working and they're all sitting in the officer station, that's a major screw up; is that right?

A.   I would --

MR. JIMENEZ:  Object to the form.  You can answer.

THE WITNESS:  I wouldn't say it's a major screw up.  Like I said, I don't know why they were in there.

BY MR. BOWMAN:

Q.   Well, let me ask the question again, okay. There was an objection to the form of the question. If the monitors aren't working, and all of the officers assigned to A Cell House are in the officers' station at this critical time that we've been talking about, when the Smith fire starts and grows, if they're there to eat their lunch, in your judgment, is that a failure to properly execute their duty?

MR. JIMENEZ:  Objection.  You can answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

23

THE WITNESS:  At that particular time, I would say yes.

BY MR. BOWMAN:

Q.   And that would be in violation of your instructions?

MR. JIMENEZ:  Same objections.  You can answer.

THE WITNESS:  Yes, I don't recall if I told them that that day, I doubt it, but...

BY MR. BOWMAN:

Q.   Yeah, what did -- what did you ever tell them that?

A.   I can't particularly tell that I said it to the A Cell House staff, but like I said, I -- I tell it to other staff.

Q.   Okay.  So you have no particular recollection of ever communicating to staff in A Cell House, that at a point where the monitors are inoperable, it would be inappropriate for all of them to gather in the officers' station and consume their lunch together?

A.   I couldn't say.

Q.   We talked last time about the fire in April of 2017 that resulted in the death of Joshua Devine.  Do you remember that came up in the earlier session of your deposition?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

A.    Yes.

Q.    Did you have any -- did you participate in any discussion with administrative and/or senior supervisory staff at the Indiana State Prison regarding that fire?

A.    I don't recall, no.

Q.    Can you identify any changes in procedure in the maintenance or structure of the physical plant anywhere in the Indiana State Prison that came about in response to the death of Mr. Devine in his cell in April, 2017?

A.    If there was, I can't recall.

Q.    Did you perceive any changes?

A.    I don't recall.

Q.    Did you participate in any way, at any time, in any review of the Devine fire and his death?

A.    No, I wasn't -- I didn't work that night, so no.

Q.    Did anybody ask you to attend a training as a result of Mr. Devine's death from the standpoint of lessons learned from that event?

A.    No.

Q.    I think I may have covered this in a question before, but let me just clarify.  You saw nothing change in terms of the physical plant at the state prison as a result of Mr. Devine's death; is that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.    If anything did, I don't recall, no.

Q.    Would you say that after Mr. Devine's death in April of 2017, you and your staff handled the supervision of prisoners in the living units in the same way that you did prior to Mr. Devine's death?

A.    I'm sure we did.

Q.    I'm going to show you a document, and this may be difficult on your cell phone.  We'll see how this works.  Okay, so we'll mark as the next numbered exhibit to your deposition and Kortney, I think with Sydney's help, we should be able to figure out how far we are.

THE REPORTER:  This one should be 9.

(Exhibit 9 was marked for identification.)

MR. BOWMAN:  Got it, thank you.  I appreciate your help.

BY MR. BOWMAN:

Q.    Exhibit 9 to your deposition is the confidential report of the investigation of the death of Mr. Smith that we received in discovery in this case. Are you able to see it on your phone screen, Mr. McCann?

A.    Yeah.

Q.    Okay, I am going to turn to Page 10 of Exhibit number 9 and I'm going to increase the size of this. Can you see and read what's on your screen?

A.    Yeah.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

Q.    I'm sorry.  I wasn't able to hear your answer.

A.    That's the report that I sent to RDC Ops Center.

Q.    Right, this tenth page of Exhibit number 9 purports to be an e-mail from you to the IDOC Operations Center regarding the death of Mr. Smith sent on January 14 at 2:33 p.m.  Is that accurate, and is that what this is?

A.    Yes.

Q.    So I -- we've talked already about your actions on that date, and I don't want to go over stuff that we've already talked about, but just to recap and make sure I understand where we stand so far, you received a radio call from Sergeant Walten at 10:58 a.m., alerting you via a code that the fire alarm had started in A Cell House?

A.    She didn't particularly -- she didn't call me in particular, but she called the control room and reported it.

Q.    And did you pick it up when it was called to the control room, or was that transmitted to you by the control room?

A.    No, I'm not in the control room, I'm in my office.

Q.    Got it, and I believe your testimony was that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

27

you remained in your office throughout this incident, correct?

A.    Yes.

Q.    Your first responsibility after hearing this was to call the warden?

A.    No.  I would wait until I had information to report to him.  Because at that time, I didn't know the -- the -- how -- how big the fire was or what was going on.

Q.    So after you received, from the control room, this 10:58 message that the alarm has gone -- had gone on -- off, what is the next thing that happened?

A.    The next thing would be the first responders would report to the cell house and assist the -- the cell house staff in putting out the fire or whatever was going on.

Q.    All right.  So getting the first responders to A Cell House was your responsibility?

A.    No.

Q.    Whose responsibility was that?

A.    That would be the first responders' responsibility.  They carry radios, and when they hear a signal come on over the radio, that's -- and then report to whatever area they need to go to.

Q.    So that would happen seamlessly, without your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

28

direct participation?

A.    Correct.

Q.    What is the next thing that happened, from your standpoint in the office?

A.    The next thing would happen would be when I -- when they had enough information, they would report to me.  And then I would call the warden and give him the information that I had at that time.  I mean, I wouldn't have all the information because they would still be working on the fire, but whatever little bit they could give me so I could tell the warden what's going on.

Q.    Well, I -- so I'm a little bit confused by your answer, Mr. McCann.  Do you have a recollection of the flow of information to you on January 14th, 2023, or are you just telling me what the procedure was and assuming that it was followed on that day?

MR. JIMENEZ:  Hold on.  And -- yeah, and Locke, I think that that's -- I think my -- maybe just to clarify for the witness, is I -- because I don't think he's clear, based off his answer, to me.  But maybe if you can clarify, Locke, if you're asking about what the procedure should have been, or what he actually did and what information he received.

MR. BOWMAN:  Well, that's -- I thought my

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

29

question had been entirely clear.

BY MR. BOWMAN:

Q.   I'm not asking about procedure.  I think we sufficiently covered the procedure last time, Mr. McCann.  This morning, I'm asking you what was communicated to you, and by whom, and at what time, and in what sequence, to the best of your recollection. And if you don't remember, that's fair enough, but that's my question.  Do you understand the distinction?

A.   Yes, I do.

Q.   So I'll ask the question again.  After the control room communicated to you that the fire alarm had gone off, your expectation would be that, as a matter of practice and protocol, the first responders would get themselves to A Cell House?

A.   Yes.

Q.   But your best recollection is that you did not participate in any way in directing them to do that, because they knew by training and procedure how to respond to a call of 1071?

A.   That's correct.

Q.   All right.  Relying now on your memory as opposed to protocol or procedure, what is the next thing that you remember happening or learning?

A.   I don't remember who I even spoke to that day.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

I don't remember exactly what they told me.

Q.    Do you remember anything about the process of information being communicated to you?

A.    No.

Q.    Do you have a recollection of your -- you did call the warden at some point?

A.    Yes.

Q.    Because obviously, this is -- it -- a death in custody is a serious and unusual event?

A.    Yes.

Q.    And is your recollection -- well, I'll ask it in a different way.  What is your recollection as to when you called the warden and what you communicated to him?

A.    Let's see, in this report?  I know whatever details I was given, that I had, I reported to him, and then he advised me to call the investigators, and who else?  Oh, the safety manager.  And then he advised me to place the unit on lockdown.

Q.    Okay.  Are you assuming that that was the conversation based on your review of Page 10 of Exhibit 9, which is in front of you, or do you actually have a recollection of the conversation?

A.    I'm just going by this report here because I don't recall what was actually said, so...

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

31

Q.   Do you have any recollection of the timing of your phone call to the warden?

A.   No, but it would be -- no, I --

Q.   I'm not asking what it would be.  I'm asking just do you have any memory of what time it was?

A.   No.

Q.   There's a lot of references here to what happened.  Officer Cross and Officer Crockett went to check the cell house, immediately saw smoke coming from the back of the 200 South Range.  That's not anything you know from personal knowledge, that's just the information you had received?

A.   Right, when I --

Q.   Can you recall when you received that information or who gave it to you?

A.   Those -- I'm going to assume I got that information from the reports that the individuals gave to me, but I'm not -- I can't say for sure.

Q.   All right.  Next sentence, "Both officers retrieved fire extinguishers and went to A Cell House 252, which was now engulfed in flames."  That would be, again, information you had received either from written reports or orally from somebody, and you don't know from whom or at what time, correct?

A.   That -- that's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

Q.    The next sentence describes the arrival of first responders as follows, "First responders arrived on the scene and assisted with putting out the fire." Same answer there, you don't know who told you that or whether you got it from a report, and you don't know at what point you learned that information; is that accurate?

A.    Yes, that's correct.

Q.    "Incarcerated Individual Michael Smith," and there -- and you've recorded his ID number, "was observed lying on his bed."  Who told you that?

A.    I don't recall.  That -- that -- once again, I probably got that from a report.  I can't say for sure.

Q.    But you don't know where that came from?

A.    No.

Q.    Do you have any personal knowledge that Mr. Smith was lying on his bed?

A.    No.

Q.    Okay.

A.    I wasn't there, so...

Q.    "A Signal 3000 was called by first responder Lieutenant V. McCormick."  First of all, what's a Signal 3000?

A.    That's a medical emergency.

Q.    And same answer here.  This is just your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

33

recording of information you got from other sources that you can't identify right now, accurate?

A.   Well, I would have heard that over the radio if Lieutenant McCormick called a Signal 3000.  That, once again, gets called, and the control room puts a alert out to all the other staff.

Q.   Okay.  So as a matter of procedure, you would have heard the Signal 3000 on the radio that you carry?

A.   Yes.

Q.   Although you do not recall hearing that and do not recall at what point it was called, correct?

A.   Correct.

Q.   The ISP fire brigade was activated and responded to the scene, who did that?

A.   They -- they're automatic.  Once they announce the fire over the radio, the different housing units let out the firefighters.  And I believe the fire chief is already at the fire station at the time.

Q.   Well, again, you think that's so, or you know that's so, which is it?

A.   That's -- that's the known procedure.  I -- I mean, I don't personally let them out of their cells myself.  Different units would let them out.

Q.   Well, we talked about the procedure last time, and you told me that it -- or you confirmed for me what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

the written procedure is, which is, it takes place in steps, right?

A.   Once the fire is called over the radio, the different units would let them out of their cells.  I don't believe there is any particular thing in writing. I could be wrong.

Q.   Okay.  Is it correct that after the members of the fire brigade are released from their cells, procedure is for them to assemble at the fire station?

A.   That's correct, to get their gear.

Q.   And is it the procedure that at that point, a decision is made as to whether they should report to the scene of a fire, or whether the circumstances are such that their presence is not required?

A.   That's correct.

Q.   Okay.  Who makes that decision?

A.   I believe -- I can't be positive on this, I -- I don't remember for sure, but I believe it is the fire chief that would report.  He would be already at the fire station.  He stays there during the day.  So he would automatically report to the cell house once he's notified by the Checkpoint 2 officer that there's a fire, and then he would determine whether or not they needed to call the rest of the fire brigade in.

Q.   Okay.  So as an automatic matter, the prisoner

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

who is chief of the fire brigade would have clearance to go to the scene of the fire?

A.    Yes.

Q.    By himself?

A.    Well, he would be escorted by the Checkpoint 2 staff.

Q.    I -- well, yeah.  I get that.  My -- the meaning of my question was, it would be that firefighter alone and no other firefighters?

A.    Yes, because he -- he would be able to get to the cell house before the rest of the brigade was in their gear.

Q.    And you said the Checkpoint 2 officer would accompany this prisoner?

A.    Yes.

Q.    And who is the Checkpoint 2 officer?

A.    I -- I don't remember.

Q.    I'm not looking for a name.  Just what is -- what is that person, where is he located, and what are his responsibilities?

A.    Their checkpoint is right outside of the fire station and right next to A Cell House.

Q.    Got it.  So there's an officer stationed at a location where that officer is in a position to help the chief of the fire brigade get to the fire?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

36

A.    Yes.

Q.    Without breaching security?

A.    Yes.

Q.    That procedure, you -- by report, you say that happened on this particular morning?

A.    I believe so, yes.

Q.    But I gather from your answer that you had no direct personal involvement in that process?

A.    That's true, yes.

Q.    And is that because by procedure that happened automatically?

A.    That's how it happened the 30 years I worked there.

Q.    I'm sorry, I didn't hear you.

A.    Said that's the way it happened the 30 years that I worked there, so...

Q.    Thank you.  What you say here is that the fire brigade was activated and responded to the scene.  Is that describing the chief coming to the scene, or is that the members of the brigade?

A.    That would be the members of the brigade.

Q.    Okay, and you have no personal information about how it was communicated that in addition to the chief, other members of the brigade should report to A Cell House for this particular fire?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.   No.

Q.   Okay.  Your next sentence, "Once the flames were extinguished enough to retrieve Smith from the cell, he was placed on a medical gurney and CPR was started."  Where do you have this information from?

A.   From reports.

Q.   "Incarcerated" -- in the next sentence, "Incarcerated Individual Smith was brought to the custody hall, where lifesaving measures were continued." You know that from reports as well?

A.   Well, that's where my office is, and I would know it from them bringing him up there, plus the reports.

Q.   So you personally observed Smith being brought on a gurney to the custody hall where your office is?"

A.   Yes.  Into the custody hall, yes.

Q.   Can you describe your observations of Smith?

A.   I don't recall.

Q.   You don't remember anything about how he appeared on the gurney?

A.   Other than he was unresponsive on the gurney, no.  I -- they -- they just wheeled him past my window pretty much.

Q.   Well, did you -- when they wheeled him past your window, did you follow to check in on how Mr. Smith

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

was doing?

A.   No.

Q.   So then the next sentence of your report reads, "EMTs were requested and arrived on grounds with the Michigan City Fire Department at 11:10 a.m."  Who was responsible for making those notifications and getting those experts on the scene?

A.   I am going to say -- and I can't be certain because I can't remember exactly, but the medical staff that responded to the scene and assisted in bringing Offender Smith to the custody hall would request the ambulance.

Q.   Okay.  In other words, you had no direct involvement in this procedure.  This was, to the best of your understanding, handled by medical personnel who were attending to Mr. Smith?

A.   Yes, it would have been -- they would have notified the control room over the radio and they would have -- they would have called the EMTs.

Q.   Okay.  So that would -- that would be the procedure, but you don't have any personal knowledge?

A.   Right.

Q.   All right.  "Incarcerated Individual Smith was pronounced deceased at 11:18 a.m."  You were not, obviously, the person to do that, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

39

A.   Yes, correct.

Q.   Were you present when Mr. Smith was pronounced?

A.   No.

Q.   Do you know who pronounced him?

A.   That would have been --

Q.   Not who it would have been.  Do you know who pronounced him?

A.   No.

Q.   But by procedure, that would be one of the EMTs?

A.   No.  I can't recall if he was in the custody hall at the time, or he was taken to the local hospital.

Q.   Okay.  Then it says, "Investigations and Intelligence was contacted and arrived at the facility at 11:42 a.m."  Did you make those contacts?

A.   Yes.

Q.   And did you do that on instructions from the warden?

A.   Yes.

Q.   So we can infer that by 11:42, you had been in touch with Warden Neal?

A.   Yes.

Q.   "Facility safety manager was contacted and arrived at 11:52."  That's you?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.    No.

Q.    I'm not saying that you're the safety manager. Was it you who made that contact?

A.    Yes, I believe so.

Q.    You believe so, or you know so?

A.    I don't particularly recall, but -- no.  I can't say, no.

Q.    Okay, the -- that particular contact would be on instruction from the warden?

A.    Yes.

Q.    And then finally, "State police investigator and state fire marshal arrived on the grounds at 1:07 p.m."  Those contacts, did you make them, or did someone else?

A.    Someone else.

Q.    Again, at this point, the warden has taken control of the situation?

A.    Yes.

Q.    Then there's a facility lockdown that the warden directs that you also report in your e-mail?

A.    Yes.

Q.    Did the warden instruct you to prepare this e-mail?

A.    No.

Q.    Did you do it by procedure or did someone else

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

tell you to do it?

A.   By procedure.

Q.   And the IDOC Ops Center, is that in Indianapolis?

A.   Yes.

Q.   And you've copied a number of people here. Warden Neal is first.  And Nikki Tafoya, who is that?

A.   She is with medical.  I believe she's from downstate.

Q.   And Sherri Fritter, who is that?

A.   She's, like, the DON at the facility's hospital.

Q.   And -- director of nursing?

A.   Yes.

Q.   Got it.  And when you say facility's hospital, is that -- does -- is that meaning in Michigan City?

A.   No, that's ISP at the facility.

Q.   At the facility?

A.   Yes.

Q.   Got it.  Okay, so you're recording events here that are happening without your direct involvement, correct?

A.   Yes.

Q.   And you are reporting on instructions that the warden provided to you and to others after you contacted

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

42

him, correct?

A.   Yes.

Q.   So in the minutes after you became -- you were informed of this fire, by a report, that's 10:58 a.m., that's the point at which the alarm goes off and the code is called, right?

A.   Yes.

Q.   So in the minutes between that time, and the time when you determined that the situation was serious enough for you to call the warden, what exactly did you do?

A.   I don't recall exactly.

Q.   Did you do anything?

A.   I'm -- I -- I can't say.

Q.   Do you think you should have done something?

A.   I was probably waiting for information to report to the warden.

Q.   Okay.

A.   I -- I -- I -- I can't say that I did, but I would try to pull up the video footage on the cameras, but I don't recall if I did it or not.

Q.   Okay.  Did you ever pull up the video footage on the cameras?

A.   Yes.

Q.   When did you pull up the video footage on the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

43

cameras?

A.   I don't recall.

Q.   Did you pull up the video footage of the camera that's pointed in such a way as to encompass Cell 252, that straight-on view of Mr. Smith's cell?

A.   If there was a straight-on view, yes.  I tried to pull up every angle I could get.

Q.   You tried to pull up every angle you could get because it would be important to have every angle, right?

A.   Yes.

Q.   Having every angle would enable you to observe and determine when officers either became aware, or should have become aware, that there was a fire emergency in A Cell House, right?

A.   Yes.

Q.   Was that what you were looking for when you pulled up the cameras?

A.   That would be one thing, yes.

Q.   What else were you looking for?

A.   To see who all was responding.

Q.   Right.  So in addition to just that straight-on view, the other cameras would provide important information about who was responding, right?

A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

44

Q.    And who was not responding, right?

A.    Yes.

Q.    And what individuals in the officers' station could or should have seen and observed from that vantage point, correct?

A.    Yes.

Q.    Do you know what happened to that footage that you pulled up?

A.    No.

Q.    Should that footage have been preserved, in your judgment?

A.    In my judgment, yes.

Q.    I mean, it's obvious, right?  That's evidence as to the sufficiency of the officer response, right?

A.    Yes.

Q.    Do you know why it was not preserved?

A.    Oh, I have no idea.  I don't preserve that video.

Q.    Understood.  Is there anything that prevented you personally from going to the scene of the fire in A Cell House and taking charge of the response?

A.    That's not my job.  I'm not -- I'm not QRT, which is quick response team, qualified.

Q.    Got it.  So there's nothing that prevents you, it's just not your job?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

45

A.   Exactly, yes.

Q.   I just wanted to quickly show you another document.  I'm placing on the screen a 16-page collection of materials that was provided to us as a single PDF.  And it appears to be a collection of e-mails relating to the Smith fire.  And I want you to have a look with me at Page 3 of the exhibit, which is an e-mail from Warden Neal to Pamela James, Donna Garrett, and Amber Siuda.  So it is dated January 14 at 6:28 p.m., and it begins, "Ladies, we had a death today in A Cell House and below is some details of what took place."  Are you able to see this on your screen?

     (Exhibit 10 was marked for identification.)

A.   It's too small.  I can't -- I can't read it.

BY MR. BOWMAN:

Q.   Let me see if I can correct it.

A.   Oh, I got it.  I got it a little bit bigger.

Q.   Here, I can help you a little bit.  Is this -- is that any better?

A.   That's fine, yeah.

Q.   Okay.  Did I correctly describe the exhibit?

A.   It looks like it, yes.

Q.   So for my information, who is Pamela James?

A.   She's the public information officer for the prison.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606




502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

46

Q.    And who is Donna Garrett?

A.    Donna Garrett is the warden's secretary.

Q.    And who is Amber Siuda?

A.    That would be the deputy warden's secretary.

Q.    So the warden's e-mail then goes on to say, "At approximately 11:15 a.m., I received a call from Captain Steve McCann reporting that Incarcerated Individual Michael Smith," his ID number follows, as well as his cell location, "had set a fire inside of his cell and was deceased."  Do you have any reason to doubt that your call to the warden took place at 11:15 a.m. as he reports?

A.    If he reported that, then that's what time it was.

Q.    Why did you delay so long in making the call?

MR. JIMENEZ:  Objection to form.  You can answer.

BY MR. BOWMAN:

Q.    I'll rephrase.  Why did you delay until that point to make the call to Mister -- to the --

A.    What time -- what time did the fire -- did I report actually start?  Do you remember?  Was it 10:53?

Q.    I'm not supposed to answer your questions, but I think that we have established that the call of 1071 was made at 10:58 a.m.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.   Okay, I waited that long until I had the information to report to him.  I can't just give him a call and say, we had a fire, and that was it.  He wants more information than that.

**Q.   What was the trigger that caused you to determine that the information was such that this needed to be transmitted to the warden?**

A.   Whoever responded to the scene would've told me.

**Q.   Right, I understand.  What I'm -- I appreciate that you're getting information from other people.  My question, which wasn't a very good question, was what was the content of the information that elevated this situation to the point where you concluded it was necessary to be in contact with the warden?**

A.   I don't recall.  Possibly the signal 3000, or information that I was just hearing over the radio that requested an ambulance.  I can't specifically recall.

**Q.   I may have asked you this already.  Do you dispute that you called Warden Neal at 11:15 a.m.?**

A.   I can't -- yeah, yes, I did.  Yes.

**Q.   So according to the warden, your information was that Mr. Smith had set a fire inside of his cell and was deceased.  First question, where did you get the idea that Smith had set a fire inside of his cell?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

48

A. It could have been reported to me. I can't recall specifically, but at the time, if I called him at 11:15, I didn't know that he was deceased yet. This is just what he put into his report. This is the first I've seen this, so...

Q. Do you have any information that Smith set a fire in his cell?

A. If that's what was reported to me, I would've put it in my report, maybe.

Q. Okay. Well, let me try and ask the question. First of all, you have no personal knowledge that Smith set a fire in his cell, right?

A. No. No, I don't -- I don't know how the fire started, no.

Q. And you're speculating that someone reported this to you?

A. Yes.

Q. Do you have any recollection of who told you this?

A. No.

Q. Do you have any recollection of a report that said this?

A. It might have been included in the other written reports that were given to me, but I can't recall specifically.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

49

Q.   Well, the way to sort that out would be to look at the reports themselves and see if any report says that, right?

A.   Yes.

Q.   Okay, so let's just assume with me that there isn't a report that says that, okay?  And I -- and I'm not asking you to take my word for it, I'm just asking you to make the assumption.  If it didn't come from your personal knowledge and it isn't in a report, where does this information come from, that Smith set a fire in his cell?

A.   The fire was not out on the range.  So the only other place the fire could be is in his cell.

Q.   Right.  So do you -- I get that.  I think it's pretty clear that the fire is inside his cell.  That's what made this such a terrible situation, right?

A.   Right.

Q.   He's in his cell and the fire's also in his cell, and he's in deep trouble because he can't get out of his cell, right?

A.   Right.

Q.   Right.  So taking that point, what is the source of information that Michael Smith set that fire to place himself in danger, if it's not in a report and you have no personal knowledge of it?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

50

A.    No, I don't -- I don't --

Q.    You don't know where that came from?

A.    -- know if that was reported to me by an individual or not, but from my vantage point where I was at, I -- I didn't know if he started it in his cell or it accidentally started.

Q.    Did you tell the warden that Smith had started the fire?

A.    I don't recall.  If -- if it's in my report, then that's what I told him.

Q.    Well, we just looked at your report and it's not there, right?

A.    Ohm okay, no.  If it's not there, that's not what I reported then.

Q.    So it -- the -- you don't know how this idea got in Warden Neal's mind, is that a fair summary?

A.    That's fair.  I'm -- I'm assuming -- and I'm this, once again, I'm assuming, but he talks to the investigators at the State Fire Marshal, and that's where that information possibly came from.

Q.    Well, he's --about an 11:15 call from you, right?

A.    That's what it states.

Q.    Right, and you know that the investigator and the fire marshal were called out subsequent to 11:15, we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

51

just looked at your report, right?

A.    That's correct.

Q.    And it's -- would it surprise you to learn that they could not identify an origin for this fire?

A.    No.

Q.    I mean, that happens sometimes in these --

A.    I mean --

Q.    -- investigations, right?

A.    -- yes, it -- it would surprise me if they couldn't determine that, yes.

Q.    Okay.  They certainly hadn't determined that at 11:15, right?

A.    No, not at that time.

Q.    Nobody knew how this fire started at 11:15; is that fair?

A.    Yeah, that's fair.

THE REPORTER:  Mr. Bowman, do you want to mark that as Exhibit 10?

MR. BOWMAN:  I want to mark that as Exhibit whatever the next number is.  And if that number is 10, that's what I want.  Thank you a lot.

BY MR. BOWMAN:

Q.    So I just want to briefly look at another document with you.  This will be Exhibit 11 for identification, I'm placing it on the screen.  This is a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

52

-- what I understand to be a daily shift report that you prepared along with your assistant shift supervisor for the day in question; is that correct?

(Exhibit 11 was marked for identification.)

A.   Yes.

BY MR. BOWMAN:

Q.   Is there -- can I adjust the size of this to help you, or are you able to see it okay?  Let me make it a little bigger.

A.   Yeah, that --

Q.   --I note -- and I'll just scroll through this for you.  I note that some of the entries are in red and some of them are in black and white.  Do you see that?

A.   Yes.

Q.   Can you tell me the difference?

A.   The -- the black entries would just be the normal running of the facility.  The red entries would be emergency--

Q.   You broke up just a little bit.  I just want to make sure I understand you.  The -- you said the red entries have to do with emergency situations that aren't routine?

A.   Yes.

Q.   So you see that the record reflects that the fire was called at 10:58, as we discussed a few minutes

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

ago, correct?

A.    Yes.

Q.    And your report here is the same report as the report that you provided in your e-mail essentially, correct?

A.    Yeah, yes.

Q.    We looked at that a few minutes ago, right?

A.    Yes.

Q.    So at 1:30 p.m., is something else I wanted to ask you about, you were advised according to this report, that a person named Brian Kendrick, who is incarcerated in a cell house, had to be sent out by ambulance for chest pains.  Do you recall that event?

A.    Not -- I don't recall it, but it's in my report.  So I'm going to say that's what happened.

Q.    Do you recall generally that prisoners in A Cell House complained after the fire about their exposure to smoke and chemicals as a result of the fire?

A.    I don't recall specifically, but I'm going to say yes.

Q.    It would make -- it would certainly make sense, right?

A.    Yes.

Q.    Did you, at any point on January 14, ever go to A Cell House to survey the situation?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

54

A.   No.

MR. BOWMAN:  I'm going to look at another exhibit.  This will be 11, for identification, right Kortney?

THE REPORTER:  12.

BY MR. BOWMAN:

Q.   12, I'm impossible.  Okay, here we go. Exhibit 12 for identification is a two-page document. Here, let me increase the size of it for your benefit, Mr. McCann. Do you see it all right?

(Exhibit 12 was marked for identification.)

A.   Yes.

BY MR. BOWMAN:

Q.   The title of the document is Critical Incident Debriefing, Indiana Conference Room, 2-21-23.  Are you familiar, not with this particular document, but with these kinds of documents generally?

A.   I'm going to say this is the first I've seen of this document.  I mean, I -- I'm not even sure of who prepares this document.

Q.   Okay.  You are -- in fairness to you, and to be clear, you are not listed as one of the staff in attendance.  Those listed are the deputy warden, Major Wardlow, a Captain Gillespie, another deputy warden, Lieutenant Jones, Lieutenant McCormick, Deborah Taylor,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

55

and Lieutenant Winn.  And it relates to this incident on January 14th, 2023 in which Mr. Smith was killed. Is this something that, as you review the document, those in attendance and the subject matter, that you should have been a part of?

A.   No, it looks like this is just people that responded to the scene, along with the deputy wardens.

Q.   Okay, so the -- you're excluded from this, in your understanding, because you never responded to the scene?

A.   Yes.

Q.   All right, just some questions about this document.  Item number 1 says, "Staff response and actions were deemed within the scope of policy and procedures."  I want to take this down for a minute and show you something else.  What I've placed on the screen is a view from the monitoring -- from the camera, the surveillance camera that is focused on Cell 252.  And you see the fire in progress, correct?

A.   Yes.

Q.   If you look down in this area at the bottom of Mr. Smith's cell, are you able to see Mr. Smith pressed against the bars of his cell trying to escape the fire?

A.   I see something down there.  I can't tell if it's a body or not.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

56

Q.   Okay.  You do see that at this point, the flames have engulfed the cell, there's smoke emerging from the cell all throughout the surrounding areas of A Cell House on the north side, right?

A.   Yes.

Q.   And I'm going to show you the timestamp that is present on this screen.  This is 10:58 a.m. on 1-14-23, do you see that?

A.   No, I don't see that.

Q.   Well, let me see if I can make it a little bigger for you.

A.   Is it on the top left?

Q.   Yeah, it's up on the top.

A.   Oops.

Q.   I just increased it a little better.  Can you see it now?  10:58 a.m., 1-14-23?

A.   Yes.

Q.   So this is that point, at which staff responds to -- for the first time to the fire in Mr. Smith's cell, correct?

A.   Yes.

Q.   10:58 is when the alarm goes off, and it is when the alarm goes off that staff reacts for the first time to this, right?

A.   I can't say.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

57

Q.   Well, do you have any information that anybody did anything in relation to this fire before 10:58?

A.   I -- I don't recall.

Q.   Well, can we agree that at this particular point of time, 10:58, that this situation has progressed well beyond the point where somebody should have seen and reacted to what was going on?

A.   I could agree with that, yeah.

Q.   I'm sorry.  You said you could agree with that, right?

A.   Yeah, yeah.

Q.   I mean, it never should have been allowed to get to this point -- to get to this point without somebody being up there to address the situation, right?

A.   I can't say.  I don't know if the other offenders alerted them to the fire, whether they found out by the fire alarm going off, or they actually observed the cell in flames.  I -- I wasn't there, so I can't say.

Q.   I get that.  It's -- you weren't there and you never went there, right?

A.   Right.

Q.   So what I am asking you is not based on your personal observation, but you did tell me that after this situation was brought to your attention, one of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

things that you did is you went and you looked back at the surveillance video, right?

A.   Yes.

Q.   And when you looked at the surveillance video, did you see this?

A.   I'm sure, yes.

Q.   And when you saw this, did you notice that at this particular point in time, 10:58 a.m., nobody has responded to Mr. Smith, right?

A.   Yes, I saw this video, that's correct.

Q.   And we talked about this last time.  The thing that happened, because there were no call buttons in the individual cells, was that when there was an emergency, offenders would call out to get the attention of staff in the cell house, right?

A.   Yes.

Q.   And you would expect, as you look at this situation that we're observing on the screen, Exhibit 13, that people confined in the cells around cell 252 would have been calling out, right?  You can surmise that?

A.   I would expect that to happen, yes.

Q.   There was smoke all around, right?

A.   It appears so, yes.

Q.   There was heat all around, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

59

A.    It -- it appears so, yeah.

Q.    And Mr. Smith, if he's not at this moment being consumed by flame, is in grave peril, correct?

A.    I would say so, yes.

Q.    All of these things would lead to you to be pretty confident in your surmise that people were calling out, asking for help from staff, right?

A.    I would believe so, yes.

Q.    And that they had been for some time prior to this moment, correct?

A.    That, I can't say.

Q.    Well, you would think so, wouldn't you?

A.    I would think so, but I can't say for sure.

Q.    All right, and as you look -- let me back this up a little bit so we can see more of the surrounding area.  As you look at this still image from the surveillance camera, you see that smoke is accumulating down the tier, right?

A.    Well, it's going up, yes.

Q.    Going up and flowing down as it goes up, yes?

A.    I don't see anything going down.  I see it going up.

Q.    Well, I'm going to indicate with my cursor right here above cell number 258, can you observe smoke on this still image up above cell 248?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

60

A.    Above 248?

Q.    Above 248?

A.    Yes.  You stated going down, that's going up.

Q.    Exactly, going up, and going down the range from 254, on further down toward the location of the officers' station, right?

A.    It looks like it's going past a couple of the cells to the right and left.

Q.    Yes.  So the smoke is accumulating, not just in front of 252, but in other locations and it's increasing evidently, correct?

A.    Appears so, yes.

Q.    Would you, as the supervisor of the staff in A Cell House, have expected that that staff have been aware of this situation?

A.    As a supervisor of the cell house?  I would say yes, but I can't -- I mean, like I said before, I wasn't there, so I don't know what was happening.  If the other offenders were screaming out that there was an emergency, or what the particular -- what was particularly going on at that moment.

Q.    We've talked about the importance of eyes on the cell house at all times, right?

A.    Yes.

Q.    So you would expect, if people in A Cell House

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

61

were doing their jobs, that somebody in the officers'
station would see what we're looking at right now in
Exhibit 13 in real time, right?

A.   I would -- I would expect it, yes.

Q.   And you would expect that they would've been
aware of this increasing fire in the minutes prior to
10:58 as well, right?

A.   I would expect, yes.

Q.   And you would expect that when they became
aware of this situation, that there would've been a
response, right?

A.   Yes.

Q.   And you would've expected that when they
became aware of the situation that was progressing
toward this moment at 10:56 and 10:57, that they
would've responded, right?

A.   I would expect that, but I can't say how -- I
don't recall how fast this fire actually started and
engulfed the cell.

Q.   Okay, well...

THE REPORTER:  Do we want to make that picture
an exhibit as well?

MR. BOWMAN:  Yes, that's 13.

(Exhibit 13 was marked for identification.)

BY MR. BOWMAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

62

Q.   Sorry for not -- so I placed on the screen what will be Exhibit 14 to your deposition for identification.  I'm going to enlarge this image so that we can look together.  This is the situation in Mr. Smith's cell at 10:57 a.m. on January 14, 2023. Can we agree as to what's on the timestamp there, Mr. Smith -- I'm sorry, Mr. McCann?  Let me enlarge it for you one more time.  Do you see it?

(Exhibit 14 was marked for identification.)

A.   Yeah.  10:57, yeah.

BY MR. BOWMAN:

Q.   All right.  I'm going to take that back down a little bit so that we can look here.  So now I'm showing you the portion of Exhibit 14 that indicates what's going on in Mr. Smith's cell, right?

A.   Yes.

Q.   And this is a minute prior to the image that we just looked at.  This is serious fire in Mr. Smith's cell at this point, right?

A.   I would say so, yeah.

Q.   Yeah, and again, at this point, you can see smoke emerging from Mr. Smith's cell and going up and also going out, both in the easterly and the westerly direction toward the other cells on Tier 2 and up onto Tier 3 as well, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

63

A.    Yes.

Q.    At this point, you would surmise confidently, that because of the smoke, because of the heat, because of the peril that Mr. Smith is in now at 10:57, that officers would be hearing cries from other prisoners in the cell house, right?

MR. JIMENEZ:  I'm going to object to form. You can go ahead and answer.

THE WITNESS:  I would -- I would say possibly. I can't say for sure.

BY MR. BOWMAN:

Q.    No, we can't -- we can't say for sure, but it certainly is reasonable to expect that people would be calling out at this point, right?

MR. JIMENEZ:  Same objection.  You can answer.

THE WITNESS:  It's reasonable, yes.

BY MR. BOWMAN:

Q.    And it's reasonable to expect that Mr. Smith would be calling out at this point, right?

A.    Yes.

Q.    Because here as well, we see a situation where Mr. Smith is in grave peril, right?

A.    It seems so, yes.

Q.    It seems to be that the fire is out of control in his cell and taking over the entire area, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.    It appears to be, yeah.

Q.    And again, if at 10:57, your staff in A Cell House were doing their jobs, somebody should be looking at a monitor and seeing this situation in real time, right?

MR. JIMENEZ:  Same objections, go ahead.

THE WITNESS:  I would believe so, yes.

BY MR. BOWMAN:

Q.    Right, and seeing this situation, they should react, correct?

A.    Yes.

Q.    And they should respond immediately to Mr. Smith's cell, right?

A.    Yes.

Q.    With the equipment available to them to control and eliminate this fire, correct?

A.    Yes.

Q.    All right.  I'm now going to place on the screen what'll be marked for identification as Exhibit 15 to your deposition.  First of all, let me increase the size.  Can we agree that the timestamp here is 10:56 a.m. on January 14th, 2023, right?

(Exhibit 15 was marked for identification.)

A.    Yeah, yes.

BY MR. BOWMAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

Q.   And if we now look at the front of Mr. Smith's cell at this point, we can already see a very serious fire blazing inside of that cell, right?

A.   Yes.

Q.   And you can also see smoke emerging from the cell and spreading upward and outward from the cell, right?

A.   Somehow, I lost the picture of the --

Q.   How did you lose the picture?

A.   I don't -- I touched the screen and I lost the picture somehow.

Q.   Okay.  Well, let me give you a minute to see if you can get that back.

MR. JIMENEZ:  I wonder if it would help, Locke, if you stopped sharing your screen and then just re-share.  I don't know if that --

MR. BOWMAN:  Yeah, let me --

MR. JIMENEZ:  -- would help anything.

MR. BOWMAN:  -- let me see if -- that's a good thought, let me see if that -- let me see if that solves the problem.  So I stopped the share, Mr. McCann.  I'm going to try it again.

THE WITNESS:  Okay.

BY MR. BOWMAN:

Q.   Now, are you able to see Exhibit 15 on your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

66

screen, Mr. McCann?

A.   Yes.

Q.   My question related to the smoke.  As you look at this image, you can see that already, smoke is emerging from the cell and spreading upward and outward from 252, right?

A.   It appears --

MR. JIMENEZ:  Objection to form.  You can answer.

THE WITNESS:  It appears to be, yes.

BY MR. BOWMAN:

Q.   You can't say for sure, you weren't there, but you can surmise that in this situation, Mr. Smith and his neighboring prisoners would be calling out for help, right?

A.   I would --

MR. JIMENEZ:  Same objection.  Go ahead.

THE WITNESS:  I would assume so, yes.

BY MR. BOWMAN:

Q.   Yeah, and again, at 10:56 a.m., as you just testified, we already have a serious fire raging inside of Mr. Smith's cell, right?

A.   It appears so, yes.

Q.   And as we've discussed, your staff should have eyes on this monitor at this time, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

MR. JIMENEZ:  Same objections.  Go ahead.

THE WITNESS:  Yes, they should have, yes.

BY MR. BOWMAN:

Q.   And seeing this, you would expect that staff would react, right?

A.   Yes.

Q.   And that their reaction would be to come to Mr. Smith's cell with appropriate equipment to extinguish the fire?

A.   Yes.

Q.   Are you aware that by report, it first became evident that there was a fire inside of Mr. Smith's cell at 10:53?

A.   No.

Q.   Let me show you another document.  This will be -- this will be Exhibit 16 to your deposition. Exhibit 16, for identification, appears to be an Internal Affairs report of investigation relating to the Smith fire and it goes on for four pages.  And I -- for present purposes, I want to direct you to the information in the report relating to the review of camera footage from the -- from the camera that we have been looking at stills from.  Do you see where that is on the first page of the exhibit?

(Exhibit 16 was marked for identification.)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

68

A.   Yes.

BY MR. BOWMAN:

Q.   The indication is that as of 10:53 a.m., flickers of flame in the cell are visible on the camera, right?

A.   Yes.  That's --

MR. JIMENEZ:  I object -- oh, hold on.  I'm going to object to all questioning related to this exhibit for lack of foundation, but you can go ahead and answer, Mr. McCann.

BY MR. BOWMAN:

Q.   Well, have you ever seen Internal Affairs division reports?

A.   No, that's above my pay grade there.

Q.   Okay, all right.  Do you have -- what I want you to do is I want you to just make an assumption as opposed to just, you know, listening to me say it. Assuming that this report was accurately prepared by competent investigators of the Indiana Department of Correction, who reviewed the footage and saw that at 10:53 a.m., flickers of Flame in Mr. Smith's cell were visible on the camera, okay?  Just assume that, that the report is accurate in that regard.  If that is so, Mr. McCann, would you expect that your staff would have had an awareness at that time of the fire?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

69

A.   I would say no.

MR. JIMENEZ:  Object to form.  You can go ahead and answer.

BY MR. BOWMAN:

Q.   **Why do you say no, sir?**

A.   I don't believe they have access to the angle -- the camera that you had -- you've been showing the still photographs of.

Q.   **You don't think they have access to that camera?**

A.   I'm not sure, but I --

Q.   **Okay.**

A.   -- I don't think so, no.

Q.   **Okay.  So now you're going to tell me that they probably didn't see this camera?**

A.   Yes.

Q.   **Okay, all right.  Well, let's assume that they did see the camera.  Or let's assume, rather, that they could have seen the camera from the officers' station on the monitor in that station, assuming it was working, okay?  Assume that.**

A.   I'm not going to assume that because I can't recall if they have the ability to see that camera angle.

Q.   **Okay, all right.**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

MR. JIMENEZ:  I was going to say, I -- yeah, I was going to say, and I would object to foundation and form for all -- any line of questioning regarding any assumption on that end.

BY MR. BOWMAN:

Q.   All right, okay.  Well, let me ask you this question.  As you look back at Exhibit -- as you look back again at Exhibit 13, sir, either by seeing the monitor, by hearing the prisoners, by smelling the smoke, by being out on the range, would you expect your staff to be aware of this situation?

A.   I would expect by this point, yes.

Q.   And you would expect them to have been aware of the situation long before it got to this point, right?

MR. JIMENEZ:  Object to form.  You can go ahead and answer.

THE WITNESS:  I can't say that.

BY MR. BOWMAN:

Q.   Wouldn't you expect them to, sir?

A.   I would expect it, but I can't say positively.

Q.   Right, you can't say what happened because you weren't there and you never went there, right?

A.   Correct.

Q.   But you're the supervisor and you have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

71

standards, right?

A. Yes.

Q. And you have expectations that your staff do their job, right?

A. I would expect they would, yes.

Q. And do it well, right?

A. Yes.

Q. And have eyes on the cell, cell area, the living area, at all times, as we've talked about throughout this deposition, right?

A. Yes.

Q. And this shows a situation that never should have been allowed to exist; can we agree?

A. Yes.

MR. BOWMAN: Yes, okay. That's all I have. Thank you.

CROSS-EXAMINATION

BY MR. JIMENEZ:

Q. All right, Mr. McCann. I have a couple of follow-up questions for you. I'm going to try to keep this brief, but I just want to clarify a couple of things that you said, and some of it is going to be related to your answers in the first portion of your deposition from last week. So when we spoke about, you know, you as the shift captain, we spoke about there

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

72

being a shelter captain and then a utility captain. And Mr. Bowman showed you a post order that sort of had the three positions on a line. Do you remember seeing that?

A. Yes.

Q. Just for clarification, can you clarify, as the shift captain, do you report to either the shelter captain or the utility captain, or are you all sort of on the same rank of -- on that hierarchy of command, if that makes sense?

A. The utility captain is technically -- I would report to, but -- but shelter captain and myself would be more on the same level. The utility captain reports directly to the major.

Q. Got it. Okay. And as the -- as the shift captain, would the major still also be one of your supervisors, one of your superiors?

A. Oh, yes.

Q. All right, and then I don't know if you've mentioned this before, and I apologize if you did, but where is your office located as the shift captain?

A. It would be in the custody hall.

Q. And where's the custody hall in relation to A Cell House?

A. It is --

Q. I guess, let me ask -- let me ask a better

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

73

question.  Is the custody hall a different building from A Cell House?

A.   Yes.

Q.   Now, as you've established throughout your testimony, you on the -- on the morning that Mr. Smith passed, you did not end up going to A Cell House, and while the fire was taking place, you remained in your -- in your office; is that correct?

A.   Yes, that's correct.

Q.   Can you explain to Mr. Bowman why, as a shift captain, you stayed in your office and didn't go to A Cell House?

MR. BOWMAN:  Object to the form of the question.

BY MR. JIMENEZ:

Q.   You can go ahead and answer.

A.   In -- in an emergency situation, I'm supposed to say -- stay in a secure area, and the -- not being a part of the first responders, I would've not went to the cell house.

Q.   But you were aware that other staff were responding to the cell house?

A.   Yes.

Q.   And that was being communicated to you via the radio traffic?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.   Yes.

Q.   And at the time, while you were in your -- in your office, in the shift office, you were -- you were listening to any communications that were being transmitted through the radio; is that right?

A.   Yes.

Q.   And while you're listening to the radio traffic, you're being kept aware of the circumstances and any new information that might be learned by the staff members that are responding to the incident; is that correct?

A.   Yes.

Q.   And if you require further information, is that something that you can follow up on and ask staff as the incident is developing or taking place?

A.   I would not ask them at the time.  If they had time to call me or -- on the radio and let me know what was going on, but I wouldn't try to interfere with the -- them responding.

Q.   All right, but once the incident is cleared, or once the incident is dealt with, if you have -- if you needed further information or require further information about what took place, is that something that you can learn by contacting staff or calling, radio, e-mail, anything of that nature?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

A.    Yes.

Q.    And we also spoke about, you know, different ways that fires could potentially start.  Do you remember that line of questioning?

A.    Yes.

Q.    And in your experience working with the DOC for several years, I think one of the -- one of the things you mentioned before was that inmates typically -- that inmates at times will start fires on their own; is that right?

A.    That's -- that's correct.

Q.    And one of the things you mentioned was using the electrical outlets as spark plugs; is that correct?

A.    Yes.

Q.    Did you ever experience times when inmates used any wiring and any electronics that they had in their cells to start fires?

A.    Yes.

Q.    Was that pretty common?

A.    Yes.

Q.    Would you say that it's more often than not the situation that inmates are starting -- that the fires at ISP are created by inmates?

A.    Yes.

Q.    And again, one of the things that could lead

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

76

to that would be the wire tampering, or messing with the wiring of electrical items?

A. Yeah, either wiring or the outlet itself.

Q. And one of the other things you mentioned that potentially could start a fire would be those hot pots, right? If they're just left on?

A. Yes.

Q. With nothing there, correct?

A. Yes.

Q. And the individuals responsible for leaving their hot pots on with nothing in there, that would be the inmate themselves, correct?

A. Correct, yes.

Q. You also mentioned earlier, in your deposition from last week, your testimony, you mentioned something about how there are also times when inmates will stick paper clips in outlets?

A. Yes.

Q. And some of the questions that we're asking, would you agree that it's a fact of life that outlets are not used for paper clips to be stuck in them?

A. Yes.

Q. All right. We also spoke about inmates hanging up blankets in order to provide some sort of privacy and kind of obstructing the view that an officer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

would have into the cell.  Do you remember that line of testimony and questioning?

A.  Yes.

Q.  And again, the -- and you spoke about how, in your experience, that -- and correct me if I'm wrong. If I'm remembering correctly from your testimony, I believe that you mentioned that if you walked the ranges, there was an expectation that the inmates -- that the inmates would put their blankets down, or you would let them know that they shouldn't have their blankets up.  Is that -- am I remembering that correctly?

A.  Yeah, that's correct.

Q.  Okay, and would you agree with me that the individuals responsible for putting blankets up when there are -- you know, when staff are not necessarily right in front of their cells, that the only person who is responsible for putting those up are the inmates themselves?

A.  Yes.

Q.  All right, we also spoke about shakedowns last week at the first part of your deposition.  Do you remember the testimony and questioning regarding shakedowns?

A.  Yes.

Q.  And part of the shakedowns, would you agree

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

78

with me that during a shakedown, that staff could monitor the cell, see if potentially an inmate has more property than they -- than they should have, and during shakedowns, some of that property can be removed from their cell and stored elsewhere for -- you know, for the safety of the inmate?

A.   Yes.

MR. BOWMAN:  Object to the form of the question.

BY MR. JIMENEZ:

Q.   And that can include possibly excess paperwork or legal work that might be a conduit for a for a fire; is that right?

A.   Yes.

Q.   And just to be clear, the reports that -- any report or e-mails that have been shown to you that you authored as part of exhibits throughout your deposition, that was all obtained through secondhand information that you received on the -- regarding the fire; is that correct?

A.   Yes.

MR. JIMENEZ:  All right.  Thank you, Mr. McCann.  That is all I have for you.

REDIRECT EXAMINATION

BY MR. BOWMAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

79

Q.    So I have a couple of follow-up questions.  In response to Mr. Jimenez just now, you said that more often than not, when fires start, they're started by prisoners.  Is that your belief?

A.    Yes.

Q.    That's -- I mean, you haven't studied the question.  That's a guess or an estimate on your part, based on your observations over the years?

A.    Yes.

Q.    We can agree that a prisoner might be said to start a fire if the prisoner sets about with an intention to set a fire, like arson, right?

A.    Yes.

Q.    And a prisoner might also be said to have started a fire when the prisoner engages in an activity that accidentally results in a fire starting?

A.    Yes.

Q.    So -- and for example, one of these hot plates, they would catch on fire from time to time if there was no liquid in the plate, right?  That was the issue?

A.    Yes.

Q.    The idea was the hot plate was a great way to heat water for a cup of ramen soup, or for a cup of tea, or for a cup of coffee, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

80

A.   Yes.

Q.   But if the hot plate was left unattended and the water all evaporated, or the liquid did, then that sets up a risk for fire, right?

A.   Yes.

Q.   And sometimes it would result in a fire, right?

A.   Yes.

Q.   So that's -- the inmate's actions have caused the fire, but it was an accident, right?

A.   Yes.

Q.   Inmate wasn't setting out to start a fire, it happened, right?

A.   Correct.

Q.   That happens sometimes, unfortunately, to folks in the free community, right?  You could be cooking something on the stove and you get distracted and a fire can start that way, in your home or in mine, right?

A.   Correct.

Q.   It's not anybody doing anything that's malicious or wrong.  It's just a unfortunate accident, right?

A.   Right.

Q.   So that is also a way in which you say that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN MCCANN, taken on February 05, 2025

81

more often or not, prisoners started the fire themselves. That's encompassed within your more often than not, right?

A. Right.

Q. Okay. The other question I wanted to ask you is that midway through my questioning you about these still photographs from the surveillance camera, it occurred to you that you did not believe or did not know that the officers in the officers' station would have access to monitor that particular camera angle; is that your belief?

A. Yes.

Q. And what do you base that on?

A. As far -- now, I cannot recall positively, but as far as I can remember, they only have access to the cameras at the end of the ranges that would be at the front of the range and would look down the range.

Q. Okay. So that's what you recall, but you're not certain?

A. Yes.

Q. Okay. So you cannot say definitively that the officers lacked access to that particular camera angle. You're just saying that that might have been the case, you don't remember?

A. Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

82

Q.   And your point is that if they didn't have access to that particular camera angle, then you can't fault them for not seeing what they didn't see on the camera?

A.   Correct.

Q.   But of course, there are other ways that their attention could be drawn to what's going on in Cell 252, other than looking at a camera, right?

A.   Yes.

Q.   Prisoners shouting is one way, right?

A.   Yes.

Q.   And smelling smoke is another way, right?

A.   Yes.

Q.   And being out on the range and looking and seeing with your own eyes, as opposed to what's on a camera, that's another way too, right?

A.   Yes.

Q.   And of course, if you're wrong, and they do have access to the camera, then that particular camera angle is another way that they should have been on alert that there was an emerging serious situation in Cell 252, right?

A.   It they could observe that camera, yes.

MR. BOWMAN:  Right, okay.  Thank you, I appreciate your time very much.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

83

MR. JIMENEZ:  Just briefly, Locke, do you mind just putting up on the screen for me what you used as Exhibit 15, please?

MR. BOWMAN:  Sure, I've placed the still from 10:56 a.m. on the screen.

MR. JIMENEZ:  Okay, thank you.

RECROSS-EXAMINATION

BY MR. JIMENEZ:

Q.   All right, Mr. McCann, so just a couple additional questions for you.  So Mr. Locke -- Mr. Bowman has Exhibit 15 up on the screen here, and you remember seeing this image earlier in your deposition?

A.   Yes.

Q.   Okay, and so you were asked several questions regarding the -- what's depicted in this picture here earlier.  Would you agree with me that at this point here, as you mentioned, there's the -- I mean, we can see some flames inside of the cell -- the cell -- in that particular cell, correct?

A.   It appears so, yes.

Q.   Okay.  And so if -- based off of what you mentioned, if the officers only had -- before -- actually, do you see any flames coming out of the cell at this point in time?

A.   At this point, I can't tell.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

84

Q.  Okay.

A.  I would say no.

Q.  Okay.  And so if -- so if the fire is not -- if the flames are not coming out of the cell and the fire is contained within the cell, and the officers only had access to cameras at the ends of the range, would it -- would you agree with me that they wouldn't be able to see what is going on that's within any particular cell?

MR. BOWMAN:  Objection to the form and foundation for that question.

BY MR. JIMENEZ:

Q.  You can answer.

A.  I would agree with that.

MR. JIMENEZ:  Okay, all right.  That's all I have.  Thank you.

MR. BOWMAN:  Okay, that does not raise anything further from me.  I have no questions.

THE REPORTER:  Thank you, and do we want to reserve or waive signature?

MR. JIMENEZ:  We'll reserve, please, Kortney.

THE REPORTER:  Okay, perfect.  And Mr. Bowman, would you like a copy of this transcript?

MR. BOWMAN:  I'm not going to order it at this time, but you'll keep it handy for us.

THE REPORTER:  Okay, sounds good.  And Mr.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

85

Jimenez, would you like a copy of the transcript?

MR. JIMENEZ:  Yeah, we'll go ahead and take a copy.

THE REPORTER:  Okay, and how would you like it?  Electronic okay?

MR. JIMENEZ:  Electronic is fine, yeah.

THE REPORTER:  All right.  Perfect, so that puts us off -- oh, and would either of you like a copy of the video?

MR. BOWMAN:  Again, I don't want it at this time, but please make sure that it's preserved.

THE REPORTER:  Yes.

MR. JIMENEZ:  Yeah, and we don't need it at this time either, but maybe in the future as well.

THE REPORTER:  Perfect.  That puts us off the record at 12:51 p.m. Central time.

(Deposition concluded at 12:51 p.m. CT)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7

The Deposition of STEVEN  MCCANN, taken on February 05, 2025

86

CERTIFICATE OF REPORTER

STATE OF INDIANA

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.

KORTNEY CHASE
COMMISSION NUMBER NP0735206
MY COMMISSION EXPIRES
AUGUST 3, 2029

KORTNEY CHASE,

COURT REPORTER/NOTARY

MY COMMISSION EXPIRES: 08/03/2029

SUBMITTED ON: 02/13/2025

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ex. 7