**EXPERT REPORT OF DAN PACHOLKE**

*Mysti Valencia, Individually and as Personal Representative of the Estate of Michael Smith,*
*Plaintiff*

*v.*

*Ron Neal, Warden, et al.*

Case No: 3:24-cv-00185 (N.D. Ind.)

December 15, 2025

## I.      Introduction

I am an expert in penology and the management of correctional facilities having worked at all levels of the Washington State Department of Corrections, from correctional officer to Secretary of the Department, over the course of a 35-year career. My qualifications are described in Section II of this report and in the attached CV.

The law firm of Loevy + Loevy has retained me to review the circumstances of the death of prisoner Michael Smith by fire on January 14, 2023 in Cellhouse A at the Indiana State Prison ("ISP") in Michigan City, Indiana and to offer my opinions regarding (a) the training of correctional staff to prevent and respond to fires within the prison; (b) the plans and protocols of ISP's administration to minimize the risk of fire and to respond when fires occur; and (c) the adequacy of the staff and administration's response to the fire that resulted in Mr. Smith's death. Those opinions and the reasons and bases for them are set forth in this report.

## II.      Credentials and Compensation

I am a former Secretary of the Washington State Department of Corrections ("WADOC") with more than 35 years of experience and related training and education in the field of adult institutional corrections.  This experience includes eight years in administration in WADOC, including as Secretary, Deputy Secretary, Director Prisons, and Deputy Director Prisons, as well

1

as more than twenty years in other corrections positions as follows: Correctional Officer (2.5 years); Lieutenant (3 years); Captain (6 years); Superintendent (5 years); Chief of Emergency Operations (7 years); and Director of Performance Management (4 years). I have performed consulting and expert work in over twenty states and six jurisdictions outside of the continental United States.  My complete CV is provided at Attachment 1.

My experience in emergency operations started when I was a correctional officer in 1982 as a member of the McNeil Island Emergency Response Team ("ERT"). I continued on ERT at the Washington Correctional Center and was later the Special Emergency Response Team leader at Clallam Bay Correctional Center where we implemented a number of innovative strategies which led to my appointment as Chief of Emergency Operations for WADOC in 1995. In that role, I managed critical incident fact-finding reviews and developed and offered a number of specialized academies. My involvement in emergency operations was central to my role in every position I held through the end of my career.

My correctional experience included responsibility for, and a focus on, people housed in close or high security units. Specifically, as a Correctional Sergeant and Captain, I managed segregation and close custody units. As a Superintendent and Deputy Director, I led efforts to reform the system-wide use of long-term segregation in Washington State, which resulted in an over 50% decrease in the number of people housed in this setting, while also lowering system-wide violence for eight consecutive years. This effort is described in more detail in a United States Department of Justice ("DOJ") policy paper I co-authored, "More than Emptying Beds: A Systems Approach to Segregation Reform."[1] I have published several other articles related to

---

[1] Dan Pacholke & Sandy Felkey Mullins, *More Than Emptying Beds: A Systems Approach to Segregation Reform*, U.S. Dep't of Justice (May 2016), *available at* https://www.bja.gov/publications/MorethanEmptyingBeds.pdf.

Ex. 8

corrections and segregation, to include prison safety, restricted housing reform, crisis management, and innovative programs.

As Deputy Secretary of WADOC, I was responsible for the oversight of multiple statewide operations divisions with an emphasis on core correctional practices and violence reduction that I maintained throughout my career.

I have served as a trainer and consultant with the National Institute of Corrections, the Defense Technology Corporation, and New York University. With these agencies and institutions, I provided training nationally in emergency operations, security management, leadership, and correctional reform development and implementation. At New York University, I was also co-director of Segregation Solutions, an initiative that assisted correctional agencies to reduce the use of segregation while also maintaining or improving safety in prison facilities. I have also served as a consultant for the U.S. Department of Justice Civil Rights Division advising in their investigations of two state correctional agencies.

I have served as an expert witness and correctional consultant for cases and disputes. A list of all other cases in which, during the previous four years, I have testified as an expert at trial or by deposition is provided at Attachment 2.

I am being compensated in this case at my standard rate of $200.00 an hour for research, report writing, and all associated casework; $100.00 an hour for travel; and $300.00 an hour for courtroom testimony and depositions. My compensation is not contingent on the opinions I reach in this case.

### III.    Methodology and Materials Reviewed

Counsel for the Plaintiff have provided me with a large volume of materials relating to the subject matter. Generically, these materials encompass: (a) information relating to the death

3

Ex. 8

of prisoner Joshua Devine by fire in B Cellhouse of ISP on April 7, 2017; (b) selected IDOC and ISP policy and emergency response materials; (c) the complete investigative file regarding Mr. Smith's death on January 14, 2023; (d) surveillance video from the time of the fire; (e) depositions from this litigation; (f) statements from prisoners who were in A cell house at the time of the fire; and (g) reports reflecting practices at ISP in the relevant timeframe, including inspection and roster reports. A complete list of each individual item that I have reviewed is available in Appendix 3.

On July 14, 2025, I toured A Cellhouse in the company of Plaintiff's counsel. I had the opportunity to examine the cell in which Mr. Smith died; to view the Officer's Station in the northwest corner of the Cellhouse; to examine the locking system on the second tier of A Cellhouse; and to observe the general layout and condition of A Cellhouse and its location in the larger prison.

In reaching my opinions, I have compared what I have learned about the training of correctional staff to prevent and respond to fires within the prison; the plans and protocols of ISP's administration to minimize the risk of fire and to respond when fires occur; and the response of staff and administrators to the fire that resulted in Mr. Smith's death to my own standard of practice at WADOC as well as to national standards, including those of the American Correctional Association ("ACA"), to the extent the ACA standards are useful. This methodology enables me to offer opinions to a reasonable degree of professional certainty as to whether the actions of the Defendants in this matter fell below accepted correctional practice.

4

Ex. 8

IV.    **Background and Context for the Assessment in this Report**

The fundamental mission of staff at all levels in a correctional facility is to ensure the security and the safety of all persons within the facility, prisoners, staff, visitors, and others on site.

Particularly in a maximum-security prison like ISP, the secure containment of prisoners with a potential for violence is a key component of the mission. But it is equally important to ensure the safety of the incarcerated population. Prisoners in a correctional facility are entirely dependent on staff for every aspect of their food, shelter, and healthcare, among other basic necessities. By design, prisoners lack control over their sleeping arrangements, their meals, their schedule, and their environment. Typically, what little autonomy prisoners might have—to choose particular programming, for example—is earned by good behavior. In this context, there is a corresponding obligation upon prison staff to be constantly vigilant to ensure that individual prisoners' basic needs are met, since prisoners have limited ability to address those needs on their own.

The cells in maximum-security prison units remain locked throughout the night and for most if not all of the day. A prisoner in a locked cell is particularly dependent on the vigilance of staff. Should a health or safety issue arise for a prisoner in a locked cell, he must be able to get the attention of staff. He has no other avenue to get help.

All corrections staff must be trained and mindful of these realities at all times.

Ex. 8

### V.    Findings From My Review

#### A.    Challenges Posed to ISP's Officers and Administration by ISP's Physical Plant and by Staffing Shortages.

##### 1.    Physical Design

**19th Century (Auburn) Construction**

ISP is the second oldest prison in Indiana. According to Warden Ron Neal, ISP has housed prisoners since the 1860s.[2] Cellhouse A, where Mr. Smith was housed, is one of the original structures within the prison complex, dating back to the 1860s, and retains many of the original design features.[3]  The Cellhouse contains five tiers of cells, which are accessed by open staircases on the east and west ends of the cellblock. Each tier has two rows of cells extending east to west, one on the north side (the even numbered cells) and one on the south side (the odd numbered cells).

This physical design is not used in modern prisons because we know more about managing behavior and security management. In particular, this design poses inherent safety risks. Visibility into the cells is limited, unlike in more recent construction where, for example, a half-moon pod layout enables corrections staff located in a central control room to view the fronts of all cells simultaneously. In contrast, the old multi-tier design of Cellhouse A does not allow a line of sight into the cells on the tiers unless a corrections officer is physically on the tier and walking the range. Moreover, the long row of cells and the need to climb multiple flights of stairs to reach the upper tiers mean that response times to an emergency within a cell will be longer than they would be in a cell house with a modern design.

---

[2] Neal Dep at 20:20-25.
[3] Neal Dep at 21:2-8.

Ex. 8

Cellhouse A has a security monitoring system that includes around 10 cameras on the north side of the Cellhouse configured in such a way as to facilitate observation of all cells on the five tiers.[4] There is a similar configuration of cameras on the south side of the Cellhouse. The Officers' Station in the northeast corner of the Cellhouse has live-feed monitors that can display the view from each camera, either sequentially or simultaneously through a split screen feature. There was testimony from at least one witness at a deposition that the monitors in the Officers' Station were not working at the time of the fire that resulted in Michael Smith's death, meaning none of the correctional staff in the Cellhouse could see the live camera feed.[5] Without a working monitor, the security monitoring system was of no value in mitigating the sightline problem in Cellhouse A. Additionally, I did not find any policy or protocols in place requiring staff to monitor the cameras, including when staff were not on the ranges.[6]

**Antiquated Locking System**

The locking system on the first and second tiers of Cellhouse A is the original system that was installed in the 1860s, again according to Warden Neal.[7] Unlocking the doors to cells on these two tiers requires at least two, and potentially three steps. First, there is a heavy metal bar that extends the length of each range with teeth at the top of each cell door along the range holding all cell doors in place. No door on a range can be unlocked until a correctional officer "rolls the bar" via a manual crank located at the east end of the Cellhouse. Second, after the bar has been rolled, an individual cell door can only be unlocked by inserting a key into that door's lock at the cell front.

---

[4] STATE026897; 2025.01.07 email from Brandyn Arnold.
[5] Crockett Dep at 93:11-94:25.
[6] Smith Dep at 55:17-23; Nowatzke Dep at 109:20-110:10
[7] Neal Dep at 85:5-10.

Ex. 8

This antiquated locking system is vastly different from a modern prison in which cell doors can be unlocked remotely by pushing a button in a centrally located place. In ISP's Cellhouse A, the third, fourth and fifth tiers have been retrofitted with a modern electronic locking system. To open a cell on those tiers, staff only need to hit a switch located in a locked box at the east end of each retrofitted tier, though there could still be a personal lock on the door that would need to be unlocked or cut off with bolt cutters.[8] The materials I reviewed did not provide an explanation as to why the two lowest tiers were not similarly retrofitted. The events leading to Mr. Smith's death show that a retrofitted locking system on the lower two tiers could have played a role in saving Mr. Smith's life (assuming proper vigilance on the part of corrections staff).

Finally, prisoners have the option of purchasing a personal combination lock at commissary, which they can use to fasten a chain around one of the bars that comprise the cell door. These personal locks afford prisoners additional security whether they are in or out of their cells.[9] If a prisoner is incapacitated and cannot furnish staff with the lock combination, bolt cutters must be used to cut the chain. [10] Allowing prisoners to have their own independent lock mechanism is an uncommon practice for good reason. Staff should always have direct access to a cell, in the event of an emergency or for routine security checks.

---

[8] Crockett Dep at 41:12-42:13; Cross Dep at 39:23-42:5.
[9] Crockett Dep at 37:15-41:8.
[10] Crockett Dep at 41:12-42:13; Cross Dep at 39:23-42:5.

Ex. 8

**Normalized Fire Risks**

Staff at all levels acknowledged in their depositions that fire has been and remains a persistent problem at ISP.[11] There are many risk factors.

Hot pots, which prisoners can purchase at commissary for use in their cells, frequently catch on fire when boiling water in the pots is allowed to evaporate while the heating element is still engaged.[12] Hot pots have been and continue to be a frequent source of in-cell fires at ISP, and have led to injury and at least one prisoner death.[13]

The electrical system throughout the prison is out of date and constitutes a pervasive fire hazard.[14] Prisoners sometimes overtax the outlets in their cells with homemade power splitters so they can use multiple appliances or devices at a time.[15] Even in the absence of tampering, the outlets sometimes spark, otherwise malfunction, and have to be replaced, and this presented a known fire risk.[16]

It is a not infrequent occurrence, particularly in D Cellhouse (the segregation area), that prisoners deliberately set fires.[17] Some deliberately set fires have resulted in serious injury to prisoners.[18]

Excess flammable property in cells can provide fuel for fires and increase their magnitude.[19] Blankets or other coverings placed over prisoners' cell fronts can hinder prompt

---

[11] Crocket Dep at 76:23-78:5; Nowatzke Dep at 60:13-61:7, 64:3-8, 129:3-13, 159:17-19, 185:8-11; Wardlow Dep at 90:18-91:4; McCann Dep at 100:7-21, 118:19-24; Lee Dep at 28:11-29:10 , 55:17-23.

[12] Crockett Dep at 75:19-76:16; Nowatzke Dep at 61:18-62:2.

[13] McCormick Dep at 42:12-24.

[14] Crocket Dep at 74:12-75:14; 203:24-204:13; Nowatzke Dep at 64:3-67:23; McCann Dep at 117:6-119:1; Walton Dep at  70:13-71:25; McCormick Dep at 66:9-69:7; McCann 2nd Dep at 9:5-20.

[15] Crocket Dep at 190:18-19:7; Nowatzke Dep at 62:3-13; 64:3-67:23; Koen Dep at 106:7-107:5, 44:10-45:6; Jones Dep at 145:19-147:4; McCann Dep at 118:13-119:1.

[16] Crocket Dep at 203:24-204:13; McCann Dep at 126:25-127:22; McCormick Dep at 66:9-69:7; McCann 2nd Dep at 9:5-20.

[17] Nowatzke Dep at 59:21-60:16; Smith Dep at 232:6-8.

[18] Neal Dep at 145:2-148:7.

[19] Crocket Dep at 75:15-18; Nowatzke Dep at 176:16-177:1.

Ex. 8

detection of a fire. The problem of excess property in cells, including coverings over cell fronts, is pervasive in ISP. It should be addressed through frequent inspections and enforcement of the rules limiting property.

Testimony and reports produced in this litigation indicate that fires were far from infrequent.[20] As Warden Neal acknowledged, fires occurred frequently enough at ISP that responding to them "with expedition and with proper procedure is an essential priority for staff."[21]

### Lack of Modern Warning and Fire Response Features

In modern high-security units, there is a call button that can be used to summon staff in case of emergency within each locked cell. ISP's Cellhouse A does not have call buttons in the cells. With no other way to alert corrections staff in case of emergency, prisoners in A Cellhouse will call down the range to alert staff of the existence and location of the emergency. Staff are fully aware of this practice and understand that they must take it seriously and respond when prisoners shout or scream for assistance.[22]

Building codes typically require the cellblocks in a modern prison to include a sprinkler system that automatically activates when there is a fire. Cellhouse A at ISP does not have a sprinkler system. One practice we used to mitigate this danger in WADOC cellhouses that lacked sprinkler systems was the inclusion, in post orders, of fire-watch duties, for areas where fire risks were high, such as kitchens, and where fire suppression infrastructure was lacking.

There are 30 smoke detectors in Cellhouse A. The smoke detectors are located just above the fifth tier of the cellblock, well above the tops of the cell fronts of the cells on the lower tiers.

---

[20] Nowatzke Dep at 58:17-63:9; Wardlow Dep at 89:17-90:12; Koen Dep at 56:14-57:13.
[21] Neal Dep at 72:7-73:25.
[22] Crocket Dep at 106:20-107:24; Nowatzke Dep at 107:13-108:6; Wardlow Dep at 63:15-65:11; Walton Dep at 33:4-21, 167:14-18; Koen Dep at 33:7-22; Jones Dep at 37:10-13.

10

Ex. 8

Since these detectors activate an alarm only when smoke reaches them, the smoke from a fire must travel to the elevation of the smoke detectors, approximately 40 feet above ground level, before an alarm will sound.

### 2. Staffing Shortages

On January 14, 2023 and the period leading up to it, there were significant staffing shortages at ISP that meant that posts frequently went unmanned.[23] Captain McCann testified that it was "typical" that he would have less than the full number of correctional officers to staff Cellhouse A. Additionally, staff sometimes did not show up for their post.[24] On the day that Mr. Smith burned to death in his cell, there were 41 officers available to fill 90 posts, and the facility was short two supervisors. A review of staffing records from that period indicates that this staffing shortage was typical.[25] McCann testified that this situation was grave and posed problems for safety and security.[26] Given this staffing shortage, it was known that vigilant supervision was even more important.[27]

On the day Mr. Smith died, four correctional officers and a sergeant were supposed to be assigned to Cellhouse A.[28] Prison-wide staffing shortage meant that only three correctional officers could be assigned to A Cellhouse that morning.[29] Of those three, one correctional officer was pulled off the unit to assist in an outside transport.[30] Cellhouse A was therefore limited to three dedicated staff: Correctional Officers Crockett and Cross and Sgt. Walton.  A lieutenant, Nadine Smith, was working the A and E zone that day, but she was present in A at the time of the

---

[23] ISP Staff Rosters from 12.14.23 to 1.13.23 (no Bates number).
[24] McCann Dep at 49:6-55:24.
[25] ISP Staff Rosters from 12.14.23 to 1.13.23 (no Bates number).
[26] McCann Dep at 49:6-55:24.
[27] McCann Dep at 56:2-21.
[28] McCann Dep 49:11-15; STATE001202
[29] Crockett Dep at 85:1-11, 86:17-87:2, 88:13-19, EXHIBIT 5 (ISP A.M. Shift Roster 1-14-23); Cross Dep at 38:22-39:7.
[30] Crockett Dep at 86:17-87:2.

11

Ex. 8

fire.[31] Sgt. Walton was assigned to cover 100 range (Tier 1) and "the flag", an open area on the first floor, CO Cross was covering Tiers 4 and 5, and CO Crockett was responsible for Tiers 2 and 3.[32] Had there been five staff in the Cellhouse, one officer would have been available for each of the five tiers.

### B. Fire Preparedness through Planning, Training and a Culture of Vigilance.

#### 1. The Emergency Fire Plan

The American Correctional Association ("ACA") has a general standard relating to fire prevention and response. ACA Standard 5-ACI-3B-01 provides, among other things, that a prison facility must have established fire prevention regulations and practices that include: adequate fire protection service; a system of fire prevention and testing of equipment; and an annual inspection of the facility.

Under the ACA Standard, a facility can employ an internal, prisoner fire department. But the prisoner fire station must be readily accessible in case of fire when the prisoner fire department is the primary first responder.[33] ISP has long used a prisoner fire brigade to fight fires within the prison. However, in my opinion, the ISP prisoner firefighters are not readily accessible in case of fire as the ACA Standard requires. The firefighters are housed in units throughout the prison. Individual firefighters cannot access their gear until they have been released from their housing units and gotten to the fire station. From there they must assemble and travel to the location of the fire. This is not ready availability. Perhaps for this reason, the ISP fire plan, Appendix C to the ISP Emergency Manual, states that staff are to use fire suppression equipment

---

[31] Crockett Dep at 87:14-88:5.
[32] Crockett Dep at 88:20-89:20, Cross Dep at 39:20-23.
[33] American Correctional Association Commission on Accreditation for Corrections. Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, March 2021, pg. 87.

12

Ex. 8

at hand to attempt to extinguish a fire.[34] Staff are also instructed to bring bolt cutters to the scene of a fire.[35]

For several years, I worked as a correctional officer at the McNeil Island Corrections Center within WADOC. McNeil Island also used a prisoner fire crew to respond to fires within that facility. But, unlike ISP, the McNeil Island prisoner firefighters all lived in a single, designated dormitory where they had direct access to their gear.

The ISP fire plan states that "[t]he most important element of fire safety is prevention" and that "[s]taff should be continually vigilant to elements that contribute to a fire [such as] [e]xcess paper…altered electrical outlets and wiring." Staff are instructed to "be mindful of housekeeping standards and enforcement" and familiar with ISP Operational Directive 01-14, the Facility Housekeeping Plan." "Fire safety is the job of all staff".[36]

In addition to these general statements, the fire plan asserts that the prison Safety Hazard Manager is responsible for ensuring the adequacy of the fire plan and its implementation. The plan further provides that the State Fire Marshal will conduct an annual fire safety inspection of the prison. The plan provides that, in case of fire, "[s]taff should try to extinguish the fire with available fire suppression equipment located on the unit."[37]

A "Fire Plan" only has value to the extent that it is implemented operationally. According to deposition testimony in this case, staff are not expected to review the ISP Emergency Manual, and for the most part, they do not.[38] Instead, the only staff-accessible policies about fire prevention and response are contained in the General Post Orders.[39] There is a short section in

---

[34] ISP Emergency Manual Appendix C Fire Plan III.A.1, STATE020467.
[35] *Id.*
[36] *Id.*
[37] *Id.*; STATE020473; Smith Dep at 98:3-10 and 99:8-13.
[38] Nowatzke Dep at 97:12-98:10; Crockett Dep at 69:10-22, 71:16-18; Smith Dep at 119:19-120:6; Koen Dep at 54:3-23.
[39] STATE020182-STATE020199; Nowatzke Dep at 90:1-01:92:10.

13

Ex. 8

the Post Orders setting out a seven part response to a fire: (1) call the code; (2) bring the bolt cutters to the cell; (3) assess the scene; (4) remove the offenders from the area of the fire; (5) try to extinguish the fire with the fire extinguishers; (6) remove offenders in the general area; and (7) release firefighters in your unit unless there is a lockdown. This makes clear that the prisoner firefighters are not expected to be the first responders to a fire emergency and that staff are expected to be ready to quickly and effectively respond to fires at the facility.

### 2. Training Failures

Fire safety training is as fundamental as basic security practices training. It should be done annually and include hands-on practice so staff will have experience to draw on in the event of an actual fire. This is especially critical for staff working in older units like Cellhouse A, in which design features make it more likely that a fire will result in death or serious injury.

It appears from the training records produced in this case and from the testimony of corrections staff that the principal fire-related training exercises for staff are periodic fire drills.[40] Fire drills are not the equivalent of fire prevention and response training. During a fire drill, the prisoner firefighters come in with their equipment; staff hit the fire alarm and evacuate everyone out of the unit, as they were supposed to do when the alarm sounds; and then staff conduct a count before bringing everyone in and back to their cells.[41] Following the drill, the officer in charge is expected to answer a list of questions posed by the safety hazard manager including: responding to a fire by calling a 10-70 (fire alarm) or 10-71 (actual fire); releasing the prisoner firefighters from the unit; understanding the types of extinguishers and which fires to use them on.[42] Staff are reminded that there are two types of fire extinguishers: water, which has a silver

---

[40] Jones Dep at 21:9-20.
[41] Crockett Dep at 58:25-59:22.
[42] Crockett Dep at 62:10-22, 62:25-63:9; STATE022491; Jones Dep at 139:13-140:2.

14

Ex. 8

tank; and chemical or ABC, which has a red tank.[43] Staff are instructed that the ABC tank can be used for any fire, particularly electrical or larger fires, whereas the water tank is reserved for smaller fires that are paper or wood based.[44]

Staff do not receive training, in their 40-hour required annual trainings, during fire drills, or in any other training, that includes actual use of the fire extinguishers to put out fires.[45] Other than the fire drills, CO Crockett did not recall any training at all on fire prevention or fire response.[46] Staff could choose to take a one-day first responder certification training that they recertify each year. CO Crockett was the only certified first responder in A at the time of Smith's death,[47] but he had not, as part of first responder certification, receive any training in fire prevention and response.[48] CO Cross only recalled having some training on which fire extinguishers to use for what fire when he first came to DOC in October of 2019.[49] Lt. Jones had been QRT (Quick Response Team) certified, which had not included fire response training other than how to evacuate for fire drills and a review of what fire extinguisher was used for what fire, verbal and computer-based training, and fire drills.[50]

The 40-hour annual in-service training is split more or less evenly between classroom and computer-based training.[51] According to Mr. Beal, the training coordinator, the only training about fire safety and response that he could recall being given during the annual in-service training program was from a single classroom training session about emergency planning.[52] Each

---

[43] Crockett Dep at 64:20-65:5; Exhibit 2 to Crockett Dep, STATE022491.
[44] Crockett Dep at 65:6-66:6; Exhibit 2 to Crockett Dep, STATE022491.
[45] Crockett Dep at 163:22-164:22; Smith Dep at 106:22-25; Walton Dep at 78:20-79:9-85:25; Koen Dep at 53:1-54:2; Jones Dep at 21:9-20; Nowatzke Dep at 39:1-21.
[46] Crockett Dep at 52:25-53:9, 57:3-12, 174:3-15.
[47] Crockett Dep at 53:13-55:8.
[48] Crockett Dep at 56:23-57:7.
[49] Cross Dep at 15:22-17:5.
[50] Jones Dep at 20:18-21:20; 26:8-16; 27:12-31:25.
[51] Exhibit 2 to Beal Deposition, STATE037129.
[52] Beal Dep at 78:18-82:16, 100:17-106:25 and Exhibits 1 &2 to Beal Dep.

15

Ex. 8

year, this classroom training session on emergency planning is limited to 1 or 1.5 hours. During the session, 25 to 30 scenarios are discussed with the group. Just two of these scenarios deal with fires. In other words, it is likely that about five minutes is spent discussing fire scenario responses. Some staff, including senior staff, did not remember any classroom-based training on fire safety.[53]

Mr. Beal also testified that fire safety might be covered in some of the computer e-learning sessions, but could not recall.[54] According to testimony from other staff, the computer training related to fire safety and response was limited to a module on the different types of fire extinguishers and when to use them; it was part of a one-hour training that touched on a variety of other topics.[55] ISP administrators had the ability to implement additional training sessions on specific topics, like fire safety, if they believed it appropriate or necessary.[56] No additional fire training sessions were ever implemented at ISP in recent years.[57] COs were required to review general post orders once a month, which include a directive for all staff to review emergency plans at least once each year.[58] This directive does not appear to have been enforced.[59] Staff were expected to review the post orders, but it appears that there was no expectation that they review the emergency manual.[60]

As noted above, ISP's fire plan covers fire and evacuation plans.[61] CO Crockett had not read the appendix, nor did he recall being asked to look at it or trained on it.[62] Cross had read the

---

[53] Nowatzke Dep at 39:1-21.
[54] Beal Dep at 80:20-24, 103:15-23.
[55] Smith Dep at 105:21-106:25
[56] Nowatzke Dep at 26:25-28:14
[57] Nowatzke Dep at 39:22-49:19
[58] Jones Dep at 122:4-7, 124:1-4; Exhibit 2 to Jones Dep, STATE020188.
[59] Smith Dep at 119:19-120:6; Koen Dep at 54:3-23.
[60] Nowatzke Dep at 97:12-98:10; Crockett Dep at 69:10-22, 71:16-18; Smith Dep at 119:19-120:6; Koen Dep at 54:3-23.
[61] Jones Dep at 124:5-16.
[62] Crockett Dep at 69:10-22, 71:16-18; STATE020467-20477.

16

Ex. 8

fire plan "a little bit", but he could only recall that it was about safely evacuating people.[63] The ISP Fire Plan states that the Safety Hazard Manager is responsible for ensuring the adequacy of the fire plan and its implementation and that all staff will be trained in the fire plan.[64] There is no evidence in this case that corrections staff are effectively trained on the fire plan. Indeed, even supervisors appeared not to be aware of or familiar with the fire plan.[65]

There are two ACA Standards related specifically to fire safety training. ACA Standard 5-ACI-1D-12 requires all new COs to receive 120 hours during their first year of employment that includes emergency and fire procedures,[66] which is consistent with our practice at WADOC. ACA Standard 5-ACI-1D-13 requires all COs to receive at least 40 hours of annual training that includes safety, security, fire, medical, and emergency procedures,[67] which is also consistent with my own experience where we attended annual fire response training that included hands-on use of fire extinguishers. ISP's ACA accreditation reports do not specifically address staff fire safety training, likely because these standards are considered non-mandatory for ACA accreditation.

### 3.  Lack of Vigilance

All supervisory staff within a prison facility, from the warden to the individual housing unit supervisors, are responsible for instilling a culture of vigilance within the prison. That has not occurred at ISP.

#### a.  Failure to Address Fire Hazards within the Cells

ACA Standard 5-ACI-3B-02 requires a comprehensive and thorough monthly inspection of the institution by a qualified fire and safety officer for compliance with safety and fire

---

[63] Cross Dep at 26:13-27:7.
[64] ISP Emergency Manual Appendix C Fire Plan III.A.3, STATE020467.
[65] Smith Dep at 107:12-108:15; Smith Dep at 118:5-120:16.
[66] ACA, p. 34.
[67] *Id.*, p. 35.

17

prevention standards. It also requires a weekly fire and safety inspection of the institution by a qualified departmental staff member who may be an institutional staff member who has received training in and is familiar with the safety and sanitation requirements in the facility's jurisdiction.[68]

In practice, according to correctional officers' testimony, living unit inspections at ISP take place once a week. The assistant shift commander is responsible for collecting the weekly inspection reports and then turning those in to the safety hazmat manager.[69] Lt. Jones testified that she would reinforce at roll call the importance of noting issues in those inspection reports, which included a check of the electrical socket.[70] At the weekly cell inspection, staff were supposed to physically enter each cell and remove any items that prisoners were not allowed to have, such as rigged extension cords or light sockets.[71] Homemade extension cords were also a prohibited fire hazard that staff were supposed to confiscate when found.[72] Records produced in this case indicate that weekly inspections were often perfunctory: staff would rate nonexistent features of cellhouses like sprinkler systems, and would rate every feature the same on a 1-5 scale, and would also fail to identify problems when providing a poor rating.[73] Some staff members testified that the only time they would actually enter a cell to inspect it would be when a prisoner moved in or out of the cell, or during a shakedown.[74] Testimony indicates that staff at all levels were aware of the risks posed by altered electrical equipment and that significant

---

[68] *Id*., pp. 87-88.
[69] Nowatzke Dep at 29:9-30:24; Jones Dep at 103:5-104:17.
[70] Jones Dep at 103:5-106:13.
[71] Jones Dep at 134:3-19.
[72] Jones Dep at 147:14-149:3.
[73] See examples: STATE010808; STATE013301; STATE013283; STATE014030; STATE014076; STATE014086; STATE011420; STATE014201; STATE012135; STATE012195; STATE012201; STATE012208; STATE012231; STATE012734; STATE012689; STATE012736
[74] Nowatzke Dep at 31:21-32:23; Koen Dep at 112:18-113:3; Smith Dep at 63:11-66:1.

18

Ex. 8

amounts of altered electrical equipment could regularly be found in cells throughout the living areas.[75]

In my review of the discovery and depositions, it is clear that ISP, or at least Cellhouse A, had an ongoing problem with prisoners hanging sheets and other material across the front of their cells. Covering cell fronts and cell windows is prohibited in correctional facilities for good reason. It blocks staff's view into cells leaving them unable to monitor for prohibited behavior or medical emergencies. They are also a fire hazard, as Cellhouse A staff were aware.[76] Covering cell fronts was a persistent and chronic problem, so much so that staff referred to these as "**curtains**". Prisoners would take them down when staff walked the tiers and hang them back up again when staff left. The replaced sheets on the cell fronts would have been visible to staff viewing the security camera feed on the video monitors in the Officers' Station.[77] Staff are inconsistent in enforcing the rule prohibiting curtains. CO Crockett did not, as a normal practice, write people up for having a curtain in their cell.[78] CO Cross testified that he did issue write-ups for prisoners covering their cell front with curtains or he confiscated their curtains.[79] Lt. Jones, when she was a CO, she took down or made prisoners take down their curtains and if they refused, she would issue a write-up.[80]

**Modified outlets** are also fire hazards. CO Crockett testified that he checked each cell for these when he made his rounds and, if there were extra outlets, he would take them out.[81] Deputy Warden Nowatzke testified that he believed if he went in a cellhouse at any given time, he would

---

[75] Nowatzke Dep at 65:13-20-66:21.
[76] Crockett Dep at 72:4-17.
[77] Crockett Dep at 72:4-74:11.
[78] Crockett Dep at 202:8-23.
[79] Cross Dep at 97:2-99:11.
[80] Jones Dep at 36:11-15.
[81] Crockett Dep at 74:15-75:15.

19

Ex. 8

find at least 5-10 homemade extension cords in that cellhouse.[82] Excess paper, cardboard and other items in the cells could also pose a fire danger. Hot pots, which prisoners could purchase from the commissary, did as well. Almost all the prisoners had hot pots, and they frequently caught fire.[83]

In practice, prisoners in A Cellhouse were permitted to have **excess property** in their cells, in violation of the prison rules.  For example, on the day of Mr. Smith's death, CO Crockett conducted his 10:00 a.m. count on Tier 2. He recalled looking into Mr. Smith's cell and seeing him sleeping. He woke him up to check that he was OK and testified that he didn't see anything out of the ordinary in his cell or any inappropriate use of his cell or contraband. He did not observe any modification of the outlet.[84] In contrast to Officer Crockett's account, the Michigan City Fire Chief's inspection of Mr. Smith's cell after the fire revealed a number of damaged items, including the remains of electrical cords, small flat-screen televisions, computer tablets, altered homemade electrical devices, and an altered light fixture.[85] On his count, CO Crockett observed that there was a covering in Mr. Smith's cell, that was "to the side" but testified that he did not take issue with it because he "could see it" and because every prisoner had one.[86]

I toured Cellhouse A on July 14, 2025 in the company of Plaintiff's lawyers and several supervisory prison officials, including the ISP Safety Hazard Manager. On that tour, I observed numerous cells with excess amounts of paper, books, ice chests, and multiple electrical devices plugged into a limited number of outlets. In a few cases, I observed Styrofoam containers, which

---

[82] Nowatzke Dep at 65:13-20.
[83] Crockett Dep at 75:15-76:16; 110:3-14.
[84] Crockett Dep at 89:21-91:8.
[85] Exhibit 7 to Crockett's Dep, STATE000016.
[86] Crockett Dep at 91:9-22

20

Ex. 8

are highly flammable and emit toxic fumes when burned, being used as ice chests in cells. These containers appeared to be from the medical unit.

At WADOC, we required daily cell inspections. A prisoner who continued to have prohibited fire hazards after being warned would receive a minor infraction. Cells were also thoroughly searched on a 30-day cycle, which provided another opportunity to remove excess paper, homemade extension cords, cardboard, Styrofoam, or any other prohibited items. It was apparent on my tour that these essential systematic procedures to eliminate the hazard of excess property were not being effectively employed at ISP.

In sum, Cellhouse A was full of fire hazards. The staff knew that this was a pervasive problem, and they knew this at the time of the fire that killed Mr. Smith.[87]

### b. Staff and Supervisory Failures

The ISP administration faces structural challenges because of the age and design of Cellhouse A, as described in Section VA1 above. *See* pp. 6-11 The administration also faces staffing shortages, which are chronic and cannot be remedied at the facility level. *See* Section VAII at pp. 11-12. Administrative and supervisory officials should require staff to make adjustments to mitigate the hazards associated with these problems. That did not occur in A Cellhouse.

In a housing unit with poor to non-existent sightlines, antiquated locking, and limited staff, the available staff must be effectively deployed so that all cells within the unit can be monitored at all times.

---

[87] Crockett Dep at 76:21-78:5.

Ex. 8

As a correctional officer at McNeil Island Corrections Center, I worked in a cellblock that was five tiers high with a design very similar to ISP's Cellhouse A. Later in my career, I managed units at the Washington State Reformatory that had a similar configuration. In these cell blocks, like any housing unit, there were regular tasks to perform, such as routine tier checks, counts, cell inspections, supervising porters, letting prisoners in and out of their cell, etc. To adequately perform these operations, staff had to be posted in direct proximity to the prisoners that they supervised and managed. Each CO was posted on a specific floor, with an officer assigned to each of the five tiers. I was assigned to the 4th tier. If the shift was running short of staff, the 3rd tier might be left vacant with the officers on the 4th and 2nd tier splitting coverage of the 3rd tier. We took our lunches up to the tier with us and could not leave the tier unless coverage was provided. All count sheets were collected by a single correctional officer who would bring them down to be reconciled before returning to their tier. Supervisors and administrators communicated that tier coverage at all times was a necessity.

Posting staff in this manner was the critical first line of response in detecting and dealing with trouble on the unit. We could detect sounds on the tier, such as an argument or a cry for help. We could smell things that may be occurring, such as cooking food, drinking or mixing homemade intoxicants, smoking controlled substances, or a fire which could occur for any number of reasons. We were able to quickly radio for help if needed and available to operate the locking mechanisms immediately. These posts were critical to maintaining safe and secure operations in those types of prison units.

At ISP, despite the challenges posed to staff in A Cellhouse, administrators and supervisors did not require staff to remain in close proximity to their assigned tiers at all times.

22

Ex. 8

Instead, following the counts, staff tended to congregate in the Officers' Station.[88] If you are short on staff in any unit, you must keep staff circulating. Under no circumstances should all staff congregate in an officer's station leaving no direct visual coverage of the unit.

It also appears that the live feed monitors in the Officers' Station were either not working or were not observed in practice.[89]

The overall lack of vigilance set forth in this section is highly problematic in a problematic older building with and staffing issues.

**C. Joshua Devine's Death by Fire in 2017 and ISP's response**

On April 7, 2017, a prisoner named Joshua Devine died because of a fire in his cell in B Cellhouse. B Cellhouse is virtually identical to A Cellhouse. Both feature the five-tier cellblock from the original 1860s construction and have the identical configuration of cells. Both cellhouses have the same limited safety features described above, including the lack of a sprinkler system and the absence of panic buttons.

After his death, Mr. Devine's family sued correctional staff and supervisory and administrative officials claiming that Mr. Devine's death by fire was preventable and had been caused by the delayed response of staff who were off the tiers when the fire started and failed to respond to Mr. Devine's and other prisoners' cries for help after the fire started in Devine's cell; by staff's failure to bring appropriate equipment to the scene of the fire (a single correctional officer eventually appeared at Devine's cell front, but he did not have a working radio, keys to the cell, or a fire extinguisher); supervisors' failure to release the prisoner fire fighter who was

---

[88] Nowatzke Dep at 108:11-109:11; Jones Dep at 206:24-208:5; Koen Dep at 30:13-31:11, 35:1-36:10; Smith Dep at 59:6-60-:7; Walton Dep at 31:19-32:24, 118:15-119:24, 120:11-20.
[89] Crockett Dep at 95:01–96:10; Smith Dep at 55:17-23; Nowatzke Dep at 109:20-110:10; Walton Dep at 38:4-7, 39:2-12.

23

Ex. 8

housed in B Cellhouse and failure to activate the other prisoner firefighters so that they could fight the fire; and staff training as to fire response that was "simplistic," "basic," and insufficient to prepare staff to address fire emergencies smoothly and efficiently. The Devine family's suit contended that supervisory Defendants were aware of persistent problems with fire, and dangerous conditions that posed substantial risks in the event of a fire, but that they failed to take reasonable action in response to those risks

In a summary judgment ruling, the court in the Devine case found that it was reasonable to infer that guards would have been alerted to the fire by prisoners' screaming, but that they failed to respond. The court found it reasonable to infer that the fire presented a substantial risk of serious harm at ISP. The court concluded that it was reasonable to infer that correctional officers' and supervisory staff's lack of immediate response to the fire reflected deliberate indifference to that risk. The case was eventually settled before trial for a payment to the family of almost $4 million.

Concerned administrators at ISP should have been alarmed by Mr. Devine's death and should have considered that event to be a wake-up call. That did not happen at ISP. Significant changes should have been made to ensure that staff understood the risks posed by fires, were inspecting cells regularly for fire risks, were monitoring the cellhouses continuously for emergencies, and were ready to respond immediately and appropriately at the first sign of an emergency. Instead, the only changes made were to acquire some new firefighting equipment (smoke evacuators and foam fire suppression backpacks, and to move fire extinguishers to the ranges). [90] These equipment changes were meaningless if staff was not prepared to appropriately and effectively use this equipment. Warden Neal testified that there were no policy or procedure

---

[90] Nowatzke Dep at 140:4-21, 151:12-152:1.

24

changes to ensure staff remained on the ranges, limit personal property in cells, or improve the fire brigade response time.[91] Neal testified that his efforts to prevent another fatal fire "failed" and it "could happen again at any time."[92]

### D. ISP's response to the fire in Mr. Smith's cell was deficient

#### 1. January 14, 2023

A fire broke out in Cell 252 of A Cellhouse, which was occupied by Michael Smith, sometime before 11:00 a.m. on January 14, 2023. Mr. Smith burned to death in that fire because corrections staff did not respond to the fire with proper equipment and in sufficient time to remove Mr. Smith from his cell.

That day, at approximately 10:30, after performing the 10:00 a.m. count, CO Crockett went to the Officers' Station in the northwest corner of A Cellhouse. CO Cross, the other correctional officer assigned to A Cellhouse that morning, was also at that location.  After count cleared in A Cellhouse, Sgt. Walton conducted a security check of the 100 range, then returned to the Officers' Station at approximately 10:46. Lt. Smith was also in the Officers' Station.[93] These were the only staff assigned to A Cellhouse; no officers were on the range. Because all count sheets had been turned in and count had cleared in the Cellhouse, there were no count-related tasks left for them to complete.[94]

Staff were trained that the Officer's Station was not a place for staff to congregate and they were expected to stay on the range, to deter wrong-doing and to identify and respond to emergencies quickly.[95] Despite this, there was nothing in policy prohibiting multiple staff from

---

[91] Neal Dep at 138:18–139:09.
[92] Neal Dep at 232:04–08.
[93] Crockett Dep at 91:23-93:10, 97:8-99:11,103:9-21; Walton Dep at 116:14-117:10, 120:11-20, 162:13-164:2; STATE000496-STATE000497.
[94] Walton Dep at 152:6-153:2, 162:13-163:1; STATE000496.
[95] Cross Dep at 85:24-87:16, 91:12-17, 95:1-9, Jones Dep at 46:9-49:14; Nowatzke Dep at 108:21-109:19.

25

Ex. 8

being in the Officers' Station at the same time and, according to testimony, correctional officers would come into the station to reconcile count and eat lunch.[96] In fact, records and testimony indicate that Officer Crockett and Cross would likely have been in the Officers' Station for about 30 minutes when the fire alarm went off.

The Officers' Station is a cage-like structure on the perimeter of the Cellhouse. The walls are of mesh steel, not solid.[97] The north side of A Cellhouse is visible from the Officers' Station and sounds and smells from the Cellhouse are easily discernable inside the Officers' Station. Prisoners housed on the north side of the Cellhouse have furnished affidavits saying that, after the fire in Mr. Smith's cell started, Smith and other prisoners began shouting that there was a fire on the 200 range. These shouts began well before the fire alarm was triggered. The four officers in the Officers' Station must have heard the shouts, according to prisoner James Jones, whose cell gave him a view of the Officers' Station, but the officers did not react.[98] I also reviewed the video and report provided by Jeremy Bauer, another expert retained by Plaintiff in this case, which showed the speed with which smoke filled the north side of A Cellhouse; given the smoke and based on my experience, the officers must have been aware that there was a fire or at least a serious and urgent problem occurring in the cellhouse.

All of the officers in the Officers' Station at the time of the fire have testified that they did not observe the fire on the live feed monitor at that location.[99] CO Crockett testified that he believed the monitor was not functioning that morning, and that staff knew it had not been working for some time.[100] My review of the video from the surveillance camera in front of Mr.

---

[96] Jones Dep at 51:15-52:20, 59:23-60:9; Nowatzke Dep at 110:11-19; Walton Dep at 31:19-32:24, 118:4-119:4
[97] Crockett Dep at 104:9-105:8.
[98] Plaintiff 002490-Plaintiff 002502.
[99] Walton Dep at 120:11-121:6; Smith Dep at 162:8-163:23; Cross Dep at 94:13-95:9.
[100] Crockett Dep at 93:11–95:12; Walton Dep at 36:22-37:24.

26

Ex. 8

Smith's cell revealed that, had someone been monitoring the live feed, the early stages of the fire would have been clearly visible. CO Crockett testified that it was the sergeant's responsibility to watch the video monitor, had it been working.[101] At the very least, it was the responsibility of the ranking officer in Cellhouse A to ensure that someone was always observing the monitor, particularly when no staff were on the range.

COs Crockett and Cross testified they were first alerted to the fire after smoke from the fire had traveled upward and triggered the fire alarm via the smoke detector at the top of the fifth tier.[102] Lt. Smith and Sgt. Walton made similar statements.[103] Sgt. Walton testified that, when the fire alarm sounded, the fire was visible from where the staff were present in the Officers' Station, and that when they turned to look after the alarm sounded, they could see the fire without leaving the Officers' Station.[104] CO Crockett acknowledged that, after the alarm was triggered, he heard the prisoners yelling "200" to indicate that the fire was on the second tier.

COs Crockett and Cross left the Officers' Station, Crockett with the keys to the Tier 2 range. CO Cross followed behind him carrying the water fire extinguisher rather than the ABC extinguisher. CO Crockett did not realize that CO Cross had the wrong extinguisher until they reached the location of the fire at Mr. Smith's cell front. The water extinguisher was ineffective against the fire, which had progressed to a raging fire, with flames and smoke pouring from Mr. Smith's cell. After an unsuccessful attempt to extinguish the fire, COs Crockett and Cross both departed to retrieve the proper extinguisher. When they returned the blaze had increased even more. While this was going on, Lt. Smith went down the flag with a fire extinguisher and looked up at the fire but did not use the extinguisher; eventually she brought the extinguisher to COs

[101] Crockett Dep at 96:8-16; Smith Dep at 139:15-21.
[102] Crockett Dep at 111:7-112:13, Cross Dep at 131:13-22.
[103] Smith Dep at 164:17-167:18; Walton Dep at 103:1-105:13, 120:7-121:6
[104] Walton Dep at 120:25-121:22.

27

Ex. 8

Cross and Crocket. Sgt. Walton went to the front door of the cellhouse to unlock the door so that additional staff and firefighters could enter.[105]

Although CO Crockett had the keys to the second tier, neither he nor CO Cross brought the bolt cutters, something CO Crockett said he had not been instructed to do as part of his first response training and that he hadn't considered doing at the time.[106] Nor did CO Crockett check to see if the locking bar was rolled or unrolled before he and CO Cross initially went to the cell.[107] Thus, even if the fire had not progressed to raging, and even if COs Crockett and Cross had brought the proper fire suppression equipment, they were not prepared to release Mr. Smith from his cell.

Eventually, with the aid of the ABC extinguisher and assistance from other staff, the fire was taken down sufficiently that Mr. Smith could be removed from his cell. By that time, most of his body had been badly burned and was no longer alive.

CO Crockett conceded in his deposition that not bringing both extinguishes to the fire was a failure.[108] He claimed that he did not see or smell the fire from the Officers' Station, but he agreed that if he or another staffer had been on the range at that time, or a functioning monitor in the office, they would have noticed the fire sooner.[109] Or if someone had been stationed on the first tier in the open space "flag" they would have been able to see the fire on the second tier.[110] CO Crockett testified that if he ran the prison, and had the authority to change something, the doors would have been on a switch rather than having to roll the bar and open each cell with a key.[111]

---

[105] Walton Dep at 104:2-10; Smith Dep at 166:16-172:5.
[106] Crockett Dep at 116:23-121:5.
[107] Crockett Dep at 121:10-14.
[108] Crockett Dep at 141:2-9.
[109] Crockett Dep at 141:9-142:14.
[110] Crockett Dep at 168:9-169:6.
[111] Crockett Dep at 162:14-163:13.

28

Ex. 8

In contrast, CO Cross testified that he made no mistakes in his response to the fire but instead handled it perfectly.[112] No one told him he made any mistakes.[113] He acknowledged that if they had noticed the fire "a couple of seconds earlier" they would have responded sooner, but did not see the problem with everyone being off the range to bring in their count sheets.[114] He did not recall reviewing his initial handwritten statement about the incident with anyone. Nor did he recall anyone giving him guidance as to how he could improve his response in the future.[115] Walton testified that she thanked Cross and Crockett for doing an excellent job, and that she could not have asked for anything better.[116] In June 2024, CO Cross became a sergeant and was put in charge of Cellhouse A.[117]

Sgt. Walton testified that she was told by her superiors that everyone did an "excellent job" responding to the fire, and that no one talked to her about what could have been done differently or better in the future. Lt. Smith testified similarly that no one ever talked to her about what could have been done differently or better in response to the fire. Lt. Jones likewise testified that she was not involved in any constructive discussions about the fire response and what could have been done better.[118]

## 2. Administrative review of the response

Two days after Mr. Smith died, before the investigation into the fire was complete, Warden Ron Neal sent a complimentary email to staff, thanking everyone for performing exceptionally well, on response time, knocking down the fire, removing Mr. Smith's body,

---

[112] Cross Dep at 25:09–10.
[113] Cross Dep at 23:14-25:17; 143:14-144:1.
[114] Cross Dep at 137:24-138:16.
[115] Cross Dep at 76:10-77:12.
[116] Walton Dep at 112:6-22.
[117] Cross Dep at 32:2-12.
[118] Walton Dep at 111:9-24, 113:5-8. Smith Dep at 179:6-22, 185:5-9; Jones Dep at 249:24-250:22.

29

Ex. 8

evacuating the cellblock, and providing medical treatment.[119] Warden Neal could have acknowledged the event and the stress it caused staff and prisoners without commenting on the quality of their response. Premature and misplaced praise undermines the investigative process and sets a bad example. The warden should have prepared staff to review the incident critically, identify issues, and make improvements.

The ISP Critical Incident Debriefing that took place on February 21, 2023, five weeks after the fire, was also disingenuous.[120] The debriefing report made no mention of the failures of vigilance, the possibly inoperable monitor in the Officers' Station, the failure to bring proper equipment to the fire, and the unnecessary loss of life. Instead, the report found that staff actions had been "within the scope of policy and procedures" and that "[a]ppropriate decisions were made by Shift Supervisors, Sergeants and Officers involved."[121] The report also noted that excess property and damaged outlets were factors that could lead to similar incidents.[122] It recommended that both types of fire extinguishers be installed on each tier, excess property and homemade electrical items be confiscated, more staff training occur on use of fire extinguishers, staff call the correct signal for the fire department right away, and staff inspect outlets.[123]

Warden Neal did not attend the debriefing. As alarming, many of the staff members who were involved in the response to the fire also were not involved in the debriefing including, importantly Cross, Crockett, Smith and Walton. I&I conducted cursory interviews with staff

---

[119] Exhibit 21 to Neal Dep, STATE035210.
[120] STATE000104-STATE000105
[121] STATE000104(1) and (7).
[122] STATE000104-5(8)
[123] STATE000104-5(10).

Ex. 8

members about the fire, but it appears that neither the warden nor any other administrators had any other constructive conversations with involved staff about the fire and fire response.[124]

At his deposition, Warden Neal testified that he did not take any corrective action against any of the staff on duty in A Cellhouse at the time of the Smith fire.[125] He admitted he has not made any changes to policies to ensure staff monitoring of video surveillance or presence on the range at all times.[126] Warden Neal testified that another death from a fire in a cell could happen again at any time.[127] Staff testified that they did not recall any changes in policy or training related to fire safety and fire response following the death of Mr. Smith. According to staff testimony, the only thing that was done in response to the fire was that some excess prisoner property was confiscated. Based on my tour of the facility, this crackdown on excess property was temporary and is no longer enforced.[128]

## VI.    Accreditation

As background, the American Correctional Association is a membership association for people who work in corrections and the vendors who sell them corrections-related products and services. In addition to hosting two annual conferences, ACA develops what is now called performance standards and expected practices for correctional facilities and promotes an accreditation process. Agencies that elect to become ACA accredited pay to receive technical assistance, checklists and an audit readiness evaluation which will help the facility know when to schedule their audit. The ACA hires correctional practitioners and retired correctional practitioners to perform the on-site audits which are typically scheduled two to three months in

---

[124] I&I videos of interviews (STATE023571-74, STATE023576, STATE026822); Smith Dep at 179:3-15; Jones Dep at 195:3-197:12;  Walton Dep at 111:9-24, 113:5-8; Smith Dep at 179:10-15; Nowatzke Dep at 80:3-81:1, 151:18-21, 185:23-186:1; Wardlow Dep at 99:12-101:12, 126:19-127:9, 156:17-157:3.
[125] Neal Dep at 226:11–17.
[126] Neal Dep at 227:24–228:21.
[127] Neal Dep at 231:16–234:07.
[128] Walton Dep at 113:9-16; Koen Dep at 118:2-16; Nowatzke Dep at 180:22-181:8; Wardlow Dep at 153:10-13.

31

advance. Once the audit is conducted the facility can apply for waivers if they are found to be deficient or contest the auditors' ratings. ACA has added outcome measures for each performance standard, data that must be at the time of their audit and in a yearly report. To be reaccredited, ACA will review this data and make a decision as to reaccreditation based on these outcome measures and the facilities' "levels of compliance with the expected practices…as part of the *totality of conditions* of the system" (emphasis theirs). The final step in the accreditation process requires the facility Superintendent or Warden to attend the ACA conference, which is where accreditation can be granted.

Although ISP is currently accredited, that does not mean that the prison meets every ACA standard. Only 10% of ACA's standards are designated as "mandatory." Moreover, ACA accreditation is a voluntary process that is based on multiple self-reported components. The ISP accreditation process was initiated with a self-evaluation, then IDOC staff conducted an internal review. Finally, ACA contractors conducted a two- or three-day planned audit with staff-provided documentation. ISP's ACA accreditation reports state that staff conducts regular fire inspections, fire drills are conducted and documented, and random-checked fire equipment appears to be in working order.[129]

In my opinion, the ACA standards set a very low bar for the industry. These performance standards/expected practices were created and modified throughout the years by the ACA Standards Committee, which is comprised of correctional administrators. Improvements made to the standards in the past decade have largely disappeared in the most recent versions. In my experience, ACA accreditation is one method to ensure that an agency has written policies and procedures that provide for the most basic measures of safe and humane operations. But, as made

---

[129] STATE008588; STATE008673; STATE008750.

32

evident by this tragic event, accreditation does not mean that these policies and procedures are being adhered to by staff or applied appropriately.

### VII.   Opinions

From my review of the case materials and based on my lifetime of experience in the field of corrections, I hold the following opinions to a reasonable degree of professional certainty:

1. **The training provided for corrections staff in fire prevention and response at ISP was grossly inadequate. That lack of training contributed to the inadequate staff response to the fire in Mr. Smith's cell on January 14, 2023.**

It appears that the only training corrections staff received on fire response was required participation in periodic fire drills. Fire drills are useful, but they are not sufficient to prepare staff to address a fire within a prison housing unit. By policy, corrections staff were expected to fight fires within the living units. Significant delays in the arrival of the prisoner firefighters to the scene of a fire were inevitable. In these circumstances, correctional staff needed training in what to expect at the scene of a fire; the equipment to be brought to the scene of a fire; and hands-on practice using fire extinguishers and other equipment. They needed to understand that rapid response is critical, with just seconds making the difference between a fire that is safely and swiftly extinguished versus one that results in significant property damage, serious physical injury, or loss of life. The facility needs to place immediate emphasis on drills. This should include tabletops, functional and full-scale exercises and additional topics generated by the exercises.

In addition, training should be provided on the requirements of the Fire Plan in the Emergency Manual. This training did not occur, a deficit that was reflected in the inept staff response to the fire that killed Michael Smith on January 14, 2023.

33

Ex. 8

Going forward, the Devine fire in 2017 and the Smith fire in 2023 should be used as case-studies in staff training.

**2. The administration of ISP does not have an appropriate plan in place to ensure that trained firefighters can respond to the scene of a fire without delay**

If ISP relies on prisoner firefighters to serve as the trained, first responders to fires within the living units and elsewhere on the prison grounds, procedures must be in place so that those firefighters can respond to fire scenes with the minimum of delay. Prisoner firefighters should be assigned to a single living unit and their equipment should be readily available to them in that unit. Without this logistical practicality, as was the case in the Smith fire, the firefighters lose critical time in responding to the scene of a fire.

**3. Excess property in cells at ISP is a pervasive problem caused by staff's failure to enforce the rules on property in cells and supervisors' failure to demand accountability from staff for enforcement of these rules.**

Staff at all levels at ISP should be aware that fire is a pervasive risk within the institution. With this in mind, staff should understand that there must be strict enforcement of the rules (a) prohibiting screens or curtains at the front of cells; (b) prohibiting homemade power splitters and other excess electronics within cells; and (c) limiting personal property within cells. When a prisoner is out of compliance, he should be warned and the excess property removed immediately. The prisoner should receive a minor infraction report if the violation persists. Supervisors should provide oversight to ensure that staff properly enforce policy. Staff, including supervisors, must be fair, firm, and consistent. They must understand and help prisoners understand that the enforcement of the rules keeps those who live in the prison and those who

34

Ex. 8

work there safe. Mr. Smith's death is an example of how failure to hold prisoners and staff accountable to policy can lead to tragic incidents that could easily have been prevented.

4. **Prisoners should not be permitted to have personal locks on their cells. Particularly in Cellhouse A, the procedure to unlock each cell door is cumbersome and time-consuming. This problem should not be exacerbated by allowing prisoners to add an additional lock to their cells.**

Current policy is to allow prisoners in Cellhouse A and other old living units to modify the locking system on their cell doors by adding a personal combination lock. In the event of an emergency, these locks create an unnecessary delay in removing a prisoner from their cell. Allowing these locks on the cells is unnecessary and dangerous. The practice should be eliminated.

5. **ISP staff fail to monitor the prisoners in the old cellhouses with poor to non-existent sightlines into the individual cells and supervisors and administrators fail to establish procedures to maximize monitoring and to underscore its importance.**

As this report explains, the configuration of Cellhouse A (and other, similarly antiquated living units at ISP) presents challenges for monitoring the prisoners in the individual cells. Sightlines into most cells are limited or non-existent, in contrast to modern prison design. When there is a health, safety or security emergency within a cell, it must be possible to swiftly and efficiently remove the affected prisoner from the cell. This cannot happen without vigilant monitoring of each prisoner.

35

Ex. 8

In Cellhouse A, and similarly designed units, staff must be assigned to circulate on the range at all times. It is unacceptable for staff to congregate in one area, such as the Officers' Station. This is especially egregious when the unit is short-staffed.

In addition to officers on the range, the live video cameras and video monitoring devices must be functional and monitored at all times. This, too, is especially critical when the unit is understaffed.

ISP supervisors and administrators failed to ensure that Cellhouse A was adequately monitored. Staff were not properly deployed on the range at all times and the security camera monitoring equipment was either not being monitored or could not be monitored because it was broken. Both of these factors created greater potential for harm, especially in a unit of this design. ISP supervisors and administrators failed to take reasonable and appropriate steps to mitigate these factors and, in doing so, created an unacceptable level of risk that endangered staff and prisoners and ultimately cost Mr. Smith his life.

6. **With no other system in place (such as call buttons) to enable prisoners to summon staff to their cells when there is an emergency, staff must be alert to shouts, yells or screams from prisoners informing staff that help is needed at a particular cell.**

Prisoners at ISP had developed a system of shouting down the range to alert corrections staff to the existence and nature of an emergency and the location where a staff response is needed. With poor to non-existent sightlines and with no call buttons in the cells, this is the only and essential means to provide an alert to staff. There is a corresponding need for staff to be alert to prisoners' cries for assistance and knowing this, staff should have been quicker to recognize and respond to the prisoners' cries for assistance.

36

Ex. 8

7. **The staff and supervisors on duty in Cellhouse A on January 14, 2023, the day of the fire in Michael Smith's cell, failed in multiple ways to respond appropriately.**

The response to the fire in Michael Smith's cell on January 14, 2023 was unacceptable in multiple ways.

Staff in Cellhouse A on this date all were congregating in the Officers' Station in a corner of the cellhouse and were not covering the range. At least two of the three assigned staff should have been on the range.

Supervisory staff in Cellhouse A did not ensure that live feed from the security cameras in the living unit was being monitored at all times. If the monitoring equipment was broken, this problem should have been reported immediately and their practices in the unit should have been adjusted to mitigate the lack of camera feed until the equipment was repaired.

Staff in Cellhouse A ignored prisoners' cries for help, which specifically informed them that a fire had started on the 200 range.

When staff belatedly responded to the fire, they did not bring proper fire suppression equipment to the fire and did not ensure that they would be in a position to unlock the affected cell or cells.

8. **Administrative and supervisory staff at ISP display an inability to learn from experience and a corresponding inability to inculcate a culture of vigilance that does not tolerate avoidable risks to prisoners' safety.**

The death of Joshua Devine in 2017 should have prompted reforms that would have prevented the death of Michael Smith a few years later.

Mr. Devine's death was avoidable. It occurred because staff were not properly trained, were not appropriately vigilant, failed to remain on the range, failed to monitor live feed security

37

Ex. 8

video, failed to respond to prisoners' cries for help, and responded to an in-cell fire without the proper equipment to unlock Mr. Devine's cell and to fight the fire. This should have been a wake-up call to ISP supervisors and administrators that more and additional training was necessary and that procedures needed to be developed and refined to ensure that similar failures did not occur in the future.

Instead of responding with concern, with enhanced training, and with improved procedures for emergency fire readiness and response, administrators' review of the incident failed to identify and correct the problems. Had there been an adequate review of the 2017 fire and a comprehensive corresponding response to remediate the points of failure that would have been identified in an adequate review, Mr. Smith would probably be alive today.

Unfortunately, the pattern has repeated in the aftermath of the Smith fire. Rather than identifying the same recurring problems and failures, administrators have determined, in effect, that nothing can be changed and there is nothing to be learned from Mr. Smith's avoidable death. Warden Neal asserted in his deposition that another death is all but certain to occur in the future.[130] Given the absence of necessary and achievable reforms and the continued inaction to ensure that staff and supervisors comply with policy, this is sadly, and likely, true. The reports and debriefing documents that I have reviewed do not reflect an interest in improving the facility's performance related to fires or other emergency incidents.

Thank you for the opportunity to review this case. I reserve the right to review and opine on additional material relevant to this case, including, but not limited to, documents produced subsequent to the filing of this report and any later-filed expert reports. In any subsequent trial

---

[130] Neal Dep at 232:04–08.

Ex. 8

testimony by me in this action, I may use as exhibits materials or documents that refer or relate to the matters discussed in this Report.

Respectfully submitted,

Dan Pacholke

Ex. 8