# In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*DANIEL MILNE*
*September 30, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary \* Merrillville \* Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-30-20 DANIEL MILNE.txt
**Min-U-Script® with Word Index**

Plaintiff 001002
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DANIEL MILNE
September 30, 2020

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the      )
ESTATE OF JOSHUA DEVINE,   )
                           )
         Plaintiff,        )
                           )
vs.                        ) Cause No.
                           ) 3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,         )
                           )
         Defendants.       )
_____)

The Videoconference Deposition of DANIEL MILNE

Date:    Wednesday, September 30, 2020

Time:    11:22 o'clock a.m.

Place:   Via Zoom

Called as a witness, by the Plaintiff, in accordance with the Federal Rules of Civil Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

Page 2

APPEARANCES:

SAM HEPPELL, ESQ.
        Loevy & Joevy
        311 North Aberdeen Street
        Chicago, Illinois  60607
        PHONE:  (312) 243-5900
        FAX:    (312) 243-5902
        sam@loevy.com

On Behalf of the Plaintiff;

GUSTAVO JIMENEZ, ESQ.
        Office of the Attorney General
        Deputy Attorney General
        Civil Litigation
        302 West Washington Street
        IGCS Fifth Floor
        Indianapolis, Indiana  46204
        PHONE:  (317) 232-6201
        FAX:    (317) 232-7979
        gustavo.jimenez@atg.in.gov

On Behalf of the Defendants.

Page 3

THE VIDEOCONFERENCE DEPOSITION OF DANIEL MILNE

DIRECT EXAMINATION
  By Mr. Heppell........................ Page  4
CROSS EXAMINATION
  By Mr. Jimenez........................ Page 43
REDIRECT EXAMINATION
  By Mr. Heppell........................ Page 55

        E X H I B I T S

PLAINTIFF'S        MARKED      IDENTIFIED

Exhibit No. 1        38            38

          *   *   *

Page 4

MR. HEPPELL: We can go on the record.  Mr. Milne, do you prefer to keep the mask on during the deposition or --

MR. MILNE: I can take it off if you want me to.

MR. HEPPELL: If you feel comfortable doing that, I think you're adequately socially distancing and --

MR. MILNE: We're okay.

MR. HEPPELL: Okay, great.  I appreciate that.  Beth, would you go ahead and swear in the witness.

DANIEL MILNE, called as a witness, by the Plaintiff, having first been duly sworn, was examined and testified as follows:

THE WITNESS: Yes, I do.

DIRECT EXAMINATION
BY MR. HEPPELL:

Q    Mr. Milne, thank you for being with us today and taking time to give testimony at the deposition.  My name is Sam Heppell.  I am one of the attorneys that represents the plaintiff in this case.  The plaintiff is Denise Dwyer, but she's the plaintiff in the capacity as a

Plaintiff 001003
Ex. 22

DENISE DWYER, et al. v. Cause No. 3:18-cv-00995-JD-MGG DANIEL MILNE
RON NEAL, et al. September 30, 2020
USDC IN/ND case 3:18-cv-00995-JD document 212-26 filed 05/25/21 page 4 of 26

Page 5

representative of the estate of Joshua Devine.
My understanding of what you can see is you can just see me right now, but I can tell you also on the Zoom call here is the court reporter named Beth and then also an attorney who's representing the defendants in this lawsuit, Gustavo Jimenez from the Indiana Attorney General's office. Okay?

A Okay.

Q Before we jump in and get started, I want to go over some background rules or sort of an explanation for how things are going to go today. And so first of all -- well, first of all, can you state and spell your full name for the record?

A Okay. Daniel, D-A-N-I-E-L; David, D-A-V-I-D; Milne, M-I-L-N-E.

Q Thank you, Mr. Milne.

A You're welcome.

Q As you know, the court reporter just swore you in at the start of the deposition, and so your testimony here is under oath, the same way as it would be if you were in a courtroom in front of a judge and jury. And all that means is that we're just asking for you to give your

Page 6

truthful testimony to the best of your memory and to the best of your ability. That's all we expect of you here today. Okay?

A That's what you'll get.

Q Perfect. And it's significantly less formal than it would be in a courtroom, but again, like in a courtroom there is a court reporter who is making a written record of your testimony, both my questions and your answers. Okay?

A Yes.

Q And because of that, it's important that I ask my questions using words without relying on gestures and sounds, and the same thing for your answers, to use words. Things like head nods and uh-huh, huh-uh are very easy for me to understand on the video, but make it very difficult for the court reporter to make a clean record. Okay?

A I'll do my best.

Q I appreciate it. And if you catch me drifting on that, you'll let me know and, likewise, I may let you know as well.

A Okay. All righty.

Q And similarly, it's kind of an unnatural way,

Page 7

because when humans are in a conversation, naturally they talk over each other, but to make a clear record, it's important for you to let me get my question out all the way to the question mark before you jump in with your answer. Okay?

A Yes.

Q And again, if we need to catch each other and correct each other just to make sure there's a clear record, we'll do that. Okay?

A Okay.

Q And along those same lines, there may be some objections that get made by the other attorney on the call. Because there's not a judge here to rule on the objections, those are just being made for the record. Okay?

A Okay.

Q So it's important that if you hear the attorney making an objection, you need to hold up on your answer, let him get the objection out for the record so we're not talking over each other. But once he's done with the objection, you can go ahead and give your answer, give your testimony. There's no one here to rule on those, so you don't need to

Page 8

wait to answer. Okay?

A Okay.

Q If at any point in time you need to take a break, that's no problem. It's not going to be super long here today, I wouldn't anticipate, but if you want to take a few minute break, it's not an issue. And same for the attorneys, we may ask for a short break just to review our notes and make sure we're covering everything. So just let us know if you want and we can go off the record and take a break. Okay?

A Okay.

Q The only thing I would ask around that is if I've asked a question, that you give your full and complete answer to that question, put that on the record before we go off the record and take a break. Okay?

A All right.

Q With that sort of background about the procedure we're going to follow here today, do you have any questions or clarifications you need about what we're here to do today or how we're going to proceed?

A No.

Plaintiff 001004
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DANIEL MILNE
September 30, 2020

| Page 9 | Page 11 |
|---|---|

**Page 9**

Q  Okay.  Is there anything you can think of that would impede your ability to give truthful and accurate testimony to the best of your ability?

A  No.

Q  Okay.  Mr. Milne, do you currently serve on the prisoner firefighter squad at Indiana State Prison?

A  Yes.

Q  And how long have you served on the -- served as a firefighter at the prison?

A  I'd say, off and on, since '98 to 2000, somewhere in there, off and on since then.

Q  Okay.  And what's the most recent time that you've joined up again on the prisoner firefighter squad?

A  I'd say probably within the last year.

Q  Okay.  And the subject matter of the lawsuit that your deposition is being taken today relates to a fire that took place at Indiana State Prison in B-cell house on April 7, 2017, which resulted in the death of a prisoner named Joshua Devine.  Are you familiar with the fire that I'm referring to?

A  Yes.

**Page 11**

A  Yes.

Q  And after they rolled the bars what did you do next?

A  Well, I would get dressed and run down to the front door.

Q  Do you recall what time it was when that announcement came in over the intercom?

A  I'm going to say, to the best of my knowledge, it was around anywhere from 9:30, 9:40 maybe.

Q  Okay.  In that range is the best of your memory when you first learned about the fire?

A  Yes.

Q  Okay.  And what happened after you -- well, strike that.
   Were you housed in a cell at the time or was that like an open dormitory style?

A  It was a cell.

Q  And when you left your cell, where did you go after that?

A  Down to the front door, the exit -- well, leaving the cell house trying to get out the front door.

Q  Okay.  Were there any problems or issues that night getting out the front door of I-cell house?

| Page 10 | Page 12 |
|---|---|

**Page 10**

Q  Okay.  And at the time of that fire did you hold a leadership capacity in the prisoner firefighter department?

A  Yes, I was the fire chief.

Q  Okay.  And how long had you served as the fire chief prior to April of 2017?

A  From 2013 to 2018, maybe.

Q  Okay.

A  '19, somewhere in there.

Q  So you've been fire chief for approximately four years prior to the April '17 fire and then for a --

A  Yes.

Q  -- couple years since then?

A  Yes.

Q  Okay.  Where were you housed on April 7, 2017?

A  I-cell house.

Q  And how did you first learn that there was a fire in B-cell house that you needed to respond to that night?

A  When they rolled the bar where I live and announced that there was 10-70, 10-71 in B-cell house.

Q  Okay.  Was that something you heard over the intercom?

**Page 12**

A  Yeah, they weren't letting us out until they had found out whether or not we were supposed to get out.

Q  Okay.  And when you say "they", who are you referring to?

A  Whoever the officer in charge was that evening.

Q  Is that an issue that had -- that you had encountered previously in terms of being held up responding to a 10-70 or 10-71 call with a delay getting out the front door of the cell house?

A  Yes.

Q  How frequently did that occur?

A  It was the luck of the draw.  It depended on whether or not there was anybody knowledgeable at the front door that knew that we were supposed to have gotten out.

Q  Okay.  Sorry, I didn't mean to interrupt you.

A  That's okay.  Let's say if there's somebody that's been here for a few years knew exactly that they're supposed to let us go.  If it was somebody brand-new, they'd always have to check on that because they weren't sure themselves.

Plaintiff 001005
Ex. 22

DENISE DWYER, et al. v.                    Cause No. 3:18-cv-00995-JD-MGG                    DANIEL MILNE
RON NEAL, et al.                                                                                                      September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-26 filed 05/25/21 page 6 of 26

Page 13

Q    Okay.  So if I understand you correctly, it was sort of inconsistent depending on who the officer was that was staffing the front of the cell house?

A    Correct.

Q    And based on your experience, the newer officers tended to not know to release you and needed additional time?  Was that your experience?

A    Not all of them, but some of them, yes.

Q    Okay.  As chief of the firefighter squad, did you have a point of contact on the prison staff, someone who you could report issues to or bring problems to their attention?

A    Yes, Steve Griffin.  He was the safety manager at the time.

Q    And as safety manager did he have sort of supervisory responsibilities over the firefighter squad?

A    Yes.

Q    And had you worked with Mr. Griffin as fire chief for a number of years prior to April of 2017?

A    No.  Steve had just been put on there after the prior safety manager got another job at

Page 14

the prison.

Q    The issue that you just testified to regarding delays being released from the cell houses, is that an issue that you had brought to Mr. Griffin's attention?

A    Yes.

Q    Okay.  How frequently would you have conversations with Mr. Griffin?

A    It varied.  The only times when it came to discussing that, it would have to do with -- let's say, for instance, there was a fire the night before.  I'd mention, hey, look, this happened, this happened.  Whenever he got my reports, he'd look at them and say what happened with this and that.  Frequency, I would -- a couple times every few weeks, I don't know, once a week.  It varied.

Q    Fair to say it was sort of an open, ongoing line of communication you had with him if there were --

A    Correct.

Q    -- if there were --

A    Sorry.

Q    No, I apologize.  Your answers are far more important than my questions.

Page 15

A    Okay.  All right.

Q    And so was it your practice as fire chief to keep that open line of communication and any issues that came up to keep Mr. Griffin apprised of what your experience was as a firefighter?

A    Yes.

Q    And as fire chief would you also have occasion to report things that you learned from members of your squad, that you could report those up to him?

A    Yes.  Once in a while, yes.

Q    Okay.  You were testifying earlier about the specific experience of being activated on the night of April 7, 2017, and you had described the experience of some delay being released from I-cell house.
        Do you recall approximately how many minutes you were delayed for at the front door of the cell house before you were allowed to be released?

A    I'm going to guess -- no, I'm not going to guess.  Anywhere from three to five minutes, maybe.

Q    And I appreciate your clarification in stating

Page 16

that.  I don't want you to guess, but I do want you to feel free to offer an estimate or a range, like you just did, to the best of your memory.

A    Yes.

Q    And so I appreciate your being clear with us about that.  Setting aside any issues like that one, where there were delays or hang-ups getting released from the cell house, when things are running smoothly and there aren't any hold-ups like that, how long would it take prisoner firefighters to arrive at a fire in B-cell house from the time that they were activated to the time that they would be sort of at the cell house ready to go?

A    With no problems, the officer being at the checkpoint to open the door, it would take us less than a minute to get there, and anywhere from one to two and a half minutes to get dressed and get over to where we got to get to, and to set up, anywhere from three to six minutes, something like that, three to eight minutes, maybe.

Q    Okay.  And just so I can break down those different steps that you just described, when

Plaintiff 001006
Ex. 22

USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 7 of 26

Page 17

you say -- I think you said to get there would be around a minute or less than a minute. Did I understand you correctly?

A   Yeah, because most of us lived in I-cell house. There would been a few, a couple in shelters, but most of us would have gotten there within a minute. As soon as they open the door, it's a straight run.

Q   And just so the record is clear and to make sure I'm understanding, when you say "there" are you referring to the fire house?

A   Yes.

Q   Okay. And then if I understood the next step in your testimony, you had described sort of a minute and a half to two minutes to gather your equipment, put on the protective fire equipment, and get over to B-cell house; is that correct?

A   About a minute, minute and a half, two minutes to get dressed. Then about anywhere from three to six minutes to get over there and set up. That's including the setup.

Q   Sure. And when you say setup, can you explain what you're referring to?

A   Getting extinguishers and taking care of the

Page 18

fire, discussing with staff on what the process should be or ask them what they think it should be. You know, anything you would do to go to a fire where you get all your guys together and -- a plan of attack.

Q   Okay. And fair to say that there might be some folks on the squad who would take longer to set up if they were having to set up hoses or do something --

A   Yes.

Q   -- more complicated?

A   Yes.

Q   And then there might be some folks who could sort of go pretty quickly, you know, up to the cell front to assess the situation? Is that fair to say?

A   Yes.

Q   Okay. And was that the procedure that the firefighter squad followed, sort of dividing up responsibilities like that, so some people could be moving more rapidly and other people would be preparing equipment as needed?

A   When we came out of I-cell house, me and another fireman grabbed a few extinguishers and ran over to the shelter, B-cell house. We

Page 19

got in there -- actually, we didn't grab any -- let me change that. We didn't grab any extinguishers. We ran to the shelter where there are extinguishers, and when we got in there, we didn't make it up to two or 300 range. We couldn't go any further without our breathing stuff, our SCVA, and stuff. So we came back down and talked to the other guys and told them what they had to do.

Q   Was that the standard protocol --

A   Yes.

Q   -- to respond in that way?

A   Yes. I have to go to -- when I was chief, and it still goes this day, where you have to -- the chief goes to the situation and assesses what's going on.

Q   Okay. And I'm not -- you know, I don't want to put words in your mouth, but from what I understand you to be describing, it sounds like the objective as chief is to get to the scene as quickly as possible and then you have other members of the crew that are sort of taking a little longer to prepare the equipment they may need. Is that fair to say?

A   Yes.

Page 20

Q   Okay. And is that protocol designed that way because, you know, a fire is a time sensitive emergency and there may be value in having someone get there as quickly as possible, even if they don't have all of their equipment prepared?

A   Yes.

Q   Okay. And you, when you arrived at B-cell house -- well, strike that.
    Were you able to observe anything about the nature of the fire on your way to B-cell house or from outside of the building?

A   Yes. When we were running down the walk from I-cell house, we noticed in the eaves of the building that there was fire shooting out the eves.

Q   Okay. Did that surprise you or strike you as unusual?

A   Yes.

Q   Is that something you've ever experienced before as a firefighter at Indiana State Prison?

A   Once.

Q   What was that other occasion?

A   In D-cell house a guy had locked his chain in

Plaintiff 001007
Ex. 22

DENISE DWYER, et al. v.    Cause No. 3:18-cv-00995-JD-MGG    DANIEL MILNE
RON NEAL, et al.    September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 8 of 26

Page 21

his cell and he had a whole bunch of newspaper in there and you seen fire rolling off the top of the shelter where he lived.  That was the only other time I ever seen something like that.

Q   When you first entered B-cell house on April 7th of 2017, can you describe what you were able to see and sense and hear when you first entered the building?

A   Well, I heard a lot of guys yelling, and first thing I did notice is that the whole building was covered in smoke, I mean the entire area, and guys yelling and talking about where the fire was or yelling where the fire was.

Q   And were you able to hear some of the specifics of what people were yelling?

A   Not really because I was so focused on doing what I had to do.  No, I can't give you a concrete answer on whether or not I heard anything specific.

Q   Okay.  And let me just clarify my question to make sure I understand you.  As you sit here today thinking back, you know, three years in the past, three years or more, it sounds like you may not be able to remember any --

Page 22

remember any of the specifics of what people were saying.  Is that fair to say?

A   Only after they were released did I hear anything what they were saying, you know, when I was talking to them.  When I was going in there, I didn't hear a bunch of stuff except maybe -- just the yelling, that's all I heard. I didn't hear anything specifically.

Q   And were you able to -- it sounded like you were focused on responding to the situation and not --

A   Yeah.

Q   -- focused specifically on trying to hear what people were saying.

A   Yes.

Q   Could you make out, you know, that there were like individual voices from the group, even if as you sit here today you can't recall specifics of what they were saying?

A   Yeah, I can't recall specifics, no.  Only after, when they started releasing guys out of the shelter, did I get a lot of the information that I got.

Q   Understood.  And you testified that you also perceived smoke; is that correct?

Page 23

A   Yes.

Q   And that was even on the 100 level immediately upon entering the cell house there was smoke present?

A   Yes.

Q   Okay.  In your experience as a firefighter and understanding that you were later able to learn that the fire was up on the 500 range, do you have any sense of how long it would have taken for that smoke to work its way down from, you know, the 500 range to be perceivable on the 100 range immediately upon entering the cell house?

A   I would say, Sam, that I'm not -- I'm a fireman.  I've been certified to do the job, and I have been in a bunch of fires in here, but the smoke that was in that building I've seen in D-cell house, but in D-cell house there was multiple fires.  It wasn't just the one.  So the only information I got about how long that could have been was given to me after I got in the building.  I couldn't give you a professional opinion on it, but I knew it was longer than ten minutes.

Q   And fair to say that the smoke got more

Page 24

concentrated and thicker the closer up to the 500 range that you got?

A   Yes, but I only got up to 300.  The other firemen that were in gear got up higher.

Q   Okay.  And was that basically as soon as you entered the cell house or shortly after you entered the cell house you started working your way up to try to get up to the 500 range?

A   Yes, me and one other fireman, yes.

Q   And at that time, if I understand you correctly, you didn't have any of your breathing gear because your goal had been get to the scene as quickly as possible; correct?

A   Yes.  Yes.

Q   And if I understand the testimony you're giving, you were only able to get up to the 300 range before the smoke became so thick that you weren't able to proceed further without the aid of breathing equipment?

A   Yes.

Q   Can you describe -- and, you know, I'm not a firefighter.  I'm not a professional.  Can you describe what that was like, the smoke that you ran into on the 300 range that you couldn't go further?

Plaintiff 001008
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DANIEL MILNE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 9 of 26

Page 25

A   My eyes started burning. I couldn't breathe, you know, everything you think would happen if you were stuck in a fire or stuck in a smoke-filled room.

Q   During your time in B-cell house responding to the fire on April 7, 2017, did you have any opportunity to observe any of the officers who were on duty in B-cell house that night?

A   All the information I got about the officers that were in there at the time when we first initially got there, that came from inmates after the fact.

Q   Okay. So did you -- did you at any point personally see any of those officers in the cell house that night?

A   Yes.

Q   Okay. And who did you see?

A   Oh, I'm not going to be good with names. There was a Latin dude, a brunette, and a skinny, younger black woman.

Q   Okay. And is it your understanding that those were the three officers who were on duty in the cell house that night?

A   Yes.

Q   Okay.

Page 26

A   It was my understanding, yes.

Q   And I'm going to -- understanding that you don't remember their names off the top of your head, does the name Justin Rodriguez sound familiar to you?

A   Rodriguez. I didn't know his first name.

Q   Is that the Hispanic male that you had been describing?

A   Yes.

Q   Okay. And then Sarah Abbassi, does that name familiar to you?

A   The brunette, yes.

Q   Okay. And Promise Blakely?

A   Didn't know her name.

Q   Okay. But the third woman in addition to Rodriguez and Abbassi was --

A   Yeah.

Q   -- a younger black female; is that correct?

A   Yeah, thinner, yeah.

Q   Okay. And where were those officers when you saw them in the cell house?

A   They were in the officer's station.

Q   And did you see them there when you first arrived in the cell house?

A   You know, I wasn't looking for them. When I

Page 27

ran in there, I was trying -- I was wanting to get up to where I had to get up to.

Q   So at what point did you observe the three officers that you just described?

A   When I came down again or maybe -- you know, that is not a hundred percent what I remember. It could have been anytime from when I came down to when I went outside and got my gear on.

Q   That would have been a few minutes after you first arrived --

A   Yeah.

Q   -- in B-cell house?

A   Yes.

Q   No more than a few minutes. Is that fair to say?

A   No more.

Q   Okay. Would it be fair to say that your movements that night were you were moving pretty quickly to get to where you needed to be? Is that fair to say?

A   Yes.

Q   Can you describe what you saw when you saw the three officers in the cell house?

A   Can you give me a little bit more on that?

Page 28

I'm not a hundred percent sure what you want from me.

Q   Sure. I think you testified to this, but can you remind me or be specific around where exactly in the cell house you observed those officers being, like what area of the cell house they were in?

A   They were in the officer's station at the front of the cell house, right by the front door.

Q   And did you have any conversation or communication with them at that time?

A   At that time, no. I was having communication with the people that were their supervisors.

Q   Were you able to observe anything about their demeanor?

A   Only afterwards I seen that they were, in my opinion, panicking because they weren't sure on what they had to do, and Ms. Abbassi -- this is after the fact, she was crying.

Q   Okay. When you say after the fact, are you referring to still that night as you were responding to the fire?

A   Yes.

Q   Just a little later on?

Plaintiff 001009
Ex. 22

Cause No. 3:18-cv-00995-JD-MGG

Page 29

A    After we had gotten there, yes.

Q    When you say that they were panicking, was that based on their behavior that you were observing?

A    That's a traumatic experience if you've never been through something like that before. Maybe the word panic was a little too hard. Maybe they were just -- I can't think of another word I can use except panic, but that's a traumatic experience, especially if you haven't seen anything like that.

Q    Fair to say, based on your perception, they did not appear to be confidently responding to the emergency in terms of taking steps that they thought should be taken?

A    Yes.

MR. JIMENEZ: Objection to the form.

BY MR. HEPPELL:

Q    You can go ahead. Just so that the answer is clear, you can answer the question.

A    Yes.

Q    You had testified that you were having -- you didn't have communications with them at that time, but you were having communications with

Page 30

some of their supervisors of other correctional officers who were in the cell house; is that correct?

A    Yes.

Q    Can you describe what those conversations were?

A    Well, I explained to them what we had to do to get up there, and everything like that. I also explained that if they didn't, in my opinion, if they didn't get fellows out of their cells, because there was so much smoke in there, there probably would have been a lot more problems.

Q    What was the response to you saying that?

A    Hesitant at first, but then they went through their chain of command and got to whoever the lead captain was that evening and decided to let the fellows out of their cells so they can get out in fresh air so they wouldn't -- you know, whatever would have happened to them, smoke inhalation.

Q    So they weren't immediately receptive, but eventually you were able to secure their agreement to that plan. Is that fair to say?

A    Yes. Me and one other man -- me and one other

Page 31

fireman explained it to them.

Q    And I think when I was asking you earlier about any interactions you had with the officers on duty in the cell house -- Abbassi, Rodriguez, and Promise Blakely, I think you said you didn't have communications with them at that time.

Was there a later point that evening when you had any direct interaction with any of those individuals?

A    Yes. It didn't have anything to do with any of them going upstairs or whatever they had to do when they were in there. Like I said, I wasn't there to see that, so I don't know. But after the fact when they were outside, I asked them if they were okay. And like I said, Ms. Abbassi was crying because she wasn't sure what was going on, or she did know what was going on, it's just how she reacted to it.

Q    Okay. Do you recall -- other than recalling Ms. Abbassi crying, do you recall any of the specifics of what she said to you?

A    No. I asked her if she was all right and she said yes.

Page 32

Q    Okay. Did you have any interactions with any of the other officers beyond what you've just described?

A    No.

Q    Okay. Was there -- as fire chief were you aware of where in the prison the different firefighters were housed?

A    Yes.

Q    Was there a firefighter housed in B-cell house that night?

A    Yes.

Q    Were you able to observe when you entered the cell house whether he had been released from his cell at that time?

A    At that time, no.

Q    Could you hear him or see him when you entered the cell house?

A    No. He may have gotten by when I went up stairs, but at that time I had not seen him yet.

Q    Okay. So he was -- he may have been released at some point while you were going up to try and get to the 500 range, but he had not been released when you entered the cell house; is that correct?

Plaintiff 001010
Ex. 22

DENISE DWYER, et al. v.                    Cause No. 3:18-cv-00995-JD-MGG                    DANIEL MILNE
RON NEAL, et al.                                                                            September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 11 of 26

Page 33

A    That I was aware of.

Q    Okay.  Is it your understanding that if there's a fire in a cell house where a prisoner firefighter is housed that that firefighter should be released by the correctional staff inside the cell house?

A    Yes.

Q    Did you later have any conversation with that individual who's housed in B-cell house about his experience that night?

A    After?

Q    After.

A    Yes.

Q    Okay.

A    He said had he been able to get out he might have been able to help a little bit.

Q    Do you recall that individual's name?

A    Danny Means.

Q    What role did the members of the prisoner firefighter squad play in terms of doing fire drills at the prison?

A    We would accompany the safety manager and we'd ring the bell, post guys on each range, make sure people got down the stairs, and time it to see how long it took.

Page 34

Q    Were there fire drills conducted on the night shift as well?

A    Yes.

Q    Were those -- were there evacuations conducted on the night shift?

A    No.

Q    Is that something that Mr. Griffin was aware of, that there weren't evacuations happening on the night shift?

A    No evacuations happened on the night shift?  Is that what you're asking?

Q    Correct.

A    He was aware of it.

Q    How successful -- well, strike that.
     Based on your experience as fire chief and as a member of the firefighter squad, how did correctional staff react to the fire drills when you and other prisoner firefighters were conducting them?

A    Again, it's something that was the luck of the draw.  Some people knew their answers to the questions.  Some people had no idea what we were talking about.

Q    So fair to say that it was inconsistent?

A    Yes.

Page 35

Q    Was there any pattern that you were able to observe in terms of whether it was newer officers that had more problems or was it just kind luck of the draw again?

A    Well, I mentioned earlier that some of the newer officers weren't -- you know, they didn't seem to know what was going on, but again, some of those newer officers new exactly what was going on.  It was like, again, luck of the draw.

Q    Sure.  And again, not for me trying to put words in your mouth, but just trying to understand what exactly your testimony is, would it be fair to say then that, generally speaking, the newer officers were more likely to be less prepared, less able to complete the fire drills, generally speaking, although some newer officers performed admirably?

A    Yes.

          MR. JIMENEZ: Object to the form and calls for speculation.

BY MR. HEPPELL:

Q    And just so the record is clear, can you give your answer to the question?

A    Yes.

Page 36

Q    Thank you.  Is that -- when there were issues like those you've just described with officer performance during fire drills, is that something you would bring to Mr. Griffin's attention?

A    Yes.

Q    Was that your consistent practice, anytime there was an issue that you would bring that to his attention?

A    I would write up a report and write in there what I had seen.

Q    What was the attitude of correctional staff towards the prisoner firefighters?

A    Well, I'd say a lot of the staff appreciated what we did, but then there was -- you know, in everything there's going to be a few that just don't think we deserve to have what we have.  A lot of people appreciate it, but again, there's always a few.

Q    And was that something that would, on occasion, cause problems or delays in terms of the firefighter squad responding to an emergency?

          MR. JIMENEZ: Objection as to form.

Min-U-Script®                    BOSS REPORTERS                    (9) Pages 33 - 36
                                 (219) 769-9090

Plaintiff 001011
Ex. 22

Page 37

BY MR. HEPPELL:

Q    You can go ahead.

A    Yes.

Q    And how would that -- how would that cause delays or problems with activating the firefighter squad?

A    Not releasing us on time, only releasing a few of us at a time.

Q    And were those issues that you brought to Mr. Griffin's attention?

A    Yes.

Q    Mr. Milne, did you create a report documenting your observations and activities on the night of the April 7, 2017 fire in B-cell house?

A    Yes.

Q    Okay. Was that your standard practice to write a report like that when there was a significant incident that you encountered during the course of your duties?

A    Yes.

Q    I'm going to pull up a copy of your report, if you'll bear with me just for one second while I pull that up. I've marked it as Exhibit 1, and hopefully you'll be able to see it on the screen.

Page 38

MR. HEPPELL: And to just identify it for the record, it's a two-page report dated April 10, 2017, Bates stamped Devine 133740 through 133741.

(Plaintiff's Exhibit No. 1 remotely marked for identification by Attorney Heppell.)

BY MR. HEPPELL:

Q    Are you able to see the document up on the screen?

A    Yes.

Q    And I've pulled it to the second page, which is sort of a half page of the report. Is that your name and signature on the report there?

A    Yeah. Very sloppy, but, yes.

Q    Well, I have poor handwriting too, so no --

A    I didn't say it was poor.

Q    Fair enough.

A    That's my handwriting, yes.

Q    Got it. Got it. I'm not going to read through every part of the report with you, but I want to draw your attention to the very last portion of the first page and going down onto the second page: That poor man sat in his cell screaming for help. The guys in BCH were

Page 39

screaming for somebody to help them get him out. They didn't release the fireman D. Means out to assist. There were a lot of things done that were right, but there was an equal amount of things done wrong.

Do you see the portion of the report that I'm referring to?

A    Yes.

Q    Now, fair to say that this contains some information that was based on by you personally, some observed, and then some information also what you had learned from some other folks after the fact?

A    Yes.

Q    Based on your personal observations and also what you were able to learn about how the response to the fire had been handled, was that your -- did that accurately represent your opinion; that there were a lot of things done right, but also a lot of things that were not done correctly?

A    Yes.

Q    And then the next sentence, continuing on in your report: The staff's inability to take fire seriously, by not getting us out in a

Page 40

timely manner is partially responsible for that man's death.

Do you see what I'm referring to?

A    Yes.

Q    The staff's inability to take fire seriously, is that referring to some of the issues that you testified to previously in terms of some staff not respecting the prisoner firefighter squad or not releasing you in a timely fashion? Is that what that refers to?

A    Yes.

Q    Then the report continues: I have heard on many occasions that we can handle it or it was count time, we can't let you out. This was bound to happen, where the ego of people who think they know more about something than us inmates bit them on the ass. They are to get us out on a 10-70 or 10-71 every time. It is better that we are ready if the situation gets too bad, not when it gets bad get us out. I have countless times asked that shift to give me the keys I need to open the tool chest or shut off alarms. In an emergency situation they always give the keys to some random person, leaving me to play find Waldo with

Plaintiff 001012
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DANIEL MILNE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 13 of 26

Page 41

them. Wasting valuable time. This is what I remember to the best my memory serves.

Q  Did I read that accurately in your report?

A  Yes.

Q  Without going back over every piece, does that accurately capture your impression, based on your experience of the inconsistencies, in how staff handled emergency situations or fire situations at Indiana State Prison?

A  Yes, but not all staff, just some of the staff.

Q  Understood. Some folks did it well and some folks did it poorly. Is that fair to say?

A  Yes.

Q  All the issues that you described in your report here and those concerns, were those concerns that you had previously brought to Mr. Griffin's attention?

A  Yes.

Q  Your report continues: The men at Fire Station 57 did everything that was asked of them and did it professionally and respectfully. I just wish that staff took our job a little more seriously. I hate that it

Page 42

took this to open eyes.

Q  Did I read that correctly?

A  You did.

Q  As far as Station 57 refers to the prisoner firefighter squad?

A  Yes.

Q  And it was your impression as chief that the firefighter response that night went well and was successful; is that correct?

A  Yes. We don't have keys. We can't get us out of anything that we can't get out of. You know, they have to open the doors.

Q  So no matter how well-equipped, well-trained, and responsive that the firefighter squad is, there's a large degree to what you're reliant on correctional staff to facilitate your ability to fight fires. Is that fair to say?

A  Yes.

MR. HEPPELL: Okay. I'm going to pull that down for now. I don't have any additional questions for you right now, Mr. Milne. I imagine Mr. Jimenez may have some questions for you and then I may have some follow-up based on what he asks, but I'll turn the deposition over to Mr. Jimenez.

Page 43

MR. JIMENEZ: All right. Is it okay if we take a quick five-minute break?

MR. HEPPELL: That's fine with me. Mr. Milne, if you wouldn't mind bearing with us. Should go we seven minutes so it's an even 20 after the hour? Does that work for everyone? Okay. If you'll bear with us, Mr. Milne, I'm going to pause the recording, we'll go off the record, and come back at 20 past.

THE WITNESS: Sounds good.

MR. HEPPELL: Thank you.

(Brief pause.)

CROSS EXAMINATION

BY MR. JIMENEZ:

Q  Good afternoon, Mr. Milne. My name is Gustavo Jimenez. I'm deputy attorney general with the Indiana Attorney General's Office. Can you hear me okay?

A  Yes.

Q  I represent the individual defendants in this case, and that includes Warden Ron Neal, Kenneth Gann, William Lessner, Christopher Beal, Steve Griffin, Jason Nowatske, Jeremy Dykstra, Anthony Watson, Timothy Redden,

Page 44

Christopher Putser, Ryan Statham, Justin Rodriguez, and Sarah Abbassi.

The same rules as Mr. Heppell explained to you at the beginning of the deposition applies to the questioning that I am going to be conducting here today. You know, same with objections. Please wait until I finish my question before answering and then we'll go from there. If you have any questions about questions I ask or need clarification, please feel free to let me know as well.

A  Okay.

Q  Mr. Milne, you testified earlier that any concerns that you had you would bring to Mr. Griffin; correct?

A  Correct.

Q  And some of those concerns included any comments about what some of the staff members would say regarding the prisoner firefighter crew; correct?

A  No, what I brought to Mr. Griffin was things that weren't done that needed to be done prior to the -- or post fire, or pre and post fire.

Q  And is that, just for clarification, is that pre and post fire in general or regarding the

Plaintiff 001013
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 14 of 26
Cause No. 3:18-cv-00995-JD-MGG
DANIEL MILNE
September 30, 2020

Page 45

specific fire from April 7, 2017?

A   In general.

Q   And what would Mr. Griffin do when you would bring those concerns to him?

A   He said that he would take them to his -- he would make a decision on some of the things, but then he would take it to ask other people, you know, people above him.

Q   And did you ever learn about what came of those concerns that you would raise to him?

A   By experience answering to other fires, I can only say that probably nothing happened from some of the stuff.

Q   But you would also -- and so outside of any concerns regarding a fire, so any other concerns that you would bring him, would you, say, for example, bring him concerns regarding staff training and their knowledge on how to respond to an emergency?

MR. HEPPELL: Objection to form. You can go ahead.

A   Can you repeat the question, please?

MR. JIMENEZ: Yes.  Could we have the court reporter repeat it for us, please.

(Question read back by reporter.)

Page 46

MR. HEPPELL: Same objection.

A   Okay.  So you're saying clarifying or talking about how they didn't release us, and things like that?  Is that where your question is going?

BY MR. JIMENEZ:

Q   No.  Let me rephrase that question.

A   Okay, please.

Q   Outside of any concerns regarding fire safety, if you brought Mr. Griffin any other concerns, would you normally hear back on how those concerns were resolved either by him or someone else at Indiana State Prison?

A   What I --

MR. HEPPELL: Object to form.  Go ahead.

A   No.

BY MR. JIMENEZ:

Q   You normally would write reports regarding any concerns; correct?

A   Yes.

Q   Would you receive any written responses to those reports?

A   No.  Steve may have, but I never did.

Q   And if -- okay.  Mr. Milne, are you familiar

Page 47

with the training that new correctional officers receive when they start their employment at the Indiana State Prison?

A   I'm not real familiar.  I know they go through some classes.  But, yeah, not -- no, not really.

Q   So you don't know the specifics of that training.

A   Well, I believe that they're taught what a 10-70 and 10-71 is.

Q   But generally, though, you don't know everything that they are taught during their training.

A   No, I do not.

Q   Are you aware of training -- any other additional training that they receive during their employment once they've had some time as a correctional officer?

A   Just experience.

Q   So are you aware of any like ongoing trainings?

A   No.

Q   Do you have any knowledge as to any training that they receive regarding handing off of the keys to different correctional officers?

Page 48

A   No.

Q   Do you have any knowledge as to any custom regarding the handing off of keys to different ranges?

A   Mr. Jimenez?

Q   Yes.

A   In my statement that I had written that the officers would give keys to everyone, I'm talking about any other firemen except for the fire chief.  It had nothing to do with handing off keys from one staff member to the other. It had to do with just giving them to any fireman at the time, not knowing to give them to the fire chief.

Q   Okay.  So just to clarify then, so when you were referring to the keys -- so I think in your report that Mr. Heppell brought during your earlier testimony, you stated -- or the report stated that they always gave the keys to some random person.  Who are you --

A   Correct.

Q   So who are you referring to by a random person?

A   Any other fireman besides the chief.

Q   Okay.  And what is your understanding of what

Plaintiff 001014
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 15 of 26
Cause No. 3:18-cv-00995-JD-MGG
DANIEL MILNE
September 30, 2020

Page 49

any sort of either written policies or procedures or customs there were regarding giving keys to either a member of the firefighter crew or to the chief?

A   Do I know of any policies?

Q   Yes.

A   No. Mr. Jimenez, on the key chain that they give to the firemen or the offender, it has the front door of the fire station and it has any of the alarm panels in the prison. That's what those keys have on them.

Q   Okay. So just then to clarify for the record, so you as a fire chief and as a member the firefighter crew, you wouldn't get keys to any of the ranges --

A   No.

Q   -- in any of the cell houses.

A   Sorry. No.

Q   Okay. Thank you for clarifying that for me. Mr. Milne, prior to today's deposition did you speak with any of plaintiff's attorneys?

A   Yes.

Q   Do you recall who you spoke with?

A   Well, initially, Mr. Heppell was the first person I spoke with, and I can't remember who

Page 50

the other person was.

Q   Did you speak with any female attorneys?

A   Yes.

Q   Does the name Sarah Grady ring a bell?

A   No, it does not.

Q   What about the name Megan Pierce?

A   Again, I don't know the name of the other attorney.

Q   Okay. But you did speak with another attorney besides Mr. Heppell?

A   Correct.

Q   Was there anything that you spoke about that you haven't testified to here today?

A   I can't remember. I'm not sure.

Q   Okay. And then with -- so you had testified you had some communications with the officers who were working in B-cell house on April 7th of 2017.

A   Yes.

Q   You testified that -- you described Ms. Abbassi as panicking. You used the word panicking, given what was going on.

A   Yeah, I'm sorry, I couldn't think of another word to use to describe it.

Q   Can you describe what either actions did you

Page 51

see or what was her demeanor that makes you use the word panic or panicking?

A   They didn't seem to know what they were doing.

Q   And do you know, Ms. Abbassi in particular, do you know the training that she received as a correctional officer?

A   No, sir, I did not.

Q   Do you know any of the training that Correctional Officer Promise Blakely received as a correctional officer?

A   No.

Q   Do you know any of the training that Justin Rodriguez received as a correctional officer?

A   No.

Q   Are you aware of any emergency plans or procedures that the staff at the Indiana State Prison has to follow when there is an emergency?

A   For evacuation, yes. Fire drills, yes.

Q   Now you also testified earlier regarding fire drills. Do you recall your testimony about that?

A   Yes.

Q   These fire drills that were conducted, some of these were conducted on the night shift; is

Page 52

that correct?

A   Yes.

Q   And you also testified that there were no evacuation drills that happened on the night shift.

A   Correct.

Q   Are you aware -- do you participate -- sorry, let me rephrase.
    Do you participate in all of the evacuations that are conducted for both the firefighter crew and the correctional officers?

A   During the day, yes, or at that time, yes.

Q   Are there -- are you aware of any fire drill training that occurs where it's only the correctional officers who are present?

A   No.

Q   Are you aware of any evacuations on the field training that is done to or conducted to correctional officers where no members of the firefighter crew are present?

A   No.

Q   Fair to say that it's possible that they receive training regarding evacuation that you're not aware of?

Plaintiff 001015
Ex. 22

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 212-26    filed 05/25/21    page 16 of 26

Cause No. 3:18-cv-00995-JD-MGG

DANIEL MILNE
September 30, 2020

Page 53

MR. HEPPELL: Object to form, foundation. You can go ahead.

A    Can you repeat the question, please?

BY MR. JIMENEZ:

Q    Yes. Is it fair to say that there are evacuation trainings that are given to correctional officers that you're not aware of?

MR. HEPPELL: Same objections.

A    Yes.

BY MR. JIMENEZ:

Q    And fair to say that there are fire drill trainings given to correctional officers that you're not aware of?

MR. HEPPELL: Same objections.

A    Yes.

BY MR. JIMENEZ:

Q    Mr. Milne, given the nature of a prison, fair to say that as a member of the firefighter crew you are dependent on the -- you're dependent on the staff at the Indiana State Prison to release you in case of an emergency?

A    Yes.

Q    Mr. Milne, did you speak with anyone from the office of investigations or intelligence

Page 54

following the fire from April 7th of 2017?

A    Not that I recall.

Q    Do you remember if you spoke with any outside law enforcement after the April 7, 2017 fire?

A    No.

Q    Did you speak with any outside fire inspector regarding the April 7, 2017 fire?

A    Yes.

Q    Who did you speak with?

A    Chip Dudley.

Q    Do you recall what the nature of your conversation was?

A    His opinion on how the fire -- how the fire started and/or finished or how long it had been going.

Q    And what did you learn from that conversation?

MR. HEPPELL: Object to form, foundation. You can go ahead.

A    In his opinion, that it was called a flashover that happened in the cell which caused the man's death. Now, the specifics on it, I don't remember him saying anything about how long the time was that it took for that to happen, but that's what I remember him mentioning to me.

Page 55

MR. JIMENEZ: I thank you, Mr. Milne. I have no further questions for you at this time.

REDIRECT EXAMINATION

BY MR. HEPPELL:

Q    Just a brief follow-up question based on the questions you were just asked by Mr. Jimenez. Mr. Milne, you were asked some questions about written communications that you would have with Mr. Griffin, that you could bring issues to his attention in writing. Is that fair to say?

A    Yes.

Q    Would you also have conversations with him that were oral conversations?

A    Yes.

Q    Okay. And so you could bring issues to his attention in that fashion also. Is that fair to say?

A    Yeah, whatever we had problems with what was going on in here, I would mention it to him.

MR. HEPPELL: Okay. I don't have anything further.

MR. JIMENEZ: And I have no further follow up.

Page 56

MR. HEPPELL: Okay. Mr. Milne, thank you very much for your time today and your testimony. There's just one other matter I need to explain to you. As I mentioned at the start of the deposition, there's a court reporter who has been making a written record of your testimony. At some point one of the attorneys may order a copy of the transcript, may ask that that transcript be formally prepared, a written transcript, and if that happens, you have two options.

You can reserve your signature, which means that at the time that someone orders the transcript, you will be provided with a copy to review and you can make -- you can note any changes or errors in the transcript. Now, you can't change your testimony, change the answer that you give, but you can note if there's been an error in the transcription, if there's, you know, a word that got missed, or something, you know, a divergence between the words you said here today and how those have been reflected on the transcript. So that's option one, you can reserve signature.

Plaintiff 001016
Ex. 22

USDC IN/ND case 3:18-cv-00995-JD    document 212-26    filed 05/25/21    page 17 of 26

---

Page 57

You can also waive your signature, which means that you're just saying, you know, I don't feel the need to review it, the court reporter can prepare the transcript and she can prepare that and have that sent out and the transcript is going to be what it's going to be. So that's your choice, your right as a witness to decide which of those two options you want to do.

THE WITNESS: You want my answer now?

MR. HEPPELL: Yes.

THE WITNESS: I would like to see it, Sam.

MR. HEPPELL: Okay. So he'll reserve signature. Again, thank you, Mr. Milne. We appreciate your willingness to come in and testify today.

THE WITNESS: Bill's in the mail, Sam.

MR. HEPPELL: Take care. Hope you enjoy the rest of your day.

THE WITNESS: You too.

MR. JIMENEZ: Thank you, everyone.

MR. HEPPELL: And thanks, Pam, for

---

Page 58

all of your help coordinating these, if you're still in the room. I think you are.

THE WITNESS: She is.

MS. JAMES: Thank you.

(Signature reserved.)

(Proceedings concluded at 12:50 p.m.)

* * *

---

Page 59

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE,  )
                         )
        Plaintiff,       )
                         )
vs.                      )    Cause No.
                         )    3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of fifty-eight (58) typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 27th day of October, 2020.

*Beth Barnette*
_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

---

Page 60

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE,  )
                         )
        Plaintiff,       )
                         )
vs.                      )    Cause No.
                         )    3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

DANIEL MILNE

I hereby acknowledge that I have read the foregoing deposition transcript regarding the above-mentioned matter, taken Wednesday, September 30, 2020, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.

_____
DANIEL MILNE

Subscribed and sworn to me this

_____ day of_____,
2020, A.D.

_____
Notary Public
State of_____
County of_____
My Commission Expires:_____

---

Plaintiff 001017
Ex. 22

DENISE DWYER, et al. v.                    Cause No. 3:18-cv-00995-JD-MGG                    DANIEL MILNE
RON NEAL, et al.                                                                          September 30, 2020
USDC IN/ND case 3:18-cv-00995-JD   document 212-26   filed 05/25/21   page 18 of 26

Page 61

DEPOSITION ERRATA SHEET

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

Page No._____ Line No._____Change to:_____
Reason for change:_____

SIGNATURE:_____DATE:_____
          DANIEL MILNE
          Date of Deposition:  September 30, 2020

Plaintiff 001018
Ex. 22