**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*LEETRAVIS GRIFFIN*
*September 22, 2020*
*Cause No. 3:18-CV-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-22-20 LEETRAVIS GRIFFIN.TXT
**Min-U-Script® with Word Index**

Plaintiff 000772
Ex. 52

DENISE DWYER, et al. v.                Cause No. 3:18-CV-00995-JD-MGG                LEETRAVIS GRIFFIN
RON NEAL, et al.                                                                September 22, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 212-22    filed 05/25/21    page 3 of 12

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the        )
ESTATE OF JOSHUA DEVINE,     )
                             )
         Plaintiff,          )
                             )
     vs.                     ) No. 3:18-CV-00995-JD-MGG
                             )
RON NEAL, et al.             )
                             )
         Defendants.         )

The Zoom videoconference deposition of LEETRAVIS GRIFFIN, called by Plaintiff Denise Dwyer for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, with the witness being located at Indiana State Prison, commencing at 12:43 p.m. on the 22nd day of September, A.D., 2020.

Page 2

APPEARANCES:

LOEVY & LOEVY
MS. SARAH GRADY (via Zoom)
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Telephone: (312) 243-5900
E-mail: sarah@loevy.com

        On behalf of the Plaintiff;

OFFICE OF THE INDIANA ATTORNEY GENERAL
MR. MICHAEL BLINN (via Zoom)
IGCS 5th Floor
Indianapolis, Indiana 46204
Telephone (317) 232-6286
E-mail: Michael.blinn@atg.in.gov

        On behalf of the Defendants.

ALSO PRESENT: Ms. Pamela James

*  *  *  *  *  *

I N D E X

WITNESSES

All Witnesses:                                  Page
LeeTravis Griffin for
  Direct Examination by Ms. Grady        3:8
  Cross-Examination by Mr. Blinn         12:3

NO EXHIBITS MARKED

Page 3

(Witness sworn.)
WHEREUPON:
        LEETRAVIS GRIFFIN,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
        DIRECT EXAMINATION
BY MS. GRADY:

Q. Hi, Mr. Griffin. Can you please state and spell your name for the record.

A. My name is LeeTravis Griffin, L E E T R A V I S, G R I F F I N.

Q. Thank you. I introduced myself before the deposition began but, again, my name is Sarah Grady. I am an attorney for Denise Dwyer, who is the administrator of the Estate of Joshua Devine. I -- your -- we've asked you to -- to sit for a deposition today to testify about what, if anything, you remember in relation to the Devine -- to the fire that killed Joshua Devine in April of 2017.

I'm going to ask you a series of questions about that, but first before we get started I want to just ask you for two -- for help on two things. The first is that we can hear a very big echo on your end whenever I'm talking or anybody else is talking, and so because of that I just ask that you wait a beat after I

Page 4

finish my question before starting your answer so that we can make sure that the court reporter can hear and get everything down accurately that you're testifying to. Okay?

A. Okay.

Q. Perfect. Great job. And then the second is that sometimes I have trouble getting my words out correctly, so if you have any confusion or I'm not being clear in my question, please just let me know. I'm very happy to rephrase. It's most important that you understand what it is I'm asking, so feel free to let me know if I'm being confusing in any way. Okay?

A. Okay.

Q. Can you tell me how long you have been incarcerated at Indiana State Prison?

A. It will be seven years in December.

Q. And during that time have you ever resided in B Cell House?

A. Yes. I lived in B Cell House from January of 2014 to January -- I mean -- maybe like -- yeah, it was January of 2020.

Q. Okay. And did -- During that period of time did you reside in just one cell or were there multiple cells that you lived in during the time that you lived at B Cell House?

Plaintiff 000773
Ex. 52

Page 5

A. I stayed in 430 in B Cell House until about April of -- March or April of 2019. Then I moved to two other cells after that.

Q. Okay. Do you recall the night that Joshua Devine died in a fire at B Cell House?

A. Yes.

Q. Were you residing in cell 430 at that time?

A. Yes.

Q. Can you tell me the first thing that you remember about that night?

A. I dozed off while watching TV to people yelling that there was a fire.

Q. And as -- Strike that.

Can you tell me approximately what time of day it was, if you recall?

A. My estimation would be off, but it was after we had secured, which is 9:00 p.m. central.

Q. Okay. And when you say we've "secured," you're referring to the time that you get locked in your cell for the evening; is that correct?

A. No, we -- the -- the majority of us lock in earlier, but when there is complete lockdown of the cell house, it is at 9:00 o'clock.

Q. Okay. I got you. And there is a count that occurs at that time when custody staff completes a

Page 6

count of everybody who's in the cell house, right?

A. Yes.

Q. Okay. And can you tell me, at the time after count, were things calm -- Before you started hearing people yelling about the fire, would you characterize the cell house as calm?

A. Calm enough for me to begin dozing off so, yes, I would say calm.

Q. Okay. And you said you woke up to people yelling. Can you -- can you tell me what happened immediately after you woke up to people yelling "Fire"?

A. Well, there was a continuation of yelling. It didn't -- No action was taken immediately. There was quite some time before the next descriptive action was taken.

Q. And was the yelling -- would you characterize that as loud yelling or barely audible yelling? Tell me how -- how loud the cell house was once the yelling began.

A. Well, there is approximately 100 individuals on one side of the cell house. And that's being, you know -- That's just my rough estimate. So you can imagine a bunch of grown men yelling at the top of their lungs, "Fire."

Q. And that's what it was on April 7th after --

Page 7

after you woke up from -- from dozing off?

A. Yes, ma'am.

Q. Did you join in in the yelling?

A. Yes, I did.

Q. And you were yelling as loud as you could as well; is that true?

A. Yes, until I was hoarse.

Q. Can you tell me approximately how many minutes until you saw any member of the custody or other staff?

A. Once again, it'd be -- my time estimated would not be correct because I -- I don't want to be too generous with the number, but it was no less than 15 minutes.

Q. And who did you see responding?

A. It was a short female. I don't know her nationality, but she looked Middle Eastern. And I was able to see her through the reflection of the glass. Because of the outside light, it forms a mirror-like reflection for the cells under me and above me. So I -- I was able to see her clearly.

Q. And your cell was one floor underneath Mr. Devine's cell; is that correct?

A. Yes. To -- to my knowledge, he was in 540. I'm in 430.

Q. Okay. What did you see the female officer

Page 8

that you described doing when you saw her?

A. Well, when I seen her walking by, you know, I'm not paying very close attention to what she's doing. When she gets out of my direct line of site through the mirrored reflection, she can be heard saying she doesn't have the keys.

Q. And then what happened?

A. And then she left.

Q. And while -- After she left, what happened next to your recollection?

A. Well, on the part of the correctional officers, it was quite some time before anything happened with them. But from there, I no longer was paying attention to the range because I'd roughly say about five -- maybe three to five minutes the cell was -- was close to ablaze. It -- it -- I can say for sure that it was quite smoky to the point that everyone else was now scared for themselves because it was becoming hard to breathe.

From that point, I am trying to protect myself, so I -- I'm not directly paying attention to the range at that point because I'm trying to find something to cover my face with as well as blow the smoke out of my cell with my fan. But it went from there that you can hear the -- the man of question

Plaintiff 000774
Ex. 52

Page 9

screaming at the top of his lungs that "It's on fire. It's on fire." And -- and no -- you -- you -- you still aren't seeing an officer. Quite some time passes before an officer finally does come, but the cell is a full blaze. Like I said, with the -- the -- the female that came up there to help him or assess what was going on, I can see the reflection of his cell clearly through the window and it is a full blaze. And -- and -- and when I say a full blaze, the fire is outside of his cell, mirroring not only off the window, but it's reflecting off the wall.

And then eventually they came up there and -- and I don't know of the exact time when they came up there, but it was -- if you put together the time it took for her to come up there, realize she didn't have keys to help, leave, and -- and then when someone finally came up there, it had to be no less than 45 minutes. And that's being generous with the -- with downplaying the number. Because I don't know exactly how much time it was, that's how long it was.

Q. Did you ever hear anything else from Mr. Devine?

A. Yes. It went from, "Help, help, help," sounding like a grown man, to his voice died, sounding like a child screaming at the top of his lungs. And

Page 10

I'm not talking about six, seven years old. I'm talking like three, four. It went that high pitched before it was no more.

Q. I want to talk to you about the time that you have spent at Indiana State Prison and your experience with the electrical system there. Have you ever -- Strike that.

In your experience have there been electrical problems at Indiana State Prison in the cells?

A. Yes.

Q. And can you tell me what -- what problems you're familiar with?

A. The problems are often indirect. I can't speak for majority of, you know, what I've heard. I'm not going to speculate on what other people have gone through. But me in particular, it is always something that has to do with someone else's socket. Because in the cell house I am in now, which is C Cell House, and the cell house I was in previously, B Cell House, only two cell houses I've been in. I don't know about A Cell House or the dormitories. But I can say that three cells are on the same circuit. So when one cell goes, so goes two others. And a lot of time when a cell goes, like a -- a -- a -- a sudden power surge from your neighbor can oftentimes spark in yours.

Page 11

Q. I want to talk to you about fire drills at Indiana State Prison. Have you ever done -- Strike that.

Have you ever participated in a fire drill during the 6:00 p.m. to 6:00 a.m. shift at Indiana State Prison?

A. Never.

Q. And before April of 2017 you had experienced fires in other cells in the prison; is that true?

A. Not as bad, but fires occur regularly.

Q. And did you ever experience a change in policy or practice in response to fires before the April 2017 fire?

A. I -- I'd be lying if I said I even paid attention. Like it -- it -- it -- it's as if the policies they have in place currently, they feel it's good enough.

MS. GRADY: Okay. I'm just going to review my notes to see if I have any other questions. Just give me one minute.

Okay. I don't have anything else for you. I think Mike is going to ask you some questions now.

THE WITNESS: Okay.

Page 12

CROSS-EXAMINATION
BY MR. BLINN:

Q. I'm going to have a few questions.

First of all, Mr. Griffin, do you have any -- do you have any medical conditions that would affect your memory in any way?

A. Not at all. Close to photographic.

Q. All right. And are you on any medications that affect your memory right now?

A. Not on any medications. I'm only taking vitamin B12 and calcium.

Q. Anything else?

A. Not at all.

Q. All right. What's your educational background?

A. Dropped out about tenth grade. Completed the high school equivalency here.

Q. Okay. Do you have any vocational training?

A. Only schooling. That's -- that's it.

Q. Only what?

A. Only the schooling they provided here. No other vocational whatsoever.

Q. Okay. What -- what kind of schooling is that?

A. It is the -- what do you call it -- the GED, I guess.

Plaintiff 000775
Ex. 52

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
LEE TRAVIS GRIFFIN
September 22, 2020

Page 13

Q. Okay. Do you have any training as an electrician?

A. Don't touch electricity at all. No type of electronics or, you know, outlets or light bulbs. I don't do any of that.

Q. Okay. So you've never worked as an electrician?

A. No, never.

Q. Or -- or as an electrician's apprentice, anything like that?

A. Like I said, never touched any of it.

Q. Okay. I want to get a little bit clear on the timing. Did I understand your testimony correct that it was about three to five minutes between when you first heard Mr. Devine yelling about the fire and when his voice fell silent?

A. I'm not -- that's -- that's incorrect in question because I said if you add the time before she came to help him --

Q. Uh-huh.

A. -- and the time that he finally did, like somebody finally did get up there, had to been no less than 45 minutes. I -- I -- I never said that his voice died in three to five minutes. I say that's when, you know, that's -- that's the next time that something

Page 14

occurred, you know.

Q. Okay. So it was about three to five minutes from when you first heard him yelling to when the cell was close to ablaze; is that right?

A. No. Once again, that is false in the question itself. Like you're -- you're erring in the way you're asking the question. Because I said that there was time that passed from the time that she left, and then three to five minutes later, that's when something occurred, which was for the blaze.

Q. I see. Okay. So do you have any idea how long it was between when Mr. Devine first said that his cell was on fire and when you didn't hear anything else out of his cell?

A. No. Because I don't know when he first started yelling because I was -- I had dozed off.

Q. Okay.

A. When I awoke --

Q. Okay. Yeah. And, thank you, that's actually a good point.

So do you remember how long it was from when you first heard Mr. Devine yelling about the fire in his cell until you didn't hear Mr. Devine anymore?

A. No, but it was quite some time though. I said -- even in my -- even in my answering I said any

Page 15

of my numbers that I give you wouldn't be correct in actuality. But it remained that the numbers that I'm giving is close to a -- a -- a good estimation because it was quite some time.

Q. Okay. So can you tell me then approximately, understanding that it's not exact, but approximately your best estimate of how long it was between when you first heard Mr. Devine yelling about the fire and when you stopped hearing Mr. Devine's voice?

A. Sir, I'm not willing to -- in totality, I'm not willing to estimate in totality because I don't know.

Q. Okay.

A. See, the question she asked for a specific portion. You're asking for totality, sir. I don't know how to give you that number even in estimate.

Q. Okay. So you don't know how long Mr. Devine was yelling about the fire before he stopped?

A. I've answered that multiple times, sir. I don't know the exact number.

Q. Okay. Okay. Do you know an approximate number?

A. If you wanted a lie, I can make up a number, but --

Q. I don't want a lie. I want to know do you

Page 16

know an approximate number of how long that went on?

A. No.

Q. Okay. Okay. You testified you've experienced other fires, I think you said, regularly; is that right?

A. Yes, sir.

Q. Was that in population or was that in a segregation unit?

A. I've never been in a segregation unit. I've worked there for about maybe a week-and-a-half. I've never lived in segregation in this prison.

Q. Okay. So then does that mean that the fires that you've seen occur regularly, those all happened in population?

A. Yes, sir. I know nothing about fires that may have occurred anywhere else.

Q. Okay. So when you say -- so when you say fires occur regularly in population, again, approximately how frequently is that?

A. One a day at the least because we have -- if -- if someone doesn't put water in their untampered with hot pot, it can cause smoke or a fire. So that occurs quite often because some people don't know how to handle the things that they've been given.

Q. Okay. And you said "untampered with" just

BOSS REPORTERS
(219) 769-9090

Plaintiff 000776
Ex. 52

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
LEE TRAVIS GRIFFIN
September 22, 2020

Page 17

there. Have you ever known of any offenders to tamper with their electrical appliances and start fires on purpose?

A. Never to start fires on purpose, but to enhance in whatever way they choose. People tamper with stuff all the time, but I've never heard of them trying to start fires on purpose.

Q. All right. Did you speak with Miss Grady before your deposition today?

A. Yes. As she said when the call started, she talked to me yesterday.

Q. Okay. And what did you talk about?

A. She was informing me on what this process was because I've never done it before.

Q. Anything else?

A. Yes, and what I remembered.

Q. And what did you tell her?

A. Exactly what I stated for you and her today.

Q. Okay. So did you tell Miss Grady anything on the phone call that you did not say today?

A. No, I stated more today than I did on the -- on the phone call yesterday.

Q. Okay. And did Miss Grady ask you any questions on the phone yesterday that she did not ask you today?

Page 18

A. Yes. I told her that I was stressed for time because of the time that she wanted me to call her. So if she wanted me to go into further detail, to ask those questions.

Q. Okay. Anything else?

A. No, sir.

Q. Have you ever spoken to Miss Grady or anybody else at Miss Grady's firm other than today and yesterday?

A. Yes, quite some time ago. I believe her name is Megan Pierce, I believe.

Q. Okay. And what did you tell Miss Pierce?

A. Probably the same thing I've told you all today, but I had a written testimony that was more accurate at the time.

Q. Okay. And did you provide that written statement to Miss Pierce?

A. I do not believe so. I used it to recall what I was informing her of.

Q. All right. Did you give that written statement to anyone else?

A. I am not sure. I -- It's been quite some time since the fire. I'm not going to lie and say that I know exactly if I provided it with the firm or anybody else really.

Page 19

Q. Do you still have that?

A. Yes, I do.

Q. Okay. Give me just a second here. I might be about finished myself.

Oh. From your cell were you -- Strike that.

You were in cell 430 in block B the night of the fire, correct?

A. Yes, sir.

Q. And from cell 430 were you able to see the officer's station?

A. No, it's on the opposite side of the cell house.

Q. Okay. So the only -- So were you able to see any officers when they were not up on the range?

A. No.

MR. BLINN: Okay. I don't have any other questions. Thank you, sir.

MS. GRADY: I don't have anything else further, Mr. Griffin. Thank you very much for your time. Sorry. Let's go off the record.

(A short break was had.)

THE WITNESS: I'd like to waive the signature. I believe I provided everything that I can for you, and what goes on from there is between you guys.

MS. GRIFFIN: All right. Well, thank you very

Page 20

much, Mr. Griffin, again. We really appreciate your time.

(Signature waived.)
(Witness excused at 1:11 p.m.)

Plaintiff 000777
Ex. 52

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEETRAVIS GRIFFIN
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-22   filed 05/25/21   page 8 of 12

Page 21

STATE OF INDIANA     )
                     )  SS.
COUNTY OF PORTER     )

            I, Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, do hereby certify that on the 22nd day of September, A.D., 2020, the deposition of the witness, LEETRAVIS GRIFFIN, called by the Plaintiff, was taken before me, reported stenographically, and was thereafter reduced to typewriting under my direction.

            The said deposition was taken via Zoom videoconference from the Indiana State Prison, and there were present counsel as previously set forth.

            The said witness, LEETRAVIS GRIFFIN, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

            I further certify that the foregoing is a true, accurate, and complete record of the questions asked of and answers made by the said witness, LEETRAVIS GRIFFIN, at the time and place hereinabove referred to.

            The signature of the witness, LEETRAVIS GRIFFIN, was waived by agreement of counsel.

            The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

            Witness my official signature on this 28th day of October, 2020, A.D.

            JESSICA M. WARNER PHIPPS, RPR
            5816 East 7th Avenue
            Gary, Indiana 46403
            Phone:   (219) 769-9090

CSR No.   084-004485

Plaintiff 000778
Ex. 52