**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

|  |  |  |
|---|---|---|
| MYSTI VALENCIA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 3:24-cv-185-DRL-SJF |
| RON NEAL, et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Jon Loevy
Locke E. Bowman
Megan Pierce
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
T: (312) 243-5900
megan@loevy.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii

ISSUE STATEMENT ......................................................................................................... vi

INTRODUCTION....................................................................................................................1

THE SUMMARY JUDGMENT RECORD ..............................................................................2

ARGUMENT...........................................................................................................................13

I.      DEFENDANTS' MOTION TURNS THE SUMMARY JUDGMENT STANDARD ON ITS HEAD ..............................................................................................................13

II.     DEFENDANTS MISSTATE THE CONTROLLING STANDARD FOR EIGHTH AMENDMENT CLAIMS FOR FAILURE TO PROTECT PRISONERS.........................16

III.    A REASONABLE JURY COULD FIND THAT THE OFFICER DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE ..................................................................19

IV.     A REASONABLE JURY COULD FIND THAT THE ADMINISTRATOR DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE..................................22

        A.      Warden Neal Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced ...............................24

        B.      Deputy Warden Nowatzke Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced............25

        C.      Custody Supervisor Wardlow Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced...27

        D.      Safety Hazard Manager Deborah Taylor Acted with Deliberate Indifference to the Serious Risk of Death or Grae Injury by Fire that Mr. Smith and Other Prisoners Faced.......................................................................................................................28

        E.      Captain McCann Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced ...........................29

V.      DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO INTERVENE CLAIM................................................................30

VI.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY .........................30

VII.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS....................................................................................34

CONCLUSION.......................................................................................................................35

i

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................... 2, 13

*Antonelli v. Sheahan*,
81 F.3d at 1422 (7th Cir. 1996) ................................................................................. 22

*Areche v. Indianapolis Dep't of Pub. Works*,
264 N.E.3d, 84 (Ind. Ct. App. 2025) ....................................................................... 35

*Armstrong v. Daily*,
786 F.3d 529 (7th Cir. 2015) ............................................................................... 30, 31

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ..................................................................................................... 31

*Backes v. Vill. of Peoria Heights*,
662 F.3d 866 (7th Cir. 2011) ..................................................................................... 22

*Borello v. Allison,*
446 F.3d 742 (7th Cir. 2006) ..................................................................................... 22

*Brown v. Budz,*
398 F.3d 904 (7th Cir. 2005) ..................................................................................... 18

*Byron v. Dart*,
825 F. Supp. 2d 958 (N.D. Ill. 2011) ....................................................................... 17

*Celotex v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................... 13

*Childress v. Walker*,
787 F.3d 433 (7th Cir. 2015) ..................................................................................... 23

*Christopher v. Buss*,
384 F.3d 879 (7th Cir. 2004) ..................................................................................... 22

*Cusick v. Gualandri*,
573 F.Supp.3d 1256 (N.D. Ill. 2021) ....................................................................... 31

*Dwyer v. Neal*,
2022 WL 462017 (N.D. Ind. February 15, 2022) ........................................... passim

*Est. of Escobedo v. Bender*,
600 F.3d 770 (7th Cir. 2010) ..................................................................................... 31

*Estate of Mintz v. Conn. Gen. Life Ins. Co.*,
905 N.E.2d 994 (Ind. 2009) ...................................................................................................35

*Farmer v. Brennan*,
511 U.S. 825 (1994) ..........................................................................................................passim

*Giles v. Godinez*,
914 F.3d 1040 (7th Cir 2019)...................................................................................................22

*Gonsalves v. Cleveland*,
980 F. Supp. 2d 1060 (N.D. Ind. 2013) .................................................................................31

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982).................................................................................................................30

*Hayes v. Snyder*,
546 F.3d 516 (7th Cir. 2008)...................................................................................................16

*Homeland Title Agency, Inc. v. Robertson*,
No. 1:15-cv-02059-SEB-DKL, 2016 WL 5661562 (S.D. Ind. Sept. 30, 2016) .................31

*Hood v. Smith*,
No. 15 C 7945, 2017 WL 2404974 (N.D. Ill. June 1, 2017).................................................31

*Hope v. Pelzer*,
536 U.S. 730 (2002).................................................................................................................31

*Horton v. Pobjecky*,
883 F.3d 931 (7th Cir. 2018)...................................................................................................16

*Lanahan v. County of Cook*,
No. 16 C 11723, 2018 WL 1784139 (N.D. Ill. Apr. 13, 2018) ............................................31

*Lopez v. Sheriff of Cook Cnty.*,
993 F.3d 981 (7th Cir. 2021)...................................................................................................31

*Lyons v. Richmond Cmty. Sch. Corp.*,
19 N.E.3d 254 (Ind. 2014) ............................................................................................. 34, 35

*McGuire v. Dykstra*,
2020 WL 4735264 (N.D. Ind. Aug. 14, 2020).......................................................................33

*Miles v. Dorre*,
2022 WL 59540 (N.D. Ind. Jan 6, 2022)......................................................................... 18, 19

*Moton v. Surguy*,
2025 WL 1827942, (S.D. Ind. July 2, 2025).................................................................... 13, 15

*NLFC, Inc. v. Devcom Mid-Am., Inc.*,
    45 F.3d 231 (7th Cir. 1995)........................................................................................................13

*Pearson v. Callahan*,
    555 U.S. 223 (2009).................................................................................................................30

*Petties v. Carter*,
    836 F.3d 722 (7th Cir. 2016)........................................................................ 16, 19, 20, 33

*Potts v. Manos*,
    Case No. 11 C 3952, 2013 WL 5968930 (N.D. Ill. Nov. 7, 2013) .......................................22

*Pyles v. Fahim*,
    772 F.3d 403 (7th Cir. 2014).....................................................................................................22

*Rabb Ra Chaka v. O'Leary*,
    1989 WL 56874 (N.D. Ill. May 24, 1989) ................................................................................33

*Sanville v. McCaughtry ; Estate of Clark v. Walker*,
    865 F.3d 544 (7th Cir. 2017).....................................................................................................19

*Saucier v. Katz*,
    533 U.S. 194 (2001).................................................................................................................30

*Scott v. Harris*,
    550 U.S. 372 (2007).................................................................................................................16

*Shepard v. State Auto. Mut. Ins. Co.*,
    463 F.3d 742 (7th Cir. 2006).....................................................................................................22

*Sinn v. Lemmon*,
    911 F.3d at 412 (7th Cir. 2018) ................................................................................................23

*Steele v. Knight*,
    2016 WL 7117155 (S.D. Ind. Dec. 7, 2016) ............................................................................34

*Sublett v. John Wiley & Sons, Inc.*,
    463 F.3d 731 (7th Cir. 2006).............................................................................................. 30, 34

*Thomas B v. Kijakazi*,
    2022 WL 6750211, (N.D. Ill. Oct. 11, 2022)...........................................................................30

*Waldridge v. Am. Hoechst Corp.*,
    24 F.3d 918 (7th Cir. 1994).......................................................................................................15

*Walker v. Benjamin*,
    293 F.3d 1030 (7th Cir. 2002)...................................................................................................32

*Walker v. Peters,*
   233 F.3d 494 (7th Cir. 2000)................................................................................................21

*Warren ex rel. Warren v. Dart,*
   No. 09 C 2512, 2010 WL 4883923 (N.D. Ill. Nov. 24, 2010).............................................22

*Washington v. LaPorte Cnty Sheriff's Dept,*
   306 F.3d 515 (7th Cir. 2002)...............................................................................................17

*White v. Cooper,*
   55 F. Supp. 2d 848 (N.D. Ill. 1999) ....................................................................................33

*Ziccarelli v. Dart,*
   35 F.4th 1079 (7th Cir. 2022) .............................................................................................13

## RULES

Fed. R. Civ. P. 56 ....................................................................................................................13

## ISSUE STATEMENT

1.    Whether it is proper to grant summary judgment to a party whose motion does not adhere to the standard of Rule 56 and instead asks the court to view the evidence in the light most favorable to the movant, ignores facts that contradict its narrative, and declines to draw inferences from the facts in the non-movant's favor.

2.    Whether, in a case in which the plaintiff contends that the defendant correctional officials have failed to protect the plaintiff's decedent from a risk of fire shared by all prisoners in a correctional facility under the doctrine of *Farmer v. Brennan,* 511 U.S. 825 (1994), the defendants can prevail by showing they were not aware of a fire risk specific to the plaintiff's decedent and his particular cell.

3.    Whether, if the evidence is construed in the light most favorable to the plaintiff and all justifiable inferences are drawn in the plaintiff's favor, a reasonable jury could conclude that the Officer Defendants and the Administrator Defendants knew or and consciously disregarded a significant risk that plaintiff's decedent and other prisoners like him would die or be seriously injured from an in-cell fire.

4.    Whether a reasonable jury could conclude that one or more of the Defendants failed to intervene to prevent the above violation of Plaintiff's decedent's constitutional rights.

5.    Whether the defendant correctional officials are entitled to qualified immunity as to the plaintiff's Eighth Amendment claim when another judge of this court issued an opinion (*Dwyer v. Neal,* 2022 WL 462017 (N.D. Ind. February 15, 2022)) before the events in this case that cited long-standing constitutional authority and found an Eighth Amendment violation as to another prisoner who died by fire in a strikingly similar way.

6.    Whether a reasonable jury could find that one or more of the Defendants is liable to Plaintiff for negligence in violation of Indiana state law.

## INTRODUCTION

Michael Smith burned to death on January 14, 2023, in a fire in his cell in A Cellhouse ("ACH") at the Indiana State Prison ("ISP"). Mr. Smith's death was needless and preventable. It would not have happened but for the deliberate indifference of key administrator staff at ISP and of the correctional staff on duty in ACH.

Plaintiff, who is Mr. Smith's daughter and personal representative, filed suit against certain ISP administrators (the "Administrator Defendants") and the on-duty correctional staff (the "Officer Defendants") contending that all Defendants violated Mr. Smith's Eighth Amendment rights by failing to protect him from the risk of death or serious injury by fire and by failing to intervene to prevent the violation of Mr. Smith's constitutional rights (Amended Complaint, Dkt. 61, Counts I and II) and that all Defendants also violated Mr. Smith's and her state law rights (*id.,* Counts III-V).

This is not a summary judgment case. Defendants' statement of facts and their memorandum of law portray the facts in the summary judgment record in the light most favorable to *them*, turning the summary judgment standard on its head by omitting almost all the evidence that contradicts their position, failing to acknowledge disputes in the evidence they cite, and drawing every possible inference in *their favor*. Defendants' memorandum of law misstates and improperly narrows the holding of *Farmer v. Brennan*, 511 U.S. 825 (1994), the seminal Supreme Court decision governing the scope of a prisoner's Eighth Amendment right to protection from custodial officials. Defendants ignore that their own conduct in relation to the risk of fire at ISP has been the subject of a carefully reasoned decision denying summary judgment on similar facts. *Dwyer v. Neal*, 2022 WL 462017 (N.D. Ind. February 15, 2022). This memorandum will demonstrate that there is also no basis for summary judgment on this extensive, hotly contested record. Defendants' motion should be denied.

## THE SUMMARY JUDGMENT RECORD

It is axiomatic that, in ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and must draw any justifiable inference from the facts in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here are the facts in the summary judgment record from that perspective:

### Defendants Knew that ACH Presented Risks for Death or Serious Injury by Fire

At the time of his death, Michael Smith was confined in Cell 252 on the so-called "200 range" of ACH. That building, according to the testimony of Defendant Warden Ron Neal, was constructed in the 1860s. PSGD, ¶¶ 21-22.[1] It was built in the classic "Auburn style," with multiple, stacked rows of individual cells arrayed back-to-back in a long, narrow configuration. PSGD, ¶ 23-24.[2] Prison cellhouses have not been constructed in this manner for many years, for the important reason that this arrangement of cells does provide the staff on duty with a ready line of sight into each cell on the ranges. PSGD, ¶¶ 25-27. That is a problem. *Id.*

ACH is a maximum-security cellhouse in which the prisoners spend a significant portion of each day locked in their individual cells. Staff is responsible for the prisoners' safety and security at all times. PSGD, ¶ 33. When there is an emergency—an urgent health issue, an attempt to self-harm, an altercation between prisoners, or any number of possible urgent issues—prisoners locked in their cells are completely dependent on correctional staff to come to their assistance. *Id.* The absence of sightlines into the cells slows staff response time in such an emergency, a problem that is compounded by the fact that ACH does not have emergency call buttons in the cells (a standard feature of modern prisons). PSGD, ¶¶ 34-35.

---

[1] PSGD refers to Plaintiff's Statement of Genuine Disputes, which is being filed contemporaneously with this memorandum. Each numbered paragraph in the PSGD contains references to evidence in the record that supports the assertion in that paragraph.

[2] The emergency evacuation diagram for ACH provides a clear visual depiction of the configuration of the cells in ACH. *See* Dkt. 147-3.

In this environment, vigilance and heightened monitoring by on-duty correctional staff is imperative. PSGD, ¶ 40. All Defendants know this. *Id.* Monitoring can happen in two ways: by staff being physically present on the ranges and aware of their surroundings, or by staff in an "officers' station" (located in the northeast corner of ACH) viewing a monitor that shows the video feeds from approximately 30 surveillance cameras positioned around the cellhouse. PSGD, ¶¶ 28-32, 41. With no call buttons, prisoners are forced to rely on shouts or screams for help when there is an emergency. PSGD, ¶ 36-38. Staff are aware of the practice of prisoners shouting or screaming "down the range" and are trained, as part of the monitoring function, to listen for prisoners' shouts and to respond. PSGD, ¶ 40.

In addition, the locking mechanism that secures many of the individual cells in ACH is antiquated and cumbersome. PSGD, ¶¶ 47-53. In modern prisons, the lock on each individual cell can be controlled with a remotely located button. PSGD, ¶ 52. Although the cells on the upper ranges of ACH have been retrofitted with remote locking technology, the cells on the lower ranges (including the 200 range, where Mr. Smith died) retain the locks from the original structure. PSGD, ¶ 53. On the lower ranges, each cell is secured via a metal bar that runs along the top of cell fronts for the length of the range and, when engaged, secures all the cell doors on the range. PSGD, ¶ 48. In addition, each individual cell door also has a lock at waist level that must be unlocked with a key. *Id.* Thus, to unlock any particular cell, the correctional officer must "roll the bar" via a crank located at the east end of each range and, in addition, must travel to that individual cell to manually unlock the cell door. *Id.* This is time-consuming. PSGD, ¶ 49. But it is not all. The administration at ISP permits all prisoners to purchase padlocks, which they may use to lock their cells for personal security using a chain that is available on the cell doors. PSGD, ¶ 54-55. Prisoners are not supposed to lock their cells when they are inside, but they often do. PSGD, ¶ 54. Staff are trained and

instructed, therefore, that in addition to the keys they must bring a pair of bolt cutters to the cell front in every emergency to ensure they can gain access to the cell. PSGD, ¶ 129.

Although sprinklers are standard in modern prisons, ACH does not have a sprinkler system—a feature that enhances the risk from fire in that building. PSGD, ¶¶ 42-43, 4, 91. ACH does have smoke detectors, but the only smoke detectors are located near the ceiling above the 500 range. PSGD, ¶ 45. When smoke reaches the detectors, a fire alarm is tripped. But time passes before the smoke rises to that level. PSGD, ¶ 46.

All these factors (and others) combined to create a high-risk environment for death or injury by fire in ACH. If a fire starts in a locked prison cell, the prisoner inside is trapped. PSGD, ¶ 83. Fire can spread rapidly and the prisoner is entirely dependent on correctional staff to get him out of the cell to prevent death or serious injury. *Id.* ACH presented inherent impediments to staff's ability to detect an in-cell fire and to promptly extricate the prisoner from the cell. PSGD, ¶ 102. All staff knew of these impediments and knew, therefore, that always having at least one officer physically present on the ranges and also watching the monitor in the officers' station was imperative. PSGD, ¶ 32, 40-41, 62.

### All Defendants Knew That Fires Could and Did Ignite in Cells at ISP

At ISP, the risk of fire was not merely abstract. Fires were a regular occurrence at the prison, as multiple Defendants acknowledged in their deposition testimony. PSGD, ¶¶ 63-64. In 2022, the year leading up to Mr. Smith's death, Safety Committee minutes indicate there were numerous reported fires—and not all of the fires were reported. PSGD, ¶¶ 65-66. Fires regularly ignited—at least once per month—when the water in a hot pot, an item prisoners were allowed to purchase at commissary, would be allowed to evaporate because the hot pot was left on. PSGD, ¶¶ 69-71. Electrical problems, including sparking outlets and prisoners tampering with in-cell electronics, posed a serious risk of fire at ISP—a risk that was known to everyone. PSGD, ¶¶ 72-78. Many fires

were deliberately set by prisoners—a particular problem in D Cellhouse, another Auburn style building used as a disciplinary unit. PSGD, ¶¶ 80-82.

In 2017, Joshua Devine, a prisoner confined in B Cellhouse (also an Auburn style building) burned to death in his cell when correctional staff failed to respond to his cries for help and the shouting of other prisoners in the cellhouse as fire engulfed his cell. PSGD, ¶¶ 104-107. In the second quarter of 2022, there was a major fire in D Cellhouse that required a prisoner to be sent to an outside hospital. PSGD, ¶ 67. Just in the two weeks before Mr. Smith's death by fire, there had been, at minimum, a fire in D Cellhouse and two fires in C Cellhouse, one involving a hot pot and one involving a bag of trash. PSGD, ¶ 68.

### Michael Smith Dies by Fire

On January 14, 2023, the day Mr. Smith burned to death, ACH was understaffed—a persistent problem in that building and throughout the prison. PSGD, ¶¶ 183-84, 60-62. Defendant Steven McCann, the Captain on duty for the day shift and the custody supervisor in the prison, assigned four officers to ACH. One of the four was pulled from the unit and assigned to perform an outside transport, leaving only three: correctional officers Kevin Cross and Darnell Crockett; Sergeant Jeniene Walton; and Lieutenant Nadine Smith. PSGD, ¶ 183. Lt. Smith was also responsible for supervising custodial staff in E Dorm, but she was present in ACH before and during the fire. PSGD, ¶ 184. Sgt. Walton supervised Cross and Crockett. PSGD, ¶¶ 189, 196. She should have had two additional COs—a total five staff in the cellhouse with a lieutenant to supervise. PSGD, ¶ 59.

The morning count at ISP is conducted at 10 a.m. PSGD, ¶ 197. Defendant Crockett was assigned to 200 and the 300 range. Cross had the topmost ranges, 400 and 500. And Walton, the sergeant, had the 100 range. PSGD, ¶¶ 216, 210. The staff on duty combined two tasks at 10 a.m.: they walked their assigned ranges counting all the prisoners present at that time and, by procedure,

they also performed a custodial "round" of the cellhouse, briefly checking on the condition of each cell and the wellbeing of each prisoner. PSGD, ¶ 197. On their rounds, the COs carry a wand that records the time they pass certain fixed points (referred to as "pipes") on each range. The times are recorded electronically and a spreadsheet (known as the "pipe report") memorializes the time that each round is completed. PSGD ¶¶ 207-208. The contemporaneous electronic record establishes that the last security round on Mr. Smith's 200 range began at 10:03 a.m. and was completed at 10:10. PSGD ¶ 208. The 10:00 a.m. rounds on the other ranges were completed around the same time: the 300 range was finished at 10:15; the 400 range was finished at 10:12; and the 500 range was finished at 10:09. *Id.*

All those rounds were started within minutes before or after 10:00 a.m. *Id.* By policy, a new round of each range was supposed to begin within 30 minutes of the commencement of the prior round. PSGD ¶ 209. That set of rounds—which should have started at about 10:30—never happened. Instead, when Cross and Crockett finished their 10:00 a.m. rounds (at about 10:15 a.m.), they both went to the officers' station, where they stayed until they responded to the fire in Mr. Smith's cell at about 10:58 a.m. PSGD ¶¶ 213, 217. Sgt. Walton was in the officers' station, as was Lt. Smith. PSGD ¶¶ 215-216. Walton briefly left at 10:45 to do a security check on the 100 range and then returned. PSGD ¶ 220. Except for Walton's brief 10:45 a.m. departure, the four officers were in the officers' station taking it easy for more than 40 minutes. PSGD ¶¶ 213, 217-18, 220-21.

No formal policy prohibited the four officers from congregating in the officers' station. PSGD ¶ 164. Nonetheless, staff and administrators understood that it was not proper practice for all assigned officers in a cellhouse to remain in the officers' station leaving the ranges unattended. PSGD ¶ 227. Emergencies can happen at any time; when staff congregate in the officers' station for a prolonged period, they are not properly carrying out their duties. PSGD ¶ 226.

Particularly with no officer on the ranges, it was important for the sergeant to watch the surveillance monitor in the officers' station herself or assign someone to do it. PSGD ¶ 223. Lt. Smith and Sgt. Walton both admitted in their depositions that none of the four officers was watching the surveillance monitor. PSGD ¶ 222. Officer Crockett testified that the monitor wasn't even working and had been non-operational for weeks—a situation that, if true, should have been reported immediately so that the monitor could be replaced. PSGD ¶¶ 224-25.

One of the surveillance cameras in ACH showed the front of cell 252 near the west end of the 200 range (the cell occupied by Mr. Smith) and recorded a developing fire within that cell. PSGD ¶¶ 230-31. The front of Mr. Smith's cell was covered with a blanket (a rule violation that Officer Crockett had not reported during his 10:00 a.m. rounds). PSGD ¶ 202. Nonetheless, ISP officials acknowledge that flickers of flame inside Mr. Smith's cell first became visible on the surveillance monitor at 10:53 a.m., while the officers were taking it easy in the officers' station at the other end of the cellhouse and paying no attention to the surveillance monitor. PSGD ¶ 237. Over the next five minutes, as the fire increased in size and intensity, no ISP staffer came to Mr. Smith's aid, even though:

- Smoke began to pour out of the front of Mr. Smith's cell, becoming plainly visible from the perspective of the officers' station against the light background formed by the windows at the west end of ACH. PSGD ¶¶ 237-39.
- Prisoners throughout ACH began to shout and scream that help was needed on the 200 range. PSGD ¶¶ 231-33.

The officers contend that they were oblivious to the smoke, the prisoners' shouts and screams, and the flames that eventually emerged from Mr. Smith's cell. Their contention is disputed. Several prisoners whose cells afforded them views into the officers' station, have provided declarations explaining that the sound of the prisoners' shouts and screams was certainly audible to the officers—and those officers ignored the pleas for help. PSGD ¶¶ 38-39, 233-34.

A few seconds before 10:56, at 10:55:53, the smoke from Mr. Smith's cell reached the smoke detectors above the 500 range. PSGD ¶¶ 238-39. At that point, it is justifiable to assume, the smoke detectors triggered the fire alarm, which sounded in ACH a few seconds before 10:56. *Id.* Sgt. Walson did not call the emergency fire code over her radio until 10:58. PSGD ¶ 245. Although it takes just a few seconds to run from the officers' station to cell 252, no officer arrived at Mr. Smith's cell until two and a half minutes after the fire alarm sounded—at 10:58:23. PSGD ¶¶ 235-36, 245, 249; Dkt. 147-6 at 140:7-15 (Walton called code at 10:58 as Crockett and Cross left officers' station, they reached the cell by 10:58:23).

The officers in ACH allowed the fire in Mr. Smith's cell to advance to the point that, at 10:58 a.m.—before anyone showed up—the fire was raging, with smoke pouring out of Mr. Smith's cell and flames licking the walkway ceiling outside the cell door. When she was shown an image of the fire at 10:58 a.m. during her deposition, ISP's Safety and Hazard Manager, Defendant Deborah Taylor, admitted, tearfully, that this situation should not have been permitted to occur without a response. PSGD ¶¶ 246-47.

When Officers Crockett and Cross got to Mr. Smith's cell at 10:58:23, they were unprepared to fight the blaze and to extricate Mr. Smith from his cell. Cross brought a fire extinguisher with him, but it was the wrong one. PSGD ¶ 252-54. The cellhouses at ISP were equipped with water fire extinguishers, for use on small, contained fires, and ABC extinguishers that spray flame retardant chemicals on major fires like the one in Mr. Smith's cell. PSGD ¶ 253. Cross brought a water extinguisher, claiming that he assumed the fire was a small one. Dkt. 147-5 at 71:18-74:7 A reasonable jury could reject that explanation considering other officers' acknowledgment that smoke and fire from the blaze was plainly visible at the officers' station when the fire alarm went off. PSGD ¶¶ 241-42; Response to DSOF ¶ 129. Crockett did not bring any fire extinguisher. PSGD ¶ 252. After a short, unsuccessful attempt to put out the fire with the useless water extinguisher, Cross

and Crockett retreated. PSGD ¶¶ 254-55. They reappeared at 10:59:25 a.m., this time with a chemical fire extinguisher, which Crockett began to use at 10:59:32 to dramatically reduce the flames in the cell. PSGD ¶ 257. Between 11:00 and 11:02 first responders began to arrive, including prisoner firefighters with gear and fire suppression equipment. PSGD ¶¶ 259-61.

The first objective in responding to an in-cell fire is to get the prisoner out of the cell. When Cross and Crockett first arrived at Mr. Smith's cell, not only did they not have the proper fire suppression equipment, they also were unprepared to open Mr. Smith's cell door. Neither Crockett nor Cross had paused at the east end of the 200 range to assess whether the bar had been rolled (an essential step to unlocking any cell door on that range). PSGD ¶¶ 48, 251. Crockett had to return to the other end of the range to roll the bar after he and Cross were unsuccessful putting down the fire with the water extinguisher. PSGD ¶¶ 251, 255. In violation of policy, neither officer brought bolt cutters, which would have been essential if Smith's personal lock had been engaged on his cell door. PSGD ¶¶ 129, 251. The door to Smith's cell was not opened until 11:00:50 a.m. PSGD ¶ 262.

Mr. Smith was finally removed from his cell at 11:07:15. PSGD ¶ 262. He was pronounced dead at 11:18 from what was later determined to be thermal burns and heat exposure. PSGD ¶¶ 264-65. Defendants contend that the failures in the officers' response after they belatedly appeared at Mr. Smith's cell did not cause any additional harm, because Mr. Smith was beyond saving by 10:58. *See* Dkt. 148 at 15-16. But a jury might justifiably infer the opposite, that Mr. Smith could have been saved. Crockett testified that, as he got his keys to try to unlock the door to Mr. Smith's cell around 11:00, Mr. Smith was still conscious and was telling Crockett, "Help me, help me." PSGD ¶ 258.

By policy, ISP relies on a prisoner fire brigade to respond to and fight major fires at the prison. PSGD ¶¶ 93, 134. Crockett and Cross were unprepared by training and experience to fight a fire as large and intense as the fire in Mr. Smith's cell. PSGD ¶¶ 139-153. The prisoner firefighters

9

did have the proper training, but, as Warden Neal admitted in his deposition, it was inherently impossible for the prisoner firefighters to get to the scene of a large, in-cell fire in time to save the prisoner trapped inside. PSGD ¶¶ 97-98, 139, 148 The firefighters were housed in locations all around the prison. Their gear was stored at a "fire station." Before the prisoner firefighters could get to the scene of a fire, an emergency fire code needed to be called over the prison intercom; the firefighters had to be released from their disparate living units; they had to assemble at the fire station and don their gear; and then be allowed passage  through multiple checkpoints and into the unit where the fire was ongoing. PSGD ¶¶ 94-96. As Warden Neal admitted in his deposition, this could never happen in time to save a prisoner from a rapidly expanding fire in an enclosed cell. PSGD ¶¶ 97-98.

It was to be expected, therefore, that the prisoner firefighters would not arrive at Mr. Smith's cell until after 11:00 when Cross and Crockett had already attempted to put out the fire. PSGD ¶¶ 257, 260-61.

<strong>The Indifference of Prison Administrators Allowed<br>The Conditions That Led to Mr. Smith's Death</strong>

The death of Michael Smith was not an unforeseeable event. Mr. Smith's death bears eerie similarities to Joshua Devine's death by fire in Cell 540 in ISP's B Cellhouse (a structure that is almost identical to ACH) on April 7, 2017. On that day, after the 9:00 p.m. evening count, a fire started in Mr. Devine's cell. He and other prisoners yelled and screamed for help, but for many minutes no one responded because most of the correctional staff in BCH that night were occupied doing paperwork in the counselor's office. When a correctional officer finally showed up at Mr. Devine's cell front, the officer did not have either the keys to the cell or a fire extinguisher. Mr. Devine perished in his locked cell from thermal burns. PSGD ¶¶ 104-114.

Through the prison's internal review of the Devine fire and judicial findings in the federal rights suit that Mr. Devine's family filed against Defendants Neal and Nowatzke and others (*Dwyer v.*

10

*Neal,* 2022 WL 462017 (N.D. Ind. Feb. 15, 2022)), the Administrator Defendants were unquestionably made aware that changes were necessary to prevent a recurrence. PSGD ¶¶ 108-114. But, despite the fact that the Devine fire should have served as a wake-up call, the Administrator Defendants, individually and collectively, continued their lax enforcement of policies designed to increase fire safety; failed to shore up gaps in policy and to correct inadequate procedures; failed to provide necessary training on fire prevention; and allowed the pervasive risk of death or serious injury by fire at ISP to go unabated. PSGD ¶¶ 115-27. In particular:

- The *Dwyer* opinion (which Warden Neal received and was familiar with) found that excessive property stored in cells enhanced the risks from fire. In response to the Devine fire, Warden Neal initially implemented a policy to limit in-cell property and, though he made early efforts to enforce it, the problem of excess property in cells was once again widespread by the time of the Smith fire because the Administrator Defendants failed in their ongoing enforcement responsibilities. PSGD ¶¶ 90, 92, 111, 119-120, 181-182. Investigation after the Smith fire revealed that his cell contained an abundance of electronic equipment, which had fueled the fire. PSGD ¶¶ 91, 268-70. A jury could justifiably infer that Officer Crockett saw the excess property when he conducted his 10:00 a.m. rounds and ignored it. *See* PSGD ¶¶ 90, 92, 202, 267-70.
- The *Dwyer* court also found that regular inspections should have been occurring to prevent electrical problems within the cells. Nonetheless, the Administrator Defendants allowed the practice of making superficial and cursory inspections, if at all, to continue. PSGD ¶¶ 111, 171-182.
- The *Dwyer* court recognized that corrections staff in the living units received only superficial and inadequate training on how to respond to fire. PSGD ¶ 111. That deficit continues without correction. Although it is inevitable that corrections staff will be called upon to respond, should a serious, major fire erupt in a prisoner's cell (because the prisoner firefighters will not arrive in time), correctional staff still receive no hands-on, experiential training in the steps they must take when a fire occurs and how to use the fire suppression equipment that is available to them. PSGD ¶¶ 137-56. ISP's emergency fire plan does not account for the reality that corrections staff in the units will be called upon to act as first responders when a major fire erupts in a prisoner's cell. PSGD ¶¶ 93, 134, 148.
- The Devine fire exposed the deadly consequences that can follow when staff are off the ranges, failing to monitor the cells, and failing to heed the cries of prisoners for assistance. Even though it could practically be accomplished, the Administrator Defendants failed to implement a policy requiring at least one staffer to always be on the ranges; requiring the video monitors in the living units to be observed at all times; and reinforcing the importance of staff being alert to prisoner cries for assistance. PSGD ¶¶ 106, 112, 116, 118, 124-27

11

It would be justifiable for a jury to infer that Mr. Smith would not have died if the Administrator Defendants had insisted that correctional staff in the living units keep close watch on the cells at all times; had implemented a fire safety plan that included giving correctional staff detailed, experiential instruction on major fire response; and had enforced meaningful cell inspections and strict limits on allowable property within the cells. As Officer Cross conceded in his deposition, seconds make a life-or-death difference in a fire response, and if officers had gotten to Mr. Smith's cell even seconds earlier, Mr. Smith's life might have been saved. PSGD ¶ 271.

### Administrator Indifference Continues Following the Smith Fire

On the day Michael Smith died, Warden Neal emailed a colleague, "we just had another one burn himself up inside his cell." PSGD ¶ 272. The ISP supervisory staff did not counsel or correct Officers Cross and Crockett regarding their actions in response to the Smith fire. PSGD ¶¶ 275, 287, 311, 318-319, 327. Internal affairs concluded that the fire response was fully in line with policy and procedure. PSGD ¶¶ 297-302. Warden Neal insisted that ACH staff responded to the fire in a "very timely manner," and that the response was "fantastic" and "excellent." PSGD ¶ 330. Other than placing ABC fire extinguishers on the ranges (rather than in the officers' station), the Administrator Defendants have made no changes at all to their procedures, training, or to the physical structure of ISP following Mr. Smith's death. PSGD ¶¶ 320-26.

In his deposition, Warden Neal displayed a remarkable indifference to the prospect that additional prisoners might die from a fire in their cell, as had happened to Mr. Devine and to Mr. Smith. Warden Neal testified that another serious fire "can happen at any time," explaining that at ISP a prisoner's death in his cell by fire is not preventable and "[t]hat's just the reality of the situation." PSGD ¶ 331. Plaintiff's corrections expert, Dan Pacholke, noted that "[r]ather than identifying the same recurring problems and failures, administrators have determined, in effect, that nothing can be changed and there is nothing to be learned from Mr. Smith's avoidable death.

Warden Neal asserted in his deposition that another death is all but certain to occur in the future. Given the absence of necessary and achievable reforms and the continued inaction to ensure that staff and supervisors comply with policy, this is sadly, and likely, true." PSGD ¶ 333.

Mr. Pacholke's observation turned out to be prescient. On March 15, 2026 at 9:25 p.m., a prisoner was severely burned in his cell on the 200 range of D Cell House. His injuries were so grave that he had to be transferred to the burn unit in an outside hospital. On April 7, 2026 at 2:13 p.m., a second prisoner was severely burned in a fire in his cell on the 500 range of D Cell House. He also was airlifted to a hospital burn unit. PSGD ¶ 332.

ARGUMENT

## I.    DEFENDANTS' MOTION TURNS THE SUMMARY JUDGMENT STANDARD ON ITS HEAD

The Court may grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The evidence of the non-movant is to be believed[.]" *Id.  See also NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Id.* at 249. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243.  The moving party bears the burden of establishing that there is no genuine issue of material fact by identifying those portions of the record that it believes demonstrate the absence of such an issue.  *Celotex*, 477 U.S. at 323. "[A] party moving

13

for summary judgment cannot simply ignore contradictory testimony from the non-moving party and assert its own narrative as undisputed." *Moton v. Surguy*, 2025 WL 1827942, at *3 (S.D. Ind. July 2, 2025) (citing *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022).

Here, Defendants pay lip service to the summary judgment standard but do not follow it. For example, a central issue in this case is *when* the Defendant Officers knew there was an emergency in the cellhouse. Defendants assert that they were not alerted to the fire until a fire alarm went off at 10:58 a.m. Dkt. 148 at 2. From this purportedly "undisputed fact," Defendants argue that there is no evidence of deliberate indifference; Defendant Officers responded immediately; they simply could not have saved Mr. Smith's life. Dkt. 148 at 2, 11, 13, 14-16. To make this argument, Defendants must disregard the evidence that contradicts their "undisputed fact." Defendants ignore the declarations from prisoners that they were yelling for help well before the fire alarm went off and that Defendant Officers remained in the officers' station ignoring the desperate screams. PSGD ¶¶ 232-33, 244. They also ignore the testimony of Defendant Walton and the expert analysis of Dr. Jeremy Bauer that the fire alarm went off prior to 10:58. PSGD, ¶ 239.

A second and related central issue is how quickly the Defendants responded to the fire. Defendants assert that they responded to the fire exactly 3 minutes and 31 seconds after fire was first visible, and 90 seconds after other prisoners in the cellhouse started reacting. From these "undisputed facts," they argue that the only reasonable inference is that Defendant Officers responded immediately to the fire upon becoming aware of it. Dkt. 148 at 4, 9-10. Here again, Defendants simply ignore the evidence that contradicts their position. Defendants ignore ISP's own investigation, which concluded the fire was visible at 10:53, at least five minutes before any response (PSGD ¶ 237) and Warden Neal's acknowledgement that the ISP timeline is accurate *(id.*; Dkt. 147-10 at 176:5-177:22, 178:10-18). They also ignore the prisoner declarations that they were yelling for

14

help well before the fire alarm went off, and that staff were ignoring the yells for help. PSGD ¶ 232-233, 315.

A third key issue is whether Defendants were on notice of the risks posed by regular fires in the prisoner cells. Defendants assert without evidence that the fire that killed Mr. Smith was entirely "unpredictable" and "unforeseeable." Dkt. 148 at 1, 8, 24. This false assertion disregards the evidence detailing the frequency of fires at the prison, including serious fires like the 2017 fire that killed Joshua Devine; it disregards evidence of numerous fire risks, such as faulty electrical outlets, hotpots, and curtains; it ignores evidence about the structural and other barriers at ISP that inhibit a response to fires and other emergencies. PSGD, ¶ 21-114 Defendants even ignore Warden Neal's own testimony that serious fires "can happen at any time" and are "just the reality of the situation" at ISP. PSGD, ¶ 331.

There is more. For example, *compare*, Dkt. 148 at 16 (asserting Crockett completed his rounds at 10:30 a.m.), *with* PSGD, ¶¶ 208, 217 (Crockett finished his rounds at 10:15 a.m.); *compare* Dkt. 148 at 23 (Crockett conducted all required rounds and his next round was at 11:00 a.m.), *with* PSGD, ¶¶ 209, 211, 213-214 (Crockett and Cross should have conducted rounds at 10:30 a.m. but did not); *compare* Dkt. 148 at 2, 11, 13, 14 (Defendants responded to the fire according to protocol), *with* PSGD, ¶¶ 251-52 (Defendants failed to bring the ABC fire extinguisher or bolt cutters to the cell); *compare* Dkt. 148 at 12 (Crockett did not appreciate the magnitude of the fire), *with* PSGD, ¶¶ 241-42 (flames shooting out of the cell and smoke were visible from officers' station), *compare* Dkt. 148 at 14-16 (a "successful rescue [was] impossible"); *with* Dkt. 147-4 (Crockett dep) at 138:5-9 (acknowledging that, "[I]f we was [sic] there a couple of seconds earlier, we probably could have been [sic] maintained it."); *id.* at 67:24-2 ("[I]n a fire situation there is literally a matter of seconds that makes the difference between life and death."), 70:1-6 (similar). This list of examples could be multiplied several times over.

15

Since Defendants' motion relies throughout on *disputed* issues of material fact, the Court should deny their motion and this case should proceed to trial. *See Moton*, 2025 WL 1827942, at *3; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."). On this record, the Court's "one task" is straightforward. The facts are in dispute. A trial is required.

## II. DEFENDANTS MISSTATE THE CONTROLLING STANDARD FOR EIGHTH AMENDMENT CLAIMS FOR FAILURE TO PROTECT PRISONERS

Plaintiff's principal claim (alleged in Count I of the Amended Complaint) is that the Officer Defendants and the Administrator Defendants, in separate ways, failed to protect Michael Smith from the risk of death or serious injury by fire in his cell at ISP. To succeed, Plaintiff must show that Michael Smith faced an objectively serious risk of harm and that Defendants were deliberately indifferent to that risk, *i.e.,* that they actually knew of and disregarded it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Plaintiff need not prove that Defendants intended for the harm to occur or even believed that the harm would result. Instead, she must establish Defendants knew of a substantial risk of harm and acted or failed to act in a way that a reasonable jury could conclude evinced disregard for that risk. *Petties*, 836 F.3d at 728; *see also Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

Defendants compound their failure to adhere to the summary judgment standard with a misstatement of the Eighth Amendment standard of *Farmer v. Brennan.* They contend they can only be found to have failed to protect Mr. Smith if they "had advance notice of a substantial risk of fire *specific to Mr. Smith or his cell.*" ECF No. 148 at 5 (emphasis added). They assert that "[i]n the cell fire context, the Constitution requires specific knowledge of the particular fire risk posed to (or in this case by) an incarcerated individual[.]" *Id.* at 7. Defendants' incorrect understanding of *Farmer v. Brennan* pervades their summary judgment memorandum and their argument: they must prevail in

this case because they did not know that *Mr. Smith's cell* was at risk for fire. *Id.* ("there is no evidence of any kind that would suggest that any of the defendants knew that there was a strong likelihood that Mr. Smith was uniquely in imminent danger of harm from fire due to his own activities").

In fact, and to the contrary, *Farmer* holds that the "substantial risk" may *either* be personal to the individual prisoner *or* may be a general risk that that prisoner faces in common with others. In *Farmer,* the issue was whether prison officials failed to protect the plaintiff from assault at the hands of another prisoner. It was no defense, the Court held, that the correctional officials could not anticipate the specifics of the assault. The "prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer,* 511 U.S. at 843. As the Court clarified:

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health ... and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack *for reasons personal to him or because all prisoners in his situation face such a risk.*

*Id.* (internal quotation marks and citations omitted) (emphasis added).

Thus, for example, correctional officials may be liable under the Eighth Amendment for failing to protect a plaintiff prisoner from attack through their failure to repair malfunctioning doors if the plaintiff could show that the officials were "aware of the general, obvious risk to inmate safety posed by the problem" and failed to act. The plaintiff did not need to establish that the problem with the doors placed the plaintiff in specific danger of being attacked. *Byron v. Dart*, 825 F. Supp. 2d 958, 964 (N.D. Ill. 2011). *See also Dwyer,* 2022 WL 462017 at *14 ("a pervasive lapse of enforcing a safety policy or recurrent unsafe conditions can show that there was an objective, substantial risk to prisoners"); *Washington v. LaPorte Cnty Sheriff's Dept,* 306 F.3d 515, 518 (7th Cir. 2002) (*Farmer* "does not require actual knowledge of an individualized threat—it is enough that defendants are aware that

17

their action may cause injury without being able to divine the most likely victim") (cleaned up); *Brown v. Budz,* 398 F.3d 904, 915 (7th Cir. 2005) ("While we have often found deliberate indifference where custodians know of threats to a *specific detainee* posed by a *specific source,* we have not been constrained by this fact pattern. It is well settled that deliberate indifference may be found though the specific identity of the ultimate assailant is not known in advance of assault.").

The opinion in *Dwyer v. Neal* correctly applies *Farmer v. Brennan* to deny summary judgment in the case against Warden Neal, Deputy Warden Nowatzke and other ISP administrators and correctional staff for failure to protect Joshua Devine from the risk of death or serious injury by fire. The court held that a reasonable jury could find that the defendant officers were aware of Mr. Devine's risk of injury by fire as the fire was burning and were deliberately indifferent to that risk. 2022 WL 462017 at *12. *Dwyer* also held that a jury could find the ISP administrators were deliberately indifferent to the pervasive risks of death or serious injury from in-cell fires at ISP. *Id.* at *22. The plaintiff in *Dwyer* did not need to provide proof that any defendant had foreknowledge of a risk specific to Mr. Devine's cell. The same is true here.

*Miles v. Dorre,* 2022 WL 59540 (N.D. Ind. Jan 6, 2022), on which Defendants exclusively rely for their incorrect interpretation of *Farmer,* is not authority to the contrary. There, an ISP prisoner contended that the defendant officers (two COs and a sergeant) should have known that the outlet in his cell could spark and cause a fire and should have taken action to *prevent* the electrical fire that eventually started in his cell. 2022 WL 59540 at *4. This Court reasoned that, because the specific named defendants had no knowledge that the plaintiff's outlet was at risk for sparking or that there were sparking problems in other cells at ISP, the defendants could not be deemed to have been deliberately indifferent to a problem in the plaintiff's cell. *Id.* at *4-6.

This is a different case. Here, like the plaintiff in *Dwyer,* Plaintiff contends that the Officer Defendants were deliberately indifferent to the risk *as the fire was engulfing Mr. Smith's cell*—a different

18

question than the one presented in *Miles*. [3] Plaintiff also contends that the Administrator Defendants were indifferent to the pervasive risk of fire at ISP, another question not presented in the *Miles* case.

Plaintiff has ample evidence to satisfy the standard of *Farmer v. Brennan* and from which a reasonable jury could find that Defendants were deliberately indifferent to the risk that Mr. Smith would die or be seriously injured from a fire in his cell. [4]

## III.    A REASONABLE JURY COULD FIND THAT THE OFFICER DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE

A jury could reasonably find that the Officer Defendants on duty in ACH the morning of the Smith fire (Cross, Crockett, Walton and Smith) violated Mr. Smith's Eighth Amendment right to protection: (1) Mr. Smith faced an objectively serious risk of harm when he was locked in his prison cell as flames began to engulf the cell; (2) as prisoners screamed and yelled for help, as smoke poured from Mr. Smith's cell, as flames began to emerge and the fire alarm sounded, the Officer Defendants became subjectively aware of the serious risk that Mr. Smith faced; and (3) the Officer Defendants disregarded the risk, remaining in the officers' station and ignoring the prisoners' cries, the emerging smoke and the sounding alarm for precious minutes in an emergency where seconds mattered. If these propositions are true, the Officer Defendants violated Mr. Smith's Eighth Amendment rights. *Farmer*, 511 U.S. at 834; *Petties*, 836 F.3d at 728; *Dwyer*, 2022 WL 462017 at *12.

It is fundamental that correctional officers violate the Eighth Amendment when they fail to respond to prisoners' cries for assistance. As the Seventh Circuit held in *Petties v. Carter*, 836 F.3d 722

---

[3] Miles did also claim that the defendants didn't timely respond to the fire in his cell once it started. But that contention was a non-starter, since Miles had succeeded in extinguishing the fire without assistance. The only evidence as to the defendants' response was that they'd arrived at Miles's cell "within a few minutes, and the fire was already out." 2022 WL 59540 at *4.

[4] Defendants also argue that they cannot be held liable for failing to protect a prisoner who put himself in harms way. *See, e.g.*, Dkt. 148 at 7 (arguing defendants did not cause Mr. Smith's injury). This argument is without merit. *See Sanville v. McCaughtry ; Estate of Clark v. Walker*, 865 F.3d 544, 551, 553 (7th Cir. 2017) (prisoner had clearly established right to be free from deliberate indifference to his risk of suicide while in custody).

(7th Cir. 2016), the "first, and most obvious" method of proving deliberate indifference is "a prison official's decision to ignore a request for . . . assistance," which is precisely what the Officer Defendants did in response to the shouted pleas of prisoners for help in the face of a growing fire, as smoke poured into ACH and the fire alarm eventually sounded.

On the morning of Mr. Smith's death, the Officer Defendants finished the 10:00 a.m. count by 10:15 and then left the ranges in ACH unattended while they sat around in the officers' station— even while knowing that an emergency can happen at any time. They ignored the surveillance monitor—which might not have been working in any event. They did not conduct the 10:30 rounds; supervisors Walton and Smith did not ensure that rounding was conducted. Thus, the Officer Defendant failed to perform their most basic duty to monitor ACH and ensure the safety and security of the prisoners confined in that antiquated, high-risk environment. PSGD ¶186-229. Walton and Smith, who were responsible for staff supervision, did not address or correct this problem. PSGD ¶¶188-89.

Mr. Smith's cell caught fire before 10:53 a.m. Smoke began to emerge from Mr. Smith's cell at 10:55. Prisoners began to shout and scream that help was needed on the 200 range. By 10:56, the smoke from Mr. Smith's cell reached the smoke detector near the top of ACH, triggering the fire alarm. All the while, the Officer Defendants remained in the officers' station, choosing not to respond to the multiple signs of a growing fire emergency. PSGD ¶¶ 230-249.

At 10:58, a full five minutes after the fire was first visible on the surveillance camera, Officers Cross and Crockett finally responded. By this time, the fire was raging and fully visible from down the range at the officers' station. Nonetheless, Cross and Crockett did not bring proper fire suppression equipment to Mr. Smith's cell (Cross brought a useless water fire extinguisher; Crockett brought nothing at all); in violation of protocol, they did not bring bolt cutters in case they might be needed to open Mr. Smith's cell; and they failed to assess whether the bar securing all the cell doors

20

on the range needed to be rolled open. Additional minutes were lost when Crockett and Cross were forced to retreat from the fire to get the proper equipment. At 10:59:24, Lt. Smith grabbed a fire extinguisher but went down the 100 range and never used it. Sgt. Walton opened the cellhouse door but never assisted with the fire. PSGD ¶¶ 241-59.

Mr. Smith died because the Officer Defendants ignored the emergency and, when they finally did respond, they acted with deliberate indifference and in violation of protocol. PSGD ¶¶ 230-71.

Defendants would like the jury to believe a different version of the events of that morning. Prisoners were not calling for help. Dkt. 148 at 8-9. The "rescue efforts" of Cross and Crockett were "immediate." *Id.* at 9-10. When Cross and Crockett responded, they adhered to protocol. *Id.* at 11-13. Sgt. Walton and Lt. Smith, the supervisors, made all the right calls as well. *Id.* at 13-14. Mr. Smith simply could not be saved; he was presumably trying to conceal the fire, which enabled it to rage out of control before the Officer Defendants became aware and could get to the scene. *Id.* at 14. A "break" in the officers' station was reasonable and in line with procedure. *Id.* at 16-17.

Defendants will be entitled to present their evidence to the jury. Plaintiff must be as well. There is simply no way that this Court can resolve at summary judgment the parties' divergent interpretations of what happened the morning that Mr. Smith died. The basic facts are in dispute: were the prisoners yelling and screaming or were they not; was the fire first visible at 10:53 or at some later point; did the fire alarm sound at 10:56 or later? A jury must decide.

Moreover, the Court may not draw inferences from disputed facts in Defendants' favor. The Defendant Officers' subjective knowledge of the fire and the risk to Mr. Smith "is a fact question that could be demonstrated by drawing an inference from circumstantial evidence." *Walker v. Peters,* 233 F.3d 494, 498-99 (7th Cir. 2000). Causation—whether the Defendant Officers' delayed and inappropriate response was responsible for Mr. Smith's death—is typically reserved for the jury.

*Shepard v. State Auto. Mut. Ins. Co.,* 463 F.3d 742, 748 (7th Cir. 2006). Nor may the Defendant Officers secure summary judgment simply because they did attempt to put out the fire. "[A] prison official is not entitled to" summary judgment "simply because he or she takes *any* action in response to a risk of harm to an inmate—that response must be reasonable." *Borello v. Allison,* 446 F.3d 742, 749 (7th Cir. 2006). The jury must assess the evidence and decide what inferences to draw.

Defendant Officers are not entitled to summary judgment.

## IV.    A REASONABLE JURY COULD FIND THAT THE ADMINISTRATOR DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE

Correctional administrators are liable where they know of and disregard conditions at a prison that objectively pose a sufficiently serious risk to health and safety. *Pyles v. Fahim*, 772 F.3d 403, 409 (7th Cir. 2014) (a warden may be held liable where he knew of a hazardous condition and turned a blind eye to it); *Antonelli v. Sheahan*, 81 F.3d at 1422, 1426-29 (7th Cir. 1996) (sheriff could be liable for systemic violations, including allegations of a pest infestation); *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir 2019); *Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (examples of sufficiently serious conditions include exposure to raw sewage or inordinate levels of tobacco smoke, among others); *Byron v. Dart*, 825 F. Supp.2d 958 (N.D. Ill. 2011) (defendants can be liable where they were aware of a widespread problem of faulty doors and the risk this presented to inmate safety); *Potts v. Manos*, Case No. 11 C 3952, 2013 WL 5968930, at *5 (N.D. Ill. Nov. 7, 2013).

"The law recognizes . . . that a defendant need not participate directly in the deprivation for liability to follow under § 1983." *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870-71 (7th Cir. 2011) (internal quotation marks omitted)); *Warren ex rel. Warren v. Dart*, No. 09 C 2512, 2010 WL 4883923, at *6 (N.D. Ill. Nov. 24, 2010) ("A senior jail official who was not personally involved in the acts or omissions complained of nonetheless may be liable in his individual capacity if he can be expected to have known of or participated in creating systematic inadequate conditions at the jail."). "Individual defendants . . . who are responsible for setting prison policy, can be held liable for a constitutional

violation if they are aware of a systematic lapse in enforcement of a policy critical to ensure inmate safety yet fail to enforce that policy." *Sinn v. Lemmon*, 911 F.3d at 412, 423 (7th Cir. 2018). "Additionally, even if policies are complied with, a policy that is substantively deficient may establish a substantial risk of harm." *Dwyer*, 2022 WL 462017, at *15 (quoting *Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015)). Prison officials responsible for staff training can also be liable for failing to provide adequate training to employees when they know that training is inadequate and places prisoners at serious risk. *Dwyer*, 2022 WL 462017, at *19-20.

The Administrator Defendants were aware of the persistent fires at ISP and the abundant fire risks, including sparking outlets, hotpots, and intentional fires set by prisoners. PSGD, ¶¶ 63-82, 104-114. They were similarly aware of the conditions that exacerbated the risks from these fires, including poor sight lines in the cellhouses, lack of emergency infrastructure including emergency call buttons and sprinkler systems, and a complicated cell locking system that slowed the process of unlocking and evacuating cells, among other things. PSGD, ¶¶ 21-62. The Administrator Defendants were also aware that the prisoner fire brigade would take several minutes to arrive to a fire, so cellhouse staff would necessarily need to respond to and put out serious fires in the cellhouses. PSGD, ¶¶ 93-101, 138. They knew that training was insufficient to equip cellhouse staff to discharge that responsibility. PSGD, ¶¶ 111, 138-156. They also knew that policies impacting fire safety and response, including policies requiring 30-minute rounds, cell shakedowns and inspections, and confiscation of curtains and excess property were not adequately enforced at ISP, further exacerbating the risk of serious injury from fires. PSGD, ¶¶ 83-92, 111, 171-82, 201, 205. The Administrator Defendants knew that these conditions had led—and would continue to lead—to serious injury and death at ISP, including the 2017 fire death of Joshua Devine in his cell in B Cell House. PSGD, ¶¶ 64, 71, 102-114.

Despite their awareness of the serious risk of injury to Mr. Smith and other prisoners at ISP, Administrator Defendants failed to take reasonable steps to address that risk. Among other things, they failed to meaningfully examine the Devine fire and take away any lessons to prevent such a horrific event from happening again. PSGD, ¶¶ 115-27. Nor did they instruct staff about what happened during the Devine fire and how a similar prisoner death could be avoided. PSGD, ¶ 124. Administrator Defendants failed to take available steps to ensure that the ranges in the cellhouses were properly and continuously monitored, including by requiring staff to be on the ranges at all times and to watch the surveillance monitor if they were in the officers' station, something a reasonable correctional administrator would have understood they should do in the circumstances. PSGD, ¶¶ 128-36, 157-70. Administrator Defendants failed to provide hands-on training regarding fire response and the use of fire extinguishers, which was critical given ISP's reliance on cellhouse staff for the first response to any fire in the cellhouse; nor did the make any changes to the prisoner fire brigade, including housing all firefighters in the same unit with their equipment so that they could respond more quickly to fires. PSGD, ¶¶ 93-101, 137-56.  Administrator Defendants failed to take a host of other available and obvious steps, including enforcing fundamental safety and security policies relating to property control and timely security rounds. PSGD, ¶¶ 54, 86, 89-90, 103, 120, 205. A reasonable jury could find that these failures caused Mr. Smith's death.

Each of the individual Administrator Defendants bears personal responsibility for some or all of these deliberate failures to respond to the serious risk of death or grave injury by fire.

### A. Warden Neal Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced

Defendant Neal was the Warden of ISP at the time of the Smith fire and the 2017 Joshua Devine fire. PSGD ¶ 1. He oversees everything at ISP and has ultimate responsibility for the security and safety of everyone behind the walls. *Id.* Defendant Neal's responsibilities include the

responsibility for development, establishment, implementation and enforcement of policy, including policies relating to fire response and fire safety. PSGD ¶¶ 1-2, 9.

In the aftermath of the Devine fire in 2017, Defendant Neal recognized that limiting personal property in cells was essential, but he failed to ensure that limits on personal property were consistently and meaningfully enforced. PSGD ¶¶ 111, 113, 119-21, 181-82.  He knew that the prisoner fire brigade would never be able to respond to an in-cell fire in time to save a prisoner trapped in his cell, but he failed to take any steps to improve response times, such as by moving the prisoner firefighters to a central living unit where they would have access to their firefighting gear. PSGD ¶¶ 94, 97-101, 115, 322. He has done nothing to ensure that staff in the housing units have the necessary experiential training to respond to major fires. PSGD ¶¶ 138-56, 322.  He has never introduced any policies or procedures to ensure that the ranges in the old Auburn cellhouses are consistently monitored. PSGD ¶¶ 157-68, 322, 324.  He failed to hold staff accountable for lapses in their responses to in-cell fires—failing even to attend critical incident review meetings or to insist on meaningful review and investigation of fatal fires at ISP. PSGD ¶¶ 125, 275, 283-84, 295-305, 318-19, 330.

Warden Neal has failed to act in all these ways, even as he acknowledges that more fatal in-cell fires at ISP are to be expected and just "the reality of the situation." PSGD, ¶331.

**B.    Deputy Warden Nowatzke Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced**

Defendant Nowatzke was the Deputy Warden of Operations at ISP in the lead up to and at the time of the fire that killed Michael Smith, and he was the Custody Supervisor when Joshua Devine died. PSGD, ¶3, 111. As Deputy Warden, Nowatzke was responsible for developing, establishing, and implementing institutional policies, procedures, and objectives, and he was notified of every incident that happened at ISP. PSGD, ¶4-5.  Nowatzke oversaw the facility training and the

training department and attended quarterly training meetings to discuss issues with training. PSGD, ¶154-156; DSOF ¶238. Defendant Nowatzke attended the After-Action Review following the Devine fire, and was aware of the numerous issues related to the response to that fire. PSGD, ¶108-114. Despite this, he took no steps to institute additional hands-on training related to fire response, something he had the power and ability to do; to make sure that property limits and security rounds policies were enforced; or to make sure that there were adequate policies in place requiring continuous monitoring of the ranges in the cellhouses, among other available action. PSGD, ¶86, 90, 115-127, 156-170, 181.

Nowatzke was responsible for critical incident reviews—meetings that were intended to critically assess serious incidents at ISP to learn from those events and to improve the prevention and/or response to such events in the future. PSGD, ¶278-281. During the critical incident review of the Smith fire, Nowatzke did not talk to any prisoner firefighters or prisoners who were assigned to ACH at the time of the fire. PSGD, ¶290. He did not even talk to the four officers stationed in ACH at the time of the fire and did not secure their presence at the review meeting. PSGD, ¶284, 286-287. Nowatzke did not provide review participants with any information about the fire except the officers' incident reports and failed to show any portion of the surveillance video. PSGD, ¶282. Nowatzke took no steps to identify what each staff member in ACH was doing at the time the fire started or when they were first alerted to the fire; he did not watch the surveillance video of the officers' station at the time of the fire. PSGD, ¶285-290.  Nowatzke's pro forma review ended with the incorrect conclusion that all staff complied with policy and procedure and made appropriate decisions. PSGD, ¶285, 292-294.  Nowatzke did not discipline any staff in relation to the Smith fire. PSGD, ¶295.

C.    **Custody Supervisor Wardlow Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced**

Defendant Wardlow was the Custody Supervisor (and major) starting in 2019 through the time of the fire that killed Michael Smith. PSGD, ¶ 6. Wardlow directly supervised the captains and shift supervisors and oversaw the daily operations at ISP related to custody staff, including the implementation of policies and the enforcement of facility rules. PSGD, ¶¶ 7, 9. He was responsible for reviewing and making changes to post orders at least once per year, including in response to incidents that occur at the facility. PSGD, ¶ 8. He is provided with a copy of every incident report written at the facility, and is expected to review them with a critical eye to ensure policy and procedure were followed; similarly, he reviews all IDOC Internal Affairs Division (I&I) investigation reports, and can recommend changes to policy or procedure, as well as additional training. PSGD, ¶¶ 12-13. Wardlow conducts daily rounds and is aware of the conditions in the cellhouses and is responsible for ensuring shakedowns are done; he attends quarterly training meetings with Defendants Neal and Nowatzke to discuss issues related to training. PSGD, ¶¶ 11, 157, 180.

Despite his authority and responsibilities, Wardlow did not amend the facility policies or procedures to ensure that staff were always monitoring the cellhouse ranges and/or surveillance monitors. PSGD, ¶¶ 157-168, 312. Nor did he implement any hands-on fire response training, although he had the power and ability to do so. PSGD, ¶¶ 155-156, 312. Under Wardlow's watch critical safety and security policies relating to excess property and timely security rounds went largely unenforced. PSGD, ¶¶ 54, 86, 90-92, 181, 205, 229, 267.

Wardlow exhibited total indifference to the safety risks posed by fires in the aftermath of Mr. Smith's death. Wardlow failed to review the surveillance video of the fire and took no steps to learn what happened in ACH between 10:53 and 10:58 a.m. on the day of the fire; what staff were doing at that time; and when prisoners started yelling. PSGD, ¶¶ 307-311. He accepted what staff

27

wrote in their incident reports as true, and he took no action to determine if mistakes were made in response to the fire or if the response was timely. PSGD, ¶¶ 282, 307-311. He did not bother to speak with any of the Defendant Officers about the fire. PSGD, ¶ 311. He took no steps to implement or changes to policy or training in response to the fire. PSGD, ¶ 312.

> **D.     Safety Hazard Manager Deborah Taylor Acted with Deliberate Indifference to the Serious Risk of Death or Grae Injury by Fire that Mr. Smith and Other Prisoners Faced**

Defendant Deborah Taylor joined IDOC in 2013, and she was promoted to Safety Hazard Manager at ISP in February 2022. PSGD, ¶14. Taylor had the primary responsibility at ISP for fire protection, fire prevention, and fire response. PSGD, ¶15. Taylor was responsible for overseeing the prisoner firefighter program; inspecting fire safety equipment like fire alarms and fire extinguishers to determine if their number and placement is adequate; ensuring the adequacy of ISP's fire plan and its implementation; leading and carrying out fire drills, including making sure they adequately prepare staff to respond in the case of a fire; and reviewing the weekly inspection reports to make sure that they were carried out and that any identified issues are addressed. PSGD, ¶¶ 15-16, 133, 147, 172-173.

Taylor received every report from the prisoner firefighters but did not review all of these reports or take steps to address trends or reoccurring issues related to fires. PSGD, ¶ 17. Nor did Taylor make any changes to the deficient ISP fire plan, implementation, or training. PSGD, ¶¶ 128-156, 320-325. Taylor knew that cellhouse staff would necessarily need to respond to fires, including major fires, in the cellhouses, and she knew that they were not trained or prepared to do this. PSGD, ¶¶ 93-101, 139, 314. Nonetheless, she took no steps to ensure that fire drills prepared staff to do so. PSGD, ¶¶ 149-153. She made no assessment of the smoke detectors and whether they were sufficient. PSGD, ¶¶ 313, 323; Dkt. 147-14 at 114:14-115:23 She was not involved in any investigation into the Smith fire and did not substantively participate in the critical incident review;

she took no steps to determine whether there were any issues related to the response to that fire, despite acknowledging that the fire should not have been allowed to get as bad as it did. PSGD, ¶¶ 247, 284, 313-314. She did not read the fire marshal's report of the fire. PSGD, ¶ 313. Under Taylor's direction, weekly inspections were perfunctory, if they were done at all. PSGD, ¶¶ 172-175.

### E.    Captain McCann Acted with Deliberate Indifference to the Serious Risk of Death or Grave Injury by Fire that Mr. Smith and Other Prisoners Faced

Defendant McCann was the shift supervisor on duty at the time of the Smith fire with responsibility for ensuring the safety and security of all prisoners and staff for the period he was on duty. PSGD, ¶¶ 18-19. He was responsible for the performance of corrections staff during his duty period. *Id.*; DSOF ¶ 274; Dkt. 147-11 at 17:10-14.

Defendant McCann fully understood the importance of continuous monitoring of the cells at ISP via the surveillance monitor in the officers' station and via walking the ranges with at least one officer on the ranges whenever possible—particularly because of understaffing and features of the Auburn cellhouses that put prisoners at risk in emergencies. PSGD, ¶¶ 41, 61-62, 102, 227. He knew that fires were a regular occurrence at ISP. PSGD, ¶ 63. He knew that fires placed prisoners locked in their cells at extreme risk for serious injury. PSGD, ¶¶ 82-83. He knew that curtains on cells increased the risks from fire and he was personally aware of the circumstances that caused the death of Joshua Devine. PSGD, ¶ 85; Dkt. 147-18 at 120:14-123:6. He was responsible for ensuring that cells were kept purged of excess personal property. PSGD, ¶¶ 18-19, 171; DSOF ¶ 274.

He enforced no changes to procedure. After Mr. Devine's death, McCann and his staff handled the supervision of prisoners in the living units just as they had before the fire. PSGD, ¶ 118. Defendant McCann did not ensure that the surveillance monitors in the officers' stations were always operative. PSGD, ¶ 224. When he had insufficient staff to assign to ACH and other living units, he did not issue directives to ensure that staff did not congregate in the officers' station and to ensure that the ranges were not left unattended. PSGD, ¶ 164. He did not ensure that staff under his

29

command received appropriate instruction on how to respond to a fire. PSGD, ¶¶ 148, 151, 322. He

allowed excess personal property to accumulate in cells throughout ACH. PSGD, ¶¶ 90, 181.

## V.      DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO INTERVENE CLAIM

Defendants provide a brief, two-sentence argument that Plaintiff's failure-to-intervene claim

can only survive if an underlying constitutional violation is established. Dkt. 148 at 4. The converse

is also true, of course. Since Plaintiff has established that her Eighth Amendment claim against each

Defendant must proceed to trial, her failure-to-intervene claim should proceed as well. *See Dwyer*,

2022 WL 462017 at *22-24 (denying summary judgment on failure to the plaintiff's intervene claim

on materially identical facts).[5]

## VI.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine if the defendants are entitled

to qualified immunity, we ask two questions: (1) whether 'the facts alleged show the officer's

conduct violated a constitutional right,' and (2) whether 'it would be clear to a reasonable officer that

his conduct was unlawful in the situation he confronted.'" *Armstrong v. Daily*, 786 F.3d 529, 538 (7th

Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).

To determine whether a right was clearly established, "the appropriate focus is 'on the

objective legal reasonableness of an official's acts. Where an official could be expected to know that

---

[5] Any other argument against this claim has been forfeited and cannot be raised in reply. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Thomas B v. Kijakazi*, 2022 WL 6750211, at *6 (N.D. Ill. Oct. 11, 2022).

certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.'" *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) (quoting *Harlow*, 457 U.S. at 819). The purpose of qualified immunity is merely to give "government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Thus, to show that a right is clearly established, a plaintiff need not identify a case "directly on point." *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) "Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Rather, even where there are notable factual distinctions between the precedents relied on and the case before the Court, if the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights they can demonstrate clearly established law." *Est. of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010); *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021); *Gonsalves v. Cleveland*, 980 F. Supp. 2d 1060, 1070 (N.D. Ind. 2013).

The first problem with Defendants' immunity argument is that it is so undeveloped that it must be deemed forfeited. While it is ultimately a plaintiff's burden to overcome a qualified immunity defense, "[i]t is [the defendant's] initial burden to properly put the defense before the Court." *Hood v. Smith*, No. 15 C 7945, 2017 WL 2404974, at *3 (N.D. Ill. June 1, 2017) (citation omitted). It is not enough for a defendant simply to invoke the qualified immunity standard, as Defendants do here. *See id.*; *see also Am. Homeland Title Agency, Inc. v. Robertson*, 1:15-cv-02059-SEB-DKL, 2016 WL 5661562, at *10-11 (S.D. Ind. Sept. 30, 2016); *Cusick v. Gualandri*, 573 F.Supp.3d 1256, 1275 (N.D. Ill. 2021); *Lanahan v. County of Cook*, No. 16 C 11723, 2018 WL 1784139, at *11 (N.D. Ill. Apr. 13, 2018) ("the defendants bear the initial burden to properly put the defense of

31

qualified immunity before the Court," and they "fail to do so" where they "do little more than recite the requirements for qualified immunity and insist that the defense applies").

Defendants have forfeited their qualified immunity defense at this stage. Though they discuss at length the first prong of qualified immunity—whether the facts show a violation of a constitutional right—they provide no analysis or discussion of whether clearly established law put Defendants on notice that their conduct was unconstitutional. *See generally* Dkt. 148 at 4-24. The sum total of their argument is the recitation of the legal standard and a portion of two sentences arguing that Plaintiff cannot "identify any clearly established right requiring prison officials to anticipate and prevent all possible ways an incarcerated individual might misuse items in his cell" and that "there is not clearly established precedent requiring the defendants to anticipate any and all possible fire risks Mr. Smith could pose to himself in his cell." Dkt. 148 at 2, 4-5, 8. This cursory, undeveloped argument for qualified immunity is forfeited.

Defendants' second problem is that Defendants' definition of the right at issue is off base. The legal issue here is not whether Defendants should have "anticipate[d] any and all possible fire risks Mr. Smith could pose to himself in his cell" as Defendants contend. Rather, the question is whether correctional officers and administrators would understand they need to take reasonable action in the face of known and pervasive risks of serious injury from fires at ISP, and to protect Mr. Smith from the fire in his locked cell. *See* Section II, *supra* at pp. 16-19. Defendants' misstatement of the constitutional right in issue necessarily defeats their argument for qualified immunity.

The third problem is that Defendants' qualified immunity argument depends on their version of a factual record that is hotly in dispute. The Seventh Circuit has held that, in cases involving claims of deliberate indifference, where "there are genuine issues of fact concerning [the deliberate indifference] elements, a defendant may not avoid trial on the grounds of qualified immunity." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002); *see also McGuire v. Dykstra*, 2020

32

WL 4735264, at *4 (N.D. Ind. Aug. 14, 2020). On that principle as well, Defendants' claim to qualified immunity must fail.

Fourth, and finally, even setting all the other problems aside, there is no doubt that Mr. Smith's rights were clearly established at the time of his death. In February 2022, the court in *Dwyer* held that in 2017 "a reasonable person would know that they could face liability for being deliberately indifferent to a substantial risk of harm posed by fire hazards and deficient fire safety protocol and policies." 2022 WL 462017, at *22; *see also White v. Cooper*, 55 F. Supp. 2d 848, 858 (N.D. Ill. 1999); *Rabb Ra Chaka v. O'Leary*, 1989 WL 56874, at *4 (N.D. Ill. May 24, 1989) ("[I]t has long been established that dangerous conditions of confinement violate the eighth amendment; more important, the Seventh Circuit, following several other circuits, has recognized that fire hazards in particular may violate prisoners' rights."). The court also concluded that correctional officers violated a prisoner's clearly established rights when they heard screams for help but ignored the screams for up to 15 minutes or failed to take reasonable action in response to the screams. *Id.* at *10-11. Although the delay in *Dwyer* was longer than that in this case, a case on all fours is not required to demonstrate that rights were clearly established. *Supra* 30-31. Here, there is evidence in the record that prisoners were audibly yelling for help well before the fire alarm went off, and that Defendant Officers were visible in the officers' station ignoring those pleas for help. PSGD, ¶ 233.

After *Dwyer*, correctional officers had to have understood that the failure to monitor ACH for an emergency despite the known pervasive fire risk and then ignoring screams for help would violate Mr. Smith's constitutional rights. *See also White*, 55 F. Supp. 2d at 858 ("[I]t is reasonable to conclude state defendants consciously disregarding a non-operational fire safety and prevention system in a state prison and failing to free a man from his burning cell would violate an inmate['s] most basic and established constitutional rights."); *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016)( the

33

"first, and most obvious" method of proving deliberate indifference is "a prison official's decision to ignore a request for . . . assistance").

*Dwyer* further concluded that the inaction of the Administrator Defendants to the conditions at ISP—which had not meaningfully changed between April 2017 and January 2023, (PSGD, ¶111-112, 115-127)—violated prisoners' constitutional rights by exposing them to an unreasonable risk of harm from fire. *Id.* at *13-22. Defendant Neal and the other Administrator Defendants were undoubtedly on notice that their continued inaction in the face of the risks of fire at ISP would violate the constitution.

## VII.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

Defendants' sole argument against Plaintiff's negligence and wrongful death claims is that they are barred by contributory negligence. Dkt. 148 at 24-25.[6] Defendants do not dispute that there is evidence in the record that Defendants breached a duty of care to Mr. Smith and caused his wrongful death through either negligent or wanton and willful conduct. These claims should go to trial for the reasons discussed in detail above. *See Steele v. Knight*, 2016 WL 7117155, at *13 (S.D. Ind. Dec. 7, 2016) ("the willful and wanton standard [under Indiana state law] is similar to the deliberate indifference standard analyzed in the context of [plaintiff's] § 1983 claim;" summary judgment denied because of material disputes on constitutional claims).

Defendants' argument that Plaintiff's negligence and wrongful death claims are barred by contributory negligence is unavailing. "[S]ummary judgment is generally inappropriate in negligence cases because issues of *contributory negligence,* causation, and reasonable care are more appropriately left for the trier of fact." *Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 261 (Ind. 2014) (quoting

---

[6] Defendants do not make any argument for dismissal of Plaintiff's intentional infliction of emotional distress claim. *See* Dkt. 148. Any argument for summary judgment on that claim is therefore forfeited, and it will proceed to trial. *See Sublett*, 463 F.3d at 736.

*Estate of Mintz v. Conn. Gen. Life Ins. Co.*, 905 N.E.2d 994, 999 (Ind. 2009) (emphasis in original)). Summary judgment is appropriate based on contributory negligence only if there are no other reasonable inferences or conclusions that can be made from the evidence. *See Areche v. Indianapolis Dep't of Pub. Works*, 264 N.E.3d, 84, 89 (Ind. Ct. App. 2025).

*Areche*, on which Defendants rely, is inapposite. In that case, the plaintiff was injured riding an electric scooter when he hit a hole in the sidewalk. A city ordinance banned use of these scooters on sidewalks, and there was no dispute that the plaintiff violated the ordinance and had no excuse for doing so. 264 N.E.3d at 90. The only question was whether the ordinance was designed to protect individuals, including scooter operators from injuries like plaintiff's—a legal question for the court. *Id.* The Court found that it was, and therefore concluded that the plaintiff's "admitted violation of the Scooter Ordinance . . . constituted negligence per se." *Id.* *93.

In contrast, the evidence in this case shows that, following an investigation by the fire marshal, the cause of the fire that killed Mr. Smith is unknown. PSGD, ¶270. The fact that Mr. Smith allegedly had homemade electrical items in his cell and that he was moving around prior to the fire does not compel a conclusion that he was negligent in causing the fire or even that he caused the fire. *See Lyons*, 19 N.E.3d at 262 (question of contributory negligence should be decided by a jury unless the "alleged negligence was so clear and palpable that no verdict could make it otherwise") (cleaned up). Plaintiff's state law negligence and wrongful death claims should go to a jury.

## CONCLUSION

For the foregoing reasons, this Court should enter an order denying Defendants' Motion for Summary Judgment in its entirety.

Dated: May 19, 2026

Respectfully submitted,

**MYSTI VALENCIA**,

35

                                    as Personal Representative of the
                                    Estate of Michael Smith


                                    By: /s/ Megan Pierce
                                            One of Plaintiff's Attorneys


Jon Loevy
Locke E. Bowman
Megan Pierce
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
T: (312) 243-5900
megan@loevy.com