**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| **MYSTI VALENCIA,** | ) |
| **PERSONAL REPRESENTATIVE OF THE** | ) |
| **ESTATE OF MICHAEL SMITH,** | ) |
| | ) |
| **Plaintiff,** | ) **No. 3:24-cv-00185-DRL** |
| | ) |
| **v.** | ) |
| | ) |
| **NEAL, *et al*.,** | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Defendants, Ron Neal, Jason Nowatzke, Deborah Taylor, Douglas Wardlow, Nadine Smith, Kevin Cross, Jeniene Walton, Darnell Crockett, Steven McCann, by counsel, file their reply in support of their motion for summary judgment, and in support thereof, state as follows:

## I. Introduction

The Plaintiff's response spans more than forty pages and discusses a wide range of subjects, including prior fires at Indiana State Prison ("ISP"), staffing levels, fire training, property restrictions, post-incident investigations, and the Court's opinion in *Dwyer v. Neal*. But despite the breadth of Plaintiff's presentation, the response never overcomes the fundamental defect in Plaintiff's case: Plaintiff still cannot identify evidence from which a reasonable jury could conclude that any Defendant knew of and consciously disregarded a substantial risk of serious harm to Mr. Smith.

Rather than focusing on what each Defendant knew before the fire, Plaintiff repeatedly relies on generalized evidence that fires can occur in prisons and hindsight criticism of how ISP could have been operated differently. The Plaintiff seeks to expand *Farmer v. Brennan* beyond its

limits, arguing that awareness of prior fires and generalized institutional risks is sufficient to establish Constitutional liability. But *Farmer* requires a far more particularized inquiry into the specific risk faced by the incarcerated individual and each defendant's subjective awareness of that risk.

The record here contains no evidence that any Defendant knew Mr. Smith faced an imminent risk of fire, knew that a fire would occur in Cell 252 on January 14, 2023, or consciously disregarded such a risk. The surveillance video and undisputed evidence instead establish that Defendants responded to an unexpected and rapidly developing emergency. Plaintiff's efforts to create factual disputes through incarcerated-individual affidavits, post-incident investigations, and references to unrelated fires do not create a genuine issue of material fact because they do not address the central question required by *Farmer*: what Defendants knew before and during this fire. Because Plaintiff has failed to produce evidence from which a reasonable jury could find deliberate indifference by any Defendant, summary judgment remains appropriate.

## II. Argument

### *A. The Defendants Properly Presented Evidence to Support Summary Judgment*

The Defendants have presented evidence, in the form of surveillance video and witness testimony, the portions of the record that demonstrate the absence of genuine issue of material fact for trial and that summary judgment in their favor is warranted. *Spierer v. Rossman*, 798 F.3d 502 (7th Cir. 2015). While the Plaintiff insists that the Defendants failed to acknowledge their anticipated evidence or point out all possible discrepancies, this is not what the summary judgment standard requires. The Defendants met their burden; the Plaintiff’s response fails to create a genuine issue of material fact for trial.

*B. The Plaintiff Seeks to Impermissibly Expand the Court's Holding in Farmer*

The Plaintiff argues that *Farmer v. Brennan*, 511 U.S. 825 (1994) stands broadly for the premise that a risk can "either be personal to the individual prisoner or may be a general risk that that prisoner faces in common with others." (ECF 169 at 24). But the Plaintiff ignores the facts in *Farmer* and that the incarcerated individual in that case was "a preoperative transsexual who projects feminine characteristics, [who had] been incarcerated with other males in the federal prison system, sometimes in the general prison population but more often in segregation." *Id*. at 825. He sought damages and permanent injunctive relief because he claimed he was "particularly vulnerable to sexual attack." *Id*. There was evidence that the incarcerated individual was particularly vulnerable to attack and underwent hormone therapy, received breast implants, and wore clothing in a feminine manner. *Id*. As the Plaintiff points out, the Supreme Court opined that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id*. at 843. When read in context, it is evident that the Supreme Court found that, when considering that particular incarcerated individual's circumstances, it would be reasonable to conclude that they faced a general risk of sexual assault that could have or should have been anticipated.

While the Plaintiff accuses the Defendants of misreading *Farmer*, it is evident that the Plaintiff seeks to impermissibly expand *Farmer* to require strict liability – that because a fire that caused a death occurred in 2017, six years prior, that all incarcerated individuals at ISP in all cell houses were also generally vulnerable to fire in 2023, and therefore, no individualized inquiry of whether the Defendants were aware of a substantial risk of fire to Mr. Smith is necessary or appropriate. The Plaintiff also points to fires that occurred in 2022 as evidence that the

administration Defendants were aware of a general risk of a cell fire (ECF 169 at 4 – 5); however, the Plaintiff admits that those cell fires involved hot pots and deliberately set protest fires in D Cellhouse. She further argues that tampering with outlets was a widespread problem at ISP. (ECF 169 at 4). Even assuming, *arguendo*, the administrative defendants were on notice of these particular sources of fire, and had removed hotpots from the list of allowed items or had increased surveillance measures in D Cellhouse, the Plaintiff fails to explain how these measures would have prevented the fire in Mr. Smith's cell. The Plaintiff presents no evidence that the fire in Mr. Smith's cell involved a hot pot, and the evidence establishes that this fire occurred in ACH and did not involve the outlet. (ECF 147-16 at 1).

In support of her argument, the Plaintiff cites case law that involves attacks by other incarcerated individuals, which is not analogous to the accidental fire that occurred due to Mr. Smith's own conduct. Nevertheless, these cases bolster the premise that the Constitutional inquiry under *Farmer* requires analysis of the specific circumstances leading up to the involved attack. In *Byron v. Dart*, 825 F.Supp.2d 958 (N.D. Ill. 2011), an opinion and order denying a motion to dismiss by the prison official defendants, the defendants were alerted to the specific problem of cell doors that could be "popped" open without a key by multiple sources, including by incarcerated individuals, work orders, and even a report by the United States Department of Justice. The plaintiff pre-trial detainee was sleeping when another inmate popped his door and stabbed him. *Id*. at 961. Additionally, there were allegations that the correctional officer on duty was often observed sleeping on his shift, thus providing no supervision whatsoever. *Id*. As the court's order denied a motion to dismiss, no facts were adjudicated; however, the alleged problem creating a substantial risk to pre-trial detainees was from a specific source: malfunctioning cell doors capable of being opened by a pre-trial detainee.

The Plaintiff also cites *Washington v. LaPorte County Sherriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002), a case in which the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendants. In that case, the jail enacted a policy allowing pre-trial detainees to choose their own cell assignments. *Id*. at 516 – 517. A detainee was attacked over a bunk selection incident, resulting in significant injury. *Id. at* 517. The detainee presented expert testimony that jail officials should have known "that allowing detainees to control bunk assignments was an obvious risk that the [jail] officials should have recognized." *Id*. at 518. In considering the jail officials' constitutional liability, the court reiterated *Farmer*'s requirement that subjective knowledge of the risk to the plaintiff is a necessary inquiry:

> There was no evidence that Washington expected to be attacked by Hood, or that he in any way feared harm from Hood, or that he or [jail] officials should have expected an attack. He shared his cell with Hood for two weeks without incident, did not inform the guards that Hood had thrown him out of their shared cell, that he had briefly fought with Hood, or that he in any way feared harm from Hood or another inmate.

*Id*. at 518. The court also found that the on-duty guards acted appropriately upon learning of the attack on the plaintiff:

> Once the guards learned of Washington's attack, they immediately removed him from the cell block, gave him appropriate medical care, and when the extent of his injuries was determined, sent him to an area hospital. As the district court noted, "[t]hat displays deliberate care, not deliberate indifference."

*Id*. at 518 – 519. The court affirmed the district court's grant of summary judgment, reiterating the fact-specific inquiry necessary for analysis of *Farmer*'s subjective component:

> Simply describing the jail officials as deliberately indifferent because they made a decision to implement a program which, in general terms, could increase the probability of violence, ignores the subjective element of *Farmer*'s test. Neither the facts of the case nor Washington's expert offers support for the conclusion that this incident was anything more than an unfortunate random act of violence in prison, which does not impose liability on prison officials.

*Id*. at 519 (citation omitted).

The Plaintiff's citation to *Brown v. Budz*, 398 F.3d 904 (7th Cir. 2005) likewise fails to support the Plaintiff's argument. In *Brown*, the Seventh Circuit considered the district court's dismissal of pre-trial detainee Brown's complaint against prison officials regarding attacks he suffered at the hands of G.B., a fellow detainee. *Id*. at 907 – 908. Brown alleged that G.B. had attacked other Caucasian residents on other occasions and that prison officials knew that he had a propensity for violence on Caucasian residents. *Id.* at 907 – 908. The court opined that, even where the victim is unknown, Farmer requires an inquiry into whether prison officials knew that the characteristics or history of a specific incarcerated individual creates a substantial risk to others:

> When our cases speak of a "substantial risk" that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to detainees with known "propensities" of violence toward a particular individual or class of individuals . . ."

*Id*. at 911.

Ultimately, the cases cited by the Plaintiff demonstrate precisely why summary judgment is warranted here. *Farmer* and its progeny do not hold that prison officials become Constitutionally liable whenever they are aware that a category of danger exists within a correctional institution. Rather, those cases require a fact-specific inquiry into the nature, the source, and the defendants' actual knowledge of that risk. *Miles v. Dorre*, 3:19-CV-456 DRL, 2022 WL 59540 (N.D. Ind. January 6, 2022), demonstrates this point. The plaintiff in *Miles* awoke to a fire in his cell which appeared to come from his outlet, resulting in burns to his hands. *Id*. at *1. The Court rejected the plaintiff's argument that previous fires equated generalized knowledge of a substantial risk to the plaintiff, applying the exact analysis regarding the specific knowledge of risk that *Farmer* requires:

> Here, [the defendants] each testified that they didn't have any knowledge regarding whether Mr. Miles ever had any electrical problems in his cell. Mr. Miles testified that, before the fire, he didn't have any issues with the electrical sockets in his cell. Officer Andrews testified that Mr. Miles had never communicated any concerns about electrical problems in his cell to her. These individual defendants didn't know

> that Mr. Miles was at serious risk of harm because they didn't know that Mr. Miles had any electrical problems in his cell. For that reason, no reasonable jury could find that [the defendants] acted with deliberate indifference toward Mr. Miles regarding the risk of fire in his cell.
>
> . . .
>
> Mr. Miles also points to incident reports of other fires at the Indiana State Prison to try to establish the defendants' awareness of the risk of harm to Mr. Miles. However, a review of these reports shows that many of the other fires were started by inmates, and none of these three individual defendants were mentioned as having been involved in any of the other incidents. To say that [the defendants] actually knew of the risk of fire in Mr. Miles' cell based on other fire incidents in other cells related to other causes where these officials weren't personally involved is a speculative reach. The law won't permit juries to speculate. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

*Id*. at *4 (citations to the record omitted). As illustrated by the Court's holding in *Miles*, the Court must engage in analysis regarding the prison official's advanced knowledge of a specific risk to the incarcerated individual; that prior fires have occurred, without more, does not serve as the basis for that knowledge.

The Plaintiff cites *Dwyer v. Neal*, 3:18-CV-995 JD, 2022 WL 462017 (N.D. Ind. Feb. 15, 2022), a case involving a 2017 fire that claimed the life of Joshua Devine at ISP, to stand for the premise that the Court's opinion in that case established knowledge of a general risk of fire to Mr. Smith. But the Plaintiff ignores that the Court in *Dwyer* denied summary judgment, stating that there were issues of material fact for the jury. Plaintiff's attempt to transform *Dwyer* into notice of every future fire risk at ISP is unsupported by law and inconsistent with the individualized inquiry required by *Farmer*. Furthermore, as the Court in *Dwyer* denied summary judgment, the decision cannot serve as an adjudication of facts. The parties settled before trial, thus no facts related to the fire involving Mr. Devine have ever been adjudicated.

More importantly, *Dwyer* was factually distinct in critical respects. The fire involving Mr. Devine considered evidence alleging that officers ignored incarcerated individuals' yells for help

for over fifteen minutes and that officers arrived at the cell without any firefighting equipment. *Dwyer*, *supra* at *2. The Court also considered evidence that the officers failed to call a fire code until thirty minutes after the first incarcerated individuals yelled for help, failed to timely release the prisoner fire brigade, and failed to bring keys cellside to release Mr. Devine. *Id*. The Court also considered evidence regarding faulty outlets at ISP, lack of fire drills, and faulty radios. *Id*. at *15 – 16. There is no evidence that any of those conditions were present in the fire that lead to Mr. Smith's death. Even assuming, *arguendo*, that the *Dwyer* opinion provided notice of the specific deficiencies identified in that case and that Defendants implemented corrective measures in response by the January 2023 fire, the Plaintiff still fails to explain how those measures played a role in the fire involving Mr. Smith. Unlike in *Dwyer*, there is no evidence that staff lacked, for example, keys necessary to access Mr. Smith's cell, that a faulty electrical outlet caused the fire, or that officers ignored reports of an ongoing fire for an extended period before responding. *Farmer* requires a far more particularized showing of both deliberate indifference and causation.

Indeed, the Plaintiff's reading of *Dwyer* would effectively eliminate *Farmer*'s subjective component altogether. Under the Plaintiff's theory, once the fire that claimed Mr. Devine's life occurred, every subsequent prison fire at ISP would constitute a constitutional violation, because prison officials thereafter knew that fires could occur and cause injury. But *Dwyer* never held that awareness of a prior fire is sufficient to establish deliberate indifference in all future cases, particularly because the Court denied summary judgment. To the contrary, the Court's opinion in *Dwyer* demonstrates that *Farmer* requires a fact-specific inquiry into what each defendant knew and did, not a generalized assumption that prior incidents create perpetual constitutional liability.

The Plaintiff's reliance on the Court's opinion in *Dwyer* denying summary judgment litigation also ignores the reality of the very significant differences in the cause of the fire and the

fire response. In the instant case, as compared to the Court's discussion of the facts in the *Dwyer* opinion, the electrical outlet was not involved, the response to the fire was measurably faster, a fire extinguisher and keys were brought to the cell upon first approach by Officers Cross and Crockett, the fire signal was called immediately, and the offender fire brigade was deployed and arrived within seven minutes and thirty-four seconds from the first flickers of flame. (Ex. A-1; ECF 147-6, 122:19 – 25; ECF 147-16 at 1).

In effect, the Plaintiff seeks to impose a standard of strict liability. Under Plaintiff's theory, the occurrence of a single fatal fire in 2017 permanently placed prison officials on notice such that any future fire, regardless of when it occurred, how it started, or what corrective measures were implemented in the interim, would create Constitutional liability. But that does not address the relevant question, which remains: whether Defendants consciously disregarded a substantial risk of serious harm *to Mr. Smith*. The Plaintiff has failed her burden of showing that *any* of the Defendants knew of, let alone disregarded, a particular risk to Mr. Smith. The Plaintiff similarly points to no pervasive problems in Mr. Smith's cell or even in ACH that put the Defendants on notice of an imminent fire risk putting Mr. Smith in danger. At most, the Plaintiff has shown that prison officials were aware that fires, like violence and countless other hazards inherent in prison life, can occur. Under *Farmer*, *Byron*, *Washington*, and *Brown*, the very cases the Plaintiff relies upon, that is insufficient as a matter of law to establish an Eighth Amendment violation. Summary judgment in favor of the Defendants is appropriate.

*C. The Plaintiff's Submitted Affidavits Fail to Create a Genuine Issue of Material Fact*

In her response, the Plaintiff presents affidavits from several incarcerated individuals regarding their recollections of the events on January 14, 2023. These affidavits plainly fail to present a genuine issue of material fact for trial for two reasons: First, surveillance video shows

that Officers Cross and Crockett responded to the fire in Mr. Smith's cell within three minutes and thirty-one seconds of the first flickers of flame, which fails to clear the "high hurdle" of "total unconcern" for Mr. Smith's welfare as a matter of law, regardless of when prisoners began shouting. *Stockton*, 44 F.4th at 615; *see also Miles*, *supra*, at *4; (ECF 136, Ex. A-1). But the affidavits also fail to create a genuine issue of material fact because they lack the requisite personal knowledge of when prisoners began shouting relative to when Officers Cross and Crockett responded to the fire or their observation of the correctional officers' actions in the officers' station. Fed. R. Civ. P. 56(c)(4); *Payne v. Pauley,* 337 F.3d 767, 772 (7th Cir. 2003); *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

James Jones was housed in Cell 124 North. (ECF 163-34 at 1). Mr. Jones stated that he could see into the officers' station in order to observe the officers inside. *Id*. However, he does not describe *how* he could see into the officers' station from twelve cells away or how many officers he viewed inside the officers' station. As is seen on the surveillance video, counting from Cell 148 back twelve cells to Cell 124 (Mr. Jones's cell), demonstrates the large distance between Cell 124 and the officers' station, which is located past the very end of the block. (ECF 136, Ex. A-1; Ex. A-2; ECF 147-3). Mr. Jones would not have been able to simply look into the officers' station. Mr. Jones's affidavit therefore fails to establish personal knowledge.

Jonathan Triplett's affidavit provides no evidence that creates a genuine issue of material fact for trial, as he states that he remembered people yelling, inhaling smoke, and that "awhile later" the fire alarm went off and people started being evacuated. (ECF 163-35).

Terrence Parker was located in Cell 138 North. (ECF 163-36 at 1). His cell is visible on the surveillance video, which shows him coming to his cell front at 10:57:48, approximately thirty

seconds before Ofcs. Cross and Crockett approach Cell 252, with an object that appears to be a mirror that flashes towards the camera. (ECF 136, Ex. A-1; Ex. A-2). Mr. Parker states that he saw "one officer" going inside the cage, but he does not attest to the actions of any other officer. (ECF 163-36 at 1). Mr. Parker's affidavit also contains impossible inconsistencies. He attests that an officer "came running up 200 North he seen the fire and ran back to tell them to call the fire men to come in put the fire out". (ECF 163-36 at 2). Mr. Parker further attests that "[t]hey come with the fire extinguisher but the fire was to [sic] much for them to use extinguisher they could not fight the fire with it." (ECF 163-36 at 2). But as is plainly seen in the surveillance video, it would be impossible for an incarcerated individual inside a cell on the 100 range to personally observe anything happening on the 200 range. (ECF 136, Ex. A-1). Mr. Parker further describes the fire department's actions that day, stating that they came and put the fire out without much problem. (ECF 163-36 at 2). But his statement is blatantly contradicted by the surveillance video, which shows that Mr. Parker evacuates his cell at approximately 1:06:51, while the firefighters are still actively fighting the fire in Cell 252. (ECF 136, Ex. A-1; Ex. A-2). *Raddant v. Douglas County, Wisconsin*, 170 F.4th 583, 591 (7th Cir. 2026)(citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)(affidavits blatantly contradicted by the record should not be adopted by the court for purposes of summary judgment).

Edward Miller's affidavit further does not establish this fact. Mr. Miller was located in Cell 404 North. (ECF 163-37 at 1). Mr. Miller stated that he smelled smoke, heard inmates yelling "fire in the cellhouse", and people were yelling "for a while before anybody came to help". (ECF 163-37 at 1). But as Mr. Miller was on the 400 range, he was unable to personally observe when incarcerated individuals began to yell relative to when correctional officers responded to the fire in Cell 252. (Ex. A-1; A-2).

Mr. Weldon was located in Cell 348 North. (ECF 163-38). Because of the solid floor that would prevent him from personally observing the activities on the 200 range, he could not know how long it was from when incarcerated individuals began shouting to the time that Ofcs. Cross and Crockett arrived at the 200 range to attempt to rescue Mr. Smith. (Ex. A-1; Ex. A-2).

Dennis Zollman was located in Cell 154 North. (ECF 163-39 at 1). Mr. Zollman attests that he heard Michael Smith begin to scream and that prisoners began to shout. (ECF 163-39 at 1). Like the other incarcerated individual affiants, Mr. Zollman could not personally observe when the prisoners began shouting relative to when Ofcs. Cross and Crockett arrived at the 200 range to begin rescue efforts at Mr. Smith's cell. (Ex. A-1; Ex. A-2).

Because these affidavits wholly fail to establish that the affiants have personal knowledge, as required by Fed. R. Civ. P. 56(e) and Fed. R. Evid. 602, regarding the matters discussed in their affidavits, they fail to create a genuine issue of material fact for trial. "Testimony about matters outside their personal knowledge is not admissible, and if not admissible at trial neither is it admissible in an affidavit used to support or resist the grant of summary judgment." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)("Testimony about matters outside their personal knowledge is not admissible, and if not admissible at trial neither is it admissible in an affidavit used to . . . resist the grant of summary judgment").

*D. The Correctional Officers Did Not Violate Mr. Smith's Eighth Amendment Rights*

In their response, the Plaintiff maintains that there is a question of fact regarding the response by Officers Cross and Crockett, as ISP's investigation states that the fire started at 10:53. (ECF 169 at 21). The ISP investigation's estimated start time of the fire does not create a genuine issue of material fact, because the surveillance video footage provides irrefutable evidence of the time that the fire started, 10:54:49 a.m. (ECF 136, Ex. A-1). "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. This is because the Court will "view the facts in the light most favorable to the nonmovant only if there is a genuine dispute about those facts." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott*, 550 U.S. at 380). Stated differently, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [the Court] will not indulge stories clearly contradicted by the footage." *Horton*, 883 F.3d at 944 (finding that video evidence can conclusively resolve factual disputes when it "firmly settles a factual issue" and is not open to reasonable interpretation.); *see also Smith v. Finkley*, 10 F.4th at 725 (2021). An ambiguous video can be relied on for facts that can be established "with confidence" and "beyond reasonable question," but a conclusive video "allows a court to know what happened and decide the legal consequences." *Smith v. Finkley*, 10 F.4th at 730 (internal citations omitted).

The undisputed evidence establishes that Officers Cross and Crockett approach Mr. Smith's cell with a water fire extinguisher three minutes and thirty-one seconds from the first flickers of the fire, deployed the water fire extinguisher, retreated to "roll the bar" and obtain an ABC fire extinguisher, returned to the scene of the fire with an ABC fire extinguisher, and Officer Crockett remained at the scene of the fire in an attempt to open Mr. Smith's cell door. (ECF 136, Ex. A-1; ECF 147-4, 37:18 – 38:4; ECF 147-5, 141:9 – 11; 142:12 – 19). Sgt. Walton called a 10-71 fire signal, and, therefore, the QRT team arrived within five minutes and eighteen seconds of the first flickers of flame, the first member of the offender fire brigade arrived within six minutes and fifty-nine seconds, and the offender fire brigade in full gear arrived within seven minutes and thirty-four seconds. (ECF 136, Ex. A-1). Lt. Smith brought an ABC fire extinguisher to the 100

range, believing she could deploy it from below. ECF 147-8, 170:4 – 9). When she could not, she brought the fire extinguisher to the 200 range, handed it off, then assisted in cellhouse evacuation efforts. (ECF 147-8, 170:12 – 21). Regardless of when the fire alarm went off, when incarcerated individuals in ACH started shouting, regardless of whether these officers brought the "correct" equipment with them, or regardless of whether ACH staff was improperly congregating in the officers' station at the same time, any criticisms of these officers' conduct would, at worst, amount to negligence:

> Certainly, too, these defendants didn't act deliberately indifferent to any risk or need once the fire started and the fire alarm went off. Mr. Miles says the defendants didn't timely respond to the fire, but [the defendants] arrived at his cell within a few minutes, and the fire was already out. . . . Mr. Miles says that [the defendants] didn't summon the Indiana State Prison's inmate firefighters, nor did they bring fire protection equipment, including a fire extinguisher, with them when they arrived at Mr. Miles' cell. Even if it could be said that [the defendants] acted negligently in their response to the fire, that wouldn't satisfy the deliberate indifference standard. *See Petties*, 836 F.3d at 728. The Eighth Amendment does not demand flawlessness from prison officials. *See Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004).

*Miles*, *supra*, at *4 (internal citations to the record omitted).

The Plaintiff also argues that Officer Crockett (who was assigned to the 200 range of ACH on January 14, 2023) completed his security check/count by approximately 10:15 a.m and that he failed to timely conduct his next security check per policy. The Plaintiff relies on the testimony of Sgt. Walton, who believed that each security check should be conducted 30 minutes after the last security check was started, to argue that the next security check was due by 10:30 a.m. (ECF 169 at 13). The post orders are silent on the timing of security checks relative to the last security check. (ECF 167, Exs. 12, 27). Mr. McCann, former captain and day shift supervisor, required the security checks to be staggered in order to not be predictable. (ECF 147-18, 40:14 – 24). But regardless of what time the security check was required, even if Officer Crockett failed to comply with ISP policy, failure to follow policy does not establish a constitutional violation. *Smith v. Warden*, 3:22-

CV-189 DRL-MGG, 2022 WL 1138444, *1 (N.D. Ind., March 14, 2022); *Thompson v. City of Chicag*o, 472 F.3d 444, 454 (7th Cir. 2006). As a matter of law, summary judgment in favor of Ofc. Cross, Ofc. Crockett, Sgt. Walton, and Lt. Smith is warranted.

*E. The Plaintiff Has Failed to Establish that the Administrative Defendants Violated Mr. Smith's Eighth Amendment Rights*

To survive summary judgment, the Plaintiff must present evidence from which a reasonable jury could conclude that each Administrative Defendant (Neal, Nowatzke, Wardlow, Taylor, and McCann) knew of and consciously disregarded a substantial risk of serious harm to Mr. Smith. *Farmer*, 511 U.S. at 837. The Plaintiff repeatedly asserts that the Administrative Defendants should have implemented additional reforms relating to property limits, inspections, staff monitoring, fire training, staffing levels, emergency response procedures, and institutional oversight. Yet the Plaintiff only succeeds in showing that such measures might generally have improved prison safety prior to January 2023. The Eighth Amendment does not impose liability simply because an institution could have been made safer. Rather, the Plaintiff must establish that Defendants consciously disregarded a known substantial risk to Mr. Smith and that the alleged Constitutional violation caused the injury at issue.

Plaintiff criticizes Neal, Nowatzke, and Wardlow for allegedly failing to enforce personal property limits, but Plaintiff has not presented evidence that Mr. Smith possessed property in excess of the amount permitted under IDOC policy. While Mr. Smith had certain *contraband* items in his cell, an important distinction, Warden Neal testified that "the things that were found in his cell . . . could be put in his cell in a single day. I mean, it doesn't take that long to gather items." (ECF 147-10, 187:2-15).

The Plaintiff likewise faults Neal, Nowatzke, and Wardlow for allegedly failing to ensure that correctional staff were adequately trained to respond to a major fire. Yet the Plaintiff points

to no evidence that Officers Cross or Crockett lacked training on the use of fire extinguishers or failed to utilize the training they received. Correctional officers are not firefighters, and the Plaintiff presents no evidence that any ISP correctional officer could reasonably have been expected to employ firefighting tactics beyond assessing the scene, deploying a fire extinguisher, and/or releasing an incarcerated individual from their cell, if possible.

Finally, the Plaintiff criticizes Neal, Nowatzke, and Wardlow for failing to require constant monitoring of ACH. But the Plaintiff cites no evidence that, following the fire involving Mr. Devine or the subsequent litigation, these Defendants were placed on notice that constant monitoring was necessary in ACH to prevent or adequately respond to cell fires. Indeed, the Plaintiff identifies no recurring problem in ACH that would have alerted these Defendants that continuous monitoring in that cellhouse was required, beyond the security checks that were already occurring. (ECF 147-18, 125:20 – 126:9). At best, the Plaintiff argues in hindsight that more monitoring may have been beneficial. *Farmer*, however, does not impose liability based on hindsight. *Farmer*, 511 U.S. at 838 (A prison official cannot be held liable for failing to alleviate a risk he did not perceive).

The Plaintiff's criticisms of Ms. Taylor reflect a lack of understanding of her role at the facility:

> The responsibilities of [the safety hazard manager] are to oversee the offender fire brigade, to make sure that they have what they need and that they're doing the things that should be done in the facility. She also does inspections through the facility to site violations of OSHA, any work orders that need to be turned into the maintenance department. She conducts a monthly report of any deficiencies found that's cited. She also follows up on that monthly reported deficiencies to make sure that the items that were previously cited or that work orders that were turned in for are repaired. She has oversight of the fire alarm system to make sure that it's functional throughout the prison. She has oversight of fire extinguishers to make sure that they are where they're supposed to be, that they're filled, they're ready to be used. She's also the offender ADA compliance manager. . . . She also provides fire drills in collaboration with custody supervisor.

(ECF 147-10, 52:2 – 19). The Plaintiff seeks to hold Ms. Taylor responsible for failing, from the time she was promoted to Safety Hazard Manager in February 2022 through the fire in January 2023, for not making sweeping changes to fire policy and protocol at ISP, all of which would be outside of her job role. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

The Plaintiff similarly misunderstands Mr. McCann's role at the prison. As the former captain and day-shift supervisor, his primary duties were shift staffing assignments and commanding emergency operations. (ECF 147:18, 37:4 – 9, 69:18 – 23). He was not responsible for ensuring that cells were purged of excess property, as the Plaintiff claims.[1] The Plaintiff wholly fails to show that Mr. McCann had the responsibility or authority to implement cell shakedowns, provide additional fire training, or ensure operational monitoring equipment. *Burks*, 555 F.3d at 595.

The Plaintiff spends much of her brief and statement of genuine issues criticizing the Administrative Defendants' actions and investigations in the aftermath of the January 14, 2023, fire. But any deficiencies present in the aftermath of the fire "has no bearing on whether the defendants knew of and disregarded an excessive risk of harm to [the plaintiff] before the fire occurred or while it was occurring." *Miles*, *supra*, at *5. This is particularly true because the Defendants do not rely on any post-fire investigative reports in seeking summary judgment. Additionally, while the Plaintiff argues that certain surveillance video was not properly preserved after the fact, this has no bearing on whether the Defendants were deliberately indifferent to Mr. Smith before or during the fire. *Id.*; *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021).

[1] The Plaintiff cites to the Defendants' Statement of Material Facts, ¶ 274 in support of this proposition. However, that paragraph states "As day shift supervisor, Mr. McCann was responsible for assigning and managing staff and managing any critical situations that arose during his shift. (ECF 147:18, 37:4 – 9)."

*F. The Defendants Remain Entitled to Qualified Immunity*

The Plaintiff's qualified immunity argument suffers from the same defect as the remainder of her response: it attempts to define the constitutional right at an impermissibly high level of generality. The relevant inquiry is whether existing precedent placed the constitutional question "beyond debate" in the particular circumstances confronted by the defendants. Plaintiff never identifies such authority.

Instead, the Plaintiff principally relies on *Dwyer* and argues that the prior Devine fire placed every Defendant on notice that their conduct violated the Constitution. But *Dwyer* did not clearly establish that the conduct alleged here violates the Eighth Amendment, as it was a summary judgment denial on a different factual record. Importantly, the Plaintiff never identifies any clearly established law holding that prison officials violate the Eighth Amendment by failing to anticipate and prevent an accidental or self-created hazard of which they had no prior knowledge..

While true that the exact cause of the fire is unknown, the evidence is irrefutable that Mr. Smith was continuously moving from Ofc. Crockett's security check through the time of the fire. (ECF 136, Ex. A-1). It is also irrefutable that electric flashes are visible on at least four separate instances: 10:13:48, 10:37:40, 10:40:10, and 10:40:59. *Id*. It is further irrefutable that Mr. Smith never came to the front of his cell for assistance following any of these flashes, which any reasonable person would expect him to do if there was an unexpected or unintentional electrical issue occurring in his cell. *Id*. It is irrefutable that, following these electrical flashes, a fire started in Mr. Smith's cell. Id. Finally, it is irrefutable that competent ignition sources were found in the area of origin of the fire, including a "heat producing device". (ECF 147-16, p. 2, 4).

Thus, even viewing the evidence in the light most favorable to Plaintiff, the record establishes that Mr. Smith or some condition within his cell created a hazardous circumstance that

ultimately resulted in the fire. But Constitutional liability does not arise simply because a hazard existed. Rather, liability requires evidence that the Defendants knew of the specific danger and consciously disregarded it. *Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014). The Plaintiff has identified no evidence that any Defendant knew of the electrical flashes, knew that Mr. Smith was engaging in conduct that created a fire risk, knew that a fire was imminent, or otherwise possessed advance knowledge of the condition that allegedly caused the fire. Accordingly, Plaintiff cannot point to any precedent that would have made it clear to a reasonable officer or administrator that his or her conduct under these circumstances violated the Constitution. Qualified immunity in favor of the Defendants is appropriate.

*G. Plaintiff's State Law Claims are Barred by Mr. Smith's Contributory Negligence*

As a threshold matter, while the Plaintiff argues that the Defendants failed to address her state law claim for intentional infliction of emotional distress, the Plaintiff cannot maintain a separate action for emotional damages on behalf of Mr. Smith under the Indiana Adult Wrongful Death Statute. Ind. Code § 34-1-2(C)(3)(A)(B); *Chamberlain v. Walpole*, 822 N.E.2d 959, 961 (Ind. 2005); *Indiana Patient's Compensation Fund v. Patrick*, 929 N.E.2d 190, 191 (Ind. 2010)("The [plaintiff] readily acknowledges that he does not have a claim for emotional distress under the AWDS, and he is correct to do so."). Because Plaintiff's common law claims are recoverable, if at all, through the wrongful death claim, the Plaintiff's intentional infliction of emotional distress claim is redundant to her wrongful death claim.

Substantively, as discussed in the Defendants' brief in support of their motion, the Plaintiff's state law claims are subject to the Indiana Tort Claims Act. *Areche v. Indianapolis Dep't of Public Works*, 264 N.E.3d 84, 89 - 90 (Ind. Ct. App. 2025). Any amount, even 1%, of contributory negligence by Mr. Smith bars the Plaintiff's tort claims against the

Defendants, government employees. *Id*. The irrefutable evidence shows, at a minimum, that Mr. Smith continued to move around his cell while multiple electrical flashes occurred throughout a period of approximately thirty minutes without seeking help from any prison official. (ECF 136, Ex. A-1). Mr. Smith failed to exercise reasonable care for his own safety that any ordinary, reasonable and prudent person would do so in his circumstances when faced with an electrical hazard in a confined space. *Areche*, 264 N.E.3d at 90. The Court should grant summary judgment on behalf of the Defendants on all of the Plaintiff's state law claims.

## III. Conclusion

For the foregoing reasons, summary judgment in favor of the Defendants remains warranted and should be granted on all of the Plaintiff's claims.

Respectfully submitted,

**EICHHORN & EICHHORN, LLP**

By: /s/ Julia M. Kwait
David J. Beach, #18531-45
Julia M. Kwait, #28474-71
One of the Attorneys for Defendants,
Ron Neal, Jason Nowatzke, Deborah Taylor, Douglas Wardlow, Nadine Smith, Kevin Cross, Jeniene Walton, Darnell Crockett, Steven McCann

EICHHORN & EICHHORN, LLP
2929 Carlson Drive, Suite 100
Hammond, Indiana 46323
Telephone: (219) 931-0560
dbeach@eichhorn-law.com
jkwait@eichhorn-law.com

**CERTIFICATE OF SERVICE**

I, Julia M. Kwait, certify that on June 12, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Julia M. Kwait
Julia M. Kwait