**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **MYSTI VALENCIA, PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL SMITH,** | ) | |
| **Plaintiff,** | ) | **No. 3:24-cv-00185-DRL** |
| **v.** | ) | |
| **NEAL, *et al*.,** | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**STATEMENT OF GENUINE DISPUTES**

Defendants, Ron Neal, Jason Nowatzke, Deborah Taylor, Douglas Wardlow, Nadine Smith, Kevin Cross, Jeniene Walton, Darnell Crockett, Steven McCann, by counsel, respond to the plaintiff's statement of genuine disputes. (ECF 164). In support thereof, the Defendants state as follows:

1. Defendant Ron Neal was the Warden of the Indiana State Prison ("ISP") at all relevant times. He was transferred to ISP in 2007 and became warden in 2014. Dkt. 147-10 (Neal Dep) at 45:16-25. As warden at ISP he oversees everything at the facility; the buck stops with him. He has the ultimate responsibility for the safety and security of everyone behind the walls. Dkt. 147-10 (Neal Dep) at 47:6-20. He directs and controls the internal operations of the prison, and oversees the development, establishment, and implementation of institutional policies, procedures and objectives. Ex. 1 (Warden Job Description) at 1.

**RESPONSE**: **Not disputed for purposes of this motion.**

2. Neal has the responsibility for fire prevention, fire response, and fire safety at ISP. Dkt.147-10 (Neal Dep) at 62:14-63:7. He is responsible for making sure that staff are prepared and ready to respond in the case of a fire. Dkt. 147-12 (Nowatzke Dep) at 133:24-134:2.

**RESPONSE**: **Disputed to the extent that Plaintiff implies that Warden Neal has the sole responsibility at ISP for fire prevention, fire response, fire safety, and making sure staff are prepared and ready to respond in the case of a fire. (ECF 147-10, Transcript of Deposition of Warden Neal, 57:22 – 63:23). Otherwise, not disputed for purposes of this motion.**

3. Defendant Jason Nowatzke was the Deputy Warden of Operations at ISP at all relevant times. He began working at ISP in 1995, and in 2019 he was promoted to the deputy warden of operations. He reports directly to Neal. Dkt. 147-10 (Neal Dep) at 48:7-12; Dkt. 147-12 (Nowatzke Dep) at 19:6-8, 20:4-22:4.

**RESPONSE**: **Not disputed for purposes of this motion.**

4. Nowatzke and Neal review information about all incidents at the facility. Dkt. 147-12 (Nowatzke Dep) at 42:8-43:12, 57:3-20.

**RESPONSE**: **Not disputed for purposes of this motion.**

5. Nowatzke is responsible for developing, establishing, and implementing institutional policies, procedures, and objectives. Ex. 2 (Deputy Warden Job Description) at 1.

**RESPONSE**: **Disputed to the extent that the Plaintiff contends that Dep. Warden Nowatzke has sole responsibility for developing, establishing, and implementing policies, procedures, and objectives. (ECF 147-12, Transcript of Deposition of Deputy Warden Nowatzke, 117:8-12.) Otherwise, not disputed for purposes of this motion.**

6. Defendant Douglas Wardlow was the Custody Supervisor at ISP all relevant times. He has worked at ISP since 2005, when he started as a correctional officer. Dkt. 147-11 (Wardlow

Dep) at 13:13-22. He moved through the ranks and was promoted to major (custody supervisor), in December 2019. Dkt. 147-11 (Wardlow Dep) 14:16-17:1.

**RESPONSE: Not disputed for purposes of this motion.**

7. As custody supervisor, Wardlow directly supervises the captains/shift supervisors and oversees the daily operations at the facility relating to custody staff. Dkt. 147-11 (Wardlow Dep) at 17:2-17; Dkt. 147-12 (Nowatzke Dep) at 34:3-10; Ex. 3 (Major Job Description) at 1.

**RESPONSE: Not disputed for purposes of this motion.**

8. The custody supervisor, along with the lead captain and deputy warden, is also responsible for reviewing and making changes to the post orders, which should be done at least once per year. Post orders might also be changed in response to an incident or incidents that occur at the facility. Dkt. 147-11 (Wardlow Dep) at 28:16-29:21; Dkt. 147-12 (Nowatzke Dep) at 54:20-55:4; Ex. 3 (Major Job Description) at 1.

**RESPONSE: Not disputed for purposes of this motion.**

9. The warden ultimately signs off on all policy changes and suggests any additional needed changes, and he is ultimately responsible for any decision about whether to amend or not amend policies, including policies relating to how to monitor and supervise a cellhouse. Dkt. 147-11 (Wardlow Dep) at 29:22-30:8; Dkt. 147-12 (Nowatzke Dep) at 117:8-12.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that Maj. Wardlow testified that Warden Neal holds ultimate responsibility for decisions related to amend or not amend policies. Maj. Wardlow testified that he did not have personal knowledge as to whether this was Warden Neal's responsibility. (ECF 147-11, 30:9 – 13). Otherwise, not disputed for purposes of this motion.**

10. As custody supervisor, Wardlow is also responsible for implementing policies and making sure staff are aware of any changes, as well as enforcing facility rules and policies. Dkt. 147-11 (Wardlow Dep) at 31:4-14, 31:25-32:9; Ex. 3 (Major Job Description) at 1

**RESPONSE**: **Not disputed for purposes of this motion.**

11. Wardlow does daily rounds where he talks to staff and prisoners and looks at the conditions in the cellhouses and the cells. Dkt. 147-11 (Wardlow Dep) at 21:7-22:7; Ex. 3 (Major Job Description) at 1.

**RESPONSE**: **Not disputed for purposes of this motion.**

12. Wardlow is provided with a copy of every incident report completed at ISP and would be aware of every incident that is reported. Dkt. 147-11 (Wardlow Dep) at 39:24-40:12, 44:19-45:2. He knows he should review them with a critical eye toward making sure everything was done correctly. Dkt. 147-11 (Wardlow Dep) at 122:15-19.

**RESPONSE**: **Not disputed for purposes of this motion.**

13. He also reviews every IDOC Internal Affairs Division ("I&I") report at ISP and can recommend changes to policy or procedure or additional training. Dkt. 147-11 (Wardlow Dep) at 46:4-12, 46:25-47:17.

**RESPONSE**: **Not disputed for purposes of this motion.**

14. Defendant Deborah Taylor was the Safety Hazard Manager at ISP at all relevant times. She joined IDOC in 2013 as a correctional officer. She did not have any background in fire safety/protection, engineering or emergency response. Dkt. 147-14 (Taylor Dep) at 44:12-19, 45:1-

10; Dkt. 147-10 (Neal Dep) at 56:10-22. Taylor was promoted from correctional officer to the Safety Hazard Manager[1] in February 2022. Dkt. 147-14 (Taylor Dep) at 19:21-23, 45:13-21.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

15. As Safety Hazard Manager, Taylor has primary responsibility at ISP for fire protection, fire prevention and fire response, including primary responsibility for fire drills. Dkt. 147-10 (Neal Dep) at 59:14-18; Dkt. 147-12 (Nowatzke Dep) at 40:2-3; 98:15-21. Among other things, she oversees the prisoner fire brigade, does inspections and creates work orders for the maintenance department, oversees the fire alarm system, and oversees fire extinguishers. Dkt. 147-10 (Neal Dep) at 51:24 52:23.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that Ms. Taylor has the sole responsibility for fire protection, fire prevention, and fire response at ISP. (ECF 147-10, 58:19 – 59:13). Otherwise, not disputed for purposes of this motion.**

16. The Safety Hazard Manager is also responsible for inspecting the fire alarms and making sure they are sufficiently placed throughout the facility, as well as doing any assessment of whether additional alarms are needed. Dkt. 147-12 (Nowatzke Dep) at 100:1-16. She is further responsible for assessing the locations of the fire extinguishers and determining if their placement and number is adequate. Dkt. 147-12 (Nowatzke Dep) at 103:3-9.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

17. Taylor retains all the reports that firefighters produce regarding fires at ISP, but she does not do any analysis of fire response records to assess trends, recurring causes, or the like. Dkt. 147-14 (Taylor Dep) at 120:12-121:14, 123:13-124:7.

---

[1] Various records produced in this case refer to this position by two different names, "safety hazard manager" and "safety hazmat manager." Plaintiff will use the term safety hazard manager.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

18. Defendant Steven McCann became a captain at ISP in 2015. He was the shift supervisor on duty on January 14, 2023. Dkt. 147-18 (McCann Dep 1) at 20:8-13, 26:12-20.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

19. As shift supervisor, he was responsible for ensuring the safety and security of the prisoners and staff for the 12-hour period he was in charge. To do this, he needed to know what was going on everywhere in the prison. Dkt. 147-18 (McCann Dep 1) at 27:16-28:3, 37:10-18.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that Mr. McCann was solely responsibility for ensuring the safety and security of the prisoners and staff while he was on shift at ISP. The Plaintiff cites no evidence to support this proposition. The Defendants further dispute this statement to the extent that the Plaintiff implies that it would be possible for Mr. McCann to know what was going on everywhere in the prison at all times. Otherwise, not disputed for purposes of this motion.**

20. In addition to overseeing the shift, McCann was responsible for setting the shift roster. He would also be notified of any incident that occurred during the shift, including fires, which he would then report up the chain to the major and warden. Dkt. 147-18 (McCann Dep 1) at 31:18-32:10, 37:4-9, 46:20-47:1.

**<u>RESPONSE</u>: The Defendants dispute that Mr. McCann would be notified of "any incident", as that term is not defined. Mr. McCann would be notified of emergency situations. (ECF 147-18, Transcript of Deposition of Steven McCann, 68:13 – 16). Otherwise, not disputed for purposes of this motion.**

## II. Conditions at Indiana State Prison Contribute to a Significant Risk of Serious Injury from Fires.

**A. Antiquated Prison Infrastructure**

**i. Facility Design Makes Monitoring More Difficult**

21. ISP was constructed in the 1860s. Dkt. 147-10 (Neal Dep) at 20:24-21:19

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

21. A Cell House is believed to be one of the original structures from the 1860s. Dkt. 147-10 (Neal Dep) at 21:2-19.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

23. A Cell House is an Auburn-style cellhouse with five tiers of cells backed up against each other, with a midway running down the middle. Dkt. 147-10 (Neal Dep) at 28:4-18; Dkt. 147-3 (Schematics of A Cell House).

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

24. The tiers are accessed by staircases on the east and west end of the cellblock, and each tier has two rows of cells extending east to west, one on the north side, and one on the south side. Ex. 8 (Dan Pacholke Expert Report) at 6; Dkt. 147-3 (Schematics of A Cell House).

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

25. This physical design is not used in modern prisons because it poses inherent safety risks by limiting visibility into the cells. Ex. 8 (Dan Pacholke Expert Report) at 6. Notably, it does not allow a direct line of sight into the cells on the tiers unless a correction officer is physically on the tier and walking the range. Ex. 8 (Dan Pacholke Expert Report) at 6; Dkt. 147-10 (Neal Dep) at 80:16-82:4 (A Cell House is long and narrow, without continuous sight lines into all cells)

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that any of the**

**Defendants are responsible for the physical structure and layout of any cellhouse at Indiana State Prison ("ISP"). The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

26. From the officers' station, you can see only one side of the ranges (the north side), and only a few cells on that side. Dkt. 147-6 (Walton Dep) at 41:3-23; Dkt. 147-3 (Schematics of A Cell House).

**RESPONSE**: **Not disputed for purposes of this motion.**

27. In contrast, modern facilities are generally built with a half-moon pod layout that enables corrections staff located in a central room to view the front of all cells simultaneously. Ex. 8 (Dan Pacholke Expert Report) at 6.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that any of the Defendants are responsible for the physical structure and layout of any cellhouse at Indiana State Prison ("ISP"). The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

28. A Cell House has a security monitoring system that includes around 10 cameras on the north side of the cellhouse configured in such a way as to facilitate observation of all cells on the five tiers. There is a similar configuration of cameras on the south side, and a total of about 30 cameras in the cellhouse. Dkt. 147-10 (Neal Dep) at 210:5-10; Ex. 9 (Map of ACH Cameras) at 1; Ex. 10 (Email from Brandyn Arnold 01/07/2025); Ex. 8 (Dan Pacholke Expert Report) at 7.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that surveillance monitoring was in operation in the monitor in the officers' station in ACH on January 14, 2023. The monitor in the officers' station was not in operation on January 14, 2023. (ECF 147-7, Affidavit of Jeniene Walton, ¶ 4). Even if it were, per Sgt. Walton, it typically showed**

**the view down the ranges and did not show the view directly into the cells. (ECF 147-7, Affidavit of Jeniene Walton, ¶ 4). Sgt. Walton testified that she did not have the ability to change the view in the officers' station. (ECF 147-7, ¶ 6). Otherwise, not disputed for purposes of this motion.**

29. The live feeds from the security cameras are visible on a monitor in the officers' station. Ex. 8 (Dan Pacholke Expert Report) at 7; Ex. 11 (Dan Pacholke Declaration) at 1-2; Dkt. 147-5 (Cross Dep) at 90:10-23, 91:6-11; Dkt. 147-18 (McCann Dep 1) at 44:15-18; Dkt. 147-10 (Neal Dep) at 140:18- 141:6; Dkt. 147-4 (Crockett Dep) at 95:23-96:7.

**RESPONSE**: **The monitor in the officers' station was not in operation on January 14, 2023. (ECF 147-7, Affidavit of Jeniene Walton, ¶ 4). Even if it were, per Sgt. Walton, it typically showed the view down the ranges and did not show the view directly into the cells. (ECF 147-7, Affidavit of Jeniene Walton, ¶ 4). Sgt. Walton testified that she did not have the ability to change the view in the officers' station. (ECF 147-7, ¶ 6).**

30. The monitor in the A Cell House officers' station shows various camera feeds, including feeds from the cameras looking at the sides of the ranges. The person viewing the monitor can have them all up at once, but they are small. If you click on a particular feed, it will make it larger. Dkt. 147-8 (Smith Dep) at 215:8-23, 217:25-219:1; Ex. 11 (Dan Pacholke Declaration) at 2.

**RESPONSE: Disputed. The monitor in the officers' station was not in operation on January 14, 2023. (ECF 147-7, Affidavit of Jeniene Walton, ¶ 4). Even if it were, per Sgt. Walton, it typically showed the view down the ranges and did not show the view directly into the cells. (ECF 147-7, Affidavit of Jeniene Walton, ¶ 4). Sgt. Walton testified that she did not have the ability to change the view in the officers' station. (ECF 147-7, ¶ 6). The Defendants**

**further dispute this statement to the extent that the Plaintiff intends to introduce fact witness testimony from their expert regarding the capabilities of the live monitoring feed during his visit to A Cellhouse ("ACH") July 14, 2025, has any bearing on the capabilities of the monitor in ACH on January 14, 2023, had it been operational.**

31. If the officers' station monitor stopped working, it should be reported immediately and would be fixed promptly because ISP has extra monitors. Dkt. 147-18 (McCann Dep 1) at 44:19-46:5; Dkt. 147-8 (Smith Dep) at 58:11-20; Dkt. 147-10 (Neal Dep) at 215:17-216:18; Dkt. 147-11 (Wardlow Dep) at 80:3-14; Ex. 8 (Dan Pacholke Expert Report) at 7, 37 (if monitors are not working, they are of no value in mitigating the sightline problems in A Cell House).

**RESPONSE: Not disputed for purposes of this motion.**

32. Given the layout of the cellhouse, if staff are in the officers' station, they should be watching the monitors with the live surveillance feed of the cellhouse. Dkt. 147-8 (Smith Dep) at 140:12-20; Dkt. 147-18 (McCann Dep 1) at 102:1-15; Dkt. 147-11 (Wardlow Dep) at 79:13-80:2.

**RESPONSE: Disputed. Sergeants are responsible for watching the monitor in the officers' station. (ECF 147-4, Transcript of Deposition of Ofc. Crockett, 96:12 – 16). A sergeant working in the officers' station can look at the monitors every once in awhile, but continuous monitoring is not required. (ECF 147-11, Transcript of Deposition of Maj. Wardlow, 147-11, 80:15 – 24). There were no requirements for watching the surveillance monitors other than to utilize them to see what is going on in the cellhouse. (ECF 147-12, Transcript of Deposition of Dep. Warden Nowatzke, 110:2 – 6).**

### ii. A Cell House Lacks Modern Emergency Infrastructure

**1. No Emergency Call Buttons**

33. All custody staff know that (a) an emergency (such as a heart attack, suicide attempt, overdose or fire) can happen in a prison at any time; (b) prisoners who are locked in their cells during an emergency are unable to help themselves and rely on staff to help them; and (c) it is critical to be vigilant at all times and to respond quickly and correctly in an emergency—seconds count. Dkt. 147-12 (Nowatzke Dep) at 111:24-112:4; Dkt. 147-6 (Walton Dep) at 23:11-24:21; Dkt. 147-5 (Cross Dep) at 45:9-15, 67:24-68:5, 69:17-71:14; Dkt. 147-8 (Smith Dep) at 43:544:18, 127:19-128:1; Dkt. 147-18 (McCann Dep 1) at 38:8-21, 80:1-14; Dkt. 147-11 (Wardlow Dep) at 162:10-22; Ex 8 (Dan Pacholke Expert Report) at 5.

**RESPONSE**: **Not disputed for purposes of this motion.**

34. In modern high-security units, there is a call button within each locked cell that can be used to summon staff in case of emergency. Ex. 8 (Dan Pacholke Expert Report) at 10.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that any of the Defendants are responsible for the physical security features of any cellhouse at ISP. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

35. There are no emergency call buttons in the cells in A Cell House, and therefore the only way to get staff's attention in an emergency, like a fire, is to yell for help or tell staff if they are conducting rounds at the time. Dkt. 147-6 (Walton Dep) at 33:1-16; Dkt. 147-5 (Cross Dep) at 42:23-43:8; Ex. 7 (Steven McCann Second Deposition) at 9:1-4; Dkt. 147-12 (Nowatzke Dep) at 107:13-17; Dkt. 147-4 (Crockett Dep) at 106:17-107:24; Ex. 8 (Dan Pacholke Expert Report) at 36.

**RESPONSE**: **Not disputed for purposes of this motion.**

36. As a result, when there is an emergency, prisoners at ISP yell for help and nearby prisoners join in; they also bang on things to get staff attention. Dkt. 147-6 (Walton Dep) 167:14-21; Dkt. 147-5 (Cross Dep) at 46:7-25; Dkt. 147-12 (Nowatzke Dep) at 115:18-116:21; Dkt. 147-11 (Wardlow Dep) at 65:14-21, 67:17-68:19, 69:23-70:4. Whenever smoke is coming out of a cell, prisoners are yelling for help. Dkt. 147-12 (Nowatzke Dep) at 183:17-185:20.

**RESPONSE**: **Not disputed for purposes of this motion.**

37. It is a common occurrence that prisoners yell or bang on things to get staff attention when there is an emergency. Dkt. 147-6 (Walton Dep) at 42:6-24; Dkt. 147-4 (Crockett Dep) at 106:24-107:6.

**RESPONSE**: **Not disputed for purposes of this motion.**

38. Staff can always hear prisoners yelling for help from anywhere in the cellhouse, including the officers' station. Dkt. 147-6 (Walton Dep) at 41:24-42:5, 114:24-115:8; Dkt. 147-5 (Cross Dep) at 89:10-18, 140:3-8, 140:11-20, 146:13-20.

**RESPONSE**: **Not disputed for purposes of this motion.**

39. The officers' station does not have solid walls or a solid roof; it is made of gate or mesh material, through which air can freely flow. As a result, staff can see, hear, and smell what is happening outside the officers' station from inside. Dkt. 147-5 (Cross Dep) at 87:17-88:20, 89:6-9; Dkt. 147-8 (Smith Dep) at 83:18-84:8; Dkt. 147-4 (Crockett Dep) at 104:9-105:8.

**RESPONSE**: **Not disputed for purposes of this motion.**

40. All custody staff at ISP know that they need to monitor the cell houses at all times, be alert for prisoners yelling for their attention, and that if prisoners are yelling, they need to respond quickly. They also know that if they are not out monitoring the cellhouse, they might not realize there is an emergency going on. Dkt. 147-6 (Walton Dep) 33:17-34:6, 35:4-36:6; Dkt. 147-

12 (Nowatzke Dep) at 107:18-108:6, 109:12-19, 185:8-15 (staff not being alert to an emergency is one of the biggest risks you can have in a cellhouse); Dkt. 147-4 (Crockett Dep) at 106:17-107:24; Dkt. 147-11 (Wardlow Dep) at 68:20-69:22; Ex. 8 (Dan Pacholke Expert Report) at 36.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that "all" ISP staff knows that they must physically monitor the cell houses at all times. Warden Neal directed staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19). Otherwise, not disputed for purposes of this motion.**

41. The best way to monitor for an emergency is to do security walks and watch the ranges, and to have at least one officer on the range whenever possible. Dkt. 147-6 (Walton Dep) at 28:17-30:22, 31:7-12, 36:7-13, 38:11-39:1, 170:12-16, 176:18-24; Dkt. 147-8 (Smith Dep) at 139:8-14; Dkt. 147-18 (McCann Dep 1) at 38:22-:39-15, 88:3-89:1, 99:19-25; Dkt. 147-11 (Wardlow Dep) at 73:14-19; Ex. 8 (Dan Pacholke Expert Report) at 21. If staff are on the range, it is more likely that they will see or smell a fire or hear cries for help. Dkt. 147-18 (McCann Dep 1) at 99:9-18.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that correctional officers were required to continuously walk the ranges. The Plaintiff cites no evidence to support this proposition. Warden Neal directed staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19). Otherwise, not disputed for purposes of this motion.**

**2. No Sprinkler System and Poorly Placed Smoke Detectors**

42. Building codes typically require the cellblocks in modern prisons to include a sprinkler system that automatically activates when there is a fire. Ex. 8 (Dan Pacholke Expert Report) at 10.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that the Defendants should be held responsible for the physical structure, physical features, and layout of ACH at ISP, or that Warden Neal violated building codes by failing to install a sprinkler system. Additionally, the Plaintiff cites no actual building codes to support this proposition. As Warden Neal testified, Defendant Warden Neal proposed installing sprinkler systems in each of the cell houses in ISP to the Indiana Department of Correction ("IDOC"). (ECF 147-10, 22:20–22). However, Warden Neal learned that IDOC deemed the project as not feasible, financially astronomical, and unable to be done. (ECF 147-10, 22:25 – 23:1). This is due to the physical structure of the buildings and their age. (ECF 147-10, 23:13 – 22). Otherwise, not disputed for purposes of this motion.**

43. There is no sprinkler system in the living units at ISP. Dkt. 147-18 (McCann Dep 1) at 117:1-5; Dkt. 147-12 (Nowatzke Dep) at 99:11-17.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that the Defendants should be held responsible for the physical structure, physical features, and layout of ACH at ISP, or that Warden Neal violated building codes by failing to install a sprinkler system. The Plaintiff cites no evidence to support this proposition. As Warden Neal testified, Defendant Warden Neal proposed installing sprinkler systems in each of the cell houses in ISP to the Indiana Department of Correction ("IDOC"). (ECF 147-10, 22:20 – 22). However, Warden Neal learned that IDOC deemed the project as not feasible, financially astronomical, and unable to be done. (ECF 147-10, 22:25 – 23:1). This is due to the physical structure of the buildings and their age. (ECF 147-10, 23:13 – 22). Otherwise, not disputed for purposes of this motion.**

44. Prison administrators can mitigate the risk from a lack of sprinkler systems by increasing vigilance for fires, including through fire-watch duties. Ex. 8 (Dan Pacholke Expert Report) at 10.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that correctional officers were required to continuously walk the ranges. The Plaintiff cites no evidence to support this proposition. Warden Neal directed staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19). Otherwise, not disputed for purposes of this motion.**

45. Additionally, the smoke detectors in A Cell House are located just above the 500 range, about 40 feet from the ground level. Ex. 8 (Dan Pacholke Expert Report) at 10-11; Dkt. 147-5 (Cross Dep) at 62:17-63:22.

**RESPONSE: Not disputed for purposes of this motion.**

46. It can take some time for smoke to travel up and reach the 500 range from the lower parts of the cellhouse. Everyone at ISP understood smoke detectors had limited utility because of how high they were placed. Ex. 8 (Dan Pacholke Expert Report) at 10-11; Dkt. 147-5 (Cross Dep) at 62:17-63:22; Dkt. 147-18 (McCann Dep 1) at 97:9-98:25; Dkt. 147-10 (Neal Dep) at 82:23-83:2.

**RESPONSE: Disputed. The Plaintiff cites their own expert's report and the testimony of three defendants for the proposition that "everyone" at ISP understood that smoke detectors had limited utility due to their placement. The Plaintiff likewise does not offer any expert testimony from a fire safety expert to discuss proper placement of smoke detectors. Mr. Pacholke is not a fire safety expert. Otherwise, the Defendants do not dispute that the smoke detectors were placed on the top of ACH.**

### iii. Antiquated Locking System Makes Removing Prisoners from Their Cells Cumbersome and Slow

47. The locks on the 100 and 200 range of A Cell House are antiquated. They date all the way back to the 1860s, when the prison was built. Dkt. 147-10 (Neal Dep) at 85:5-10; Ex. 8 (Dan Pacholke Expert Report) at 7.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that any of the Defendants are responsible for the physical security features of any cellhouse at ISP. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

48. To unlock a cell, staff have to roll a bar at the end of the range and must also go to the door of the cell and manually unlock the cell with a physical key. Dkt. 147-5 (Cross Dep) at 40:6-41:2, 41:24-42:8; Dkt. 147-8 (Smith Dep) at 103:1-104:10; Dkt. 147-18 (McCann Dep 1) at 119:2-120:7; Dkt. 147-10 (Neal Dep) at 85:8-10, 86:5-15, 87:8-25; Ex. 8 (Dan Pacholke Expert Report) at 7; Dkt. 147-4 (Crockett Dep) at 37:7-39:4.

**RESPONSE: Not disputed for purposes of this motion.**

49. Unlocking these doors takes significant time. Dkt. 147-18 (McCann Dep 1) at 119:2-120:7. The cell locking system increases the risk and vulnerability from fire to prisoners inside the cells. Dkt. 147-10 (Neal Dep) 93:8-21.

**RESPONSE: Disputed. Mr. McCann's testimony was that the locks were more time consuming. (ECF 147-18, 120:6 - 7). Warden Neal's testimony was that, when a fire starts in an incarcerated individual's cell, the extra lock will "take extra time" to remove him from the cell. (ECF 147-10, 93:15 – 17).**

50. In addition, staff are provided with keys for only the range(s) that they are assigned to, meaning staff responding to an emergency on another range must acquire the keys. Dkt. 147-8 (Smith Dep) at 48:15-49:21.

**RESPONSE: Disputed to the extent that the Plaintiff implies that there was a delay in response to the fire in Cell 252 due to staff not having access to the keys to the 200 North Range. To the contrary, Officer Crockett responded within three minutes and thirty-one seconds to the fire, with the keys to the 200 North range. (ECF 136, Ex. A-1). The Defendants further dispute this fact to the extent that the Plaintiff implies that staff was responding to an emergency on another range on the morning of January 14, 2023, thus delaying response to the fire in Michael Smith's cell. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

51. The locking system is another reason that it is important for staff to respond immediately to a fire, to be vigilant, and to monitor the cells at all times. Dkt. 147-18 (McCann Dep 1) at 120:8-13; Ex. 8 (Dan Pacholke Expert Report) at 21.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that correctional officers were required to continuously walk the ranges. The Plaintiff cites no evidence to support this proposition. Warden Neal directed staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19). Otherwise, not disputed for purposes of this motion.**

52. Most cells today are built with magnetic locking systems that can be "popped" or opened from the control station. Dkt. 147-10 (Neal Dep) at 86:21-25; Ex. 8 (Dan Pacholke Expert Report) at 8.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that any of the Defendants are responsible for the physical security features of any cellhouse at ISP. The**

**Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

53. Some, but not all the ranges in A Cell House have been updated with these modern locks. The 300-500 ranges have been updated. The remaining ranges, including the 200 range, have not. Dkt. 147-4 (Crockett Dep) at 41:18-42:9; Ex. 8 (Dan Pacholke Expert Report) at 8.

**RESPONSE**: **Not disputed for purposes of this motion.**

54. Prisoners at ISP are also permitted to have padlocks that they can use to lock their cells in addition to the locks described above. Policy prohibits using the personal locks while prisoners are inside their cells, but this rule is not enforced. Dkt. 147-18 (McCann Dep 1) at 76:19-78:18; Ex. 12 (General Post Orders 10/5/2021) at 17; Dkt. 147-5 (Cross Dep) at 41:3-42:8; Dkt. 147-10 (Neal Dep) at 88:22-89:5.

**RESPONSE**: **Disputed. Mr. Smith's personal lock played no role in the January 14, 2023 fire in ACH. As is plainly shown in the surveillance video, Mr. Smith places his loose lock on his door at 10:00:22. (ECF 136, Ex. A-1). He never locks it. (ECF 136, Ex. A-1).**

55. Allowing prisoners to use personal padlocks on their cells is uncommon in corrections and can impede access to a cell during an emergency. Ex. 8 (Dan Pacholke Expert Report) at 8. The practice should be eliminated. Ex. 8 (Dan Pacholke Expert Report) at 35.

**RESPONSE**: **Disputed. Mr. Smith's personal lock played no role in the January 14, 2023 fire in ACH. As is plainly shown in the surveillance video, Mr. Smith places his loose lock on his door at 10:00:22. (ECF 136, Ex. A-1). He never locks it. (ECF 136, Ex. A-1).**

56. In addition, the front stairs used by staff and the doors to each range are locked, meaning both the stair door and the range door must be unlocked to respond to an emergency if staff are not already on the range in question. Dkt. 147-8 (Smith Dep) at 49:6-13, 50:1-18.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

**B. Staffing Shortages Impact Safety and Security**

57. Understaffing was an ongoing issue at ISP in the period leading up to Michael Smith's death. Dkt. 147-18 (McCann Dep 1) at 19:2-9, 49:24-51:23; Ex. 8 (Dan Pacholke Expert Report) at 11; Ex 13 (ISP Staff Rosters from 12/14/23 to 1/13/23).

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

58. It was typical that Captain McCann, when he served as shift supervisor, would not have enough staff to fill all the posts in A Cell House. Dkt. 147-18 (McCann Dep 1) at 51:22-25.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

59. On January 14, 2023, staffing levels were at about 50%. Dkt. 147-18 (McCann Dep 1) at 52:21-55:24; Ex. 8 (Dan Pacholke Expert Report) at 11. A Cell House was limited to three assigned staff. Ex. 8 (Dan Pacholke Expert Report) at 11; Ex. 14 (Duty log ACH) at 1; Dkt. 147-4 (Crockett Dep) 86:17-87:2. There should have been five staff members assigned to A Cell House. Ex. 8 (Dan Pacholke Expert Report) at 11; Dkt. 147-5 (Cross Dep) at 38:22-39:10.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that there were only three staff members present in ACH on January 14, 2023. There were four staff members present on January 14, 2023: Lt. Smith, Sgt. Walton, Ofc. Cross, and Ofc. Crockett. (ECF 147-4, Transcript of Deposition of Officer Crockett, 88:3 - 15). Otherwise, not disputed for purposes of this motion.**

60. Staffing levels on January 14 were typical of staffing levels around that time. Ex. 8 (Dan Pacholke Expert Report) at 11; Ex 13 (ISP Staff Rosters from 12/14/23 to 1/13/23); Dkt. 147-18 (McCann Dep 1) at 52:21-55:24 (staffing situation was "grave"); Dkt. 147-4 (Crockett Dep) at 88:6-19.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

61. Staffing levels created additional risks to safety and security of prisoners and staff. Dkt. 147-18 (McCann Dep 1) at 52:21-55:24 (staffing situation was "grave").

**<u>RESPONSE</u>: Disputed. Two staff members responded to the fire on January 14, 2023, within three minutes and thirty-one seconds of the first flickers of flame from the fire. (ECF 136, Ex. A-1). Sgt. Walton called a 10-71, per protocol. The first member of the offender fire brigade arrived within six minutes and fifty-nine seconds, and the offender fire brigade in full gear arrived within seven minutes and thirty-four seconds. (ECF 136, Ex. A-1; ECF 147-6, Transcript of Deposition of Jeniene Walton, 122:19 – 25).**

62. With limited staff, it was even more important for staff to be vigilant and out on the ranges at all times, and for surveillance monitors in the officers' station to be operational and to be observed. Dkt. 147-18 (McCann Dep 1) at 56:2-21; Ex. 8 (Dan Pacholke Expert Report) at 11, 21; Dkt. 147-4 (Crockett Dep) at 164:24-165:9.

**<u>RESPONSE</u>: Disputed. Two staff members responded to the fire on January 14, 2023, within three minutes and thirty-one seconds of the first flickers of flame from the fire. (ECF 136, Ex. A-1). Sgt. Walton called a 10-71, per protocol. The first member of the offender fire brigade arrived within six minutes and fifty-nine seconds, and the offender fire brigade in full gear arrived within seven minutes and thirty-four seconds. (ECF 136, Ex. A-1; ECF 147-6, Transcript of Deposition of Jeniene Walton, 122:19 – 25). Warden Neal directed staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19).**

### C. Numerous Factors Contributed to a Substantial Risk of Injury from Fires

**i. Fires Were Happening Regularly**

63. Fires were a regular occurrence at ISP. Dkt. 147-18 (McCann Dep 1) at 100:7-21, 125:1-127:13; Dkt. 147-10 (Neal Dep) at 70:15-24 (fires are a fact of life and occur in every cellhouse); Dkt. 147-14 (Taylor Dep) at 53:14-17, 120:7-11; Dkt. 147-4 (Crockett Dep) at 76:23-78:5; Dkt. 147-12 (Nowatzke Dep) at 60:13-61:24, 64:3-8, 129:3-13, 159:17-19, 185:8-11; Dkt. 147-11 (Wardlow Dep) at 90:18-91:4; Ex. 15 (Amon Lee Deposition) at 28:11-29:10, 55:17-23; Ex. 8 (Dan Pacholke Expert Report) at 10; Ex. 16 (Prisoner Firefighter Reports).

**RESPONSE**: **Disputed, as "regular occurrence" at ISP is ambiguous and undefined, nor is a time period identified. Otherwise, not disputed that other fires had occurred at ISP prior to January 14, 2023.**

64. Prior to the death of Mr. Smith, other fires at ISP had resulted in serious injury or death. Dkt. 147-11 (Wardlow Dep) at 152:4-153:13, 153:24-157:22. ISP administrators, including Neal and Nowatzke, were informed about fires at the facility. Ex. 147-12 (Nowatzke Dep) at 42:8-43:12, 57:3-20.

**RESPONSE**: **Disputed, as "prior to the death of Mr. Smith" is an undefined time period. Otherwise, not disputed that other fires had occurred at ISP resulting in injury prior to January 14, 2023.**

65. Not every fire that occurred at the facility in this time period was captured in an incident report because there were problems with staff not reporting fire incidents, even when they had to call the prisoner fire brigade. Ex. 18 (Safety Committee Meeting Minutes) at 1. Moreover, staff were not required to report fires that they did not deem serious. Dkt. 147-12 (Nowatzke Dep) at 58:17-25; Dkt. 147-11 (Wardlow Dep) at 40:20-42:14, 43:14-19.

**<u>RESPONSE</u>: Disputed, as the time period is not defined, and therefore, Defendants cannot meaningfully respond to this statement. The portion of the report cited by the Plaintiff (ECF 163-18 at 1) covered the first quarter of 2022. To the extent that the Plaintiff is referring to the first quarter of 2022 only, the Defendants do not dispute that Ms. Taylor reported that there was an issue with staff not filling out fire reports. (ECF 163-18). Furthermore, in some situations, such as an incarcerated individual setting fire to a toilet paper roll that was put out nearly immediately, the fires were often not reported. (ECF 147-12, Transcript of Deposition of Dep. Warden Nowatzke, 58:17 – 59:11).**

66. In 2022, there were numerous *reported* fires, including hot pot fires, electrical outlet fires, fires from unknown causes, and an unspecified number of "protest fires." Ex. 18 (Safety Committee Meeting) at 1-2, 5, 8.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

67. In the second quarter of 2022, there was a major fire in D cellhouse that required a prisoner to be sent to an outside hospital. Ex. 18 (Safety Committee Meeting) at 5.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

68. In the two weeks before Mr. Smith was killed, there was a fire in D cellhouse, as well as two fires in C cellhouse, one involving a hot pot and one involving a bag of trash. Ex. 18 (Safety Committee Meeting) at 14.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

**ii. Numerous Risk Factors Contributed to These Fires**

**1. Fires Start From Numerous Sources**

**a. Hot Pots**

69. Almost every prisoner at ISP has a hot pot, which can be purchased at commissary. Dkt. 147-4 (Crockett Dep) at 75:19-76:22.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that a hot pot played a role in the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

70. It is well known to all staff that hot pots regularly catch fire, including when they are left on and the water in them is allowed to evaporate. They cause fires at least once per month. Dkt. 147-4 (Crockett Dep) at 75:19-76:22; Dkt. 147-18 (McCann Dep 1) at 126:25-127:9; Dkt. 147-10 (Neal Dep) at 78:12-79:1; Dkt. 147-12 (Nowatzke Dep) at 61:18-62:2; Dkt. 147-14 (Taylor Dep) at 112:8-16.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that a hot pot played a role in the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

71. At least one hot pot fire at the facility has resulted in a prisoner death. Ex. 19 (Vincent McCormick Deposition) at 42:12-24.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that a hot pot played a role in the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. The Defendants further clarify Mr. McCormick's testimony, which is that the hot pot fire occurred in 2003 or 2004, in D Cell House. (ECF 163-19, 42:13 – 18). Otherwise, not disputed for purposes of this motion.**

**b. Electrical Issues**

72. There are frequent electrical problems at ISP, including sparking outlets, that pose a serious risk of fire that is known by everyone. Dkt. 147-6 (Walton Dep) at 70:16-72:15; Dkt. 147-18 (McCann Dep 1) at 117:21-118:7, 118:13-119:1; Ex. 20 (Examples of Maintenance Reports); Dkt. 147-4 (Crockett Dep) at 74:12-23, 77:5-78:5, 203:25-204:13; Dkt. 147-14 (Taylor Dep) at 72:12-17, 111:11-19, 112:2-7); Ex. 8 (Dan Pacholke Expert Report) at 9, 19-20; Ex. 51 (Calvin Patton Declaration) at 3; Ex. 52 (Lee Travis Griffin Deposition) at 10:8-25; Ex. 53 (7/21/16 Incident report); Ex. 54 (8/31/2022 Incident Report); Ex. 55 (Alvin Christmas Declaration) at 4.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that a sparking outlet caused the January 14, 2023, fire in ACH. The outlet in Mr. Smith's cell was ruled out as the origin point of the fire. (ECF 147-16, Report of Richard Besse, p. 1). Otherwise, not disputed for purposes of this motion that outlets at ISP had sparked in the past.**

73. It is common at ISP for prisoners to modify electrical equipment like TVs, lighting, hotpots, and outlets; these altered items present a fire risk. Dkt. 147-12 (Nowatzke Dep) at 129:3-13; Dkt. 147-4 (Crockett Dep) at 74:12-23, 190:18-191:7.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that a tv, lighting, hotpot, or outlet caused the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Dep Warden Nowatzke testified that incarcerated individuals often would take the thermostat out of their hot pots in order to make them burn hotter; incarcerated individuals will also make homemade power strips. (ECF 147-12, 63:3 – 21). Otherwise, not disputed for purposes of this motion.**

74. It is also common for prisoners to make homemade power cords or power strips. Dkt. 147-12 (Nowatzke Dep) at 65:13-20 (if he walked through cellhouse now, he would expect to find at least five to ten in a single cellhouse), 131:15-21 (Nowatzke recently confiscated 10 to 15 altered power strips from a single dorm); Dkt. 147-14 (Taylor Dep) at 111:11-112:1.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that a homemade power cord or power strip caused the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

75. Each prisoner has two outlets in their cell, but they have a lot of electrical items including fans, lights, TVs, tablets, and hotpots, as well as some illegal cellphones. The cellhouses get very hot, necessitating the use of fans. Dkt. 147-11 (Wardlow Dep) at 75:13-14, 76:6-7 (the cellhouses can be as hot as 110 degrees). As a result, prisoners often make homemade power strips so they can plug in more than two items at a time. Dkt. 147-12 (Nowatzke Dep) at 64:24-65:10.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that a homemade power strip played any role in the January 14, 2023 fire. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

76. Homemade power cords or power strips are a known fire risk, and staff know they are supposed to confiscate them. Dkt. 147-12 (Nowatzke Dep) at 65:21-66:21; Dkt. 147-11 (Wardlow Dep) at 112:25-113:2, 113:19-114:4.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

77. Even in the absence of tampering, outlets spark or otherwise malfunction, presenting a known fire risk. Dkt. 147-4 (Crockett Dep) at 203:24-204:13; Dkt. 147-18 (McCann Dep 1) at 126:25- 127:22; Ex. 19 (Vincent McCormick Deposition) at 66:9-69:7; Ex. 7 (Steven McCann Second Deposition) at 9:5-20; Ex. 16 (Prisoner Firefighter Reports) at 8, 14-15.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that a sparking outlet caused the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Dep. Warden Nowatzke testified that he had never seen an outlet have an issue unless the outlet had been subject to tampering. (ECF 147-12, 64:12 – 23).**

78. Based on the frequency of electrical outlet problems and other electrical problems, all staff know that they need to be looking for such problems, and that fires can occur if they are not regularly inspecting the outlets. Dkt. 147-12 (Nowatzke Dep) at 64:3-23; Ex. 8 (Dan Pacholke Expert Report) at 18-19.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that the outlet in Mr. Smith's cell played any role in the January 14, 2023 fire. The Plaintiff cites no evidence to support this proposition. Dep. Warden Nowatzke testified that he had never seen an outlet have an issue unless the outlet had been subject to tampering. (ECF 147-12, 64:12 – 23). Otherwise, not disputed for purposes of this motion.**

79. The safety hazard manager, warden, deputy warden and major would all be notified of any potential fire hazards, including altered outlets. Dkt. 147-12 (Nowatzke Dep) at 93:13-23.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

**c. Intentional Fires**

80. It is also common for prisoners to intentionally start fires at ISP, especially in D Cell House. Dkt. 147-18 (McCann Dep 1) at 126:2-6; Dkt. 147-12 (Nowatzke Dep) at 60:24-61:7; Dkt. 147-8 (Smith Dep) at 232:6-8; Ex.19 (Vincent McCormick Deposition) at 41:15-42:3; Dkt. 147-14 (Taylor Dep) at 170:17-171:9 (there are no after action reviews for small, intentionally set fires because "we'd be in after-action reviews every day, all day").

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

81. Whether a fire is deliberately set or accidental, the responsibility of staff is to save those who may be harmed by the fire. Dkt. 147-10 (Neal Dep) at 77:13-78:4; Dkt. 147-11 (Wardlow Dep) at 90:18-91:4.

**RESPONSE: Disputed, to the extent that the Plaintiff claims that all ISP staff is responsible for seeing rescue efforts through until rescue. Per Lt. Smith, in the event of a fire, correctional officers are instructed to contact the control room via radio. (ECF 147-8, Transcript of Deposition of Lt. Smith, 96:12 – 14). They are to call a Signal 1070 if a fire alarm is going off, and a Signal 1071 if fire is visible. (ECF 147-8, 97:7 – 23). Correctional staff is responsible for rescue efforts until the Quick Response Team (QRT) or the offender fire brigade arrives. (ECF 147-8, 98:11 – 16).**

82. Staff knew that even a small, intentionally set fire could quickly turn into a large fire—and a serious emergency. Rapid and effective response is imperative to save lives and prevent injury, especially when a fire occurs in a locked cell. Dkt. 147-18 (McCann Dep 1) at 79:17-25, 85:11-16, 126:18-24; Dkt. 147-10 (Neal Dep) at 70:25-72:1; Dkt. 147-12 (Nowatzke Dep) at 60:14-23, 159:13-19; Dkt. 147-5 (Cross Dep) at 60:7-61:12.

**RESPONSE: Disputed to the extent that the Plaintiff seeks for the Defendants to respond on behalf of each and every staff member at Indiana State Prison. The Defendants can only respond for themselves. Otherwise, not disputed for purposes of this motion.**

### 2. Additional Risks Increased the Likelihood of Serious Injury Once a Fire Started

#### a. Curtains Posed an Ongoing Risk

83. When a fire starts in a locked cell, a prisoner confined in that cell faces an extreme risk of serious injury or death. Dkt. 147-18 (McCann Dep 1) at 127:17-24; Dkt. 147-10 (Neal Dep)

at 83:3-9. The fire can grow and escalate quickly to engulf the whole cell, with the prisoner locked inside. Dkt. 147-18 (McCann Dep 1) at 79:12-25.

**RESPONSE**: **Not disputed for purposes of this motion.**

84. It is very common for prisoners to have sheets or curtains up over their cell doors, even though it is prohibited by policy. Any prisoner violating the policy should be disciplined. Ex. 12 (General Post Orders 10/5/2021) at 16; Dkt. 147-8 (Smith Dep) at 115:4-116:7; Dkt. 147-18 (McCann Dep 1) at 112:4-9, 113:17-24 ("I can't tell you how many times I walked the unit and confiscated 50 sheets when I walked down the range."); *id.*at 114:15-116:9; Dkt. 147-12 (Nowatzke Dep) at 52:24-53:10; Ex. 8 (Dan Pacholke Expert Report) at 19; Dkt. 147-4 (Crockett Dep) at 72:18-73:25.

**RESPONSE**: **Not disputed for purposes of this motion.**

85. Curtains create a known risk that an emergency could happen in the cell and not be visible to staff; they are also a known fire hazard. Dkt. 147-6 (Walton Dep) at 60:4-12; Dkt. 147-18 (McCann Dep 1) at 112:18-113:6, 116:11-25; Ex 8 (Dan Pacholke Expert Report) at 9-10, 19; Dkt. 147-4 (Crockett Dep) at 72:4-17; Dkt. 147-14 (Taylor Dep) at 110:22-111:10.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that the curtain in Mr. Smith's cell caused or fueled the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

86. Despite this, the curtain policy does not appear to have been regularly enforced. The preserved video from the time of Smith fire shows that a large portion of prisoners in A Cell House had curtains or blankets hung up to cover their cells. Dkt. 147 (Def' Ex. A-1) at 10:51:00; Dkt. 147-4 (Crockett Dep) at 202:8-23; Ex. 8 (Dan Pacholke Expert Report) at 19.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that the curtain in Mr. Smith's cell caused or fueled the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Warden Neal also expects staff to remove curtains. (ECF 147-10, 35:7 – 10). Staff writes up incarcerated individuals who are caught with curtains with a conduct violation; however, incarcerated individuals usually put the curtains right back up. (ECF 147-10, 236:2 – 12). Despite these constant reminders and that hundreds of conduct reports are written monthly for the use of curtains, not all staff abides by the Warden's directives. (ECF 147-10, 40:19 – 41:2). When staff does not abide by these directives, management staff tries to hold them accountable through discipline until those staff are no longer employed. (ECF 147-10, 41:2 – 5). Otherwise, not disputed for purposes of this motion.**

87. The warden would be notified of any recurring issue with policy compliance, including prisoners using curtains in their cells. Dkt. 147-12 (Nowatzke Dep) at 53:19-54:3.

**RESPONSE**: **Not disputed for purposes of this motion.**

**b. Excess Property Posed on Ongoing Risk**

88. ISP policy limits the amount of property prisoners can have in their cells to whatever can fit inside a 4.5 cubic foot steel property box (excluding large items like televisions). Dkt. 147-10 (Neal Dep) at 31:8-32:11.

**RESPONSE**: **Not disputed for purposes of this motion.**

89. This rule limiting prisoner property is supposed to be enforced through shakedowns of each cell once per quarter. Dkt. 147-10 (Neal Dep) at 34:21-35:1.

**RESPONSE**: **Not disputed for purposes of this motion**.

90. Despite the rule, property accumulates in cells because staff fail to enforce the policy, even though enforcement is a fundamental and essential safety and security procedure. Dkt. 147-10 (Neal Dep) at 40:12-41:12; Ex. 8 (Dan Pacholke Expert Report) at 20-21; Dkt. 147-11 (Wardlow Dep) 111:9-112:9.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that excess property in Mr. Smith's cell caused or fueled the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Despite these constant reminders and that hundreds of conduct reports are written monthly for excess property, not all staff abides by the Warden's directives. (ECF 147-10, 40:19 – 41:2). When staff does not abide by these directives, management staff tries to hold them accountable through discipline until those staff are no longer employed. (ECF 147-10, 41:2 – 5). Otherwise, not disputed for purposes of this motion.**

91. Excess property in a cell can affect how hot a fire burns and how rapidly it increases, which is one of the reasons for limiting personal property in cells. This is especially important in an old building like A Cell House that does not have a sprinkler system. Dkt. 147-10 (Neal Dep) at 79:5-80:13; Ex. 8 (Dan Pacholke Expert Report) at 20-21; Dkt. 147-12 (Nowatzke Dep) at 99:11-17; Dkt. 147-4 (Crockett Dep) at 75:15-18; Dkt. 147-14 (Taylor Dep) at 112:17-113:2.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that excess property in Mr. Smith's cell caused or fueled the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

92. Before Mr. Smith's death, there were concerns at ISP that staff needed to be more vigilant about confiscating excess property. Dkt. 147-11 (Wardlow Dep) at 151:9-18.

**<u>RESPONSE</u>: Disputed, as no time period is defined such that the Defendants can meaningfully response to this statement. The Defendants further dispute this statement to the extent that the Plaintiff implies that excess property in Mr. Smith's cell caused or fueled the January 14, 2023, fire in ACH. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

**c. Prisoner Firefighters are Unable to Timely Respond**

93. ISP has a prisoner firefighter program. Dkt. 147-14 (Taylor Dep) at 14:3-15:18, 35:6-13. According to ISP policy, ISP administration relies exclusively on the prisoner firefighter program, also called the ISP Fire Brigade, to fight major fires at the facility. Ex. 21 (Emergency Manual - Appendix C Fire Plan) at 4.

**<u>RESPONSE</u>: Disputed. Per Lt. Smith, in the event of a fire, correctional officers are instructed to contact the control room via radio. (ECF 147-8, Transcript of Deposition of Lt. Smith, 96:12 – 14). They are to call a Signal 1070 if a fire alarm is going off, and a Signal 1071 if fire is visible. (ECF 147-8, 97:7 – 23). Correctional staff is responsible for rescue efforts until the Quick Response Team (QRT) or the offender fire brigade arrives. (ECF 147-8, 98:11 – 16). Therefore, ISP administration does not rely exclusively on the offender fire brigade to fight fires, as other ISP personnel must attempt to extinguish a fire, if possible, until the offender fire brigade arrives. Otherwise, not disputed for purposes of this motion that the ISP offender fire brigade is relied upon, once they arrive to the scene of a fire.**

94. The prisoner firefighters are housed throughout various living units at the facility. When a smoke or fire signal is called (10-70 or 10-71), staff in the living units are supposed to

immediately release the firefighters who live in their assigned units. Dkt. 147-8 (Smith Dep) at 125:21-126:15.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

95. Even if staff do not delay in releasing the firefighters, the process of firefighters responding to a fire is time consuming and can often take several minutes. Dkt. 147-18 (McCann Dep 1) at 83:12-86:7; Dkt. 147-14 (Taylor Dep) at 81:5-84:12; Ex. 8 (Dan Pacholke Expert Report) at 33; Ex. 22 (Daniel Milne Deposition in *Devine*) at 12:8-14:6.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

96. The firefighters have to be released from their cells and cellhouses by staff; they then have to gather their gear at the fire station, and then they must wait for staff at the checkpoints to allow them to go to the fire. Dkt. 147-14 (Taylor Dep) at 82:13-94:2; Dkt. 147-8 (Smith Dep) at 126:5 127:2.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

97. According to Neal, "it will always" be the case in a major fire that the prisoner fire brigade will arrive after the prisoner locked in his cell has burned to death. This was the case with a fire on April 7, 2017, that killed a prisoner named Joshua Devine (*see* ¶¶ 102-112, *infra*), as well as the January 14, 2023, fire that killed Michael Smith. Dkt. 147-10 (Neal Dep) at 219:9-23.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

98. As a result, staff in the cellhouse are expected and relied on to be the first individuals responding to a fire emergency. Ex. 12 (General Post Orders 10/5/2021) at 7-8; Dkt. 147-8 (Smith Dep) at 97:25-98:16; Ex. 8 (Dan Pacholke Expert Report) at 12, 13-14, 33. Their response is critical given the time it takes for firefighters to arrive. Dkt. 147-18 (McCann Dep 1) at 90:20-24.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

99. According to the American Correctional Association (ACA) standards, facilities must establish an adequate fire protection service; they can use an internal prisoner fire department, but only if the firefighters are readily accessible. Ex. 8 (Dan Pacholke Expert Report) at 12.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

100. The ISP prisoner firefighters are not "readily accessible," which is a violation of the ACA Standard. Ex. 8 (Dan Pacholke Expert Report) at 12.

**<u>RESPONSE</u>: Disputed. The offender fire brigade arrived to the scene of the fire within seven minutes and thirty-four seconds. (ECF 136, Ex. A-1).**

101. There were steps that Defendant Neal and others could have taken at ISP to shorten the time it takes prisoner firefighters to respond to a fire, including having them live in a single dorm where they had access to their gear. Ex. 8 (Dan Pacholke Expert Report) at 13. If the prison is going to rely on prisoner firefighters to fight major fires, they must take such steps. Ex. 8 (Dan Pacholke Expert Report) at 34.

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that, had they lived in a single dorm with access to their gear, the offender fire brigade could have or would have arrived sooner such that the outcome to Mr. Smith would have been different. The Plaintiff cites no evidence to support this proposition. The offender fire brigade arrived to the scene of the fire within seven minutes and thirty-four seconds. (ECF 136, Ex. A-1).**

#### iii. These Risks Together Posed a Substantial Risk of Serious Injury from Fire

102. All these risks combined created a substantial risk at ISP in 2023 that a prisoner would be seriously injured from a fire; and staff were all well-aware of these risks and their

consequences. Dkt. 147-18 (McCann Dep 1) at 100:7-25; Ex. 8 (Dan Pacholke Expert Report) at 21.

**<u>RESPONSE</u>: Disputed. The Plaintiff cites the deposition testimony of one individual, Steven McCann, to stand for the premise that all "staff" were aware of the substantial risk of fire causing injury to a prisoner. The Defendants further dispute this statement, as the Plaintiff cites no evidence that any of the Defendants had knowledge of any substantial risk of fire to Mr. Smith.**

103. To address the risk of injury from fires, staff should have taken steps to meaningfully enforce ISP policies, including policies limiting prisoner property, curtains, and homemade electrical equipment. Steps needed to be taken to hold both prisoners and staff accountable when these rules are violated. Ex. 8 (Dan Pacholke Expert report) at 34-35.

**<u>RESPONSE</u>: Disputed, as the Defendants, particularly Warden Neal, took steps to address these issues. Defendant Neal instructed his staff to shake down every cell in Indiana State Prison once per quarter. (ECF 147-10, 33:23 – 24). When prison staff shakes down cells, they are looking for drugs, contraband, or altered property. (ECF 147-10, 33:25 – 34:4). Staff also verifies that incarcerated individuals do not have more than 4.5 cubic feet of property. (ECF 147-10, 34:2 – 4). Warden Neal also expects staff to remove curtains. (ECF 147-10, 35:7 – 10). Staff writes up incarcerated individuals who are caught with curtains with a conduct violation; however, incarcerated individuals usually put the curtains right back up. (ECF 147-10, 236:2 – 12). Per Warden Neal, Indiana State Prison uses an outside contractor to run scans of the facility to identify cell phones and other electronics in the prison. (ECF 147-10 35:17 – 20). Once those items are identified, Warden Neal expects his staff to go find those items and remove them. (ECF 147-10, 35:20 – 23).**

**III. In 2017, a prisoner named Joshua Devine Died in a Fire in His Locked Cell at ISP**

104. After the 9:00 p.m. count on April 7, 2017, a fire erupted in cell 540 of B Cell House, where Joshua Devine was living. Ex. 23 (Devine Internal Affairs Report) at 1, 3. The fire apparently started when Mr. Devine's TV caught fire. *Id.* at 2-3.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Otherwise, not disputed for purposes of this motion.**

105. B Cell House has an almost identical structure to A Cell House. Dkt. 147-5 (Cross Dep) at 29:17-30:19.

**RESPONSE: Not disputed for purposes of this motion.**

106. According to ISP's own investigation report, there were numerous problems with the response to the fire, including:

b. A significant delay in staff response to the fire. Ex. 23 (Devine Internal Affairs Report) at 1-3 (staff did not respond for 10 minutes after the fire started).

c. A failure by multiple officers to bring the key to Mr. Devine's cell to the range. *Id.* at 2.

d. A failure by multiple officers to bring a fire extinguisher when they responded to the cell. *Id.* at 2.

e. Two of the three officers staffed in the cellhouse that night were in the counselor's office doing paperwork while the fire burned. *Id.* at 3-4.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Otherwise, not disputed for purposes of this motion that these were the findings stated in the ISP report.**

107. Mr. Devine ultimately burned to death in the fire in his locked cell. His cause of death was thermal burns. *Id.* at 7.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Otherwise, not disputed for purposes of this motion.**

**A. Administrators Knew Changes Were Needed Following Mr. Devine's Death**

108. An "After Action Review" was held to look at the response to the fire; Defendants Neal and Nowatzke were in attendance. Ex. 24 (Devine After Action Review) at 1.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Otherwise, not disputed for purposes of this motion.**

109. At the After-Action Review, staff discussed suggestions for what needed to be done to "aid in being prepared for similar incidents." *Id.* at 2. Among other things, they recognized that they needed to "[w]ork on fire drills and plan of action for staff." *Id.*

<u>RESPONSE</u>: **Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Otherwise, not disputed for purposes of this motion.**

110. Mr. Devine's family brought a lawsuit against Defendants Neal and Nowatzke, among others, alleging that they violated Mr. Devine's constitutional rights by ignoring the risk that he would be seriously harmed by a fire at ISP. The case continued through discovery and summary judgment. The federal district court denied summary judgment on February 15, 2022, about 11 months before Mr. Smith's death. *See Dwyer v. Neal*, Case No. 3:18-CV-995-JD, 2022 WL 462017 (N.D. Ind. Feb. 15, 2022); Ex. 8 (Dan Pacholke Expert Report) at 23-24.

<u>RESPONSE</u>: **Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Otherwise, not disputed for purposes of this motion.**

111. The court in *Dwyer* concluded, among other things, that there was sufficient evidence for a jury to find that Defendants Neal, Nowatzke (who was the custody supervisor at the time), and others were aware of an abundant number of safety hazards at ISP that created a substantial risk of serious injury from fires. *Dwyer*, 2022 WL 462017, at *4, 17-21; Dkt. 147-12 (Nowatzke Dep) at 118:12-14; Ex 8 (Dan Pacholke Expert Report) at 24. By way of example:

a. "One particularly glaring safety hazard was the widespread, persistent issues with fires and electrical outlets sparking. There could be as many as five to six

fires every week or two. Prisoners considered plugging devices into outlets to be risky, due to them frequently catching fire. And, just a few months prior to the fire on April 7, 2027, a large electrical fire on the 400 range of the B Cell House was reported." *Id.* (internal record citations omitted); *see also id.* at *15 (a firefighter testified that he had responded to five or six fires in a week and sometimes two or three in a day; Officer Statham testified that in a 5-year period, he had easily responded to over a hundred fires).

b. There was also evidence that: (a) excessive property was stored in cells; (b) inspections were performed perfunctorily, and (c) officer training on fire safety and response was deficient where it consisted of only modules on "identification of the fire extinguishers, use of the fire extinguisher, and fire emergency plans" and "the training fail[ed] to cover fire safety and response in any real depth." *Id.* at *4,16.

<u>**RESPONSE**</u>: **Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Additionally, the portions of the Court's opinion in *Dwyer* contain facts that were never adjudicated, as they were matters for the jury to decide at trial. The parties in *Dwyer v. Neal* settled the case before trial, and therefore the facts have never been adjudicated. Accordingly, *Dwyer* is not precedent and cannot be cited for the premise that the Defendants were aware of a substantial risk of fire particular to Mr. Smith, nor can it be used to show that facts and/or liability has been previously established. Otherwise, not disputed for purposes of this motion.**

112. The Court also concluded that a reasonable jury could conclude that (a) B Cell House staff unreasonably delayed in responding to the fire despite prisoner screams for help, *id.* at *9, and (b) the first responders failed to bring fire extinguishers to the fire despite knowing about the fire and how serious it was, *id.* at *12.

__RESPONSE__: **Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Additionally, the portions of the Court's opinion in *Dwyer* contain facts that were never adjudicated, as they were matters for the jury to decide at trial. The parties in *Dwyer v. Neal* settled the case before trial, and therefore the facts have never been adjudicated. Accordingly, *Dwyer* is not precedent and cannot be cited for the premise that the Defendants were aware of a substantial risk of fire particular to Mr. Smith, nor can it be used to show that facts and/or liability has been previously established. Otherwise, not disputed for purposes of this motion.**

113. Warden Neal received this opinion and was familiar with the court's findings well before Mr. Smith was killed in a fire in his locked cell in January 2023. Dkt. 147-10 (Neal Dep) at 12:9-13:9; Ex. 25 (Neal email about Summary Judgment) at 1.

__RESPONSE__: **Disputed, to the extent that the Plaintiff implies that the death of Joshua Devine in 2017 serves as the legal basis for knowledge of a substantial risk of fire particular to Mr. Smith in 2023. The Plaintiff offers no evidence that any of the Defendants were aware of a substantial risk of fire particular to Mr. Smith in 2023. Additionally, the portions of the Court's opinion in *Dwyer* contain facts that were never adjudicated, as they were matters for the jury to decide at trial. The parties in *Dwyer v. Neal* settled the case before trial, and**

**therefore the facts have never been adjudicated. Accordingly, *Dwyer* is not precedent and cannot be cited for the premise that the Defendants were aware of a substantial risk of fire particular to Mr. Smith, nor can it be used to show that facts and/or liability has been previously established. Otherwise, not disputed that Warden Neal received the Court's opinion and order denying summary judgment in *Dwyer*.**

114. Supervisors at ISP were well aware after the Devine fire that a timely response to a fire was critical, in part because there had been problems with a delay in response to the Devine fire. They also knew that the only way to timely identify an emergency like a fire is to have somebody out monitoring the cellhouse. Dkt. 147-12 (Nowatzke Dep) at 199:2-200:4.

**RESPONSE: Disputed, as the Plaintiff cites Defendant Nowatzke's testimony to stand for the premise that all supervisors knew that the only way to timely identify an emergency was to have somebody out monitoring the cellhouse. Additionally, Defendant Nowatzke testified that staff was required to make security rounds every half hour. (ECF 147:12, 110:11 – 19).**

**B. No Meaningful Changes Were Implemented**

115. Despite the After-Action Review and the Court's decision in *Dwyer*, no changes to policy, procedure, training, or instruction were made in response to the Devine fire. Dkt. 147-6 (Walton Dep) at 91:7-94:1; Dkt. 147-18 (McCann Dep 1) at 123:8-123:24, 124:13-20; Ex. 7 (Steven McCann Second Deposition) at 23:22-25:1; Dkt. 147-12 (Nowatzke Dep) at 117:21-118:11, 139:25-140:2; Dkt. 147-11 (Wardlow Dep) at 70:14-71:16, 86:7-87:7, 87:11-21.

**RESPONSE: Disputed. Defendant Warden Neal proposed installing sprinkler systems in each of the cell houses in ISP to the Indiana Department of Correction ("IDOC"). (ECF 147-10, 22:20 – 22). However, Warden Neal learned that IDOC deemed the project**

**as not feasible, financially astronomical, and unable to be done. (ECF 147-10, 22:25 – 23:1). This is due to the physical structure of the buildings and their age. (ECF 147-10, 23:13 – 22). Warden Neal also pursued upgrading fire hydrant infrastructure across the prison, resulting in installation of additional hydrants on Indiana State Prison property. (ECF 147-10, 24:14–18; 143:22 - 144:5). The offender fire brigade is trained to deploy hoses from these hydrants and reach any location in the prison. (ECF 147-10, 143:13 – 21). Defendant Neal instructed his staff to shake down every cell in Indiana State Prison once per quarter. (ECF 147-10, 33:23 – 24). If staff notices a cell with an abundance of property, they are to report it to the custody supervisor for a shakedown. (ECF 147-10, 36:10 – 19). Additionally, Warden Neal sends out an Incident Review Committee report every Monday through Friday, which discusses the issue of property and fire hazards in cells. (ECF 147-10, 40:4 – 7).**

116. Among other things, Neal did not institute a policy requiring staff to monitor the surveillance feed in the officers' station when no staff were on the range, or to be on the ranges at all times; nor did he institute any changes to improve the response time of the prisoner fire brigade or require hydrants and hoses to be installed in each housing unit. Dkt. 147-10 (Neal Dep) at 137:12 138:24, 139:1-9, 140:18-141:21, 143:22-144:5.

**RESPONSE: Not disputed for purposes of this motion.**

117. Administrators also failed to have any conversation about whether staff were adequately trained to respond to a fire. Dkt. 147-12 (Nowatzke Dep) at 151:18-21.

**RESPONSE: Not disputed for purposes of this motion.**

118. After Mr. Devine's death, Captain McCann and his staff handled supervision of prisoners in the living units in the same way as they did prior to his death. Ex. 7 (Steven McCann Second Deposition) at 25:2-6.

**RESPONSE**: **Not disputed for purposes of this motion.**

119. Staff conducted a single sweep of the prison to confiscate excess property in prisoner cells. Dkt. 147-18 (McCann Dep 1) at 123:25-124:25; Dkt. 147-10 (Neal Dep) at 139:18-140:17.

**RESPONSE**: **Disputed. Defendant Neal instructed his staff to shake down every cell in Indiana State Prison once per quarter. (ECF 147-10, 33:23 – 24). If staff notices a cell with an abundance of property, they are to report it to the custody supervisor for a shakedown. (ECF 147-10, 36:10 – 19).**

120. However, there have been no subsequent facility-wide property purges; the policy limiting prison property is largely unenforced. Dkt. 147-10 (Neal Dep) at 140:11-15; Ex. 8 (Dan Pacholke Expert Report) ("Based on my tour of the facility, this crackdown on excess property was temporary and is no longer enforced.").

**RESPONSE**: **Disputed. Defendant Neal instructed his staff to shake down every cell in Indiana State Prison once per quarter. (ECF 147-10, 33:23 – 24). If staff notices a cell with an abundance of property, they are to report it to the custody supervisor for a shakedown. (ECF 147-10, 36:10 – 19).**

121. After the fire that killed Mr. Smith, for example, the fire marshal found a great deal of excess property in Mr. Smith's cell, including three tablets, four televisions, two cellphones and electrical cords. Ex. 26 (Fire Marshal Report) at 33.

<u>**RESPONSE**</u>: **Disputed. The fire marshal's report makes no mention or finding of excess property that would exceed the 4.5 cubic feet box allotted to incarcerated individuals for their personal property. (ECF 163-26 at 33). Otherwise, the Defendants do not dispute that the items listed in this statement were found in the Plaintiff's cell.**

122. The only other changes that were made following the Devine fire were that fire extinguishers were moved to the front of the ranges, and smoke evacuation fans and a new fire suppression backpack were purchased for the fire station. Dkt. 147-12 (Nowatzke Dep) at 100:24-101:16, 102:12-17-121:4, 140:4-18, 151:12-17; Dkt. 147-11 (Wardlow Dep) at 86:7-87:7, 87:11-21; Ex. 8 (Dan Pacholke Expert Report) at 24.

<u>**RESPONSE**</u>: **Disputed. Defendant Warden Neal proposed installing sprinkler systems in each of the cell houses in ISP to the Indiana Department of Correction ("IDOC"). (ECF 147-10, 22:20 – 22). However, Warden Neal learned that IDOC deemed the project as not feasible, financially astronomical, and unable to be done. (ECF 147-10, 22:25 – 23:1). This is due to the physical structure of the buildings and their age. (ECF 147-10, 23:13 – 22). Warden Neal also pursued upgrading fire hydrant infrastructure across the prison, resulting in installation of additional hydrants on Indiana State Prison property. (ECF 147-10, 24:14–18; 143:22 - 144:5). The offender fire brigade is trained to deploy hoses from these hydrants and reach any location in the prison. (ECF 147-10, 143:13 – 21). Defendant Neal instructed his staff to shake down every cell in Indiana State Prison once per quarter. (ECF 147-10, 33:23 – 24). If staff notices a cell with an abundance of property, they are to report it to the custody supervisor for a shakedown. (ECF 147-10, 36:10 – 19). Additionally, Warden Neal sends out an Incident Review Committee report every Monday through**

**Friday, which discusses the issue of property and fire hazards in cells. (ECF 147-10, 40:4 – 7).**

123. These changes were meaningless if staff were not prepared to appropriately and effectively use this equipment. Ex. 8 (Dan Pacholke Expert Report) at 24.

<u>**RESPONSE**</u>: **Disputed. The staff would not use the suppression backpack, as it is professional fire fighting equipment for use by the offender fire brigade. (ECF 147-11 at 86:13 – 18). The Defendants further dispute this statement to the extent that the Plaintiff implies that correctional staff would use smoke evacuation fans or that Ofcs. Cross and Crockett incorrectly deployed their fire extinguishers. The Plaintiff cites no evidence to support these propositions.**

124. Staff at ISP were not informed about the details of what happened during the Devine fire, or about any issues with the response to the fire or lessons learned, including during any training sessions. Dkt.147-6 (Walton Dep) at 91:7-94:1; Dkt. 147-5 (Cross Dep) at 78:11-80:13; Dkt. 147-11 (Wardlow Dep) at 85:17-86:6, 87:22-88:4, 88:14-24.

<u>**RESPONSE**</u>: **Not disputed for purposes of this motion.**

125. Despite the failures of response set forth in paragraphs 104 to 110 above (including that most staff in the unit were occupied filling out paperwork and that the sole officer who did respond to Mr. Devine's cell arrived without a key or a fire extinguisher as the fire was raging), Warden Neal testified in his deposition that there was no staff misconduct, and no violation of any procedure or policy, in the response to the Devine fire. Dkt. 147-10 (Neal Dep) at 127:16-128:11.

<u>**RESPONSE**</u>: **Not disputed for purposes of this motion.**

126. Concerned administrators at ISP should have been alarmed by Mr. Devine's death and should have made significant changes to ensure that staff understood the risks posed by fire,

were inspecting cells regularly for fire risks, were monitoring the cellhouses continuously for emergencies, and were ready to respond immediately and appropriately at the first sign of an emergency. Ex. 8 (Dan Pacholke Expert Report) at 24, 37-38.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that excess property played a role in the January 14, 2023 fire. The Defendants further dispute this statement to the extent that the Plaintiff implies that the Defendants failed to respond immediately and appropriately on January 14, 2023. Ofcs. Cross and Crockett arrived to Mr. Smith's cell with a fire extinguisher within three minutes and thirty-one seconds of the first flickers of flame. (ECF 136, Ex. A-1).**

127. Despite this, administrators did not take reasonable, appropriate, or available steps to address the risks. Ex. 8 (Dan Pacholke Expert Report) at 24.

**RESPONSE: Disputed. Defendant Warden Neal proposed installing sprinkler systems in each of the cell houses in ISP to the Indiana Department of Correction ("IDOC"). (ECF 147-10, 22:20 – 22). However, Warden Neal learned that IDOC deemed the project as not feasible, financially astronomical, and unable to be done. (ECF 147-10, 22:25 – 23:1). This is due to the physical structure of the buildings and their age. (ECF 147-10, 23:13 – 22). Warden Neal also pursued upgrading fire hydrant infrastructure across the prison, resulting in installation of additional hydrants on Indiana State Prison property. (ECF 147-10, 24:14–18; 143:22 - 144:5). The offender fire brigade is trained to deploy hoses from these hydrants and reach any location in the prison. (ECF 147-10, 143:13 – 21). Warden Neal instructed his staff to shake down every cell in Indiana State Prison once per quarter. (ECF 147-10, 33:23 – 24). If staff notices a cell with an abundance of property, they are to report it to the custody supervisor for a shakedown. (ECF 147-10, 36:10 – 19). Additionally,**

**Warden Neal sends out an Incident Review Committee report every Monday through Friday, which discusses the issue of property and fire hazards in cells. (ECF 147-10, 40:4 – 7). Warden Neal directs staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19).**

## IV. Policies, Procedures and Training are Woefully Inadequate and Exacerbate the Risk

### A. Despite Serious Risk of Injury by Fire, ISP Had Minimal Policies relating to Fire Safety and Responses

128. Fire response instructions are set out in the General Post Orders, which are available in each cellhouse, albeit in a locked box. Ex. 27 (ACH Post Orders 08/01/2019) at 1; Ex. 12 (General Post Orders 10/5/2021) at 1; Dkt.147-12 (Nowatzke Dep) at 90:1-01:92:10, 97:12-98:10, 123:15-124:17; Dkt. 147-8 (Smith Dep) at 61:18-63:25.

**RESPONSE: Not disputed for purposes of this motion.**

129. The sum of the fire response instructions are found in section P and set out seven steps for fire response: (1) report a 10-70 to the control room; (2) bring bolt cutters to the fire; (3) assess the scene of the fire; (4) remove offenders that are in the immediate area of the fire; (5) if possible, extinguish the fire; (6) remove prisoners in the general area of the fire if in immediate dangers; and (7) release the prisoner firemen anytime a 10-70 or 10-71 is called. Ex. 12 (General Post Orders 10/5/2021) at 7-8.

**RESPONSE: Not disputed for purposes of this motion.**

130. There are no other instructions or policies provided to staff on what steps to take in the event of a fire. Dkt. 147-8 (Smith Dep) at 107:12-16; Dkt. 147-18 (McCann Dep 1) at 86:16-91:25, 92:6-17, 93:24-94:15.

**RESPONSE: Disputed. ISP staff is trained on fire response during their yearly training. (ECF 147-18, 59:12 - 61:22).**

131. The prison also has an emergency response manual that sets out guidance on fire safety and fire response. *See* Ex. 21 (Emergency Manual – Appendix C Fire Plan). Staff are not provided with a copy of the Manual; instead, a copy is kept in the training department and shift supervisor's office. Staff members must seek permission from a supervisor to view it. Ex. 12 (General Post Orders 10/5/2021) at 7.

**RESPONSE: Not disputed for purposes of this motion.**

132. Although written policy required staff to review the emergency manual once per year, this was never done or enforced. Ex. 12 (General Post Orders 10/5/2021) at 7. Staff, including supervisors, believed they had no responsibility to review the emergency manual and did not generally review it. Dkt. 147-8 (Smith Dep) at 68:15-69:2, 118:3-119:25, 120:1-6; Dkt. 147-4 (Crockett Dep) at 22:16-24, 69:10-22.

**RESPONSE: Disputed, to the extent that the Plaintiff extrapolates the testimony of two staff members to stand for the understanding of all staff at ISP. Otherwise, not disputed for purposes of this motion.**

133. An emergency plan has value only to the extent it is understood and implemented operationally. Ex. 8 (Dan Pacholke Expert Report) at 13. Defendant Taylor, as the Safety Hazard Manager, is responsible for ensuring the adequacy of the fire plan and its implementation. Ex. 21 (Emergency Manual – Appendix C Fire Plan) at 2. However, other than quarterly evacuation drills, Taylor does not provide any safety education to prisoners or staff. Dkt. 147-14 (Taylor Dep) at 56:16-19.

**RESPONSE: Disputed. The Plaintiff cites no authority to support her contention that Defendant Taylor holds any authority or responsibility for training prisoners or staff. Defendant Taylor holds no such authority. (ECF 147-10, 52:2 – 19).**

134. Even if staff had looked at it, the emergency manual provides minimal instruction to cellhouse staff responding to a fire. After explaining the difference between a major and minor fire and stressing the importance of being vigilant for things like excess paper and altered electrical outlets in order to prevent fires, the manual instructs staff witnessing a fire to notify the control room and to attempt to extinguish the fire with an extinguisher if it is still in the minor stage. The manual instructs staff that if the fire has progressed beyond the minor stage, all firefighting should be done by the ISP fire brigade. Ex. 21 (Emergency Manual – Appendix C Fire Plan) at 1-4

**RESPONSE**: **Disputed as to the term "minimal instruction", which is argument and not a fact. Otherwise, not disputed for purposes of this motion.**

135. In addition to General Post Orders and the Emergency Plan, ISP also has many Facility Directives, including Facility Directive 009, the only Directive that pertains to fire prevention and safety. Dkt. 147-12 (Nowatzke Dep) at 92:5-10. There is a copy of the Facility Directives in the warden's office, but they are not in the cellhouses. There is no requirement that staff review them, and staff are never instructed to read or review them. Dkt. 147-12 (Nowatzke Dep) at 89:21-91:23.

**RESPONSE**: **Not disputed for purposes of this motion.**

136. Even if staff were to review Facility Directive 009, it provides no actual guidance on how to respond to a fire and instead merely directs staff to familiarize themselves with the institution's fire plan. Ex. 29 (Facility Directive 00-9) at 2.

**RESPONSE**: **Not disputed for purposes of this motion.**

**B. Fire Response Training Was Grossly Inadequate**

137. When a fire emergency is announced over the radio, a Quick Response Team, also referred to as first responders, automatically leave their posts to respond to the emergency. Ex. 21 (Emergency Manual – Appendix C Fire Plan) at 2; Dkt. 147-9 (Koen Dep) at 48:7-24

**RESPONSE**: **Not disputed for purposes of this motion.**

138. Until first responders (and prisoner firefighters) arrive, staff assigned to the cellhouse are responsible for doing whatever they can to put out a fire. Dkt. 147-5 (Cross Dep) at 61:18-62:3; Dkt.147-8 (Smith Dep) at 98:11-19.

**RESPONSE**: **Disputed. In terms of putting out a fire, assigned cellhouse staff is responsible for assessing the scene of the fire, and, if possible, to extinguish the fire with extinguishers. (ECF 163-12 at pp. 7 – 8).**

139. Despite this responsibility, staff do not receive any meaningful training on responding to a fire. Dkt. 147-18 (McCann Dep 1) at 73:2-15, 92:18-94:15. As the safety hazard manager acknowledged, staff in the living units are not trained or equipped to respond to a major fire. Dkt. 147-14 (Taylor Dep) at 78:3-8. The prisoner firefighters are the only individuals at ISP who are specifically trained on how to respond to a fire. Dkt. 147-18 (McCann Dep 1) at 92:1-5; Dkt. 147-14 (Taylor Dep) 82:22-83:10, 86:24-87:11 (explaining that the firefighters are the ones who should respond to major fires because they have proper training).

**RESPONSE**: **Disputed to the extent that the Plaintiff implies that correctional staff should or are expected to fight a major fire without proper, professional grade firefighting equipment and training. The Plaintiff offers no evidence to support this proposition. ISP staff is trained on fire response during their yearly training. (ECF 147-18, 59:12 - 61:22). The Defendants further dispute this statement, because the Plaintiff's statement that the fire**

**training was not meaningful is argument and not fact. Otherwise, not disputed for purposes of this motion.**

140. Members of the Quick Response Team also do not get any specific or additional fire safety or fire response training. Dkt. 147-6 (Walton Dep) at 20:9-23:3; Dkt. 147-18 (McCann Dep 1) at 66:19-67:11; Dkt. 147-4 (Crockett Dep) at 53:21-54:22, 56:23-57:12; Dkt. 147-5 (Koen Dep) at 48:4-6.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

141. The training that staff in the living units do receive is, in reality, fire safety training, not fire response training. Dkt. 147-18 (McCann Dep 1) at 59:12-61:22.

**<u>RESPONSE</u>: Disputed. At his deposition, Mr. McCann described yearly training that explained different types of fires and the use of fire extinguishers. (ECF 147-18 at 59:12 – 23). Mr. McCann's further testimony was as follows:**

**Q: You said there was a module on fire response as part of the –is – was that part of the annual training that you were required to take when you were at IDOC?**

**A: I don't know if you would call it fire response, but yes, it was part of the modules for our yearly training.**

**Q: If fire response isn't a good name for the module, what would be a better name?**

**A: I don't know, honestly. Fire safety?**

**(ECF 147-18, 60:11 – 20). As shown in context, Mr. McCann was unsure of what to call the fire training he received after counsel for the Plaintiff framed the training as fire response. It is, therefore, inaccurate to state that his testimony was that ISP employees were only given fire safety training.**

142. This fire safety training is limited to a portion of a broader one-hour computer-based training on a variety of topics, including the care of chemicals. The portion focused on fire

safety covers the types of fire extinguishers in the prison, and on which fires to use them. Dkt. 147-5 (Cross Dep) at 16:17-17:5; 147-8 (Smith Dep) at 105:19-106:21; Dkt. 147-18 (McCann Dep 1) at 59:12-61:22. No guidance is given about what fire extinguisher to use when staff are uncertain as to the nature or magnitude of the fire to which they are responding. Dkt.147-11 (Wardlow dep) at 142:2-20.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

143. Christopher Beal, the training instructor testified that there is also an annual training session that lasts about an hour, during which 30 or so emergency scenarios are discussed. About two of those scenarios are supposed to deal with fires, meaning a few minutes, at most, would be dedicated to discussing fire safety at the annual training. Dkt. 147-19 (Beal Dep) at 78:18-82:16, 100:17-102:7. However, other staff, including the deputy warden who was responsible for overseeing the training instructor, testified that there was no classroom-based training or hands-on training related to fire safety or fire response in the annual training program in the period leading up to Mr. Smith's death. Dkt. 147-12 (Nowatzke dep) at 23:23-24:1, 39:2-40:19; Dkt. 147-4 (Crockett Dep) at 53:5-9, 173:16 174:15.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

144. The only other fire-related training that staff receive is through participation in fire drills. Dkt. 147-12 (Nowatzke Dep) at 39:2-40:19, 111:17-112:4, 113:5-115:13; Dkt. 147-4 (Crockett Dep) at 23:6-24:18, 57:3-12; Dkt. 147-14 (Taylor Dep) at 78:15-81:4.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

145. Fire drills are supposed to be done quarterly. Dkt. 147-12 (Nowatzke Dep) at 40:14-16; Dkt. 147-14 (Taylor Dep) at 56:16-19.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

146. Crockett, who started at IDOC in 2017, recalls participating in a total of just three fire drills prior to the fire that killed Mr. Smith. Dkt. 147-4 (Crockett Dep) at 67:12-68:3. During one fire drill in which he participated, he received a score of 5/8 on the basic fire safety questions and the comments state "fire training", indicating additional training is necessary. Dkt. 147-2 (Defs' Ex. A-6) at 19-20. Defendant McCann has worked at ISP for years, does not recall ever participating in any type of fire or evacuation drill. Dkt. 147-18 (McCann Dep 1) at 59:24-25.

**RESPONSE: Not disputed for purposes of this motion.**

147. Defendant Taylor determines what happens during fire drills, and she is responsible for making sure that fire drills are adequately preparing staff to respond in the case of a fire. Dkt. 147-12 (Nowatzke Dep) at 132:23-133:1; Dkt. 147-14 (Taylor Dep) at 144:12-16.

**RESPONSE: Not disputed for purposes of this motion.**

148. The ISP Fire drills do not train staff on how to respond to or fight a fire—according to Taylor, that is the firefighters' job. Dkt. 147-14 (Taylor Dep) at 86:24-87:11, 99:20-100:6; Ex. 8 (Dan Pacholke Expert Report) at 14, 33 ("Fire drills are not the equivalent of fire prevention and response training.").

**RESPONSE: Disputed, as in the case of a fire, assigned cellhouse staff is responsible for assessing the scene of the fire, and, if possible, to extinguish the fire with extinguishers. (ECF 163-12 at pp. 7 – 8). Correctional staff is not tasked with full firefighting responsibilities. Otherwise, not disputed for purposes of this motion.**

149. ISP "Fire drills" are evacuation drills. Before these drills begin, staff are alerted that a drill is happening, and then they immediately evacuate all prisoners in the cellhouse without further direction. The drills do not involve any mock fire response by staff, just evacuation. Dkt.

147-8 (Smith Dep) at 114:19-115:3, 152:23-153:3; Dkt. 147-6 (Walton Dep) 77:19-80:19; Dkt. 147-5 (Cross Dep) at 51:21-52:21, 55:5-9; Dkt. 147-4 (Crockett Dep) at 58:25-59:12.

**RESPONSE**: **Not disputed for purposes of this motion.**

150. In contrast, if there is a real fire, staff would be required to assess the fire, try to put the fire out, and then would have to wait for authorization before evacuating all or part of the cellhouse. Ex. 12 (General Post Orders 10/5/2021) at 7-8; Dkt. 147-8 (Smith Dep) at 110:7-112:20, 152:23-153:3.

**RESPONSE**: **Not disputed for purposes of this motion.**

151. At the end of the evacuation drill, the staff in the cellhouse where the drill is happening are asked, as a group, to orally answer basic fire safety questions, such as what code do you call when you see a fire and what are the different types of fire extinguishers. These questions do not cover how to actually respond to a fire. Dkt. 147-2 (Def 's A-6) at 4 (basic fire questions); Dkt. 147-8 (Smith Dep) at 153:4-154:16; Dkt. 147-6 (Walton Dep) 77:19-80:19.

**RESPONSE**: **Not disputed for purposes of this motion.**

152. Staff do not ever receive hands-on, experiential training in the use of a fire extinguisher or the steps for responding to a fire. Dkt. 147-8 (Smith Dep) at 106:22-25, 148:5-16; Dkt. 147-18 (McCann Dep 1) at 73:2-15; Dkt. 147-14 (Taylor Dep) at 56:16-19; Ex. 8 (Dan Pacholke Expert Report) at 15.

**RESPONSE**: **Not disputed for purposes of this motion.**

153. ISP staff training falls below generally accepted corrections practices and is “grossly inadequate.” Fire safety training is fundamental in corrections, and it should include annual hands-on practice so that staff will have experience to draw on in the event of a fire. This is especially important in an old building like A Cell House. Ex. 8 (Dan Pacholke Expert Report)

at 14, 17, 33. In addition, staff at ISP are not effectively trained on the existing fire plan, even with its deficiencies. Ex. 8 (Dan Pacholke Expert Report) at 17, 33. Staff need to be adequately trained on the fire plan. Ex. 8 (Dan Pacholke Expert Report) at 33.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that Ofc. Cross, Ofc. Crockett, Sgt. Walton, and Lt. Smith failed to respond appropriately to their post orders. Officers Cross and Crockett approach Mr. Smith's cell with a water fire extinguisher three minutes and thirty-one seconds from the first flickers of flame of the fire, deployed the water fire extinguisher, retreated to "roll the bar" and obtain an ABC fire extinguisher, returned to the scene of the fire with an ABC fire extinguisher, and Officer Crockett remained at the scene of the fire in an attempt to open Mr. Smith's cell door. (ECF 136, Ex. A-1; ECF 147-4, 37:18 – 38:4; ECF 147-5, Transcript of Deposition of Ofc. Cross, 141:9 – 11; 142:12 – 19). Sgt. Walton called a 10-71 fire signal. (ECF 147-7, 122:19 – 25). The Defendants do not otherwise dispute that, prior to the 2023 fire, ISP's training did not include hands-on fire safety training.**

154. Quarterly training meetings are attended by Defendants Neal, Nowatzke, Wardlow, the field training manager, the training coordinator and the training officers; they discuss any issues with training that they believe should be addressed. Dkt. 147-11 (Wardlow Dep) at 34:21-35:4, 35:23 36:11.

**RESPONSE**: **Not disputed for purposes of this motion.**

155. Administrators at ISP, including Neal, Nowatzke, and Wardlow, have the power and authority to institute any additional training on any topic that they believe is needed at ISP. Dkt. 147-12 (Nowatzke Dep) at 27:3-28:14; Dkt. 147-11 (Wardlow Dep) at 36:12-37:6.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that ISP staff can directly make changes to the training curriculum. If changes to the training curriculum are deemed necessary by ISP staff, they would submit feedback to the training coordinator. (ECF 147-19, Transcript of Deposition of Christopher Beal, 93:6 – 22). ISP administrators could provide refresher training where deemed necessary. (ECF 147-12, 27:8 – 15).**

156. Nowatzke has put on refresher trainings in the past, including on the use of restraints. Dkt. 147-12 (Nowatzke Dep) at 27:8-15. However, he has not taken any steps to make sure that there are training and instruction in place to identify and respond to emergencies like fires. Dkt. 147-12 (Nowatzke Dep) at 113:18-114:1; Dkt. 147-11 (Wardlow Dep) at 36:12-37:6.

**RESPONSE: Not disputed for purposes of this motion.**

**C. Gaps in ISP's policies relating to fire response**

157. It is generally accepted correctional practice that, in a cellhouse with a physical layout and infrastructure similar to A Cell House, staff should be circulating on the ranges at all times. Ex. 8 (Dan Pacholke Expert Report) at 36.

**RESPONSE: Disputed. Per Mr. McCann, officers could go to the officers' station in between doing rounds and performing their duties. (ECF 147-18, 101:1 – 9). Officers can be together in the officers' station to eat their lunch or take little breaks. (ECF 147-18, 101:10 – 25). Per Lt. Smith, custody staff does not leave the cell house for breaks or lunch, so most officers will try to eat their lunch or go to the restroom after finishing counts. (ECF 147-8, 230:18 – 25). They fit in those tasks when they can. (ECF 147-8, 230:24 – 25). Per Lt. Smith, eating and using the restroom after count is a good time to do those things, because the incarcerated individuals are secure in their cells. (ECF 147-8, 231:1 – 22). Per Sgt. Walton, After the count sheets are turned in, that is when staff can use the restroom, eat, or drink**

**water. (ECF 147-7, 118:4 – 14). Correctional staff does not get formal breaks. (ECF 147-7, 119:8 – 9). But correctional staff is still mindful of what is going on in the cell house during this time. (ECF 147-7, 119:23 – 24).**

158. It is unacceptable for staff to congregate in one area, such as the officers' station, especially when the cellhouse is short staffed. Ex. 8 (Dan Pacholke Expert Report) at 23, 36; Dkt. 147- 12 (Nowatzke Dep) at 108:7-109:7.

<u>**RESPONSE**</u>: **Disputed. Per Mr. McCann, officers could go to the officers' station in between doing rounds and performing their duties. (ECF 147-18, 101:1 – 9). Officers can be together in the officers' station to eat their lunch or take little breaks. (ECF 147-18, 101:10 – 25). Per Lt. Smith, custody staff does not leave the cell house for breaks or lunch, so most officers will try to eat their lunch or go to the restroom after finishing counts. (ECF 147-8, 230:18 – 25). They fit in those tasks when they can. (ECF 147-8, 230:24 – 25). Per Lt. Smith, eating and using the restroom after count is a good time to do those things, because the incarcerated individuals are secure in their cells. (ECF 147-8, 231:1 – 22). Per Sgt. Walton, After the count sheets are turned in, that is when staff can use the restroom, eat, or drink water. (ECF 147-7, 118:4 – 14). Correctional staff does not get formal breaks. (ECF 147-7, 119:8 – 9). But correctional staff is still mindful of what is going on in the cell house during this time. (ECF 147-7, 119:23 – 24).**

159. Whenever staff are in the officers' station, someone must be watching the monitor with the live surveillance feed. Ex. 8 (Dan Pacholke Expert Report) at 27.

<u>**RESPONSE**</u>: **Disputed. Sergeants are responsible for watching the monitor in the officers' station. (ECF 147-4, Transcript of Deposition of Ofc. Crockett, 96:12 – 16). A sergeant working in the officers' station can look at the monitors every once in awhile, but**

**continuous monitoring is not required. (ECF 147-11, Transcript of Deposition of Maj. Wardlow, 147-11, 80:15 – 24). There were no requirements for watching the surveillance monitors other than to utilize them to see what is going on in the cellhouse. (ECF 147-12, Transcript of Deposition of Dep. Warden Nowatzke, 110:2 – 6).**

160. It is understood among staff that, if officers are on the range, they are more likely to sense an emergency like a fire, either by hearing calls for help, smelling smoke, or seeing the smoke or fire. Dkt. 147-18 (McCann Dep 1) at 99:9-18. If staff are not out monitoring, they might not realize there is an emergency going on. Dkt. 147-12 (Nowatzke Dep) at 109:12-19.

**RESPONSE: Disputed to the extent that the Plaintiff argues that Lt. Smith, Sgt. Walton, Ofc. Crockett, and Ofc. Cross failed to monitor A Cell House properly on January 14, 2023. Defendants Cross and Crockett responded to the fire in Michael Smith's cell within three minutes and thirty-one seconds. (ECF 136, Ex. A-1). Otherwise, not disputed for purposes of this motion.**

161. Despite the risks of failing to monitor the cells properly, ISP has no policy requiring a staff member to be out on the ranges or floor in each cellhouse at all times; the only policy related to when or how often staff should be on the ranges is the policy requiring rounds every 30 minutes. Dkt. 147-12 (Nowatzke dep) at 110:11-19.

**RESPONSE: Disputed to the extent that the Plaintiff argues that Lt. Smith, Sgt. Walton, Ofc. Crockett, and Ofc. Cross failed to monitor A Cell House properly on January 14, 2023. Defendants Cross and Crockett responded to the fire in Michael Smith's cell within three minutes and thirty-one seconds. (ECF 136, Ex. A-1). Otherwise, not disputed for purposes of this motion.**

162. The custody supervisor and warden are responsible for making sure that there are adequate policies and instructions in place establishing how to monitor and supervise a cellhouse. Dkt. 147-12 (Nowatzke dep) at 117:2-7; Dkt. 147-11 (Wardlow Dep) at 29:22-30:8; Dkt. 147-12 (Nowatzke Dep) at 117:8-12.

**RESPONSE: Not disputed for purposes of this motion.**

163. The custody supervisor and warden should have required staff to monitor the cells at ISP at all times to mitigate the risk of serious injury. Ex. 8 (Dan Pacholke Expert Report) at 21-23. There were concrete steps Defendant Administrators could have taken to this end, including requiring staff to be on their tiers at all times unless coverage was provided. Ex. 8 (Dan Pacholke Expert Report) at 22; Dkt. 147-6 (Walton Dep) at 110:3-4; Dkt. 147-5 (Cross Dep) at 125:11-22.

**RESPONSE: Disputed. It is not possible for prison staff to be physically present on the ranges for the duration of their twelve-hour shift. (ECF 147-10, 100:12 – 101:3). That is because a correctional officer needs to go to the bathroom, take a break, and make phone calls. (ECF 147-10, 100:24 – 101:6). Instead, Warden Neal directs staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19).**

164. ISP also has no policy prohibiting staff from congregating in the officers' station; instead, this practice is permitted and staff believe it is okay to gather in the officers' station. Dkt. 147-8 (Smith Dep) 161:2-11; Dkt. 147-6 (Walton Dep) at 31:19-32:20; Dkt. 147-18 (McCann Dep 1) at 100:1-25; Ex. 7 (Steven McCann Second Deposition) at 21:24-22:6; Dkt. 147-11 (Wardlow Dep) at 77:16- 78:10; Ex. 8 (Dan Pacholke Expert Report) at 22-23. No policy limits how long a staff member may stay in the officers' station, other than the requirement for rounds every 30 minutes.; Dkt. 147-8 (Smith Dep) at 59:6-11, 59:19-22.

**RESPONSE: Not disputed for purposes of this motion.**

165. Staggering rounds so that staff do not conduct their rounds simultaneously is important; it ensures that staff are always on the ranges. Staff are supposed to stagger rounds. Dkt. 147-18 (McCann Dep 1) at 40:14-41:15. However, there is no policy or written instruction requiring staff to stagger their rounds. Dkt. 147-8 (Smith Dep) at 50:23-51:9; Ex. 7 (Steven McCann Second Deposition) at 17:17-18:5. Lieutenant Walton testified that she prefers when staff all do their rounds at the same time. Dkt. 147-8 (Smith Dep) at 50:23-51:9.

**RESPONSE**: **Disputed. It is not possible for prison staff to be physically present on the ranges for the duration of their twelve-hour shift. (ECF 147-10, 100:12 – 101:3). That is because a correctional officer needs to go to the bathroom, take a break, and make phone calls. (ECF 147-10, 100:24 – 101:6). Instead, Warden Neal directs staff to conduct security rounds twice per hour. (Ex. H, 235:10 – 19).**

166. There is no policy or instruction requiring staff to stagger when they eat lunch, and there is no rule prohibiting staff from all eating together at the same time in the officers' station. Dkt. 147-6 (Walton Dep) at 119:3-6; Dkt. 147-8 (Smith Dep) at 198:2-24. Staff could have eaten their lunches on the ranges. Ex. 8 (Dan Pacholke Expert Report) at 22; Dkt. 147-6 (Walton Dep) at 110:3-4; Dkt.147-5 (Cross Dep) at 125:11-22.

**RESPONSE**: **Disputed. It is not possible for prison staff to be physically present on the ranges for the duration of their twelve-hour shift. (ECF 147-10, 100:12 – 101:3). That is because a correctional officer needs to go to the bathroom, take a break, eat lunch, and make phone calls. (ECF 147-6, 118:4 – 14; Ex. H, 100:24 – 101:6). Instead, Warden Neal directs staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19).**

167. There is no policy regarding if, when, and how often staff should watch the monitors in the officers' station. Dkt. 147-12 (Nowatzke Dep) at 110:2-10; Dkt. 147-6 (Walton

Dep) at 37:18-7; Dkt. 147-5 (Cross Dep) at 94:7-12. Nor is there any training or instruction to staff about watching the monitors at any point. Dkt. 147-6 (Walton Dep) at 37:18-7; Dkt. 147-8 (Smith Dep) at 55:17-23, 57:16-25, 140:12-20. In particular, there is no policy requiring staff to watch the monitor when no staff are on the ranges. Ex. 8 (Dan Pacholke Expert Report) at 7.

**RESPONSE**: **Not disputed for purposes of this motion.**

168. By failing to institute policies requiring staff to be present on the ranges at all times and to monitor the surveillance feed, ISP supervisors and administrators failed to ensure that A Cell House was adequately monitored, creating an unacceptable risk that endangered prisoners and staff. Ex. 8 (Dan Pacholke Expert Report) at 35-36

**RESPONSE**: **Disputed. Defendants Cross and Crockett responded to the January 14, 2023, fire within three minutes and thirty-one seconds of the first flickers of flame. (ECF 136, Ex. A-1).**

169. Despite the failure of staff to bring fire extinguishers to the Devine fire, ISP administrators have not implemented a policy requiring staff to get a fire extinguisher before responding if they have reason to believe there is a fire on the ranges or in a cell. *See* Ex. 12 (General Post Orders 10/5/2021) at 7-8. Major Wardlow testified that if prisoners are yelling that there is a fire, a staff member should go investigate to determine if there is actually a fire before going to collect a fire extinguisher and trying to put the fire out. Dkt. 147- 11 (Wardlow Dep) at 82:22-83:1.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that Officers Cross and Crockett failed to bring a fire extinguisher to the fire in Cell 252 upon their first approach. Officers Cross and Crockett did bring a fire extinguisher to Cell 252 upon their first**

**approach, at 10:58:20. (ECF 136, Ex. A-1). Otherwise, not disputed for purposes of this motion.**

170. There is no policy prohibiting prisoners from fixing electrical equipment in their cells, and staff are not concerned about this type of behavior. Walton has not been part of any discussion about the risks posed by prisoners fixing things in their cells. Dkt. 147-6 (Walton Dep) at 180:7 181:14.

**RESPONSE**: **Disputed. The Plaintiff cites no evidence to support her statement that "staff are not concerned about this type of behavior." In fact, staff are directed to look for altered electrical equipment, such as altered hot pots or homemade power strips, during cell inspections and while conducting rounds. (ECF 147:12, 63:14 – 25).**

## V. Lack of Meaningful Inspections

171. Sergeants and lieutenants assigned to a living unit are required to conduct weekly inspections of their unit for physical plant problems and safety and security concerns, and any such problems need to be reported. The inspection reports are then turned into the shift supervisor. Dkt. 147-6 (Walton Dep) at 69:13-70:2; Dkt. 147-8 (Smith Dep) at 63:24-64:4; Dkt. 147-12 (Nowatzke Dep) at 29:10-19.

**RESPONSE**: **Not disputed for purposes of this motion.**

172. The inspection reports are also sent to the safety hazard manager, who is ultimately responsible for making sure the weekly inspections are carried out, and for making sure any issues identified during the inspections are corrected. Dkt. 147-12 (Nowatzke Dep) at 29:20-30:10; Dkt. 147-11 (Wardlow Dep) at 19:15-20, 20:7-21:1; Ex. 29 (Facility Directive 009) at 2.

**RESPONSE**: **Not disputed for purposes of this motion.**

173. The weekly inspection reports should have notations explaining any issue, even a minor issue. The safety hazard manager is then responsible for creating a plan of correction to address the problem. Ex. 29 (Nowatzke Dep) at 104:2-105:1, 105:25-106:3.

**RESPONSE: Not disputed for purposes of this motion.**

174. In the years leading up to Mr. Smith's death, the inspection records show that staff often filled out inspection forms but failed to conduct any meaningful inspection. Ex. 30 (Examples of Inspection Reports); Ex. 8 (Dan Pacholke Expert Report) at 18. Staff would frequently mark every item to be inspected as the same "rating", would fail to identify problems despite giving low ratings, and would indicate they inspected things that did not exist, such as sprinklers. Ex. 30 (Sample of Weekly Inspection Reports); Among others, Defendant Walton conducted perfunctory inspections in this manner. *See, e.g.*, Ex. 30 (Sample of Weekly Inspection Reports) at 6-7.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that perfunctory inspections played any role in the January 14, 2023, fire. The Plaintiff fails to support this proposition with any evidence.**

175. In the period leading up to Mr. Smith's death, there was also a known and widespread problem with staff not completing and submitting their weekly inspection reports. Ex 18 (Safety Committee Meeting Minutes) at 3, 6, 9-10, 12-13.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that incomplete or unsubmitted weekly inspection reports played any role in the January 14, 2023, fire. The Plaintiff fails to support this proposition with any evidence.**

176. In addition to weekly inspections, staff were required to look out during their regular security rounds for violations of ISP's rules and procedures (including rules on property

limits, curtains, contraband, etc.), electrical or plumbing problems, and other safety and security hazards, in addition to emergencies. Ex. 27 (ACH Post Orders 08/01/2019) at 2; Ex. 12 (General Post Orders 10/5/2021) at 2; Dkt. 147-8 (Smith Dep) at 122:19-123:3; Dkt. 147-12 (Nowatzke Dep) at 32:9-33:4, 63:18-25; Dkt. 147-5 (Cross Dep) at 96:20-97:5; Dkt. 147-10 (Neal Dep) at 35:5-36:1. This includes visually inspecting each cell, and ensuring that each cell is in compliance with the facility's cell standardization rules. Ex. 12 (General Post Orders 10/5/2021) at 16.

**RESPONSE: Not disputed for purposes of this motion.**

177. Staff are also supposed to do shakedowns of two cells in each cell house on each shift. Ex.12 (General Post Orders 10/5/2021) at 14; Ex. 27 (ACH Post Orders 08/01/2019) at 3; Dkt. 147-8 (Smith Dep) at 64:5-65:10, 66:12-24; Dkt. 147-11 (Wardlow Dep) at 94:2-69:2. This means every cell in a cellhouse should be shaken down once every quarter, and this shakedown should be documented. Dkt. 147-11 (Wardlow Dep) at 93:15-95:23.

**RESPONSE: Not disputed for purposes of this motion.**

178. During these shakedowns, staff were supposed to look for contraband and other concerns to safety and security, including excess property. Dkt. 147-8 (Smith Dep) at 64:5-65:10.

**RESPONSE: Not disputed for purposes of this motion.**

179. Shakedown reports are to be submitted to the zone lieutenant for review. Ex. 27 (ACH Post Orders 08/01/2019) at 3.

**RESPONSE: Not disputed for purposes of this motion.**

180. The custody supervisor is also responsible for making sure shakedowns are completed according to policy. Dkt. 147-18 (McCann Dep 1) at 103:2-23, 105:17-21.

**RESPONSE: Not disputed for purposes of this motion.**

181. Conditions at ISP indicate cell inspections and shakedowns were not regularly or meaningfully done. Ex. 8 (Dan Pacholke Expert Report) at 10 ("The problem of excess property in cells, including coverings over cell fronts, is pervasive in ISP"), 20-21 ("It was apparent on my tour that these essential systematic procedures to eliminate the hazard of excess property were not being effectively employed at ISP."); Dkt. 147-10 (Neal Dep) at 35:5-36:1 (staff were supposed to look for abundant property during rounds and report to the custody supervisor, but this does not always happen).

**RESPONSE: Disputed, to the extent that the Plaintiff implies that the conditions in ACH on July 14, 2025, during Mr. Pacholke's tour of ACH accurately represent the conditions that existed in ACH on January 14, 2023. Additionally, Mr. Pacholke examined the following: Cell 252; the officers' station; the locking system; and "the general layout and condition of A Cellhouse and its location in the larger prison." (ECF 163-8 at 4). He stated that he observed paper, books, ice chests, and electrical devices plugged into a limited number of outlets. (ECF 163-8 at 20). Mr. Pacholke's limited observation of an unidentified number of cells on July 14, 2025, does not lead to the broader conclusion that cell inspections and shakedowns were not regularly or meaningfully done in the days and months leading up to the fire in ACH on January 14, 2023.**

182. Moreover, records indicate no such shakedowns were done in Mr. Smith's cell in the last quarter before the fire that killed him, in violation of policy. Dkt. 147-10 (Neal Dep) 184:24-186:17

**RESPONSE: Disputed, to the extent that the Plaintiff implies that a shakedown would have necessarily "caught" the items in Mr. Smith's cell; As Warden Neal testified, "The things that were found in his cell . . . could be put in his cell in a single day. I mean, it doesn't**

**take that long to gather items." (ECF 147-10:187:2 – 15). Otherwise, not disputed for purposes of this motion.**

## VI. The Death of Mr. Smith

### A. A Cell House Staff

183. On January 14, 2023, Officer Cross, Officer Crockett, Officer Singleton, and Sergeant Walton were assigned to A Cell House. Ex. 14 (Duty Log ACH) at 1. However, Officer Singleton was pulled from the unit and assigned to do an outside transport, so he was not actually working in A Cell House in the lead-up to the fire. Dkt. 147-4 (Crockett Dep) at 83:6-19, 86:18-87:2.

**RESPONSE: Not disputed for purposes of this motion.**

184. Lieutenant Smith was also assigned as the Zone Lieutenant over A Cell House and E Dorm, and she was in A Cell House in the lead-up to and at the time of the fire. Ex. 31 (Shift Roster Jan 14 and 15) at 1; Dkt. 147-8 (Smith Dep) at 155:3-15, 156:15-23.

**RESPONSE: Not disputed for purposes of this motion.**

185. Walton, Crockett, Cross and Lt. Smith worked together regularly, Dkt. 147-8 (Smith Dep) at 156:18-157:2, 157:18-158:1.

**RESPONSE: Disputed, as Sgt. Walton had only recently been assigned to ACH at the time of the fire. (ECF 147-6, 100:1 - 9). Otherwise, not disputed for purposes of this motion.**

186. Lt. Smith started working with IDOC in 2018. Dkt 147-8 (Smith Dep) at 16:10-13. As Zone Lieutenant, Smith was responsible for the safety and security of the incarcerated individuals and the staff; walking the unit to make sure it was clean, safe and running correctly; making sure subordinates (sergeants and officers) were doing their jobs correctly and were familiar with relevant policies; and making sure that incarcerated individuals were doing what they were

supposed to be doing. Dkt. 147-8 (Smith Dep) at 21:5-18, 128:21-129:9; Dkt. 147-18 (McCann Dep 1) at 48:8-17.

**RESPONSE: Not disputed for purposes of this motion.**

187. Lt. Smith's duties included reviewing records of officer-conducted rounds, and doing daily rounds herself. Dkt. 147-8 (Smith Dep) at 28:25-29:24.

**RESPONSE: Not disputed for purposes of this motion.**

188. Lt. Smith, as Zone Lieutenant, was also responsible for instructing staff and delegating tasks to staff during any emergency in A Cell House, including a fire emergency. Dkt. 147-8 (Smith Dep) at 128:13-20.

**RESPONSE: Not disputed for purposes of this motion.**

189. Sergeant Walton started working at Indiana State Prison in 2014. Dkt. 147-6 (Walton Dep) at 15:11-16. As the sergeant in charge of A Cell House, she was responsible for running the cell house. Dkt. 147-6 (Walton Dep) at 26:13-19. She was also responsible for disciplining staff in her cellhouse, and making sure they were following all polices, rules and procedures. Dkt. 147-6 (Walton Dep) at 87:15-88:21; Dkt. 147-18 (McCann Dep 1) at 48:20-23.

**RESPONSE: Not disputed for purposes of this motion.**

190. Walton was familiar with the belongings and conditions of the prisoners' cells in A Cell House at the time of the fire. Dkt. 147-6 (Walton Dep) at 195:2-13.

**RESPONSE: Disputed. Sgt. Walton testified that she was not familiar with every small detail inside of the incarcerated individuals' cells. (ECF 147-6, 195:10 – 13).**

191. The sergeants and lieutenants assigned to a cellhouse should be doing rounds on all the ranges to monitor what is going on. Dkt. 147-8 (Smith Dep) at 58:1-10.

**RESPONSE: Not disputed for purposes of this motion.**

192. Officers Cross and Crockett were responsible for keeping everyone in the cellhouse safe and secure, which included being alert and aware at all times. Dkt. 147-5 (Cross Dep) at 34:10-35:14. (job responsibilities)

**RESPONSE: Not disputed for purposes of this motion.**

193. Cross started at Indiana State Prison in October 2019. Dkt. 147-5 (Cross Dep) at 28:4- 25. Crockett started at ISP in 2017. Dkt. 147-4 (Crockett Dep) at 21:2-11.

**RESPONSE: Not disputed for purposes of this motion.**

194. In each cellhouse, officers are assigned to cover a specific range or ranges. Dkt. 147-6 (Walton Dep) at 26:13-22.

**RESPONSE: Not disputed for purposes of this motion.**

195. In A Cell House on January 14, 2024, Cross was assigned to the 400 and 500 ranges; Crockett was assigned to the 200 and 300 ranges; and Walton was in charge of the 100 range. Dkt. 147-8 (Smith Dep) at 158:14-18; Dkt. 147-5 (Cross Dep) at 39:11-22.

**RESPONSE: Disputed, as the fire occurred on January 14, 2023. Otherwise, not disputed for purposes of this motion.**

196. Walton was the only sergeant on duty in A Cell House, and she was the officer in charge of the cellhouse. 147-8 (Smith Dep) 157:21-158:4.

**RESPONSE: Not disputed for purposes of this motion.**

### B. Staff Fail to Conduct Timely Security Rounds Following the 10am Count

197. The morning count in A Cell House occurs at 10 a.m. every day. Ex. 27 (ACH Post Orders 08/01/2019) at 5; Ex. 12 (General Post Orders 10/5/2021) at 10. The 10 a.m. count is combined with a security round, so that count and a security round are conducted simultaneously. *See* Dkt. 147-5 (Cross Dep) at 49:1-13.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

198. Generally, the officers begin the count a little before 10am, usually around 9:55 a.m. Dkt. 147-5 (Cross Dep) at 100:7-19.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

199. During count, staff walk their assigned range(s), count the prisoners, and then turn in their count slips to the sergeant in the officers' station. Once officers turn in their count slips, there is nothing else for them to do relating to count and they are free to go back to whatever business they have to do, including rounds. Dkt. 147-6 (Walton Dep) at 116:21-118:3; Dkt. 147-5 (Cross Dep) at 47:21-48:25; Dkt. 147-8 (Smith Dep) at 197:17-198:1. It is the sergeant's job to combine the tallies and make sure count clears. Dkt. 147-5 (Cross Dep) at 47:21-48:25.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

200. After each officer has turned in their count slips, the sergeant compiles the count and calls it in. The sergeant then has no further tasks related to count except waiting for confirmation that the count cleared facility wide. Ex. 12 (General Post Orders 10/5/2021) at 10; Dkt. 147-6 (Walton Dep) at 151:18-22.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

201. Count usually takes about 15-20 minutes. Dkt. 147-5 (Cross Dep) at 99:24-100:6

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

202. Michael Smith was secured in his cell during count at 10:09 a.m. Ex. 32 (Smith Internal Affairs Report) at 1. At the time, Mr. Smith was sleeping, and Crockett woke him up to confirm he was okay, which he was. According to Crockett, he did not see any contraband in Mr. Smith's cell. He asked Mr. Smith to move the curtain covering the front of Mr. Smith's cell to one side, but Crockett did not ask Mr. Smith to take the curtain down. Even though they are prohibited,

Crockett believed that curtains on the cell fronts are a fact of life. Dkt. 147-4 (Crockett Dep) at 89:21-91:22.

**RESPONSE**: **Not disputed for purposes of this motion.**

203. According to policy, security rounds must be done on each range of a cellhouse twice per hour, at minimum. They should be done at irregular times, but no more than 30 minutes should pass between that start of one round and the start of the next round. Ex. 27 (ACH Post Orders 08/01/2019) at 2; Dkt. 147-6 (Walton Dep) at 24:16-25:13; Ex. 12 (General Post Orders 10/5/2021) at 2; Dkt. 147-5 (Cross Dep) at 38:4-21.

**RESPONSE**: **Disputed. The Plaintiff relies on the testimony of Sgt. Walton to argue that thirty minutes should pass between the start of one round and the start of the next. The post orders are silent on the timing of security checks relative to the last security check. (ECF 168, Exs. 12, 27).**

204. Some staff believed that the next security round follows 30 minutes from the time the prior security check is *completed*. Dkt. 147-4 (Crockett Dep) at 171:22-172:2. This is an incorrect understanding of the policy. Ex. 12 (General Post Orders 10/5/2021) at 2.

**RESPONSE**: **Disputed. The Plaintiff relies on the testimony of Sgt. Walton to argue that thirty minutes should pass between the start of one round and the start of the next. The post orders are silent on the timing of security checks relative to the last security check. (ECF 168, Exs. 12, 27).**

205. Staff knew that security rounds were a critical and fundamental part of the correctional officers' job to maintain safety and security. Dkt. 147-5 (Cross Dep) at 45:18-46:6. Despite this, there was a known problem with staff not timely conducting their security rounds at ISP, including in 2023. Dkt. 147-12 (Nowatzke Dep) at 201:15-202:1.

<u>**RESPONSE**</u>: **Not disputed for purposes of this motion.**

206. A round of a single range should generally take 5-7 minutes absent any interruptions. Dkt. 147-6 (Walton Dep) at 27:14-18.

<u>**RESPONSE**</u>: **Not disputed for purposes of this motion.**

207. When staff conduct rounds, they use a "pipe" to tap three sensors on each side of the range, which records the time they did their rounds. Dkt. 147-8 (Smith Dep) at 51:21-52:8. Those individual records are combined into a spreadsheet commonly known as the "pipe report," which shows the timing of rounds in all locations of all units on a particular day. Dkt. 147-4 (Crockett Dep) at 110:2- 111:1; Ex. 33 (Excel Spreadsheet).

<u>**RESPONSE**</u>: **Not disputed for purposes of this motion.**

208. The pipe report for A Cellhouse on January 14, 2023 shows that the last security round on the 200 range, before the fire, began at 10:03 a.m. and was completed at 10:10 a.m. Ex. 33 (Excel Spreadsheet). The last round of the 300 range, before the fire, began at 9:56 a.m. and was completed at 10:15 a.m. *Id.* The last round of the 400 range, before the fire, began at 10:02 a.m. and was completed at 10:12 a.m. *Id.* The last round of the 500 range, before the fire, began at 9:57 a.m. and was completed at 10:09 a.m.

<u>**RESPONSE**</u>: **Not disputed for purposes of this motion.**

209. After the combined count/security walk, Cross and Crockett were required to conduct another security round on their respective ranges within the prescribed 30 minutes. Dkt. 147-5 (Cross Dep) at 49:1-7. Thus, there should have been another security round at approximately 10:33 a.m. on the 200 range, 10:26 a.m. on the 300 range, 10:32 a.m. on the 400 range, and 10:27 a.m. on the 500 range. Following that, the next rounds should have been around 11:03 a.m., 10:56 a.m., 11:02 a.m., and 10:57 a.m., respectively.

**RESPONSE**: **Disputed. The Plaintiff relies on the testimony of Sgt. Walton to argue that thirty minutes should pass between the start of one round and the start of the next. The post orders are silent on the timing of security checks relative to the last security check. (ECF 168, Exs. 12, 27).**

210. Sergeant Walton, who was in charge of the 100 range, conducted her combined count and security round on that range between 9:47 and 9:57. Ex. 33 (Excel Spreadsheet).

**RESPONSE**: **Not disputed for purposes of this motion.**

211. Pursuant to policy, security rounds on all the ranges should have begun at approximately 10:30. Dkt. 147-8 (Smith Dep) at 159:15-20.

**RESPONSE**: **Disputed. The Plaintiff relies on the testimony of Sgt. Walton to argue that thirty minutes should pass between the start of one round and the start of the next. The post orders are silent on the timing of security checks relative to the last security check. (ECF 168, Exs. 12, 27).**

212. After count cleared in A Cell House, Sergeant Walton did a subsequent round on the 100 range at 10:45, ending at 10:48. Ex. 33 (Excel Spreadsheet); Ex. 32 (Smith Internal Affairs Report) at 1; Dkt. 147-6 (Walton Dep) at 103:10-16, 115:13-24, 151:4-152:17.

**RESPONSE**: **Not disputed for purposes of this motion.**

213. Cross and Crockett did not conduct the 10:30 a.m. security rounds on their assigned ranges. Instead, after they completed their 10:00 a.m. count and security checks, they went to the Officers' Station and remained there until they left to respond to the fire in Mr. Smith's cell at 10:58. Ex. 33 (Excel Spreadsheet). In other words, they had let an hour pass since their last security round.

**<u>RESPONSE</u>: Disputed. The Plaintiff relies on the testimony of Sgt. Walton to argue that thirty minutes should pass between the start of one round and the start of the next. The post orders are silent on the timing of security checks relative to the last security check. (ECF 168, Exs. 12, 27). Otherwise, not disputed for purposes of this motion that Ofcs. Cross and Crockett did not complete a security check after their 10 a.m. "count" rounds.**

214. If there is a legitimate reason for skipping a security round, it must be logged in the cellhouse logbook. Ex. 12 (General Post Orders 10/5/2021) at 2. There was no explanation put in the logbook for why Cross and Crockett did not conduct 10:30am rounds on the 200, 300, 400 and 500 ranges. Ex. 14 (Duty log ACH) at 1.

**<u>RESPONSE</u>: Disputed. The Plaintiff relies on the testimony of Sgt. Walton to argue that thirty minutes should pass between the start of one round and the start of the next. The post orders are silent on the timing of security checks relative to the last security check. (ECF 168, Exs. 12, 27). Otherwise, not disputed for purposes of this motion that Ofcs. Cross and Crockett did not complete a security check after their 10 a.m. "count" rounds and there was no information in the logbook.**

**C. Staff Congregated in the Officers' Station Following Count**

215. After helping A Cell House staff conduct the 10am count, Lt. Smith went into the officers' station. Dkt. 147-8 (Smith Dep) at 160:8-17. Lt. Smith did not do anything in particular in the officers' station, she was just with the officers while they waited to hear that count cleared. Dkt. 147-8 (Smith Dep) at 160:8-17, 161:12-15, 163:24-164:4.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

216. After Cross and Crockett completed their combined count and rounds of the 400/500 and 200/300 ranges, respectively, they went to the officers' station. Officer Cross turned

in his count sheet to Walton, who was already in the officers' station, and Crockett was right behind him. They remained in the officers' station until they responded to the fire in Mr. Smith's cell at 10:58. Dkt. 147-5 (Cross Dep) at 100:20-101:3, 123:3-12; Dkt. 147-4 (Crockett Dep) at 91:23-93:11.

**RESPONSE: Not disputed for purposes of this motion.**

217. Based on the records of the security rounds and the typical length of count, they returned to the officers' station after count around 10:15am. Ex. 33 (excel spreadsheet of guard one patrol report); Dkt. 147-5 (Cross Dep) at 99:24-100:6, 100:7-19 (count begins at 9:55 and lasts 15-20 minutes, and the last record of the pipe tap during security rounds was at 10:15).

**RESPONSE: Not disputed for purposes of this motion.**

218. Cross and Crockett did not do anything else after turning in their count sheets besides waiting to hear that count had cleared. They sat in the officers' station with Walton and Lt. Smith and were taking it easy. Dkt. 147-5 (Cross Dep) at 100:20-101:15, 122:18-123:22, 124:25-125:13, 125:23-25; Dkt. 147-4 (Crockett Dep) at 92:8-93:10, 97:8-100:12, 103:1-8.

**RESPONSE: Not disputed for purposes of this motion.**

219. Cross was not eating his lunch while they were in the officers' station. He usually eats around the time of the 2 p.m. count. Dkt. 147-5 (Cross Dep) at 125:11-22. Nor were the A Cell House staff doing paperwork, as the 11am line-movement paperwork is done by the sergeant earlier in the shift. Dkt. 147-5 (Cross Dep) at 116:9-117:3; Dkt. 147-8 (Smith Dep) at 196:20-197:16.

**RESPONSE: Not disputed for purposes of this motion.**

220. After the count cleared, Walton left the officers' station briefly to conduct a security round on the 100 range, which lasted from 10:45 until 10:48. Ex. 32 (Smith Internal Affairs Report) at 1; Ex. 33 (Excel Spreadsheet).

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

221. After that security round, Walton went back to the officers' station, where Cross, Crockett and Lt. Smith had remained. Ex. 32 (Smith Internal Affairs Report) at 1; Dkt. 147-8 (Smith Dep) at 201:9-202:6.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

222. All A Cell House staff—Walton, Cross, Crockett, and Smith—were again in the officers' station together. Although the security feeds are always up on the monitor, no one was watching the monitor. Dkt. 147-8 (Smith Dep) at 162:8-25, 167:19-22; Dkt. 147-6 (Walton Dep) at 120:11-20; Dkt. 147-5 (Cross Dep) at 134:7-15.

**<u>RESPONSE</u>: Disputed. While Defendants do not dispute that Walton, Cross, Crockett and Smith were in the officers station together after 10 a.m. count, the Defendants dispute that security feeds are always up on the monitor. Per Sgt. Walton, the surveillance monitor was not operational on January 14, 2023. (ECF 147-7, ¶ 4).**

223. The sergeant should have made sure that someone was watching the monitor if all staff were in the officers' station. Ex. 8 (Dan Pacholke Expert Report) at 27; Dkt. 147-5 (Cross Dep) at 134:11-15.

**<u>RESPONSE</u>: Disputed. Per Sgt. Walton, the surveillance monitor was not operational on January 14, 2023. (ECF 147-7, ¶ 4). Sergeants are responsible for watching the monitor in the officers' station. (ECF 147-4, 96:12 – 16). A sergeant working in the officers' station can look at the monitors every once in awhile, but continuous monitoring is**

**not required. (ECF 147-11, 147-11, 80:15 – 24). There were no requirements for watching the surveillance monitors other than to utilize them to see what is going on in the cellhouse. (ECF 147-12, Transcript of Deposition of Dep. Warden Nowatzke, 110:2 – 6).**

224. According to Crockett, the monitor in the A Cell House officers' station was not working and had not been working since he was assigned to the cellhouse in November or December 2022. Crockett said, contrary to other officers' testimony, that all the officers and the supervising officers on duty in A Cell House knew that the monitor was not working. Dkt. 147-4 (Crockett Dep) at 28:10-29:12, 93:11-95:12.

**RESPONSE**: **Not disputed for purposes of this motion.**

225. If the monitors were not working, this should have been reported immediately. Dkt. 147-18 (McCann Dep 1) at 44:19-46:5; Dkt. 147-8 (Smith Dep) at 58:11-20; Dkt.147-10 (Neal Dep) at 215:17-216:18; Dkt. 147-11 (Wardlow Dep) at 80:3-14; Ex. 8 (Dan Pacholke Expert Report) at 7, 37 (if monitors are not working, they are of no value in mitigating the sightline problems in A Cell House). There are extra monitors available and a non-working monitor could have been replaced immediately. Dkt.147-10 (Neal Dep) at 216:2-4. No such problem was reported. Ex. 7 (Steven McCann Second Deposition) at 13:13-21, 15:11-24; Dkt. 147-10 (Neal Dep) at 215:17-216:18.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that Lt. Smith, Sgt. Walton, Ofc. Cross, and/or Ofc. Crockett were responsible for ensuring that a working monitor was installed. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for the purposes of this motion.**

226. By congregating in the officers' station together for a prolonged period, staff were not properly carrying out their duties. Dkt. 147-5 (Cross Dep) at 87:11-16; Dkt. 147-8 (Smith Dep)

at 195:1-9 (if they were in there for 25 minutes, they were not doing their job); Dkt. 147-10 (Neal Dep) at 213:2-14; Ex. 8 (Dan Pacholke Expert Report) at 23, 37.

**RESPONSE**: **Disputed. Per Mr. McCann, officers could go to the officers' station in between doing rounds and performing their duties. (ECF 147-18, 101:1 – 9). Officers can be together in the officers' station to eat their lunch or take little breaks. (ECF 147-18, 101:10 – 25). Per Lt. Smith, custody staff does not leave the cell house for breaks or lunch, so most officers will try to eat their lunch or go to the restroom after finishing counts. (ECF 147-8, 230:18 – 25). They fit in those tasks when they can. (ECF 147-8, 230:24 – 25). Per Lt. Smith, eating and using the restroom after count is a good time to do those things, because the incarcerated individuals are secure in their cells. (ECF 147-8, 231:1 – 22). Per Sgt. Walton, After the count sheets are turned in, that is when staff can use the restroom, eat, or drink water. (ECF 147-7, 118:4 – 14). Correctional staff does not get formal breaks. (ECF 147-7, 119:8 – 9). But correctional staff is still mindful of what is going on in the cell house during this time. (ECF 147-7, 119:23 – 24).**

227. Staff knew they should not congregate in the officers' station together, and that if someone was in the officers' station, others should be out on the ranges. Dkt. 147-5 (Cross Dep) at 85:24-86:15, 86:19-87:10, 91:12-17; Dkt. 147-8 (Smith Dep) at 58:11-20, 58:21-59:5; Ex. 7 (Steven McCann Second Deposition) at 20:16-21:12, 21:19-24; Dkt. 147-10 (Neal Dep) at 213:2-14; Dkt. 147-12 (Nowatzke Dep) at 175:1-21; Ex. 8 (Dan Pacholke Expert Report) at 23, 37. Cross testified that he knew that there should be someone on the ranges at all times without exception because emergencies can happen at any time. Dkt. 147-5 (Cross Dep) at 85:24-86:15, 86:19-87:10, 91:12-17.

<u>**RESPONSE**</u>: **Disputed. Per Mr. McCann, officers could go to the officers' station in between doing rounds and performing their duties. (ECF 147-18, 101:1 – 9). Officers can be together in the officers' station to eat their lunch or take little breaks. (ECF 147-18, 101:10 – 25). Per Lt. Smith, custody staff does not leave the cell house for breaks or lunch, so most officers will try to eat their lunch or go to the restroom after finishing counts. (ECF 147-8, 230:18 – 25). They fit in those tasks when they can. (ECF 147-8, 230:24 – 25). Per Lt. Smith, eating and using the restroom after count is a good time to do those things, because the incarcerated individuals are secure in their cells. (ECF 147-8, 231:1 – 22). Per Sgt. Walton, After the count sheets are turned in, that is when staff can use the restroom, eat, or drink water. (ECF 147-7, 118:4 – 14). Correctional staff does not get formal breaks. (ECF 147-7, 119:8 – 9). But correctional staff is still mindful of what is going on in the cell house during this time. (ECF 147-7, 119:23 – 24).**

228. If monitors are not working, it is even more important for officers to get out on the range and make sure everyone is okay; that is the only way to ensure safety in the cellhouse if the monitors are not working. Dkt. 147-4 (Crockett Dep) at 96:17-97:7.

<u>**RESPONSE**</u>: **Disputed, to the extent that the Plaintiff implies that "all" ISP staff knows that they must physically monitor the cell houses at all times. Warden Neal directed staff to conduct security rounds twice per hour. (ECF 147-10, 235:10 – 19). Otherwise, not disputed for purposes of this motion that this was the testimony of Ofc. Crockett.**

229. Nonetheless, prisoners whose cell locations permit them to see into the officers' station observe that A Cell House staff regularly hang out in the officers' station together. Ex. 34 (James Jones Declaration) at 1-2.

**<u>RESPONSE</u>: James Jones was housed in Cell 124 North. (ECF 163-34 at 1). Mr. Jones stated that he could see into the officers' station in order to observe the officers inside. However, he does not describe *how* he could see into the officers station from twelve cells away. As is seen on the surveillance video, counting from Cell 148 back twelve cells to Cell 124 (Mr. Jones's cell), demonstrates the large distance between Cell 124 and the officers' station, which is located at the end of the block. (ECF 136, Ex. A-1, Ex. A-2; ECF 147-3, Schematic of A Cell House). As is plainly demonstrated from the distances shown in the surveillance video, Mr. Jones would not have been able to simply look into the officers' station.**

**D. The Fire in Mr. Smith's Cell**

230. Sometime after the Defendants conducted the 10am count, a fire started in cell 252, the cell to which Michael Smith was assigned. Ex. 32 (Smith Internal Affairs Report) at 1.

**<u>RESPONSE</u>: Disputed, as "sometime after the Defendants conducted the 10am count" is vague. As is seen on the surveillance video, the first flickers of flame occurred at 10:54:49. (ECF 136, Ex. A-1).**

231. As the fire grew, smoke began to fill the cellhouse, and prisoners, including Michael Smith, began to yell for help and to alert staff that there was a fire on the 200 range. Dkt. 147 (Defs' Ex. A-1) at 10:54:00-10:59:00; Ex. 35 (Jonathan Triplett Declaration) at 1; Ex. 36 (Parker Declaration) at 1-2; Ex. 37 (Edward Miller Declaration) at 1-2; Ex. 34 (Jones Declaration) at 1-2; Ex. 38 (Dustin Weldon Declaration) at 1-2; Ex. 39 (Dennis Zollman Declaration) at 1-2; Dkt. 147-4 (Crockett Dep) at 174:16- 23; Ex. 8 (Dan Pacholke Expert Report) at 26.

**<u>RESPONSE</u>: Not disputed for purposes of this motion that incarcerated individuals began shouting, however, the Defendants dispute that these affiants possess the requisite**

**personal knowledge in order to testify to the matters in their affidavits. (*See* response to Plaintiff's Statement No. 232).**

232. Prisoners yelled for a while before the fire alarm went off and before any staff responded to the fire. Ex. 35 (Jonathan Triplett Declaration) at 1; Ex. 36 (Terrence Parker Declaration) at 1-2; Ex. 37 (Edward Miller Declaration) at 1-2; Ex. 34 (James Jones Declaration) at 1-2; Ex. 38 (Dustin Weldon Declaration) at 1-2; Ex. 39 (Dennis Zollman Declaration) at 1-2; Ex. 8 (Dan Pacholke Report) at 26.

**RESPONSE**: **Disputed. Surveillance video shows that Officers Cross and Crockett responded to the fire in Mr. Smith's cell within three minutes and thirty-one seconds of the first flickers of flame. (ECF 136, Ex. A-1).**

**James Jones was housed in Cell 124 North. (ECF 163-34 at 1). Mr. Jones stated that he could see into the officers' station in order to observe the officers inside. *Id.* However, he does not describe *how* he could see into the officers' station from twelve cells away or how many officers he viewed inside the officers' station. As is seen on the surveillance video, counting from Cell 148 back twelve cells to Cell 124 (Mr. Jones's cell), demonstrates the large distance between Cell 124 and the officers' station, which is located past the very end of the block. (ECF 136, Ex. A-1; Ex. A-2; ECF 147-3). Mr. Jones would not have been able to simply look into the officers' station. Mr. Jones's affidavit therefore fails to establish personal knowledge.**

**Jonathan Triplett's affidavit provides no evidence to refute this timeline, as he states that he remembered people yelling, inhaling smoke, and that "awhile later" the fire alarm went off and people started being evacuated. (ECF 163-35).**

**Terrence Parker was located in Cell 138 North. (ECF 163-36 at 1). His cell is visible on the surveillance video, which shows him coming to his cell front at 10:57:48, approximately thirty seconds before Ofcs. Cross and Crockett approach Cell 252, with an object that appears to be a mirror that flashes towards the camera. (ECF 136, Ex. A-1; Ex. A-2). Mr. Parker states that he saw one officer going inside the cage, but he does not attest to the actions of any other officer. (ECF 163-36 at 1). Mr. Parker's affidavit also contains impossible inconsistencies. He attests that an officer "came running up 200 North he seen the fire and ran back to tell them to call the fire men to come in put the fire out", but because of the solid ranges, he could not personally observe what any officer was doing on the 200 North range. (ECF 163-36 at 2). Mr. Parker further attests that "[t]hey come with the fire extinguisher but the fire was to [sic] much for them to use extinguisher they could not fight the fire with it." (ECF 163-36 at 2). But as is plainly seen in the surveillance video, it would be impossible for an incarcerated individual inside a cell on the 100 range to personally observe anything happening on the 200 range. (Ex. A-1). Mr. Parker further describes the fire department's actions that day, stating that they came and put the fire out without much problem. But this belies the evidence, which shows that Mr. Parker evacuates his cell at approximately 1:06:51, while the firefighters are still actively fighting the fire in Cell 252. (ECF 136, Ex. A-1; Ex. A-2).**

**Edward Miller's affidavit further does not establish this statement. Mr. Miller was located in Cell 404 North. (ECF 163-37 at 1). Mr. Miller stated that he smelled smoke, heard inmates yelling "fire in the cellhouse", and people were yelling "for a while before anybody came to help". (ECF 163-37 at 1). But as Mr. Miller was on the 400 range, he was unable to**

**personally observe when incarcerated individuals began to yell relative to when correctional officers responded to the fire in Cell 252. (Ex. A-1; A-2).**

**Dustin Weldon's affidavit also fails to establish this statement. Mr. Weldon was located in Cell 348 North. (ECF 163-38). Because of the solid floor that would prevent him from personally observing the activities on the 200 range, he could not know how long it was from when incarcerated individuals began shouting to the time that Ofcs. Cross and Crockett arrived at the 200 range to attempt to rescue Mr. Smith. (Ex. A-1; Ex. A-2).**

**Dennis Zollman was located in Cell 154 North. (ECF 163-39 at 1). Mr. Zollman attests that he heard Michael Smith begin to scream and that prisoners began to shout. (ECF 163-39 at 1). Like the other incarcerated individual affiants, Mr. Zollman could not personally observe when the prisoners began shouting relative to when Ofcs. Cross and Crockett arrived at the 200 range to begin rescue efforts at Mr. Smith's cell. (Ex. A-1; Ex. A-2).**

233. Several prisoners who could see into the officers' station from their cells saw Defendants standing in the officers' station, not responding to the yells and screams for help. *See* Ex. 36 (Terrence Parker Declaration) at 1-2; Ex. 34 (James Jones Declaration) at 1-2.

**<u>RESPONSE</u>: Disputed. The Plaintiff extrapolates the affidavits of two prisoners into the implication that "several" prisoners could see into the officers' station and attested to their activities.**

**James Jones was housed in Cell 124 North. (ECF 163-34 at 1). Mr. Jones stated that he could see into the officers' station in order to observe the officers inside. However, he does not describe *how* he could see into the officers station from twelve cells away. As is seen on the surveillance video, counting from Cell 148 back twelve cells to Cell 124 (Mr. Jones's cell), demonstrates the large distance between Cell 124 and the officers' station, which is located**

**at the end of the block. (ECF 136, Ex. A-1; Ex. A-2; ECF 147-3). As is plainly demonstrated from the distances shown in the surveillance video, Mr. Jones would not have been able to simply look into the officers' station. Mr. Jones's affidavit therefore fails to establish personal knowledge.**

**Terrence Parker was located in Cell 138 North. (ECF 163-36 at 1). His cell is visible on the surveillance video, which shows him coming to his cell front at 10:57:48, approximately thirty seconds before Ofcs. Cross and Crockett approach Cell 252, with an object that appears to be a mirror that flashes towards the camera. (ECF 136, Ex. A-1; Ex. A-2). Mr. Parker states that he saw one officer going inside the cage, but he does not attest to the actions of any other officer. (ECF 163-36 at 1).**

234. Staff should have been quicker to recognize and respond to the prisoners' cries for assistance. Ex. 8 (Dan Pacholke Expert Report) at 36. Instead, they ignored the clear signs of an emergency. Ex. 8 (Dan Pacholke Expert Report) at 37.

**RESPONSE**: **Disputed. Ofcs. Cross and Crockett responded to the fire in Mr. Smith's cell within three minutes and thirty-one seconds from the first flickers of flame. (ECF 136, Ex. A-1).**

235. The officers' station is in the northeast corner of the cellhouse; Dkt. 147-3 at 2; Dkt. 147-5 (Cross Dep) at 85:21-23. An officer would travel 202 feet to get from the officers' station to cell 252. Ex. 40 (Jeremy Bauer Expert Report) at 4.

**RESPONSE**: **Not disputed for purposes of this motion.**

236. Staff can get from the officers' station to the range stairs in a few seconds. Dkt. 147-8 (Smith Dep) at 206:4-18.

**RESPONSE**: **Not disputed for purposes of this motion.**

237. The fire in cell 252 is visible on surveillance cameras at least by 10:53. *See* Ex. 32 (Smith Internal Affairs Report) at 1; Dkt. 147-10 (Neal Dep) at 176:5-177:22, 178:10-18. Smoke outside the walkway on the 300 range is visible from the officers' station by 10:55. Ex. 40 (Jeremy Bauer Expert Report) at 7, 10.

**<u>RESPONSE</u>: Disputed. The surveillance video establishes that the first flickers of flame occur in Cell 252 at 10:54:49. (ECF 136, Ex. A-1). The Defendants dispute, in summary, that Dr. Bauer's report is accurate smoke plume that emanates from Mr. Smith's cell and have sought to exclude his report. (ECF 141).**

238. Smoke reached the smoke detectors above the 500 range by 10:55:53. Ex. 40 (Jeremy Bauer Expert Report) at 7, 9 (showing view from officers' station).

**<u>RESPONSE</u>: Disputed. Dr. Bauer holds no opinions regarding whether the smoke load would have been sufficient to actually activate the smoke detection system. (ECF 141-2, 62:16 – 63:1).**

239. When the smoke reached the smoke detectors shortly before 10:56, it is a reasonable assumption that it triggered the fire alarm. Ex. 40 (Jeremy Bauer Expert Report) at 5, 10. Walton reported that the fire alarm went off around 10:57 a.m.; Ex. 41 (Sgt. Walton Internal Affairs Walton Statement) at 1; Dkt. 147-6 (Walton Dep) 139:19-140:6 (fire alarm went off at 10:57).

**<u>RESPONSE</u>: Disputed. Dr. Bauer holds no opinions regarding whether the smoke load would have been sufficient to actually activate the smoke detection system. (ECF 141-2, 62:16 – 63:1). Sgt. Walton's statement stated "On 1-14-23 at *approximately* 10:57 a.m., the fire alarm in ACH went off." (ECF 163-41at 1)(emphasis supplied). Sgt. Walton's testimony**

**regarding the estimated time that the fire alarm went off does not establish a definitive timeline. As Sgt. Walton testified,**

**Q: Do you believe that all of this is accurate?**

**A: To what I can remember, yes.**

**(ECF 147-6, 140:5 – 6).**

240. When the alarm went off, Cross, Crockett, Walton, and Lt. Smith were all in the officers' station. Dkt. 147-5 (Cross Dep) at 123:6-17; Ex. 32 (Smith Internal Affairs Report) at 1; Dkt. 147-8 (Smith Dep) at 222:12-19.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

241. The flames begin moving out of Mr. Smith's cell at 10:57. *See* Ex. 32 (Smith Internal Affairs Report) at 1. Given the progression of the fire, by this time the prisoners would have been screaming. Dkt. 147-4 (Crockett Dep) at 157:20-160:4; Dkt. 147-11 (Wardlow Dep) at 128:5-16; Ex. 8 (Pacholke Report) at 26.

**<u>RESPONSE</u>: Disputed. As demonstrated on the surveillance video, the flames began moving out of Mr. Smith's cell at or around 10:57:57, twenty-three seconds before Ofcs. Cross and Crockett arrived at Mr. Smith's cell. (ECF 136, Ex. A-1). The deposition testimony cited by the Plaintiff does not establish the timeline of when prisoners began shouting, and the testimony pertains to how the fire appeared on a still of the surveillance video at 10:57:00. (ECF 157:20-160:4; ECF 147-11 at 128:5-16).**

242. The fire, once it moved out of Mr. Smith's cell, was visible from inside the officers' station. Dkt. 147-6 (Walton Dep) at 103:22-25, 120:25-121:25, 140:11-21; Dkt. 147-8 (Smith Dep) at 164:17-165:1; Dkt. 147-5 (Cross Dep) at 128:17-129:18, 135:6-10.

**RESPONSE: Disputed. Sgt. Walton testified that when the fire alarm went off (as opposed to when the fire moved out of Mr. Smith's cell, as the Plaintiff suggests) she turned and saw flames shooting from the cell. (ECF 147-6, 103:22 – 25, 120:25 – 121:25, 140:11 - 21). Likewise, Lt. Smith testified that the fire alarm went off, and she looked and saw flames coming over the range. (ECF 147-8, 164:17 – 165:1). Officer Cross testified that after he heard the alarm, he walked out of the officers' station and saw smoke and flames. (ECF 147-5, 129:8 – 12, 135:6 – 10).**

243. If one of the four A Cell House staff had been on the ranges or watching the monitor, they would have been aware of the fire earlier, even as early as 10:53 a.m. Had they seen the fire earlier, they could have put it out and saved Mr. Smith's life. Dkt. 147-4 (Crockett Dep) at 141:9-142:17, 155:15-156:5, 157:20-160:4, 160:16-161:24; Ex. 8 (Pacholke Report) at 26-27.

**RESPONSE: Disputed. No one could have seen any fire as early as 10:53:00, because the fire did not start until 10:54:49. (ECF 136, Ex. A-1). Additionally, no one could have watched the surveillance monitor, because it was not operational on January 14, 2023. (ECF 147-7, ¶ 4). It is speculation that an officer on the ranges would have detected the fire earlier, resulting in less than the actual response time of three minutes and thirty-one seconds.**

244. Crockett testified that he realized prisoners were screaming when he heard the fire alarm go off. Dkt. 147-4 (Crockett Dep) at 113:12-114:8. They were yelling "come to 200." Dkt. 147-4 (Crockett Dep) at 174:16-23.

**RESPONSE: Not disputed for purposes of this motion.**

245. At 10:58 a.m., Defendant Walton called a 10-71, or fire code, over the radio. Ex. 14 (Duty log ACH) at 1; Ex. 32 (Smith Internal Affairs Report ) at 1; Ex 41 (Walton Statement) at

1. She then went to the cellhouse door to unlock it so that first responders and firefighters would be able to enter the cellhouse. Dkt. 147-6 (Walton Dep) at 123:17-21.

**<u>RESPONSE</u>: Disputed. Sgt. Walton called a 10-71 after the fire alarm went off, at the estimated time of 10:58 a.m. (ECF 147-6, 122:19 – 25); ECF 163-14 at 2 ("All times are approximate")). Otherwise, not disputed for purposes of this motion.**

246. At 10:58, the fire can be seen on surveillance video to be engulfing Mr. Smith's cell. Ex. 28 (10:58:00 screen shot). Despite this, no one is at the cell to help Mr. Smith. *Id*

**<u>RESPONSE</u>: Disputed to the extent that the Plaintiff implies that no one is in the process of helping Mr. Smith at 10:58:00, as the Defendants were traveling from the officers' station and arrived at Mr. Smith's cell at 10:58:20. (ECF 136, Ex. A-1). Otherwise, not disputed for the purposes of this motion.**



247. Confronted with this image at her deposition, Defendant Taylor acknowledged that the situation depicted should not have been permitted to occur without a response. Dkt. 147-14 (Taylor Dep) at 141:18-23.

**RESPONSE: Disputed to the extent that the Plaintiff implies that no one is in the process of helping Mr. Smith at 10:58:00, as the Defendants were traveling from the officers' station and arrived at Mr. Smith's cell at 10:58:20. (ECF 136, Ex. A-1). The Defendants further dispute this statement to the extent that the Plaintiff implies that Ms. Taylor was present in the cellhouse and should have rendered assistance. The Plaintiff cites no evidence to support this proposition. The Defendants further dispute this statement to the extent that they purport to offer Ms. Taylor's testimony as expert testimony regarding appropriate response times for correctional officers responding to an emergency, as she has not been identified as such. Otherwise, not disputed that this was Ms. Taylor's testimony when presented with a screenshot for the purposes of this motion.**

248. Deputy Warden Nowatzke similarly agreed that if staff failed to identify a fire in A Cell House within 5 minutes, changes need to be made. Dkt. 147-12 (Nowatzke Dep) at 164:1-3, 164:16-19.

**RESPONSE**: **Disputed to the extent that Plaintiff implies that custody staff failed to identify the fire in Mr. Smith's cell within five minutes. The surveillance video depicts the first flickers of flame at 10:54:49, with response by Officers Cross and Crockett at 10:58:20, three minutes and thirty-one seconds later. (ECF 136, Ex. A-1). Otherwise, not disputed for the purposes of this motion that this was Dep. Warden Nowatzke's testimony.**

249. Defendants Crockett and Cross arrived at the fire at 10:58:23, a full five minutes after the fire first became visible on the surveillance monitor. They were the first ones to arrive at the fire. Dkt. 147 (Defs' Ex. A-1) at 10:53:00-10:58:23.

**RESPONSE**: **Disputed. There was no surveillance monitor capabilities on January 14, 2023, in A Cell House. (ECF 147-7, ¶ 4). Officers Cross and Crockett arrived at the fire at 10:58:20, approximately three and a half minutes after the first flickers of flame visible on the video surveillance footage, at 10:54:49. (ECF 136, Ex. A-1). Otherwise, not disputed that Defendants Cross and Crockett were the first correctional staff to respond to the fire in Mr. Smith's cell.**

250. When Crockett arrived at Smith's cell, he heard Mr. Smith say "help me." Dkt. 147-4 (Crockett Dep) at 126:22-127:16. Mr. Smith was also writhing in agony. Dkt. 147-4 (Crockett Dep) at 132:2-11.

**RESPONSE**: **Not disputed for purposes of this motion that this was Officer Crockett's testimony.**

251. Crockett and Cross did not have the tools to open the door to Mr. Smith's cell when they arrived. Crockett did not assess whether the bar had been rolled as he was running toward the fire in Smith's cell. Dkt. 147-4 (Crockett Dep) at 121:10-14. It had not been rolled, and he would eventually have to go back to unroll the bar so that the doors to cells on the 200 range (including the door to Smith's cell) could be opened. Dkt. 147-4 (Crockett Dep) at 145:24-146:4, 152:15-24; Ex. 32 (Smith Internal Affairs Report) at 2; Ex. 8 (Pacholke Report) at 27. Neither Crockett nor Cross brought bolt cutters to the fire, in violation of a requirement in the ISP Fire Plan. Dkt. 147-4 (Crockett Dep) at 120:6-7; Dkt. 147 (Defs' Ex. A-1) at 10:58:25; Ex. 12 (General Post Orders) at 8.

**<u>RESPONSE</u>: Disputed. Officer Crockett had the keys to open Cell 252. (ECF 147-4, 117:8 – 11). Officers Cross and Crockett appropriately first assessed the scene and attempted to fight the fire with fire extinguishers prior to rolling the bar. (ECF 147-4, 118:19 – 23, 146:3 – 4). Whether or not the bar was already rolled is immaterial, as is plainly shown in the surveillance video, Officers Cross and Crockett did not have the appropriate protective gear to open the cell upon first approach, as the flames fully engulfed the cell and were shooting out of the cell. (ECF 136, Ex. A-1). Officers Cross and Crockett did not bring bolt cutters upon their first approach to Mr. Smith's cell, however, these were unnecessary as Mr. Smith's personal lock was not closed. (ECF 136, Ex. A-1).**

252. Crockett and Cross did not have the proper equipment to extinguish the fire. Cross and Crockett brought one water fire extinguisher between the two of them and did not bring an ABC fire extinguisher. Dkt. 147-4 (Crockett Dep) at 117:12-22, 120:6-16; Dkt. 147-5 (Cross Dep) at 71:18-22. Crockett acknowledged in his deposition that he should have brought his own fire extinguisher. Dkt. 147-4 (Crockett Dep) at 141:2-8. Although Cross understood the difference between ABC and water fire extinguishers, including that the water fire extinguisher had limited purposes, and he knew it was important to bring the correct fire extinguisher to the fire, Cross just grabbed the first fire extinguisher, which was a water fire extinguisher. Dkt. 147-5 (Cross Dep) at 65:22-66:1, 67:1:23, 71:2-10; 129:24- 130:23; Dkt. 147-4 (Crockett Dep) at 117:12-22.

**<u>RESPONSE</u>: Disputed. The Plaintiff's statement that Crockett and Cross did not have the proper equipment to extinguish the fire is unsupported argument, and therefore, not appropriate for a statement of genuine issues. However, to the extent that this argument is treated as fact, Officers Cross and Crockett brought a water fire extinguisher as this is the first one they could grab, and they did not know the nature or breadth of the fire until they**

**approached. (ECF 147-5, 130:17 – 19, 153:3 – 11). Additionally, Officers Cross and Crockett did not have the proper firefighting equipment to fight the fire, to the extent that the Plaintiff implies that Officers Cross and Crockett should have put the fire out. As plainly seen in the surveillance video, multiple ABC fire extinguishers were insufficient to fight the raging fire. (ECF 136, Ex. A-1). Even the offender fire brigade could not fully put the fire out until 11:08:29, after deploying a foam suppression backpack and a water hose. (ECF 136, Ex. A-1). Additionally, Lt. Koen testified that the fire kept reigniting. (ECF 147-9, 65:23 – 66:1). The Defendants otherwise do not dispute that Officers Cross and Crockett brought a water extinguisher with them on their first approach, and they did not bring an ABC fire extinguisher.**

253. There are five fire extinguishers in the officers' station, three water and two ABC extinguishers. Dkt. 147-8 (Smith Dep) at 104:18-105:6. Staff know that when responding to a major fire, they should use the ABC or chemical fire extinguisher, which is more effective than the water fire extinguishers. Dkt. 147-18 (McCann Dep 1) at 90:3-19. The water extinguisher was the wrong extinguisher to bring to the fire given the magnitude of the fire. Dkt. 147-10 (Neal Dep) at 178:19 179:12; Dkt. 147-4 (Crockett Dep) at 117:12-22.

**<u>RESPONSE</u>: Disputed to the extent that the Plaintiff implies that any fire extinguisher was sufficient to fight the large, raging fire in Mr. Smith's cell. As plainly seen in the surveillance video, even multiple ABC fire extinguishers were insufficient to fight the raging fire. Even the offender fire brigade could not fully put the fire out until 11:08:29, after deploying a foam suppression backpack and a water hose. (ECF 136, Ex. A-1). Additionally, Lt. Koen testified that the fire kept reigniting. (ECF 147-9, 65:23 – 66:1). The Defendants otherwise do not dispute that the water extinguisher was ineffective on the fire.**

254. The water fire extinguisher was wholly ineffective on the fire. Dkt. 147 (Defs' Ex. A-1) at 10:58:25-10:58:35; Dkt. 147-5 (Cross Dep) at 141:9-143:4; Dkt. 147-4 (Crockett Dep) at 129:10-25; Ex. 8 (Pacholke Report) at 37. Cross therefore left to get the ABC fire extinguisher from Lieutenant Smith. Dkt. 147-5 (Cross Dep) at 141:9-143:4.

**RESPONSE: Disputed to the extent that the Plaintiff implies that any fire extinguisher was sufficient to fight the large, raging fire in Mr. Smith's cell. As plainly seen in the surveillance video, even multiple ABC fire extinguishers were insufficient to fight the raging fire. Even the offender fire brigade could not fully put the fire out until 11:08:29, after deploying a foam suppression backpack and a water hose. (ECF 136, Ex. A-1). Additionally, Lt. Koen testified that the fire kept reigniting. (ECF 147-9, 65:23 – 66:1). The Defendants otherwise do not dispute that Officers Cross and Crockett brought a water extinguisher with them on their first approach, and they did not bring an ABC fire extinguisher. The Defendants otherwise do not dispute that the water extinguisher was ineffective on the fire.**

255. Crockett left the cell as well. Dkt. 147-4 (Crockett Dep) at 148:4-149:10. He went to go unroll the bar, which was a necessary step to get Mr. Smith and others out of their locked cells. Dkt. 147-4 (Crockett Dep) at 152:9-153:17; Dkt. 147 (Defs' Ex. A-1) at 10:58:30-10:58:40 a.m.; Dkt. 147 (Defs' Ex. A-5 (200 north range)) at 10:58:50-10:59:02.

**RESPONSE: Not disputed for purposes of this motion.**

256. At around 10:59:24, Lt Smith left the officers' station and went down the 100 range and stood below the fire. She brought an ABC fire extinguisher but did not use it. About 20 seconds later, she went to the 200 range and handed off the fire extinguisher. At that time, the fire was still very large. Dkt. 147 (Defs' Ex. A-1) at 10:59:20-10:59:55; Dkt. 147-8 (Smith Dep) at 161:17-162:7, 169:14-172:5 ,174:23-175:1, 176:8-25, 210:12-212:11, 212:24-214:12.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

257. Crockett returned to Smith's cell at 10:59:25, again without a fire extinguisher. Dkt. 147 (Defs' Ex. A-1) at 10:59:25. Cross handed Crockett an ABC fire extinguisher at 10:59:32 and Crockett then sprayed the fire. Dkt. 147 (Defs' Ex. A-1) at 10:59:30-11:00:00. The extinguisher did not put out the fire entirely, but it did diminish it significantly. Dkt. 147 (Defs' Ex. A-1) at 10:59:30-11:00:00.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

258. Around 11:00:28, Crockett got out his keys to try to unlock the door to Smith's cell. At this time, Mr. Smith was telling Crockett "help me, help me." Dkt. 147-4 (Crockett Dep) at 181:2-20, 184:7-25.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

259. Eventually, more staff and prisoner firefighters arrived at the cell. Dkt. 147 (Defs' Ex. A- 1) at 11:00:10-11:02:30. No one brought another fire extinguisher until 11:01:00, despite that at least six staff members had responded to the cell by this time. Dkt. 147 (Defs' Ex. A-1).

**<u>RESPONSE</u>: Disputed, to the extent that the Plaintiff implies that staff were doing nothing during this time period. Lt. Koen sprayed a fire extinguisher from 11:00:19 through 11:00:23. (ECF 136, Ex. A-1). Ofc. Crockett and Lt. Koen attempted to open the cell door. (ECF 136, Ex. A-1). The cell door was opened at 11:00:49, and Lt. Koen attempted to pull Mr. Smith out of his cell at 11:00:53. (ECF 136, Ex. A-1).**

260. The first prisoner firefighter to arrive was the fire chief. He did not have his gear or fire suit. Ex. 42 (Matthew Stidham report) at 1-2; Dkt. 147 (Defs' Ex. A-1) at 11:01:22-11:01:45.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

261. The next firefighters, dressed in their gear, arrived at 11:02:20. Dkt. 147 (Defs' Ex. A-1).

**RESPONSE: Not disputed for purposes of this motion.**

262. The door to Mr. Smith's cell was finally opened at 11:00:50. Dkt. 147 (Defs' Ex. A-1). Mr. Smith was finally removed from his cell at 11:07:15. Dkt. 147 (Defs' Ex. A-1).

**RESPONSE: Not disputed for purposes of this motion.**

263. Between learning of the January 14, 2023 fire through the code being called at 10:58 and determining that it was a serious enough situation to call the warden at 11:15 a.m., McCann does not recall taking any steps to address or deal with the emergency; he was probably waiting for more information to communicate to the warden. Ex. 7 (Steven McCann Second Deposition) at 42:3-17, 46:5- 47:4. Nothing prevented McCann from responding directly to the scene of the fire, but he believed it was not his job. Ex. 7 (Steven McCann Second Deposition) at 44:19-45:1.

**RESPONSE: Disputed, to the extent that the Plaintiff implies that Mr. McCann's presence following the 10-71 signal would have changed the outcome in this case. The Plaintiff cites no evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

264. Mr. Smith was pronounced dead at 11:18am. Ex. 43 (Critical Incident Review) at 1.

**RESPONSE: Not disputed for purposes of this motion.**

265. An autopsy of Mr. Smith revealed that he died of thermal burns and heat exposure. Ex. 26 (Fire Marshal Report) at 34.

**RESPONSE: Not disputed for purposes of this motion.**

266. Prisoners in the cellhouse made complaints after the fire that the response was inadequate. Dkt. 147-6 (Walton Dep) at 107:4-107:20; Ex. 4 (Richardson Report) at 1.

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that unnamed, non-expert, non-testifying prisoners' hearsay statements regarding the adequacy of fire response can create a genuine issue of material fact.**

267. The surveillance video also shows that Mr. Smith had a curtain up while rounds were going on and at the time of the fire. Dkt. 147 (Defs' Ex. A-1) at 10:09:00-8:11:15. This should have been confiscated. Dkt. 147-12 (Nowatzke Dep) at 174:16-25. Numerous other prisoners in the cellhouse had curtains up as well. Dkt. 147 (Defs' Ex. A-1) at 10:51:00 (showing curtains in at least cells 246, 248, 250, 254, 256, 144, 156, 344, 346, 350, among others)

**RESPONSE**: **Disputed, to the extent that the Plaintiff implies that Mr. Smith's curtain played a role in starting or fueling the fire. The Plaintiff cites to evidence to support this proposition. Otherwise, not disputed for purposes of this motion.**

268. After the fire, an investigation by the state fire marshal found a great deal of excess property in Mr. Smith's cell, including three tablets, four televisions, two cellphones and electrical cords. Ex. 26 (Fire Marshal Report) at 33; Dkt. 147-10 (Neal Dep) at 169:18-171:5.

**RESPONSE**: **Disputed. The fire marshal's report makes no mention or finding of excess property that would exceed the 4.5 cubic feet box allotted to incarcerated individuals for their personal property. (ECF 163-26 at 33). Otherwise, the Defendants do not dispute that the items listed in this statement were found in the Plaintiff's cell.**

269. This raised concerns about how Mr. Smith had been allowed to have so much in his cell that he was not supposed to have. Dkt. 147-10 (Neal Dep) at 169:18-171:5.

**<u>RESPONSE</u>: The fire marshal's report makes no mention or finding of excess property that would exceed the 4.5 cubic feet box allotted to incarcerated individuals for their personal property. (ECF 163-26 at 33). Otherwise, the Defendants do not dispute that the items listed in this statement were found in the Plaintiff's cell.**

270. After conducting their investigation, the state fire marshal determined that the cause and ignition source of the fire could not be determined. Ex. 26 (Fire Marshal Report) at 34.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

271. If staff had arrived earlier or with the proper equipment, Mr. Smith could have been saved. *See* Dkt. 147-5 (Cross dep) at 138:5-9 (acknowledging that, "[I]f we was [sic] there a couple of seconds earlier, we probably could have been [sic] maintained it."); *id.* at 67:24-65:2 ("[I]n a fire situation there is literally a matter of seconds that makes the difference between life and death."), 70:1-6 (similar).

**<u>RESPONSE</u>: Disputed. Officer Cross is not a fire or medical expert and his testimony cannot be used to establish whether or at what point the fire could be sufficiently contained such that Mr. Smith's chances of survival would be increased.**

### E. The Aftermath

#### i. Administrators Immediately Blame Mr. Smith and Praise Staff

272. Following the fire, Neal emailed a colleague: "We just had another one burn himself up inside of his cell, A cellhouse." Dkt. 147-10 (Neal Dep) at 158:9-25.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of**

**this motion that this statement was contained in one of Warden Neal's e-mails following the fire.**

273. Neal told his superiors that Mr. Smith "set a fire inside his cell and was deceased," even though, earlier that day, he had received information from the internal affairs department that they believed the fire occurred accidentally as a result of a short circuit. Dkt. 147-10 (Neal Dep) 162:17 - 165:9.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants further dispute this statement, as the information that Warden Neal received from William Lessner of the internal affairs department was that the "*preliminary* indication was started by a short circuit *in an electrical device*." (ECF 47-10, 164:10 – 15)(emphasis supplied). Therefore, the Defendants dispute this fact to the extent that the Plaintiff implies that a short circuit in the electrical outlet in Mr. Smith's cell was the origin of the fire. The outlet was ruled out as a ignition source. (ECF 147-16, p. 1). Otherwise, undisputed that this statement was contained in one of Warden Neal's e-mails following the fire.**

274. Neal acknowledged in his deposition that he believes the fire that killed Mr. Smith was accidental. Dkt. 147-10 (Neal Dep) at 163:7-10.

**RESPONSE**: **Not disputed for the purposes of this motion.**

275. Two days after the fire and well before the internal affairs investigation was complete, Neal sent an email telling A Cell House staff and first responders that "everyone performed exceptionally well" during the fire. Ex. 44 (Warden Neal Email) at 1.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, undisputed that this statement was contained in one of Warden Neal's e-mails following the fire.**

276. Wardlow emailed Lieutenant Jones to tell her they did a good job getting everyone out safely on the day of the fire. Ex. 45 (Lt. Jones Email 01/19/2023) at 1. He remains uncertain if anyone else was injured in the fire besides Mr. Smith. Dkt. 147-11 (Wardlow Dep) at 145:19-146:9.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants further dispute this statement to the extent that the Plaintiff implies that Major Wardlow's comments referred to Mr. Smith. When read in context of the e-mail, Major Wardlow was referring to evacuation of ACH on the day of the fire. (ECF 163-45). Otherwise, not disputed for purposes of this motion that this statement was contained in one of Major Wardlow's e-mails following the fire and was his testimony during his deposition.**

277. This premature praise was unwarranted. It was also inappropriate because it would tend to undermine the investigative process. Administrators should be prepared to review the incident critically and identify issues and areas for improvement. Ex. 8 (Dan Pacholke Report) at 29-30.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims.**

**ii. Supervisors Fail to Meaningfully Assess the Fire and Make Changes 1. Critical Incident Review**

278. After each critical incident at ISP, a critical incident review meeting is held. A critical incident is one that involves escape, death, sexual misconduct, or serious injury. Dkt. 147-12 (Nowatzke Dep) at 43:24-44:11, 45:3-15.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

279. Defendant Nowatzke is responsible for all critical incident debriefings, and he leads each one. Dkt. 147-12 (Nowatzke Dep) at 44:12-21; Dkt. 147-11 (Wardlow Dep) at 106:18-107:2.

**<u>RESPONSE</u>: Not disputed for purposes of this motion.**

280. During the critical incident review, participants are supposed to discuss the incident, answer questions about the incident, identify any changes that should be made, and identify things that might have gone wrong or right in relation to the incident. Dkt. 147-12 (Nowatzke Dep) at 44:3 11.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

281. Critical incident reviews are important, and they are the best way to make sure something terrible—like a prisoner burning to death in his cell—does not happen again. Dkt. 147-12 (Nowatzke Dep) at 144:3-9, 149:17-150:10. It is important to be as critical as possible to identify what steps can be taken to avoid similar incidents from happening in the future. Dkt. 147-12 (Nowatzke Dep) at 144:10-18; Dkt. 147-11 (Wardlow Dep) at 105:17-23, 109:20-110:11; Dkt. 147-18 (McCann Dep 1) at 121:3-8.

<u>RESPONSE</u>: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants also dispute this fact to the extent that the Plaintiff implies that critical incident reviews are the only post-incident analysis that occur. Post-event analysis is done by Indiana Department of Correction Emergency Response Operations, which is a formal evaluation of the emergency situation. (ECF 147-12, 135:25 – 136:7). A report is completed, which is several pages long as includes recommended changes to implement at the facility. (ECF 147-12, 139:11 – 14). Otherwise, not disputed for purposes of this motion.**

282. Despite these objectives, the only documents made available to staff participating in the critical incident reviews are the short, cursory incident reports relating to the incident under review. Participating staff would not have access to videos, photos or other materials. Dkt. 147-12 (Nowatzke Dep) at 141:17-142:5; Ex. 59 (1/14/2024 Sgt Walton Incident Report). Wardlow takes whatever staff write in their incident reports as true and does not look for additional information. Dkt. 147-11 (Wardlow Dep) at 123:8-20.

<u>RESPONSE</u>: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants further dispute this statement, as Deputy Warden Nowatzke testified that "[a]t the debriefing, the incident reports – the incident reports, and photos, and things like that are there." (ECF 147-12, 141:10 – 16). Otherwise, not disputed for purposes of this motion.**

283. The warden does not participate in the critical incident reviews, and Nowatzke did not have any conversations with the Warden about how to fix or correct issues that contributed to major incidents at ISP. Dkt. 147-12 (Nowatzke Dep) at 80:3-81:1

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

284. On February 2, 2023, a critical incident review was held regarding the fire that killed Mr. Smith. None of the staff assigned to A Cell House at the time of the fire were in attendance. Warden Neal and Captain McCann were also absent. Ex. 43 (Critical Incident Review) at 1. Taylor, the safety hazard manager, was present but did not substantively participate. Dkt. 147-14 (Taylor Dep) at 158:8-11, 158:20-22.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion**.

285. In the judgment of Plaintiff's corrections expert, this critical incident review was disingenuous because it made no note of numerous failures in the fire response, including the failure to bring proper equipment and the failure of vigilance. The decision not to include the warden and A Cell House staff in the review further supports the fact that this review was not taken seriously Ex. 8 (Dan Pacholke Report) at 30.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims.**

286. It is very difficult to have a meaningful discussion and assessment of whether staff responded timely to the fire if none of the A Cell House staff attended the critical incident review, as they did not in this case. Dkt. 147-12 (Nowatzke Dep) at 176:11-15; Ex. 43 (Critical Incident Review) at 1.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

287. Defendant Nowatzke, who led the review, did not take any steps to identify what each staff member assigned to A Cell House was doing at the time the fire started, or when they were first alerted to the fire, other than read their incident reports and view some surveillance video. Among other things, he did not have any conversation with the staff that were on duty in A Cell House at the time of the fire. Dkt. 147-12 (Nowatzke Dep) at 144:19-24, 167:8-168:6, 168:7-169.15.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

288. There is a camera in A Cell House that points at the officers' station, but Nowatzke did not look at it to see when the officers left the officers' station to respond to the Smith fire. Dkt. 147-12 (Nowatzke Dep) at 146:4-15.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

289. Nowatzke never looked at the firefighter statements about the response to the Michael Smith fire at any time. Dkt. 147-12 (Nowatzke Dep) at 155:24-156:5. If the firefighters reported that prisoners in A Cell House were upset because they had been yelling for several minutes before staff came to help and put out the fire, that would be very concerning and should be investigated. Dkt. 147- 12 (Nowatzke Dep) at 156:10-19.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

290. Staff do not speak to incarcerated individuals to gather information for a critical incident review. Dkt. 147-12 (Nowatzke Dep) at 49:6-20. Nowatzke took no steps to learn if the prisoners were yelling to alert staff to the fire before the alarm went off, including speaking to prisoner in the cellhouse. Dkt. 147-12 (Nowatzke Dep) at 163:17-24. Nor was he part of any conversation discussing whether prisoners were yelling for some time before staff responded to the fire. Dkt. 147-12 (Nowatzke Dep) at 157:14-16

<u>**RESPONSE**</u>: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

291. Deputy Warden Nowatzke acknowledged that, since the Smith fire was the second recent fire leading to a death at ISP, he should have made sure he was getting as much information as possible about what actually happened and the timeline of the response to the fire. Dkt. 147-12 (Nowatzke Dep) at 158:21-159:12.

<u>**RESPONSE**</u>: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

292. The review concluded that staff response was completely in line with policies and procedures at the facility, and that "[a]ppropriate decisions were made by Shift Supervisors, Sergeants and Officers involved." Ex. 43 (Critical Incident Review) at 1; Dkt. 147-10 (Neal Dep) at 206:16 17.

<u>**RESPONSE**</u>: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

293. Nowatzke reached this conclusion without knowing whether staff ignored prisoners yelling for help, whether staff were properly monitoring the cellhouse at the time of the fire, or

exactly what staff were doing at the time the fire started. Dkt. 147-12 (Nowatzke Dep) at 168:7-169:15.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

294. Nowatzke reached this conclusion while also acknowledging at his deposition that it would *not* be correct (1) for an officer to respond to the fire without a fire extinguisher; (2) for an officer to take a fire extinguisher down the 100 range and just look up at the fire without using the fire extinguisher; (3) for an officer to fail to confiscate Mr. Smith's curtain; and (4) for all officers to be in the officers' station together at the time of the fire. He also acknowledged that there was excessive property in Mr. Smith's cell. Dkt. 147-12 (Nowatzke Dep) at 173:16-175:21, 176:16-177:1.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

295. No one was disciplined in relation to Mr. Smith's death, nor was any corrective action taken. Dkt. 147-10 (Neal Dep) at 206:16-17, 226:11-17.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

296. Critical incident reviews at ISP under Nowatzke have never resulted in discipline of staff, even though it is Nowatzke's responsibility to determine if staff complied with policy and whether they need to be disciplined. Dkt. 147-12 (Nowatzke Dep) at 147:1-13.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

**2. Internal Affairs Investigation**

297. The ISP Internal Affairs Investigator Larry Haskell also investigated the fire that killed Mr. Smith and the staff response. He issued a report on March 7, 2023. Ex. 32 (Smith Internal Affairs Report).

**<u>RESPONSE</u>: Disputed, as Mr. Haskell's report and his findings are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

298. Mr. Haskell did not interview any prisoner firefighters or prisoners living in A Cell House. Ex. 32 (Smith Internal Affairs Report) at 1-2.

**<u>RESPONSE</u>: Disputed, as Mr. Haskell's report and his findings are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

299. Mr. Haskell did interview some of the staff who responded to the fire, but these interviews were cursory and failed to investigate what staff were doing in the leadup to the fire. Ex. 8 (Dan Pacholke Report) at 30-31; Ex. 32 (Smith Internal Affairs Report) at 1-2; Group Ex. 46-A (Internal Affairs Interview Lt. Jones); Group Ex. 46-B (Internal Affairs Interview Lt. Smith); Group Ex. 46-C (Internal Affairs Interview Nurse Turner); Group Ex.46-D (Internal Affairs Interview Officer Crockett); Group Ex. 46-E (Internal Affairs Interview Sgt. Walton); Group Ex. 46-F (Internal Affairs Interview Officer Cross).

**RESPONSE**: **Disputed, as Mr. Haskell's report and his findings are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants further dispute that Mr. Haskell's interviews were cursory. To support this alleged statement, the Plaintiff cites her expert's report, in which he states without supporting facts that "I&I conducted cursory interviews with staff". (ECF 163-8 at 30 – 31). Otherwise, not disputed for purposes of this motion that Mr. Haskell conducted staff interviews as part of his investigation.**

300. When internal affairs investigated the Devine fire, they interviewed multiple prisoners in nearby cells who were able to provide information about what happened in the leadup to the fire, including that Devine said the fire started in his TV and that prisoners were yelling for a long time before staff arrived *and* before the fire alarm went off. Ex. 23 (Devine Internal Affairs Report) at 2-3.

**RESPONSE**: **Disputed, as the internal affairs investigation into the Devine fire as it compares to the internal investigation into the Smith fire is not material to the constitutional questions of failure to protect and failure to intervene; nor is it material to the Plaintiff's common law claims. The Defendants further object to the interview statements made by**

**incarcerated individuals in the investigation regarding the fire involving Mr. Devine and their recollection of Mr. Devine's statements as hearsay. Otherwise, not disputed for the purposes of this motion that internal affairs interviewed prisoners as part of the investigation into the fire involving Mr. Devine.**

301. Mr. Haskell's report omits any discussion of: (1) when the last rounds were done on each of the ranges; (2) the exact time the fire alarm went off; (3) what A Cell House staff were doing in the period prior to and when the alarm went off; (4) whether prisoners were yelling for help; (5) why Lieutenant Smith took the ABC fire extinguisher to the 100 range when she knew the fire was on the 200 range; and (6) why A Cell House staff were all in the officers' station together, among other things. Ex. 32 (Smith Internal Affairs Report). Internal affairs investigators do not appear to have investigated these issues at all. *Id.*

**RESPONSE**: **Disputed, as Mr. Haskell's report and his findings are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants further dispute this statement of genuine issues as speculation, as the Plaintiff herself admits that she bases her statement that Mr. Haskell did not investigate these issues on how it "appears". Otherwise, not disputed for purposes of this motion**.

302. Mr. Haskell concluded that the case reflected an "accidental offender's death," but did not identify any violations of policy and procedure or any other issues. Ex. 32 (Smith Internal Affairs Report) at 3.

**RESPONSE**: **Disputed, as Mr. Haskell's report and his findings are not material to the constitutional questions of failure to protect and failure to intervene; nor are they**

**material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

303. Mr. Haskell's report was sent to Warden Neal for review. Ex. 32 (Smith Internal Affairs Report) at 3.

<u>**RESPONSE**</u>: **Disputed, as whether or not Mr. Haskell's report was sent to Warden Neal after the fire is not material to the constitutional questions of failure to protect and failure to intervene; nor is not material to the Plaintiff's common law claims.**

304. Neal had the power to give investigators like Mr. Haskell feedback on their findings, as well as to request additional investigation. Dkt. 147-10 (Neal Dep) at 133:24-134:11. The record indicates that there was no additional investigation.

<u>**RESPONSE**</u>: **Disputed, as whether or not Warden Neal had the power to give feedback to Mr. Haskell is not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

305. Neal does not recall ever considering or looking into whether staff could have seen or heard the fire before the fire alarm was activated. Dkt. 147-10 (Neal Dep) at 180:22-181:5.

<u>**RESPONSE**</u>: **Disputed, as the Plaintiff does not explain how staff could have heard the fire. Additionally, Warden Neal's actions (or inaction) after the fire is not relevant to the constitutional questions of failure to protect and failure to intervene; nor is it relevant to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

306. Nowatzke would receive and review all internal affairs investigation reports, including the report related to the Smith fire; Nowatzke is responsible for any discipline that should result following the investigation. Dkt. 147-12 (Nowatzke Dep) at 50:11-51:2, 51:20-52:15

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

307. Major Wardlow also reviewed the I&I report and incident reports relating to the fire, and he did not think there were any problems with the response, nor did he think anything needed to be done differently or changed, even though staff responded with a water fire extinguisher. He did not take any other steps to learn about what problems there might have been in the response to the fire. Dkt. 147-11 (Wardlow Dep) at 100:2-11, 101:24-102:2, 125:18-126:1.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

308. Specifically, Wardlow did not take any steps to figure out what was happening in the five-minute period between 10:53 and 10:58. Dkt. 147-11 (Wardlow Dep) 125:11-17. He took no steps to learn when staff became aware of the fire, or when inmates started yelling. Dkt. 147-11 (Wardlow Dep) at 140:17-141:2, 141:18-22.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

309. Wardlow did not attempt to determine whether staff timely responded to the January 14 fire or whether changes needed to be made regarding supervision of cellhouses and/or emergency response. Dkt. 147-11 (Wardlow Dep) at 139:11-25

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion**.

310. Wardlow was not involved in any assessment of whether the fire alarm went off timely or whether additional smoke detectors were needed. Dkt. 147-11 (Wardlow Dep) at 136:25-137:3

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

311. Wardlow did not speak with any of the officers, sergeants, or lieutenants who were involved in the fire and the response, nor did he take any steps to speak with any of the incarcerated individuals who were in A Cell House at the time of the fire or the firefighters who responded. Dkt. 147-11 (Wardlow Dep) at 101:1-11. Wardlow does not believe he viewed the surveillance video relating to the fire. Dkt. 147-11 (Wardlow Dep) at 101:13-23.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion**.

312. Wardlow did not take any steps to change anything or implement any new policies or training in response to the fire, nor did he raise any concerns about the fire to anyone. No one raised any concerns with him, and he did not raise any concerns to Neal. Dkt. 147-11 (Wardlow Dep) at 100:12-25, 127:7-9.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

313. Defendant Taylor did not participate in any investigation of the Smith fire to assess what had happened, nor did she review the Fire Marshal's report regarding their investigation into the fire. Dkt. 147-14 (Taylor Dep) at 85:11-17, 86:4-6.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

314. The firefighters provided reports relating to the response to Smith fire. Taylor oversees the firefighter program and is their "go to" person for any issues, but she did not know if it was her job to review their reports; she read only some of their reports about the Smith fire. Dkt. 147-14 (Taylor Dep) at 15:10-25, 17:7-18:18.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

315. The firefighters reported, among other things, that they were not called to the scene of the Smith fire soon enough, that prisoners reported yelling for a while before staff responded to the fire, that the evacuation of A Cell House after the fire was not handled properly, and that material accumulated in Smith's cell without adequate storage. She did not raise these concerns to the internal affairs department, which was investigating the fire and response. Dkt. 147-14 (Taylor Dep) at 154:5-22; Ex. 4 (Matthew Richardson Incident Report) at 1; Ex. 5 (Daniel Milne Incident Report) at 1; Ex. 6 (Kelly Holland Incident Report) at 1.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

316. Staff involved in the fire were not shown the internal affairs report. Dkt. 147-8 (Smith Dep) at 189:12-190:1.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

### 3. Lack of Any Meaningful Follow-up Conversations

317. At a department head meeting four days after Mr. Smith was killed, Nowatzke reported that "offender morale are [sic] upbeat and positive for the most part." He did not talk to prisoners in A Cell House before he made that statement, and he did not try to find out how the prisoners were feeling about Mr. Smith's death. Dkt. 147-12 (Nowatzke Dep) at 72:23-73:10, 74:7-9, 74:23-75:10, 76:10-77:5, 171:14-172:2. Nothing about Michael Smith's death was discussed at

this meeting except to say that he died in a fire in A Cell House. Dkt. 147-12 (Nowatzke Dep) at 77:14-78:24.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

318. None of the staff assigned to A Cell House were involved in any conversation about what could have been done to prevent or respond to the fire, or whether their response complied with policy and procedure. Nor were they involved in any conversation about what could be done better in the future. Dkt. 147-8 (Smith Dep) 179:6-15, 185:5-13; Dkt. 147-6 (Walton Dep) at 108:21-109:9, 111:9-112:2, 113:5-8, 156:25-157:22, 158:4-160:2 (the only thing any supervisor said to Walton about the response was that they did an excellent job); Dkt. 147-6 (Walton Dep) at 112:23-113:4; Dkt. 147-5 (Cross Dep) at 23:22-24:8, 25:11-17, 76:3-77:12; Ex. 47 (Latrice Jones Dep) at 195:3-197:12, 249:24- 250:22; Dkt. 147-11 (Wardlow Dep) at 99:12-101:12, 126:19-127:9, 156:17-157:3.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

319. There was no discussion with staff about whether it was correct for staff to respond to this fire with a water extinguisher. Dkt. 147-6 (Walton Dep) at 153:25-155:1; Dkt. 147-5 (Cross Dep) at 77:5-12; Dkt. 147-10 (Neal Dep) at 217:1-219:8.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

**F. Continued Indifference**

320. Following the Smith fire, Neal and other ISP administrators continued to fail to implement necessary and achievable reforms that would mitigate the risks that other prisoners would be seriously injured in fires at the facility. Ex. 8 (Dan Pacholke Report) at 38.

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Mr. Pacholke bases this opinion on Warden Neal's response to one question in his deposition, and non-specifically, "the reports and debriefing documents that I have reviewed". (ECF 163-8 at 38).**

321. The only action that was taken in response to the Smith fire was incorporating a chemical (ABC) fire extinguisher on all ranges. Dkt. 147-12 (Nowatzke Dep) at 164:20-165:19; Dkt. 147-14 (Taylor Dep) at 125:17-126:1.[2]

**<u>RESPONSE</u>: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

[2] Nowatzke discussed at his deposition a plan to incorporate hands-on fire extinguisher training during a future training cycle (in 2025), something that had not been done since Nowatzke's first few years on the job. This training had not yet been put in place at the time of his deposition. Dkt. 147-12 (Nowatzke Dep) at 179:7-180:3.

322. Apart from that single change, there have been no changes to policy, procedure, training or instruction relating to how to prevent or respond to a fire. Dkt. 147-12 (Nowatzke Dep) at 179:7 181:8; Dkt. 147-6 (Walton Dep) at 113:9-16; Dkt. 147-11 (Wardlow Dep) at 102:5-9; Dkt. 147-8 (Smith Dep) at 30:25-31:32:3; Dkt. 147-12 (Nowatzke Dep) at 70:3-9.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

323. Administrators did not consider adding more smoke alarms after the Smith fire. Dkt. 147-12 (Nowatzke Dep) at 198:23-199:6.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

324. Administrators did not consider requiring at least one correctional officer to be on the ranges at all times so that they would become aware of a fire more quickly. Dkt. 147-12 (Nowatzke Dep) at 198:23-199:6.

**RESPONSE: Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

325. Administrators have been aware for some time, and firefighters have recommended, that in-cell storage for electronics could reduce the risk for fire. Despite this, no steps have been taken to implement such a safeguard. Dkt. 147-14 (Taylor Dep) at 147:3-23.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion**.

326. Nowatzke testified that he believed if staff failed to identify a fire that was burning for five minutes, changes needed to be made; yet he did not implement any changes that would ensure that staff would more quickly identify and respond to a fire. Dkt. 147-12 (Nowatzke Dep) at 164:25 165:5.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. The Defendants further dispute this statement to the extent that the Plaintiff implies that Ofcs. Cross and Crockett failed to respond to the fire within five minutes. Ofcs. Cross and Crockett arrived to the Plaintiff's cell within three minutes and thirty-one seconds from the first flickers of flame. (ECF 136, Ex. A-1). Otherwise, not disputed for purposes of this motion.**

327. Walton testified that she would not have done anything differently in response to the fire, and she would not have had her subordinates do anything differently. Dkt. 147-6 (Walton Dep) at 178:19-179:8.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are**

**they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

328. Walton was on duty in a cellhouse when another fire erupted in that cellhouse in summer 2025. She was in the officers' station when she realized there was a fire. When she was deposed in October 2025, she testified that, since the death of Michael Smith, she has had at least two more fires in cellhouses she was running. Dkt. 147-6 (Walton Dep) at 184:23-185:19.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Otherwise, not disputed for purposes of this motion.**

329. Cross testified that he believes he handled the fire perfectly, and he also would not change anything if he could go back in time to the fire. Dkt. 147-5 (Cross Dep) at 25:5-10, 74:8-75:7.

**RESPONSE**: **Not disputed for purposes of this motion.**

330. Neal testified that he believes A Cell House staff responded to the fire in a "very timely manner" and that their response was "fantastic" or "excellent". Dkt. 147-10 (Neal Dep) at 96:9-97:10, 113:6-11, 205:17-206:4

**RESPONSE**: **Not disputed for purposes of this motion.**

331. Warden Neal further testified that another serious fire "can happen at any time;" that a serious fire resulting in death at ISP is not preventable; and "[t]hat's just the reality of the situation." ISP. Dkt. 147-10 (Neal Dep) at 232:9-21.

**RESPONSE**: **Not disputed for purposes of this motion.**

332. Since Mr. Smith's death, at least two individuals have been gravely burned in fires at ISP:

f. On March 15, 2026 at 9:25pm, a prisoner A.S. was severely burned in his cell on the 200 range of D Cell House. He was transferred to an outside hospital with a burn unit. Ex. 48 (3/15/26 Fire Incident Report).

g. On April 7, 2026 at 2:13pm, a prisoner C.S. was severely burned in a fire in his cell on the 500 range of D Cell House. He had to be airlifted to a hospital with a burn unit. Ex. 49 (3/15/26 Fire Incident Report)

**RESPONSE**: **Not disputed for purposes of this motion.**

333. Plaintiff's expert Dan Pacholke opined that, "[r]ather than identifying the same recurring problems and failures, administrators have determined, in effect, that nothing can be changed and there is nothing to be learned from Mr. Smith's avoidable death. Warden Neal asserted in his deposition that another death is all but certain to occur in the future. Given the absence of necessary and achievable reforms and the continued inaction to ensure that staff and supervisors comply with policy, this is sadly, and likely, true." Ex. 8 (Pacholke Report) at 38.

**RESPONSE**: **Disputed, as the Defendants' actions or statements after the fire are not material to the constitutional questions of failure to protect and failure to intervene; nor are they material to the Plaintiff's common law claims. Additionally, fires that occurred after January 14, 2023, are not relevant to the issues of the Defendants' constitutional and state law negligence liability in this lawsuit. The Defendants further dispute this statement of genuine issues, as Mr. Pacholke bases this opinion on Warden Neal's response to one question in his deposition, and non-specifically, "the reports and debriefing documents that I have reviewed". (ECF 163-8 at 38).**

Respectfully submitted,

**EICHHORN & EICHHORN, LLP**

By: /*s*/ Julia M. Kwait
David J. Beach, #18531-45
Julia M. Kwait, #28474-71
One of the Attorneys for Defendants,
Ron Neal, Jason Nowatzke, Deborah Taylor, Douglas Wardlow, Nadine Smith, Kevin Cross, Jeniene Walton, Darnell Crockett, Steven McCann

EICHHORN & EICHHORN, LLP
2929 Carlson Drive, Suite 100
Hammond, Indiana 46323
Telephone: (219) 931-0560
dbeach@eichhorn-law.com
jkwait@eichhorn-law.com

**CERTIFICATE OF SERVICE**

I, Julia M. Kwait, certify that on the 12th day of June, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Julia M. Kwait
Julia M. Kwait